## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **AARON LEININGER,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 16-2627-DDC** |
| **UNITED STATES OF AMERICA AND MARK WISNER,** | |
| **Defendants.** | |

## MEMORANDUM OF DECISION UNDER RULE 52(a)

Over the course of a week in July 2020, the court conducted a bench trial via Zoom video technology with the active parties in this case, plaintiff Aaron Leininger and defendant United States of America. Both parties consented to the trial being conducted in this manner, given the global pandemic affecting our country. Defendant Mark Wisner—who is an inmate in a Kansas correctional facility—did not participate in the trial, although his deposition was taken to preserve his testimony for trial.

Post-trial, the court allowed the parties to submit optional briefing and proposed findings of fact. The court has reviewed the evidence from trial—including the evidence submitted for review outside the (virtual) courtroom. At the conclusion of the parties' presentation of evidence, several evidentiary questions remained for the court's decision. To the extent necessary to resolve the case, the court makes the requisite determinations on relevance and admissibility in this Memorandum and Order. If this Memorandum and Order does not refer to contested evidence or its admissibility, the court found the evidence immaterial to its ruling and decided that no ruling was necessary.

At a very high level, this case involves the repeated improper touching of plaintiff's genitals during medical appointments with Wisner at the Veterans Administration Medical Center in Leavenworth, Kansas.  Plaintiff seeks to hold the United States responsible for Wisner's actions, on theories of medical malpractice and intentional infliction of emotional distress.  The parties don't dispute plaintiff's allegation that Wisner examined plaintiff's genitals when unnecessary, without gloves, and for too long.  Instead, the disputes here focus on:

    (1) whether the United States can be held liable at all for Wisner's actions because

        (a) the acts were not in the scope of his employment,

        (b) the acts were not taken "in furnishing medical care," and

        (c) plaintiff knew or should have known of his injury much earlier, making his claims barred by the statute of limitations; and, if so,

    (2) whether Wisner caused plaintiff any injury; and, if so,

    (3) how much plaintiff should recover as damages for that injury.

As required by Fed. R. Civ. P. 52(a)(1), this Memorandum and Order includes separate findings of fact and conclusions of law.  "A district court's findings of fact 'should be sufficient to indicate the factual basis for the court's general conclusion as to ultimate facts[,] . . . should indicate the legal standards against which the evidence was measured[,] . . . [and] should be broad enough to cover all material issues.'"  *OCI Wyo., L.P. v. PacifiCorp*, 479 F.3d 1199, 1203 (10th Cir. 2007) (quoting *Otero v. Mesa Cty. Valley Sch. Dist.*, 568 F.2d 1312, 1316 (10th Cir. 1977); further citations omitted).  But "Rule 52(a) does not require the district court to set out its findings and conclusions in excruciating detail."  *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 902 (10th Cir. 2013) (Martinez, J., dissenting) (citation omitted).  On the other hand, "too little detail frustrates meaningful appellate review by requiring the parties and this court to guess at

why the district court reached its conclusion." *OCI Wyo., L.P.*, 479 F.3d at 1204 (citation omitted).

      With these standards in mind, the court turns to its Findings of Fact and Conclusions of Law.

## Findings of Fact

1. Plaintiff saw Wisner nine times between July 13, 2012 and February 25, 2014.  During all nine appointments, Wisner performed a genital examination of plaintiff.  He never wore gloves during any of those exams.  Also, the exams were excessively long.

2. During the exams, Wisner made unnecessary and inappropriate comments about the size of plaintiff's penis and the sexual satisfaction of plaintiff's spouse.

3. Although plaintiff may have felt uncomfortable during his visits with Wisner, he did not realize immediately that Wisner was doing anything inappropriate, he did not voluntarily stop seeing Wisner for appointments, and he did not suffer psychological damage until later learning that Wisner had manipulated him.

**A.**    **Findings About the Scope of Employment Question**

              **The Work Which the VA Hired the Employee to Perform**

4. Wisner was hired by the Department of Veterans Affairs ("VA") in 2008 as a Physician Assistant ("PA").

5. A PA administers basic medical care and screenings.  These duties include genital, rectal, and prostate examinations when they are medically indicated.  These exams may involve sensitive, intimate, or uncomfortable matters.

6.  As a primary care provider, Wisner took the personal history of patients.  Taking a personal history may involve asking personal and private questions, which could include questions about sexual anatomy and the patient's sexuality and sexual practices.

7.  In short, Wisner was hired to conduct, among other things, genital examinations.  He also was expected to ask personal questions that might make patients uncomfortable—with the goal of obtaining a comprehensive medical history.

**The Freedom Allowed the Employee in Performing His Job Responsibilities**

8.  Wisner led the OEF-OIF (Operation Enduring Freedom and Operation Iraqi Freedom) clinic in Leavenworth, Kansas.  In that role, he had a great deal of autonomy.  He was the only primary care practitioner at the clinic, and was responsible for nearly a thousand patients, although there was a 750-patient limit.

9.  No supervisor or chaperone was required to be present during Wisner's examinations of male patients.

10. Daniel Cline, M.D. was Wisner's first-line supervisor.  Dr. Cline was unaware that he was supposed to review Wisner's charts, and he did not monitor Wisner's activities.[1] This omission violated VHA Directive 2004-029, which required monitoring and evaluation of a PA's clinical activities.  No one at the VA told Dr. Cline about rules governing him as a supervising doctor or ensured that he was monitoring Wisner's clinical activities.

---

[1]  Defendant repeatedly has challenged the admissibility of evidence of this nature—evidence about what Wisner's supervisors did or did not do.  Defendant maintains that this evidence is not relevant because the court has dismissed plaintiff's claims for negligent supervision.  The court ruled before trial that evidence of this nature was relevant to the foreseeability of Wisner's conduct.  This ruling stands.  While it's true that this evidence overtly supports a negligent supervision claim that is no longer in the case, the evidence also tends to make it more probable than not that the VA should have foreseen Wisner's misconduct, and therefore should be held responsible for it.  The court has considered throughout this Memorandum and Order evidence showing what Wisner's supervisors did or didn't do and what various employees knew or didn't know as evidence relevant to foreseeability.

11. In determining Wisner's competency, Dr. Cline relied on what Wisner said he did.  He did not investigate complaints about Wisner.

12. VHA Directive 1063 required oversight, consultation, and assistance with patient care management, but the VA did not follow any of these requirements with Wisner.

13. VHA Directive 1063 gives PAs varying levels of autonomy based on their experience: "full," "limited," and "supervised."  Wisner had full autonomy; he had "full leeway to do his job, make independent medical decisions, and decide what tests to order, and perform diagnoses."

14. Wisner thus enjoyed unfettered authority to decide when and how to do genital, rectal, and prostate exams.  The court finds that Wisner had substantial freedom—in retrospect, far too much freedom—in performing his job duties.

### The Incidental Acts Reasonably Expected by the Employer

15. The VA Eastern Kansas Health Care System issued a Policy Memorandum on February 5, 2010, to identify and address suspected abuse (including sexual abuse) among the patient population.  On May 21, 2013, the VA Eastern Kansas Health Care System issued another Policy Memorandum addressing incidents of patient abuse.

16. The Leavenworth VA's policy recognizes the potential for patient abuse.

17. Healthcare provider abuse is a known risk in the healthcare community.

18. Given the acknowledgment of the risk of patient abuse by the VA and the healthcare community, the court finds that the VA should have anticipated that acts of abuse could occur in an un-monitored situation—particularly when the job, by nature, involved sensitive and intimate examinations and discussions.

**The Nature, Time, and Place of the Deviation**

19. Wisner conducted all of his examinations during working hours, in an examination room
    at the VA Medical Center in Leavenworth, Kansas.

