1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
2

3  AARON LEININGER,
                                        Case No. 16-2627
4    Plaintiff,                         Circuit No. 21-3031

5    v.
                                        Kansas City, Kansas
6  UNITED STATES OF AMERICA and         Date:  07/06/2020
   MARK E. WISNER,
7                                        Volume 1
     Defendants.                        (Pages 1-239)
8
   .........................
9

10

11                   TRANSCRIPT OF BENCH TRIAL
                            Via Zoom
12
              BEFORE THE HONORABLE DANIEL D. CRABTREE
13               UNITED STATES DISTRICT COURT JUDGE

14  APPEARANCES:

15  For the              Daniel A. Thomas
    Plaintiff:           Michael S. Kilgore
16                       Humphrey, Farrington & McClain
                         221 West Lexington Avenue
17                       Suite 400
                         Independence, MO 64050
18

19  For the United       Lawrence Eiser
    States of America:   Sarah Haston
20                       U.S. Department of Justice
                         Civil Division, Torts Branch
21                       Benjamin Franklin Station
                         P.O. Box 888
22                       Washington, DC 20044

23

24  _____
         Proceedings recorded by machine shorthand, transcript
25  produced by computer-aided transcription.

```
 1                        I N D E X

 2    Opening Statement by Mr. Thomas                      4

 3    Opening Statement by Mr. Eiser                      27

 4

 5    Plaintiff's Witnesses:                            Page

 6    STEPHEN E. PETERSON, M.D.
        Direct Examination By Mr. Thomas                 44
 7      Cross-Examination By Mr. Eiser                   170
        Redirect Examination By Mr. Thomas              218
 8      Recross-Examination By Mr. Eiser                231

 9    Rule 615 Argument                                  65

10

11                     E X H I B I T S

12    Plaintiff's
      Exhibits              Offered          Received
13
             154              169
14           157B             169              169
             211               75               75
15
      Defendant's
16    Exhibits              Offered          Received

17           400              183              183
             413         173, 233              234
18           414         173, 233              234
             420         180, 236              236
19           421              235              235
             422              236
20

21

22

23

24

25
```

```
 1         (Court called to order 9:00 a.m.)

 2         THE COURT:  I'll go ahead and open the record.  This

 3    is the case that is captioned John Doe, A.L. versus United

 4    States of America and Mark E. Wisner.  I'll begin with the

 5    appearances of counsel starting with the plaintiffs.

 6         MR. THOMAS:  Your Honor, on behalf of the plaintiff,

 7    this is Danny Thomas, Michael Kilgore, Scott Britton Mehlisch

 8    and Maggie Goodman.

 9         THE COURT:  Good morning to you in the plaintiff's

10    room, and I am starting to put faces with names.  And,

11    unfortunately, I didn't live with you through the balance of

12    the case, so help me as I start to match up names and images.

13    Thank you very much.

14         Is the plaintiff ready for trial this morning?

15         MR. THOMAS:  Yes, Your Honor.

16         THE COURT:  Very well.  And I'll hear the appearance

17    of the defendant, the United States.

18         MR. EISER:  Good morning, Your Honor.  Lawrence Eiser

19    for the United States.  With me is Sarah Haston.  Back here is

20    Darrell Black.  He is a paralegal with our office.  Off the

21    screen is IT professional, Akil Bailey, who will be helping us

22    with the technology.

23         THE COURT:  All right.  Good morning there.  Is the

24    United States ready to commence trial this morning?

25         MR. EISER:  We are, Your Honor.
```

1        THE COURT:  Very well.  And just -- I assume, there's

2   no appearance for Mr. Wisner.  But just to be sure, is there?

3   All right.  I don't see/hear anyone.

4        Counsel, thank you for being ready to go, and I'm

5   ready to proceed with the trial.  I just want to step across

6   the room and grab a couple of things.  Does the plaintiff wish

7   to give an opening statement?

8        MR. THOMAS:  Yes, Your Honor.

9        THE COURT:  All right.  Mr. Thomas, give me just a

10  moment to grab a couple things off the printer and then I'll

11  come back and recognize you for that statement.

12        MR. EISER:  Your Honor...

13        THE COURT:  All right.  Mr. Thomas, you may proceed.

14        MR. THOMAS:  Thank you, Your Honor.  May it please the

15  court.

16        THE COURT:  Counsel.

17        MR. THOMAS:  Your Honor, defense counsel, I've asked

18  my client, Aaron Leininger, to step out of the room for

19  portions of the trial, including the opening statement due to

20  the nature of some of the content.

21        My client's name is Aaron Leininger.  He was sexually

22  molested by Mark Wisner nine times over a two-year period.

23  This is not in dispute.  The United States has stipulated to

24  all nine times.  It is not disputed that Mark Wisner committed

25  malpractice each and every time he examined Aaron Leininger.

1   This alone merits judgment in our favor.

2           The first time it happened was on July 13, 2012, but

3   two-and-a-half months before that there was a very serious

4   incident involving Mark Wisner at the VA in Leavenworth.  The

5   date was March 29, 2012.  VA police were dispatched to the

6   VA Hospital in Leavenworth because there was a report that a

7   nurse had overheard a patient threatening to harm Wisner or

8   maybe even kill him if he saw him again.  The patient

9   complained that Wisner was performing excessive and unnecessary

10  genital exams and that Wisner made inappropriate sexual

11  comments towards him.  The VA police were notified and here's

12  how the investigation went down at VA Leavenworth:

13          The VA police asked Wisner, "Did you do that?"

14          He said, "No."

15          They asked his supervising doctor, Dr. Daniel Cline,

16  "Is he allowed to do genital exams?"

17          "Yes."

18          The VA police in Leavenworth called the Office of

19  Inspector General for the Veterans Administration in Kansas

20  City.  Ninety-nine percent of what they do is fraud, waste and

21  abuse investigations for comp and pen exams.  But they asked

22  OIG, "Do you want to investigate this?"

23          They said, "No."  Didn't take any witness statements.

24  Didn't review any records.  OIG didn't even question the

25  witness -- the victim.

1           So the complaint goes back to the VA police and they

2   decide to close it; Wisner said he didn't do it.  The

3   investigation lasted a total of 14 hours.  Fourteen hours.

4           But the story didn't end there.  You see, as a result

5   of this patient making a threat to a healthcare provider, the

6   VA institutionalized him.  They admitted him to the psychiatric

7   unit against his will.  He eventually got out and he killed

8   himself.  Dr. Daniel Cline knew all about these allegations.

9   Remember, he's Mark Wisner's supervising physician.  They just

10   didn't believe the victim.

11          It's a scenario that played out repeatedly with

12   Wisner's victims over a period of years, a hundred victims in

13   six years.  Six years of unnecessary and excessive genital

14   exams.  Six years of ungloved genital exams.  Six years of

15   prolonged genital exams.  Six years of fondling patients'

16   genitals.  All of these things happened to Aaron Leininger.

17   Nine times and the United States has admitted each and every

18   time it happened with a violation of a standard of care.

19          There was also six years of inappropriate sexual

20   comments, overprescribing powerful pain medication to his

21   patients, overmedicating his patients to the point of impairing

22   their judgment, refusing or threatening to refuse to fill

23   patients' pain medication refills unless they would agree to

24   genital exams.

25          Once again, all of these things happened to Aaron

1    Leininger, and each and every time it was a violation of the

2    standard of care.  There was also six years of excessive and

3    unnecessary anal exams, overprescribing testosterone to

4    patients, unnecessarily prescribing testosterone, ungloved anal

5    exams, unnecessary and excessive rectal probes.  Six years of

6    gross and incompetent medical practice not just by Mark Wisner

7    but by the VA in Leavenworth.

8            How could something like this happen?  Who is Mark

9    Wisner?  How did he get away with it for so long?  How did he

10   get access to so many patients?  I'm going to talk about that

11   in a minute.

12           First, I want to talk about the standard in this case.

13   You see we've heard years of excuses from the VA.  They say,

14   "We didn't know this was happening."  They say, "How could we

15   have known this was happening?"  We'll prove they did know and

16   we'll prove they could have known, but that's not our burden.

17   I say again, that's not our burden.

18           The standard, as set forth by Judge Murguia, is should

19   they have foreseen?  Now, the VA's going to throw red herrings

20   around all week.  They're going to say this was an intentional

21   tort.  They're going to say these were crimes.  But as

22   Judge Murguia noted, that's not the standard.  The standard is

23   should they have foreseen?  And to that the evidence will be

24   overwhelming.

25           The court's going to analyze Mark Wisner's conduct to

 1   determine if it was a slight deviation from his scope of

 2   practice, and there's four -- there's six factors to this.

 3   Four of them are undisputed.  The court doesn't have to find

 4   all six, but four of them are undisputed.

 5          The first one is nature, time and place of the

 6   deviation.  Every time Mark Wisner molested Aaron Leininger, it

 7   occurred at the VA Hospital in Leavenworth, Kansas.  It

 8   occurred at regularly-scheduled appointment times.  It occurred

 9   in Mark Wisner's medical office and it occurred in the course

10   of routine medical exams.  So that's the first prong.

11          Second:  The time consumed in the deviation.  Wisner

12   testified that the average physical would take about an hour.

13   It is undisputed by both sides that these genital exams took

14   anywhere from two minutes to five minutes, sometimes just

15   seconds.  It was -- the genital exams were a small part of the

16   larger exams.  So that's undisputed.

17          The work -- the third prong, the work for which the

18   employee was hired.  It is undisputed and it's in the pretrial

19   order that Wisner was hired to conduct genital -- or conduct

20   physical exams and that included genital, anal and rectal

21   exams.  It is undisputed that part of his exams included asking

22   probing and personal questions including questions of a sexual

23   nature.  It is undisputed that Wisner had authority to

24   prescribe opioids.  So the third *O'Shea* prong is undisputed.

25          The fourth *O'Shea* prong is also undisputed, that is

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    9

```
1    the freedom allowed the employee in performing their job

2    duties.  It is undisputed that Wisner operated with complete

3    freedom.  I'll talk more about that in a moment.

4          So there are only two factors from O'Shea that remain

5    in dispute.  The first one is the employee's intent.  For this

6    the court will need to look no further than Wisner himself.

7    When he was first questioned by the OIG's office back in 2014,

8    the special agent's name was Kerry Baker.  This is before he

9    was ever charged with a crime.  And he told him, "Even if I

10   went too far, my reasoning was always the intent to do a full

11   and thorough exam."

12         Now, Agent Baker tried to twist his words a little,

13   but that's what he said.  He said, "Thoroughness was his

14   intent."

15         And when we deposed him last week, he reiterated that

16   fact and explained his training and how he was supposed to be

17   so thorough.  He explained he was supposed to do genital exams

18   even if it was medically unnecessary.  Thoroughness was his

19   intent.

20         The second prong that remains in dispute of the -- the

21   other prong that remains in dispute is the incidental acts

22   reasonably expected by the employer.  For that let me say this:

23   Wisner could have never gained access to these patients and

24   could have never committed these crimes but-for his employment

25   at the VA in Leavenworth.  I'm going to talk more about
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    10

1    foreseeability here in my opening, but the reality is they

2    should have known.  They should have known.  So let's explore

3    that a little more.

4            Who is Mark Wisner?  He's a physician's assistant at

5    the VA Hospital in Leavenworth.  He is not a doctor.  That

6    means by Kansas statute and by VHA directive, he's supposed to

7    work under the supervision of a doctor.

8            (Conferring with IT.)

9            MR. THOMAS:  I apologize.  I have the wrong copy of my

10   outline.

11           THE COURT:  That's all right.

12           MR. THOMAS:  The VHA directive is VHA Directive 1063.

13   It's in evidence.  It's been undisputed.  It's Exhibit 59 and

14   60.

15           But this didn't happen here.  This didn't happen here.

16   He was not properly supervised.  This is not in dispute either.

17   The Department of Justice may argue this is in dispute, but

18   that's in direct contradiction to what the VA witness has said.

19           I've already told you about Dr. Daniel Cline, his

20   supervising physician.  There's also Anil Desai, the chief of

21   staff; Rudy Klopfer, the CEO at the time of his deposition.

22   We've given the court these deposition transcripts and we ask

23   the court read them carefully.  They all admit Wisner was not

24   properly supervised.  They all three admit to multiple

25   deviations in the standard of care.  Dr. Daniel Cline, his

1     supervising physician, flat out said, "I let my patients down."

2          I want to talk about the clinic that Wisner worked out

3     of.  In approximately 2011, the VA established something called

4     the OIF/OEF.  That stands for Operation Iraqi Freedom/Operation

5     Enduring Freedom.  The clinic was particularly established by

6     the VA to provide medical care for veterans.

7          (Court reporter interruption.)

8          THE COURT:  You're back.  And the court reporter, the

9     last thing we heard was it was specifically established to

10    provide... and then you sounded out on us.

11         MR. THOMAS:  I apologize.  It said the host muted us.

12         COURTROOM DEPUTY:  Judge, I apologize that was my bad.

13         THE COURT:  That's all right.  We'll work through

14    several technical problems like this and we'll just make it

15    work.

16         So, Mr. Thomas, regather and pick up where you were.

17         MR. THOMAS:  Absolutely.  And I -- I predict it won't

18    be the last time we have a technical snafu, so no worries.

19         This clinic was specifically established to provide

20    care -- medical care for veterans who are returning from the

21    Iraqi and Afghanistan theatres of war.  It was supposed to be

22    the primary care clinic for soldiers, sailors, airmen and

23    marines who are returning from combat zones.  Many of these

24    veterans suffered serious combat-related injuries.  The

25    majority of them already had PTSD, combat-related PTSD.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    12

1          In the case of Aaron Leininger, he does have service

2     injuries and combat-related PTSD.  Both facts which were

3     determined by the Department of Veteran Affairs.

4          The other thing about this clinic is it was supposed

5     to have a limit, a capacity.  Wisner testified it was never

6     supposed to exceed 750 patients.  But in reality, the average

7     patient load was a thousand.  Dr. Cline admits this in his

8     deposition as well, and the DOJ admitted it in their portion of

9     the pretrial order.  Not only was he not being supervised, he

10    had 250 more patients than he should have.  They didn't know

11    any of this was going on.

12         Wisner was in charge of this clinic.  There was no

13    doctor assigned to the OIF/OEF clinic.  Dr. Cline was assigned

14    to a different clinic even though he was a supervising

15    physician.  Wisner was it.

16         For several years he didn't even have an RN.  He

17    operated with full autonomy, and all of this goes to that sixth

18    *O'Shea* factor.  In fact, in his deposition, Dr. Cline said

19    there were really no -- this is a quote.  "There were really no

20    providers at VAMC-Leavenworth with whom to compare Wisner, as

21    he was the only primary care provider for the OIF/OEF clinic."

22    Not only did he have free reign but they treated him like a

23    licensed physician.

24         But here's the thing:  For at least three years

25    leading up to his arrest, there were multiple complaints from

16-2627 Leininger v USA et al   7.6.20 Vol. 1                 13

1    multiple veterans about Wisner.  I've already told you about

2    the veteran who took his own life.  But there were numerous

3    other complaints, and they all had to do with the sexualized

4    nature of his exams, the fact he wouldn't wear gloves, the fact

5    he wouldn't wash his hands before or after genital exams, that

6    he made inappropriate sexual comments, that he inappropriately

7    touched patients, that he performed excessive genital exams and

8    excessive rectal exams.  The list goes on.

9           But none of these complaints were properly

10   investigated.  Not a single one was reported to the civilian

11   police departments.  None of them are reported to the state.

12   And none of them are reported to the Board of Healing Arts.  To

13   this day, Dr. Cline has still not reported it to the Board of

14   Healing Arts even though the physician database -- even though

15   there's a VHA policy that says he should have.

16          The court has been provided with some depositions of

17   some of these VA employees who received complaints.  This

18   includes Michelle Boylan who was deposed twice, Dawn Clouse,

19   Richard Lawrenz and Melanie Lehman.  These people are social

20   workers and a patient advocate, all of whom received complaints

21   about Wisner's sexual conduct at some point.  Please read their

22   complaints with a careful eye because we ask them about every

23   complaint.  Oh, let me correct that.  We asked them about every

24   complaint we can find.

25          See, here's the thing about this foreseeability

1    argument:  There was supposed to be a centralized tracking

2    system for these complaints, a single system to keep track of

3    any and all sexual misconduct complaints against a provider.

4    It's another nationwide VHA directive.  It's called VHA

5    Directive 2012-026, and it has already been stipulated for

6    admissibility, Exhibit 27.  It took effect September 27, 2012,

7    which is just two months after Mark Wisner first molested Aaron

8    Leininger.  It would happen to him eight more times.

9            The directive states, "It is the policy," the VHA

10   policy, "that each VHA facility director" -- that would be

11   Dr. Ani Desai -- "must maintain and implement a centralized

12   policy on the reporting and tracking of sexual assaults, sexual

13   assault incidents or other public safety incidents."  You see,

14   the VA knew something like this could happen, that's why they

15   had a policy like this.

16           They wanted a single system where the complaints would

17   be registered, and the reasoning is simple:  They wanted to be

18   able to identify patterns and behaviors in these complaints.

19   They knew it was possible.  It was foreseeable.  But here's the

20   problem with VA Leavenworth:  They didn't have any such

21   centralized and comprehensive tracking policy.

22           Now, the Department of Justice is going to say, well,

23   they did routine employee evaluations and things of that

24   nature.  But that's not what the VHA directive calls for.  It

25   calls for a separate centralized comprehensive tracking system.

1    I mentioned earlier the transcripts of the social workers and

2    the patient advocates who were receiving complaints.

3         None of them knew that their co-workers were receiving

4    complaints at the same time they were receiving complaints.

5    The patient advocate used a system called PATS whenever he

6    received a complaint, but he's the only one that had access to

7    it.  The physicians didn't have access.  The social workers

8    didn't have access.  The nurses didn't have access.  Even the

9    VA police didn't have access.  And certainly Dr. Cline didn't

10   have access.  It's not centralized and comprehensive.

11        The social workers didn't have a process at all.

12   Sometimes they would e-mail the complaints.  Sometimes they

13   would make a phone call.  Sometimes they would write up

14   something called a Report of Contact.  But there wasn't even a

15   single system among the social workers, let alone all the

16   reporters, to log and track complaints.  The left hand truly

17   had absolutely no idea what the right was doing.

18        This was all foreseeable and it was all preventible.

19   And, in fact, the VA in Leavenworth, in addition to the

20   national policy, they had their own policies.  They had -- they

21   had the Eastern District Healthcare System which covers

22   Leavenworth; had their own policies regarding abuse, negligence

23   and exploitation by healthcare providers -- by healthcare

24   providers.  We have one that's took effect in 2010, it's

25   Exhibit 61, and it's already been stipulated to.  The other one

1    replaced it in 2013.  It's Exhibit 63.  It has likewise been

2    stipulated to.

3            How can the Department of Justice stand up here and

4    say this wasn't foreseeable when they had policies to address

5    it, when there was supposed to be a centralized tracking

6    system?  A hundred veterans in six years right under their nose

7    and they say it wasn't foreseeable.

8            Now, I want to talk about Wisner's MO.  First, he held

9    himself out to his patients as a physician.  The patients

10   called him doc and even some of the staff called him doc.  Most

11   of his patients thought he was actually a doctor.  Aaron

12   Leininger did.  See, by holding himself as a doctor, that gave

13   him an air of authority and wisdom and it made it easier for

14   his victims to trust him.  It's called mentor abuse.

15           Two, Wisner selected victims who were vulnerable to

16   exploitation.  This includes veterans with a history of sexual

17   trauma, PTSD, combat, orthopedic and neurologic injuries,

18   alcohol and drug dependency, low self-esteem, anxiety and

19   depression.

20           Three:  The use of prescription drugs.  Now, the

21   Department of Justice didn't want the court to hear about

22   Wisner's prescription drug habits.  Here's why:  When he

23   surrendered his license back in 2014, there's a document.  It's

24   Exhibit 129.  It's also been stipulated for admissibility.

25   It's called a Surrender of License.  Also around that time he

1    was interviewed by Agent Kerry Baker.  There are multiple

2    documents about his interviews, Exhibits 16, 19, and 174A.  I

3    believe the first two are stipulated to.  I don't know about

4    the third one.

5         In these documents, Wisner admitted that he frequently

6    overprescribed opiates and testosterone to his victims.  Now,

7    he did this for several reasons.  First, it made his victims

8    dependent upon him.  It's like that drug dealer who gives the

9    first sample for free.  It gets them hooked and keeps them

10   coming back.  And if the patient complained or didn't want to

11   do the genital exam, Wisner would threaten to withhold the pain

12   medication.

13        Number two, it ingratiated Wisner to his patients.

14   These men and women were in pain.  Most of them had

15   combat-related injuries, many of them extraordinarily severe.

16   They needed their pain medications and they were thankful to

17   Wisner when he was so easily and readily available to prescribe

18   them.

19        Number three, it impaired their judgment.  In the

20   medical records of Aaron Leininger and any veteran in these

21   cases, whenever they're prescribed opioids, there's a warning

22   from the VA that's in the records.  And it says, "Taking

23   opioids can impair your judgment."  Wisner admitted that it

24   impaired judgment.  There was a physician who came on after

25   Wisner retired.

1        I said retired.  He was allowed to retire with full

2   benefits.  He was not fired.

3        They brought a physician on afterwards to look at his

4   prescription writing habits.  And she noted that Wisner was

5   prescribing opioids at a level -- at levels that would impair

6   patients' judgment.  See, impaired judgment made it easier for

7   Wisner to get access to the victims.  It lowered their

8   inhibitions.  It made them more susceptible to his advances.

9        And the fourth thing about Wisner's prescription drug

10  writing habits is probably the most sinister.  If somebody, one

11  of his patients, were ever to report him, nobody would believe

12  them.  That's exactly what happened to the patient who killed

13  himself in 2012.  Wisner said, don't believe him, he's the --

14  he's the opioid-addicted-drug-seeker.  He's just mad because I

15  won't refill his scripts.  It's a scenario that played out

16  several times over Wisner's career at the VA.  And here's

17  probably the most disturbing aspect of this one, this is going

18  to be the same tactic that the Department of Justice is going

19  to use this week.  It's the same tactic they used the last four

20  years.

21       Now, they've already admitted Aaron was molested nine

22  times.  But their expert, Dr. Abrams, is still going to come in

23  and try to challenge his credibility.  He will argue that even

24  though he was molested nine times, he doesn't think he has

25  PTSD.  He thinks Aaron's lying about it.  They want to stomp

```
 1    all over his character by calling him an opioid abuser.  Watch

 2    how many times Dr. Abrams tries to sprinkle this information

 3    into his testimony.  I counted 20 times during his last

 4    deposition where he tried to squeeze it in.

 5           And here's the problem with that defense:  They refuse

 6    to acknowledge Wisner's role and the VA's role in feeding that

 7    addiction for years.  It's textbook victim blaming.  This is

 8    why the DOJ didn't want you to hear about Wisner's drug writing

 9    habits.

10           So there are two parts to their defense:

11    Foreseeability, which we've already talked about, and the

12    second part is to try to discredit Aaron Leininger.

13           Let me just talk about Aaron Leininger for a minute.

14    As a young man, he took an oath and went off to war for his

15    country.  He saw and experienced things these lawyers, these

16    bureaucrats, these lab coats and experts couldn't possibly

17    fathom.  He showed a level of bravery they will never know.

18    You see, he wrote a blank check made payable to the United

19    States of America with an amount up to and including his life.

20           And I'll be the first to admit that I'm passionate and

21    connected to these cases, and I think part of that is because

22    as a young marine I wrote the same check a long time ago.