20. For a new patient, the first intake was scheduled for one hour, and included a medical
    history and a head-to-toe physical.

21. When Wisner performed a genital exam, it consumed only a small fraction of the time he
    spent with the patient during the medical appointment.

**The Time Consumed in the Deviation**

22. Wisner's genital exams of plaintiff lasted two to three minutes.

23. In the context of an office visit lasting 30 to 60 minutes, two to three minutes was a small
    amount of time dedicated to either unnecessary, ungloved, or needlessly extended genital
    exams.  Had the medically-indicated examinations been limited to a "reasonable" time,
    they still would have lasted 30 seconds to one minute.

**The Employee's Intent**

24. Wisner exhibited mixed motives.  He wanted to be thorough in his exams, but also had an
    inappropriate sexual curiosity.  As a healthcare provider, Wisner strove to be thorough—
    even though his genital or rectal exams lasted too long.  Dr. Thomas Kelley, plaintiff's
    expert witness, testified credibly about Wisner's mixed motives.  The court found his
    testimony to be reasonable, well-supported, and consistent with the record as a whole.
    Specifically, Dr. Kelley's characterization of Wisner's motives is consistent with
    Wisner's background in the military.  It also comports with the fact that Wisner appeared
    to conduct full physical examinations on his patients; he did not wholly abandon his role
    as a healthcare provider during appointments.  And during Wisner's January 23, 2015

interview with Special Agent Kerry Baker, Wisner told Agent Baker that "his method was simply thoroughness in looking for any irregularities in their genitals."  (Ex. 406, at WIS00034987.)

25. The court makes its factual finding about mixed motives despite some of Wisner's other statements in his January 23, 2015 interview with Agent Baker.  In that interview, Wisner indicated that he crossed the professional line and provided excessive genital exams.  He said he knew it was wrong but he lacked self-control.  He also said that he conducted genital exams to satisfy his own curiosity.  When the examinations were not medically indicated or necessary, Wisner admitted that he would have conducted them for his own pleasure.

26. In that same interview, Wisner acknowledged that he chose victims who were attractive and of a similar body-type.  He also took steps to avoid getting caught.  They included falsifying medical records and failing to document some of the genital examinations he performed.

27. While this evidence underscores Wisner's "sexual curiosity" motive, it does not mean that Wisner lacked motives that were unrelated to his sexual curiosity.  Conducting genital examinations was still part of his job.  It still was necessary in many instances, and it still served a valid, independent purpose.

28. Moreover, Wisner's answers were recorded by Agent Baker after the interview—not transcribed in a deposition or sworn under oath.  And they responded to questions that appeared fairly confrontational from Agent Baker's descriptions of Wisner's responses. While Wisner was not in custody at the time of the interview, Agent Baker's Memorandum of Interview uses many words suggesting he had pressed the issue when

Wisner answered in a way that appeared less than truthful or until Wisner "admitted" one thing or another.[2]  The court gives Wisner's "admissions" during this interview slightly less weight than it would had the court heard Wisner's testimony live or via a deposition with admissible answers to review.

29. All of these facts considered, the court finds that mixed motives existed in this case.

### Additional Findings on General Foreseeability

30. The Veterans Health Administration (VHA) required a centralized and comprehensive policy on reporting and tracking allegations of sexual misconduct at VHA facilities (among other things).  The Leavenworth VA wholly failed to comply with this directive. Its reporting system was decentralized and lacked any coherent plan for tracking patient complaints.  The VA should have foreseen that this omission could produce serious problems if an employee took advantage of his position with patients.  The following evidence demonstrates how the Leavenworth VA's so-called tracking "system" made Wisner's conduct both foreseeable and actually foreseen (albeit not foreseen by supervisors in a position to remove Wisner from patient care).

    a.  Patient Advocate Richard Lawrenz used a Patient Advocate Tracking System ("PATS") to record complaints he received about healthcare providers.  But other

---

[2]   Examples of "admissions" included in the Memorandum of Interview include:

- "[Wisner] initially tried to rationalize the incident as a simple reaction but then admitted that what he did was wrong."
- "Wisner eventually admitted that he crossed the professional line and was excessive in his genital exams."
- "[Wisner] admitted that these exams were conducted to satisfy his own curiosity and that he ultimately hid behind his 'thoroughness' as an excuse to examine their genitals."
- "[Wisner] admitted that he knew that what he was doing to these patients was wrong and that he had no self-control."

(Ex. 406, at WIS00034986 – WIS00034987.)

VA Leavenworth employees used a "Report of Contact" form that they did not enter into the PATS system.  In fact, the VA social workers and medical providers lacked access to PATS.

b.  VA Social Worker Dawn Clouse received complaints about Wisner's physical exams.  But she did not investigate any of the complaints she received.  She did not know about any centralized tracking system at VA Leavenworth for reporting sexual assaults.  Clouse told Agent Baker that while Wisner was at VA Leavenworth, "she did not believe that there was a formal process in place" for reporting patient complaints.

c.  <u>During 2011</u>:  A patient ("R.D.") reported that Wisner failed to wash his hands when performing a physical examination.  But Clouse never brought this complaint to Rudy Klopfer's attention.  Klopfer was the Director and CEO of VA Eastern Kansas Healthcare System, and in that role, he was principally responsible for ensuring that the PA supervising policies were implemented.  (During part of the time relevant to this lawsuit, Klopfer shared this responsibility with others, including Dr. Anil Desai, Chief of Service).

d.  <u>February 17, 2012</u>:  Wisner's supervisors, Dr. Desai and Dr. Cline, knew that Wisner, on at least two occasions, had performed knee injections without having privileges to perform those procedures.  In response, Dr. Desai merely recommended that Wisner not carry out any procedures for which he did not have privileges.

e.  <u>February 21, 2012</u>:  Lawrenz received a report from a patient ("T.S.") who was "uncomfortable" with comments made by Wisner during a medical visit.  The

patient also reported that Wisner used a scope to perform a rectal exam.  Lawrenz

issued a "heads up" to Drs. Cline and Desai.  He also coded the complaint as an

allegation of "negligence/malpractice."  Although the patient reported feeling

"violated," Lawrenz did not report the complaints to the VA police because the

patient was not "graphic" when he described what had occurred.  But in seven and

a half years, it was the only time Lawrenz coded a complaint in the PATS system

as "allegations of negligence/malpractice."

f.   <u>During 2012</u>:  Another patient ("N.A.") made a complaint about Wisner to

Clouse.  The patient said that he felt uncomfortable with Wisner's genital exams

and that Wisner acted inappropriately during his exams.  The patient demanded a

new provider.

g.   <u>March 29, 2012</u>:  Another patient ("J.D.") reported to VA police that Wisner had

sexually assaulted him during a medical appointment.  Specifically, J.D. alleged

that Wisner sexually assaulted him the day before this report in an exam room by

putting his hand down his underwear to his groin area without warning the patient

in advance.  J.D. was admitted to the VA acute psychiatry unit that same day,

stating he felt "homicidal" toward Wisner.

h.   <u>April 2, 2013</u>:  Another patient ("J.E.") reported to the VA that he did not feel that

Wisner had his best interests at heart.  According to the complaint, Wisner told

J.E. that he could "put more pain medication up his rear end and it wouldn't do

any good."  J.E. requested another provider.

i. <u>September 20, 2013</u>:  Another veteran reported to Lawrenz that he would like another provider because he would be more comfortable with someone other than Wisner.

j. <u>January 23, 2014</u>:  A veteran ("M.S.") reported to VA social worker Melanie Lehman that he felt "uncomfortable" and "creeped out" by his medical visits with Wisner; the veteran reported having two testicular exams in a two-week time frame; and the veteran stated the testicular exams felt "different" compared to past testicular exams provided by others.

k. <u>February 20, 2014</u>:  M.S. made a complaint about Wisner's genital exams.  It is memorialized in a "Report of Contact" authored by Lehman.  Dr. Cline was made aware of this complaint and looked into it, but Klopfer said that no one brought this complaint to his attention until May 2014.