23           Aaron Leininger --

24           MR. EISER:  Objection.

25           MR. THOMAS:  -- left a great hero.
```

1          THE COURT:  Excuse me a second.  I thought I heard an

2    objection.

3          MR. EISER:  I apologize, Your Honor.  I've let a lot

4    go.  Inserting his own military history is too much at this

5    point.  It's really not relevant to anything.

6          THE COURT:  Well, Mr. Thomas, this is an opening

7    statement, and in a bench trial I suppose the boundaries of

8    where argument versus prediction of the evidence is a little

9    more forgiving, but I do -- I want to bring you back that this

10   is supposed to be a preview of what the evidence will show and

11   suggest that you stay clear of argument during this section of

12   the trial.  You'll have a chance to argue your case.

13         MR. THOMAS:  Yes, Your Honor.

14         We'll be the first to admit that when Aaron came back

15   from Iraq he was different.  He had debilitating injuries.  He

16   was haunted by what he had seen and done.  He had very severe

17   combat-related PTSD which was diagnosed and verified by the VA.

18   But, once again, Dr. Abrams will even challenge that.  And,

19   yes, there were times when Aaron Leininger turned to

20   prescription drugs to ease his physical and emotional pain.

21         This is why they chose him.  The United States got to

22   pick the first case that would go to trial and they chose Aaron

23   Leininger because of his history of opioid addiction.  It's the

24   same reason Wisner chose him.  So that's their second defense,

25   but it's all going to be distraction and subterfuge.  They've

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    21

1   already admitted he was molested nine times.  I don't think

2   they truly believe that this did not cause him PTSD, and I

3   don't think they believe they can convince the court of this

4   either.

5           The court's going to hear from three experts from the

6   plaintiffs this week in addition to our client.  The first

7   expert is Dr. Stephen Peterson.  He's a clinical and forensic

8   psychiatrist and he's board certified.  Thirty-three years of

9   clinical experience.  He's trained at the Menard Clinic and he

10  also trained at the VA in Topeka, Kansas, which at the time was

11  the preeminent facility for evaluating and treating Vietnam

12  veterans with post -- with war-related PTSD.

13          In fact, Dr. Peterson has treated veterans from every

14  conflict just about in the last 100 years except World War I.

15  He's licensed in Kansas and Missouri and has an office over in

16  Johnson County.  He's one of the few forensic psychiatrists

17  left that also practice -- practices clinical psychiatry.  He's

18  examined somewhere between 200 and 250 people in mentor abuse

19  cases on both sides of the aisle.

20          And he conducted a forensic examination of Aaron

21  Leininger and he wanted to determine if the actions of being

22  molested nine times by Mr. Wisner worsened Aaron's wartime PTSD

23  and whether he needed further treatment and whether that

24  treatment should come from the VA.

25          And after he conducted his tests and evaluations, he

1    determined, yes, Wisner's actions did worsen his PTSD severely.

2    He doesn't trust the VA.  He doesn't trust any doctor.  He has

3    ongoing and intrusive memories of the war, ongoing and

4    intrusive memories of what Wisner did to him, and he's got an

5    ongoing risk for substance abuse and he needs substantial

6    mental health care and, most importantly, it should be provided

7    outside the VA health system.

8            In contrast, the Department of Justice is going to

9    bring you Dr. Abrams, who I mentioned earlier.  He's from

10   San Diego.  And by his own admission, he's a professional

11   testifier.  He's an advocate, not a clinician, and his

12   purported specialty is drug addiction which is why they chose

13   him.

14           After Dr. Peterson, we're going to present Dr. Kelley,

15   a board certified general practitioner.  His office is on the

16   other side of the state line up in North Kansas City.  He's

17   been a general primary care physician for 22 years and he has

18   extensive experience in supervising physician assistants.

19           He's going to talk about the multitude of standard of

20   care violations, not only from Wisner but from the VA and

21   Wisner's supervisors, and he's going to talk about the

22   foreseeability issues.

23           In contrast to Dr. Kelley, the DOJ is going to bring

24   Dr. Nicholson, another ringer.  He advertises in every expert

25   clearinghouse in the country.  And all he's going to say is

1   Wisner's conduct was so criminal -- it was criminal.

2   Therefore, it must be beyond the scope of practice.  But that's

3   not the standard, and the court has already rejected that

4   argument twice, once in the motions to dismiss and another time

5   in the motion for summary judgment.  That's all they got.  So

6   we're going to hear about it all week.

7           The last expert witness you're going to hear from us

8   is Dr. Jack Ward.  He's well-known in these parts.  He's often

9   called the father of forensic economics.  He's practiced over

10  in Prairie Village for decades.  I'm sure he's been before this

11  court before.  He's going to discuss the economic damages

12  suffered by Aaron Leininger as a result of Wisner's actions and

13  the VA's.  And he's going to talk about the costs of the

14  healthcare Aaron needs moving forward.  But please keep in

15  mind, Your Honor, Dr. Ward only provides calculations for

16  economic damages.  Aaron Leininger has experienced extensive

17  non-economic damages and there is a value for that as well.

18          In contrast to Dr. Ward, the DOJ is going to bring

19  Dr. Clark, another paid advocate.  We don't usually see expert

20  defense economists at trial, but we will here.  And all

21  Dr. Clark is going to say is that Aaron may be eligible for

22  other benefits, like something called Veterans Choice.  We

23  asked him in his deposition, "Do you know what the flexibility

24  requirements are for that?"  And he said, "No."

25          But, more importantly, Aaron Leininger shouldn't have

1   to look to the VA or the United States government for

2   healthcare for the rest of his life.  As a combat veteran, he's

3   entitled to it, but they need to provide it in some other way.

4           Dr. Clark is going to somehow argue, even though he's

5   not a medical doctor, that Aaron Leininger doesn't have future

6   medical needs, but he's going to hedge his bets.  He's going to

7   say even if he does have future medical needs, I've come up

8   with some calculations of my own.  We asked him in his

9   deposition did the method you used -- are the methods you used

10  for your calculations generally accepted in the field of

11  economics?  He said, "I don't know."  We could have *Daubert*ed

12  him and we probably should have.

13          I'm going to sit down in a minute but I want to talk

14  about a couple more things.  Lawsuits are about responsibility

15  and justice.  We are here because the VA will not take

16  responsibility for the largest sex abuse scandal in the history

17  of the VA.  They're going to argue all week that Wisner's the

18  real perpetrator and he's already in jail.  Yes, he's in jail.

19  But out of a hundred victims, the OIG only presented four of

20  them to the prosecutors.  We asked him why he only submitted

21  four.  And he said to submit more would have been redundant in

22  his experience.  This was only his second sex abuse

23  investigation in his 20-year career.

24          Countless veterans have never got their day in court.

25  They've never gotten justice and, more importantly, not a

1   single person from the VA has ever been held accountable.

2   There was never an internal investigation.  The OIG's

3   investigation was strictly limited to Wisner.  Nobody

4   investigated these healthcare workers, these social workers,

5   patient advocates, supervising doctors.  Cline and Desai had

6   since been promoted.  Nobody's been held accountable.

7           Meanwhile, six years have passed and the suffering

8   continues.  He was already fragile when he came back from war,

9   Aaron was.  He was the proverbial eggshell plaintiff and now

10  he's been broken and the court's going to hear about his six

11  years of torment, of shame, of anger, of severe depression, of

12  anxiety, of guilt, self-doubt, white-knuckled nights,

13  nightmares, loneliness and a complete inability to trust

14  anybody.

15          I have a book in my office that one of my partners

16  gave me.  It's a book of quotes from philosophers.  And I came

17  across a quote this week from Edmund Burke.  He was a statesman

18  in Great Britain during the Revolutionary War.  And it's

19  poignant.  It says, "It is not what a lawyer tells me I may do;

20  but what humility, reason, and justice tell me I ought to do."

21          We're going to prove our case.  We're going to meet

22  our burden of proof and we're going to go above and beyond our

23  burden of proof.  And when it's over, we're going to ask that

24  the court enter findings of fact and conclusions of law and

25  award damages commensurate with the severe trauma our client

1    has experienced.  Thank you.

2           THE COURT:  All right.  Mr. Eiser, does the United

3    States wish to give an opening statement at this time?

4           MR. EISER:  We do, Your Honor.

5           THE COURT:  All right.  You may proceed.

6           MR. EISER:  I want to be clear, I'm not sure the court

7    references -- there are a couple of visual aids that I'd like

8    to use during my opening that make it smoother and keep me on

9    course.  Is that all right with Your Honor?

10          THE COURT:  It is.

11          MR. THOMAS:  Your Honor, may I ask for clarification?

12   One of those was demonstrative, and we told him we don't have

13   objection to actual exhibits.  The demonstrative we don't think

14   is appropriate for opening statement.

15          Are you still planning on using that?

16          MR. EISER:  Yes.

17          THE COURT:  So what is the objection to the use of a

18   demonstrative during opening statement?

19          MR. THOMAS:  Well, opening statement is supposed to

20   disclose what the evidence is going to be, and I don't think

21   demonstratives are going to be evidence.

22          THE COURT:  All right.  Your objection's overruled.

23   You may proceed, Mr. Eiser.

24      (Defendant's opening statement previously transcribed and

25   filed.)

1       MR. EISER:  Thank you, Your Honor.  And I want to

2   thank you for allowing the -- the parties to present this trial

3   in this unusual format, keeping us all safe.

4       Outrage.  Plaintiff's counsel begins and ends his case

5   in outrage, outrage that is shared by all involved in this

6   case, plaintiff and his family certainly but also the many

7   other veterans who were victimized by Mr. Wisner and the

8   Eastern Kansas VA and its healthcare providers who commit their

9   lives to caring for our nation's veterans, and the VA Office of

10  Inspector General which investigated and caught Mr. Wisner,

11  laying the foundation for his prosecution, conviction, and

12  15-year prison sentence.

13      Indeed, all who have heard about these matters cannot

14  help but be outraged.  A sexual predator in the guise of a

15  healthcare provider preying upon wounded warriors:  outrageous.

16  But the task of the court, in deciding the legal issues here,

17  is putting aside the disgust and outrage at Mr. Wisner's

18  conduct and dispassionately apply the facts to the law.

19      In all aspects of our presentation of our defense, the

20  United States seeks to respect and honor Mr. Leininger.  We

21  respect and honor his service to his country and his sacrifices

22  in that cause.  That respect and honor compels us to make

23  certain concessions in this case.  We accept that plaintiff was

24  abused by Mr. Wisner.  We accept his version of the facts of

25  his encounters with Mr. Wisner.  We will not dispute that he

1    was subjected to unnecessary, ungloved genital examinations of

2    two to three minutes in duration during each and every one of

3    his nine encounters with Mr. Wisner over a two-year period in

4    2012 to 2014.  We accept his assertion that he was subjected to

5    gross and inappropriate sexual statements from Mr. Wisner

6    during some of his examinations, and we stipulated to some of

7    those concessions in the court's pretrial order.

8            So if we accept his statement of facts, why are we

9    here, particularly given that, as noted in one of plaintiff's

10   own filings, his opposition to the United States' motion to

11   continue, Docket 108, the United States has resolved the vast

12   majority -- 85 to be precise -- of the cases brought by other

13   veterans abused by Mr. Wisner in the same manner?

14           Two reasons compel us to continue.  First, it's the

15   plaintiff's -- this plaintiff's damages claim.  While we

16   respect and honor plaintiff and his service, that does not mean

17   that the United States --

18           MR. THOMAS:  Your Honor --

19           MR. EISER:  -- will pay for damage claims --

20           THE COURT:  Hold on just a second; there is an

21   objection apparently.

22           Mr. Thomas.

23           MR. THOMAS:  I will object that this is getting into

24   confidential settlement negotiations, which are not admissible

25   evidence, and that's what he -- that's what's happening here.

16-2627 Leininger v USA et al   7.6.20 Vol. 1          29

1         THE COURT:  Well, just to review, the defense counsel

2     had begun to talk about plaintiff's damage claims.  That's

3     certainly a fair topic for opening statement and for evidence.

4     I did not anticipate that Mr. Eiser was going to talk about

5     settlement discussions.  If he was, that -- I would agree with

6     your objection.  It doesn't appear to me he was; so your

7     objection's overruled.

8         MR. EISER:  While we respect and honor plaintiff and

9     his service, that does not mean that the United States will pay

10    for damage claims that are unsupported by the evidence and

11    untethered to reality.  As the evidence will show, plaintiff is

12    asking the court for just that:  damages to pay for a lifetime

13    of medical treatment for an extensive variety of medical

14    ailments completely unrelated to the emotional distress caused

15    by his encounters with Mr. Wisner.

16        Indeed, plaintiff seeks damages for mental health

17    treatment that he will never incur because he will not obtain

18    such treatment from private medical doctors.  And even -- and

19    if he returns to the VA, the doctors most familiar with PTSD

20    suffering veterans, also the mental healthcare providers that

21    he says he would prefer, that care would be again free to him

22    and incurred by the VA.

23        The costs for a lifetime of private Cadillac medical

24    insurance is simply too high and untethered to the facts of

25    this particular case.  Given this, the United States is

1    obligated to defend the case despite its frank acknowledgement

2    of its employee's wrongs, its concessions in the court's

3    pretrial order and its continuing respect for plaintiff's

4    service and sacrifice.

5           Second, the United States -- the United States

6    presents three legal defenses:  statute of limitations, scope

7    of employment, and intentional battery, all of which the court

8    has said it will decide pursuant to post-trial briefing.

9           The first defense is simple:  statute of limitations.

10   We contend that a reasonable plaintiff -- this test is an

11   objective one -- would have known of his injury and its

12   government cause more than two years before he filed his

13   administrative claim with the VA in February of 2016.  The only

14   evidence we offer is the only evidence that is relevant from

15   plaintiff's own medical records, which are USA Exhibits 413 and

16   414, which show the dates of his visits with Mr. Wisner and the

17   date that he filed his administrative claim.  As you will see,

18   he filed his administrative claim in February of 2016, which is

19   well after the two-year time bar when a reasonable plaintiff

20   would have known of his injury and its cause.

21          Second, our second defense is scope of employment.  By

22   this defense, the United States points out that if the court

23   concludes from the plaintiff's evidence that he was subjected

24   to intentional sexual assaults, that would, we submit, under

25   Kansas law render those acts outside the scope of his

1    employment as a physician's assistant with the Eastern Kansas

2    VA.  Scope of employment is a fact question and the fact finder

3    is you, Your Honor.  As this court accurately summarized the

4    law in its order resolving our dispositive motion dated April

5    24th, 2017, in Kansas an employee acts within the scope of his

6    employment when (1) he performs services for which he has been

7    employed or (2) he does anything reasonably incidental to his

8    employment.  The test is not whether the employer expressly

9    authorized or forbid the conduct.  Instead the court asks

10   whether the employer should have fairly foreseen the conduct

11   from the nature of the employment and the duties relating to

12   it.

13            The scope question doesn't turn on whether

14   Mr. Wisner's misconduct was foreseeable to the VA.  This isn't

15   a criminal case.  It -- whether it was foreseeable to the VA

16   because of particular actions from Mr. Wisner's past, as stated

17   by this court, it turns on whether this court finds that the VA

18   should have foreseen Wisner's misconduct from the nature of the

19   employment and the duties relating to it.

20            For example, courts generally find that it is

21   foreseeable that a -- the misconduct of a security guard or

22   that his -- his conduct will escalate to violence in his

23   encounters with the public and thus remains within the scope of

24   employment for it.  Here, as part of our concessions to

25   plaintiff, the United States has stipulated in the court's

1    pretrial order to all the relevant facts that the court would

2    need in answering the question about scope.  Those -- those

3    concessions are:

4            No. 8.  The VA employed Mark Wisner to conduct

5    physical exams which may have involved sensitive or intimate

6    matters.

7            9.  The VA employed Mark Wisner to, in part, conduct

8    physical examinations of plaintiffs which may have involved

9    sensitive or uncomfortable matters.

10           10 and 11.  The VA did not require a supervisor or

11   chaperone to be present during Mark Wisner's examinations of

12   his male patients.

13           15.  Plaintiff was seeking medical care at medical

14   appointments documented in the medical records.

15           16.  Mark Wisner's medically documented medical

16   examinations of the plaintiff occurred at a Leavenworth VA

17   facility while the facility was opened and operating.

18           17.  Mark Wisner's medically documented examinations

19   of plaintiff occurred in an exam room at the Leavenworth VA

20   facility.

21           18.  Mark Wisner's medically documented genital exams

22   were part of his overall physical examinations.

23           19.  At least some portions of the medical care Mark

24   Wisner provided plaintiff was for a valid medical purpose in

25   order to provide diagnostic care.

1          These are all the relevant facts that might address

2     this scope question as it's properly been stated by this court

3     and in Kansas law.  Now the VA, of course, did not foresee the

4     misconduct.  And this court, in ruling on summary judgment,

5     agreed but held that Mr. Wisner's misconduct may be deemed "a

6     slight deviation from his assigned duties, in which case the

7     scope defense is lost."  But, in defending this case, we simply

8     cannot accept that when a healthcare provider who is assigned

9     to heal wounded warriors instead harms them with intentional

10    repeated sexual assaults, that conduct cannot be seen as a

11    slight deviation.  Indeed, those actions are entirely

12    antithetical to his assigned duties.

13         Either way there's no additional evidence from the VA

14    or the plaintiff that could impact the legal decision, and we

15    will not offer any.  Rather, we will rely on the plaintiff's

16    evidence and some brief opinion testimony from our physician's

17    assistant expert, Dr. Jeffery Nicholson, regarding the nature

18    and duties of a PA.

19         Three, our third and final liability defense is the

20    intentional battery exception to the FTCA.  If the court should

21    find that Mr. Leininger was the victim of an intentional sexual

22    assault and battery, then that conduct is an expressed

23    exception to the FTCA.  Even plaintiff admits this was

24    intentional conduct by Mr. Wisner, but plaintiff believes there

25    is an exception to this exception in the VA statute -- fair

 1    enough -- and the parties will brief these legal issues in

 2    post-trial briefs.  But this answer, like the scope and time

 3    limit defenses, is simply a legal conclusion that the court is

 4    to draw from the plaintiff's presentation of his claim.  We

 5    have no additional facts to provide.  That's it.  That's the

 6    extent of the relevant liability evidence.

 7         Now, Mr. Thomas, in his opening, said -- made several

 8    statements about what Mr. Wisner did to others, what VA

 9    supervisors and investigators should have done, what they knew,

10    and what VA policies say, and none of that could possibly be

11    relevant to the scope of employment, to the three technical

12    legal defenses that we present here.

13         Now, we'll also present the expert testimony of

14    Dr. Alan Abrams who conducted a detailed examination of the

15    plaintiff and his extensive medical history to help you sort

16    out what injury plaintiff has suffered as a result of his

17    interactions with Mr. Wisner as opposed to the extensive

18    chronic mental health conditions and injuries that pre-existed

19    for 20 years before he ever encountered Mark Wisner in 2012.

20         We may also call Dr. William Clark, an economist, to

21    rebut certain assertions by plaintiff's expert economist

22    regarding plaintiff's claimed damages.  But that and

23    cross-examination of plaintiff's witnesses is the extent of our

24    presentation at this trial.  We will be brief because, while

25    the legal defenses will be addressed post-trial, the main

1    triable issue here is plaintiff's claim for damages.

2          Now, a word about damages.  In this regard, plaintiff

3    makes an exceedingly unusual request for damages as you've

4    heard.  If this were a jury case, the jury would -- would be

5    instructed on the law of damages pursuant to Kansas Pattern

6    Instruction 171.02 which states:

7          "When determining the amount of damages sustained by

8    the plaintiff, you must allow the amount of money that will

9    reasonably compensate plaintiff for his injuries and losses

10   resulting from the occurrence in question.  These injuries and

11   losses may include any of the following shown by the evidence.

12         1.  Medical expenses.  Medical expenses include the

13   reasonable expense of necessary medical care, hospitalization

14   and treatment received as a result of plaintiff's injuries to

15   date and the medical expenses plaintiff reasonably expected to

16   incur in the future reduced to present value."

17         Here there will be none.  Plaintiff presents no bills

18   for past medical treatment related to the mental health

19   injuries he claims were caused by Mr. Wisner.  Indeed, he has

20   no bills because he had sought no treatment for those claimed

21   emotional injuries.

22         Back to the instruction.

23         "2.  Economic loss.  Economic loss includes loss of

24   time or income and losses other than medical expenses incurred

25   as a result of plaintiff's injuries to date and the economic

16-2627 Leininger v USA et al   7.6.20 Vol. 1                36

1   loss plaintiff is reasonably expected to incur in the future

2   reduced to present value."

3          Here there is no claim for lost income or lost wages,

4   though plaintiff makes the unusual claim that he should be

5   awarded sufficient money to purchase a gold-plated health

6   insurance policy for the rest of his life, which I'll discuss

7   in a moment.

8          The instruction continues.

9          "Non-economic loss.  Non-economic loss includes pain,

10  suffering, disabilities, disfigurement and any accompanying

11  mental anguish suffered as a result of plaintiff's injuries to

12  date and the non-economic loss plaintiff is reasonably expected

13  to suffer in the future reduced to present value."

14         Here plaintiff will present some evidence of his pain

15  and suffering as a result of his encounters with Mr. Wisner.

16  But the instruction of the law goes on to state, "When

17  determining the amount of plaintiff's damages, you must

18  consider the plaintiff's age, condition of health before and

19  after the occurrence in question, and the nature, extent and

20  duration of the plaintiff's injuries."

21         Here the evidence will show that -- the following:

22  Plaintiff suffered from serious and permanent mental health

23  conditions prior to his contact with Mr. Wisner.

24         2.  That he was sufficiently untroubled by his

25  encounter with Mr. Wisner to ever complain about it to anyone

1    at the VA or anywhere else until after Wisner was caught.

2         3.   Plaintiff never sought active mental health

3    treatment for any of the problems that could have been caused

4    or exacerbated by his encounters with Mr. Wisner; and

5         4.   His objective medical records and examinations

6    indicate that his mental health condition appears to be better

7    today in 2020 than it was in the years before he ever

8    encountered Mr. Wisner in 2012.

9         The pattern instruction continues.

10        "You must itemize the amount of damages awarded in

11   this case on the verdict form."  The itemization of damages, in

12   particular future care damages, is particularly important in

13   this case because, in our post-trial briefs, we will ask that

14   any such award be placed into a U.S. grantor medical care

15   reversionary trust because of the uncertainty about whether

16   plaintiff needs or would obtain such care; that way the funds

17   will be preserved for the purpose of the medical care needed

18   for the injuries here.  But if those funds are not needed or

19   used, as plaintiff's medical history would indicate, they would

20   be returned to the United States.

21        We submit that the unusual request for an award of an

22   insurance policy is unwarranted, unnecessary and in violation

23   of the Supreme Court's admonition that the United States is not

24   to pay twice for plaintiff's damages in an FTCA action.

25   Plaintiff claims that private health insurance is needed

 1    because he is uncertain if he will return to the VA, any of the

 2    hundreds of VA medical centers around the country.  He -- he

 3    claims he will not return -- he may not return to any of them

 4    for his free medical care because doing so may be too

 5    emotionally traumatic for him.

 6            This claim is belied by the fact that plaintiff

 7    returned to the Eastern Kansas VA many times in the three years

 8    immediately after his encounters with Mr. Wisner from June 2014

 9    to June 2017, which included over 20 in person examinations,

10    and he did this without incident.  He -- he will -- the

11    evidence will show that he only stopped going to the VA in 2017

12    because, as he told his new private doctors, of this lawsuit.

13            Now, perhaps more importantly, plaintiff actually had

14    private health insurance both through the VA Choice Program and

15    through an employer from August 2016 to September 2018 and

16    still never sought treatment for his PTSD and related mental

17    health problems that he claims to have been exacerbated because

18    of Mr. Wisner despite his private doctors telling him to get

19    that treatment.  As I said, the -- some of that private

20    treatment was through the VA Choice Program.  So the plaintiff

21    knows how to access private medical care through the VA and its

22    Choice Program because he's done it.

23            Now, plaintiff explains his omission of ever getting

24    the mental health treatment that his lawyer claims he needs in

25    the two years that he had private health insurance because he

1    says he can't talk to private sector doctors about his PTSD

2    related problems because they are unfamiliar with the problems

3    of military veterans.  So, in asking for a private health

4    insurance policy for life, plaintiff's -- plaintiff is

5    requesting an extraordinary amount of damages that he doesn't

6    need and will not use.

7            So the triable issue here and now is damages, but for

8    some reason plaintiff's counsel wants to dump a mountain of

9    deposition transcripts and VA policies and other evidence on

10   the court that can have no relevance to the claims that remain

11   in the case.

12           After more than three years of discovery and two

13   thoughtful dispositive motion rulings by this court, the

14   plaintiff presents two claims here:  (1) medical malpractice,

15   negligence; and (2) outrage, intentional infliction of

16   emotional distress.

17           Plaintiff claims he needs to dump his discovery

18   mountain on the court for two reasons:  (1) to show

19   foreseeability to defeat the United States' scope of employment

20   defense; and (2) to prove up his outrage claim.  Neither claim

21   withstands scrutiny.

22           Foreseeability.  Plaintiff's counsel claims he needs

23   to present multiple deposition transcripts of VA employees to

24   show that they should have foreseen Mr. Wisner's misconduct.

25   That assertion misapprehends the scope of employment analysis

16-2627 Leininger v USA et al   7.6.20 Vol. 1          40

1    under Kansas law.  As noted previously, under the governing law

2    of this case, foreseeability is relevant to whether the

3    employee's misconduct at issue is foreseeable to the employer

4    from the nature and duties of the employment.  We have

5    stipulated that Wisner was hired as a PA.  His job duties

6    included providing genital exams, which are uncomfortable and

7    sensitive, and the VA did not require a chaperone to be in the

8    exam room when he was examining male patients.

9           What individual VA supervisors knew about Mr. Wisner's

10   prior conduct and/or what they should have done about it might

11   be relevant to a claim for negligent supervision.  However,

12   that claim has been firmly dismissed by this court for two

13   independent reasons.

14          As this court stated in its dispositive ruling dated

15   January 6th, 2020, "Plaintiff did not mention 'negligent

16   supervision' or any action or inaction of supervisors in its

17   administrative claim."  That's from page 9.  So there's no

18   claim in this case arising from anything that plaintiff's

19   supervisors did or failed to do.

20          Mr. Thomas seeks to present his mountain of evidence

21   in support of claims that are not in this case, in particular

22   claims against the VA for negligent hiring, negligent retention

23   and negligent supervision.  Those claims have all been

24   dismissed by this court.  They are not before the court.  There

25   is no claim against any VA supervisor or the VA generally for

1   its conduct in supervising Wisner.  The only liability here is

2   respondeat superior.  The United States may be liable only for

3   the conduct of Mr. Wisner.

4          Now, the other reason Mr. Thomas wants to dump this

5   evidence is to prove his intentional infliction of emotional

6   distress claim.  Now, the court has already ruled that the only

7   VA employee's conduct at issue in this case is that of

8   Mr. Wisner because that's the only employee mentioned in

9   plaintiff's administrative claim.  The United States has

10  stipulated that Mr. Wisner's assault happened, were intentional

11  and outrageous.

12         If the court finds from plaintiff's own testimony that

13  he has suffered the requisite severe emotional distress, then

14  the outrage claim would be established subject to the same

15  three technical FTCA defenses of statute of limitation, scope

16  and intentional battery to be briefed in post-trial motions.

17  No further evidence is necessary or relevant on that outrage

18  claim.  Indeed, the claim for outrage appears entirely

19  superfluous because all parties agree that what Mr. Wisner did

20  was outrageous and outside the bounds of civil society, which

21  is why he is in prison right now.

22         If the United States' defenses to the negligence claim

23  fail and the additional claim for outrage based on the same

24  conduct -- let me back up.

25         If the United States' defenses to the negligence claim

1   fail and the additional claim for outrage based on the same --

2   same conduct doesn't add anything to the damages, it is, in

3   fact, a redundant distraction.

4          Mr. Thomas will begin and end his presentation of

5   plaintiff's case in outrage, but that outrage gets us nowhere.

6   As I stated, the United States, the VA, and all of its

7   employees share his outrage at the conduct of Mr. Wisner.  That

8   outrage doesn't prove the claim.  It doesn't disprove the legal

9   defenses and it doesn't multiply the legal damages.

10         We look forward to presenting our defense case to the

11  court.  Thank you, Your Honor.

12      (End of previously filed excerpt.)

13         THE COURT:  All right.  Thank you very much,

14  Mr. Eiser.

15         Mr. Thomas, the plaintiff ready to call his first

16  witness?

17         MR. THOMAS:  I am, Your Honor.  We call Dr. Stephen

18  Peterson.

19         THE COURT:  All right.

20         MR. THOMAS:  If the court would give me a moment to

21  get my materials.

22         THE COURT:  Of course.  And I was just going to say to

23  counsel, I've got a picture shooting me and my presence in

24  here.  I don't have as much space as I have in the courtroom,

25  so at times I may appear to you to be off camera.  I've gone to

1    get something.  I am going to be here.  If you don't see my
2    image, don't give up on me.
3              MR. THOMAS:  Got you.
4              THE COURT:  All right.  Is Mr. Peterson in the room
5    where you're going to present his testimony?
6              MR. THOMAS:  He is.  You should be able to see him
7    now, Your Honor.
8              THE WITNESS:  Hello, Your Honor, it's Dr. Peterson.
9              THE COURT:  I can hear you but I can't see you.
10             MR. BRITTON MEHLISCH:  It says David Olsen.
11             MR. THOMAS:  Do you see somebody where it says David
12   Olsen, Your Honor?
13             THE COURT:  Let me work on my display here.
14             I've got it now.  Thank you very much.
15             Mr. Peterson, can I ask you to raise your right hand
16   to accept the oath from the deputy clerk.
17             THE WITNESS:  Yes, sir.
18                  STEPHEN E. PETERSON, M.D.,
19   called as a witness on behalf of the Plaintiff, having first
20   been duly sworn, testified as follows:
21             THE COURT:  All right.  Mr. Thomas, before you start,
22   let me just step off camera for a second and retrieve something
23   I'll need.  All right.  Mr. Thomas, I'm back; you may proceed
24   when ready.
25             MR. THOMAS:  May it please the court.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    44

```
 1            THE COURT:  Counsel.
 2                      DIRECT EXAMINATION
 3  BY MR. THOMAS:
 4  Q.   Doctor, can you please introduce yourself.
 5  A.   I'm Stephen Eugene Peterson.
 6  Q.   And are you a doctor?
 7  A.   Yes, sir, I'm a medical doctor.  I practice general,
 8  adolescent, and forensic psychiatry.
 9  Q.   I'm going to hand you what has been marked as Exhibit 157-B
10  as in bravo.
11  A.   Thank you.
12  Q.   Is this a copy of your curriculum vitae?
13  A.   Yes, sir.
14  Q.   First of all, let's -- let's go over your undergraduate
15  work.  Where did you go to undergraduate?
16  A.   I went to the University of California, Santa Barbara.
17  Graduated in 1979 with a bachelor's degree in cell biology and
18  cell physiology.
19  Q.   And then did you go to graduate school?
20  A.   Yes.  I went to the St. Louis University, Department of
21  Cellular and Molecular Biology, where I did graduate work on
22  photosynthetic bacteria until 1982.
23  Q.   And then did you go to medical school?
24  A.   Yes, sir, at St. Louis University Medical School.  I
25  graduated in 1986 with a medical degree.
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1                45

1   Q.   What was your class rank?

2   A.   I don't know.  I was in the top third but I don't know the

3   rank.

4   Q.   All right.  After graduating, did you do an internship in

5   medicine?

6   A.   I started a four-year general psychiatry residency training

7   program at the Menninger Clinic in Topeka, Kansas, and the

8   first year is an internship year with tasks in internal

9   medicine, neurology, psychiatry, and substance abuse.

10  Q.   And what is the Menninger School of Psychiatry?

11  A.   The Menninger Clinic is a -- was a free-standing

12  psychiatric residency training program and hospital in Topeka,

13  Kansas.  Started in the 1940s after World War II under a

14  request by the Department of Defense to be able to take care of

15  returning veterans from World War II.

16  Q.   And did you also do a residency there?

17  A.   Yes, the last three years of the four years was a general

18  psychiatric residency training.

19  Q.   Now, did you also do a fellowship?

20  A.   Yes.

21  Q.   Where was your fellowship done?

22  A.   My fellowship was at the Menninger Clinic in the Department

23  of Law and Psychiatry, a one-year didactic and experiential and

24  treatment/evaluation set of responsibilities.

25  Q.   Do you have any board certifications?

16-2627 Leininger v USA et al   7.6.20 Vol. 1                 46

1    A.  I am board certified in general psychiatry, which I have

2    been since 1992.  I also had the American Academy of -- pardon

3    me -- American Board of Psychiatry and Neurology added

4    qualifications in forensic psychiatry.  I passed that exam in

5    1994 and then in 2003 exam.

6    Q.  Now, I noticed, on your resume, it says you are -- is it

7    diplomate -- diplomate of the National Board of Medical

8    Examiners?

9    A.  Yes.

10   Q.  What is that?

11   A.  That means I passed the -- sort of the exit exam from

12   medical school showing that I had adequate knowledge to

13   function as a physician.

14   Q.  Have you ever served as a board examiner yourself?

15   A.  Yes, many times.

16   Q.  How many years have you been doing that?

17   A.  I haven't done it for 10 or 15 years, but I did it three or

18   four years and running.  I did that at -- I think in Austin and

19   then also in Kansas City.

20   Q.  Okay.  Now, your licensure, are you licensed in the state

21   of Kansas?

22   A.  Yes.

23   Q.  Okay.  What about -- and what is your license for in

24   Kansas?

25   A.  It's for medicine and surgery.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    47

1    Q.   And are you licensed in the state of Missouri?

2    A.   Yes.

3    Q.   And what is your licensure there?

4    A.   Same thing.

5    Q.   Okay.  Are you licensed to dispense controlled substances

6    by the U.S. Department of Justice drug enforcement agency?

7    A.   Yes.

8    Q.   Have you ever given any lectures that would be germane to

9    the issues in this case?

10   A.   Yes.

11   Q.   What lectures have you given?

12   A.   Well --

13   Q.   Or to whom?

14   A.   I mean, let's see, over the years I've lectured to the

15   Washburn Law School on evidence standards.  I also lectured at

16   the United States Medical Center for Federal Prisoners on PTSD

17   and difficult to treat patient populations.  I've lectured at

18   the Larned State Security Hospital in Larned, Kansas on

19   treatment topics such as use of lithium.  I've lectured at the

20   American Academy of Psychiatry and Law on posttraumatic stress

21   disorder and traumatic brain injury in veterans.  I don't know

22   if I said this.  But I've also lectured at the Missouri Defense

23   College on PTSD and veterans to the Defense College here in

24   Missouri.  That's all that come to mind.

25   Q.   That's fine.

1          MR. THOMAS:  Counsel --

2          MR. EISER:  Your Honor, I apologize to interrupt, but

3    it appears that the witness is reading from a document.  Could

4    we be told what that is and if he has -- what documents he has

5    in front of them.

6          MR. THOMAS:  Yes.

7          THE COURT:  Is there?  I --

8          MR. THOMAS:  I'm sorry, Your Honor, yes.  I identified

9    for the record 157B, as in bravo.  We provided it to opposing

10   counsel.  We didn't publish it because it's multiple pages.

11   It's his CV.

12         MR. EISER:  Okay.  I understand that.  But for the

13   record of the trial, there's -- there needs to be a record that

14   he's reading from something.

15         THE COURT:  Well, you can ask that during

16   cross-examination.  I don't think it's appropriate for me to

17   comment on at this stage.

18         MR. EISER:  Thank you, Your Honor.

19         MR. THOMAS:  All right.

20   BY MR. THOMAS:

21   Q.  Do you have a question, sir?

22   A.  I'm actually not reading.  I'm not quite sure where to

23   look, to you or the camera, and this is my CV, which my hands

24   are folded on top of it.  I'll move it off to the side.

25   Q.  Understood.  Sorry about the interruption.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    49

1        In addition to your work at the Menard (sic) Clinic for all

2    those years, did you have any veteran specific training?

3    A.   Yes.

4    Q.   Can you explain that, please.

5    A.   Sure.  I -- when I trained at the Menninger Clinic, the

6    Topeka VA, which is the Colmery O'Neil Medical Center, is a

7    medical center for treating -- evaluating and treating Vietnam

8    era veterans, I did outpatient therapy, inpatient therapy and

9    individually, as well as inpatient treatment of Vietnam era

10   veterans as well as basically every war except for World War I,

11   because there weren't very many veterans around at that time

12   from that war.

13       I also had specific training on wartime PTSD as part of my

14   training at the Menninger Clinic.  At one point, the Menninger

15   Clinic -- because of their Department of Defense initiative,

16   actually trained five percent of all the psychiatrists in the

17   United States and they had a strong presence at the VA.

18   Q.   At the time was there a preeminent clinic in the country

19   for treating Vietnam veterans with post-war PTSD?

20   A.   Well, I mean, I wouldn't say that I know where the

21   preeminent clinic is, but the Menninger Clinic was one of the

22   areas for excellence in treating PTSD in Vietnam veterans,

23   including that the -- during my second or third year, there

24   were Israeli Defense Force psychiatrists who came over to

25   observe and learn from the techniques used and actually better

16-2627 Leininger v USA et al   7.6.20 Vol. 1

1    some of the techniques that we used at the hospital at the

2    time.

3    Q.   And did you say that you have evaluated combat veterans

4    from every major conflict going back except for World War I?

5    A.   Yes.

6    Q.   Now, did you already talk about your work with the Kansas

7    Department of Corrections?

8    A.   No.

9    Q.   All right.  Can you explain what you did there.

10   A.   Sure.  Well, I was a fellow -- actually, well, I was a

11   resident at the Menninger Clinic.  I was -- I worked as a

12   moonlighter at the Kansas Department of Corrections in the

13   Reception and Diagnostic Center, which my job was to provide

14   for dispositional assessments with a psychologist and a social

15   worker on appropriate treatment interventions, educational

16   interventions and vocational interventions for newly convicted

17   persons.

18   Q.   Did you also do something similar to that over in

19   Springfield, Missouri?

20   A.   Yes, that was part of my fellowship.  I valuated a

21   difficult to treat patient -- patients there as well as

22   pretrial evaluees.  Did that for a number of -- probably two or

23   three years.

24   Q.   Do you remember -- did you do work for the Larned State

25   Security Hospital?

16-2627 Leininger v USA et al   7.6.20 Vol. 1            51

1   A.   Yes.

2   Q.   And that's here in Kansas?

3   A.   Yes.

4   Q.   Can you, please, explain the work you did for Larned State

5   Security Hospital?

6   A.   Sure.   There are two parts to my work there and they were

7   both related to the Law and Psychiatry Department at the

8   Menninger Clinic.  First, when I was a resident, I would travel

9   to Larned State Security Hospital with Dr. Walter Menninger to

10  do treatment consultations for their difficult to treat

11  patients.  And then, when I was a fellow, I would go on my own

12  and evaluate a person they were having difficulty, diagnostic

13  or treatment problems, and that was at the Security Hospital,

14  the Juvenile Inpatient Unit and the treatment hospital.

15  Q.   Now, did you also do -- do you also do work for the Topeka

16  Police Department?

17  A.   Not any more.  I did when I was a fellow.

18  Q.   What did you do for Topeka Police Department?

19  A.   I was the consultant to the police department for officer

20  difficulties, for pre-employment evaluations for suitability to

21  be a police officer; that included individual interviews,

22  psychological testing, and review of their application file.  I

23  also participated in post-incident debriefing such as after

24  officer-involved shootings, and a few times I was involved with

25  the Street Crimes Unit planning how to approach teenagers, as

1    well as I participated in SWAT team negotiations as a

2    consultant on the SWAT team.

3    Q.   Let's change gears for a minute.  Can you tell us --

4         You're a clinical psychiatrist but you're also a forensic

5    psychiatrist; correct?

6    A.   Yes.  That's an interesting separation that attorneys

7    always deal with, yeah.

8    Q.   Okay.  Well, we'll come back to clinical, but what is

9    forensic psychiatry?

10   A.   Forensic psychiatry is the subspecialty of general

11   psychiatry that focuses on evaluating and treating people who

12   are involved in the court system, whether it's a federal court,

13   state court, juvenile justice, criminal, and civil worker's

14   compensation and also in the Second Injury Fund as well as

15   Board of Healing Arts cases and in military cases periodically.

16   Q.   In the work comp setting, what are you -- what is your --

17   what are you typically asked to examine?

18   A.   Well, there I'm usually asked to examine whether or not the

19   person was injured at -- at work and what elements would -- a

20   treatment would help restore them to work capacity; and if not

21   full work capacity, what kind of adaptive work they could do

22   and what treatment might be required to do that, both for

23   plaintiff and defense, and several times I've been asked by the

24   court to be the treater.

25   Q.   Courts have appointed you to be treaters?

1    A.   Yes.

2    Q.   What about -- did you mention the Board of Healing Arts?

3    A.   Yes, sir.

4    Q.   What work do you do for the Board of Healing Arts?

5    A.   Well, I haven't done that for a while, probably more than

6    10 years.  But I used to do evaluations of physician's conduct

7    to determine whether their clinical treatment met the

8    appropriate standard of care for their particular state.  I did

9    those both for the Missouri Board of Healing Arts and Kansas

10   Board of Healing Arts.

11   Q.   In the criminal capacity, what kind of evaluations are you

12   asked to provide?

13   A.   Over my career, I've been asked to provide evaluations of a

14   defendant's capacity to make a knowing, voluntarily and

15   intelligent Miranda, competency to stand trial, criminal

16   responsibility such as, you know, full criminal responsibility

17   in his capacity, not guilty by reason of insanity, also

18   mitigation and aggravation assessments, as well as determining

19   whether someone is still a -- is a sexually violent predator

20   under the Kansas and Missouri statutes.

21        The range of cases I've done -- I guess the last element is

22   in the juvenile justice cases I've done over the last 10 or

23   15 years, they have almost always been about either

24   certification of the juvenile into the court of general laws or

25   return of the child to the juvenile court system.  Almost all

1    those cases were either a -- homicide cases or sexual homicide

2    cases.

3    Q.   Now, have you also been asked to participate in military

4    courts?

5    A.   Yes, occasionally.

6    Q.   And what's -- what capacity?

7    A.   Usually those were conduct of an officer towards an

8    enlisted person or an enlisted person's family member related

9    to sexual.

10   Q.   So, if you can, just briefly explain to the court what the

11   difference is between general psychiatry, or what I call

12   clinical psychiatry, versus forensic psychiatry?

13   A.   Sure.  I'll be happy to do that succinctly as possible.

14   There is a difference between what you're calling clinical

15   psychiatry and forensic psychiatry.

16        In clinical psychiatry, usually the psychiatrist is tasked

17   with alleviating the person's suffering through medicines or

18   therapy or hospitalization and utilization of other treatment

19   modalities.  Often there is not a major concern about causation

20   for some of the difficulties the person might be having, so --

21   with better psychiatrists that is the case.  So the clinical

22   approach is for alleviating suffering and improving

23   functioning.

24        The difference between that and forensic psychiatry is that

25   forensic psychiatry is actually clinical psychiatry focused on

1    answering a question that comes before a court or a judicial

2    body.  For example, in competency to stand trial, a -- a

3    defense attorney or a prosecuting attorney will want to know

4    whether the person has a mental disease or defect, which is

5    what you might think of as a relevant clinical element such as

6    severe psychosis or depression.  But the secondary question is,

7    as a consequence of that mental defect, does the person have

8    the capacity to participate in preparing their defense.  That's

9    where it's a question.  So it's focused on answering some --

10   something for the court.

11        In my practice, the -- I would clarify that it is what's

12   called clinical forensic psychiatry in that the sharp line is

13   about who the question is being answered for, not that one is

14   clinical and one is not.  It is the application of time-honored

15   medical principles of valid psychiatric record review, valid

16   psychological and psychiatric evaluation, usage of tests or

17   collateral sources or collateral experts coming up with an

18   appropriate diagnosis and then answering the question before

19   the court.

20   Q.   Thank you.

21        As a forensic psychiatrist, who typically hires you?

22   A.   I've been hired by defense attorneys, prosecuting

23   attorneys, plaintiff's experts, defense experts, magistrates in

24   the federal court, insurance companies, Board of Healing Arts,

25   juvenile justice, both juvenile attorneys and prosecuting

1   attorneys, pretty much every possible -- that sounds weird,

2   that sounds like too much to say, but quite a variety of

3   persons have hired me over the years.

4   Q.   Now, do you also -- and I alluded to this earlier, do you

5   also currently have a clinical practice or a general psychiatry

6   practice?

7   A.   Yes.   For your artificial separation, yes, I have -- I

8   evaluate and treat people in my office who have no involvement

9   in the court system.   These are people who have either been

10  referred to me by other patients or have called me directly or

11  I have been referred by family members.

12  Q.   Is it common for forensic psychiatrists to still do general

13  psychiatry in this day and age?

14  A.   I don't know what's common.   I mean, I -- I know that my

15  training is in psychotherapy and medications and psychodynamic

16  understanding of human behavior, and so I do both.   I think

17  having both skills enhances my ability for whether the court is

18  the ultimate focus of the question or treatment --

19  Q.   Now --

20  A.   -- separate from the court.

21  Q.   And I guess I'll just be more blunt.   Isn't it true most

22  general psychiatrists don't carry a general practice anymore?

23  A.   I know a very -- I know a lot do not.   I would say the more

24  -- the more interesting comment is that most psychiatrists do

25  not do psychotherapy anymore, that is relegated to

1   psychologists and social workers mainly because insurance

2   companies don't pay for it.  And many psychiatrists are not --

3   do not receive any psychotherapy training in their residency

4   training program; whereas, at the Menninger, we had four years

5   of intensive psychotherapy training.

6   Q.   And you still do psychotherapy?

7   A.   Yes.

8   Q.   Now, when you're asked to evaluate cases from a forensic

9   aspect, is it true that you get hired more by defendants than

10  prosecutors?

11  A.   Yes, but I do get hired by some prosecutors.

12  Q.   Right.  And you still do cases for prosecutors on the

13  Missouri and Kansas side; is that correct?

14  A.   Yes, sir.

15  Q.   Okay.  Now, in addition to the experience that we've talked

16  about with all these other -- with Menninger and Larned and the

17  VA in Topeka, do you also do work for National Security

18  Psychological Service?

19  A.   Yes.

20  Q.   Explain that please.

21  A.   National Security Psychological Service is a company based

22  in Albuquerque, New Mexico.  We are tasked with evaluating

23  persons who are trying to obtain clearance or who have had a

24  problem with their clearance.  Our job is to evaluate their

25  suitability to retain the clearance from the psychiatric

16-2627 Leininger v USA et al   7.6.20 Vol. 1          58

1   standpoint.  That final decision is with the U.S. Department of

2   Energy, obviously, but I do that -- I evaluate persons who are

3   employed at the National Nuclear Security Administration campus

4   in Belton, Missouri.  The company, National Security

5   Psychological Services, is a contractor to the U.S. Department

6   of Energy and -- and all the people that we have -- I evaluate,

7   anyway, are at the National Security campus.

8   Q.  And when you say "security," you're actually evaluating

9   these high-level government officials to determine whether or

10  not from a psychological perspective they're fit to have

11  security clearances; is that right?

12  A.  Well, I don't know that they're all high-level officials.

13  Q.  Sure.

14  A.  People who work at the plant doing important elements for

15  the Department of Energy, and so their judgment and reliability

16  is very important.

17  Q.  Now, you've done this work directly as a contractor for the

18  Department of Energy; is that correct?

19  A.  Yes.  In 2005 through about 2007, I was a direct contractor

20  to the U.S. Department of Energy when their facility was in a

21  different place.  And then, starting in 2013, I was again asked

22  to -- I was hired by National Security Psychological Services

23  to resume that work.

24  Q.  The U.S. Department of Energy trusts your clinical

25  assessments; true?