31. Based on the VA receiving all of these reports before plaintiff's last visit with Wisner on February 25, 2014, the court finds that Wisner's conduct toward plaintiff was foreseeable to the VA.  The VA certainly had all this information about Wisner's behavior while he was treating plaintiff; the problem was that various discrete silos within the VA organization housed the information.  But the VA should have collected the reports and complaints in a centralized manner that would have brought Wisner's wide-spread actions to the attention of decision-makers in a far more reasonable and timely manner. The VA violated its own policies by failing to implement a centralized reporting

mechanism, and this violation renders unpersuasive any argument that Wisner's conduct was not foreseeable because the right people did not know about it.[3]

**B.     Whether Wisner's Actions Were Taken "In Furnishing Medical Care"**

32.  The findings in this section address the question whether Wisner's actions were taken "in furnishing medical care."  Wisner's job duties included conducting genital exams.  As noted previously, every genital examination happened within the context of a longer medical appointment.  Wisner had mixed motives, and, without question, five of plaintiff's genital examinations were medically justified.  And failing to wear gloves or conducting a needlessly lengthy exam did not convert otherwise legitimate medical care to something that did not qualify as medical care.

33.  On this point, the court finds the testimony of defendant's expert, Jeffrey Nicholson, unpersuasive and unhelpful.  Mr. Nicholson testified that when Wisner's intent changed from practicing medical care to committing criminal activity, Wisner ceased providing medical care.  But the court finds this theory unrealistic, illogical, and unsupported.  This on-again-off-again test advocated to define when a medical provider is practicing medicine relies far too heavily on subjective measurements of intent.  It also can lead to absurd results.  For example, during a single medical appointment Mr. Nicholson's test would allow a practitioner's intent to change multiple times within an hour.  Mr. Nicholson admitted that his theory had not been peer-reviewed, and the court rejects it.

---

3   The VA doesn't make this argument overtly.  Instead, throughout this litigation, the VA has urged the court to take an overly narrow view of foreseeability—looking exclusively at the nature of the employment and the duties related to it.  Respectfully, the court holds that the analysis requires more than a mere review of the job title and its duties.  The court's view is consistent with the Tenth Circuit's use of the "*O'Shea* factors," as identified and applied later in this Memorandum and Order.  (*See* pp. 21–24 of this Order.)

34. The court finds that Wisner's acts, even when improper, were taken "in furnishing medical care."

**C.      When Plaintiff Knew or Should Have Known of His Injury and Its Cause**

35. On or around August 15, 2014, the VA distributed a questionnaire (through Agent Baker) to Wisner's patients.  It inquired about genital examinations the patients had received at the VA.

36. On May 21, 2015, plaintiff told Agent Baker that he had been so uncomfortable with Wisner's demeanor that he sometimes chose to miss appointments.

37. But when Wisner was administering the genital exams to plaintiff, plaintiff did not know they were illegitimate.  Wisner was an officer who outranked plaintiff, and plaintiff believed Wisner was a doctor.  Plaintiff was not allowed to question orders, officers, or doctors in the military.

38. Wisner told plaintiff that the genital exams were medically necessary.  And plaintiff thought the genital exams were just part of the medical exams.  It was not until plaintiff received the letter from Agent Baker on August 15, 2014, that he realized Wisner had done something wrong.

39. The court finds credible plaintiff's testimony about his perceptions of Wisner, the exams, and his reasons for not questioning them at the time.  Plaintiff answered these questions with confidence (something that was not necessarily consistent throughout his testimony).  And, plaintiff's testimony was consistent with expert testimony about how veterans and others often react to sexual abuse.  Although there was some ambiguity whether plaintiff felt uncomfortable enough with Wisner to try to bring his wife to an

appointment, this ambiguity, the court finds, does not overcome the other credible evidence about when plaintiff knew of his injury.

40. The timing of when plaintiff's PTSD was triggered also supports a finding that plaintiff did not recognize the abuse contemporaneously with its occurrence.  The court heard credible testimony that plaintiff's PTSD resulting from Wisner's conduct was triggered when he received the letter from Agent Baker.

41. The court also finds that this timing meets an objective standard of reasonableness.  The overwhelming majority of veterans (90%) came forward after receiving letters from Agent Baker.  And the court heard credible testimony that only 5 to 10% of persons abused by a physician will actually report it.

42. The court also heard credible testimony from Dr. Stephen Peterson that persons do not recognize sexual abuse until something pierces their defenses or overcomes their tolerance.  An outside validator is an alternative source of information that validates subjective certainty.  Here, Agent Baker functioned as the outside validator.  This finding leads the court to conclude that a reasonable person would not have recognized plaintiff's injury until receiving the letter.

**D.     Findings About Plaintiff's Medical Malpractice Claim**

43. Before seeing Wisner for the first time, plaintiff had a service-connected disability rating of 60%, for PTSD, patellofemoral Syndrome, and gastroesophageal reflux.  He had experienced problems with alcohol, opiates, benzodiazepines, methamphetamines, his mental health, and his marriage.

44. Failing to wear gloves when conducting a genital exam is a deviation from the standard of care.

45. Wisner deviated from the standard of care at least nine times, committing malpractice when he conducted genital exams of plaintiff without wearing gloves.

46. These deviations arose out of the scope of Wisner's job duties.

47. Wisner also deviated from the standard of care when he performed unnecessary genital exams of plaintiff on July 31, 2012; August 23, 2012; August 22, 2013; and August 28, 2013.  All of these deviations arose from the scope of Wisner's job duties.

48. The genital examinations on the following dates did have some medical justification: July 13, 2012; October 9, 2012; January 9, 2013; July 30, 2013; and February 25, 2014.  But the standard of care requires that healthcare providers make the genital exam as brief as possible—something Wisner never did.  He thus deviated from the standard of care a second way by conducting needlessly lengthy genital exams.

49. A genital exam lasting from 30 seconds to one minute falls within the standard of care, but Wisner's exams exceeded this length—deviating from the standard of care.

50. Still, genital examinations can serve a medical purpose, even if they deviate from the standard of care.  And, certainly, some portions of the medical care Wisner provided plaintiff pursued a valid medical purpose:  to provide diagnostic care.

51. Wisner's deviations from the standard of care, along with other deviations not specifically listed here, harmed plaintiff.

52. Wisner's deviations from the standard of care have long range, long-term consequences for patients like plaintiff.  They can result in distrust, anger, humiliation, shame, embarrassment, and emotional distress.  These results are consistent with the injuries that plaintiff credibly testified he has suffered since his encounters with Wisner.

53. The court does not find credible Mr. Nicholson's theory that the standard of care evaporated based on Wisner's contemporaneous intent. More specifically, the court does not accept Mr. Nicholson's view that the standard of care applied until Wisner's genital exam exceeded the length of time of an acceptable exam—*i.e.*, it essentially evaporated the moment Wisner developed sexual curiosity or derived sexual pleasure. The court found this testimony unpersuasive, illogical, and not based on a sound, peer-reviewed theory.

54. The court also rejects Mr. Nicholson's theory that a criminal act cannot amount to medical malpractice. As Dr. Kelley testified, a breach in the standard of care and a criminal act may co-exist in the same moment. A tortfeasor's exposure to criminal liability does not foreclose a finding that his wrongdoing also violated the standard of care. The court found this testimony by Dr. Kelley logical and credible.