16-2627 Leininger v USA et al   7.6.20 Vol. 1          59

1    A.  Again, that sounds very self-aggrandizing.  These

2    evaluations are very important and they are scrutinized by the

3    U.S. Department of Energy.  So they do rely on the medical

4    opinion, although we're not the final arbiter of that:  that's

5    a decision made by the Department of Energy.

6    Q.  Thank you.

7        Now, in your 33 years of clinical experience, have you

8    evaluated and treated people who have been sexually or

9    physically abused?

10   A.  Yes.

11   Q.  Have you treated people who have suffered PTSD as a result

12   of sexual or physical abuse?

13   A.  Yes.

14        MR. EISER:  Objection, Your Honor.  I don't want to

15   interrupt, but that's about eight leading questions in a row.

16   So the basis of the objection is leading.

17        THE COURT:  I'm overruling the last objection.  Indeed

18   it asked have you treated.  That's a question that does not

19   direct or suggest an answer, so your objection's overruled.

20        MR. EISER:  Thank you, Your Honor.

21        MR. THOMAS:  And I believe he already answered; is

22   that correct?

23        THE COURT:  The answer is -- was taken by the court

24   reporter.

25        MR. THOMAS:  Okay.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    60

BY MR. THOMAS:

Q.   In treating victims of sexual abuse, do you treat one
gender more than the other?

A.   I tend to treat more women than men, but I have both adult
men and adult women in my case load.

Q.   Do you have -- in treating patients who are claiming PTSD
as a result of sexual abuse, have you come across patients who
may be fabricating symptoms?

A.   Yes, I have.

Q.   Explain that please.

     Well, explain:  Are there things that you have to do as a
psychiatrist to discern whether or not a patient's purported
presentation of PTSD is genuine or not?

A.   Yes.

Q.   Explain that, please.

A.   Well, let's see, PTSD has a specific set of criteria, and
some of them are very widely published and very readily
accessible to anyone who wants to look on the Internet or in
the diagnostic and statistics manual for psychiatry.

     The process of determining whether somebody's claim of PTSD
includes a number of factors.  The first one is viewing the
person's claims in a time frame of before, during and after the
event, meaning, in other words, there are people who claim
severe psychiatric problems that start the instant something
happened, but close review of their records and functioning

1    shows that they had problems -- substantial psychiatric

2    problems before that that might cloud the presentation.

3         In the evaluation process, the "before" is the context of

4    the person's prior psychiatric functioning.  The "during" is

5    what was alleged to have occurred.  And the "after" is what the

6    person claims the consequences are.  All of these can be

7    evaluated with various techniques, including, when someone is

8    very distressed or appears very distressed, there are

9    evaluation techniques as well as psychiatric -- psychological

10   tests that can help discern whether the person's assertions are

11   false, overexaggerated, or minimized and defensive that they're

12   underreporting their difficulty; in other words, each one of

13   these assessments is evaluated on individual merits.  I could

14   go into detail.

15   Q.  So I just want to ask:  Whenever you're asked to treat a

16   patient who purports to have PTSD secondary to sexual abuse,

17   are you -- are you always on the lookout for typical versus

18   atypical presentations?

19             MR. EISER:  Objection.  Leading.

20             THE COURT:  Sustained.  You can rephrase the question.

21             MR. THOMAS:  Thank you, Your Honor.

22   BY MR. THOMAS:

23   Q.  When you're treating patients with purported PTSD secondary

24   to sexual abuse, are there -- do you take into account -- are

25   there things that you take into account to determine the

1    veracity of that complaint?

2    A.   Yes.

3    Q.   Okay.  And do you do that with every complaint?

4    A.   Yes.

5    Q.   And do you do that in the cases where you're hired as a

6    forensic expert?

7    A.   Yes.

8    Q.   Now --

9    A.   Even as a clinical expert, since you're making an

10   artificial distinction, like I said, before, during and after

11   time frames are very important to discern.  Because a patient

12   can claim many difficulties for which, on close questioning,

13   there is -- or is either a substantial basis, or whether or not

14   they are typical or atypical reporter, as well as times when

15   they're making things up entirely and what they claim never

16   happened.

17   Q.   Are you familiar with the concept of mentor abuse?

18   A.   Yes.

19   Q.   Have you done any work in cases involving allegations of

20   mentor abuse?

21   A.   Yes.

22   Q.   How many patients have you examined in cases involving

23   allegations of mentor abuse?

24   A.   Patients isn't probably the right word.  It would be

25   evaluees and patients together.  I have evaluated -- since

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    63

1    2003, I've evaluated more than 200 persons who alleged mentor

2    abuse, whether it's a teacher or a coach or a Boy Scout leader

3    or a Girl Scout leader, a physician, a minister or priest or a

4    pastor of some kind.

5    Q.   When you're hired on these cases, do you just do one side?

6    A.   No.

7    Q.   Do you do work for both sides?

8    A.   Yes.

9    Q.   Have you been the expert witness on some significant mentor

10   abuse cases in the Midwest?

11   A.   Again, I don't know the word significant.  I certainly have

12   been -- have been involved in some cases I know one of which

13   went to the Supreme Court in Illinois.

14   Q.   Some time over the past week, you told me that you

15   approached all of these mentor abuse cases with a clean slate?

16   Do you remember that?

17   A.   Yes.

18   Q.   What did you mean by that?

19   A.   I mean that's my job as a forensic evaluator.  And so, when

20   an attorney calls me to evaluate a claim, I am happy to hear

21   what the attorney has to tell me about their position, but I do

22   an independent assessment of the person's claim using prior

23   treatment records, current treatment, in-depth psychiatric

24   interview, face-to-face mental status examination and sometimes

25   collateral interviews and often psychological tests.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    64

1    Q.  In all the years you've been doing this work, do you

2    advertise your services?

3    A.  No.  I think we have a -- we had a yellow pages listing

4    when we were at Logan and Peterson, which is technically

5    advertising; but, no, we don't advertise.

6    Q.  How do people find out about you?

7    A.  I believe by word of mouth.

8              MR. THOMAS:  Your Honor, I'm not sure what time you

9    said for break, and I'm not keeping track of time, but I'm

10   getting ready to start a new line of questioning.  And if this

11   is a good time, great.  If not, I'll keep moving forward.

12             THE COURT:  This is a good time.  It's approximately

13   halfway through and I suppose everybody could, including the

14   court reporter, could use a few minutes to refresh their minds.

15   It's a few minutes until the hour.  We'll go into the top of

16   the hour and we'll go until our luncheon recess.  All right.

17   See you in a few minutes, counsel.  All right.

18        (Recess.)

19             THE COURT:  All right.  Counsel, back in position

20   after a short break.  I just want to do something I neglected

21   to do this morning, actually two things.  First of all, just so

22   the record is clear, this is a trial that is being presented by

23   rather unconventional means and that counsel have agreed before

24   the trial started to proceed by Zoom teleconference --

25   tele-videoconference, I guess I should say, in recognition of

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    65

1   the limitations that have been imposed by the pandemic in so

2   many factors in our mode of living.

3           And so by agreement counsel are appearing from in or

4   near their office locations.  I am in the courthouse.  The

5   court reporter is preparing a transcript.  She is also

6   displayed on the video that's visible to everyone.  And the

7   video technique I think, as now is known widely, does allow

8   participants to see other participants during a hearing.

9           I do want to come back to the second thing that was

10  there was a bit of a discussion on Friday during -- or Thursday

11  -- Friday -- last Thursday, I should say, before the July 4th

12  holiday about permitting defendant's experts to, in a sense,

13  except them from the Rule 615 exclusion.  I told you I thought

14  they would be permitted -- or they were permitted, and I guess

15  I just want to return to that.

16          The standard, Mr. Eiser, appears to be a showing that

17  having the rebuttal -- a rebuttal expert listen to the witness

18  is essential to the party's defense, and I just wanted to hear

19  from you.  I think this is something you addressed in part last

20  week, but I do want to hear from you why you believe that is

21  so.  And if you're not prepared to take this up, I didn't warn

22  you before the recess, we can return to it.

23          MR. EISER:  No, I am ready, Your Honor, and I

24  appreciate it, and I wanted to let you know during the break I

25  was communicating with Dr. Abrams, who's the defense

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    66

1    psychologist, and he's connected.  His microphone and camera

2    are disabled as the court instructed, but I just wanted to let

3    you know that.  We'll disconnect them if you don't want them

4    to.

5          We think it's essential in this case because the

6    plaintiff has told several different versions of material facts

7    here regarding what happened to him and his encounters with

8    Mr. Wisner and what he knew.  I'm surprised Dr. Peterson is

9    testifying before the plaintiff because I -- I wouldn't be sure

10   how the plaintiff is going to -- what set of facts he's going

11   to put forward in his testimony.  He gave us three under oath

12   at his deposition.

13         So, but aside from that, that's the main reason we

14   want Dr. Abrams to be able to observe Dr. Peterson's testimony,

15   to be able to adequately rebut it whatever direction we're

16   going to go with this.

17         THE COURT:  Mr. Thomas, you oppose this measure.  Do

18   you want to briefly be heard on the reasons you oppose?

19         MR. THOMAS:  I do, Your Honor.  Number one, we're

20   calling Dr. Peterson first because, as I explained in my prior

21   pleading with the court, we would have to call witnesses out of

22   time if we chose this trial date, and this is just the time

23   that worked for Dr. Peterson because normally, you're right, I

24   wouldn't be calling him first.

25         I haven't heard any argument that says it's essential.

1    What I've heard is they want him to and they would like him to.

2    And the standard is it must be essential and there hasn't been

3    any argument.

4              To say that the plaintiff has given inconsistent

5    testimony, I haven't heard of inconsistent testimony and I

6    haven't been presented any.  But that doesn't make it essential

7    that Dr. Abrams listen to Dr. Peterson's testimony, and that's

8    the only thing they offered.  It's not essential.  They just

9    want to do it because he's an expert whose sole purpose is to

10   try to poke holes in Dr. Peterson's testimony.

11             THE COURT:  All right.  I think I understand your

12   argument.  Here's my ruling:

13             First of all, the circuit has recognized for a long

14   time that exceptions from the exclusion are something that is

15   committed to the discretion of the trial court.  I've concluded

16   that the defendant has made a sufficient showing that allowing

17   experts to listen to, if you will, their counterpart on the

18   other side of the caption not only is essential to a case -- to

19   their case but is essential to the presentation of an efficient

20   trial in this case, and so I'm going to overrule the objection.

21             This will be subject to the goose and gander rule,

22   Mr. Thomas.  So that I think it's also within my discretion

23   that, based upon the defendant's asking for their expert to

24   listen, that the plaintiff's experts will have the same access

25   and be able to listen to other witnesses.  I would emphasize

 1   that this is -- this ruling is confined to the disclosed

 2   designated expert witnesses only.  Everyone clear on that?

 3            MR. EISER:  Yes, Your Honor.

 4            MR. THOMAS:  Yes.

 5            THE COURT:  All right.  With those, we're ready to

 6   resume the testimony.  And, Mr. Thomas, if you're ready to

 7   resume your direct examination.

 8            MR. THOMAS:  Thank you, Your Honor.

 9   BY MR. THOMAS:

10   Q.  Dr. Peterson, I'd like to switch gears now and talk about

11   the case of Aaron Leininger.  You were asked to conduct a

12   forensic psychiatric evaluation of Aaron Leininger; is that

13   correct?

14   A.  Yes.

15   Q.  And did you meet with him for that purpose?

16   A.  Yes.

17   Q.  And following your evaluation, did you prepare a report?

18   A.  Yes.

19   Q.  I would like to hand you what has been marked as

20   Exhibit 154.  Is this a copy of your report?

21   A.  Yes, it is.

22   Q.  Okay.  I've handed it to you, so feel free to consult with

23   it when answering my questions about the evaluation.  Okay?