E.     **Damages**

55. The court does not find credible plaintiff's assertion that he never can return to the VA for his general healthcare. In reaching this finding, the court finds the following facts significant:

a.   Although plaintiff had access to private healthcare from 2016 through 2018, he failed to seek any mental health treatment during that time based on his encounters with Wisner.

b.   Dr. Peterson testified that plaintiff would never return to the VA for healthcare, based on plaintiff's January 2019 statement to him that plaintiff had not returned to the VA for any reason for five years. Plaintiff's statement, however, was not correct. Indeed, plaintiff had sought medical care more than 20 times during the

three-year period following his last appointment with Wisner.  And plaintiff had more than 70 contacts with the Eastern Kansas VA during that same period, although many of those contacts were phone calls and VA emergency room visits. The court finds Dr. Peterson's expert opinion on this subject unreliable, because he largely based his opinion on incorrect factual representations.

c.   Indeed, in October 2014—several months after plaintiff's last encounter with Wisner, and, significantly, after plaintiff received the letter from Agent Baker— plaintiff received psychiatric treatment at the VA for his PTSD symptoms. During these sessions, plaintiff never mentioned his appointments with Wisner.

d.   Plaintiff only stopped going to the VA for his care in 2017 because of this lawsuit.

e.   On the other hand, the court finds credible plaintiff's testimony that it would be difficult to trust the VA to help with treatment for his Wisner-induced PTSD.  His reluctance is both justified and logical.  But the court does not find it credible that plaintiff will not visit the VA for any medical treatment.  His actions continuing to seek medical care from the VA after his interactions with Wisner demonstrate his willingness (and capability) to refill his prescriptions and obtain emergency and other medical care from the VA.

56. The court finds that plaintiff did suffer additional PTSD because of his encounters with Wisner.  But the evidence that plaintiff suffered additional PTSD from his encounters with Wisner is not based on evidence that is unmistakable.  Instead, much of the evidence has many shades of gray.  The court has difficulty discerning what percentage of plaintiff's condition is attributable to Wisner's conduct vis-a-vis pre-existing conditions. Specifically, the court finds:

a.  The following evidence suggests that plaintiff has not suffered significant
    additional damages resulting from Wisner's actions:

    i.  Plaintiff did not offer any evidence that he suffered adverse problems from
        returning to the VA for his post-Wisner medical and mental health
        treatments there between 2014 to 2017.

    ii.  Since plaintiff's last encounter with Wisner in 2014, plaintiff has neither
        sought nor received mental health treatment for problems caused by
        Wisner.

    iii.  Plaintiff is currently off alcohol, off methamphetamine, off opiates, and
        has a good job that he enjoys.[4]

    iv.  Plaintiff's wife testified that plaintiff's PTSD symptoms were no worse
        post-Wisner than they were pre-Wisner.

    v.  Plaintiff and his wife do not have fun together in their marriage, but those
        problems also predated Wisner.

b.  On the other hand, the following evidence suggests that plaintiff indeed suffered
    additional damages:

    i.  The court heard credible testimony that being sexually molested affects
        hyper-masculine men, such as those in the military, because the men were
        fooled and prevented from functioning as a strong protector of themselves
        or others.

---

[4]  Notably, however, the court is hesitant to punish plaintiff because plaintiff successfully has overcome drug habits
and addictions.

ii. Likewise, the court heard credible testimony that sexually molested men feel humiliated because they failed to recognize immediately that they were victimized.

iii. Consistent with this testimony, Dr. Peterson testified that plaintiff was humiliated when he realized Wisner had sexually molested him. Plaintiff does not know who to trust. Because Wisner manipulated plaintiff, plaintiff feels no reason to trust the VA medical profession or facility.

iv. After plaintiff realized Wisner had molested him, plaintiff experienced: doubts about his own sexual ability, affecting his marital relationship; substantial difficulties with isolation; substantial difficulty having normal, interpersonal relationships; and damage to his ability to interact with others.

v. Dr. Peterson explained rationally and credibly how Wisner's misconduct exacerbated and worsened plaintiff's pre-existing wartime PTSD. He explained that plaintiff had ceased treatments after his encounters with Wisner (and as a result of Wisner's misconduct), which ultimately worsened plaintiff's depression and PTSD.

vi. Wisner's actions caused plaintiff dysthymia (never really feeling happy); a loss of interest in sex; and an increased risk of relapse for substance abuse disorder.

vii. Plaintiff's testimony about the injuries he has suffered since discovering that Wisner manipulated him is credible. It was clear from plaintiff's testimony that it was difficult for him to admit these types of injuries—

particularly in open court—but plaintiff testified without hesitation about their presence.  Plaintiff also testified about an incident where he contemplated shooting himself because of Wisner's actions.  This testimony, plainly heartbreaking, was credible.

    c.  Dr. Peterson recommends the following treatment for plaintiff, with the need for the treatment specifically arising from Wisner's actions:

        i.  appropriate medications to manage plaintiff's difficulties, at the cost of $100 per month for the rest of plaintiff's life;

        ii.  private, non-VA provided psychotherapy on a monthly basis for 24 to 48 sessions, and then quarterly thereafter for the rest of plaintiff's life, at a cost between $175–$300 per session; and

        iii.  150 sessions for couples counseling at a cost of $125 per session.

57. The court finds Dr. Peterson's treatment recommendations reasonable and appropriately tied to Wisner's conduct.

<u>**Conclusions of Law**</u>

**A.**    **Wisner's Actions Were Within the Scope of His Employment**

1. The United States is liable under the FTCA only for tortious acts committed by its employees "acting within the scope of [their] office or employment."  28 U.S.C. § 1346(b)(1).

2. The court determines "scope of employment" by the law of the place where the allegedly tortious act occurred—in this instance, Kansas.  *Fowler v. United States*, 647 F.3d 1232, 1237 (10th Cir. 2011); *see also* 28 U.S.C. § 1346(b)(1).

3.  A Kansas employee acts within the scope of employment when (1) he performs services for which he has been employed, or (2) he does anything "reasonably incidental to [his employment]." *O'Shea v. Welch*, 350 F.3d 1101, 1103 (10th Cir. 2003) (quoting Pattern Instructions Kansas 3d 107.06; *Williams v. Cmty. Drive-In Theater, Inc.*, 520 P.2d 1296, 1301–02 (Kan. 1974)).[5]

4.  As reiterated in *O'Shea*, the test does <u>not</u> ask whether the employer "expressly authorized or forb[ade]" the conduct.  350 F.3d at 1103 (quoting Pattern Instructions Kansas 3d 107.06).

5.  Instead, the test is whether the employer should have "fairly foreseen" the conduct "from the nature of the [employment] and the duties relating to it." *Id.* (quoting Pattern Instructions Kansas 3d 107.06); *see also Commerce Bank of St. Joseph, N.A. v. State*, 833 P.2d 996, 999 (Kan. 1992).