24   A.  Yes, sir.

25   Q.  In general, can you please describe --

```
 1          MR. EISER:  Your Honor --
 2   BY MR. THOMAS:
 3   Q.   -- what it looks like?
 4          MR. EISER:  Your Honor, I'm sorry, I need to object to
 5   that instruction.  If he's going to read from a document, it
 6   needs to be in evidence.  He's not offered it into evidence, so
 7   I'm -- I'm -- he's not exhausted his memory.  I'm not sure how
 8   you can put a document in front of someone.
 9          THE COURT:  I'm going to overrule the objection.  I
10   did not hear Mr. Thomas ask the witness to read from it.  I
11   asked him -- I heard him ask that he may refer to it, both for
12   terms of efficiency and reminding him of things, and so he's
13   not -- does not appear to me that he's going to be reading from
14   the report.  Your objection's overruled.
15          MR. EISER:  Thank you, Your Honor.
16   BY MR. THOMAS:
17   Q.   Could you just describe in a nutshell what the process of
18   this evaluation in a case like this looks like.
19   A.   The process you called me to evaluate Mr. Leininger, for --
20   there were two questions that are a part of that evaluation:
21   One, did he have posttraumatic stress disorder; and, two, was
22   that posttraumatic stress disorder worsened or changed as a
23   consequence of Mr. Wisner's actions, if at all.
24   Q.   And was there another part to that question if there was
25   exacerbated PTSD?
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1          70

1    A.   Yes, the second part of the question is if there was

2    exacerbated PTSD, what sorts of treatment would I recommend to

3    correct that injury.

4    Q.   In -- in performing this analysis, do you review records?

5    A.   Yes.

6    Q.   What records did you review in this case?

7    A.   I reviewed records related to the legal discovery for

8    Mr. Leininger.  I also reviewed VA Medical Center records and

9    some of the correspondence related to the -- to the Office of

10   Inspector General reports and letters to Mr. Leininger.  I also

11   -- I did things in preparation for psychiatrically evaluating

12   Mr. Leininger.

13   Q.   Does your process include a face-to-face interview?

14   A.   Yes.

15   Q.   Did it include -- include administering psychological

16   tests?

17   A.   Yes.

18   Q.   Did it include reaching a diagnostic formulation?

19   A.   Yes.

20   Q.   Now, you told me at one point your interview is kind of a

21   four-part thing.  You know what I'm talking about?

22        Well, let me ask you this:  How many parts are there to

23   your evaluation?

24   A.   Well, it depends on the case.  In this -- in this

25   particular case, there's record review; there's a face-to-face;

1    background interview informed by the prior medical treatment

2    and the discovery; then there is mental status examination

3    which is like a quick assessment of a person's general mental

4    functioning; then there is psychological testing if that's

5    warranted.  That information's all put together.  And as part

6    of the -- I guess, the last element is discussion of the claims

7    that the person makes.

8         Then there is a diagnostic formula.  I created a diagnostic

9    formulation and I give an opinion about whether I think the

10   claims are warranted or not from a psychiatric standpoint.  And

11   if I think they -- it's my opinion I think they are warranted,

12   then I provide a treatment recommendation.

13   Q.   In terms of his background history, did you ask questions

14   about his military experience?

15   A.   Yes.

16   Q.   And what did you learn?

17   A.   I learned that Mr. Leininger served the United States

18   infantry from 1988 through 1991 in Iraq and Kuwait.  He was

19   part of Desert Storm, before that Desert Shield and then part

20   of Desert Storm.  He has substantial combat experience that

21   included being in the line of fire as well as observing his

22   fellow soldiers shoot a 25-millimeter canon or maybe a

23   30-millimeter canon at a father and daughter and kill them in a

24   way that he was helpless to stop, and he was very distraught

25   about that; and then last, that he was -- as part of his

1    duties, he was -- he had been a tow truck gunner, which is a

2    particular kind of missile.  But he also worked for mortuary

3    affairs where his job was to pick up and remove and identify

4    and classify dead Iraqi soldiers and some civilians as well as

5    U.S. soldiers.

6    Q.  Let me stop you there.  This mortuary job, there's a name

7    for it, grave men or something like that.  Do you remember?

8    A.  Well, in World War II, it was called grave registration.

9    Q.  That's it.

10   A.  And subsequently changed the title.  It involves everything

11   from -- from collecting and identifying human remains, even if

12   they are badly burned or exploded, identifying those persons,

13   cleaning vehicles of, especially U.S. servicemen, remains, and

14   then also preparing personal effects to send back to the

15   family.  It's an extremely important and one of the most

16   difficult duties for an infantry man.

17   Q.  Do you have experience in working with veterans who did

18   grave registration in prior wars?

19   A.  Yes, from World War II when I was at the VA in Topeka.

20   Q.  Do you have experience with veterans who suffered PTSD as a

21   result of that job alone?

22   A.  Yes.

23   Q.  And explain that to the court if you would.

24   A.  Well, I'm not sure I can give a flavor of the emotional

25   tone, but this is -- can be a very gruesome task of, you know,

16-2627 Leininger v USA et al   7.6.20 Vol. 1                73

1    cleaning vehicles of burned, or partially burned or injured,

2    but destroyed tissue of American soldiers.  And especially if

3    the soldiers are combatants that person knows, that makes it

4    even more personal and a very -- it's a very mode of response

5    even when someone steels themselves to do the job for their

6    fellow combatants.  It's not a common experience for people to

7    collect and scrape and remove human remains from a -- blasted

8    vehicles.  This is a -- this is a -- especially for infantrymen

9    who really have no training in mortuary science or medical

10   examination or physician or doctor or nurse or any kind of

11   training.

12   Q.  Do the records reflect that Aaron Leininger had trauma

13   associated with being shot at and returning fire --

14   A.  Yes.

15   Q.  -- in Iraq?

16   A.  Sorry.  Yes.

17   Q.  Did the records reflect that Aaron Leininger had trauma as

18   a result of watching his unit kill a little girl and her

19   father?

20   A.  Yes.

21   Q.  Do the records reflect that Aaron Leininger had trauma as a

22   result of his mortuary duties?

23   A.  Yes.

24   Q.  Do you know what a comp and pen exam is?

25   A.  Yes.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                74

1    Q.   What is a comp and pen examination?

2    A.   Compensation and pension examination is an examination that

3    has the VA determine whether a person, a veteran, has

4    experienced compensable physical or emotional injuries as a

5    consequence of a military service.

6    Q.   In preparing your analysis in this case, did you review any

7    comp and pen exams as it relates to Aaron Leininger?

8    A.   Yes.

9    Q.   And did those comp and pen exams demonstrate his medical

10   history?

11   A.   Yes.

12   Q.   Did it demonstrate his psychological history?

13   A.   Yes.

14   Q.   And did they demonstrate his service history?

15   A.   Yes.

16            MR. EISER:  Objection.  Leading and again -- again,

17   we're -- I don't understand why we're leading or just saying

18   what's in the records rather than just introduce the record and

19   then he can speak about what's in it.  But to do it this way,

20   we're putting this document back here and saying is this in it,

21   is that in it.  It has to be in evidence before he starts

22   talking about what's in it.

23            THE COURT:  Well, I'm going to overrule the objection.

24   Certainly, on topics that matter, there should not be a leading

25   examination.  I took what the questions were to be sort of in

1   the nature of table setting for direct questions to come.

2         The fact that something is recorded elsewhere in a

3   report or in some other document does not require that the

4   proponent put the exhibit in first.  The witness can testify

5   from his personal knowledge.  Your objections are overruled.

6         MR. EISER:  Thank you, Your Honor.

7   BY MR. THOMAS:

8   Q.  Did you rely on the comp and pen exam in reaching your

9   opinions in this case?

10  A.  Yes, it's one of the things I relied on.

11  Q.  I'm going to hand you what has been marked as Plaintiff's

12  Exhibit 211, which we will now offer into evidence.

13        MR. EISER:  No objection.

14        THE COURT:  Exhibit 211's received.

15  BY MR. THOMAS:

16  Q.  If you could start us on the first page.  There are

17  passages that you wanted to go over from this; is that correct?

18  A.  I didn't have any plan about what I wanted to go over.  I

19  mean, I read the entire compensation and pension exam.

20  Q.  Let's do it this way:  On the first page, is there a

21  discussion of his significant non-psychiatric illnesses,

22  injuries or hospitalizations?

23  A.  Yes.

24        MR. THOMAS:  Your Honor, since it's admitted, may we

25  publish?

1          THE COURT:  Of course.

2          MR. THOMAS:  Okay.  Scott, let's go ahead and pull up

3    page 1.

4          THE WITNESS:  Your Honor, do you mind if I change

5    glasses so I can put everybody in focus?

6          THE COURT:  Your glasses are at your discretion.

7          THE WITNESS:  Thank you, sir.

8          MR. THOMAS:  I came to the exhibit out of order, so

9    Scott probably wasn't ready.

10   BY MR. THOMAS:

11   Q.   If you go to the bottom there, what does that tell us about

12   his medical history?

13   A.   These are highlights by Dr. Wendler of non-psychiatric

14   illnesses that Mr. Leininger experienced as a result of his

15   combat experience.

16   Q.   And here we see that, on May 5th, 2010, he underwent back

17   surgery for a lumbar discectomy; is that correct?

18   A.   Yes.

19   Q.   Is there mention of whether his pain is ongoing?

20   A.   Yes.

21   Q.   And what does it say?

22   A.   It says he has ongoing chronic pain.

23   Q.   If you go to the next page at the top, what does this top

24   section identify?

25   A.   This top section identifies treatment prior to the comp and

1    pen exam, and it indicates that Mr. Leininger had treatment --

2    he had evaluations starting in 1997, then in 2000.  Then he was

3    evaluated in outpatient setting at the -- the Leavenworth VA in

4    October 2008 and he continued treatment.  Then -- this is a

5    very brief summary.  He continued to experience posttraumatic

6    stress disorder, attention deficit disorder and possibly

7    bipolar effective disorder, which used to be called manic

8    depressive disease.

9    Q.   Now, if you go to the summary of treatment, what does the

10   VA psychiatric examiner indicate for his current treatments?

11   A.   This is a listing of the classes of medicines that he's

12   being treated with.  It includes an antidepressant, antianxiety

13   agent, an ADHD medicine, which is a sympathomimetic like an

14   amphetamine-like drug, and then a neuropathic treatment drug,

15   which is gabapentin, and then opiates for pain.  So there's 1,

16   2, 3, 4, 5 classes of medicines he's being treated with.

17   Q.   Now, is there a comment, if you go down to the

18   effectiveness in therapy, what does this section tell us about?

19   In general what does the effectiveness of the therapy session

20   address?

21   A.   It addresses how Mr. Leininger has participated in

22   treatment and benefited or not benefitted from prior treatment.

23   Q.   Okay.  And what did Dr. Wendler write in this regard?

24   A.   He basically wrote that he was off medications for more

25   than a month and his condition was deteriorating.  I mean, if

16-2627 Leininger v USA et al   7.6.20 Vol. 1

1   you want me to read, it has to do with more intense emotions,

2   more agitation and then -- then, most importantly, the VA

3   medical records corroborate his self-report of effectiveness of

4   ongoing treatment and psychotherapy and medication compliance.

5   Q.   One thing, before we move on, I didn't highlight it, but it

6   says he also describes that he derived benefits from attending

7   outpatient psychotherapy for treatment of PTSD; is that

8   correct?

9   A.   Yes.

10  Q.   And what does that mean?

11  A.   Well, it means her summary of his -- her general summary is

12  he had benefited from outpatient treatment, which is usually

13  individual psychotherapy or group psychotherapy.

14  Q.   And it means he had been doing outpatient psychotherapy;

15  correct?

16  A.   Yes.

17  Q.   When she says VA medical records corroborate veteran's

18  self-report of effectiveness of ongoing psychotherapy

19  medication compliance, what does that mean?

20  A.   Well, it means the doctor's not relying solely on what

21  Mr. Leininger said; that she's checking his statements against

22  the usual business records of the VA that catalog his

23  treatment.

24  Q.   Now, if we can go down to the bottom under frequency,

25  severity and duration -- well, actually, let's just move on.

1        Do we know from this record what kind of discharge

2    Mr. Leininger received from the army?  Look on page 3 at the

3    bottom.

4    A.   It should be on there, yeah.

5    Q.   The bottom of page 3.

6    A.   Oh, he was -- I'm sorry, I don't see...

7    Q.   Very last line on page 3.

8    A.   It says he was an honorably discharged E4.

9    Q.   All right.  Now, if we go to the next page, page 4.  Let's

10   start at the top; it's not highlighted.  I'm asking you this

11   because some of these things are going to be disputed, but what

12   does Dr. Wendler list as his military occupational specialty?

13   Very top there.

14   A.   Listed infantryman and tow missile gunner.

15   Q.   Okay.  And what were his decorations and medals?

16   A.   Overseas awards, combat.  They're not fully listed here.

17   Q.   Sure.

18   A.   Combat infantry; Southwest, Southeast Asia awards and

19   medals.

20   Q.   Right.  Now, if we go down to the middle where it says

21   legal or problematic consequences of alcohol use or drug abuse,

22   what does Dr. Wendler report there?

23   A.   She reported that Mr. Leininger had problems with alcohol

24   abuse towards the end of his service and that continued.  He

25   had drunk beforehand but that continued in a abusive pattern

1   after the military.

2   Q.  And just two lines below that she also noted that he

3   injured his knee for which he receives compensation.  Is that a

4   VA benefit as well?

5   A.  Yes, it's a physical injury.  It was a consequence of

6   stepping out of a vehicle.

7   Q.  Go on to the next page.  How did Mr. Leininger describe

8   himself to Dr. Wendler?

9   A.  Well, you have to remember this is her summary of his

10  description.  He describes himself as a loner, having

11  difficulty being in crowded places; having difficulty

12  interacting socially, trying to reconnect with friends, trying

13  to reengage with leisurely pursuits.  In other words, his --

14  his social relationships had been impacted by his military

15  service.

16  Q.  Under history of suicide attempts, she wrote unclear; is

17  that correct?

18  A.  Yes.

19  Q.  Why did she write unclear?

20  A.  Because -- well, this is kind of probably a technique

21  issue.  Some psychiatrists, when they're not co-evaluators,

22  when they're not sure about the specific details, they will put

23  their own question mark about it for further thought later.

24      Mr. Leininger apparently told Dr. Wendler that he had never

25  intentionally tried to kill himself but put himself in danger,

1  which is not caring if he was injured, and she describes those

2  behaviors.

3  Q.   Now, you -- she touched on this alcohol issue and she goes

4  into a little more detail down here at the bottom where it says

5  "issues associated with alcohol use." Can you describe that,

6  please.

7  A.   This is a quantity of alcohol that Mr. Leininger started to

8  use after he got back from Desert Storm.  He indicated at least

9  a case of beer a day, which included destructive behavior,

10 fighting blackouts -- often blackouts, you know,

11 self-endangering type behavior; and also another element of

12 alcohol tolerance and dependency is that he would withdraw and

13 have to have a drink in order to stop shakes in the morning.

14 Q.   But what does he say about the last time he used or drank

15 alcohol?

16 A.   Well, he said he hadn't drunk or used illicit drugs in four

17 years.

18 Q.   Okay.  Now, at the bottom of this, where she starts her

19 physical exam, she goes into his demeanor and his affect; do

20 you see that?

21 A.   Yes.

22 Q.   And what did she write in terms of his -- what is

23 psychomotor activity?  What is that?

24 A.   Psychomotor activity is sort of the overall physical

25 presentation; in other words, did somebody have normal

1    movements?  Do they have heightened excessive movements or

2    diminished or -- or movements that are abnormal.

3         A person's countenance, or behavior, while they are in

4    front of the doctor can tell them some things about their

5    internal world even if they're not sharing them.  In this case,

6    Mr. Leininger appeared to have --

7    Q.  Go ahead.

8    A.  -- appeared he had some abnormal movements that was hand

9    ringing.  This was a repetitive thing.  He appeared hyperactive

10   and restless and tense; in other words, his affect wasn't

11   normal, it was -- physical affect wasn't normal.

12   Q.  Was he cooperative with the examiner?

13   A.  Yes.

14   Q.  What did she write for his affect underneath attitude?

15   A.  Well, similar to a psychomotor activity, he was tense and

16   tearful throughout the interview and the testing.

17   Q.  And his mood?

18   A.  He was both agitated and depressed, which is not uncommon.

19   Q.  If we go to the next page, start off at the top under her

20   comments.  These are her comments; correct?

21   A.  Yes.

22   Q.  And there, at the bottom of that first paragraph, she made

23   a comment on his symptoms as it relates to PTSD.

24   A.  Yes.  Dr. Wendler believed that Mr. Leininger's symptoms

25   impacted his capacity for attention and concentration; in other

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    83

1   words, they were so significant, as including the mood

2   disorder, that they impaired his ability to attend and

3   concentrate.

4   Q.  Did he have a -- a prior diagnosis of ADD?

5   A.  She states later that he did.

6   Q.  Okay.  We'll get to that then.  What does she write here

7   about his sleep problems?

8   A.  He has 20 years of significant sleep problems never really

9   feeling rested, awakens with nightmares related to combat.

10  They can be weekly to daily.  He describes common symptoms of

11  nightmares, cold sweats to the point that he soaks the sheets,

12  significant fatigue during the day as well as being tired and

13  irritable as a consequence of not getting enough restorative

14  sleep.

15  Q.  The night sweats and the terrors were so bad that he used a

16  different kind of bed cover, didn't he?

17  A.  Yeah.  It says he has -- he used plastic covers often which

18  -- I wasn't entirely clear if that meant that he had a plastic

19  mattress cover that regular sheets were on or he used

20  waterproof sheets.

21  Q.  Okay.  Let's go down to her comments about obsessive

22  ritualistic behavior.  What did you glean for this section?

23  A.  I gleaned that like many persons with significant PTSD,

24  that -- that he had demonstrated elevated motor functioning,

25  that he fidgeted a lot and that he was restless.  He also was

16-2627 Leininger v USA et al   7.6.20 Vol. 1                     84

1    somewhat obsessively organized and preoccupied with compulsive

2    behaviors, like compulsively cleaning, which he attributed to

3    his -- his experience in wartime.  It's not -- it is a common

4    -- put it this way:  It's not an uncommon reaction to wartime

5    PTSD to try and order things after they return.

6    Q.  And did -- she even talks about how he attributed that.  Do

7    you see that, where she says he attributes this issue?

8    A.  Yes, sir.

9    Q.  What did she write?

10   A.  I'm not sure he used the word attributed.

11   Q.  He attributes this issue to "seven months of not being able

12   to shower."  Do you see that?

13   A.  Yes.  I'm sorry.

14   Q.  That's okay.

15       And have these obsessive, compulsive behaviors interfered

16   with his relationships?

17   A.  Apparently they did.  They drove -- she writes that he

18   drove his wife crazy, although that wasn't further defined.

19   Q.  What is a panic attack?

20   A.  Panic attacks are short periods of time where a person has

21   an overwhelming sense of dread perhaps that they're going to go

22   crazy or have a heart attack or die.  It's one of the anxiety

23   disorders and it is usually a response to an overwhelming

24   anxiety.  Sometimes it's triggered; sometimes it's not

25   triggered.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    85

1    Q.  And was he having -- did he have a history of panic

2    attacks?

3    A.  In the past he did, yes.

4    Q.  All right.  Let's go on to the next page where it lists

5    stressors that the veteran found particularly traumatic.  The

6    first paragraph, can you read that, please?

7    A.  Sure.  It says, "Combat experience, non-sexual personal

8    assault, accident involving actual or threatened serious injury

9    or death to self, accident involving actual or threatened

10   serious injury of death to others."

11   Q.  Okay.  And then when -- did she continue on to describe

12   that stressor?

13   A.  Well, this is doctor -- the first part is Dr. Wendler

14   indicating these are combat -- these are experiences that would

15   qualify as criteria A for PTSD, which is a violent act of some

16   kind whether it's sexual, physical or emotional.  And then she

17   -- then she defines what she means by that, and that's the

18   description of the stressors.

19   Q.  And can you, please, read that for the record, please?

20   A.  Sure.  "Combat experience:  Veteran describes that his

21   infantry brigade was sent to Saudi Arabia in September 1990.

22   He reports they saw combat January-February 1991 in Iraq

23   fighting the Republican Guard who'd been forced out of Kuwait.

24   He describes that he saw action on the 'Highway of Death.'  He

25   had men in his unit injured by shrapnel.  He saw numerous dead

16-2627 Leininger v USA et al   7.6.20 Vol. 1                86

1   Iraqi army soldiers.  He was involved in body recovery

2   operations where he had to pick up dead Saudis or Iraqis.  His

3   unit had a few small fire fights.

4       A traumatic report -- events he reports as most stressful

5   and the most problematic PTSD symptoms included the following:

6   His unit was on a sand road in an area believed to be only

7   Americans.  A young girl was waving an American flag who was

8   with her father.  The vehicle in front of the veteran's company

9   fired a 25-millimeter cannon at the car, the father and young

10  girl, killing them.  The veteran reported -- veteran's reported

11  stressors are consistent with his military service.

12      On October 21, 2008, the VA mental health consultation

13  reiterates the killing of the little girl and her father."

14  Q.  Stop right there.  What does that mean that the veteran's

15  reported stressors are consistent with his military service?

16  A.  This means that Dr. Wendler checked with a prior evaluation

17  that Mr. Leininger had, and it was in October of 2008 by a

18  different clinician, and that the -- the rendition of what

19  happened was substantially similar between 2010 and 2008.

20  Q.  And it looks like he'd been deployed to Saudi Arabia,

21  Kuwait and Iraq; correct?

22  A.  Yes.

23  Q.  It asks:  During military service, intense fear and then

24  there's a colon.  What did she write after that?

25  A.  "These are primary criteria for entry criteria for PTSD at

16-2627 Leininger v USA et al   7.6.20 Vol. 1                87

1   the time."

2   Q.   Okay.

3   A.   So intense fear is yes; feelings of helplessness yes;

4   feeling of horror yes.  If you look at the old DSM-IV TR

5   criteria, those are some of the primary criteria for qualifying

6   for posttraumatic stress disorder.

7   Q.   And feeling of horror was -- was checked off?

8   A.   Yes.

9   Q.   Let's go to the next page, the bottom of page 8.  Well,

10  actually, do you see -- I'm sorry.  The checklists of the 17

11  common PTSD stressors?

12  A.   Yes.

13  Q.   Explain this.  It starts on the -- on page 7 and it

14  continues on to page 8.  Is this what you're talking about?  Is

15  this from the DSM-IV?

16  A.   No, this is VA -- internal VA checklist.

17  Q.   So one of the things they wanted to know, if he experienced

18  fires or explosion as a veteran?

19  A.   Yes.

20  Q.   And he had; correct?

21  A.   Yes.

22  Q.   They wanted to know if he had experienced a transportation

23  accident; for example, car accident, boat accident, train wreck

24  or plane crash.  And he had experienced that; correct?

25  A.   That's correct.

16-2627 Leininger v USA et al   7.6.20 Vol. 1

1   Q.   They wanted to know if he had been exposed to toxic

2   substances as a veteran, and he had?

3   A.   That is correct.

4   Q.   And they wanted to know if he had been in a physical

5   assault as a veteran; for example, being attacked, hit, slap,

6   kicked, or beaten up.   And he had been; correct?

7   A.   Yes.

8   Q.   They wanted to know, as a veteran, if he had been a victim

9   of assault with a weapon such as being shot, shot at, stabbed,

10  threatened with a knife, gun or a bomb.   And he had; correct?

11  A.   Yes.

12  Q.   They wanted to know if he had combat or exposure to a war

13  zone.   And he had experienced that; correct?

14  A.   Yes.

15  Q.   They wanted to know if, as a veteran, he witnessed sudden

16  or violent death.   And he had; correct?

17  A.   Yes.

18  Q.   They wanted to know if, as a veteran, he experienced sudden

19  or an unexpected death of somebody close to you.   And he had;

20  correct?

21  A.   Yes.

22  Q.   They wanted to know if, as a veteran, he saw somebody who

23  was seriously injured or harmed or killed?

24  A.   Yes, that's correct.

25  Q.   And he had?

1  A.  Yes, sir.

2  Q.  And the last one is just kind of global.  It says any other

3  very stressful event or experience.  And it just says event has

4  been experienced by the veteran; right?

5  A.  Yes.

6  Q.  Now, underneath there, the PTSD symptoms, are those

7  symptoms that he experienced or are these symptoms that they're

8  looking for?

9  A.  These are a description of the primary other symptoms of

10  PTSD at the time in the DSM-IV TR.

11  Q.  Gotcha.  We can go on to the next page.  Now, if we go on

12  to the next page, Dr. Wendler goes into a discussion of the

13  frequency, severity and duration of the PTSD symptoms found;

14  correct?

15  A.  Yes.

16  Q.  And, as is it relates to when he first begins to experience

17  PTSD, what did she write?

18  A.  She wrote it starts after his service in Desert Storm.

19  Q.  In that first paragraph -- after Desert Storm; right?

20  A.  Yes.

21  Q.  In that first paragraph, does she talk about whether the

22  symptoms are more severe, when he's taking his medications?

23  A.  Yes.  She lists that -- some of the symptoms, that they are

24  chronic impairment history of violence and assaultiveness which

25  increased in severity when he's not on medications.  And even

1    with medications, they help but he continues to experience the

2    PTSD symptoms on a daily basis.

3    Q.  She calls his PTSD symptoms chronic in nature.  What does

4    that mean?

5    A.  It means it's lasting longer than six months, which is not

6    a very good criteria, because many people with PTSD have it for

7    lifelong.

8    Q.  In addition to taking the medications he was prescribed,

9    does she also note he was attending outpatient therapy?

10   A.  Yes.

11   Q.  And he was starting to see improvements in his symptoms,

12   his mood, his affect, his regulation and his concentration?

13   A.  Yes, but without full remission.

14   Q.  What does that mean?

15      She says, "However, he has not experienced a true full

16   remission -- a true remission in his PTSD symptoms."  What does

17   that mean?

18   A.  This is an interesting word.  Remission can mean there are

19   no symptoms anymore or they are controlled with treatment.  Not

20   unlike someone who has diabetes who is out there and they might

21   have a very, very high blood sugar.  But with their insulin and

22   diet their blood sugar is in the normal range; however, while

23   it's -- the blood sugar is normal, meaning in remission, they

24   never are free of diabetes.

25   Q.  I got you.  I got you.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    91

1          And the next one we highlighted is, again, her emphasizing

2     that his use of alcohol and -- and also drugs occurred

3     post-deployment; is that correct?

4     A.   Yes, that's what it intimates.

5     Q.   Now --

6     A.   He expands on that later, but, yes, that's correct.

7     Q.   Okay.  And we'll come to that later then.

8          Let's highlight that paragraph where it says cognitively.

9     What did she write here?

10    A.   This is another one of the criteria for PTSD.  She --

11    intrusive trauma related thoughts for which they are -- he

12    develops physiological symptoms like increased heart rate, peer

13    response, sweating, et cetera, and he also ruminates on past

14    combat events.  There is also vigilance, which is readiness for

15    harm to fight, flight or freeze.  Hyperresponsiveness to loud

16    noises and other stimuli and other post-trauma reaction, also

17    impaired concentration, impaired ability to focus on -- since

18    he was finished with the deployment, he's sort of

19    catastrophizing worse things are happening or will happen, as

20    well as nightmares and sleep impairment.

21    Q.   What does the phrase intrusive trauma-related thoughts

22    mean?

23    A.   Well, it's -- it means something a little -- it means that

24    this person has -- is having involuntary memories, involuntary

25    experiences that are related to the trauma that they

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    92

1    experienced.  It means that he's trying not to think about them

2    but they are intruding into his thinking, such as reminders

3    during the day from smells and particular people he might see

4    or intrusive nightmares or intrusive recollections based on

5    sounds or specific reminders of prior trauma.

6    Q.  She goes on in the next paragraph to describe down there at

7    the bottom whether or not he ever experiences comfort.  What

8    does she write?

9    A.  Well, she says that Mr. Leininger is not comfortable

10   anywhere.  He's always on guard.  Again, this is another kind

11   of vigilance, hypervigilance thing, triggered by people being

12   loud, anything that's a close call or people doing dangerous

13   things.  These are all things that increase his level of

14   tension and irritability sometimes to the point that he gets in

15   physical altercations.  Similarly, it's part of this -- his

16   affect, which is his emotional tone is not normal.  It has both

17   elements of depression and anxiety that have caused functional

18   impairment related to the PTSD.

19   Q.  And then she continues on with that discussion on the next

20   page.  What else did she report?

21   A.  Well, the -- that Mr. Leininger continues to experience

22   depression and the most severe elements of that are sadness,

23   feelings of punishment, agitation, loss of interest,

24   indecisiveness, sleep pattern change, in this case less

25   irritability, less appetite, difficulties concentrating -- with

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    93

1    concentration and he has physiological reactivity, physical

2    symptoms related to those experiences that include anxiety,

3    feeling hot, heart pounding or racing, difficulty breathing,

4    sweating separate from the heart rate -- not -- separate from

5    heat, and then fears that the worst will happen and fear that

6    he might lose control.

7    Q.   That phrase punishment feelings, what does that mean?

8    A.   Well, she doesn't define what it means.  I can --

9    Q.   In your -- in your evaluation of Aaron Leininger, did you

10   -- did you observe anything that you think may correlate with

11   this description?

12   A.   Yes.

13   Q.   And please explain.

14   A.   Well, Mr. Leininger is still wanting to get better from

15   PTSD and he has had significant -- he has significant daily

16   difficulties with that and feels that the focus on him is a

17   form of punishment in order, meaning reminding of things he'd

18   rather forget, reminding of things he'd want to push out of his

19   mind even though he needs treatment.  So the punishment element

20   is that he knows he is being required to talk about things that

21   are very painful for him in that field, like, punishment.

22   Q.   Okay.  The next section of the comp and pen exam identifies

23   the tests that she administered; correct?

24   A.   Yes.

25   Q.   It should be on that same page.  It's not highlighted.  Can

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    94

1    you just briefly explain to the court what tests Dr. Wendler

2    administered to Mr. Leininger.

3    A.   Sure.  Your Honor, the -- Mr. Leininger had -- was given

4    four tests:  the CAPS, which is the Clinician Administered

5    Posttraumatic Stress Disorder Scale, the Mississippi Scale for

6    Combat-Related PTSD, the Beck Depression Inventory and the Beck

7    Anxiety Inventory.  There's -- sorry, also the PCLM, which is

8    the -- I forgot what that exact acronym is, but it's a

9    checklist for combat trauma.

10   Q.   Okay.  And are these -- at the time were these generally

11   accepted diagnostic tools in the field of psychiatry?

12   A.   Yeah, I mean, they -- yes, they are screening exams that

13   help guide the clinician in -- because they provide an

14   alternative perspective on Mr. Leininger's self-report as

15   similar to a -- how his medical record provides an alternative

16   perspective on his self-report.

17   Q.   Understood.  I want to talk to you about the psychometric

18   assessment score, the Beck Depression Inventory.

19   A.   Yes.

20   Q.   Okay.  She wrote that his score of 45 is at a severe level

21   with symptoms of sadness, punishment feelings, agitation, loss

22   of interest, indecisiveness, changes of sleeping patterns,

23   irritability, changes in appetite and concentration, difficulty

24   as the most remarkable; is that correct?

25   A.   Yes, you read that accurately.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    95

1    Q.  And are you familiar with the Beck inventory?

2    A.  I'm familiar.  I don't use it; but, yes, it's been around

3    quite a while.

4    Q.  Okay.  All right.  It was used quite a bit for Vietnam; is

5    that correct?

6    A.  It's correctly used now, but I tend to have a different set

7    of questions.

8    Q.  Sure.

9    A.  Maybe more specified to a particular person.

10   Q.  She's also noticed that his Beck score was 45, which was

11   also at a severe level, with many symptoms related to physical

12   anxiety, including hot, heart pounding or racing, difficulty

13   breathing and sweating not due to heat, as well as fear of the

14   worst happening and fear of losing control.

15        Did I read that correct?

16   A.  Yes.

17   Q.  Do you know what the Mississippi scale is?

18   A.  It's the Mississippi Posttraumatic Stress Disorder Scale.

19   Q.  She wrote that his score of 159 was well above the cutoff

20   of 107 which was suggested for Vietnam combat related groups,

21   and the PCLM-M score of 81 was well above the cutoff of 55,

22   both indicative of moderate to severe level of PTSD; correct?

23   A.  Yes.

24   Q.  And that is her clinical assessment; correct?

25   A.  Yes, that's her review of Mr. Leininger's answers filing on

16-2627 Leininger v USA et al   7.6.20 Vol. 1

1   those tests, and they are -- her summary indicates that he has

2   clinically significant level of depression, clinically

3   significant level of anxiety, a questionnaire based evidence

4   for a posttraumatic stress disorder at a moderate to severe

5   level.

6   Q.   Now, if you go on to the next page, it talks about some

7   PTSD factors as it relates to his employment history.  The

8   bottom -- the last sentence on that first she writes he

9   describes difficulties with daily non-significant conversations

10  and would prefer to engage in more isolated work patterns;

11  i.e., delivery driver.

12       Did I read that correct?

13  A.   Yes.

14  Q.   And is that what you -- what does it mean that he prefers

15  to engage in isolated work patterns?

16  A.   That means that he prefers to be alone and is more

17  comfortable when he's alone minimizing contact with others.

18  Q.   She reported that he had a long history of "packing up and

19  leaving" and kind of wandering the countryside since the Gulf

20  War.

21       Did I read that correct?

22  A.   Yes.

23  Q.   What does that tell us?

24  A.   It means he doesn't feel like he has any roots anywhere and

25  he may be on the basis of anxiety or impulsive interpersonal

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    97

1    relationships; can't adjust himself, so he adjusts where he

2    lives.

3    Q.   The question asks -- it moves on and it says:  Does the

4    veteran meet the DSM-IV stressor criterion?  And what did she

5    write?

6    A.   She said, yes, related to combat-related PTSD from

7    Desert Storm.

8    Q.   And that was a diagnosis; correct?

9    A.   I actually think this is not a diagnosis.  I think this is

10   a summary of the stressor criterion that are -- has been listed

11   above --

12   Q.   Got you.

13   A.   -- the questionnaires and his descriptions as well as her

14   recounting of the PTSD factors from the DSM-IV that she deemed

15   met the criteria.

16   Q.   Then she goes on and it asks:  Did the veteran meet the

17   DSM-IV criteria for a diagnosis of PTSD?  And what did she say?

18   A.   So this is her diagnosis.  The answer is yes.

19   Q.   So she did diagnose him with PTSD secondary to his combat

20   duties; correct?

21   A.   Yes.

22   Q.   She wrote that the claimed stressor is related to the

23   veteran's fear of hostile, military or terrorist activity; is

24   that correct?

25   A.   Yes.  This is boilerplate language as part of the

1   evaluation --

2   Q.  Understood.  The -- the --

3   A.  -- the phrase hostile military or terrorist activity.

4   Q.  That's boilerplate from the -- from the --

5   A.  VA itself.

6   Q.  Got you.  Okay.

7       All right.  Let's go on to the next page, and here this is

8   still a discussion of the diagnosis.  And she wrote -- and it

9   asks if any mental disorders have been diagnosed, explanation

10  of how the symptoms are related to or part of each mental

11  disorder.

12      Did I read that correct?

13  A.  Yes.

14  Q.  And right out of the gate she does identify that he had

15  been diagnosed and treated for ADHD; correct?

16  A.  Yes.

17  Q.  But that goes back to high school?

18  A.  Yes.

19  Q.  Okay.  But she writes --

20          MR. THOMAS:  Where are we -- what page are we on,

21  Scott?

22      (Counsel conferring with IT support.)

23  BY MR. THOMAS:

24  Q.  As it relates to the ADHD, she says the veteran's ADHD is

25  not likely to be caused by combat exposure as it is by

1    definition a disorder that must manifest itself during

2    childhood.  However, she con --

3         Did I read that correct?

4    A.   You're on a different page.

5    Q.   Page 12.  Look on your screen.  It should be up on your

6    screen.  It's not highlighted?

7    A.   No, I know you're on -- let's see.  There we go.  Now

8    you're on the same page.

9    Q.   Okay.  So did I read that correctly?

10   A.   Yes.

11   Q.   Okay.  But, however, she goes on, she says more likely than

12   not his ADHD symptoms are exacerbated by PTSD.  The combination

13   of these two disorders have resulted in difficulties in

14   post-military academic performance, social and occupational

15   function, and affect regulation problems.

16        Did I read that correct?

17   A.   Yes.

18   Q.   How can ADHD be exacerbated by PTSD?

19   A.   Because PTSD -- well, it's now a trauma and distress

20   related disorder.  It used to be one of the anxiety disorders

21   of the 11 anxiety disorders before it was redefined in DSM-V.

22        Persons who have high levels of anxiety and inattentiveness

23   as a consequence of worries about being attacked very often do

24   not pay attention as well as they could because their attention

25   is already diverted, then have worsened ADHD symptoms, which

1   is -- ADHD means attention deficit hyperactivity disorder.  In

2   other words, a person who is constantly on guard, who is

3   constantly moving, constantly up and down is going to have more

4   difficulty paying attention which will -- if you don't

5   understand the context will look like two different disorders

6   or two disorders that are overlapping.

7   Q.  Okay.  Now, if you go on, she also goes on to talk about

8   the alcohol and methamphetamine dependence, just that one

9   paragraph that's highlighted.  The first one that's

10  highlighted.  What does she say in regards to his alcohol and

11  methamphetamine dependence post deployment?

12  A.  This is what I was referring to earlier.  Dr. Wendler

13  indicates that the alcohol and methamphetamine use was a means

14  of coping with his PTSD symptoms and it started after combat

15  exposure or worsened after combat exposure for the alcohol use.

16  Q.  And she says it is not possible to separate the effects of

17  the veteran's alcohol and drug and methamphetamine use after

18  his deployment because the PTSD symptoms had onset after his

19  combat exposure; right?  I'm paraphrasing.

20  A.  I believe -- I believe what she's actually saying is that

21  -- that PTSD and the alcohol and methamphetamine use commingle

22  because of his combat exposure.  And so he's regulating affect,

23  in other words, his emotional tone, by the central nervous

24  system depressant alcohol and then also a sympathomimetic

25  agent, which means methamphetamine or adrenaline like effect of

16-2627 Leininger v USA et al   7.6.20 Vol. 1                101

1   the methamphetamine.  Things he is having difficulty managing

2   on his own, he is maladaptively using to manage his feelings.

3   Q.  That's what she means, it is likely a means of coping with

4   his PTSD symptoms?

5   A.  Yes.

6   Q.  Okay.  Let's go down to the bottom where she's asked --

7        MR. THOMAS:  Well, I went too far.  You're right,

8   Scott.

9   BY MR. THOMAS:

10  Q.  The next one is additional information requested.  They

11  want to know if the diagnosis of PTSD is established, please

12  specifically state whether or not the claimed stressor is

13  related to the veteran's fear of hostile, military or terrorist

14  activity.  And that's where that language comes from; right?

15  A.  Yes.

16  Q.  And then it gives you a definition of what fear of hostile

17  or military, terrorist activity is; correct?

18  A.  Yes.

19  Q.  And then at the bottom she writes:  In case of this

20  veteran, it is clear that the development of his PTSD symptoms

21  is most likely caused by or result of combat trauma he

22  experienced during Desert Storm.  (A) Veteran was involved in

23  combat missions, was shot at and did shoot at others, including

24  civilians, and came into contact with dead and wounded soldiers

25  and civilians.  His response to these situations was fear,

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    102

1   helplessness and horror.

2   A.   Yeah, that's the -- this establishes PTSD by the primary

3   first criteria in DSM-IV.

4   Q.   Prior -- they asked for description of the linkage between

5   the PTSD symptoms and aforementioned changes in impairment and

6   functional statement in quality of life.  Does he have any

7   history of psychiatric problems or explosive behaviors before

8   he went to war?

9   A.   According to Dr. Wendler, he did not.

10  Q.   What does it say he does at the bottom?  Again, this is on

11  the -- this discusses the linkage between his wartime

12  experience and the symptoms about him isolating himself again.

13  A.   You mean -- I'm not sure I understand the question.

14  Q.   Well, it says --

15  A.   Mr. --

16  Q.   Go ahead.

17  A.   Mr. Leininger had prototypical symptoms of posttraumatic

18  stress disorder, which includes behavior problems, new onset

19  psychiatric problems, anger, violence, et cetera, and also

20  social isolation and great difficulty managing his day-to-day

21  affairs.

22  Q.   Why did she put that information here again though?

23       She puts that he isolates.  She talks about his nightmares

24  again and the difficulty going back to sleep.  Why did she put

25  that back in this section again?

1    A.   Because there has to be a direct link between the post --

2    the reported posttraumatic experience and changes in the

3    person's functioning.  So criteria (A) is presence of violence

4    experiences, then it's intrusive thoughts or experiences, then

5    it's avoidance and any manner of things, then it's changed

6    cognition and mood, and then it's alteration in activity in

7    affect.

8    Q.   Okay.  Now, if you go on to the next page, again, then, I

9    guess, she goes over a lot of that same information we covered,

10   but the whole -- in the top there, the very top it's not

11   highlighted, Scott.  That top paragraph covers information that

12   we've already covered but she's putting it in this section

13   because she's drawing a causal connection or a link to his

14   combat; is that correct?

15   A.   Yes, that's correct.

16   Q.   The next section asks for the extent to which other

17   disorders other than PTSD are independently responsible for his

18   impairment and psychosocial adjustment and life quality.  And

19   here she talks about he has ADHD in addition to PTSD; correct?

20   A.   Yes.

21   Q.   But, again, she talks about how the PTSD exacerbates the

22   ADHD; correct?

23   A.   Yes.  In fact, she writes in the middle of the

24   paragraph that there wasn't any evidence of ADHD symptoms

25   impacting his functioning until after deployment with the onset

1    of posttraumatic stress disorder.

2    Q.   Got you.

3    A.   So this is -- this is her summary to say that -- in my

4    opinion, it's her summary to say that he has ADHD, which is

5    commingled with his PTSD that was non-existent at this level

6    before he was in the military.

7    Q.   This next paragraph, and it's not highlighted but I wanted

8    to ask you about it, description of pretrauma risk factors or

9    characteristic that -- characteristics that may have rendered

10   the veteran vulnerable to developing PTSD subsequent to trauma

11   exposure.  Before I asked you what she wrote, what does this

12   mean?  What are they asking for here?

13   A.   Well, it's well-established, in the trauma literature, that

14   persons who had prior traumas are at risk for stronger

15   responses for subsequent traumas.  So it's important for the

16   diagnostician to discern if the person who is claiming military

17   trauma to determine if they've experienced physical, emotional,

18   sexual abuse or emotional neglect or other traumatic

19   experiences that might make them more susceptible to subsequent

20   trauma.

21   Q.   Now, she -- what did she write --

22        If he had any risk factors, some pretrauma risk factors,

23   that would make him more susceptible to PTSD, what did she

24   note?

25   A.   She indicated there were no significant pretrauma risk

1   factors.

2   Q.   What would be written today if asked to evaluate PTSD as a

3   result of Wisner's conduct, would he have pre-Wisner risk

4   factors for an even stronger PTSD response?

5   A.   Yes, because he had pre-existing PTSD before he was treated

6   by Mr. Wisner.

7   Q.   Now, there's an addendum to this.  It's at the bottom.

8   What is an addendum?

9   A.   An addendum is a note provided after the assessment is

10   completed.  Addendums are -- they're additional important

11   opinions or factors that the evaluator feels need to be

12   included.

13   Q.   When you worked for the VA, did you ever review something

14   called a C file?

15   A.   Yes, many times.

16   Q.   And, in doing your work for the various court cases and

17   government bodies, have you reviewed something called a C file?

18   A.   Yes.

19   Q.   What is a C file?

20   A.   A C file is a claim file or a compensation file.  It is the

21   -- it's a complete record of the veteran's service as well as

22   injuries and prior treatments as part of their application for

23   disability.

24   Q.   It states here that on January 5th, 11 -- so at about two

25   months after this report, the original -- well, I should have

 1   made a record of that.

 2          MR. THOMAS:  If you go up, Scott, Dr. Wendler

 3   indicated this.  Underneath that last section I read.  Right

 4   there.  Nope.  Right here, signature.  There you go.

 5   BY MR. THOMAS:

 6   Q.  As relates to the comp and pen exam, that report is

 7   electronically signed by Dr. Wendler; correct?

 8   A.  Yes.  On November 19th, 2010, ten days after she evaluated

 9   Mr. Leininger.

10   Q.  Okay.  And so then about a month-and-a-half later this

11   addendum comes along; correct?

12   A.  Yes.

13   Q.  And what does the addendum tell us?

14   A.  The addendum tells the records; that Dr. Wendler obtained

15   the C file and compared Mr. Leininger's assertions and

16   experiences that she had given to him, and she compared those

17   to what's in the C file and found that they were -- the C file

18   supported that Mr. Wendler's (sic) assertion of PTSD is

19   accurate.

20   Q.  His deployments would be in the C file; correct?

21   A.  Yes.

22   Q.  His combat exposures would be in the C file; correct?

23   A.  Yes.

24   Q.  His military awards and medals would be in the combat C

25   file; correct?

16-2627 Leininger v USA et al   7.6.20 Vol. 1          107

1   A.  Yes.  I think those are usually on the DD-214, but they're

2   also on the C file.

3   Q.  Exactly.  His military campaigns would be in the C file;

4   correct?

5   A.  Yes.

6   Q.  All right.  And what is the -- I already asked for the date

7   on this, January 5th, 2011; correct?

8   A.  That's correct.

9   Q.  All right.  We can put that document aside.

10      So you reviewed this when you were doing your history of

11  Aaron Leininger; correct?

12  A.  I reviewed it before I gave you my...

13  Q.  Right.  Right.

14      I believe the next thing you mentioned that you -- was a

15  mental status exam after you did the -- the medical background,

16  the psychological background and the -- whatever the third one

17  was, military background?

18  A.  Yes.

19  Q.  You do a mental status exam; is that correct?

20  A.  Yes.

21  Q.  Okay.  What does that consist of?

22  A.  Again, it's an assessment of a person's physical --

23  apparent physical health, physical countenance, their mood,

24  their attention, their concentration, relative level of

25  depression, presence or absence of thought disorder or

1    affective difficulties, and then a cognitive --

2        Let's see what else?

3        -- also a -- a quick assessment of their psychosocial

4    history as well as a cognitive assessment to ascertaining, you

5    know, attention, concentration, capacity for memory, capacity

6    for reasoning processes, and then evidence of brain injury such

7    as lateralized dysfunction of the brain right to left, and then

8    constructionally apraxia and visual neglect, which are often

9    related to strokes or other injuries that the person may not be

10   aware of.

11   Q.   And what did your mental status exam of Aaron Leininger

12   reveal to you?

13   A.   Revealed to me that he had some problems with -- with

14   attention and memory, however, overall his -- his intelligence

15   level was intact, and he had significant depression as well as

16   significant sleep disorder with nightmares and with intrusive

17   nightmares and intrusive remembrances of wartime service as

18   well as intrusive experiences related to Mr. Wisner's

19   actions -- or Wisner's actions.

20   Q.   Did you --

21   A.   But I didn't find any evidence of psychotic decompensation

22   or mania or hyperbolic assertions that would suggest false or

23   falsely exaggerated psychiatric difficulties on face-to-face

24   interview.

25   Q.   Any evidence on malingering on the face-to-face interview?

1   A.   No.

2   Q.   Any evidence of major cognitive impairment?

3   A.   No, only about -- only related to what's called recognition

4   memory, which can be a consequence of anxiety.

5   Q.   Now, is this information that you gleaned from the legal

6   status exam, is it compared to anything?

7   A.   It's compared to his prior psychiatric treatment record,

8   prior evaluation such as by Dr. Wendler, and also the other

9   previous evaluators.  It's also compared to psychological

10  testing that I might -- that I had him take.

11  Q.   Did Mr. Leininger have a history of actually going to and

12  receiving psychiatric treatment prior to Wisner?

13  A.   Yes.  At the VA, I think in Kentucky and Kansas -- and back

14  in Kentucky or West Virginia.  Sorry.

15  Q.   And what about after Wisner, would he go back?

16  A.   He is not.

17       MR. EISER:  Objection.

18       THE COURT:  What's the objection?

19       MR. EISER:  Predicting what the plaintiff is going to

20  do in the future.

21       THE COURT:  You want to rephrase the question.

22  BY MR. THOMAS:

23  Q.   Has he been back over the last six years?

24  A.   When I interviewed him, he hadn't been to the VA for

25  treatment for five years.  I don't know if he has been back

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    110

1    since then.

2    Q.   We'll talk about that a little bit more in a minute.

3         You mentioned that the psychological test is used as an

4    alternate viewpoint on his presentation function.  What does

5    that mean?

6    A.   It means that, especially in a detailed clinical

7    assessment, this allows me to have a different perspective than

8    what the person is telling me as well as what my face-to-face

9    interview is.  Some people can -- can try to present a false

10   persona or false abilities.  Having the person take tests that

11   are self-report but scored objectively against normative

12   samples can give the evaluator a clear picture of whether they

13   are reporting honestly or not and the kind of abnormal report,

14   such as I'll give you an example.

15        I've had college professor evaluations where the person

16   teaches physics and then they take a Shipley-2 and they score

17   as though they have an IQ at 50 or 60, which is clearly not how

18   they're functioning face-to-face to me, and that suggests they

19   are trying to manipulate the evaluation.

20   Q.   Understood.  So it's a layman way of saying this is -- you

21   just don't rely on their word alone?

22   A.   That's correct.

23   Q.   Okay.  After comparing the mental status exam to the other

24   records and data, what did you discern?

25   A.   I discerned that Mr. Leininger was accurately reporting

1   wartime posttraumatic stress disorder with ongoing symptoms of

2   moderate posttraumatic stress disorder and moderate depression

3   with significant history of substance abuse in the -- primarily

4   amphetamines in the past, opiates, also sedative hypnotic drugs

5   like benzodiazepines, and he made some effort to cut down on

6   the illicit drug use as well as prescription drug use.

7        I found that he was -- his presentation for his wartime

8   PTSD experience was accurate, to my understanding of that type

9   of PTSD and traumatic experiences, as well as he told a

10  consistent story about what had happened in his wartime

11  experience in the VA records, in particular by -- to

12  Dr. Wendler, who did a thorough evaluation.  And there was a

13  previous evaluator, his name I have a hard time pronouncing,

14  like Dr. La Sorta, who he had been evaluated back in --

15  Q.   '8?

16  A.   '8.  It's November -- no, December 2008, that's wrong.

17  October 2008 and she had found a similar presentation of

18  posttraumatic stress disorder.  So I had essentially three data

19  points, 2008, 2010 and then my own evaluation of him in 2019,

20  and I -- it was my opinion, based on that assessment, that he

21  was -- he presented a valid -- credible is not -- I guess it's

22  for the judge to determine -- a reasonable and accurate

23  portrayal of wartime PTSD as it affected him individually.

24  Q.   After the self-exam you did, you administered psychological

25  testing; is that correct?

16-2627 Leininger v USA et al   7.6.20 Vol. 1          112

1    A.   Yes.

2    Q.   And what were the tests that you administered?

3    A.   I had Mr. Leininger take two tests.  The first one was the

4    Shipley-2, which is a rapid intelligence test.  It has

5    vocabulary and abstraction elements.  Two page tests.  Takes

6    about 10 to 15 minutes.  And also had him take the PAI, which

7    is personality assessment inventory.  It's a 344 question

8    true-false test with validity scales and proposed DSM-IV

9    diagnoses as well as discussion of known clinical groups

10   established by the PAI.

11   Q.   Let's talk about the Shipley test.  After he answers them,

12   do you compare his answers to anything?

13   A.   The Shipley is a self-report objectively scored test.  His

14   answers are compared to other persons his age.  There's no need

15   for correction based on gender or race.

16   Q.   And what did his Shipley-2 score or test reveal?

17   A.   Well, it revealed that Mr. Leininger had about an average

18   IQ, functioned at the average range, which was consistent with

19   his face-to-face presentation, his career choices and his

20   mental status examination --

21   Q.   Any evidence --

22   A.   -- as well as his history in high school and academic

23   pursuits subsequent to the military.

24   Q.   Any evidence of mismatched with vocabulary?

25   A.   No.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                113

1   Q.  And why is that important?

2   A.  Well, I mean --

3   Q.  What is mismatched with vocabulary?

4   A.  Mismatched is a situation in which it's either vocabulary

5   or abstraction scores are more than 10 points apart.  It can

6   indicate -- if it's genuine illness, it can indicate the person

7   may have had a brain injury or they have a problem with a

8   learning disorder, maybe they read well but they have severe

9   logic and math difficulties and therefore don't do as well.

10  The Shipley-2 is a screening test for further study if there

11  are mismatches like that.

12  Q.  And because there were no mismatches, it didn't -- that

13  would not suggest any traumatic brain injury; correct?

14  A.  Well, it wouldn't suggest that he had significant traumatic

15  brain injury that affected him in the very relaxed interview

16  session -- session.  Plus I didn't see any evidence in his

17  clinical record of traumatic brain injury.  His only wartime

18  injuries were to his back and to his knee as opposed to

19  concussive injuries from IEDs or VBIEDs, vehicle borne IEDs, or

20  impact of shell or rocket.

21  Q.  Can mismatched vocabulary be indicative of falsification?

22  A.  It can be, yeah.

23  Q.  And exaggeration?

24  A.  Yes.

25  Q.  And, again, we didn't have that here; correct?

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    114

1   A.   That's correct.

2   Q.   Now, you've mentioned the PAI, the personal assessment

3   inventory.  Why did you choose the PAI over the MMPI?

4   A.   I chose the PAI because it's a test that's for which the

5   validity scales and diagnostic scales are more readily

6   understood by non-medical personnel.

7   Q.   Understood.  You described it to me as a true or false

8   question with a -- a true or false test with a twist; right?

9   A.   Yes.

10  Q.   What does that mean?

11  A.   That means that unlike the MMPI-II where it's -- true or

12  false are the only alternatives for each question, the PAI, if

13  the question is false about the person, meaning not at all

14  true, they answer false.  But if it is true, they rate whether

15  it's slightly, mainly, or very true about themselves.  And

16  that's the twist.

17  Q.   Okay.  And what did your PAI test reveal as it relates to

18  Aaron Leininger?

19  A.   The PAI indicated that Mr. Leininger answered similar

20  items -- some or similar items inconsistently, which was enough

21  answers that the test was considered invalid; however, that

22  wasn't all the information that was available.  Sometimes

23  invalid profiles can give valuable information.  And in this --

24  the additional valuable information about Mr. Leininger was

25  that:  He did not provide false or falsely exaggerated

1    symptoms; he did not malinger; he did not present as a

2    psychiatric simulator; and he also answered as a honest

3    responder, is the other validity scale.

4        So this is a -- this is a form of art, in terms of

5    interpreting this type of test.  Strictly the PAI isn't to be

6    interpreted; however, there is valuable information in the PAI,

7    and I have mentioned the valuable information, which is his

8    overall profile showed levels of anxiety, levels of depression,

9    levels of alienation from others that is consistent with his

10   actual face-to-face presentation as -- as well as his VA

11   medical record.

12   Q.  Was there any evidence of false reporting?

13   A.  No, and there's specific validity scales about that.  One

14   of them the malingering scales, the MAL, and his score on that

15   was zero, meaning no effort to provide false answers.

16       There's another one called the casual discriminate

17   function, which is -- which is a measure of whether the person

18   is simulating psychiatric conditions or they are a bona fide

19   psychiatric condition.

20   Q.  Okay.  Now, you mentioned that -- and, by the way, was

21   there any evidence of exaggerated reporting?

22   A.  No.

23   Q.  Okay.  Now, you mentioned that he had an invalid profile

24   but it wasn't because he was false reporting or exaggerating;

25   correct?

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    116

1   A.   That's correct.

2   Q.   Is it uncommon for patients with PTSD to result -- to yield

3   an invalid profile from time to time?

4   A.   It -- that's actually not the right question.  The right

5   question is:  Is it possible for people who have traumatic

6   disorders to answer inconsistently even though they are

7   symptomatic?  And the answer to that is yes.

8   Q.   And why does that happen with somebody like Aaron

9   Leininger?

10  A.   He or anyone like him, if they are the -- is experiencing

11  ongoing trauma that alters their level of attention, they may

12  skip over questions and not understand the -- especially the

13  questions that have a "not" in them or a -- they often miss the

14  "not" in them, in the question and answer, in a way that

15  appears to be inconsistent though the rest of the validity

16  scales suggests that they are answering to the best of their

17  ability.

18  Q.   And you mentioned that there was still meaningful

19  information revealed by this test that you could -- that you

20  used; correct?

21  A.   Yes.

22       And actually I want to correct an answer I just gave a few

23  minutes ago.  There are four primary validity question scales

24  that I utilize.  One of them is called the defensiveness index

25  and that's -- Mr. Leininger's style was not defensive; in other

1    words, he didn't minimize his symptoms.  The second is the

2    casual discriminate function scale, which indicates he was an

3    honest responder.  The third is the malingering index, which

4    indicates that he was not attempting to malinger.  Zero is well

5    below the cutoff of five.  And then the Rogers discriminate

6    function, which is the indication that he is answering in a way

7    that is similar to a bona fide patient as opposed to someone

8    who is trying to simulate psychiatric illness.  I want to make

9    sure that's clear.

10   Q.  So in those -- I mean, there's just no evidence of

11   falsification; is that right?

12   A.  Not on the PAI, and there certainly wasn't evidence of

13   falsification that Dr. Wendler discerned either.

14   Q.  Now, back to this issue of useful information that can

15   still be gleaned from this 344 part test -- 334 part test.

16   What information were you able to still glean from the test as

17   it relates to Mr. Leininger?

18   A.  I've -- I -- let me look at my report for a second.

19   Q.  Sure.

20   A.  Can't from memory.

21       The first is that his inconsistency was -- his answer style

22   was not due to an effort to try and derail the real test.  His

23   inconsistency was evidence of his difficulty --

24   Q.  Hold on.

25       (Court reporter interruption.)

1    BY MR. THOMAS:

2    Q.  So when you're flipping --

3    A.  Sorry, ma'am.  I'll move it over here.

4         I said that his inconsistency was not due to some effort,

5    but it was -- but it was evidence of his ongoing psychiatric

6    difficulties, taking into account that we'll have to say it's

7    invalid every time there was -- there were elevations of

8    somatization which is expressed through physical symptoms.

9    Q.  Let me -- let me stop you there.  For years I have been

10   confusing somatization with somatoform.  What is somatization?

11   A.  Somatization is expression of psychological or psychiatric

12   distress through physical symptoms.  A person -- for example, a

13   person who gets headaches because they are worried about

14   something, that's somatization.  It's not a fake thing.  It's

15   that they are tense and they get muscle spasms.  As opposed to

16   somatoform disorder, which is a disorder of someone who is

17   claiming medical symptoms or conditions for which subjectively

18   they are not supported.

19   Q.  Okay.  And, in this case, you did note evidence of

20   somatization; correct?

21   A.  Yes.  And somatization scales are often elevated in persons

22   who have chronic physical pain.

23   Q.  Any evidence of somatoform?

24   A.  No.

25   Q.  All right.  Continue on.  I interrupted you about what you

1   were able to glean.

2   A.   The second there was evidence in the PAI for traumatic

3   stress, specifically through prior traumatic events that still

4   bothered him.

5        The third question --

6   Q.   Does that include war and Wisner?

7   A.   It would include both, yes.

8   Q.   Okay.  Go ahead.

9   A.   The third element is that he has evidence of depression,

10  both what's called physiological and affective.  Affective

11  would be the person obviously looks depressed when you interact

12  with them.  And physiological are abnormal habits such as poor

13  sleep, feeling sad, not feeling like life is worth living,

14  et cetera, loss of appetite, changed appetite, changed sexual

15  interest.  Then the last two are social detachment and some

16  aggression.  Something in social detachment, Mr. Leininger

17  describes himself as a loner and that comes across in the test.

18  And last, that level of aggression is a level Mr. Leininger

19  endorsed it as a person feels aggressive but doesn't act on it

20  any more.

21  Q.   When we were talking about this test, you mentioned to me

22  that he presented as an honest responder.  What does that mean?

23  A.   It means that Mr. Leininger is doing his best to answer the

24  questions honestly.  He's trying to express his feelings and

25  answer in a way that is accurate to how he feels internally.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                120

1    Q.  You also mentioned that he presented as a bona fide

2    patient.  What does that mean?

3    A.  Well, it means that he's not trying to fake illnesses, fake

4    as though he has illnesses he doesn't have.

5    Q.  You told me last night that he's not a simulator.  What

6    does that mean?

7    A.  Well, that's the -- that's the -- that's the validity

8    scale.  There's a -- it's the dichotomy in the PAI.  It's a

9    person who is a bona fide patient versus a person who is a

10   coached psychiatric simulator; in other words, in his answer

11   style was the style of someone who has tried to express their

12   actual difficulty as opposed to simulating or faking

13   psychiatric difficulties they don't have.

14   Q.  Did you detect, through the testing, through the self-exam

15   and through your interview any evidence of malingering

16   whatsoever?

17   A.  Regarding PTSD and the consequences of Mr. Wendler --

18   Mr. Wisner's actions, no.

19   Q.  As it relates to his PTSD, does it affect his bodily

20   functions?

21   A.  Yes.

22   Q.  Does it affect his detachment disorder?

23   A.  I'm sorry, detachment?

24   Q.  Does it cause him to feel isolated or detached?

25   A.  Yes.  Yes, to the latter.

1    Q.   Does it contribute to his major depression?

2    A.   Yes.

3    Q.   Does it contribute to his risk of substance abuse?

4    A.   Yes.

5         MR. THOMAS:  It is 12:30.  I'm actually getting ready

6    to move on to a new topic, Your Honor, would this be a good

7    time?

8         THE COURT:  It is.  Go ahead and take our lunch

9    recess, planning to resume with our work half past the hour,

10   1:30 in the middle of the country.  Counsel, I'll look forward

11   to seeing you then.  Thank you very much.  Enjoy your lunch.

12       (Recess.)

13       THE COURT:  All right.  Counsel, we'll resume with the

14   witness in just a moment.  I want to touch briefly on an issue

15   that came up at Friday's conference, and this concerns the

16   plaintiff's capacity to proceed by pseudonym, namely initials.

17   I have looked back at some of the case law on this, and it is,

18   as I remembered it, limited capacity for people to litigate by

19   pseudonym requiring various levels of showings.

20       I did note during the evidence this morning,

21   Mr. Thomas, that you did refer to the plaintiff by his name.

22   Is that significant?  Is the plaintiff still taking the

23   position that the case should proceed as is currently captioned

24   with the John Doe designation?

25       MR. THOMAS:  I didn't think I had the choice anymore,

```
1   Your Honor.  I know your ruling on Friday was tentative and we
2   didn't readdress it this morning, and so I didn't think I had
3   the choice anymore.
4            THE COURT:  Yeah, I don't -- I think what I wanted to
5   communicate on Friday and perhaps I didn't -- worded it
6   poorly -- that the case law from our circuit says when the
7   court's deciding whether to allow a party to litigate by
8   pseudonym, that's not the norm and the court has to weigh the
9   interests of the public -- and these are the phrases -- this is
10  the phrase that's important -- interests of the public which is
11  paramount against those of the parties.  That's from the
12  Dobbins case, 616 F.2nd 458 back in 1980.
13           Certainly there's recognized -- there is a recognized
14  procedure that permits a party to proceed by pseudonym, but
15  they have to make a showing; they have to request it.  I've
16  looked at the docket and I don't see a place where the
17  plaintiff in this case, or any of the others, actually raised
18  the issue and sought permission to litigate in this fashion.
19  It's entirely possible I've overlooked it.  I'm new to the
20  case, but has that issue been presented to the court for
21  decision?
22           MR. THOMAS:  No, Your Honor.  It never came up with
23  Magistrate James or Judge Murguia, and we didn't know we would
24  have -- we didn't know that, Your Honor.  And obviously the
25  onus is upon us to know what our responsibilities and burdens
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1       123

1   and obligations are.