6.  Applying this test alone, the evidence shows that the VA should have fairly foreseen Wisner's tortious conduct.  Indeed, the VA did foresee it.  Multiple patients had complained to the VA about Wisner's conduct while he was treating plaintiff.  And

---

[5]   The court notes that the Kansas Judicial Council has amended the Pattern Instructions Kansas 3d since *O'Shea* cited it.  The Pattern Instructions Kansas is now in its fourth edition.  Much of the language quoted in *O'Shea* has been omitted from the current model instruction.  In the fourth edition, the model instruction simply states, "The scope of employment is the complete range of activities an employee is authorized to perform and those an employee might reasonably be expected to perform while carrying out the business of the employer."  But the Comment to the revised 107.06 discussed *O'Shea* with apparent approval.  Moreover, the Kansas Supreme Court relied on the second edition of 7.04 (which became 107.06 in the third and fourth editions) in several "scope of employment" cases.  *See, e.g.*, *Williams*, 520 P.2d at 1301–02; *Commerce Bank of St. Joseph, N.A. v. State*, 833 P.2d 996, 999 (Kan. 1992).  More recently, the Kansas Court of Appeals cited *Williams* and *Commerce Bank* for the "scope of employment" standard, using the identical language from the second and third editions of the model instruction, but attributing the language to the Kansas Supreme Court itself instead of the older pattern jury instructions.  *Farmers Bank & Trust v. Homestead Cmty. Dev.*, No. 120,671, 2020 WL 5849345, at *15 (Kan. Ct. App. Oct. 2, 2020).  The Comment to the fourth edition of 107.06 also cites *Williams* and *Commerce Bank*, again with apparent approval.  Given this context, the court determines that the language in *Williams* and *Commerce Bank* remains a valid expression of the Kansas test for determining whether conduct is within the scope of employment.  The court concludes that the guidance in *O'Shea* remains relevant and useful for evaluating employees' conduct.

Wisner was in the healthcare business—one where the risk for patient abuse is recognized and has been addressed by directives designed to minimize that risk. Wisner's duties included meeting one-on-one with patients in closed-door examination rooms. He engaged in full-body exams and asked intimate and probing questions. This conduct was all within the nature of his employment.

7. In addition to this general determination, the parties agree that the "slight deviation" test, *O'Shea v. Welch*, 350 F.3d at 1106, applies to determine whether an employee's conduct was "reasonably incidental" to his employment—thereby rendering the conduct within the scope of employment. The *O'Shea* case certainly involved different facts than this one, but it does provide helpful guidance about how Kansas determines which actions are reasonably incidental to employment, making the actions within the scope of employment.

8. "Application of the slight deviation analysis allows for more flexibility and accuracy in the application of the law to each fact scenario. The Kansas pattern jury instruction[] . . . does not express a bright-line rule but instead illustrates a type of slight deviation rule which requires a determination of what is reasonably incidental to employment and what conduct should have been fairly foreseen." *Id.*

9. The slight deviation test allows for an employee to pursue "dual purpose ventures" without wholly departing from the scope of employment. *Id.* at 1107. In using the phrase "dual purpose ventures," the Tenth Circuit cited the following language from a California appellate court case, which helps explain the term: "Where the employee may be deemed to be pursuing a business errand and a personal objective simultaneously, he

will still be acting within the scope of his employment." *Id.* (citing *Felix v. Asai*, 237

Cal. Rptr. 718, 722 (Cal. Ct. App. 1987)).

10. "An employee does not cease to be acting within the course of his employment because

of an incidental personal act, or by slight deflections for a personal or private purpose, if

his main purpose is still to carry on the business of his employer.  Such deviations which

do not amount to a turning aside completely from the employer's business, so as to be

inconsistent with its pursuit, are often reasonably expected and the employer's assent

may be fairly assumed." *Id.*

11. Under Kansas law, these factors control the analysis whether an employee has engaged in

a slight or substantial deviation:  (1) the employee's intent; (2) the nature, time, and place

of the deviation; (3) the time consumed in the deviation; (4) the work for which the

employee was hired; (5) the incidental acts reasonably expected by the employer; and (6)

the freedom allowed the employee in performing his job responsibilities.  *Id.* at 1108

(citation omitted).

12. Applying the court's factual findings, Wisner engaged in a slight deviation from his

employment when he abused plaintiff, his patient.  Specifically, his intent was mixed; he

sought both to be thorough, as well as satisfy his sexual curiosity.  The deviations took

place within the context of medical examinations that generally lasted between 30 and 60

minutes, in a medical exam room during regular clinic hours.  The deviations themselves

lasted two to three minutes, but Wisner properly could have devoted as much as one

minute of that time to a proper genital exam.  Wisner was hired to physically examine

patients, which would include genital and rectal examinations when medically

recommended.  The VA had received many complaints about Wisner's practices before

and while he was seeing plaintiff as a patient, making his deviations foreseeable. Moreover, the VA was well aware of the risks of patient abuse, rendering it reasonable to expect acts of sexual abuse could occur if it exercised inadequate supervision—which was the case here.  Wisner was given wide latitude and freedom to perform his job responsibilities.  He was the only primary care provider in a clinic with as many as 1,000 veteran patients.  Although the VA was required to devote oversight to his patient interactions, the evidence shows that it neglected to review his activities.

13. Applying the Kansas scope of employment test, the court concludes that Wisner acted within the scope of his employment, or reasonably incidental to it, when he conducted improper and unnecessary genital examinations on plaintiff.  The VA may therefore be liable under the FTCA, absent any other bar to recovery.

**B.      The VA Immunity Statute Applies to Plaintiff's Claims**

14. The FTCA does not waive sovereign immunity for claims arising out of a battery.  28 U.S.C. § 2680(h) (exempting from its waiver "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights").

15. But there is also a statutory "exception to the exception" in § 2680(h).

16. The VA Immunity Statute allows a remedy against the United States under the FTCA for damages arising from providing medical services by health care employees of the VA under 38 U.S.C. § 7316(a)(1), (f).  *Ingram v. Faruque*, 728 F.3d 1239, 1245–46 (10th Cir. 2013) ("'[Section] 2680(h) does not bar application of the FTCA to [intentional] tort claims arising out of the conduct of VA medical personnel within the scope of' 38 U.S.C. § 7316(f).") (citation omitted).

17. The Tenth Circuit has explained the rationale behind the VA Immunity Statute:  "In some instances, State law characterize[d] an act of medical malpractice as an intentional tort, leaving VA medical personnel potentially liable for an action for which the law intends the Government to assume liability."  *Franklin v. United States*, 992 F.2d 1492, 1500 (10th Cir. 1993) (citing H.R. Rep. No. 100-191, 100th Cong., 2d Sess. 19 (1988), *reprinted in* 1988 U.S.C.C.A.N. 432, 450).

18. The plain language of this exception-to-the-exception statute, however, does not confine the statute's waiver to claims of medical battery:

> Although Congress was specifically concerned with medical battery, the remedy available under § 7316(f) is not limited to battery.  Instead, by rendering 28 U.S.C. § 2680(h) inapplicable, § 7316(f) allows the United States to be sued for "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights," . . . .  Thus, in the context of VA health care employees providing medical care or treatment, § 7316(f) provides a remedy under the FTCA for claims of intentional torts, including false arrest and false imprisonment.

*Ingram*, 728 F.3d at 1249.

19. To apply, § 7316(f) requires only that a battery be committed by VA personnel "in furnishing medical care or treatment."  38 U.S.C. § 7316(f).  Now, in the full evidentiary context of a trial, the court recommits to the gravamen of its earlier rulings:  the VA Immunity Statute's plain language controls, and it does not limit immunity to claims of medical battery.  *Doe A.L. v. United States*, No. 16-2627, 2020 WL 59861, at *4 (D. Kan. Jan. 6, 2020); *see also Doe S.B. v. United States*, No. 16-2575, 2020 WL 59646, at *4 (D. Kan. Jan. 6, 2020); *Doe P.M. v. United States*, No. 16-2315, 2020 WL 59645, at *4 (D. Kan. Jan. 6, 2020); *Doe D.P. v. United States*, No. 16-2267, 2020 WL 59640, at *4 (D. Kan. Jan. 6, 2020).

20. As noted in the Findings of Fact, Wisner's improper actions were taken while he furnished medical care or treatment.  They occurred during medical appointments, and while Wisner conducted medical and genital exams as part of his duties as a PA.  Many times, justification existed for conducting genital examinations—although Wisner conducted them improperly, without gloves.  The court once again rejects defendant's position that "sexual molestation" can never qualify as "medical care or treatment." (Doc. 157, at 5, 6.)  Its isolation of behavior improperly simplifies the analysis and glosses over the plain language of the statute.  Every time Wisner touched plaintiff, he did so within the larger context of a medical appointment and a lengthy physical examination.  The court concludes that Wisner was in the process of furnishing medical care when he committed his wrongful acts.