2         THE COURT:  Well, and I -- and I -- you know, I've

3   been assigned to the case for a while now, so I regret that I

4   didn't spot the issue sooner, and I know the rigors of trial

5   and preparation for it don't leave a lot of room around the

6   margins.

7         I guess what I would say to the plaintiff is that I

8   will give you a chance, if you want to present something that

9   tries to make the showing, that the case ought to remain

10  captioned as it is.  But if you are not going to do that, then

11  I don't think I have any authority even or even meaningful

12  choice, under the existing law in the circuit, to leave the

13  case where it stands now.  So I don't think it's going to

14  change anything you're doing this afternoon because, at

15  present, there's no request that would warrant you by referring

16  in the evidence to some sort of a pseudonym, but I think we

17  have to address at some point the recaptioning of the case if

18  the plaintiff is going to make the showing that's required.

19        MR. THOMAS:  Understood, Your Honor.  Thank you very

20  much, and we will -- we will take up the court's offer and

21  present some pleading on that.

22        THE COURT:  All right.  Are you ready to resume the

23  direct examination, please?

24        MR. THOMAS:  I am, Your Honor.

25        THE COURT:  Please proceed.

1   BY MR. THOMAS:

2   Q.  Welcome back, doctor.

3   A.  Thank you.

4   Q.  I was getting ready to move on to the portion of your

5   examination where you began discussing plaintiff's interactions

6   with Wisner.  But before I do, there's a few things in your

7   report I wanted to note.  Do you have your report in front of

8   you again?

9   A.  Yes.

10  Q.  First of all, on the first page of your report, it says

11  that plaintiff had been touched some eight times

12  inappropriately by Mr. Wisner.

13      Did I read that correct?

14  A.  Yes.

15  Q.  I'll represent to you that it has been stipulated that

16  there were actually nine encounters based on the medical

17  records.

18  A.  Okay.

19  Q.  Is that fair?

20  A.  Yes.

21  Q.  Okay.  The other thing I wanted to ask you about, I asked

22  you in detail to go over the military history and the war

23  history that the plaintiff recounted to the physicians and the

24  psychiatrists at the Veterans Administration back in 2008 and

25  2010; correct?

16-2627 Leininger v USA et al   7.6.20 Vol. 1     125

1    A.  Yes.

2    Q.  But you also go into some detail about it, and we're not

3    going to retread that ground.  But what I want to ask, you

4    mention it if I can find the page, you mention in several

5    spots -- you go over that same -- do you go over that same

6    history in your report --

7    A.  Yes.

8    Q.  -- in terms of wartime traumas?

9    A.  Yes.

10   Q.  And did you find it was consistent with what you reported

11   in the medical records back in 2010 and 2008?

12   A.  Yes, although he minimized the severity of the -- of the

13   combat experience.

14   Q.  He minimized it?

15   A.  Yes.

16   Q.  To you he did?

17   A.  Yes.

18   Q.  Okay.  And what do you mean by that?

19   A.  Well, it means that he mentioned what -- he answered my

20   questions.  He mentioned what -- the -- in a way that suggested

21   it was very difficult for him to talk about those things as

22   opposed to thrusting forward many war stories and aggrandizing

23   his military experience.  To him it was very private and very

24   painful and not uncommon for someone to minimize their affect

25   and their reaction, just to give the appropriate content.

1    Q.  I'm glad you bring that up.  In your report you used a word

2    that I admittedly had to look up.  You said he spoke with great

3    parsimony.  It's a great word.  I had to look it up.

4    A.  Parsimony means with few words.

5    Q.  I can't pronounce it right.  Parsimony.

6    A.  The reason I brought that up is because that was his style

7    of answering, not that he was trying to not say things, but he

8    was trying to answer things with as few words as possible,

9    especially topics that were very uncomfortable for him.

10   Q.  Is that uncommon with people who have suffered PTSD?

11   A.  For people who suffered trauma, no, it's not uncommon, no.

12   Actually, it's very common.

13   Q.  Okay.  Moving on the fourth part of your analysis involved

14   talking to Mr. Leininger, plaintiff, about his interactions

15   with Wisner; is that correct?

16   A.  That's correct.

17   Q.  First, what can you tell us about how he described when he

18   first met Wisner?

19   A.  Well, Mr. -- I'm not sure -- calling him --

20   Q.  Call him the plaintiff.

21   A.  The plaintiff indicated that he was returning to treatment

22   and Mr. Wisner was his primary care doctor; that he was --

23   Mr. Wisner was touchy and the plaintiff didn't like to be

24   touched.  He put his hands on the plaintiff's shoulders.

25   Seemed very familiar.  Mr. Wisner also put him at ease, which

 1   at first was very comforting, that he talked about both being

 2   battle buddies, both having served in the war, that Mr. Wisner

 3   discussed his military service and his rank and his -- and his

 4   special intention to take care of veterans, and that the VA was

 5   a safe place for veterans.  These things overcame Mr. -- the

 6   plaintiff's initial apprehension about even being there at all.

 7   Q.  Did Wisner tell him the VA was a safe place?

 8   A.  Yes.

 9   Q.  Did he tell him that as one veteran to another veteran that

10   veterans take care of each other?

11   A.  Yes, this was -- sorry.  This was something that he said to

12   the plaintiff.

13   Q.  What did -- did the plaintiff mention anything to you about

14   the kind of language that Wisner would use?

15   A.  Well, sometimes Mr. Wisner would use sort of

16   non-professional language to discuss the plaintiff's sexual

17   activity, sexual activity with his wife, discussed what it

18   might be, what you might call gruff talk or locker room talk

19   about the plaintiff's sexual activities in a way that was

20   unnecessarily sort of inquisitive especially since Mr. -- since

21   the plaintiff was there initially to be evaluated for back pain

22   and sciatica and had neurological problems.

23   Q.  I don't want to get gross or get too far in the weeds on

24   this, but can you give the court the idea of some of the kinds

25   of things that Wisner would say?

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    128

1    A.   You mean in general or to this particular plaintiff?

2    Q.   To this plaintiff.

3    A.   To this plaintiff, it was about the size of his penis, that

4    -- that he could please his wife, et cetera.

5    Q.   Is that -- now, this isn't the only Wisner victim that

6    you've evaluated, is it?

7    A.   That's correct.

8    Q.   Do you know how many you've evaluated?

9    A.   Yes.

10   Q.   How many?

11   A.   I've evaluated 18, including this plaintiff.

12   Q.   And is this kind of coarse talk, sexualized talk consistent

13   with the cases you evaluated?

14   A.   Yes, sir.

15   Q.   What else have you evaluated, in terms of how Wisner would

16   talk to these patients?

17   A.   That Mr. Wisner had a particular approach to the individual

18   plaintiffs.  He would talk about his military service; that he

19   was, I think, a lieutenant colonel, or that he would bring up

20   his rank; he would bring -- which almost always, except for one

21   plaintiff, was superior to the -- the plaintiffs; he would

22   bring up his medals; he would sometimes have his uniform in his

23   office; he would talk about how they were veterans together;

24   that veterans take care of each other; he would use his

25   position not only as a medical treater but also as a -- usually

1   a higher-ranking officer to put the veterans at ease; and he

2   also generally referred to many sexualized topics and sexual

3   and genital or rectal exams were a consistent part of his

4   longer medical examinations of each of the plaintiffs.

5   Q.   Now, when it came time for Wisner to conduct a genital exam

6   -- well, first of all, was Mr. Leininger there for any kind of

7   urologic issues?

8   A.   No.  Mr. Leininger came to establish care at the Dwight

9   David Eisenhower VA for back pain and sciatica, which is

10  irritation of the nerves of the lower back.

11  Q.   When he first told Mr. -- the plaintiff that he needed to

12  examine -- or conduct a genital examination, what -- how did he

13  phrase it?

14  A.   Well, he -- I'm confused what you mean.

15  Q.   Well, it's in your report he said he needed to check "your

16  junk;" is that correct?

17  A.   I'm sorry, I'm thinking of something.

18       Mr. Wisner -- that's some of the coarse talk.  Again,

19  remember that this is -- these are men dealing with men about

20  physical problems, especially about their genitals, and

21  especially younger men are often very -- very sensitive about

22  being touched, their genitals, by another man, and so often

23  coarse talk is used to sort of make it seem less personalized.

24       In this case, the -- the -- there was a method to Mr. -- in

25  my opinion, Mr. Wisner's approach, and that was to make the

1   veteran feel at ease when they actually shouldn't feel at ease.

2   There was some other things that were also important.

3        Medical exams, you know, due to the safety of for infection

4   and transmitting diseases from one patient to another and

5   protecting the practitioner, these kinds of close personal

6   examinations are usually mitigated by not having skin-to-skin

7   contact; in other words, the clinician wears gloves.  And, in

8   this case, this particular plaintiff, Mr. Wisner did not use

9   gloves to examine his penis or his scrotum; that the exams

10  lasted several minutes instead of a few seconds.  These are

11  things that were outside the range of his normal experience and

12  of a medical -- an appropriate medical exam.

13  Q.  Did Mr. Leininger tell you how long these genital exams

14  would usually last?

15  A.  Yeah, he said they were like two to five minutes instead of

16  10 seconds, which was what his experience was with all other

17  clinicians.

18  Q.  Let's split that time, 2 to 5 minutes.  Let's say it lasted

19  3 minutes and 30 seconds.

20       MR. THOMAS:  With the court's permission, I would like

21  to conduct a demonstration of how long that would last to a

22  plaintiff?

23       MR. EISER:  Objection.

24       THE COURT:  What's the nature of the demonstration?

25       MR. THOMAS:  I'm just going to start my clock and

1   count -- and for three-and-a-half minutes and have the doctor

2   explain what that would be like to be standing there disrobed

3   while somebody's fondling you.

4         THE COURT:  What's the objection?

5         MR. EISER:  I think we all know how long three minutes

6   and 30 seconds is.  I don't think this is necessary.

7         THE COURT:  Yeah, I agree, I don't -- I don't think

8   this is necessary.  I -- certainly the doctor is -- the witness

9   is free to talk about things that are within his expertise.

10  But how long three minutes and 30 seconds lasts I don't think

11  is -- he has special training or experience for that, so I'm

12  going to sustain the objection.

13        MR. THOMAS:  Understood.

14  BY MR. THOMAS:

15  Q.  Did Mr. Leininger -- or the plaintiff report to you whether

16  or not these long or prolonged -- these prolonged genital exams

17  were different than other genital exams he'd received from

18  healthcare providers?

19  A.  Yes.

20  Q.  And what did he say?

21  A.  He said that other healthcare providers wore gloves and/or

22  during the exams that the exams were as long -- never nearly as

23  long as though with Mr. Wisner.  This is in particular to this

24  plaintiff.

25  Q.  So now your report mentions that after the first visit

1   plaintiff tried to refuse -- when he came back the next time,

2   he tried to say no to the genital exam.  Do you recall that?

3   A.  Yes.

4   Q.  I'm not sure what page it is.  I had it marked but I've got

5   so many marks, I -- they're pointless.

6   A.  Page 5 of my report.

7   Q.  Page 5 of your report.

8       It says, after the first time being touched like that, the

9   plaintiff attempted to prevent PA Wisner from touching him

10  there.  At least once PA Wisner directly stated that he needed

11  to do this for the medication.  Is that what was reported to

12  you?

13  A.  Yes.

14  Q.  Now, let me ask you this:  Because he was of -- what did

15  that mean?  What did he mean when he said he tried to say no?

16  A.  Well, it means that the plaintiff was uncomfortable with

17  the examination being done by PA Wisner, not unlike someone who

18  might be uncomfortable with having their blood drawn or having

19  a COVID cotton swab inserted into the back of their sinuses;

20  that it was uncomfortable for the plaintiff but he believed

21  that this was part of the medical procedure, just like a COVID

22  swab would be, and so he allowed it even though he didn't --

23  even though he would have rather not have it done.

24  Q.  Right.  Does it mean that he knew that this was a crime?

25  A.  No, it means that --

16-2627 Leininger v USA et al   7.6.20 Vol. 1          133

```
 1              MR. EISER:  Objection.

 2   A.  -- Mr. Wisner --

 3              THE COURT:  What is the objection?

 4              MR. EISER:  Well, if there's two -- first, he's saying

 5   what did the plaintiff know; and, secondly, he's asking this

 6   psychiatrist to tell us what is a crime.

 7              MR. THOMAS:  It's in his report as to when he knew he

 8   had been the victim of a tort.

 9              THE COURT:  Why don't you rephrase it.  If you -- I

10   don't think the question in its current format is -- is an

11   appropriate question, but I do understand the point you're

12   trying to make and I'll let you rephrase it.

13   BY MR. THOMAS:

14   Q.  Let me ask it to you this way:  At the time where he felt

15   uncomfortable with the exams and asked if it was necessary, do

16   you have an opinion as to whether or not Mr. -- the plaintiff

17   knew what Wisner was doing was inappropriate?

18              MR. EISER:  Objection.  Foundation.

19              THE COURT:  Just asking him if he had an opinion.

20   Overruled.

21              THE WITNESS:  My opinion is that the plaintiff allowed

22   the examinations because he believed it was part of the medical

23   care that PA Wisner was providing even though it was

24   uncomfortable for him.

25   BY MR. THOMAS:
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    134

1    Q.   Thank you.

2         During this -- during this first exam, did Mr. Wisner offer

3    to do a rectal exam?

4    A.   Yes.

5    Q.   And what did plaintiff say to that?

6    A.   Oh, the plaintiff declined the rectal exam.

7    Q.   Did Mr. Wisner offer erectile dysfunction medications to

8    the plaintiff during this first exam?

9    A.   I don't recall if that was the first exam, but that was a

10   common pattern of Mr. Wisner's.

11   Q.   Did he eventually, at some point, offer Viagra and/or

12   Cialis to plaintiff?

13   A.   Yes and Mr. -- the plaintiff declined needing them.

14   Q.   Did Mr. Wisner offer testosterone treatment to the

15   plaintiff?

16   A.   I believe that he did.  That's also another behavior --

17   common approach by Mr. Wisner.

18   Q.   Now, I want to -- I wrote something down and I want to ask

19   you -- I'm going to pose it as a hypothetical.  If somebody

20   said that the plaintiff was sufficiently untroubled by what

21   Wisner had done to them until after Wisner was caught, would

22   you agree with that sentence?

23        MR. EISER:  Objection.  Foundation.

24   A.   I'm sorry.  Could you --

25        MR. THOMAS:  Hold on; the judge has to rule.

1          THE COURT:  Just a second.  Well, I'm going to

2     overrule the objection -- the foundation objection.  I'll

3     permit the witness to answer this question.

4          THE WITNESS:  I'm sorry, could you restate the

5     question.

6     BY MR. THOMAS:

7     Q.  The hypothetical is if somebody said that the plaintiff was

8     "sufficiently untroubled until after Wisner was caught," would

9     you agree with that?

10    A.  I don't understand -- I don't know what that means,

11    "sufficiently untroubled."

12    Q.  Let me word it a different way then.  Why didn't the

13    plaintiff report Wisner before he did?

14         MR. EISER:  Objection.

15         THE COURT:  What's the objection?

16         MR. EISER:  Again, he's asking this witness to tell us

17    what his client, who hasn't testified yet, what his motivation

18    or what was on his mind.  There's no foundation for this.

19         THE COURT:  I agree.  I sustain the objection.

20    BY MR. THOMAS:

21    Q.  In conducting your analysis and your expert opinion, did

22    you also discuss why the plaintiff didn't report sooner?

23    A.  Yes.

24    Q.  Okay.

25         MR. THOMAS:  Have I laid the foundation now, Your

1   Honor?

2          THE COURT:  I don't know what the question is going to

3   be.

4          MR. THOMAS:  Fair enough.

5   BY MR. THOMAS:

6   Q.  In interviewing the plaintiff and trying to determine why

7   he did not report sooner than he did, did you reach an opinion

8   or a conclusion?

9   A.  Yes, I reached -- I reached an opinion.

10         MR. EISER:  Objection.  Foundation.

11         THE COURT:  Well, your objection is overruled, that

12  objection is.  I don't know what else is coming.  So long as

13  the questions go to this witness's expertise, matters within

14  his expertise, I'll permit it.  But I don't know what the

15  answer or the question is that's coming, so I can't sustain the

16  objection.  I'm not sustaining.

17  BY MR. THOMAS:

18  Q.  So let me -- let me lay a little more foundation.  How many

19  mentor sex abuse cases did you say you had done?

20  A.  More than 200.

21  Q.  In your experience, as a clinical -- excuse me, as a

22  psychiatrist, have you been asked to exam why plaintiff -- why

23  victims come forward when they do?

24  A.  Yes.

25  Q.  And is that something that you're regularly asked to do as

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    137

1    a forensic and general psychiatrist?

2    A.   Yes.

3    Q.   And is that something that other forensic and general

4    psychiatrists are qualified to evaluate?

5    A.   I would say those who have experience in trauma and

6    trauma-focused treatment, yes, it's a question they would

7    address regularly.  Probably not general psychiatrists who

8    don't do specialized evaluations of those of experienced sexual

9    trauma but...

10   Q.   But you've done over 200?

11   A.   Yes, sir.

12   Q.   And, in this case, did you offer opinions about why or --

13   why the plaintiff came forward when he did?

14   A.   Yes.

15   Q.   And, in fact, didn't you offer the same analysis for all

16   these other plaintiffs who came forward when they did?

17   A.   Well, they're all individualized analysis -- assessments,

18   but it's very similar reaction that these men had to

19   Mr. Wisner's sexualized approach to them.

20   Q.   Did the plaintiff convey to you when at what point he

21   realized that he had been a victim of -- that he had been

22   victimized by Wisner?

23   A.   Yes.

24   Q.   And did you include that information in your expert report?

25   A.   Yes.

1  Q.  Okay.  Based on your experience and the information

2  provided to you --

3       First of all, let me ask you this:  When did the plaintiff

4  come forward with his experience about Wisner?

5  A.  After he received a notice from the Officer of Inspector

6  General.  I think that inspector general name was Kerry Baker

7  or Kelly Baker.

8  Q.  And isn't it true that the vast majority, probably

9  90 percent of these veterans, came forward only after they

10  received notification from Kerry Baker?

11  A.  That's my understanding.

12  Q.  Okay.  Do you know what it was, as conveyed to you by the

13  plaintiff, what it was about that letter that made the

14  plaintiff want to come forward?

15  A.  There was the general question that's, "Anything troubling

16  at the VA that had happened?"

17  Q.  In your expert opinion, did the plaintiff know that he had

18  -- was a victim of Wisner's before he received that letter from

19  Agent Baker?

20          MR. EISER:  Objection.  Foundation.

21          THE WITNESS:  No.

22          THE COURT:  Overruled.

23          THE WITNESS:  It wasn't until Mr. -- the plaintiff was

24  noticed that -- that there were -- that Mr. Wisner's conduct

25  was troubling and inappropriate that he recognized he'd been

1   sexually molested by Mr. Wisner.  Until that point, he had

2   tolerated the uncomfortable examinations thinking that was part

3   of his medical care.

4   BY MR. THOMAS:

5   Q.  Did he even know that Wisner did anything wrong before

6   receiving that letter from -- from Baker?

7   A.  My understanding is he did not and my opinion is that he

8   did not.

9   Q.  And when did the PTSD get triggered as a result of Wisner's

10  behavior?

11  A.  Once he recognized that he'd been molested, sexually

12  touched against his will.

13  Q.  So he didn't know and he didn't have the damage yet until

14  he received the letter from Agent Kerry Baker?

15  A.  Yes.

16          MR. EISER:  Objection.  Leading.

17          THE COURT:  Sustained.  Please rephrase the question.

18  BY MR. THOMAS:

19  Q.  Did he know that he had suffered trauma as a result of what

20  Wisner did to him before he received that letter from Baker?

21          MR. EISER:  Objection.  Leading.

22          THE COURT:  Overruled.

23          THE WITNESS:  The short answer is very often persons

24  in this situation don't recognize they were sexually abused

25  until something pierces their defenses, overcomes their

1   defenses of tolerating it, and that's the case when Mr. -- when

2   the plaintiff received the letter, he recognized -- he finally

3   recognized that Mr. Wisner's conduct was not appropriate

4   medical care but was actually sexual molestation and, in that

5   way, he didn't understand what happened to him as -- as a

6   molestation until he was noticed by someone else.

7   BY MR. THOMAS:

8   Q.   What is -- what does the term outside validator mean?

9   A.   Well, it's -- an outside validator is an alternative source

10  of information not unlike a psychological test that provides

11  validation.  Okay.  In a personal interview -- or a very simple

12  example would be the -- a person who says -- fell and their arm

13  is crooked and they're pretty sure that it's broken and it

14  turns out that it's -- an x-ray shows that, yes, it's broken

15  badly or their arm is dislocated, those would be outside

16  validation of their subjective certainty.

17  Q.   Was there outside validation for the plaintiff after he

18  received that letter from Agent Kerry Baker?

19  A.   Yes.

20  Q.   Before he ever saw Mr. Wisner, the plaintiff had been

21  diagnosed with combat-related PTSD from the VA; correct?

22  A.   That's correct, first in probably 1997, then 2008, then

23  2010.

24  Q.   And he was even given a disability rating from the VA as a

25  result of his combat-related PTSD?

1   A.   Yes, first at 30 percent and then 50 percent I think six

2   months later.  I don't remember the exact number of months.

3   Q.   With that as the basis -- let's put a hold on that for a

4   second.  Explain how being sexually molested impacts men in

5   general.

6              MR. EISER:  Objection.  Foundation.

7              THE COURT:  The objection is foundation?

8              MR. EISER:  Yes.

9              THE COURT:  Overruled.  I conclude that the question

10  is directed at the witness's scientific, technical, or other

11  specialized knowledge, so it's appropriate.  Overruled.

12             THE WITNESS:  I think within the context that every

13  one of these persons is evaluated as an individual, there are

14  some common threads, especially for hypermasculine men such as

15  police officers, firemen, those that have been in the military

16  and that is they are very strongly invested in being in control

17  of their -- themselves, in control of their body and their body

18  space, and the -- one of the biggest traumatic elements of

19  being sexually molested is that these men feel that they were

20  fooled, that they were prevented from being the strong

21  protector of themselves as well as other men, and they feel

22  humiliated at not being able to recognize that they were --

23  they were victimized.

24  BY MR. THOMAS:

25  Q.   And that brings me to my next question.  We've talked about

1    this concept of mentor abuse; correct?

2    A.   Yes.

3    Q.   How does being the victim of mentor abuse impact a victim?

4    A.   Well, for an adult who, in this current plaintiff's

5    specific experience, he has had substantial trouble since his

6    military experience trusting anyone, and that means his --

7    anyone who's in authority, who provides care for him, who -- he

8    has to impart some level of giving up of control.  And only

9    usually when a person is in treatment for PTSD, one of the

10   elements of treatment is to re-establish control over things

11   that they lost when they were in the military.

12        And so, as a mentor, Mr. Wisner held himself out as a

13   medical treater who knew what it was like to be a veteran, who

14   knew what it was like to be in battle, who could put this

15   plaintiff at ease, and basically developed a false level of

16   trust of the plaintiff of Mr. Wisner's approach to him so he

17   was disarmed and didn't realize that he was being sexually

18   abused.  And, when he finally came to realize that, like other

19   men, he was extremely humiliated.

20        And now, as a worsening of his PTSD, now doesn't know who

21   to trust at all, anyone at the VA.  And in particular because

22   the VA has a centralized note system that anybody can access

23   his notes who has access to the computer, he now has a global

24   loss of connection -- of trust to the system.  And since he has

25   a -- has PTSD and already has trust issues, he was reaching out

 1    to get some help for the first time in a while and now is --

 2    and, in my medical opinion about the concept of trauma and --

 3    trauma -- loss of trust, he now has reached out and had that

 4    trust bashed entirely because Mr. Wisner manipulated him.  That

 5    can make it so he feels no reason to trust anyone in that

 6    particular medical professional or that medical facility ever.

 7    Q.   Before you took the stand, I made a representation that

 8    plaintiff was vulnerable to exploitation.  Would you agree with

 9    that?

10    A.   Yes.

11    Q.   And is that based on the extensive history you've already

12    talked about?

13    A.   Yes, but it's also -- he's also vulnerable because of his

14    prior traumas, and I think I explained that earlier.  A person

15    who experiences traumas is then vulnerable to a stronger

16    response through subsequent traumas.  The plaintiff was coming

17    to establish care at the VA having moved from West Virginia,

18    and so he was very much subject to Mr. Wisner's expertise as a

19    clinician.  In this case, he was also subject to Mr. Wisner's

20    expertise to manipulate him.  He did not realize that that way

21    he's vulnerable also because of the PTSD as well as his other

22    physical problems.

23         Chronic pain means that he's going to -- Mr. Plaintiff is

24    going to need ongoing medical care in terms of analgesic agents

25    and opiates and alternative support therapy.  And because of

1   his substance abuse, he's also going to need some knowledgeable

2   treater to not provide a situation where he can become, well --

3   provide a situation where his substance abuse problems can be

4   appropriately addressed and managed.

5   Q.   Are you familiar, in your work in mentor abuse cases of

6   mentor sexual abuse cases, of the concept of grooming?

7   A.   Yes.

8   Q.   Can you explain to the court what that means?

9   A.   Grooming is the process that a motivated perpetrator uses

10  to disarm a victim or potential victim's awareness they are

11  being manipulated.

12       Such as with children, the person who is grooming a younger

13  child can be extra friendly, can show special attention, can

14  remind the child's parents how safe they are with that

15  particular person.  If the child gives -- approximate sexual

16  touching without ever doing it exactly and see what the child's

17  reaction is or actually sexually touch the child and then

18  apologize and see how the child reacts; in other words,

19  behaviors that eventually approximate the sexual activity that

20  the perpetrator wants.

21       With adults the technique is -- the approach is very

22  similar only they're dealing with people who have more

23  psychological sophistication.  So the perpetrator often picks

24  out vulnerable people who are either severely depressed or have

25  developmental problems or substance abuse problems or problems

1    with loneliness and isolation and makes their environment very

2    safe.  But the reason they're making the environment safe is

3    not for the purpose of providing health and recovery but for

4    the purpose of laying the groundwork to be able to sexually

5    touch a person who, in a way that they don't recognize, they're

6    being manipulated.

7    Q.   You mentioned -- you mentioned too that when somebody

8    realizes after being groomed that they had, in fact, been

9    sexually molested, you called it a "double whammy."  Do you

10   remember that?

11   A.   No but I have said that to your other people before.

12   Q.   What does that mean, double whammy, as it relates in this

13   concept?

14   A.   Well, this concept in grooming, the first whammy is they

15   recognized that they were sexually abused when they thought

16   they were being cared for and the second is their nascent trust

17   in the person sometimes for the first time was dramatically

18   abused also.  And so they have the reality of the sexual --

19   abusive sexual act as well as the -- the tearing down of their

20   trust in someone who is in authority over them, in that way

21   it's a double whammy.

22   Q.   With all that background in mind and the background of what

23   happened to him and keeping in mind his already pre-existing

24   depression and PTSD, how has Wisner's conduct affected the

25   plaintiff?

1   A.  Well --

2              MR. EISER:  Objection.  Foundation.

3              THE COURT:  Hold on just a second.  The objection is

4   foundation?

5              MR. EISER:  Yes, Your Honor.

6              THE COURT:  What foundation do you contend is missing?

7              MR. EISER:  Mr. Thomas has not tendered this witness

8   to the court as an expert.  He's not been qualified as an

9   expert by the court to render an opinion.  He's rendered a few,

10  but none of them would be admissible.

11             THE COURT:  Well, is the objection that the opinion on

12  this subject is undisclosed?

13             MR. EISER:  No.  He has not been tendered as an expert

14  witness, nor have you qualified him as an expert witness

15  justifying him to render opinions at all.

16             THE COURT:  Well, I disagree with that.

17             I do want to hear from the plaintiff.  The question is

18  -- the question you want to phrase to the witness is:  How was

19  the -- how did the conduct affect the plaintiff?  What about it

20  is -- Mr. Thomas, what about the witness's qualifications,

21  experience and training qualify him to answer that question?

22             MR. THOMAS:  I have covered -- I covered his

23  expertise, his education, his training, his experience, his

24  work specifically with veterans, his work specifically with

25  over 200 sex abuse victims.  He is a clinical psychiatrist.  He

```
1    is a forensic psychiatrist.  He administered tests.  He
2    conducted extensive record review and he interviewed the
3    plaintiff.  That is my foundation, which I believe I'd already
4    laid, to ask this question.  I have never been asked to tender
5    a witness of an expert outside of criminal court in my career.
6              THE COURT:  Yeah, I -- a formal tender is not required
7    under the Federal Rules of Evidence, so I'm going to overrule
8    the present objection, permit the witness to answer the
9    question.
10   BY MR. THOMAS:
11   Q.  Let me see if I can rephrase -- or remember it.
12       Let me just ask you -- yeah.  How has what has happened to
13   him as a result of Wisner impacted the plaintiff?
14   A.  Well, once Mr. -- plaintiff recognized that he'd been
15   sexually molested, he experienced worsening of his normal PTSD,
16   became more isolative.  He became less trusting.
17       He has been unable to go to the VA because of the sights
18   and smells of the place, reminders of Mr. Wisner.  He dropped
19   out of PTSD treatment entirely for five years, meaning no
20   psychiatric medications or psychotherapy, which caused his
21   condition to deteriorate at least by the time I saw him
22   relative to the medical record.
23       He had substantial doubts about his own sexual ability, and
24   that affected his marital relationship.
25       He had problems with -- he had problems with some substance
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1          148

1   abuse issues that he's still struggling with.

2       He has come to recognize that another thing he didn't want

3   to be, which was a victim of somebody else's maltreatment of

4   him, especially when he was trying to overcome his wartime

5   difficulties.

6       He's had substantial difficulties with isolation,

7   substantial difficulty having normal interpersonal

8   relationships.  He's come to recognize that -- that his trust

9   in himself, his ability to interact with others has all been

10  damaged.

11  Q.  At the time you examined him, how long had it been since he

12  would step foot in a VA facility?

13  A.  Mr. -- plaintiff told me he hadn't been in the VA for five

14  years.

15  Q.  And --

16  A.  Out of treatment for five years.

17  Q.  And, in your expert opinion, is there a clinical reason,

18  based on your review of the facts, your testing and your

19  examination of the plaintiff, is there a clinical reason why he

20  refuses to go back to the VA?

21  A.  Yes.

22  Q.  What is that reason?

23  A.  The clinical reason is that going back to the VA system,

24  especially the VA in Leavenworth, triggers memories of the

25  abuse by Mr. Wisner that are intolerable to him, and this

1    includes being in the building, being on the same floor, being

2    in the same clinic floor where Mr. Wisner's office was, the

3    smell of the place, things that are not uncommon for persons

4    who have been sexually abused or physically abused.

5    Q.   Okay.  But there's a VA Hospital here over in Kansas City;

6    why hasn't he gone there?

7    A.   Well, the other element is that Mr. Plaintiff has lost his

8    capacity to trust that the VA will safeguard him as a veteran

9    and that has generalized to all the facilities.  And, as I said

10   earlier, all the VAs -- all the VA record systems are linked.

11   He does -- he has no one that he can talk to about at the VA

12   because, if he talks about what happened -- again, this is my

13   opinion, if he talks about what happened with Mr. Wisner to

14   people at the VA in Leavenworth, he's talking to people who

15   worked with him, and the level of confidentiality is lower.

16   Often he does not feel -- he would not feel comfortable sharing

17   that kind of thing.