21. Defendant now cites a recent Eleventh Circuit case to support its argument, *Knezevich v. Carter*, 805 F. App'x 717 (11th Cir. 2020), decided since the court's earlier orders on this subject.  In *Knezevich*, the plaintiff brought a defamation claim against his VA doctor because, while discussing a surgical procedure with the plaintiff, the VA doctor yelled into the hallway that the plaintiff was threatening him.  A nurse already had taken plaintiff's vital signs, and the doctor had drawn the shape of an incision on the plaintiff's chest when the doctor's outburst occurred.  The Eleventh Circuit separated the "harm-causing conduct"—the doctor's hallway defamation—from the rest of the medical appointment, noting that the checking of vital signs and drawing the incision's shape were "not what allegedly caused [the plaintiff] harm."  *Id.* at 725.

22. *Knezevich* differs from this case.  The tort alleged in *Knezevich*—defamation—had a distinct beginning and end and was easily separable from any medical care provided by

the doctor.  In contrast, in this case, the edges of the boundary separating proper medical

care from wrongful conduct are far fuzzier.  At times, a full genital examination was

warranted as part of plaintiff's medical care.  It was never appropriate without gloves, but

performing the exam itself still had a valid basis in providing medical care.  Wisner just

executed it improperly.  The lines between what was an intentional tort and what was not

an intentional tort are much more muddled than in *Knezevich*.

23. For these reasons, the court concludes that the rationale of *Knezevich* does not apply to

this case.  It does not justify modifying the court's rulings defining the boundaries of the

operative phrase—"in furnishing medical care or treatment."

24. Because Wisner's improper actions were committed "in furnishing medical care or

treatment," the VA Immunity Statute applies and, on these facts, waives the sovereign

immunity of the United States.

**C.      The Statute of Limitations Does Not Bar Plaintiff's Claims**

25. Under the FTCA, "a tort claim against the United States 'shall be forever barred' unless it

is presented to the 'appropriate Federal agency within two years after such claim accrues'

and then brought to federal court 'within six months' after the agency acts on the claim."

*United States v. Kwai Fun Wong*, 575 U.S. 402, 405 (2015) (quoting 28 U.S.C. §

2401(b)).

26. Because these limits are not jurisdictional, *id.* at 409–12, failing to comply with the

FTCA's statute of limitations is an affirmative defense, *see, e.g.*, *Saofaigaalii v. United*

*States*, No. 14-00455 SOM/KSC, 2016 WL 3527095, at *6 (D. Haw. June 23, 2016);

*Crowder v. Hansen*, No. 15-CV-3216 (MJD/HB), 2016 WL 4870621, at *7 (D. Minn.

July 29, 2016).  The burden therefore falls on defendant.  *See Koch v. Shell Oil Co.*, 52 F.3d 878, 880 (10th Cir. 1995) (applying Kansas statute of limitations law).

27. "The general accrual rule for FTCA claims is the "injury-occurrence rule," where the tort claim accrues on the date of injury."  *Bayless v. United States*, 767 F.3d 958, 964 (10th Cir. 2014).

28. The "discovery rule" is an exception to the general accrual rule and it applies to "'protect plaintiffs who are blamelessly unaware of their claim because the injury has not yet manifested itself or because the facts establishing a causal link between the injury and the medical malpractice are in the control of the tortfeasor or otherwise not evident.'"  *Id.* (quoting *Diaz v. United States*, 165 F.3d 1337, 1339 (11th Cir. 1999)).

29. When the discovery rule applies, the date of accrual is when a reasonably diligent plaintiff knew or should have known both of the existence of the injury and its cause.  *Id.*

30. Plaintiff's last appointment with Wisner occurred February 25, 2014.  He received the letter from Agent Baker on August 15, 2014 and filed an administrative claim on February 18, 2016.  The VA denied the claim on August 24, 2016, and plaintiff filed this suit on September 13, 2016.

31. At minimum, plaintiff's administrative claim was filed within two years of his last appointment.  But other appointments may fall within the statute of limitations if plaintiff's claims did not accrue until he learned of the OIG's investigation into Wisner's conduct, as plaintiff argues.  The court determines that the other appointments do fall within the statute of limitations for the reasons below.

32. Defendant failed to prove that plaintiff knew—or should have known—of his emotional injury before the VA released information indicating that Wisner's physical examinations may have been improper.

33. As noted above, plaintiff felt "uncomfortable" during Wisner's genital examinations. But being uncomfortable is not the same thing as knowing both the injury and its cause. Plaintiff thought that Wisner was a doctor, and he was plaintiff's military superior. As did plaintiff, a reasonably diligent person would have trusted Wisner to provide appropriate medical care, even if that care made him uncomfortable.

34. A reasonably diligent person would have recognized both the emotional injury and its cause when he received Agent Baker's letter. It was at this point that plaintiff, charged by this standard to behave as a reasonably diligent person, recognized that Wisner's conduct had been improper and he had taken advantage of plaintiff. Plaintiff filed his administrative claim within two years of receiving the letter, thereby rendering his claims for all appointments with Wisner timely-presented.

**D.      Plaintiff Has Met the Elements of His Medical Malpractice Claim**

35. Because plaintiff's medical malpractice claim has survived defendant's various challenges, the court now must evaluate whether plaintiff has carried his burden to prove the elements of his claim. These elements are (1) a duty to meet or exceed a certain standard of care; (2) breach of that duty; and (3) the breach proximately caused the patient injury. *Nold v. Binyon*, 31 P.3d 274, 285 (Kan. 2001); *Wozniak v. Lipoff*, 750 P.2d 971, 975 (Kan. 1988).[6]

---

[6]   The court only considers the merits of this claim with respect to the actions of Wisner himself as the tortfeasor. While the court has considered the actions or inactions of other VA actors for purposes of foreseeability analysis and other contextual purposes, plaintiff only preserved an actual claim for recovery based on Wisner's actions.

36. *First:  Duty.*  Plaintiff presented evidence by way of expert testimony, establishing the standard of care.  Gloves were always required when conducting genital or rectal examinations under the relevant standard of care.  Genital and rectal examinations were not required at every visit, and they typically should take 30 to 60 seconds.  Wisner, as a PA, had a duty to comply with this standard of care.

37. *Second:  Breach.*  Plaintiff presented evidence showing that Wisner breached that standard of care.  Specifically, every time Wisner conducted a genital examination without using gloves, he violated the standard of care.  He also conducted a number of genital examinations that were unnecessary.  Also, each of the genital exams lasted longer than appropriate under the standard of care.

38. *Third:  Causation of Injury.*  Plaintiff also presented evidence establishing that he suffered harm as a proximate result of Wisner's breach of the standard of care.  As noted above, the extent of that harm is difficult to assess here because of plaintiff's pre-existing conditions.  But the court does find that Wisner's acts caused plaintiff harm independent of his pre-existing conditions.