18   Q.   Does he trust the Department of Veteran Affairs?

19   A.   No, he does not.

20   Q.   And is that understandable from a clinical perspective?

21   A.   It's understandable.  Many -- many wartime combat vets

22   don't have much trust but they participate in treatment because

23   it's the only way they can get care and...

24   Q.   But it's different from plaintiff?

25   A.   But also Mr. Plaintiff has now experienced an additional

1   trauma caused by the lack of oversight of Mr. Wisner's

2   supervisors and Mr. Wisner's conduct towards him so that he

3   doesn't believe that those at the VA will protect him as a

4   patient should be.

5   Q.   And, in your review of the plaintiff's and other Wisner

6   cases, was that a common theme, their distrust and not wanting

7   to return to the VA?

8            MR. EISER:  Objection as to "others."

9            THE COURT:  Overruled.

10           THE WITNESS:  It is a common theme because, for the

11  reasons I stated about the -- many of the co-workers of

12  Mr. Wisner are still there, and there is no -- many of these

13  men don't feel like they have enough privacy to be able to

14  share what happened with Mr. Wisner in that clinical context.

15  BY MR. THOMAS:

16  Q.   He's lost five years of progress he was making in

17  psychotherapy; is that correct?

18  A.   Well, again, my opinion is that progress stopped and he was

19  clinically worse -- significantly worse when I saw him.  So he

20  had, prior to his interactions with Mr. Wisner, had started to

21  make improvements in treatment, although it was a slow moving

22  process.

23  Q.   As a clinician and from a clinical standpoint, if he was

24  forced to go back into the VA system for psychiatric care,

25  would that cause you concern?

1    A.   Yes because of his lack of trust.  And if he can't develop

2    a therapeutic alliance with treaters available to him at the

3    VA, there's not going to be the capacity to talk about the most

4    difficult things.

5    Q.   And he deserves to be able to have a healthcare and

6    psychiatric provider that he can trust and won't abuse his

7    relationship; fair?

8    A.   Yes.  If you're referring to Mr. Wisner, that's exactly

9    right.

10   Q.   And I'm also refusing -- referring to the people who failed

11   to supervise Wisner.

12   A.   Yes, that's correct.

13   Q.   Did he tell you, on page 3 of your report, that he was not

14   receiving any care from VAMC and he was "really leery about

15   going back because of what had happened to him"?

16   A.   Yes.  I quoted that because that's what he told me.

17   Q.   Did he tell you there was no staff that he could trust?

18   A.   Yes.

19   Q.   If you go to page 4, did he tell you that he was unsure

20   about his mental health and he felt "spooked" the last few

21   years and had nobody he could trust, including his wife?

22   A.   Yes.  These are consequences of Mr. Wisner's actions.

23   Q.   Did he tell you that he felt screwed -- "screwed" by VAMC

24   and put through a bad situation with Wisner?

25   A.   Yes.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    152

```
1    Q.  Did he tell you that he has problems sleeping and that he

2    has intrusive thoughts about what Wisner did to him?

3    A.  Yes.

4    Q.  Did he tell you that more than ever he didn't like anybody

5    to touch him?

6    A.  Yes.  That's impacted his sex life with his wife.

7    Q.  He has -- not engaged in any affairs of the heart with his

8    wife; is that correct?

9    A.  That's not what I said.  There's a portion of my report

10   where somebody has -- tells me they have diminished sex

11   activity with their spouse.  I ask questions about whether they

12   had an affair of the heart, which is a non-sexual attachment to

13   some other person.

14   Q.  I got you.

15   A.  The answer is no and neither did his wife.

16       And the second question is whether he has had a sexual

17   affair or spouse has had sexual affairs, because those are --

18   contribute to loss of sexual intimacy, and the answer to that

19   question is none of those things.

20   Q.  I apologize, I totally took that out of context and misread

21   it.

22       Did he tell you he shrunk away from his wife and everybody?

23   A.  Yes.

24   Q.  Did he tell you that at one point he wanted to do bodily

25   harm to Wisner?
```

1    A.   Yes.  Not an uncommon statement.

2    Q.   Did he -- he mentioned -- and you talked about how Wisner

3    prescribed opioids and benzos, benzodiazepines, to the

4    plaintiff even though he had a history of opioid addiction.

5    Did Mr. Wisner ever offer alternative treatments?

6    A.   I mentioned this in my report in terms of things, like,

7    physical therapy and ultrasound and electrostimulation of the

8    back, spinal cord stimulators, et cetera, et cetera, none of

9    that was offered.

10   Q.   In your review of this case and other Wisner cases, did you

11   notice a pattern of him excessively and unnecessarily

12   prescribing opioids and benzodiazepine?

13   A.   Yes.

14   Q.   It was part of his MO; correct?

15   A.   Yes, part of his approach to vulnerable people, which is

16   also a common perpetrator's approach, which is to -- to attach

17   something that the person values with something taboo.

18   Q.   Did the plaintiff tell you that -- the worst things about

19   what happened to him from Wisner were the long-term side

20   effects on his psyche, that he can't function, and he can't

21   even talk to his wife about what happened to him?

22   A.   Yes, those are things he told me based on questions I

23   asked.  All right, he didn't say those things, but I asked him

24   questions about the consequences, in part to get an idea of

25   what -- if he could benefit from treatment, what those topics

1    might be.

2    Q.   If you go to page 7, when was the last time the plaintiff

3    reported to you of ever feeling happy?

4    A.   Oh, that was -- this is a part of my questions about his

5    past level of personal satisfaction.  The last he felt happy

6    was before the events with PA Wisner.

7    Q.   Now, he had always had problems sleeping going back to the

8    war.  Has that been exacerbated by what Wisner did to him?

9    A.   Yes.

10   Q.   Explain.

11   A.   Well, if you look through his VA record, Mr. Plaintiff had

12   problems with insomnia and nightly or weekly recollections of

13   combat after the events with Mr. Wisner, and not only did he

14   have those combat recollections and nightmares, he now had

15   recollections of what Mr. Wisner did with him.

16   Q.   Did he specifically tell you that he had nightmares related

17   to Wisner?

18   A.   Yes.

19   Q.   Did he try to interpret his dreams in terms of what the

20   themes were?

21   A.   Yes.

22   Q.   What did he tell you?

23   A.   Well, he was -- the dreams are -- dreams like this are

24   often about control and arresting control from someone else,

25   and that's what his themes were about, trying to control what

1    the -- "the jerk," what Mr. Wisner did to him.

2    Q.   You wrote this down.  You wrote, "He hoped his future would

3    be 'better than this,'" and quote/end quote on "better than

4    this;" correct?

5    A.   Yes.  Mr. Plaintiff was very depressed when I evaluated

6    him.

7    Q.   Did he describe suicidal ideation?

8    A.   Some, yes.

9    Q.   Had he ever had suicidal ideation before Wisner?

10   A.   He said no -- well, actually, he said he had a few but not

11   as intense.

12   Q.   He wrote he had no suicidal ideation before the events of

13   PA Wisner; is that correct?

14   A.   I'm sorry, that is correct.

15   Q.   But you wrote he had some suicidal ideation a year or two

16   earlier but resisted by keeping in mind what he has.  Is that a

17   quote?

18   A.   Yes.

19   Q.   Referencing his family?

20   A.   Yes.

21   Q.   But there was a time when he thought about killing himself

22   due to Wisner.  That's what you wrote; correct?

23   A.   Yes.

24   Q.   That he sat on a bed and he chambered a round into a

25   firearm and he thought about killing himself; correct?

16-2627 Leininger v USA et al   7.6.20 Vol. 1                156

1    A.   Yes.   The reason I ask those kinds of questions is because

2    it gets to how close the person actually is to trying to kill

3    themself.   You know, there's a real difference between somebody

4    thinking about a firearm versus chambering a round and aiming

5    it at themselves or pulling a trigger, which I've seen a few

6    times but the weapon didn't go off.

7    Q.   He didn't do it though?

8    A.   That's correct.

9    Q.   What did he -- why did he tell you he didn't squeeze that

10   trigger?

11   A.   Well, because he thought about those who were important in

12   his life.

13   Q.   And there was one other reason, probably secondary?

14   A.   I'm sorry, right.   The other reason is one of the most

15   important ones, and that is that if he killed himself then --

16   then Wisner would win.   And this is one thing that often keeps

17   people from killing themselves or doing harm to themselves is

18   because, if they die or they quit even though they are in pain,

19   then the perpetrator has that power over them.   And he

20   fortunately backed away from it.

21   Q.   He had so much anger and rage and depression that he

22   actually looked Wisner up at some point on the Internet;

23   correct?

24   A.   Yes, that's -- I'm sorry, I sound dismissive.   That's not

25   uncommon for this group.   It's not uncommon for anyone.   What's

1    important is whether he went to find him.

2    Q.  He didn't act on it?

3    A.  That's correct.

4    Q.  But the anger and the emotion and the trauma is there;

5    right?

6    A.  Yes.

7    Q.  You mentioned that he is somewhat agoraphobic since the

8    events at -- regarding Wisner and now he prefers to be at home.

9    What does that mean?

10   A.  Well, agoraphobia is one of the -- one of the anxieties,

11   panic with or without agoraphobia.  Persons who are agoraphobic

12   tend to be -- I forgot the exact word -- I think it has to do

13   with being afraid of open spaces.  And what it really means is

14   the person feels unsafe out in the crowd or out away from home,

15   and so they often are comfortable only at home.  Very severe

16   agoraphobic persons often are only comfortable in their bedroom

17   with the door locked.  In this case, Mr. -- Mr. Plaintiff

18   experienced dread and anxiety when he's -- when he's out in

19   public.

20   Q.  Let me -- I'm going to switch gears and then I'm going to

21   come back, but it's a quick -- it's a quick detour.

22       Is drug-seeking behavior uncommon for victims of sexual

23   trauma?

24   A.  No.

25   Q.  Is drug-seeking behavior common for people with wartime

16-2627 Leininger v USA et al   7.6.20 Vol. 1          158

1  trauma?

2  A.  No, it's very common.

3  Q.  Is drug-seeking behavior uncommon with people who suffer

4  from bipolar depression?

5  A.  No, not at all.

6  Q.  But he had been in treatment for these things, hadn't he?

7  A.  Yes.  But, as you know, substance abuse or substance abuse

8  disorders or addiction, depending on how you want -- kind of

9  what area you're from, these are medical diseases.  They are

10  not your -- they are controlled and they need appropriate

11  interventions to help the person functioning optimally.

12  Q.  You wrote that Mr. Leininger's PTSD treatment was totally

13  derailed by PA Wisner's sexual manipulation, and this for that

14  prescribing of opiates and benzodiazepine?

15  A.  Sounds like what I would have written.

16  Q.  And do you agree with that?

17  A.  Yes.

18  Q.  That the plaintiff felt extremely uncomfortable with the

19  genital exams but Wisner made him solely reliant on the opiate

20  and benzodiazepine to be able to tolerate his wartime

21  exposures?

22  A.  Yes, that's my opinion based on the understanding -- my

23  understanding of Mr. Wisner's approach to this plaintiff as

24  well as this plaintiff's vulnerabilities.

25  Q.  You also opined that Wisner's actions effectively stopped

1    plaintiff's PTSD treatment and he has not recovered very much?

2    A.   Yes.

3    Q.   What is a therapeutic alliance?

4    A.   A therapeutic alliance is the agreement between a treater

5    and a patient, or a treater and a client, that they will work

6    to use techniques to help the person get better.

7         For example, a therapeutic alliance between, say, an

8    orthopedic surgeon and someone who has broken their leg is that

9    the person whose leg is broken understands that they are going

10   to tolerate the surgeon pulling on their leg to put it back in

11   place so they can cast it; that it is a very uncomfortable

12   thing if you've ever had it done.

13        A therapeutic alliance in psychiatry is an agreement to

14   work towards the patient's good to help them be relieved of

15   illness or even cured, if that's possible, using appropriate

16   techniques such as medication if the person has significant

17   bars to their ability to talk because of, say, depression or

18   anxiety or psychosis or mood swings.  And then the talk therapy

19   is focused on what would help the person deal with their most

20   difficult problem.  Such as in the case of someone who's

21   experienced sexual, physical or emotional trauma, then a trauma

22   focused therapy process is -- will be assisted by medication

23   treatment.

24        But all together the alliance is an agreement between the

25   patient based on trust of the clinician and the clinician

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    160

1    method to work toward getting better.

2    Q.   Doesn't there have to be a therapeutic alliance on behalf

3    of the patient in order for the treatment to work?

4    A.   I think I just said that:  yes.

5    Q.   And is there any chance that the plaintiff can have a

6    therapeutic alliance with VA healthcare providers?

7    A.   Not that I've seen, especially based on the five years of

8    being unable to restart treatment at the VA.

9    Q.   You indicated and you opined that the plaintiff's

10   presentation is consistent with DSM-V posttraumatic stress

11   disorder?

12   A.   Yes.

13   Q.   Major depression?

14   A.   Yes.

15   Q.   Moderate, single episode, a severe opiate use disorder, and

16   a history of severe sedative hypnotic use disorder; is that

17   correct?

18   A.   Yes.

19   Q.   Do you believe that the plaintiff in your -- in your expert

20   opinion, do you believe that the plaintiff suffered severe and

21   worsened PTSD as a result of what happened to him at the VA by

22   Wisner?

23   A.   Yes, by Wisner.

24   Q.   Do you believe that that exacerbated and worsened his

25   wartime PTSD?

16-2627 Leininger v USA et al   7.6.20 Vol. 1

1    A.  Yes, because he dropped out of treatment and had five years

2    of no beneficial treatment which he had needed and was

3    benefitting from before he met and was treated by Mr. Wisner.

4    Q.  And is it your opinion that the plaintiff's moderate to

5    major depression is secondary to what happened to him at the

6    hands of Mark Wisner?

7    A.  My opinion is that he had depression beforehand, which --

8    which was being treated moderately well at the VA, and when he

9    dropped out of treatment because of Mr. Wisner's actions then

10   depression started to get worse.

11   Q.  So it was an additional traumatic experience that worsened

12   his depression and his PTSD; is that correct?

13   A.  Yes.

14   Q.  There's a depressive response to his wartime experience,

15   and a depressive response to what Wisner did to him; correct?

16   A.  Yes.

17   Q.  What is dysthymia (onomatopoeia), dysthymia?

18   A.  Dysthymia means -- it's an old, old psychiatric term.

19   Normal moods used to be called euthymic:  normal emotional

20   tone.  Dysthymia now is thought of as sort of lower grade

21   persistent depression but not so severe as to be major

22   depression.  So Mr. Plaintiff has dysthymia most of the time;

23   in other words, he never really feels happy.

24   Q.  This is directly caused by his experiences with Wisner?

25   A.  Yes, because he dropped out of treatment as a consequence

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    162

1    of Mr. Wisner's actions and lost the benefit of medicines as

2    well as supportive therapy and perhaps expressive persistent

3    exposure therapy or cognitive processing therapy that could

4    have helped him with his PTSD, both for the wartime experience

5    and with Mr. Wisner.

6    Q.   I'm going to ask you a question that always makes doctors

7    uncomfortable, but I'm going to ask it anyway.  Is there any

8    doubt in your mind as to whether or not plaintiff is

9    malingering?

10   A.   There is no doubt in my mind about Mr. Plaintiff's

11   malingering.  The answer is I do not find evidence that he is

12   malingering, either false or falsely exaggerated posttraumatic

13   stress disorder from the war, false or falsely exaggerated

14   major depression, or false or falsely exaggerated response to

15   Mr. Wisner's actions.

16   Q.   Is he -- has Wisner's actions caused an increased risk of

17   relapse as it relates to his substance use disorder?

18   A.   Yes.  To manage his affects in the past, Mr. Plaintiff had

19   used methamphetamines to boost his low mood and then alcohol to

20   depress him or slow him down or sedate him.  So he is at risk

21   for those things to occur again.  Same thing with the opiates:

22   that's a depressant.

23   Q.   Now, on the last page -- well, did you make any clinical

24   recommendations for the plaintiff moving forward?

25   A.   Yes.

1    Q.  Let's go through those, please.  What were your

2    recommendations for the plaintiff?

3    A.   I have two basic recommendations for the plaintiff.  The

4    first is that he needs to have appropriate medications

5    restarted to manage his difficulties:  that's one part.

6         The second part is that once he's in a -- is probably at

7    the same time as his medications are being optimized, he could

8    benefit greatly from psychotherapy to address the five years of

9    untreated PTSD and additional problems caused by Mr. Wisner.

10         The way I see this formulation is that Mr. Plaintiff's best

11   benefit is the balance between medicine and talk therapy.  When

12   I saw him, he was so significantly depressed and anxious that

13   he didn't have much ability to participate in treatment even if

14   it were available.

15         So the two recommendations, as I said, are medicines and

16   the services of therapy.

17         And then the last is his relationship with his wife has

18   been substantially disrupted by Mr. Wisner's actions towards

19   him, and I separated out couples therapy as something that

20   would -- he would benefit individually and they would benefit

21   as a couple because of the direct impact of Mr. Wisner's

22   actions on Mr. Plaintiff's sexuality.

23   Q.  As it relates to the medications, you indicated four

24   medications that you thought he needed to be on; correct?

25   A.   Yes.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                164

1   Q.  And what were those four classes or four names of

2   medications?

3   A.  I gave four classes.  One, the first is a non-addictive or

4   non-benzodiazepine antianxiety agent; the second is nightmare

5   suppressing agents such as prazosin, which is also called

6   Minipress; and then SNRI or SN -- sorry -- serotonin

7   norepinephrine reuptake inhibitors or serotonin

8   norepinephrine -- select serotonin norepinephrine dopamine

9   reuptake inhibitors as antidepressants sometimes in

10  combination.  So there's four classes of medicines I thought

11  would benefit his mood.

12  Q.  And what did you estimate the cost for those medications

13  would be?

14  A.  Oh, I estimated at $100 per medicine per month

15  indefinitely.

16  Q.  For the rest of his life?

17  A.  Yes.

18  Q.  You also mentioned that you had recommended therapy,

19  couples therapy between him and his wife; correct?

20  A.  Yes.

21  Q.  Why has this impacted his relationship with his wife?

22  A.  You're asking an opinion about my -- my impression of why

23  it's affected?

24  Q.  Yes.

25  A.  Usually men, in this situation -- well, Mr. Plaintiff, in

1    this situation, has -- has already had problems with trusting

2    others.  And when Mr. Wisner's actions -- well, he recognized

3    that Mr. Wisner had been sexually manipulating him, and it also

4    caused him to judge his own judgment and doubt his own

5    decisions and own ability to trust others, and he became more

6    isolated more separated from others and withdrawn from those

7    who were important to him, and that included his wife, and

8    that's been going on for a number of years.

9    Q.   Has it impacted his ability to be sexual?

10   A.   Yes.  I mean, you can read my report.  He -- he definitely

11   has a much lower sex drive than he did before, much lower

12   interest in sex.  The absolute quantity is always -- always

13   difficult to specifically lay out, but there's a substantial

14   drop-off in sexual desire and sexual incidence that's not

15   related to his ability to get an erection.

16   Q.   Did he -- did he report to you or anywhere in his medical

17   records any history with having a sexual relationship with his

18   wife before Wisner?

19   A.   There were no problems in his sex life with his wife

20   beforehand that I could discern.  For example, I talked about

21   no affairs of the heart, no sexual affairs.  They had a

22   tumultuous relationship at times but they were clinging

23   together and standing firm together.

24   Q.   And how many sessions -- okay.  So it looks like you

25   recommended 150 sessions for couples counseling at across -- a

16-2627 Leininger v USA et al   7.6.20 Vol. 1          166

1    cost of about $125 per session; is that correct?

2    A.   Yes.

3    Q.   And you also noted that the -- the therapist should be

4    highly experienced and preferably LMFT trained; correct?

5    A.   Yes.

6    Q.   What does that mean?

7    A.   That's a licensed marital and family therapist or licensed

8    marriage and family therapist.  That -- that requires an

9    additional education and ancillary amount of experience.  The

10   reason I made that recommendation is because Mr. Plaintiff is

11   dealing with not only sexual difficulties as a consequence of

12   Mr. Wisner's actions but they are on the foundation of his

13   problems with PTSD.  So the therapist needs to be able to

14   address the communication problems by both.

15   Q.   Okay.  As it relates to his personal psychiatric needs, you

16   wrote because he cannot establish a psychotherapeutic alliance

17   with the VAMC due to the mistrust of the system that created --

18   or tolerated Wisner's actions, it is recommended for an

19   indefinite private psychiatric treatment on a monthly basis 24

20   to 48 sessions and then quarterly after that; correct?

21   A.   Yes.

22   Q.   For the rest of his life?

23   A.   Yes.

24   Q.   And you priced that out in the Kansas area, and it would

25   cost somewhere between 175 to 300 dollars per hour; is that

1    correct?

2    A.   Yes.

3    Q.   And that should be budgeted for an indefinite --

4    indefinitely; correct?

5    A.   Well, indefinitely until the end of his life.  A lot of --

6    in Missouri probably looking at the actuarial table it's around

7    79 years depending upon socioeconomic group among men.

8    Q.   We'll bring in an economist to give us that information and

9    reduce to present value.

10        The last thing you wrote is:  It is unclear if

11   Mr. Leininger, or the plaintiff, will ever be able to

12   re-establish trust in the VA except perhaps for minimal

13   required examination.  It is medically likely that he will be

14   unable to accept even basic treatment from the VA or from any

15   VA healthcare provider without exacerbating his underlying PTSD

16   due to his history with Wisner and the VA's failure to protect

17   him.

18        Did I read that correct?

19   A.   Yes.

20   Q.   And is that your opinion?

21   A.   Yes.

22   Q.   Dr. Peterson, what do you charge -- what is your charge for

23   reviewing cases as a forensic psychiatrist?

24   A.   I charge $300 per hour to review records, interview the

25   person, write a report, consult with the attorneys and prepare

1   for testimony.

2   Q.  You have clinics in Kansas City and St. Louis; right?

3   A.  I wouldn't say clinics.  I have an office.

4   Q.  Office?

5   A.  I have an office in St. Louis and an office in Kansas City.

6   Q.  My experience is the most expensive group in town is Wash U

7   for psychotherapy.  Is that your experience?

8   A.  Yes.

9   Q.  What do they charge over there?

10  A.  The last case I was involved with they were involved in,

11  they charged $400 an hour and testimony was $500 an hour.

12  Q.  Have all of the opinions you've provided today been stated

13  to a reasonable degree of medical certainty?

14  A.  Yes.

15          MR. EISER:  Objection.

16          THE COURT:  What's the objection?

17          MR. EISER:  I -- -- I've been waiting for that for

18  about five hours now.  Typically the question is do you hold

19  this opinion to a reasonable degree of medical certainty:  that

20  renders the foundation proper and I can either, you know,

21  object or not.  You don't get to go for five hours and then go

22  all that stuff that's admissible --

23          THE COURT:  Well, you --

24          MR. EISER:  We know -- we know a lot of what he has

25  said is not to -- to a reasonable degree of psychiatric

```
 1    certainty.  Most of the time he's simply saying yes to what

 2    Mr. Thomas is reading from his report.

 3            THE COURT:  Certainly you would have been, if you

 4    believe your position correct, free to make an objection

 5    earlier.  You didn't.  If you think that there are -- there is

 6    testimony he's skipping that is not appropriate to a reasonable

 7    degree of medical certainty, you'll have a chance on

 8    cross-examination.  I don't recognize any rule of evidence that

 9    makes your objection appropriate.  I'm overruling it.

10            MR. EISER:  Thank you, Your Honor.

11            MR. THOMAS:  And before I sit down, I want to offer

12    your CV into evidence.  It's Exhibit 157B as in boy.

13            THE COURT:  The offer is of 157; is that correct?

14            MR. THOMAS:  157B as in boy.

15            THE COURT:  Any objection to 157B boy?

16            MR. EISER:  No, Your Honor, as long as reciprocal

17    understanding for defense experts' CVs.

18            MR. THOMAS:  We would also offer Exhibit 154, which is

19    his expert report.

20            THE COURT:  Rule 157B -- 157B is --

21            MR. THOMAS:  I'm so sorry, Your Honor.

22            THE COURT:  That's all right.  157B is received.

23            You're now offering 154?

24            MR. THOMAS:  Yes, Your Honor.

25            THE COURT:  Objection to 154?
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    170

 1          MR. EISER:  Hearsay.

 2          THE COURT:  Yeah, I think it's an appropriate

 3  objection.  I -- I'm amazed the number of reports that go in.

 4  It is an out-of-court statement, it seems to me.  Do you want

 5  to respond to it or if there's something I'm missing?

 6          MR. THOMAS:  Yes, Your Honor.  Sometimes it comes in

 7  and sometimes it doesn't.

 8          THE COURT:  I get it.  I -- I -- I've never quite

 9  understood why it is.  I don't find an exception to the hearsay

10  rule for it.  So when it's made, I sustain it, as I will if you

11  offer your expert report.

12          MR. THOMAS:  Thank you, Your Honor.

13          I have no further questions for the witness and I

14  tender him.

15          THE COURT:  All right.  Cross-examination for the

16  witness.

17          MR. EISER:  Thank you, Your Honor.

18                       CROSS-EXAMINATION

19  BY MR. EISER:

20  Q.  Good afternoon, Dr. Peterson.

21  A.  Good afternoon.

22  Q.  You are plaintiff's hired expert on sexual trauma; is that

23  right?

24  A.  In this case, yes.

25  Q.  Okay.  And you've been a psychiatrist for how many years?

16-2627 Leininger v USA et al   7.6.20 Vol. 1                171

1   A.   Let's see, I graduated from residency training in 1990, so
2   about 30 years.
3   Q.   Okay.  In that 30 years, you've never published a
4   peer-reviewed article on the treatment of sexual trauma, have
5   you?
6   A.   That's correct.
7   Q.   Nor an article on any aspect of sexual trauma; correct?
8   A.   No, I have not.
9   Q.   Okay.  Nor on PTSD?
10   A.   Correct.
11   Q.   Nor on treatment of addiction?
12   A.   Correct.
13   Q.   Nor on treatment of veterans?
14   A.   I'm sorry, treatment of what?
15   Q.   Veterans.
16   A.   Oh, veterans.  Correct.
17   Q.   Okay.  And you've not authored a peer-reviewed publication
18   on any subject; is that right?
19   A.   I think only in terms of teaching lectures at the American
20   Academy of Psychiatry and Law.  But I think if you mean
21   articles that appeared in a journal, no.
22   Q.   The report that you've been referring to, that contains
23   your -- all of your opinions in this case; is that right?
24   A.   Well, it contained my opinions up through the time of the
25   report; so, yes, I mean --

1   Q.  Have they -- all right.  I'm sorry.

2   A.  I'm done, yeah.

3   Q.  Okay.  Have you changed any of your opinions since you

4   submitted your report?

5   A.  No.

6   Q.  All right.  You'd agree with me that there was a

7   substantial amount of documents that you had to review in

8   forming your opinions; correct?

9   A.  Well, there were -- yes, there were substantial amount of

10  documents available for me to review, yes.

11  Q.  Okay.  On your report, page 2, you've listed the documents

12  you had to review.  The defendant's deposition of Aaron

13  Leininger, did you read that?

14  A.  I believe I did quite a while ago.

15  Q.  Did you read the deposition of his wife?

16  A.  No.

17  Q.  Would you be surprised to learn that she told us in her

18  deposition that she -- she has not -- she and her husband have

19  not had any fun together for more than eight years?

20          MR. THOMAS:  Foundation.

21          THE COURT:  Overruled.

22          THE WITNESS:  I wouldn't surprise -- I wouldn't be

23  surprised that they had had a difficult relationship; so, no, I

24  wouldn't be surprised by that.

25  BY MR. EISER:

16-2627 Leininger v USA et al   7.6.20 Vol. 1     173

1  Q.  All right.  You looked at the VA records -- I'm looking at

2  No. 2 -- the -- August --

3       Is that right, you received all of the VA records that we

4  produced in this case; is that right?

5  A.  I did, yes.

6       MR. EISER:  Okay.  Your Honor, the VA records for Mr.

7  -- for the plaintiff are listed as Exhibits 413 and 414 of the

8  United States and, for example, the comp and pen report that

9  used -- that we went through on this witness's direct, that

10  comes from Exhibit 413.  And what I'd like to do is simply put

11  in Exhibit 413 and 414 and ask this witness about them.

12       THE COURT:  So you're offering Exhibits 413 and 414 at

13  this time?

14       MR. EISER:  Yes.

15       THE COURT:  Objection -- any objection to that?

16       MR. THOMAS:  We object, Your Honor.  He hasn't laid

17  the foundation for these, let alone the relevance.  This is --

18  he's literally just trying to dump in thousands of pages.  I

19  believe it's -- it's almost 2,000 pages.  Don't quote me on

20  that.  If he wants to pull out specific records and ask the

21  witness about that record and lay the foundation and so forth,

22  I think that's a more appropriate way.  I don't think you can

23  bootstrap hundreds and hundreds and hundreds of pages of

24  medical records this way.

25       MR. EISER:  Your Honor, I just laid the foundation.

1    He said he reviewed them forming his opinions.  And I'm not

2    going to ask anybody to read through the whole thing.  I'm

3    going to pull out individual pages and ask him about them, but

4    not out of context the way the plaintiff did.

5            THE COURT:  Well, look, the witness -- the witness was

6    asked at great length about aspects of some of these -- some

7    passages in these exhibits.  I doubt very much that in the end

8    all of these medical records from the VA will end up being

9    relevant to the issue in the case.  I'm going to go ahead and

10   receive the document at this time simply because the plaintiff

11   has already started down this road to some great detail.  If

12   you want -- if you want to seek to remove specific portions of

13   it from the record, Mr. Thomas, later, but to just try to get

14   us through this examination, I'm going to let him have some

15   leeway here to refer to them though they're not formally

16   received in evidence at this time.

17   BY MR. EISER:

18   Q.  Now --

19           MR. THOMAS:  Your Honor, can I ask for a

20   clarification?  What -- what was offered is 413 and what else?

21           MR. EISER:  414 was the --

22           THE COURT:  413 and 414.

23           MR. THOMAS:  This is 413 and 414.  There's no way I'll

24   be able to get through this in a week.  I've never had somebody

25   just try and introduce the whole thing like this.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                 175

1          THE COURT:  I assume you've had the records for some

2     time.

3          MR. THOMAS:  I'm sorry, Your Honor, I didn't hear you.

4          THE COURT:  I said I assume you've had these records

5     for some time.

6          MR. THOMAS:  Sure.  Sure.  But I don't have these

7     things memorized as to what's relevant or irrelevant or what's

8     appropriate or inappropriate; that's why you usually go at it

9     one record at a time.

10         THE COURT:  Well, I'm going to let -- look, I didn't

11    receive the documents in evidence.  I'm going to let the

12    examination proceed with some latitude because of where we are

13    with the case, so that's the clarification.

14         Mr. Eiser, you can proceed to exam about parts of them

15    and even display them so that I can follow the examination.

16    We'll return to what of these records you really want to put

17    into evidence.

18         MR. EISER:  I will, Your Honor.  I appreciate

19    plaintiff's counsel showing those two notebooks.

20    BY MR. EISER:

21    Q.   It's about 2,700 pages in those OIG records; correct?

22    A.   Is that a question to me?

23    Q.   Yes.

24    A.   Yes, they're quite voluminous records.

25    Q.   And you reviewed all those documents and materials and

16-2627 Leininger v USA et al   7.6.20 Vol. 1                     176

 1   completed a full in-person interview and examination of the

 2   plaintiff; right?

 3   A.   I reviewed the records and I reviewed essentially parts

 4   that I highlighted, parts I thought were important, and I

 5   interviewed the person, yes.

 6   Q.   Okay.  And you also spent some time in consultation with

 7   his attorney and doing independent research; right?

 8   A.   I'm not sure what you mean by that.  Independent research

 9   with the attorney?

10   Q.   No.

11   A.   My own understanding of childhood and physical, emotional,

12   sexual abuse of adults?

13   Q.   Yeah.  In forming your opinions and writing your report,

14   you met with the attorney; you also did some research, yes?

15   A.   Yes, generally.

16   Q.   And you spent some time drafting and revising your report

17   also; correct?

18   A.   Yes.

19   Q.   And the grand total of time you spent for all that activity

20   in plaintiff's case was 8.6 hours; is that right?

21   A.   Yes, that's I think from a bill you discussed in my

22   deposition or one of your colleagues did.

23   Q.   Now, in your review of plaintiff's records, you noted he

24   had significant psychological and mental health problems before

25   he ever saw Mr. Wisner in July 2012; correct?

16-2627 Leininger v USA et al   7.6.20 Vol. 1

1  A.  Yes.

2  Q.  He had problems with drug and alcohol addiction?

3  A.  Yes.

4  Q.  And sleep disturbance?

5  A.  Yes.

6  Q.  And depression?

7  A.  Yes.

8  Q.  Okay.  Now, you wrote in your report on page 10 that he had

9  significant alcohol and opiate benzodiazepine problems as well

10  as social distancing, emotional numbing, active suppression of

11  memory, social isolation and estrangement from others before

12  his interactions with PA Wisner; is that right?

13  A.  Yes, by way of general history that's correct.

14  Q.  Okay.  Well, he didn't just have these some time in his

15  past, he had them right up until the time he encountered

16  Mr. Wisner; correct?

17  A.  Yes.

18  Q.  And he still has them today; right?

19  A.  I haven't interviewed him for a while, but at least the

20  posttraumatic stress disorder and depression -- yes, I haven't

21  interviewed him since I saw him.  I do not know what his

22  condition is today.

23  Q.  His condition is better now.  At least he says he's gotten

24  himself off opioids; right?

25  A.  If that's accurate that would be good.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    178

1  Q.  Okay.  You spent a good deal of time talking about

2  Mr. Wisner's condition as of his comp and pen evaluation in

3  November of 2010; is that right?

4  A.  Today, yes.

5  Q.  Dr. Wendler's exam?

6  A.  Yes.

7  Q.  And you told the court that Mr. Wisner was doing better and

8  -- I'm sorry -- that the plaintiff was doing better at that

9  time; right?

10  A.  As part of Dr. Wendler's assessment, she indicated he'd

11  benefited from medication and psychotherapy treatment.  And

12  that state compared to when I saw him, he was doing better at

13  the time of the comp and pen exam in November of 2010 than when

14  I saw him.

15  Q.  Okay.  And I'm -- put up ER report.  You were talking about

16  him doing better in November of 2010 but you didn't mention

17  that in June -- in June of 2011 he had a psychotic breakdown,

18  was homicidal and was hospitalized.  Did you -- did you know

19  that was in the record?

20          MR. THOMAS:  May I ask for the Bates number, please?

21          MR. EISER:  I'm sorry.  Scroll that down some.

22  WIS16655.

23  BY MR. EISER:

24  Q.  Did you know that?

25  A.  I had seen that when I reviewed the records, yes.  He's had

```
 1   an up and down course, in terms of his treatment over the
 2   years.
 3   Q.   Okay.  Well, at this time in June of 2011, that's as down
 4   as he ever got, isn't it?  I mean, being hospitalized into a --
 5   because of a psychiatric condition?
 6   A.   Well, I mean, that is certainly down, yes.  Being homicidal
 7   is not a normal condition.
 8   Q.   And he was never having psychotic problems like this such
 9   that he had to be hospitalized other than this in June of 2011;
10   right?
11   A.   I did not see a consistent history or in his rendition to
12   me of consistent homicidality or need for repetitive
13   hospitalization.
14   Q.   Okay.  Now, this in June of 2011, that's before the
15   plaintiff ever saw Mr. Wisner; correct?
16   A.   Yes.  He had PTSD before he ever saw Wisner.
17              MR. EISER:  Can we mark this exhibit I guess
18   separately and move this into evidence, Your Honor?
19              THE COURT:  So you want to mark this as 413A?
20              MR. EISER:  I think U.S. -- it's up to you.  We could
21   go for 420 or 413A.  It's up to you.
22              THE COURT:  It's really your case.  I can't read your
23   mind.  You tell me what your proposing.
24              MR. EISER:  We'll identify this as 420, his emergency
25   department note at the VA June of 2011, and it begins on
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1                180

1   page 166 -- 655 and it is a total of nine pages to reporting on

2   that hospitalization and his problems.  May that be admitted?