39. Plaintiff also seeks to recover on an intentional infliction of emotional distress claim.  But the court already has determined that plaintiff is entitled to recover from the VA on his medical malpractice claim.  Any recovery for intentional infliction of emotional distress would duplicate plaintiff's malpractice claim, so the court need not address the claim further, other than to note this point:  To the extent that plaintiff is still trying to bring this claim against the VA for the actions of Wisner's supervisors, he may not do so.  Plaintiff

---

The court makes this distinction explicit because when the court asked plaintiff's counsel after closing argument who he claimed was negligent, plaintiff's counsel listed off the names of nearly every involved VA actor.

administratively exhausted claims only for the personal conduct of Wisner.  "[A]lthough a plaintiff's administrative claim need not elaborate all possible causes of action or theories of liability, it must provide notice of the facts and circumstances underlying the plaintiff's claims."  *Estate of Trentadue v. United States*, 397 F.3d 840, 853 (10th Cir. 2005) (internal quotations omitted).  Plaintiff did not mention any action or inaction by Wisner's supervisors (or the VA as an entity) in his administrative claim.  For an FTCA claim, each individual claimant must exhaust his individual claims prior to filing suit.  *Haceesa v. United States*, 309 F.3d 722, 734 (10th Cir. 2002).  The court therefore determines that plaintiff failed to exhaust an intentional infliction of emotional distress claim based on the actions of anyone other than Wisner.  And even if the court were to consider the merits of an intentional infliction of emotional distress claim, it would limit such claim to the actions of Wisner himself.

40. Because plaintiff has shown that all three elements of a medical malpractice claim are met, the court will next address the last element—the amount of damages plaintiff sustained by Wisner's conduct.

**E.      Damages**

41. Plaintiff requests economic damages in the amount of $780,000—the value of recommended treatment, plus the cost of private healthcare equal to what plaintiff could receive for free from the VA.  If the court awards economic damages, defendant asks the court to place the amount in a reversionary trust.

42. Plaintiff also requests non-economic damages in the total amount of $2,340,000, broken out in this fashion:  $780,000 for depression, $780,000 for PTSD, and $780,000 for "loss of trust."

43. A plaintiff may recover for medical expenses and economic loss he is reasonably expected to suffer in the future.  Pattern Instructions Kansas 4th 171.02.  And a plaintiff may recover noneconomic loss for "pain, suffering, disabilities, disfigurement and any accompanying mental anguish."  *Id.*

44. Kansas law allows a plaintiff to recover for aggravation or activation of a preexisting condition.  Pattern Instructions Kansas 4th 171.43 ("[I]f the plaintiff had a preexisting physical ailment, defect or disability and you find this condition was aggravated or made active causing increased suffering or disability, then the plaintiff is entitled to recover for such increased suffering and disability.").

45. Plaintiff undoubtedly suffered from PTSD and depression before he ever saw Wisner.  The court heard persuasive testimony that plaintiff's condition was aggravated and would remain aggravated after he learned that Wisner had manipulated him for sexual gratification.  Plaintiff unquestionably deserves to recover some damages.  The court thus examines, first, whether any economic damages are warranted, and, if so, how much.  The court then turns to non-economic damages.  The analysis concludes with the question whether utilizing a reversionary trust is appropriate.

**Economic Damages**

46. Plaintiff requests two kinds of economic damages:  value of recommended treatment for his PTSD and anticipated costs of private healthcare, assuming he never returns to the VA for care.  The court concludes that the evidence supports an award allowing plaintiff to seek treatment—outside the VA—for the PTSD and depression caused by Wisner.  On the other hand, requiring the VA to pay for private healthcare for the rest of plaintiff's life is not supported by the evidence.

47. Allowing plaintiff to seek treatment for his PTSD outside of the resources provided by the VA is reasonable and supported by the evidence.  Requiring plaintiff to return to the VA for treatment necessitated by wrongdoing inflicted on him by one of the VA's providers is both unfair and illogical.  The court accepts, to a limited extent, the testimony that plaintiff would struggle to open up to or trust VA providers to discuss mental health issues caused by one of their other providers.  Plaintiff credibly testified under oath that he will seek the treatment recommended and that he wants to improve his mental health and marital relationship.  The court steadfastly hopes that plaintiff follows through on this commitment so that he can heal and take positive steps to recover from his lurid and sad experiences at the VA.  The court heard credible evidence that this treatment is valued at $228,213, and defendant adduced no contrary evidence (other than the testimony of Dr. Abrams, who does not believe plaintiff will actually pursue treatment to improve his life).  Predicting the future of events always presents a daunting challenge.  But conduct of the VA's employee caused the court to answer this difficult question and so, its arguments about uncertainty are not availing ones.  The court thus awards $228,213 in economic damages.

48. Requiring the VA to pay for ongoing private healthcare, however, is not justified by the evidence in this case.  Plaintiff failed to tie this claim to his injuries.  The court recognizes that some courts have approved similar damages because a prevailing plaintiff should not be forced to return time-after-time to his tortfeasor for care.  *See, e.g.*, *Molzof v. United States*, 6 F.3d 461, 468 (7th Cir. 1993) ("[W]e share the reluctance of other courts addressing this issue to deny the plaintiff the freedom to choose his medical provider and, in effect, to compel him to undergo treatment from his tortfeasor.").  But

the damages in those cases involved future medical expenses that the tortfeasor directly caused.  Here, plaintiff's need for ongoing medical treatment, prescriptions for physical ailments, and other diagnostic care is not directly related to Wisner's acts.  The court also is unpersuaded by plaintiff's "freedom to choose" argument.  Wisner's tortious conduct didn't deprive plaintiff of his freedom to choose his healthcare provider.  He still has the same degree of freedom he enjoyed before the wrong.  Instead, the court concludes, the question is this one:  Should the court award damages to fund the cost of plaintiff acquiring a substitute provider of medical care because, plaintiff says, he has "lost faith and trust in the VA" and it makes him "uncomfortable" to return to a VA-aligned medical provider?  The evidence here did not provide a basis for such a finding.

49. Indeed, the evidence showed that plaintiff, on multiple occasions after learning of Wisner's transgressions, was willing to return to the VA for medical care.  In fact, he didn't stop going to the VA for care until he had filed this lawsuit.  The court finds plaintiff's behavior inconsistent with his statements suggesting that he could not return to the VA.  Under these circumstances, the court finds it reasonable to expect plaintiff to use the VA's medical benefits for treatment, prescriptions, preventive care, and consultation unrelated to his experiences with Wisner—particularly when he can seek treatment outside the VA environment for injuries caused by Wisner.

### Non-Economic Damages

50. The court next turns to non-economic damages.  Plaintiff asks for compensation for three distinct injuries:  depression, PTSD, and "loss of trust."  The court agrees that plaintiff has suffered damages.  But the court does not find that plaintiff's damages arising solely

from Wisner's actions should be valued as plaintiff values them ($780,000 for each of the three types of injury).

51. Kan. Stat. Ann. § 60-249a requires that the trier of fact itemize the amount of non-economic damages in the categories of (1) pain and suffering, (2) disability, and (3) disfigurement, and any accompanying mental anguish.  The same statute requires the court to itemize those three categories of damages "to reflect those amounts awarded for damages sustained to date and those awarded for damages reasonably expected to be sustained in the future."

52. Plaintiff has not categorized his claimed damages as required under the Kansas statute. But the court determines that all three injuries plaintiff claims fall under the category of disability, both to-date and in the future.

53. Of course, non-economic damages are notoriously difficult to quantify.  In Kansas, when courts instruct juries how to assess non-economic damages, they often acknowledge, "There is no unit value and no mathematical formula the court can give you for determining items such as pain, suffering, disability, and mental anguish.  You must establish an amount that will fairly and adequately compensate the plaintiff.  This amount rests within your sound discretion."  Pattern Instructions Kansas 4th 171.02.