3          THE COURT:  The offer is of Exhibit 420 which has been

4   described.  It's a passage from Exhibit 413.  Does the

5   plaintiff object?

6          MR. THOMAS:  He said it's nine pages, Your Honor.  So

7   I'm trying to review them really fast.

8          What page is it in, sir?  I can't see the page number

9   because the picture-in-picture is blocking it.

10         MR. EISER:  Bates number 16663.  It comes from

11  Exhibit 413.

12         THE COURT:  And is that the only page that is making

13  up Exhibit 420?

14         MR. EISER:  Yes, Your Honor, nine pages.

15         THE COURT:  All right.  So it's 16663 and the

16  following eight pages?

17         MR. EISER:  Yes.  I'm sorry.  16655 and the following

18  eight.

19         THE COURT:  Thank you.  Let's go ahead with the

20  examination.  Mr. Thomas, if you're going to make an objection

21  to the exhibit, we'll take it up at that time, but at least we

22  can proceed with the examination.

23  BY MR. EISER:

24  Q.  In your report you discussed --

25         I'm sorry, Dr. Peterson?

16-2627 Leininger v USA et al   7.6.20 Vol. 1                181

1   A.  Yes.

2   Q.  In your report, you -- and in your testimony you discussed

3   Wisner's "this for that" opiate prescriptions as part of his

4   sexual manipulation; right?

5   A.  Yes.

6   Q.  And you talked about in general how that works and how it

7   works with other people.  But did the plaintiff tell you

8   exactly what was said to him by Mr. Wisner?

9   A.  Yes, that he had to have the genital exam in order for the

10  medication.  This is on page 5 of my report.

11  Q.  Okay.

12  A.  Fifth full paragraph, last two lines.

13  Q.  Did you review the OIG report, the investigation of

14  Mr. Wisner, in forming your opinions?

15  A.  I believe I -- I don't know that I -- I don't recall at

16  this time.  I reviewed the initial letter, notice letter.

17  Q.  Well, did Mr. Wisner tell you that he actually never made

18  this claim about this for that prescription to the OIG when

19  they were investigating this?

20  A.  Mr. Wisner said that?  If he said that, that's in contrast

21  to what Mr. Leininger or Mr. Plaintiff said to me.

22  Q.  Would it surprise you that Mr. -- that the plaintiff never

23  told the OIG that claim that there had been sort of "this for

24  that" prescription?

25  A.  It doesn't surprise me that things are missed.  So it

16-2627 Leininger v USA et al   7.6.20 Vol. 1         182

1    doesn't surprise me that there are differences in some

2    reportings.

3    Q.  Okay.  Well, it's not in Mr. -- it's not in the plaintiff's

4    administrative claim which would be USA Exhibit 400.  Have you

5    seen that?

6    A.  Yes, I reviewed that.

7         This is a one-line complaint; correct?  You're talking

8    about Item No. 10?

9    Q.  Right.

10   A.  This doesn't get any kind of -- any of the details of what

11   happened.

12         MR. EISER:  Roll that back down.

13   BY MR. EISER:

14   Q.  I understand that.  But it's important for the lawyers that

15   he state his entire claim on this; otherwise, it doesn't come

16   into the civil action.

17        And can you read for us what was his entire claim when he

18   initiated the civil action with his administrative claim?

19         MR. THOMAS:  Your Honor, this isn't something he

20   filed.  It's a document I filed.  It's inappropriate and it's

21   being misused.

22         THE COURT:  Overruled.  Overruled.

23         THE WITNESS:  What was -- was the question I should

24   read this into the record?

25   BY MR. EISER:

16-2627 Leininger v USA et al   7.6.20 Vol. 1                183

1   Q.  Yes, just --

2   A.  I can't see all of it because of the box on the right side.

3   Q.  Let me read it.  You tell me if I've read it right.

4       "From 2012 to 2014, Mr. Plaintiff was seen at the VA

5   Hospital in Leavenworth, Kansas for his primary medical care.

6   While a patient at the hospital, plaintiff was subject to

7   several intentional and/or negligent sexual advances, assaults

8   and comments by Mark Wisner, PA."

9       Did I read that right?

10  A.  Yes, that's a very general holistic sentence.

11  Q.  Okay.

12          MR. EISER:  Roll it back down.  This would -- the

13  administrative claim is USA Exhibit 400 and I would move it

14  into evidence, Your Honor.

15          THE COURT:  Is there objection to 400?

16          MR. THOMAS:  No, Your Honor.

17          THE COURT:  Exhibit 400 is received.

18  BY MR. EISER:

19  Q.  So his claim about prescriptions wasn't in the AD claim,

20  but he did tell it to you, I guess is what you're saying;

21  correct?

22  A.  Yeah, I -- yes, I asked; so, yes, he told me.

23  Q.  And he had met with his attorney to prepare for his

24  interview with you, didn't he?

25  A.  I don't know if he did or not.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                 184

```
1   Q.  Well --
2   A.  He didn't know.
3   Q.  -- you noted in your report --
4   A.  He didn't know what questions I was going to ask.
5   Q.  As you noted in your report, your entire interview with the
6   plaintiff happened in his attorney's office, didn't it?
7   A.  No, it occurred in my office.
8   Q.  I'll come back to that.
9       In your report on page 11, you note the plaintiff believes
10  that nobody can treat him unless they've experienced what he's
11  experienced; is that right?
12  A.  That's his statement about psychotherapy, and that's a very
13  common statement that occurs with combat veterans and sometimes
14  sexual abuse victims.
15  Q.  Okay.  And the providers who have experienced what he has
16  experienced are at the VA; right?
17  A.  No, I'm not sure I understand your question.  That sounds
18  like a statement.
19      No, not all the providers at the VA have even been in the
20  military.  Many of the providers are civilians who work in the
21  VA system have never been in the military at all.  This is
22  often -- this is often kind of a roadblock question that
23  persons who have severe trauma put up because they are so
24  defended because of what is horrible to them and they feel they
25  can't reveal it except to someone who knows what they went
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1                185

1    through --

2    Q.  Right.

3    A.  -- because they went through it themselves.

4    Q.  Right.

5    A.  And this is not -- this is a roadblock that is -- often has

6    to be overcome by treaters to develop an evaluative alliance

7    and treatment alliance.

8    Q.  Right.  His particular roadblock in this case is he can't

9    be treated by anybody unless they've experienced military life;

10   is that right?

11   A.  No.  He means all -- he means all treatment.  It's a very

12   -- again, it's in general.  It's a -- it's his feelings that --

13   that -- as I clarify in the next sentence, that it helps

14   protect him from having to face what happened to him.

15   Q.  What helps protect him?

16   A.  Saying that nobody can help him even though he's wanting

17   help.

18   Q.  Right.

19   A.  It's a very common -- it's a very common defense --

20   psychiatric or psychological defense mechanism to dealing with

21   trauma, which is they try and block it out or they try and

22   avoid it or they try and compartmentalize it so the person

23   doesn't have to face what's horrible to them.

24   Q.  What -- what do you mean by "horrible?"  Are you talking

25   about --

```
 1              MR. THOMAS:  Your Honor, I object.  He wasn't finished

 2    answering.

 3              THE COURT:  I didn't hear the objection.

 4              MR. THOMAS:  He interrupted the witness.  He was still

 5    answering.

 6              THE COURT:  I agree.  Your objection is sustained.

 7              Mr. Peterson, you may finish your answer.

 8              THE WITNESS:  Thank you, Your Honor.

 9              This is when I was discussing treatment planning for

10    Mr. Plaintiff, and that is that one of the road blocks is that

11    he is so emotionally injured that he knows he needs treatment

12    but sets up conditions which are very difficult to get him into

13    treatment.  This is not -- this is not a lack of interest in

14    treatment.  This is a protective statement that he makes

15    because what he has to deal with is so horrible for him.

16    BY MR. EISER:

17    Q.  Well, I'm trying to understand who would be able to treat

18    him then.  Nobody?  They have to be -- have war experience and

19    been abused by Mr. Wisner; is that what you're saying?

20    A.  No, I would say they have to be -- they have to be somebody

21    who is fully aware of trauma treatment and trauma-focused

22    therapy that this is not an uncommon thing for a traumatized

23    person to say.  And it speaks to the degree of emotional

24    damage.  The therapist can still find inroads to get around

25    this -- to -- pardon me -- to create a safe holding environment
```

1   so the patient will be able to start talking about these things

2   and get some relief.

3   Q.   And the therapists who have the most experience and

4   resources for dealing with veterans with PTSD and war -- from

5   their war experiences are at the VA; correct?

6   A.   I'm not sure that I would agree with that, because many of

7   the persons who staff the VAs in -- in the United States are

8   residents and fellows who have never been in wartime themselves

9   and have transitioned in and out of units for -- I mean,

10  treatment units every 6 months to 12 months.  And these are

11  this patient -- this patient group very often needs years of

12  treatment and very often find it difficult to continue to open

13  up their most sacred experiences to a new group of young

14  treaters every 6 months to 12 months.

15       Now, the kind of treater that Mr. Plaintiff needs is

16  someone who will be there for years, if decades, because it may

17  take him a while to reveal what is the most troubling to him.

18  So while on the one hand he may identify with some parts of the

19  VA mind-set and the battle buddy and the veterans for each

20  other, that has been dashed by his experience with Mr. Wisner

21  and he now needs somebody who -- who is just as strong and just

22  as motivated and just as knowledgeable about trauma but outside

23  the VA.

24  Q.   Okay.  I want to ask you --

25            MR. EISER:  Move down on that page.  Yeah.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                188

BY MR. EISER:

Q.   You say on that same page, "It is unclear if Mr. -- if plaintiff will ever be able to re-establish trust in the VA except for perhaps minimal required examinations.  It is medically likely that he will be unable to accept even basic medical treatment from any VA healthcare provider without exacerbating his underlying PTSD due to his history with PA Wisner and the VA's failure to protect him."

A.   Yes, that's what I wrote.

Q.   Yeah, I know.

     It strikes me those two sentences don't connect.  In the first sentence you say it's unclear and in the next sentence you say it's medically likely that he will be unable; do you see the disconnect?

A.   No, there's no disconnect here.

Q.   To be clear -- I'm sorry.

          MR. THOMAS:  Go ahead and answer.

          THE WITNESS:  There is no -- there is no disconnect.  When I saw Mr. Plaintiff, he'd been unable to allow treatment at the VA for five years even though he was desperate with symptoms of PTSD and Mr. Wisner's treatment of him.  He could only -- so that's why it's unclear if he would ever be able to.

          Second, and I still can't -- wait a second, hold on.  The other part of it is -- the other part of it is that, when I refer to minimal required examinations, the VA may require

1    ongoing compensation in pension exams to continue his

2    disability, that's those -- those are the minimal required

3    examination.

4            And over -- beyond that, he -- it was my clinical

5    opinion, my forensic opinion, that he wasn't going to be able

6    to tolerate medical treatment from any VA healthcare provider

7    due to his generalization of experience with Mr. Wisner and the

8    VA's failure to protect him from Mr. Wisner.  All it means is

9    that he's a very difficult person to treat because his

10   psychopathology is difficult and his treatment needs to adjust

11   around him.

12   BY MR. EISER:

13   Q.   You've told us several times that your opinion that he

14   wouldn't return to the VA for care is primarily based on the

15   fact that he told you he hadn't been back in five years and

16   that that -- he told you that on January 25th of 2019; right?

17   A.   In terms of no psychiatric care for PTSD, that's correct.

18   Q.   Well, now you just changed it.  He said he told you he had

19   not been back to the VA for any reason for five years.  Is that

20   what he told you?

21   A.   Yes.

22   Q.   Okay.

23   A.   That's what he told me, yes.

24   Q.   Now, the VA records that plaintiff's counsel just held up

25   show that he had over 70 contacts with the Eastern Kansas VA

```
 1    between April 2014 and June of 2017 when he stopped going
 2    because -- as he told his new private doctors -- of this
 3    lawsuit.
 4              MR. THOMAS:  Foundation.
 5    BY MR. EISER:
 6    Q.  Do you know about -- were you aware there were that many
 7    contacts?
 8              THE COURT:  Hold on a second.  There's an objection.
 9    What's the objection?
10              MR. THOMAS:  The foundation.  Counsel has just pulled
11    a number out of thin air.  I don't know where it comes from.
12    There's -- it's foundation, Your Honor.
13              THE COURT:  Overruled.  You can answer the question if
14    you're able.
15              THE WITNESS:  My understanding -- my impression of
16    that was that he wasn't able to participate in any trusting
17    relationship with the VA.
18    BY MR. EISER:
19    Q.  Well, now you're changing -- I'm sorry.  Go ahead.
20    A.  So if he went at all, he may have had contacts.  But in
21    terms of -- so he never was comfortable with the VA again after
22    Mr. Wisner's treatment of him.
23    Q.  Okay.  Now, this isn't what he told you, which was that he
24    hadn't been back at all, isn't it?
25    A.  Yes, that's what he told me.
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1                 191

1    Q.   What's what he told you?

2    A.   That he hadn't been back at all.

3    Q.   Okay.  I'm going to show you an excerpt from Exhibit 413

4    and 414.  At the back end of those notebooks are -- the VA

5    records have health summaries that just list the contacts that

6    the plaintiff had with the -- with that VA Medical Center, and

7    I want to show you this would be -- what's that -- what's the

8    first page.

9        Okay.  Now, the contacts are separated out into the health

10   summaries at the end of the two VA -- sets of VA records that

11   were provided to you for review and they were marked as

12   Exhibit --

13           MR. THOMAS:  Can you enlarge that?

14           MR. EISER:  Can you enlarge that?

15           MR. THOMAS:  Please.

16           Your Honor, I'd ask for a question as well.  We don't

17   know the Bates number of these.  There's no question.

18           THE COURT:  I think he's getting ready to ask him a

19   question, Mr. Thomas.  So he's trying to --

20           MR. EISER:  Yeah.

21           THE COURT:  -- trying to get the exhibit before the

22   witness.  Let's hear what the question is.  If you have an

23   objection, then you may make it.

24   BY MR. EISER:

25   Q.   All right.  The health summaries are at the back end of the

```
 1   records marked as Exhibits 413 and 414.  We have created a new

 2   exhibit that's in front of you which we'll mark -- or identify,

 3   at least, as 422.

 4           MR. EISER:  Is that what we're up to, 421?

 5   BY MR. EISER:

 6   Q.  Now, this puts the two summaries together.  So it includes

 7   all the contacts from 2014 to 2015, which is from USA

 8   Exhibit 414 and Bates stamp WIS129617 to WIS129625 and also

 9   from the years 2016 to 2017 contacts, the summary for which is

10   USA Exhibit 413 and consists of pages WIS129380 to 129382, just

11   two pages.  We've combined these two summaries and it consists

12   of 12 pages.  Now, do you see that on June 20th of 2017, Mr. --

13   the plaintiff was in to see a provider at the VA named Chantal

14   DeSasso?

15           MR. THOMAS:  I object.  It says it's a phone call.

16           MR. EISER:  I'm sorry.  I'm sorry; you're right.

17           THE COURT:  Look.  Look, we don't -- we don't need --

18   if you disagree with a premise of the question, you can take

19   that up during cross.  You don't need to be interrupting with

20   things of that nature.

21           MR. THOMAS:  I'm having a hard time here, Your Honor.

22           THE COURT:  Well, so am I.

23           MR. THOMAS:  I don't know what --

24           THE COURT:  There is some difficulty and some of it is

25   that we're doing this not in the same room with one another.
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1                193

```
1   I'm not sure I understand what's in Exhibit 421.  Here's what
2   we'll do:  We'll take our afternoon recess.  We'll try to get
3   straight on what is before the witness so that the plaintiff
4   fairly knows what the witness is looking at.
5           I'll just say this:  Object when you need to, but you
6   don't need to object before a question is answered -- asked of
7   the witness.  That's not a proper time for an objection.
8           So we'll take the 15 minutes.  We'll resume at 3:40.
9   Let's get the record that you have before the witness
10  identified for the plaintiff so he knows what you're examining
11  the witness about.  See you in 15 minutes.
12      (Recess.)
13          THE COURT:  Let me just say to both sides of the
14  caption, you proposed that we do this trial across this video.
15  I am happy to try to accommodate.  I appreciate your ingenuity
16  in trying to work around this.  There are bound to be
17  logistical snags along the way.
18          I would say to both of you, I'm not very interested in
19  making those logistical issues that are exacerbated by us
20  working across video a partisan issue.  And so let's just get
21  through it and have controversy where we really have
22  controversies and where we're not just trying to throw rocks
23  down the hill.
24          Let's return to the cross-examination.  Mr. Eiser, I
25  believe you were in the middle of your cross.  You may resume.
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1                 194

1          MR. THOMAS:  I need to go -- I need to get my witness.

2    I'm sorry.

3          THE COURT:  Well, we can't resume without him.  I'm

4    sorry, I did not know he was not in the chair.

5          MR. THOMAS:  That's my fault, Your Honor.  We were

6    untimely.  I apologize.  Are you ready, doctor?

7          THE WITNESS:  Hold on.

8          MR. THOMAS:  Okay.

9          THE COURT:  So if I could just ask whoever is

10   directing the show, please put up -- the display so I can see

11   all the participants, make sure I know we're all back and

12   working.  All right.  That's it.  Thank you very much.

13         All right.  I see the witness has returned to the

14   witness chair.  And now, Mr. Eiser, I believe you are ready to

15   resume your examination if you can do that and work with your

16   exhibit.

17         MR. EISER:  Thank you, Your Honor.

18   BY MR. EISER:

19   Q.  Dr. Peterson, you are at the plaintiff's attorney's office

20   right now; is that right?

21   A.  Yes.

22   Q.  Okay.  Did you speak to anybody about your testimony during

23   that break?

24   A.  No.  They brought me this health summary that you have on

25   the page.  That's it.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                195

1   Q.  All right.  So you now have what we've marked for

2   identification as Exhibit 421, which is the health summary

3   indexes from 413 and 414; is that right?

4   A.  Yes.

5   Q.  Okay.  Now, there's a number of contacts that I mentioned.

6   Most of them phone, some of them administrative, but there are

7   a number of visits where the plaintiff comes in for medical

8   care.  For example, we're looking at page 129380.  He saw a

9   provider named Jenni Rosenblatt?

10          MR. EISER:  Roll that down a little bit.

11  BY MR. EISER:

12  Q.  -- on March 31st, 2017 for dental care; do you see that?

13  A.  Yes.

14          MR. EISER:  Okay.  Roll down some more.

15  BY MR. EISER:

16  Q.  On June 21st, 2016, he saw Dr. Catherine Anderson, low back

17  pain and tobacco problems, other problems; do you see that?

18  A.  Yes.

19  Q.  Okay.  On March 21st, 2016, he saw provider named Daniel

20  Lee for knee pain; is that right?  Do you see that?

21  A.  Yes.

22  Q.  Okay.  On March 20th, 2016, he saw provider Jenni

23  Rosenblatt again for folliculitis; do you see that?

24  A.  Yes.

25  Q.  That's an emergency department visit.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                   196

1        What's folliculitis?

2    A.   Infection of hair follicles.

3    Q.   Okay.  Moving on we're moving back in time actually.  On

4    October 2nd, 2015, he saw a provider named John Verschoor for

5    low back pain; is that right?

6    A.   Yes.

7    Q.   Okay.  On September 20th, 2015, he saw a provider Muhammad

8    Afzal in the emergency room for chronic gingivitis; is that

9    right?

10   A.   Yes.

11   Q.   On August 25th, 2015, he saw a provider named John Satchell

12   at the VA emergency room for cellulitis and abscess of

13   unspecified sites; do you see that?

14   A.   Yes, I do.

15   Q.   Okay.  On July 28th, 2015, he again saw John Verschoor for

16   lumbago, unspecified bipolar disorders, unspecified

17   hyperkinetic syndrome from childhood, osteoarthritis and

18   degeneration and intervertebral disc; do you see that?

19   A.   I'm sorry, which date?

20   Q.   July 28th, 2015.

21   A.   I'm sorry.  Yes, I see that.

22   Q.   Okay.  On July 7th, 2015, he saw Mr. Verschoor again for

23   lumbago and bipolar disorders and pain in his joint involving

24   his lower leg; do you see that?

25   A.   Yes.

1   Q.  On June 18th, 2015, he saw provider Girma Assefa for
2   arrythmia (sic) burn first degree of his leg; do you see that?
3   A.  That's not correct.  That's not arrythmia like heart.  It's
4   erythema like reddened skin.
5   Q.  Thank you.  Okay.
6       On May 30th, 2015, he saw a provider named Imran in the
7   emergency room for cellulitis and abscess; do you see that?
8   A.  Yes.
9   Q.  April 24th, 2015, he saw Mr. Satchell for the cellulitis;
10  do you see that?
11  A.  Yes.
12  Q.  On March 20th, 2015, he saw a provider Arthur Hickson for
13  his lumbago complaints; is that right?
14  A.  That is correct.
15  Q.  On February 11th, 2015, he saw a provider Sumulong in the
16  emergency room for dental caries; is that right?
17  A.  That's correct.
18  Q.  On October 27th, 2014, he saw a provider Jose Menendez for
19  psychological diagnostic evaluation for his posttraumatic
20  stress disorder; do you see that?
21  A.  Yes.
22  Q.  On October 5th, 2014, he had a visit with Lisa Cerutti,
23  provider, for therapeutic drug monitoring; do you see that?
24  A.  Yes.
25  Q.  Okay.  October 2nd, 2014, he was seen by Dr. Colleen

1    McManaman for lumbago, pain, posttraumatic stress disorder,

2    tobacco use disorder; do you see that?

3    A.   Yes.

4    Q.   On August 22nd, 2014, he was back in the emergency room and

5    saw provider named Erin Griffith for pain in his lower leg; do

6    you see that?

7    A.   Yes.

8    Q.   A July 6th, 2014 he saw provider Satchell again in the

9    afternoon for dental caries; do you see that?

10   A.   Yes.

11   Q.   July 24th, 2014, he saw a provider Amy Tousseau for

12   counseling; do you see that?

13   A.   In 2014 -- yes.

14   Q.   Okay.  June 29th, 2014, again saw provider named John

15   Satchell for cellulitis; do you see that?  That was in the

16   emergency room.

17   A.   Yes.

18   Q.   June 10th, 2014, he saw a provider Linda Hamidjaja for

19   acute respiratory infections of unspecified site; do you see

20   that.

21   A.   Yes.

22   Q.   Okay.  What we just went through, 24 or 25 visits by the

23   plaintiff to the VA center, and we've now displayed them on a

24   demonstrative exhibit which I will identify simply for

25   identification as 422 -- we'll provide that.  Thank you -- do

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    199

1    you see that?

2    A.   Yes.  It's in blue, blue and white.

3    Q.   Okay.  Now, does this affect your opinion to know that the

4    plaintiff told you he can't go back to the VA because he hasn't

5    been back for any reason for five years?

6         And you've just been through this.  He's been back 24 or 25

7    times for various problems, including counseling.

8    A.   Well, it doesn't affect my opinion for a number of reasons.

9         One, the only point of care Mr. Plaintiff actually has is

10   the VA at this point.  So I'm not surprised that he had some

11   care there.  I also -- I don't want to quibble with your

12   numbers here, but we talk -- I talked to him about the last

13   five years, which would -- which would be not any earlier than

14   -- that would go back to January 2015.  So a bunch of the

15   visits would have still been under the time he was still at the

16   VA before he stopped going according to him, which was, I

17   think -- 1, 2, 3, 4, 5, 6, 7, 8 of the visits on the left side

18   would have been outside the time frame he told me about.

19        And, most importantly, Mr. Plaintiff received no specific

20   care about his PTSD.  The counseling was in the time of 2014

21   which was before he stopped going, according to me -- according

22   to me what he told me.  So I -- I completely agree that

23   Mr. Plaintiff had some care.  But in terms of PTSD care and

24   follow-up for what happened with Mr. Wisner, I saw no care

25   about that.

16-2627 Leininger v USA et al   7.6.20 Vol. 1     200

1   Q.  I don't want to go through it again.  You don't recall us

2   rolling through that and a couple of those visits dealing with

3   PTSD?

4   A.  Which ones were the PTSD?  The one I thought that was

5   October 2014 and that's outside the range.

6   Q.  Well, I was going to ask you about that.  He told you on

7   January 25th of 2019, at least this is what you told us on

8   direct, that he told you after January 25th, 2019, that he

9   hadn't been back for five years.  Unless my math is wrong, five

10  years from then would be January 25th, 2014.

11  A.  I'm not -- I mean, isn't it, '15, sir, 19, 18, 17, 16,

12  15 -- January '15?

13  Q.  You take five from 19 you end up with 14.

14  A.  You have to include the year that he's in '19.  I mean,

15  I'm -- the point from my psychiatric standpoint about

16  Mr. Plaintiff is that his investment, his psychological

17  treatment at the VA stopped after Mr. Wisner.  Some of this

18  other stuff is emergency care, dental caries, burns.  He has no

19  other alternative.  It is not surprising that he had some care

20  but it was emergent care and not regular follow-up directed at

21  his PTSD.

22  Q.  I'm assuming since he never told you that he went into the

23  VA for whatever care for 24 times over these years that he also

24  never told you that he had any emotional upset from going into

25  the VA Medical Center for this care?

1    A.  Well, that's -- none of that's -- I mean, these records

2    don't reflect his mental state at the time.

3    Q.  No, I'm asking you what he told you.  Did he tell you that

4    I did go back and it was very upsetting to me, that's why I

5    didn't want to go back again?  No, he told you I'd never been

6    back.

7    A.  Yes, that's ultimately not an entirely accurate statement.

8    It's an incorrect statement and -- but, in terms of treatment

9    for PTSD, it's not inaccurate.

10   Q.  Now, in your report on page 5, you say Mr. Leininger

11   remembered that at first he felt comfortable with PA Wisner

12   talking about their special relationship as battle buddies.

13   However, that quickly changed when PA Wisner wanted to "check

14   your junk."  He was so uncomfortable that Mr. Leininger asked

15   his wife to come to an appointment.  And when his wife was

16   there, there was no genital exam.  Is that what he told you?

17   A.  Yes.

18   Q.  So as of -- well, you say on the same page when examining

19   Mr. Plaintiff -- "PA Wisner did not wear gloves, did not wash

20   his hands afterwards and did not use hand sanitizer after the

21   genital exams, that was despite touching his "junk" moniker,

22   his penis and his scrotum skin-to-skin.  After that first time

23   being touched like that, plaintiff attempted to prevent

24   PA Wisner from touching him there."  That's what he told you?

25   A.  Yes.

1   Q.  So as of his first visit with Mr. Wisner that would be

2   February, 2014, he knew that the treatment was inappropriate

3   and made him uncomfortable; is that what he told you?

4   A.  No, he knew that the treatment was uncomfortable for him

5   and he didn't want PA Wisner to do that, but Mr. Wisner told

6   him that the exams are required for the medication.  That's the

7   quote, "Do this for the medication."

8   Q.  Well, then why did he tell him -- why didn't he try to stop

9   him?  Doesn't him trying to stop him indicate he knew it was

10  wrong?

11  A.  Well, it was -- it was uncomfortable for him but it was

12  expected of him for that care being provided by Mr. Wisner.

13  Q.  Okay.  You're aware that -- I'm sorry.  I said the first

14  visit was in 2014.  I meant 2012.

15      Now, in that first visit, I think you testified he thought

16  this was appropriate; is that what you testified?

17  A.  When Mr. Plaintiff first had -- was introduced to

18  PA Wisner, PA Wisner took efforts to put him at ease such as

19  the battle buddies special relationship because they were both

20  veterans, et cetera, and that put him at ease.

21      That he felt uncomfortable after, even though PA Wisner had

22  been too friendly to him and touched him on the shoulders too

23  much, which is something he didn't want because of his wartime

24  PTSD, things changed when Mr. Wisner start -- examined him --

25  did the scrotal and penis exam.  That made him uncomfortable.

1       But as I said, he tolerated it because he believed it was

2   appropriate medical care by a senior officer who said he was

3   acting in Mr. -- Mr. Plaintiff's best interests.

4   Q.   As you said on direct, he never complained to anyone and

5   didn't know he was harmed, I guess, until after he had been

6   told of the investigation by the Officer of Inspector General;

7   is that right?

8   A.   That's pretty close to what I said earlier, yes.

9   Q.   So if the OIG had never done an investigation,

10  Mr. Plaintiff would have never suffered any harm?

11  A.   No, he wouldn't have been aware of the harm.  That's

12  well-established that most sexual abuse victims don't report

13  what happened.  Many times if they are seduced or put off guard

14  or groomed, they don't even recognize that they were molested.

15  Q.   You're talking about children?

16  A.   Oh, adults too.  Children's an easier example because the

17  power imbalance is so obvious between the adult and child.  But

18  in this situation where there is a person who is establishing

19  trust to a trusted mentor who is advising him over and over

20  that the VA is safe and his care is safe, that puts him at ease

21  and takes him off guard.

22  Q.   You -- he told you that he asked his wife to go.  He was so

23  uncomfortable, he asked his wife to come in during his exams

24  with Mr. Wisner; is that right?

25  A.   One time at least, yes.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    204

1   Q.  Okay.  Do you know which time that was?

2   A.  I don't have it recorded in my report, no.

3   Q.  Okay.  You administered a PAI test to the plaintiff; is

4   that right?  You described that on direct.

5   A.  Yes.

6   Q.  Okay.  And just briefly remind the court, what is that?

7   A.  A PAI is a general personality assessment with validity

8   scales and proposed DSM-IV diagnosis.  It's a 344-questionnaire

9   -- question questionnaire.  It's used as an alternative

10  viewpoint on somebody's presentation.

11  Q.  Okay.  But he gave you inconsistent information in his

12  answers; is that right?

13  A.  No, that's -- I said that the level of inconsistency for it

14  was high in one area but not others.

15      I can't hear you.  Sorry, I can't hear the attorney.

16  Q.  Okay.  What you mean by --

17      Can you hear me now?

18  A.  Yes, sir.

19  Q.  Can you hear me now?

20  A.  Yes.

21  Q.  What you mean by inconsistent information then would be his

22  answers weren't coherent where they should have been; is that

23  right?

24  A.  No, it means that one of the validity tests has consistency

25  elements such as does he answer the same type of question

1    consistently from -- throughout the test.

2    Q.  Okay.

3    A.  His inconsistency was high enough it raised a question

4    about validity.

5    Q.  Right.  He gave -- as it turned out, the test results were

6    -- you determined were invalid; is that right?

7    A.  Well, the protocol says they're invalid, though you can, as

8    I said before, prove -- read the rest of the report to see if

9    there is anything that is accurate.  That, of course, means one

10   has to have clinical history and face-to-face interview with

11   the person who is taking the test.  If at first an evaluator is

12   giving a test blind, in other words, they have no interview

13   information or background information, then they have no

14   ability to determine the test at all.  But in this situation I

15   had substantial information about Mr. Plaintiff, so it put --

16   put the PAI in context.

17   Q.  Right.  Well, in the objective context using the protocol

18   that professionals in your profession use, the result was

19   invalid; right?

20   A.  I had several times.

21   Q.  In other words, you -- you found a way to find certain

22   information that you thought was useful.  But in terms of the

23   protocol -- the psychiatric protocol, when you get these sort

24   of incoherent answers as you described them, it invalidates the

25   result of the test, doesn't it?

1            MR. THOMAS:   The witness was answering the last

2    question and he cut him off.

3            THE COURT:   Overruled.

4            THE WITNESS:   By the protocol, if they're not

5    incoherent answers they are inconsistent answers; and, yes, I

6    discussed that already.   I also discussed that there are pieces

7    of information in the PAI which are clinically meaningful in

8    context.

9    BY MR. EISER:

10   Q.   What are the possible reasons for getting an invalid result

11   from inconsistent answers?

12   A.   Well, somebody can have a poor reading ability.   Someone

13   can be so anxious that they don't see -- they don't recognize

14   sentences that have opposite content.   A person could be

15   intentionally providing false responses.   A person could not

16   have the reading ability to -- to understand the questions.

17   Some of the other validity scales address that.

18        And, as I described before, there was no indication of

19   malingering.   There was no indication of other than honest

20   responding.   And there was no indication of trying to look like

21   a psychiatric simulator.

22        But I fully agree with you that the ultimate issue on the

23   PAI is that it has some relevant clinical information but it is

24   an invalid profile.

25   Q.   Okay.   I -- did you do any further research to find out --

1   either with the plaintiff or otherwise to find out the cause of

2   his inconsistent answers in the invalid result?

3   A.   Well, I mean -- you --

4   Q.   You just mentioned several possible causes.  I'm wondering

5   if you ever alighted on one?

6   A.   Yeah and I already explained that.  What I did was I

7   compared Mr. Plaintiff's responses to his clinical -- to his --

8   his responses on the PAI to his clinical presentation and the

9   available medical records and my -- and his mental status

10  examination.  So those are external pieces of information from

11  the test itself.

12      Then I applied my knowledge of the PAI because I have given

13  this test now for almost 20 years, especially with persons who

14  have posttraumatic stress disorder.

15      And then the last thing is I referred to the professional

16  manual about dealing with this particular situation, and I very

17  carefully addressed what information could be gleaned from it

18  even though it -- technically it's an invalid profile.

19  Q.   Okay.

20  A.   And last thing is -- last thing is I noticed the reader,

21  which is you and the plaintiff counsel, of the exact nature of

22  the reason the test was considered invalid.

23  Q.   Okay.  You never mentioned in your report any observation

24  of inconsistent responses to you in your actual interview of

25  the plaintiff; right?

1    A.   Related to the PAI?

2    Q.   No.

3    A.   No, of course not related to the PAI.

4    Q.   No, not related to the PAI.

5         You just don't say -- you said he could answer questions;

6    he was fine?

7    A.   Well, this is a summary report.  I certainly -- I certainly

8    evaluated the veracity or my thought of the veracity of his

9    responses, especially in relationship to his accusations of

10   having wartime PTSD and his reaction to Mr. Wisner's conduct

11   towards him.

12   Q.   In your interview, you didn't note that the plaintiff was

13   confused about events or symptoms; right?

14   A.   There's almost always some confusion in these reports -- I

15   mean, in these -- in these evaluations, especially if the

16   person is very depressed or very anxious or doesn't want to

17   disclose much about how -- their traumas.  So there is

18   certainly the possibility that there is inconsistency in human

19   report from time to time.

20        However, overall with the multiple sources of information

21   that I used, I came to the clinical opinion that he was being

22   consistent about his PTSD, and that his reports of what

23   Mr. Wisner did to him were consistent with someone who's been

24   sexually abused.

25   Q.   You state that the plaintiff should be prescribed certain

1    medications, antianxiety agents.  Help me if I -- Buspar?

2    A.   That's pretty close.

3    Q.   Buspar.

4         That he should also get nightmare suppressing prazosin or

5    Minipress; is that right?

6    A.   Yes.

7    Q.   Or possibly nightmare suppressing propranolol and SNRI or

8    SNDRI antidepressants to lift his mood; is that right?

9    A.   Yes.

10   Q.   Are you aware he has tried those medications before?

11   A.   Yes, they have been tried before, some of them.

12   Q.   You estimate the cost of the four medications at a hundred

13   dollars per medication per month forever; is that right?

14   A.   Well, not forever.  For about his adult life, which is

15   about 27 years or maybe 26 now.