54. The trier of fact here is the court—not a jury.  When assessing non-economic damages, the court follows the guidance of the Kansas Pattern Instruction and the Supreme Court of Kansas, who has counseled:  "'Pain and suffering have no known dimensions, mathematical or financial.  There is no exact relationship between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents.  For this very practical reason the only standard for evaluation is such

amount as reasonable persons estimate to be fair compensation for the injuries suffered, and the law has entrusted the administration of this criterion to the impartial conscience and judgment of jurors, who may be expected to act reasonably, intelligently and in harmony with the evidence.'" *Kan. Malpractice Victims Coal. v. Bell*, 757 P.2d 251, 260 (Kan. 1988), *disapproved of on other grounds by Bair v. Peck*, 811 P.2d 1176 (Kan. 1991) (citation omitted); *Tucker v. Lower*, 434 P.2d 320, 327 (Kan. 1967) ("There is no exact yardstick by which pain and suffering can be measured and the various factors involved are not capable of proof in dollars.  For this reason the only standard for evaluation is such amount as twelve reasonable persons estimate to be fair compensation when that amount appears to be in harmony with the evidence and arrived at without passion or prejudice.").  While the standard isn't particularly satisfying, the court is mindful of two things.  One, trying to define a workable measure for this category of damages is a daunting task.  Two, the Kansas Supreme Court is in charge of the legal standards used by that state's laws.  This court's job is to follow those state law standards when, as they do here, they control a particular aspect of a federal lawsuit.

55. The caselaw reporting and reviewing jury awards of non-economic damages reports the imprecise nature of this endeavor, even within the same jurisdiction, involving the same defendant.  *Compare Howsmon v. Ricci*, 1993 WL 794315 (Cal. Super. Ct. Trial Div. 1993) (reporting $325,000 jury verdict for non-economic damages after doctor negligently performed unnecessary rectal examination at physician's office, committing a sexual battery) *with Prendergast v. Ricci*, 1994 WL 847897 (Cal. Super. Ct. Trial Div. 1994) (reporting a $100,000 "general damages" jury verdict after doctor performed rectal examinations and sexually assaulted the plaintiff during the exams); *see also Elk v.*

*United States*, 87 Fed. Cl. 70, 97 (Fed. Cl. 2009) (awarding $250,000 for pain and suffering after Army officer sexually assaulted prospective soldier during recruitment process).

56. Using this guidance, the court finds that an appropriate award for plaintiff's disability to-date is $240,000.  For future disability, the court awards $70,000.  These amounts represent the value that the court—as finder of the facts—attributes to the harm caused by Wisner's conduct exacerbating plaintiff's depression and PTSD.  The record establishes that plaintiff's conditions worsened after he learned that Wisner had manipulated and sexually molested him.

57. In contrast, the evidence supporting an award for "loss of trust" is vague and difficult to value.  The court understands that Wisner's selfish and perverse conduct may make plaintiff more reluctant to see a VA physician.  The court heard credible evidence supporting this conclusion.  But trying to value that reluctance is a struggle, particularly where plaintiff, after he learned Wisner molested him, continued to go to the VA for medical care.  And to the extent supported by the evidence, the court has addressed the "loss of trust" by awarding plaintiff economic damages to fund psychiatric treatment outside the VA.  To avoid duplication and overcompensation, the court bases the majority of plaintiff's disability award on Wisner's conduct exacerbating plaintiff's depression and PTSD.  The court believes that the amounts awarded above fairly compensate plaintiff for the non-economic losses he suffered at the hands of Wisner, taking into consideration plaintiff's baseline of pre-existing personal and mental health conditions.

**Proposed Reversionary Trust**

58. Finally, defendant asks the court to place any economic damages in a reversionary trust. Defendant first raised this issue at trial.  Because it was not included in the pretrial order, the court could dismiss the request without further consideration.  *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1220 (10th Cir. 2000) ("[A] pretrial order defines the scope of an action for trial . . . ."); *see also Sunderman v. Westar Energy, Inc.*, 520 F. Supp. 2d 1269, 1278 (D. Kan. 2007) ("The pretrial order is the controlling document for trial . . . . Claims not included in the pretrial order are waived."); *Lewis v. Glickman*, No. 98-4154-SAC, 2000 WL 1863407, at *1 (D. Kan. Nov. 1, 2000) ("The decision to exclude facts or issues as not found in the pretrial order is committed to the trial court's sound discretion.") (citation omitted).  Fed. R. Civ. P. 16(d) provides that the Pretrial Order "controls the course of the action unless the court modifies it."  And, under Fed. R. Civ. P. 16(e), the "court may modify the order issued after a final pretrial conference only to prevent manifest injustice."  But, while trial courts should adhere to pretrial orders, they also construe them "liberally . . . to cover any of the legal or factual theories that might be embraced by [the order's] language.'"  *Koch*, 203 F.3d at 1220–21 (quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979)); *see also In re Cessna 208 Series Aircraft Prod. Liab. Litig.*, No. 05-md-1721-KHV, 2009 WL 1247096, at *3 (D. Kan. May 5, 2009).

59. Here, placing plaintiff's recovery in a reversionary trust is not a claim or a defense; it is more of a special request by defendant.  It is not necessarily in the nature of items ordinarily contained in the pretrial order.  Because, as explained below, the court determines that a reversionary trust is not appropriate in this instance, the court assumes

without deciding that defendant may ask the court to impose a reversionary trust without preserving that special request in the pretrial order.

60. Under Tenth Circuit law, reversionary trusts have been approved when it is in a minor's best interest. *Hull v. United States*, 971 F.2d 1499, 1504 (10th Cir. 1992); *Hill v. United States*, 81 F.3d 118, 121 (10th Cir. 1996) (recognizing inherent authority to create a reversionary trust if it is "in the best interests of the child"); *cf. Duplan v. Harper*, 188 F.3d 1195, 1202 (10th Cir. 1999) ("The damages belong to the true plaintiffs, the [parents], and the district court would have erred in imposing a trust on this award in the absence of their consent."). But plaintiff here isn't a minor and he hasn't consented to a reversionary trust. To the contrary, he vigorously opposes it. Nevertheless, in at least one case, a reversionary trust was used when the plaintiff was <u>not</u> a minor. *See, e.g.*, *Deasy v. United States*, 99 F.3d 354, 359–60 (10th Cir. 1996).

61. In the end, the court determines that a reversionary trust is not warranted here. The court understands defendant's concern that plaintiff will not use his damage award to procure psychiatric treatment. And the court certainly hopes that plaintiff uses it for that purpose, as promised, to secure psychiatric treatment to heal his injuries. But plaintiff is not a minor and defendant has failed to establish any reason why the court should treat him as one. Simply, it's overly paternalistic for the court to assume that plaintiff, absent a structured, limited-use award, will misuse the funds. The court is unwilling to make that assumption in the absence of evidence suggesting it should do so. To some extent, the court understands defendant's request originates from the concern that it might have to fund plaintiff's psychiatric care twice, *i.e.*, once by the damage award made in this Memorandum and Order and again if plaintiff presents himself at a VA clinic in the

future.  But this concern—even if it ever comes to pass—overlooks two important truths.  One, the United States already owes plaintiff veteran benefits for service he rendered to the United States Army.  And two, plaintiff sustained significant psychiatric injuries by virtue of that service.  This concern is not persuasive enough to justify this unusual measure.

**IT IS THEREFORE ORDERED** that the court finds in favor of plaintiff and against defendant.  The court will direct the Clerk of Court to enter judgment in plaintiff's favor and against defendant United States in the amount of $538,213.  But before the Clerk of Court enters judgment, plaintiff must resolve his case against the other outstanding defendant, Mark Wisner.  Plaintiff is therefore ordered to show cause within fourteen days why his claims against defendant Wisner should not be dismissed without prejudice for failure to prosecute.  If plaintiff seeks another resolution of his claims against defendant Wisner, he must identify that outcome (and provide legal authority supporting his proposal) in his response to the show cause order.

**IT IS SO ORDERED.**

**Dated this 2nd day of November, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree_____**
**Daniel D. Crabtree**
**United States District Judge**