16   Q.   Now, that number, $100 per medication per month, was used

17   by the plaintiff's economist in his calculation of plaintiff's

18   claimed future expenses.  Yet you know that Buspar, propranolol

19   and prazosin can be obtained for 8 to 10 dollars per month;

20   right?

21   A.   Yes.  Medicines like duloxetine, which is one of these

22   SNDRIs, or -- and bupropion brand can be $1,600 a month.  So I

23   was fully aware of the range.

24   Q.   I said -- I said -- right.  I said you told us that Buspar,

25   propranolol and prazosin can be obtained for 8 to 10 dollars a

1   month.  Didn't you tell us that at your deposition?

2   A.  Yes.

3   Q.  So why are you telling -- in your report why are we getting

4   charged a hundred dollars for it?

5   A.  Because there are other psychiatric medicines that are like

6   several hundred dollars to 15 or 1,600 dollars per month and I

7   -- when they're in brand form.  So, for example, 20 years ago

8   Prozac was extraordinarily expensive.  That's duloxetine.  It

9   was, you know, 150 to 300 dollars a month and now it's $10 a

10  month.

11      So I was -- I am fully aware that over his life some of

12  these medicines may not cost very much.  But newer

13  antidepressants, if he needs them, may be exorbitantly

14  expensive, and so I tried to factor that in my budget of

15  medicines if he had to buy them privately.

16  Q.  These medicines would be free if he got them from the VA;

17  right?

18  A.  Yes, if he did.

19  Q.  Now, he couldn't be on all of those medications at the same

20  time in any event; right?

21  A.  Oh, he could actually be on more, right, than on there.  I

22  had -- I have seen patients who are Buspar, which is an

23  antianxiety agent which is not addictive nightmare-suppressing,

24  prazosin and propranolol, which is to reduce the severity of

25  the startle response at night, and two antidepressants such as

16-2627 Leininger v USA et al   7.6.20 Vol. 1                211

1    duloxetine as augmented with bupropion or Trazodone.  So, yes,

2    these are -- we're in the era of specific psychiatric

3    medications focused on particular difficulties.  So it's --

4    it's not a surprise -- it's not uncommon for patients to be on

5    four or five or six psychiatric medications.

6    Q.   Right.

7    A.   I steered away -- I steered away from the medicines that --

8    such as Ambien or Valium or librium or Xanax which have risk

9    for -- for substance dependency.  Because of his psychiatric

10   problem and his addiction problems, some of those medicines

11   would actually be more appropriate than the Buspar.  Many

12   patients with agitated depression from PTSD do very well on

13   clonazepam, which is long-acting benzodiazepine, but I elected

14   not to put that in the armamentarium at this time because of

15   his risk for substance abuse.

16   Q.   You also stated that the plaintiff will need 150 sessions

17   of marital counseling at $125 per session; is that right?

18   A.   Yes.

19   Q.   Now, you haven't done any independent research regarding

20   the cost of treatment that you testified about; is that right?

21   A.   In terms of talking to marital family therapists?  Only

22   from experience talking to them and how much they charge.  It

23   would depend greatly on where he lives and where he got the

24   treatment.

25   Q.   Okay.  Right.  You're doing it just based on your general

16-2627 Leininger v USA et al   7.6.20 Vol. 1                 212

```
 1    knowledge.  You didn't do any independent research to check
 2    into this; right?
 3    A.   No, I didn't -- I didn't feel I needed to.
 4    Q.   Now, assuming these marital counseling sessions last --
 5         You say once a week, is that - is that accurate, once a
 6    week?
 7    A.   I'm sorry, for the marital counseling?  I -- this could be
 8    a little bit more well-described.  Marital counseling sessions
 9    are usually given blocks of, like, 10 to 15 appointments
10    depending on the -- on the problem that the couple are having.
11         So I saw this treatment as not 150 continuous sessions but
12    that a 10 -- a 5- to 15-session block for a particular problem
13    the couple might have.  They work on it for a few weeks or
14    months with a therapist and then it's -- it's an ongoing
15    problem and they come and revisit the therapist later.
16         That's how -- that's a detail that was not in my report --
17    Q.   Right.
18    A.   -- but that --
19    Q.   Makes more --
20    A.   -- that's a very common approach for marital and family
21    therapy.  It's a -- it's a task-focused intervention.
22         For example, if somebody has sexual problems, then there
23    would be a few sessions about the below indicated to
24    communication.  If there's intimacy problems, if there's
25    honesty problems, things like that, it's focused on relieving
```

1   the distress so the couple can reengage better.

2   Q.   Your report at page 2, it quotes from the -- and I think we

3   talked about this in -- in your direct.  It quotes from the

4   attending emergency department note.  It says that, "Plaintiff

5   had a history -- past history of low back pain, sciatica,

6   bipolar II disorder, ADHD, hyperlipidemia, osteoarthritis of

7   the spine, intervertebral disc disease, hypertension,

8   gastroesophageal reflux, peptic ulcer disease, lower leg pain

9   and joint, PTSD, parasomnia, insomnia, narcolepsy, homicidal

10  ideation, shoulder pain, male erectile disorder, testicular

11  hypofunction, chronic periodontitis, cellulitis and tobacco

12  dependence."  Have I read that correct?

13  A.   Yes.

14  Q.   Now, that seems like a heavy load of medical conditions,

15  and treatment for those conditions could be quite expensive

16  over the course of his future life; correct?

17  A.   They could.

18  Q.   But, doctor, the entire list of conditions that you have

19  listed in your report and which I just read are extensively

20  documented in plaintiff's VA records going back years before he

21  ever encountered Mr. Wisner in July 2012; isn't that right?

22  A.   Yes.

23  Q.   And his medical history confirms that none of these mental

24  health symptoms:  PTSD, sleep disturbance, depression, social

25  isolation, ever resolved at any point up to his first encounter

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    214

1   with Mr. Wisner; correct?

2   A.   Well, the word "resolved," again, is he was in the process

3   of being treated for PTSD and some of the related conditions

4   such as insomnia, behavior problems, et cetera, and that was

5   certainly stopped as a consequence of Mr. Wisner's actions.

6   Q.   Okay.  Your report, page 6, it notes the worst mental

7   health problems that plaintiff attributes to his encounters

8   with Mr. Wisner --

9   A.   Where are you in my reports?  Oh, sorry, fifth paragraph.

10  Q.   Yeah.  You -- you listed, "What are the worst mental health

11  problems that he attributes specifically to his encounters with

12  Mr. Wisner?"

13       Those are, one, social isolation from his wife and others,

14  anger, and intrusive thoughts three or four times a month,

15  sometimes less if no one reminds him; is that accurate?

16  A.   That's what he said about himself, yes, but that's not --

17  Q.   Okay.  Now --

18  A.   -- my opinion.

19  Q.   -- he suffered from social isolation going way back before

20  Wisner; right?

21  A.   Yes, and it was worsened -- worsened by Wisner's actions.

22  Q.   Okay.  But you can't identify how much worse?

23  A.   He became more -- I can identify some things.  He certainly

24  became more isolative, even from his wife.  His sex life with

25  his wife dropped off.  He felt much more withdrawn.  He had

```
1   problems with anger.  He has new -- new thoughts about -- that
2   are intrusive to deal with, and that's about Mr. Wisner's
3   actions.  He doesn't want to have those.  And as long as he's
4   not around reminders, they're less.  But if he's around
5   reminders such as going to the VA building or interacting with
6   VA clinicians, then those thoughts come back.
7   Q.  Okay.  But of the list of conditions you listed here, the
8   only one that didn't -- that wasn't a condition or symptoms
9   that he was suffering before he ever saw Mr. Wisner is the
10  intrusive thoughts three ore four times per month; isn't that
11  right?
12  A.  I don't understand your question.  This is what he said
13  about himself; it doesn't preclude my assessment of him.
14  Q.  Okay.  But that is, of the main problems that he believes
15  he's having, the only one that didn't preexist his first visit
16  with Mr. Wisner is these three or four times a month having
17  intrusive thoughts about Mr. Wisner; is that right?
18  A.  No, that's inaccurate.  He certainly had a much better
19  sexual relationship and emotional connection with his wife.  He
20  had -- was functioning better at work.  He was in treatment for
21  his PTSD with medicines and group therapy.  He had much better
22  functioning.  So his -- his summary of how he's doing is his
23  summary but it's not the entire story.
24  Q.  You just mentioned that he -- he's functioning worse at
25  work now than he was before he saw Mr. Wisner.  That's a new
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1                216

1    one on us.  It's not in your report and it's not in his

2    deposition.  I'm wondering where you got it from.

3    A.   He wasn't working anywhere after --

4    Q.   Do you know whether he's --

5    A.   We were --

6    Q.   I'm sorry.  Go ahead.

7    A.   It's my error.  Go ahead.

8    Q.   What were you just saying?  He wasn't working when?  He was

9    unemployed before he saw --

10   A.   I --

11   Q.   Sorry.  Go ahead.  When was he not working?  When was he

12   not working?

13   A.   He had been working at Midwest Express before Mr. Wisner is

14   my understanding and was no longer working there.

15   Q.   Right.  Do you know where he's employed today?

16   A.   No.  I haven't spoken to him since the evaluation.

17   Q.   All right.  He's told us at deposition that he's got this

18   job where he tracks wildlife and he enjoys it quite a bit.

19   Does that surprise you?

20   A.   No, that would fit right in with his PTSD because he

21   doesn't want to be around people, he wants to be isolated and

22   away from others and set his own pace.  That could be very --

23   that could be within the context of treatment a potentially

24   adaptive improvement for him.

25   Q.   But in terms of his function at work, he makes no claim in

```
 1   this case that he ever suffered any losses of income from his
 2   job or that his function has impaired any future income
 3   possibilities for him; isn't that right?
 4   A.   Well, again, that -- my focus was on whether or not his
 5   PTSD was affected by Mr. Wisner's actions.  And one of the
 6   things Mr. Plaintiff discussed with me was that he wasn't
 7   functioning as well, and I delineated some of that.  It was not
 8   my role to do future vocation planning assessment.  It was that
 9   he felt more isolated and seemed to be more isolated based on
10   his behavior.
11   Q.   But aside from that, you have no evidence that he has --
12   his mental health condition has impaired his ability to work?
13   A.   Again, that's a question that's hard to answer because he
14   certainly is a wildlife trapper or somebody who is out, that
15   could be a very -- a very low-key job with -- with no
16   requirement to report to anyone or could be very self-managed
17   and would not be similar to working at a business so that the
18   -- you can't compare his prior work.  I think you would have
19   difficulty comparing his prior work to wildlife manager or
20   wildlife trapper.
21   Q.   Right.  He was unemployed before and now he's functioning
22   quite well, according to him and his wife, at his new job.
23   A.   I'm -- again, information I don't have other than what you
24   just told me.
25   Q.   Thank you.
```

1              MR. EISER:  That's all I have, Your Honor.

2              THE COURT:  Redirect for the witness?

3              MR. THOMAS:  I didn't want to speak from over there,

4    Your Honor, but permission to redirect.

5              THE COURT:  Please.

6                        REDIRECT EXAMINATION

7    BY MR. THOMAS:

8    Q.  I want to -- do you have that document in front of you that

9    they marked as Exhibit 421?

10   A.  The health summary?

11   Q.  Yes, sir.

12   A.  Yes, I do.

13   Q.  Did you hear opposing counsel say -- or he asked you, he

14   said, "Did you know that he had 70 contacts with the VA after

15   Wisner?"  Do you remember that?

16   A.  Yes.

17   Q.  Have you had a chance to look this over?

18   A.  Only briefly.

19   Q.  What is this -- what is this by and large?

20   A.  Well, it's a -- it's a listing of various what are called

21   outpatient encounters, whether they are face-to-face visits,

22   phone calls, any kind of contact.  Some of them I'm not sure

23   what they are.  It says administrative fee.  So...

24   Q.  Many --

25   A.  Some of the contacts are canceled by the patient.  Some are

1    canceled by the clinic.  Some are unscheduled.

2    Q.  He didn't go over all the ones that were canceled or

3    rescheduled that he --

4    A.  I mean, no, of course not.

5    Q.  Did -- did these administrative ones, those aren't medical

6    encounters, are they?

7    A.  I don't know what the codes mean, but they're certainly

8    not, as I said, appointments for posttraumatic stress disorder.

9    Q.  Well, there's no billing code or DSM code assigned to any

10   of these; correct?

11   A.  Yes.  It's just a listing contact in the computer.

12   Q.  Many of these are phone calls; correct?

13   A.  Yes.

14   Q.  Many of these are phone calls to the pharmacy; correct?

15   A.  Yes.

16   Q.  Who is his only source of healthcare at the time?

17   A.  Well, as I said, it was the VA.

18   Q.  If he has to go back in, how do comp and pen exams work?

19   A.  You have to make an appointment with the compensation and

20   pension office and go have a physical and psychological and

21   psychiatric evaluation.

22   Q.  And are there mandatory report -- are there things that

23   they have to do in terms of their care that are mandatory in

24   order to keep their pension, their benefits?

25   A.  Yes, it's a very large bureaucracy.  There are actually

1   people who are assigned to assist people with their

2   compensation and pension exam processes because they are so

3   convoluted.

4   Q.  Part of his pension or benefits come from the injuries to

5   his back; correct?

6   A.  Yes.

7   Q.  And we see that opposing counsel went over maybe one or two

8   of these that were actually appointments and not just whatever

9   these are that just address the injury to his back; correct?

10  A.  Some address back injury, yes.

11  Q.  Did he actually show you the medical records of any of

12  these visits --

13  A.  No.

14  Q.  -- to give you context of what we're actually looking at

15  here?

16  A.  Well, again, no, it's just a summary.

17  Q.  Right.  And I noted that there were -- you mentioned two of

18  these that were in reference to counseling.  I looked them up.

19  The first one there is on the first page.  It's from June 20th,

20  2007.

21  A.  17?

22  Q.  '17.  It says, "Other specified counseling," and then it

23  gives an ICD code, ICD10 code of 27189.  Do you know what that

24  is?

25  A.  Actually, Z7189.

16-2627 Leininger v USA et al   7.6.20 Vol. 1                221

1   Q.   Do you know what that is?

2   A.   I'd have to look it up.

3   Q.   Do you have a phone on you?

4   A.   No, but I have a DSM-IV.  It won't be there.  Sorry.

5   Q.   Well, here let me give you my phone.

6          MR. EISER:  Objection.

7          THE COURT:  What's the objection?

8          MR. EISER:  Counsel is just testifying here, and now

9   he's going to tell the witness what to say in response to his

10  testimony.

11         THE COURT:  So let me hear the question before -- I

12  can't rule the objection as things stand right now.

13         MR. THOMAS:  I'll hand -- Your Honor, may I approach

14  the witness?

15         THE COURT:  You can.

16         MR. EISER:  Objection.  Objection.

17         THE COURT:  What?

18         MR. EISER:  He asked him -- the question was:  Do you

19  know what this diagnostic code is?

20         He said, No.

21         THE COURT:  So -- so can't he let the witness refresh

22  his recollection and see whether he knows then?

23         MR. EISER:  Well, he's doing independent research here

24  but --

25         THE COURT:  Well, that may be your view of it.  I

```
 1    don't know.  I don't know what he's going to show him, and so I

 2    can't rule your objection now without knowing what's coming.  I

 3    know you know -- I know you think you know what's coming, but I

 4    don't know.

 5              So you may proceed by approaching the witness and

 6    we'll go from there.

 7              MR. EISER:  Thank you, Your Honor.

 8              MR. THOMAS:  Thank you, Your Honor.

 9    BY MR. THOMAS:

10    Q.  I'll hand you my partner's cell phone that has the ICD

11    pulled up for Z71.89.  Can you review it?

12    A.  Sure.  It says --

13    Q.  Just review it, then I'll ask you a question.  Let me know

14    when you've read it.

15    A.  I've read it.

16    Q.  What is this ICD code now that you've had a chance to

17    refresh your recollection.

18    A.  It's a -- a billing code that says -- refers to a

19    circumstance which influences the patient's health status but

20    not a current illness or injury.  The code is unacceptable as a

21    principal diagnosis.  It -- it --

22    Q.  Let me --

23    A.  It doesn't specify a particular diagnosis.  It's a billing

24    contact.

25    Q.  It's -- let me ask you this:  Would you agree that it's a
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1                223

1   non-specific code for patient education?

2   A.  It could be that.

3   Q.  If you would turn to page -- the very last page of this

4   exhibit that they gave you.  There's another classified

5   counseling code.  It's from the July 24th, 2014; do you see it?

6   A.  I'm sorry, July what?

7   Q.  4th, 2014.

8   A.  Yeah, ICD9C65.40.

9   Q.  Do you have your ICD9 with you?

10  A.  No, I don't.  I wouldn't have access to an ICD9 here today

11  except by phone.

12          MR. THOMAS:  May I approach the witness, Your Honor?

13          THE COURT:  So long as it's for a proper purpose, you

14  can.

15          MR. THOMAS:  Yes.

16  BY MR. THOMAS:

17  Q.  Let me ask you to review the ICD code that is V as in

18  Victor 65.40.

19  A.  This code, and I'll quote it --

20  Q.  Read it first and then I'll ask you a question; that's the

21  appropriate way to do it.

22  A.  I already read it.

23  Q.  Okay.  What is this code now that you had a chance to

24  refresh your recollection?

25  A.  It's a billable code and I'll read it to you.

16-2627 Leininger v USA et al   7.6.20 Vol. 1           224

```
1        (Court reporter interruption.)
2   A.   The quote is, "ICD-9-CMB65.40.  The billable medical code
3   that can be used to indicate a diagnosis on a reimbursement
4   claim.  However, B65.40 should only be used for claims with a
5   date service on or before September 30, 2015.  Claims of date
6   of service on or after October 1, 2015 use a equivalent ICD
7   code."
8        The approximate synonyms for this code include case
9   management, case or care management, case or care management,
10  counseling, counseling done, health advice, education or
11  counseling, health advice, education or counseling, health
12  education or counseling, prenatal intake interview or prenatal
13  intake interview done.
14       This can refer to any -- any physical condition from a --
15  there's a list of about 200 here from adjustment of an
16  artificial arm all the way to placement of pacemaker and
17  chemotherapy.  Just a billing code to indicate there was
18  contact.
19  BY MR. THOMAS:
20  Q.   Not an ICD9 code for PTSD counseling, is it?
21  A.   No.
22  Q.   Now, he also asked you about some of these visits that were
23  emergency room visits; is that correct?
24  A.   Yes.
25  Q.   Now, let me ask you:  If the VA was his only source of
```

```
 1   healthcare at the time and he has an emergency medical

 2   situation, where is he supposed to go?

 3   A.   He can go to an emergency room and -- private emergency

 4   room or he can go to the VA.  If he goes to a private emergency

 5   room and they found out that he's a service-connected veteran,

 6   they will ship him to the VA, meaning they will transfer him.

 7   Sorry.

 8   Q.   Opposing counsel went over some dates in 2014.  What

 9   month --

10        Did you know that Kerry Baker didn't even send his letter

11   out to the veterans until August of 2014?

12   A.   I don't remember the date.  I know it was late 2014 or

13   early 2015.

14   Q.   Right.  Now, in this document that opposing -- is there any

15   visits in here from 2020?

16   A.   No.

17   Q.   Are there any visits in here from 2019?

18   A.   No.

19   Q.   Are there any visits in here from 2018?

20   A.   Nope.

21   Q.   The last one is August of 2017; is that right?

22   A.   Yes.

23   Q.   You were asked this question about him trying -- being

24   uncomfortable with that first exam.

25        Let me ask you again:  After reviewing the records, after
```

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    226

1   interviewing him, in your expert opinion, did he know that

2   Wisner had done something improper before he received Kerry

3   Baker's letter?

4   A.   No, he did not.

5   Q.   And you can state that to a reasonable degree of medical

6   certainty?

7   A.   Yes.

8   Q.   There is a difference between being uncomfortable with

9   something and knowing it's actually wrong; isn't that true?

10  A.   Yes, that's correct.  And, again, not unlike -- not unlike

11  any medical procedures would cause discomfort, people tolerate

12  them because they believe they're going to benefit, their

13  health will benefit as a consequence of it such as getting a

14  blood transfusion.

15  Q.   Out of the hundred victims that Wisner had, did -- did

16  defense counsel mention the fact that 90 percent of them didn't

17  come forward until after they received that letter?

18  A.   I know that they -- many did not until they -- at least the

19  ones I evaluated didn't come forward until they received notice

20  that there was an action against him.

21  Q.   You -- if you go to page 6 of your report, opposing counsel

22  read this part.  Let me -- are you there?

23  A.   Yes, sir.

24  Q.   Where it says he has intrusive thoughts of PA Wisner's

25  actions three to four times a month; it can be less if no one

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    227

1    reminds me.  And then you said that's not my entire opinion.

2    And I want to come back to that because you never got to ask

3    (sic) what was your entire opinion as relates to that passage.

4    Do you remember?

5    A.   Yes.

6    Q.   What were you going to say?

7    A.   Well, that's not the only thing that PA Wisner's conduct

8    caused for Mr. Plaintiff.  There are -- like I said, intrusive

9    thoughts is one of them.  There's sleep disturbance.  There's

10   social anger, impaired social functioning, the lack of trust in

11   the VA in its entirety.  All of these are consequences of

12   Mr. Wisner's conduct, the aspects of events and things like

13   that.

14       So it -- the reason I took issue was it only read one

15   sentence of a description of the things I was using to

16   illustrate the plethora of difficulties Mr. Plaintiff

17   experienced as a consequence of Mr. Wisner's actions.

18   Q.   The United States in this case has admitted that my client

19   was sexually molested nine times by this man.  Is there any

20   doubt in your mind that he suffered severe psychological trauma

21   as a result?

22   A.   No.  From a reasonable degree of medical certainty, he

23   certainly experienced sexual trauma based upon or caused by

24   Mr. Wisner.

25   Q.   And one thing I forgot to ask.  Opposing counsel got -- got

16-2627 Leininger v USA et al   7.6.20 Vol. 1                    228

```
 1    pretty far in the weeds on this five-year thing.  If you look
 2    at your report on page 2 --
 3    A.   Yes.
 4    Q.   -- down there at the bottom you actually document an
 5    emergency room visit from August of 2015 and then another --
 6    well, you -- document that emergency room visit from August of
 7    2015; right?
 8    A.   Yes.
 9    Q.   By opposing counsel's math, that's four years from your
10    examination.  You knew about this visit; right?
11    A.   Yes.
12    Q.   And opposing counsel went into detail to ask you about all
13    of these pre-existing conditions.  We're not denying that he
14    had a plethora of pre-existing medical conditions, many of
15    which were service related; correct?
16    A.   That's correct.
17    Q.   And he still needs healthcare for it; correct?
18    A.   Yes.
19    Q.   And you don't think that he should go back to the VA or
20    should have to go back to the VA; correct?
21    A.   That's correct.
22    Q.   There's no way he's going to trust them with his
23    psychotherapy again, is there?
24    A.   Not from my evaluation of him.
25    Q.   There's no way he's going to trust them with any of his
```

1    care, is there?

2    A.   That's my impression, yes, and my clinical opinion.

3    Q.   Now, he does have to go back to maintain his benefits as

4    you mentioned.  He has no choice about that; correct?

5    A.   That is correct.

6    Q.   They said, "Well, wouldn't these medications be free if he

7    just went to the VA?"  Do you remember that?

8    A.   Yes.

9    Q.   Should he have to ever step foot in a VA again?

10   A.   Well, I mean, in terms of compensation and pension exams,

11   yes, he'll have to do that in order to maintain his benefits.

12   In terms of -- of obtaining care other places, no, he doesn't

13   have to go back to the VA at all.

14   Q.   As it relates to your recommendations for the marital

15   counseling, nowhere in your report did you say he should do

16   that weekly.  Go ahead and look at page 11.

17   A.   Yeah, I know it's not in there that it's weekly.  That's

18   why I explained that it's a number of sessions task oriented.

19   Q.   Okay.  I just want to make sure because the way I was

20   hearing it, I thought it sounded like evidence it was in your

21   report.

22        He asked you -- oh, by the way, he didn't show this one to

23   you.  This is also from their exhibit.  It's page 18066.

24           THE COURT:  What exhibit number is this?

25           MR. THOMAS:  It was in their exhibit -- I believe it

1   was in their Exhibit 414, Your Honor.

2         THE COURT:  Okay.

3         MR. THOMAS:  All right.

4   BY MR. THOMAS:

5   Q.  Those are also -- that's also a health summary, correct, of

6   visits?

7   A.  Yes, it's a listing of them.

8   Q.  They didn't show you this list, did they, sir?

9   A.  No.

10  Q.  What does that tell you?

11  A.  It tells me that there's many lists; I mean, that's what it

12  tells me.

13  Q.  Are there call -- are there canceled appointments on there,

14  sir?

15  A.  Yes.  There are 1, 2 -- well, 1 -- there's two canceled and

16  two no-show visits by the patient, one canceled by the clinic.

17  So, I mean, hard to know exactly what all these -- some of

18  these are phone contact.  It shows that -- that even when he

19  had scheduled appointments such as sleep disorder evaluation,

20  he didn't attend.

21  Q.  They showed you the SF95 Form which was his claim form and

22  asked you if he mentioned the quid pro quo medication practice.

23  Do you remember that?

24  A.  Yeah.

25  Q.  I typed that up and I submitted it.  Did you know that?

1    A.   Your signature -- his signature is on the list.

2    Q.   But I typed it.

3    A.   I didn't know that.

4    Q.   Okay.  They asked you if he ever said anything to

5    Agent Baker about the quid pro quo practice.  Do you know if

6    Agent Baker asked him anything about Wisner's pharmaceutical

7    writing habits?

8    A.   No.

9    Q.   The entire interview is about ten lines.  Did you ever see

10   it?

11   A.   I might have glanced at it.  Those evaluations are always

12   -- investigations are rather limited.

13   Q.   Once again, I'll ask you before I sit down:  Is the

14   questions I've asked you on redirect, have you answered those

15   to a reasonable degree of professional certainty?

16   A.   Yes.

17              MR. THOMAS:  No further questions.

18              THE COURT:  Recross for the witness?

19              MR. EISER:  Very brief, Your Honor.

20                         RECROSS-EXAMINATION

21   BY MR. EISER:

22   Q.   Did you -- Dr. Peterson, did you not know that the

23   plaintiff had private health insurance in 2016?

24   A.   When he was working, he had some private health insurance,

25   yes.  But he lost his job, unless that's not accurate.

1    Q.  Well --

2        (Conferring with IT support.)

3    BY MR. EISER:

4    Q.  Doctor, You admitted you're familiar with veterans.  Are

5    you familiar with the Veterans Choice program that allows

6    veterans to get medical care outside of the VA?

7    A.  Yes, I am.

8    Q.  Okay.  Were you aware that the VA set up Mr. Leininger into

9    this program in 2016?

10   A.  I saw entries about Choice, yes.

11   Q.  Okay.  So when you said if he went to a private doctor they

12   would send him to the VA, that wasn't accurate.  If he had a

13   private doctor through private insurance, he would see that

14   doctor; correct?

15   A.  No, that's not what I said, sir.  I said if he went to an

16   emergency room for an emergency and they found out that he was

17   a service-connected veteran, they would send him to the VA for

18   emergent care.

19   Q.  What if he's a service-connected veteran with private

20   insurance through Cigna?  They're not going to send him

21   anywhere; they're going to take the money.

22   A.  Well, that is a possibility, yes.  Yes, but if he doesn't

23   have insurance, which then he will go -- they will send him to

24   the VA.

25   Q.  Right.  But he had insurance in 2016 and 2018; correct?

1    A.  So there are Choice entries, so he had some, yes.  I don't

2    know about 2018.  He had some in 2016.

3    Q.  Okay.  Thank you.

4         MR. EISER:  Your Honor, before the witness -- I'd like

5    to move into evidence our Exhibits 413 and 414, the VA records

6    we talked about.

7         THE COURT:  All right.  Are there objections to 413

8    and 414?

9         MR. THOMAS:  Same objections I made earlier, Your

10   Honor.  These are the big, giant binders.  He said it was 2,700

11   pages.

12        THE COURT:  What's the objection?

13        MR. THOMAS:  Relevance, foundation, hearsay.  I mean,

14   it's -- there's 2,700.

15        THE COURT:  Is there a controversy about these being

16   the plaintiff's medical records?

17        MR. THOMAS:  No, Your Honor.  That's why I said

18   hearsay and foundation and relevance.

19        THE COURT:  What's the foundation objection?

20        MR. THOMAS:  That it's -- that there's any germane --

21   they have to lay the foundation that it's germane to the

22   medical issues at issue in this case.

23        THE COURT:  Look, every trial I've ever had there have

24   been exhibits that contain information in them that weren't

25   relevant to the narrow controversy.  They were typically stray

1    remarks that didn't matter on much.  If your objection is

2    really to 413 and 414 on relevance, then, Mr. Eiser, it's

3    incumbent upon you to show that the exhibit as a whole is

4    relevant.  I don't know anything about 413 or 414 except what

5    you've told me.

6              MR. EISER:  Your Honor, I'm planning --

7              THE COURT:  So -- go ahead.

8              MR. EISER:  The plaintiff has said in this unusual

9    damages claim that he is seeking private health insurance that

10   would cover all of his ailments.  There's a lot of them and

11   there's a lot of mental health treatment in his past all

12   documented in his records.  It seems unconceivable to me

13   someone would come in and say they have this broad of -- range

14   of medical problems, this broad of -- range of medical needs

15   but nobody can see my medical records because they're not

16   relevant to my healthcare conditions.  It doesn't make any

17   sense.

18             THE COURT:  All right.  Here's what I'm going to do:

19   I'm going to admit 413 and 414.  It's a bench trial.  The

20   portions of it that aren't relevant in this case are going to

21   end up being non-events.  So I'm overruling the plaintiff's

22   objections and admitting 413 and 414.

23             Mr. Eiser, you have not made an offer of 421.  Are you

24   offering it as well?

25             MR. THOMAS:  Did they get disconnected?

 1          THE COURT:  Let's let Mr. Peterson step down.  Let's

 2   get them rejoined.  Ms. Garrett, can you assist with that.

 3          MR. THOMAS:  May I officially excuse him, Your Honor?

 4          THE COURT:  Let's hang on until we get the other party

 5   back.

 6          MR. THOMAS:  If the court sees me leaning on the

 7   podium, I'm not trying to be inappropriate or familiar, my back

 8   is killing me.

 9      (Off-the-record waiting Zoom reconnection.)

10          COURTROOM DEPUTY:  Judge, I will admit defense counsel

11   as soon as I see they're trying to rejoin.

12          THE COURT:  Ms. Garrett, I take it you have no sign

13   they are asking to rejoin the conference?

14          COURTROOM DEPUTY:  Not yet.  They just did.

15          THE COURT:  All right.  All right.  Mr. Eiser, I think

16   we have you back.  So I don't know what you heard and didn't

17   hear.  I have admitted Exhibits 413 and 414.  My question to

18   you is there's been reference by both parties to exhibit --

19   what I believe to be Exhibit 421.  Are you offering that at

20   this time?

21          MR. EISER:  Yes, Your Honor.

22          THE COURT:  All right.  Is there objection to 421?

23          MR. THOMAS:  No, Your Honor.

24          THE COURT:  All right.  It's received.

25          MR. EISER:  Your Honor, we'd had also move in

```
 1    Exhibit 420, which was an emergency room visit that we
 2    discussed during this witness's testimony.
 3             THE COURT:  Any objection?
 4             MR. EISER:  I'm sorry, June 28th, 2011.
 5             THE COURT:  Any objection to 420?
 6             MR. THOMAS:  No, Your Honor.
 7             THE COURT:  It's received.
 8             MR. EISER:  And I would also move in 422, the
 9    demonstrative exhibit of the in-person visits that we showed
10    during the cross of the witness.
11             THE COURT:  It's the -- what is it?
12             MR. EISER:  It's the -- it's the chart from the data
13    that was in 421 about the -- not the general context but the
14    actual in person visits.
15             THE COURT:  Do I have a copy of 422?  I don't think
16    that was listed pretrial.
17             MR. EISER:  No, I'll shoot that to you.
18             THE COURT:  Let's postpone 422.  The plaintiff fairly
19    gets a chance to see that.  I know it was displayed, I think,
20    on the screen but I don't think they've had a chance to examine
21    it for objections, so we're going to defer ruling on 422.
22             MR. EISER:  If it's -- what we'll do is mark it and
23    then we'll send it to opposing counsel and to the court with
24    the identifying exhibit numbers on them.
25             THE COURT:  That's what I was going to -- by the way,
```

1    Mr. Eiser, may Mr. Peterson be released?

2              MR. EISER:  Yes, Your Honor.

3              THE COURT:  All right.  Sir, you're free to step down

4    and go.

5              So here's -- I do want to address --

6              THE WITNESS:  Thank you, Your Honor.

7              THE COURT:  Thank you.

8              -- hygiene concerns that have been created about

9    subsets of larger exhibits or demonstrative exhibits that are

10   created.  I know this happens during trials, but we have to

11   have here, as well as opposing party, a copy of that particular

12   exhibit.  So overnight 420, 421 and 422, stickered

13   appropriately, should be submitted.

14             MR. EISER:  We'll submit those.  Should we also submit

15   those to the clerk?  Is there a separate address for the court?

16             THE COURT:  If you send them to Ms. Garrett at the

17   chambers e-mail address, we'll make sure they get distributed

18   internally.  We're coming up against the five o'clock hour.  I

19   don't think it makes much sense to start for six minutes of

20   testimony, so we're not going to do that tonight.

21             I do -- I want to come back to the -- the pseudonym

22   issue, and my concern about it has increased a little bit over

23   the day.  I'm going to give you a cite to a case.  It is 257

24   F.3rd 1171.  This is pursuant -- for simplicity I'll call

25   initials *WNJ against Yoakum*, Y-O-A-K-U-M, and others.  This is

1    a 2001 case from our circuit which dismissed on appeal a case

2    because the trial court which had resolved the case on summary

3    judgment lacks subject matter jurisdiction because it had

4    allowed the plaintiff to litigate the case by using the

5    pseudonym initials.

6            The rationale for the case -- I'll let you see it --

7    but essentially the court, the circuit concluded that it did

8    not comply with Rule 17 and that that compliance was essential

9    to the existence of subject matter jurisdiction.

10           So I know you've got a lot going on during trial, but

11   this matter needs to be resolved, and I'm going to try to

12   resolve it some time during our session in the morning and take

13   whatever appropriate actions are necessary to cure the problem

14   that -- now that it's been diagnosed, but you're on to that.

15   And so if the plaintiff is going to contend that he should

16   continue to have the right to litigate it by initials, he's

17   going to need to do something quickly to demonstrate that.

18           I conclude from my reading of this case at least that

19   even in the absence of a challenge by the opposing party, this

20   is an essential item that I've got to resolve.  All right.

21   That -- that's a last word on pseudonyms.  Are there other

22   trial planning issues that we ought to take up today before we

23   leave for the day?

24           MR. THOMAS:  Not from plaintiffs, Your Honor.

25           THE COURT:  From the defendant's room?

16-2627 Leininger v USA and Wisner 7.6.20 Vol. 1                239

1          MR. EISER:  No, Your Honor.

2          THE COURT:  All right.  I'll plan to see you ready to

3    resume with the testimony tomorrow morning at 9:00 Central

4    Daylight Time, ten o'clock in the Eastern part of the country,

5    and we'll to from there.  Have a good evening and thank you.

6          (Proceedings adjourned to July 7th, 2020 at 9:00 a.m. )

7

8

9                          CERTIFICATE

10         I certify that the foregoing is a true and correct

11   transcript from the stenographically reported proceedings in

12   the above-entitled matter.

13         DATE:  March 5, 2021

14
                        /s/Kimberly R. Greiner
15                      KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                        United States Court Reporter
16

17

18

19

20

21

22

23

24

25