1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
2

3    AARON LEININGER,
                                        Case No. 16-2627
4      Plaintiff,                       Circuit No. 21-3031

5      v.
                                        Kansas City, Kansas
6    UNITED STATES OF AMERICA           Date:  07/07/2020
     and MARK E. WISNER,
7                                       Volume 2
       Defendants.                      (Pages 240-490)
8
     ........................
9

10
                       TRANSCRIPT OF BENCH TRIAL
11                            Via Zoom

12             BEFORE THE HONORABLE DANIEL D. CRABTREE
                  UNITED STATES DISTRICT COURT JUDGE
13
     APPEARANCES:
14
     For the                 Daniel A. Thomas
15   Plaintiff:              Michael S. Kilgore
                             Humphrey, Farrington & McClain
16                           221 West Lexington Avenue
                             Suite 400
17                           Independence, MO 64050

18
     For the United          Lawrence Eiser
19   States of America:      Sarah Haston
                             U.S. Department of Justice
20                           Civil Division, Torts Branch
                             Benjamin Franklin Station
21                           P.O. Box 888
                             Washington, DC 20044
22

23

24   _____
       Proceedings recorded by machine shorthand, transcript
25   produced by computer-aided transcription.

1                         I N D E X

2
      Plaintiff's Witnesses:                              Page
3
      THOMAS D. KELLEY, III, M.D.
4       Direct Examination By Mr. Kilgore                  244
        Cross-Examination By Ms. Haston                    397
5       Redirect Examination By Mr. Kilgore                408

6     MARY LEININGER
        Direct Examination By Mr. Thomas                   412
7       Cross-Examination By Mr. Eiser                     427
        Redirect Examination By Mr. Thomas                 435
8       Recross-Examination By Mr. Eiser                   438

9     JOHN O. WARD, Ph.D.
        Direct Examination By Mr. Thomas                   440
10      Cross-Examination By Ms. Haston                    464
        Redirect Examination By Mr. Thomas                 475

11

12
                       E X H I B I T S
13
      Plaintiff's
14    Exhibits              Offered          Received

15        20                 312                312
          27                 331                332
16        29                 345                346
          32                 341                342
17        40                 355                356
          55                 371                371
18        56                 350                351
          58                 262                262
19        59                 264                264
          60                 269                269
20        61                 334                334
          63                 335                335
21        65                 391                391
          66                 363           364, 372
22        75                 270                270
          76                 377                378
23        77                 379                379
          78                 383                383
24        80            386, 390           386, 391
          82                 367                369
25        99                 373                373

16-2627 Leininger v USA et al  7.7.20 Vol. 2                242

```
 1                        E X H I B I T S

 2        Plaintiff's
 3        Exhibits              Offered              Received

 4           100                  376                  376
             102                  394                  394
 5           129                  322                  322
             145                  441                  441
 6           160                  246                  246
             197                  283                  283
 7           199                  283                  283
             200                  283                  283
 8           201                  283                  283
             202                  283                  283
 9           203                  283                  283
             204                  283                  283
10           205                  283                  283
             206                  283                  283
11           241                  316                  316

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       (Court called to order 9:07 a.m.)

2           THE COURT:  Just a timing update, our timing records

3   show the plaintiff has 13 hours and 23 minutes left.  The

4   defense has 15 hours, 36 minutes.

5           Just one thing, I looked again some more at the cases

6   last night on the pseudonym issue, and I concluded that I am

7   not going to decide that issue until I've heard testimony from

8   the plaintiff if indeed he testifies in the trial.  And so that

9   gives you kind of an update on my thinking.

10          So I think we're ready for the next witness.

11  Mr. Kilgore, are you ready to proceed with the next witness?

12          MR. KILGORE:  Your Honor, I am, although Mr. Thomas

13  tells me he'd like to make a record briefly.

14          THE COURT:  About what?

15          MR. KILGORE:  About two exhibits I believe.

16          THE COURT:  Let's try to do that early afternoon -- go

17  ahead.  Go ahead.

18          MR. KILGORE:  And, Your Honor, the plaintiff calls

19  Dr. Thomas Kelley.

20          THE COURT:  Ms. Garrett, can you administer the oath

21  to Mr. Kelley.

22          COURTROOM DEPUTY:  Please raise your right hand.

23              THOMAS D. KELLEY, III, M.D.,

24  called as a witness on behalf of the Plaintiff, having first

25  been duly sworn, testified as follows:

```
 1              THE COURT:  All right.  Sir, can I just ask you to say

 2   your full name for the record.

 3              THE WITNESS:  Sure.  It's Thomas Dennis Kelley

 4   K-E-L-L-E-Y, III.

 5       (Court reporter interruption.)

 6              THE COURT:  Those who called in, I do ask you to mute

 7   your devices so there won't be feedback on that.

 8              All right.  Ms. Greiner is that better?

 9              COURT REPORTER:  Thank you.

10              THE COURT:  All right.  Mr. Kilgore, you may proceed

11   with your examination.

12              MR. KILGORE:  Thank you, Your Honor.

13                        DIRECT EXAMINATION

14   BY MR. KILGORE:

15   Q.  Sir, please, introduce yourself to the court.

16   A.  I'm Dr. Thomas Kelley, M.D.

17   Q.  Dr. Kelley, you are a physician; correct?

18   A.  Correct.

19   Q.  What area of practice is your specialty?

20   A.  I practice in family medicine.  I've been in practice for

21   22 years and private practice up in Liberty, Missouri.

22   Q.  When we consider the -- the area of family practice, is it

23   -- does it involve primary care medicine?

24   A.  It is primary care medicine.  It's the -- it's -- the

25   definition of family medicine is primary care, so...
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2

1   Q.  Are you board certified?

2   A.  Yes, sir, I am.

3   Q.  And what are you board certified in?

4   A.  I'm board certified in the -- in family medicine.  I'm also

5   board certified in medical examiners, the national boards that

6   we have to take to graduate from residency.

7   Q.  You're board certified by the American Board of Family

8   Practice; is that correct?

9   A.  Family medicine.

10  Q.  Family medicine.

11      And how long have you held that board certification?

12  A.  Since 1998 I believe.

13  Q.  That's what my notes indicate; so your memory seems good.

14      You've been board certified from 1998 to it looks like it

15  goes to 2024?

16  A.  2024, correct.

17  Q.  At one time you were -- you were also board certified by

18  the National Board of Medical Examiners; is that correct?

19  A.  That's what I was referring to, and it's -- we're all --

20  all physicians are certified by them.

21  Q.  Okay.  Are you also licensed to practice medicine?

22  A.  Yes, I am in the state of Missouri.

23  Q.  And how long have you been licensed to practice medicine?

24  A.  Since 1996.

25  Q.  You already alluded to this, but you -- you maintain a

1   full-time clinical practice; is that correct?

2   A.   Correct.

3   Q.   I want to hand you what I've marked as Exhibit 160.

4   A.   Thank you.

5   Q.   And I ask you, please, to identify that exhibit for the

6   record.

7   A.   Well, this is my curriculum vitae.

8   Q.   Is it current?

9   A.   I believe so, yes.

10          MR. KILGORE:  Your Honor, I offer Exhibit 160 into

11   evidence.

12          THE COURT:  Any objection to 160?

13          MS. HASTON:  No objection.

14          THE COURT:  All right.  It's received.  Mr. Kelley,

15   can I just ask you, that may be coming from your end, those

16   materials are materials might ruffle microphone.  Thank you so

17   much.

18   BY MR. KILGORE:

19   Q.   Dr. Kelley, tell us about your educational background.

20   A.   I went to Creighton University in Omaha, Nebraska,

21   graduated there in 1989 with a degree in psychology.  I went to

22   -- from there stayed at Creighton University and received a

23   Master's Degree in Counseling in 1991, and then I graduated

24   from the University of Kansas School of Medicine in 1995.

25   Q.   And do you currently live in Kansas City?

1    A.   I do.

2    Q.   And have you lived here for most of your life?

3    A.   For since I was age four.

4    Q.   Upon your graduation from the University of Kansas where

5    you obtained a medical degree, were you required to complete a

6    residency?

7    A.   Yes.  I completed my residency at Trinity Lutheran Hospital

8    here in Kansas City.

9    Q.   And it looks like you did that residency from 1995 to 1998;

10   correct?

11   A.   Correct.

12   Q.   And what is a residency?

13   A.   Residency is basically extended training in medicine in a

14   specific area of your specialty.  Since mine is family

15   medicine, I was trained in everything from cardiology to

16   urology to even general surgery during that time.

17   Q.   My understanding is that you also teach medical students;

18   is that correct?

19   A.   I've been a clinical instructor for a number of years with

20   the University of Kansas School of Medicine.

21   Q.   All right.  Now, first, tell us, for those of us that don't

22   know, what does -- what does a clinical instructor do?

23   A.   So a clinical instructor, I'm not on campus and I'm not an

24   employee of the University of Kansas School of Medicine.  I'm a

25   volunteer instructor in the community who has students and

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    248

1    sometimes residents, but generally students, first and second

2    year students, sometimes first and fourth year students spend

3    time with me and I educate them about clinical medicine.

4    Q.   Students coming into your practice, do you supervise them?

5    A.   Yes.

6    Q.   Teach them?

7    A.   Yes.

8    Q.   And you may have mentioned you've been doing that since

9    1999?

10   A.   1999, yes, sir.

11   Q.   You continued to do that from 1999 to the present; is that

12   right?

13   A.   Correct.

14   Q.   Those are students from the University of Kansas?

15   A.   Correct.

16   Q.   You've also served as a clinical instructor for other

17   universities, have you not?

18   A.   I have.  I was with the University of Missouri for -- for a

19   few years and did some clinical instructing, exact same thing

20   with them.

21   Q.   Okay.  And it looks like that you were a clinical

22   instructor at the University of Missouri from 2004 to 2010; is

23   that right?

24   A.   Correct.

25   Q.   It looks like you were also on the faculty at Baptist

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    249

1   Lutheran Family Medicine Residency Program; is that right?

2   A.  I was.  I was part-time and, frankly, again, it was a -- an

3   opportunity to go into the clinic and educate residents.  It

4   was not a full-time job in any way, shape, or form.  It was

5   just a side.

6   Q.  But more teaching --

7   A.  But more teaching, correct.

8   Q.  -- that you've done?

9   A.  Yes.

10  Q.  It looks like you did that from 2002 to 2004?

11  A.  Correct.

12  Q.  What hospitals are you affiliated with?

13  A.  Liberty Hospital up in my neck of the woods here in Kansas

14  City, so...

15  Q.  And how long have you been affiliated with Liberty

16  Hospital?

17  A.  Since 1998.

18  Q.  Have you ever chaired any departments at Liberty Hospital?

19  A.  I was department chair, I believe, in 2001 and 2002, Family

20  Medicine Department Chair.

21  Q.  And as the Family Medicine Department Chair, what were your

22  responsibilities in that regard?

23  A.  Overseeing -- overseeing the department, any issues that

24  arose in the department that would come -- come to my -- myself

25  and the other family physicians on the board there, and we

 1   would manage and deal with those.

 2   Q.   Now, as part of that role as the chair of the Department of

 3   Family Medicine, did it involve supervising practitioners or

 4   addressing problems that may arise with respect to

 5   practitioners?

 6   A.   If problems arose, we would address those, correct.

 7   Q.   You would be advised of them and you would address them?

 8   A.   Yes.

 9   Q.   Are you a member of any professional organizations?

10   A.   I'm a member of the American Academy of Family Physicians.

11   Q.   And how long have you been a member of the American Academy

12   of Family Physicians?

13   A.   I would -- since '95 probably.

14   Q.   My notes indicate from 1995 to the present?

15   A.   So that's correct.

16   Q.   All right.  At some point were you named a fellow of that

17   organization?

18   A.   I was.  Gosh, I don't even remember what year that was but

19   it was probably -- it's been a long time, 2008 maybe but...

20   somewhere around that time I was named a fellow.

21   Q.   Your memory turns out to be pretty good.  I think it was

22   2008 according to your CV.

23       And what does it mean to be a fellow of the American

24   Academy of Family Physicians?

25   A.   Fellows are folks who excelled in either leadership or

1   academics or in some way to better the overall general aspects

2   of family medicine, so...

3   Q.  Did you hold other -- other offices with that organization?

4   A.  When I was in -- having to go back to my CV; I don't

5   remember this.  I was on a -- as a resident I was involved as a

6   national delegate from the State of Missouri, so that was back

7   in '96, '97.

8   Q.  Fair to say you've been active in that organization for

9   some time?

10  A.  Oh, correct, yes.

11  Q.  Are you a member of any other organizations?

12  A.  Missouri Academy of Family Physicians.

13  Q.  And how long have you been a member of the Missouri Academy

14  of Family Physicians?

15  A.  Since 1995 also.

16  Q.  '95 to the present?

17  A.  Correct.

18  Q.  Did you hold any offices with that organization?

19  A.  Yeah, I was pretty heavily involved with the Missouri

20  Academy.  I was a -- a director, which is -- we have different

21  regions.  So I was a regional director.  I sat on the board,

22  started as a secretary treasurer, and moved my way up to

23  chairman of the board over a number of years.

24  Q.  You were also the president of the organization?

25  A.  Correct.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    252

```
 1   Q.  And then, of course, have you given numerous presentations
 2   and lectures in the area of family medicine that are identified
 3   in your CV?
 4   A.  Correct.
 5   Q.  You're here today because you do do some litigation
 6   consulting; is that right?
 7   A.  That is true.
 8   Q.  And how much of your time, when we compare the time spent
 9   in your clinical practice versus the time spent in doing
10   litigation consulting like you're doing today, what does that
11   breakdown look like?
12   A.  Truthfully, I only do about 5 percent of my time with
13   med-mal stuff.
14   Q.  So when you do get involved in litigation consulting, is it
15   primarily medical malpractice cases?
16   A.  It is, yes.
17   Q.  And on those occasions, when you've done that consulting,
18   is it primarily on behalf of plaintiffs or defendants or a mix?
19   What does that look like?
20   A.  I think a mix is actually a really good -- good
21   description.  I've done plaintiff's work.  I've done defense
22   work.  I've really kind of straddled the line over the years.
23   Q.  When you are getting involved in a medical malpractice case
24   in that capacity, are you determining whether particular
25   conduct that is at issue in the case deviates from the standard
```

253

1    of care?

2    A.   Yes.

3    Q.   And when you do that on every occasion where you're

4    determining whether or not certain conduct deviates from the

5    standard of care, do you consider the scope of the -- of the

6    medical practice at issue?

7    A.   Oh, absolutely, that's -- that's a critical component to

8    this.  You have to understand what they're -- what they're

9    capable of doing and, frankly, allowed to do.

10   Q.   That is part and parcel and probably the first step in

11   determining whether or not the conduct deviates in the first

12   place?

13   A.   Correct.

14   Q.   I want to talk a little bit more about your clinical

15   practice.  The -- what is the name of your practice?

16   A.   My practice at Barry Pointe Family Care.

17   Q.   And do you hold any position there other than in being a

18   medical doctor at that practice?

19   A.   I'm also president of the -- of the organization.

20   Q.   And how long have you been president of Barry Pointe Family

21   Care?

22   A.   Since 2009.

23   Q.   And where is that practice located generally?

24   A.   It's -- so it's -- it's Kansas City, Missouri, but it's

25   right outside of Liberty, Missouri, which we kind of equate

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    254

1  ourselves with Liberty, Missouri.

2  Q.   In your clinical practice, how many patients do you see in

3  an average day at Barry Pointe Family Care?

4  A.   Generally between 25 to 35.

5  Q.   That's every day generally?

6  A.   Pretty much every day.

7  Q.   It may have gone without saying, but in your clinical

8  practice where you're seeing 25 to 35 patients a day, are you

9  routinely and regularly performing physical exams?

10 A.   Absolutely.

11 Q.   Is that a core component of your practice?

12 A.   Fundamental to what I do.

13 Q.   Now, in -- within the physical exams that you conduct in

14 your practice are genital exams or genitalia urinary?

15 A.   Genitourinary.

16 Q.   Genitourinary exams, are they a routine and regular part of

17 your practice?

18 A.   They are.

19 Q.   I think you alluded to this, but how many years have you

20 maintained that active clinical practice?

21 A.   Twenty-two years.

22 Q.   In the course of your clinical practice, you've told us

23 about teaching medical students and supervising medical

24 students in that practice.  Are you also in a position where

25 you are regularly supervising non-physician practitioners?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    255

1    A.  Yeah, physician extenders.  We've had physician assistants

2    and we've's had nurse practitioners in our practice.

3    Q.  And have you used physicians assistants in your practice

4    over the course of 22 years?

5    A.  Yes.

6    Q.  When you employ physician extenders, and more specifically

7    physicians assistants, do you utilize a written collaborative

8    agreement?

9    A.  Yes.  Yeah, that's, again, a fundamental part of our

10   practice.  That's a vital component to outline what -- what the

11   capabilities are of the physician extender.

12   Q.  And tell us what is a collaborative agreement.

13   A.  So a collaborative agreement kind of defines what the --

14   you know, the scope of the practice is for that physician

15   extender.  It gives them a clearer path to what they should be

16   able to do and, honestly, what they can't do within that

17   practice.  Sometimes what they can't do is more important than

18   actually what they are capable of doing.

19   Q.  In the course of you employing physician extenders and

20   physicians assistants, do you audit their records?

21   A.  Yes, absolutely.

22   Q.  Is that a necessary component and add-on to the

23   collaborative agreement?

24   A.  It is.  It's, again, critical.

25   Q.  In your practice, do you utilize physician assistants to

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    256

1   obtain patient histories and physical exams?

2   A.   Yeah, that's core and fundamental to what they do.

3   Q.   And with respect to physician assistants, is it universally

4   recognized in the medical field, the primary care of medicine,

5   that the job of a PA is to obtain patient histories and

6   physical exams?

7   A.   Absolutely.

8   Q.   Is it considered -- within the field of primary care of

9   medicine, are those functions considered core fundamental

10  functions of a physician assistant?

11  A.   Physician assistant, physicians, nurse practitioners, all

12  those individuals.

13  Q.   All right.  Now, we've referred to a component of the

14  physical exam is a genitourinary exam; correct?

15  A.   Correct.

16  Q.   And tell us what is a genitourinary exam?

17  A.   My question back to you:  I assume we're talking about male

18  genitalia not female?

19  Q.   I did not -- yes, we are.

20  A.   So -- get it.

21       So in the male genital exam, it involves first inspecting

22  the -- the outside of the genitalia.  You look at the penis.

23  You look at the scrotum.  You look at the pubic area in

24  general.  And then the next part involves palpation, you would

25  examine the penis.  You would -- if they have foreskin,

16-2627 Leininger v USA et al  7.7.20 Vol. 2                     257

1    sometimes you would have to retract that.  If you've got -- you

2    want to do a scrotal exam.  You have to check the testicles.

3    You have to check the epididymis.  You have to check the

4    vas deferens.  Often times hernias related to that too, so you

5    have to check for hernias, and palpate the lymph nodes to

6    determine any pathology there.  So pretty much sums it up.

7    Q.  Now, what medical purposes are served by performing a

8    genitourinary exam?

9    A.  You're looking for pathology.  You're looking -- with a

10   hernia you're obviously looking for, you know, intra-abdominal

11   contents extruding into the scrotum.  You're also looking for

12   testicular masses, signs of infection, looking for rashes.  So

13   it's -- there's a lot of pathology that can occur down there.

14   Q.  Now, with respect to physician assistants, is it

15   universally recognized that genitourinary exams are a

16   legitimate part of a physical exam when they are clinically

17   indicated?

18   A.  Absolutely, unquestionably, yeah.

19   Q.  Is it universally recognized that a physician assistant's

20   job is to perform genitourinary exams when clinically

21   indicated?

22   A.  Correct.

23   Q.  And, of course, Mark Wisner was practicing primary care

24   medicine as a physician assistant OIF-OEF VA clinic; correct?

25   A.  Correct.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    258

1    Q.   Now, you've reviewed medical records for numerous patients

2    of Mr. Wisner receiving medical treatment at the Leavenworth VA

3    outpatient clinic; correct?

4    A.   That's true.

5    Q.   You've done so in your role as a consultant like you are

6    doing here today; is that right?

7    A.   Correct.

8    Q.   Now, with respect to the medical records that you've

9    reviewed, how many patients -- how many patients' medical

10   records have you reviewed related to Mr. Wisner?

11   A.   A total of 20 so far.

12   Q.   And, of course, that includes the medical records for Aaron

13   Leininger --

14   A.   Correct.

15   Q.   -- is that right?

16   A.   Yes.

17   Q.   In the course of your work in this case, have you also

18   spoken directly to those 20 patients?

19   A.   I have spoken to each and every one, yes.

20   Q.   In the course of doing that work, did you find any

21   commonality or consistency among the information that was

22   provided by those patients and the information that was

23   contained in the medical records you reviewed?

24   A.   Remarkably consistent.  It was -- the pattern of physical

25   exam, the pattern of, you know, prescribing habits, the -- it

16-2627 Leininger v USA et al  7.7.20 Vol. 2                 259

1   was unbelievable how similar they all were.  It felt like,

2   talking to these gentlemen, it was the same story over and over

3   again.

4   Q.  And with respect to the prescribing habits, you're

5   referring to the prescribing habits of Mr. Wisner?

6   A.  Correct.

7   Q.  And generally what did you observe about the prescribing

8   habits of Mr. Wisner?

9   A.  Oh, in general there was one aspect that really sticks out

10  is that he was quite generous with his prescriptions of

11  narcotics.

12  Q.  Narcotics, these are medications that have -- carry a high

13  risk of dependency?

14  A.  Correct.

15  Q.  Medications that carry a high risk of abuse?

16  A.  Yes.

17  Q.  Medications that carry a high risk of causing impaired

18  judgment --

19  A.  Yes.

20  Q.  -- on the part of the patient?

21  A.  Yes.

22  Q.  In the course of that review, did you find that Mr. Wisner

23  was routinely performing genital exams or genitourinary exams

24  on those patients?

25  A.  Yes.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                   260

1    Q.   Now, when a -- when a physician's assistant is performing

2    the functions that we're going to talk about here today, like

3    performing physical exams and like performing genitourinary

4    exams, does the standard of care apply equally to a physician

5    or a physician assistant when they're performing those

6    functions?

7    A.   Yes, any physician extender is held to that same standard

8    of care.

9    Q.   When it comes to those types of physical exams, there's a

10   proper way to do it and there's an improper way to do it; true?

11   A.   That is true.

12   Q.   And that's dictated by the standard of care?

13   A.   Correct.

14   Q.   Now, with respect to the prescription practices, in those

15   situations in which a physician assistant is prescribing

16   medications like the narcotics that you've observed Wisner

17   prescribing, is he held to the same standard of care in that

18   role when he's -- when he's prescribing those medications as a

19   physician would be?

20   A.   Absolutely.

21   Q.   We're going to talk about a number of opinions that you

22   have developed in this case, and do you agree, will you express

23   those opinions here today, that you will do so to a reasonable

24   degree of medical certainty?

25   A.   I do.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    261

1   Q.  In all the opinions that you're going to express today,

2   you, in fact, hold to a reasonable degree of medical certainty?

3   A.  I do.

4   Q.  Mr. Wisner, in performing his duties at the OEF-OIF clinic,

5   how many practitioners at that clinic were performing those

6   functions?

7   A.  Just one, him.

8   Q.  Mr. Wisner was the only primary care practitioner that was

9   caring for patients at that clinic during the duration of the

10  time he was there?

11  A.  He is the only one.  Had a great deal of autonomy.

12  Q.  Now, were you able to glean from the material you reviewed,

13  in fact, how many patients was Mr. Wisner responsible for at

14  that clinic?

15  A.  Nearly a thousand.

16  Q.  We've talked about the job duties that are recognized in

17  the primary -- the field of primary care medicine for PAs.  Did

18  you also consider the scope of practice for Mr. Wisner

19  specifically as well as the scope of practice for PAs that are

20  utilized at the VA?

21  A.  Yes.

22  Q.  I want to -- I want to hand you what has been marked as

23  Exhibit 58, and do you recognize this document?

24  A.  Yes, I do.

25  Q.  And what is it?

1   A.   It's a utilization of physician assistants.

2   Q.   And is it a VHA Directive 2004-029?

3   A.   Yes.

4   Q.   Did you consider it in forming your opinions here today?

5   A.   Yes.

6            MR. KILGORE:  Your Honor, I offer Exhibit 58.  I

7   believe it's been stipulated to.

8            THE COURT:  Assuming no objection from the defendant,

9   Ms. Haston?

10           MS. HASTON:  Your Honor, no objection subject to there

11  may be some objections to the questions about the document, but

12  no objection to the document itself.

13           THE COURT:  All right.  Exhibit -- Exhibit 58 is

14  received.

15           MR. KILGORE:  I'd like to publish that exhibit.

16           THE COURT:  You may.

17           MR. KILGORE:  I apologize, Your Honor, we're having a

18  technical glitch here.

19           THE COURT:  After my start this morning, no need to

20  apologize.

21           MR. KILGORE:  All right.  I believe we have it up.

22           THE COURT:  I can see it, Mr. Kilgore.

23  BY MR. KILGORE:

24  Q.   Dr. Kelley, directing your attention to Section 1, The

25  Purpose, does this VHA directive state that, "The Veterans

1    Health Administration, VHA, directive defines the Department of

2    Veteran Affairs, VA, utilization of physician assistants, PAs,

3    in medical centers, outpatient clinics, and administrative

4    support positions?"

5    A.   Yes.

6    Q.   It's dated July 2nd, 2004 --

7    A.   Yes.

8    Q.   -- is that correct?

9    A.   Yes.

10   Q.   I'd like to turn to page 3, the third page of the exhibit,

11   and this is the physician assistant, PA, scope of practice at

12   the VA; is that correct?

13   A.   Yes.

14   Q.   It states, "The physician assistant, PA, scope of practice,

15   SOP, must contain and address the following headings."

16        Did I read that correctly?

17   A.   Correct.

18   Q.   And the first section is routine duties; is that right?

19   A.   Yes.

20   Q.   And it defines routine duties are those performed on a

21   regular, repetitive basis.  Examples of duties which are often

22   considered routine are as follows, and the very first one, (A),

23   is performing initial histories and physical examinations?

24   A.   Correct.

25   Q.   That's consistent with your knowledge of the job duties and

1    the responsibilities of physician assistants universally in the

2    field of primary care medicine?

3    A.   Correct.

4    Q.   I want to hand you what we've marked as Exhibit 59.  Do you

5    recognize this document?

6    A.   I do.

7    Q.   It's another VHA directive and this is VHA Directive 1063

8    dated December 24th, 2013; is that correct?

9    A.   Correct.

10   Q.   Did you consider this VHA directive in forming your

11   opinions in this case?

12   A.   Yes.

13           MR. KILGORE:  Your Honor, I offer Exhibit 59.  It's

14   stipulated to.  I'd move to admit it.

15           THE COURT:  Any objection to 59?

16           MS. HASTON:  No objection, but, again, reserving the

17   right to object to the way it's used, Your Honor.

18           THE COURT:  And naturally you only need to preserve

19   objections or make objections to the offer of the exhibit

20   itself.  I understand your position.  You may object to topics

21   that are related to it.  You don't have to say it each time.

22           Exhibit 59's received.

23           MS. HASTON:  Thank you, Your Honor.

24   BY MR. KILGORE:

25   Q.   Dr. Kelley, this -- this VHA directive is also on the

16-2627 Leininger v USA et al  7.7.20 Vol. 2                265

1    subject of utilization of physician assistants; is that right?

2    A.   Correct.

3    Q.   And -- and it looks like that this directive makes certain

4    changes to the utilization of physician assistants' scope of

5    practice; is that right?

6    A.   Correct.

7    Q.   In Section (2) it has a summary of changes, and the first

8    one is it establishes core PA scope of practice and expanded

9    scope of practice elements; is that correct?

10   A.   Correct.

11   Q.   And it also updates requirements for physician oversight of

12   PA practice; is that right?

13   A.   Correct.

14   Q.   I'd like to turn your attention to page 3, and does this

15   directive outline the context of collaborate -- collaborating

16   physicians with respect to PAs?

17   A.   Yes.

18   Q.   And it provides that the collaborating physician is

19   responsible for providing appropriate clinical oversight,

20   consultation, and patient care management assistance to the PA

21   assigned; is that correct?

22   A.   Yes.

23   Q.   Consistent with your understanding of the standard of care

24   in primary care medicine?

25   A.   Yes.

1   Q.  It also provides that the collaborating physician is

2   responsible for providing readily available consultation and

3   collaboration --

4   A.  Correct.

5   Q.  -- correct?

6   A.  Yes.

7   Q.  Now, do you know who the collaborating physician was for

8   PA Wisner?

9   A.  I believe it was Dr. Cline.

10  Q.  Did you have an opportunity to review deposition testimony

11  and documents concerning that relationship and supervision by

12  Dr. Cline?

13  A.  Yes.

14  Q.  In your opinion, in your medical opinion, did Dr. Cline

15  fulfill this directive in serving as a collaborating physician

16  for Mr. Wisner?

17  A.  No, in fact, he even --

18          MS. HASTON:  Objection.

19          THE COURT:  Hold on just a second.  There's an

20  objection.  What's the objection?

21          MS. HASTON:  Relevance, Your Honor.

22          THE COURT:  Overruled.  You may answer the question.

23          THE WITNESS:  The -- Dr. Cline, in his deposition,

24  even admitted that he wasn't even aware that he was supposed to

25  review Mr. Wisner's charts, that he was lacking in oversight of

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    267

1    Mr. Wisner.

2    BY MR. KILGORE:

3    Q.  And we'll talk more -- about that in more detail.  But on

4    this particular exhibit, I'd like to look at page 4, and

5    specifically No. 5 at the top of the page.  This -- this,

6    again, expands on the responsibility of the collaborating

7    physician, which in this case is Dr. Cline.  No. 5 states,

8    "Monitoring the PA's clinical activities to ensure they are

9    within the authorized scope of practice and are medically

10   appropriate."

11        Did I read that correctly?

12   A.  Yes.

13   Q.  "The collaborating physician must provide timely

14   notification to the chief of service of any deficiencies in

15   relationship to the PA's established scope of practice for

16   corrective actions."

17        Did I read that correctly?

18   A.  Yes.

19   Q.  Do you have an opinion as to whether or not Dr. Cline

20   fulfilled that directive?

21   A.  He did not.

22             MS. HASTON:  Objection.

23             THE COURT:  What's the objection?

24             MS. HASTON:  Relevance.

25             THE COURT:  I don't understand the relevance

1    objection.  Help me understand why you're contesting this --

2    these opinions.

3         MS. HASTON:  Your Honor, he's asking for the witness's

4    opinions on the -- Wisner's supervisor, and the court has

5    already determined that the conduct of Wisner's supervisor is

6    not at issue.

7         THE COURT:  Mr. Kilgore, you want to be heard on that

8    issue?

9         MR. KILGORE:  Briefly, Your Honor.  I thought we had

10   already been down that road.  At issue in this case is what is

11   foreseeable to the VA with respect to Mr. Wisner's conduct.

12   This directive and the compliance or failure to comply with it

13   is directly relevant to the issues in this case.

14        THE COURT:  I agree.  The objection is overruled.

15        MS. HASTON:  Thank you.

16   BY MR. KILGORE:

17   Q.  Dr. Kelley, I'd like to hand you what's been marked as

18   Exhibit 60.  Dr. Kelley, do you recognize this document?

19   A.  Yes.

20   Q.  I believe this is the appendix to the previous exhibit

21   regarding VHA Directive 1063?

22   A.  Correct.

23   Q.  Is that your understanding?

24   A.  Yes.

25   Q.  Did you consider it in forming your opinions?

1  A.  Yes.

2         MR. KILGORE:  Your Honor, I -- I offer Exhibit 60 into

3  evidence.

4         THE COURT:  Any objection to 60?

5         MS. HASTON:  No objection.

6         THE COURT:  It's received.

7  BY MR. KILGORE:

8  Q.  And I'd like to direct your attention, Dr. Kelley, to the

9  first page of Exhibit 60.  Let me -- let me see if I can just

10 do this briefly so we don't have to wait on technology here.

11     Dr. Kelley, this particular directive, 1063 Appendix A,

12 again, refers to scope of practice for PAs at the VA; is that

13 correct?

14 A.  Correct.

15 Q.  And in this one actually identifies obtaining medical

16 histories and performing physical exams as the first core

17 element for a PA in their scope of practice?

18 A.  Yes.

19 Q.  Did I read it correctly?

20 A.  Exactly.

21 Q.  Consistent with your understanding of the job duties of a

22 PA recognized in the primary care field?

23 A.  Yes.

24 Q.  All right.  I want to hand you Exhibit 75.  Dr. Kelley, do

25 you recognize Exhibit 75?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    270

```
1   A.  I do.

2   Q.  And what is it?

3   A.  It is the -- pull it up on the screen here.  It's the

4   privilege reviewed and approved by -- by the director.

5   Q.  And who does it pertain -- what provider does it pertain

6   to?

7   A.  Mr. Wisner.

8   Q.  And is this a scope of practice document for Mr. Wisner?

9   A.  Yes.

10  Q.  Did you review it and consider it in forming your opinions

11  in this case?

12  A.  Yes.

13          MR. KILGORE:  Your Honor, I offer Exhibit 75.  It's

14  stipulated to.  I move to admit it.

15          THE COURT:  Ms. Haston?

16          MS. HASTON:  No objection.

17          THE COURT:  Received.

18  BY MR. KILGORE:

19  Q.  Now, I want to direct your attention, Dr. Kelley, to the

20  privileges with respect to prescription medications.  It was

21  held by Mr. Wisner.  I believe it's on page 7.  We have it up

22  on the screen.  Based on your review of this document, was

23  Mr. Wisner authorized and privileged to prescribe these

24  medications to his patients?

25  A.  Yes.
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2

1  Q.  Okay.  And, in looking at this list of medication, are they

2  -- you tell me, what are they, as a class, as a group?

3  A.  So you've got -- you got two classes here.  You've got --

4  that first part is morphine and oxycodone and codeine and such

5  is your opioid group of medications.  Those are powerful pain

6  narcotics.

7      And then the lower group relates to benzodiazepine.

8      You do have some lesser narcotic agents, like, codeine

9  there and propoxyphene but -- and hydrocodone.

10     You also have at the very end there zolpidem, which is

11  Ambien, which is sleep aid, which is Schedule 2 drug.

12     He's got -- I mean, this is -- this is a who's who of

13  narcotics right here.

14  Q.  And with respect to the opioids and perhaps the benzos and

15  some of the other medications, but are these medications, do

16  they all carry a high risk for dependency and abuse?

17  A.  Yes, every -- that's why they use --

18     Schedule 2 drugs, as clinicians, we have to be very aware

19  of who we're prescribing this to and how we're prescribing

20  these medicines.

21  Q.  Do these medications, can they cause impaired judgment in

22  the patient?

23  A.  Yes.

24  Q.  I want to direct your attention to --

25     Well, before we leave that.  In the course of -- in the

16-2627 Leininger v USA et al  7.7.20 Vol. 2                272

1    course of your review of the medical records for the 20

2    patients that you've seen and had contact with in -- in your

3    work in this case, does that -- does that list of opioids

4    represent the medications that you've seen over and over again

5    prescribed by Mr. Wisner?

6    A.   When I was referring to that earlier, that's exactly what I

7    was referring to is the fact that I consistently would see

8    multiple opioids, multiple benzodiazepines being prescribed to

9    these patients.  I can't tell you specifically if all 20 were

10   being prescribed that, but I can tell you the predominance was

11   the vast majority were on a variety of these kind of meds.

12   Q.   All right.  I want to -- I want to turn to one more part of

13   this exhibit, the routine responsibilities.  And now this is

14   specifically directed at PA Wisner; is that right?

15   A.   Correct.

16   Q.   And under routine responsibilities, No. 2 states that, "As

17   an agent of the supervising physician, the PA makes clinical

18   practice decisions autonomously within the scope of practice

19   prescriptive authority granted and with supervision,

20   collaboration, consultation of the supervising physician as

21   well as other physicians."

22       Did I read that correctly?

23   A.   Correct.

24   Q.   The second item here is -- for the routine responsibilities

25   of PA Wisner is "conduct and document findings on initial

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    273

```
 1   periodic, episodic, and/or annual health histories and physical

 2   examinations on patients seen in the clinical setting."

 3        Did I read that correctly?

 4   A.   Correct.

 5   Q.   Says, "The supervising physician will review,

 6   concur/countersign as required by VA EKHCS bylaws or policy,

 7   providing an addendum if needed."

 8   A.   Correct.

 9   Q.   Now, Dr. Kelley, in the course of your review of the

10   medical records pertaining to Mr. Leininger, did you observe

11   any time where Dr. Cline was countersigning Mr. Wisner's

12   progress notes?

13   A.   No.

14   Q.   I want to talk to you, Dr. Kelley, about the pretrial order

15   that's been entered in this case.  We've marked it as

16   Exhibit 239.  We're handing it to you now.  I want to direct

17   your attention to page 3.  It provides that, "The following

18   facts which apply to all Group I plaintiffs, including the

19   above-captioned case, are stipulated."

20        Did I read that right?

21   A.   Correct.

22   Q.   It indicates that, "PA Wisner was employed as a physician

23   assistant with the Department of Veteran Affairs from September

24   28, 2008 until June 28, 2014."

25        Did I read that correctly?
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2

274

1   A.  Correct.

2   Q.  I want to direct your attention to the next page, page 4.

3   Stipulated Fact No. 8 states, "The VA employed Mark E. Wisner

4   to, in part, conduct physical exams of patients which may have

5   involved sensitive or intimate matters."

6        Did I read that correctly?

7   A.  Correct.

8   Q.  Any question in your mind that that's why he was employed

9   at the OEF-OIF clinic?

10  A.  No.  In fact, I mean, according to the scope of practice, I

11  mean, it's clear that physical exams, whether general or more

12  intimate, were a core function of his -- of his job

13  description, so...

14  Q.  Stipulated Fact No. 9 states, "The VA employed Mark

15  E. Wisner to, in part, conduct physical examinations of

16  patients which may have involved sensitive or uncomfortable

17  matters."

18        Did I read that correctly?

19  A.  Correct.

20  Q.  Any doubt in your mind that that's why he was employed at

21  the OEF-OIF clinic?

22  A.  No.  All the -- again, scope of practice and records

23  reflect that's exactly what he was -- one of the aspects he was

24  supposed to do.

25  Q.  Stipulated Fact No. 10 states, "The United States did not

1    require a supervisor to be present during Mark E. Wisner's

2    examinations of his patients."

3         Did I read that correctly?

4    A.  That's correct.

5    Q.  Consistent with your review of all the documents that

6    you've -- you've seen with respect to the 20 patients that

7    you've been involved with in this litigation?

8    A.  Yes.  And to me it's significant in the sense it reflects

9    how much autonomy he had.  I mean, he was by himself.  I mean,

10   he could -- you know, he ran that clinic.  He was the primary

11   care doc there.

12   Q.  Stipulated Fact No. 11 states, "The United States did not

13   require a chaperone to be present during Mark E Wisner's

14   examinations of his male patients."

15        Did I read that correctly?

16   A.  That's correct.

17   Q.  Consistent with your review?

18   A.  Yes.

19   Q.  Significant for you?

20   A.  Yes, in the sense that being left alone with gentlemen

21   afforded him opportunities to perform exams that if a chaperone

22   had been present he probably wouldn't have done.

23   Q.  I want to move down to Stipulated Facts No. 16 and 17.

24        No. 16 states, "Mark E. Wisner's medically-documented

25   examinations of the plaintiff occurred at the Leavenworth VA

1  facility while the facility was open and operating."

2      Did I read that correctly?

3  A.   That's correct.

4  Q.   No. 17 states, "Mark E. Wisner's medically-documented

5  examinations of the plaintiff occurred in an exam room at the

6  Leavenworth VA facility."  Did I read that correctly?

7  A.   That's correct.

8  Q.   Those stipulated facts consistent with your review of the

9  material in this case?

10  A.   Yes.

11  Q.   Are those stipulated facts and undisputed facts significant

12  in your review and your opinions here today?

13  A.   You know, it's interesting because it's really significant.

14  You've got a situation where all these events have occurred in

15  an exam room in a VA run facility in those four walls.  None of

16  these events occurred in a private residence or in a back alley

17  or seedy bar.  They all occurred under -- under a federally,

18  you know, funded, represented entity; so that is very

19  significant to me.

20  Q.   They -- they occurred within the scope of -- of PA Wisner's

21  job duties, responsibilities, and scope of his employment;

22  isn't that right?

23  A.   Absolutely.

24  Q.   I want to turn the page of Stipulated Facts 18 and 19.

25      Fact 18 states, "Mark E. Wisner's medically-documented

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    277

1   genital exams were part of his overall physician examinations."

2        Did I read that correctly?

3   A.   Correct.

4   Q.   Consistent with your review?

5   A.   Yes.

6   Q.   Consistent with everything we know about the performance of

7   a PA's job both at the VA and everywhere elsewhere PAs are

8   employed?

9   A.   Yes.

10  Q.   Fact No. 19 states, "At least some portions of the medical

11  care Mark E. Wisner provided plaintiff was for a valid medical

12  purpose in order to provide diagnostic care."

13       Did I read that correctly?

14  A.   Correct.

15  Q.   Is that significant in terms of your review and opinions?

16  A.   Yes.

17  Q.   How so?

18  A.   You know, it's -- again, it speaks to the fact that while

19  there -- there can be this fine line between doing an exam and

20  then perhaps doing an exam more frequently.  There still can be

21  a valid medical purpose for doing the exam even when it's done

22  more frequently.  So...

23  Q.   And are you -- are you referring to the genital exams?

24  A.   Yes, I am.

25  Q.   Fact No. 22 -- let's actually go down to 24.  This -- this

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    278

1   confirms and removes any dispute to what we've already

2   discussed.  And 24 states, "Mark Wisner's collaborating

3   physicians at the VA, including Dr. Daniel Cline, were

4   responsible pursuant to VHA Directive 1063 for providing

5   clinical oversight, consultation, and patient care management

6   assistance to Mark Wisner."

7        Did I read that correctly?

8   A.  Yes.

9   Q.  Did you look at that document; is that right?

10  A.  Correct.

11  Q.  "Mark Wisner's collaborating physician at the VA, including

12  Dr. Daniel Cline, were responsible pursuant to VHA 1063 for

13  monitoring Mark Wisner's clinical activities to ensure they

14  were within the authorized scope of practice."  That's fact

15  No. 25.  Did I read it correctly?

16  A.  Yes.

17  Q.  Exhibit 26 -- excuse me.  Fact No. 26 states, "The chief of

18  service in Mark Wisner's chain of command at the VA was

19  responsible pursuant to VHA Directive 1063 for taking action to

20  correct any discovered deficiencies in Mark Wisner's clinical

21  practice."

22        Did I read that correctly?

23  A.  That's correct.

24  Q.  Did you undertake any review of the performance of Mark

25  Wisner's chain of command in this case?

1  A.  I did.  It's -- you've got -- the VA has admitted that they

2  didn't, you know, appropriately audit his chart.  You have

3  Dr. Cline saying, in his deposition, he wasn't even aware that

4  he was supposed to be auditing his charts.

5      Then you have Dr. Desai and Dr. -- Mr. Wisner's line

6  service supervisor who -- excuse me -- he clearly says that

7  Dr. Cline wasn't doing his job in auditing the charts.

8      And then you have Dr. Leeson, the interim chair of the

9  department -- the interim chair -- I'm sorry, the interim chief

10 of staff for the hospital saying that the chain of command did

11 not follow protocol; they did not review and audit Mr. Wisner.

12 Q.  And given that review, do you have an opinion as to whether

13 or not that chain of command complied with VHA Directive 1063?

14 A.  Yes, they obviously did not.

15 Q.  I want -- I want to go to the next page, page 6.  Fact

16 No. 6 stipulates that -- that, "Plaintiff had a total of nine

17 visits with Mr. Wisner at the VAMC according to his medical

18 records;" is that correct?

19 A.  That's correct.

20 Q.  Consistent with the progress notes that you have reviewed?

21 A.  Yes.

22 Q.  And then it provides the dates for those visits consistent

23 with your review?

24 A.  Yes.

25 Q.  Now, Fact No. 8 states, "Mr. Wisner performed a genital

1   exam during each visit."  Did I read that correctly?

2   A.   Yes.

3   Q.   Consistent with what Mr. Leininger told you?

4   A.   As I recall, I think Mr. Leininger said nearly every visit,

5   but I take this at its word, so...

6   Q.   All right.  Turning the page to -- to Fact No. 9.  Fact

7   No. 9 states that, "Mr. Wisner did not wear gloves for any of

8   the genital exams."  Did I read that correctly?

9   A.   You did.

10  Q.   Now, Dr. Kelley, is that undisputed fact significant for

11  your opinions here today?

12  A.   Absolutely and this is such a clear deviation from the

13  standard of care.  There's not a provider around who would tell

14  you that doing ungloved genital exams was appropriate.

15  Q.   All right.  And why does the standard of care require

16  gloves when performing a physical exam like a genital exam?

17  A.   Well, you have to -- protecting the patient and the -- and

18  the physician.  I mean, you want to make sure that -- there's a

19  tremendous amount of pathology that can occur down there, and

20  so you want to make sure that as a provider you're not

21  contracting anything.  And as a provider your obligation is to

22  do no harm and it's to protect the patient, so you've got

23  gloves on so in case you could have transmitted something to

24  them you can prevent that from happening.

25  Q.   Based on these undisputed facts, Mr. Kelley, is it

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    281

 1   undisputed that Mr. Wisner deviated from the standard of care

 2   on nine separate occasions when he conducted genital exams on

 3   Mr. Leininger without wearing gloves?

 4   A.   Yes.

 5   Q.   And as a physician, in your view, is there any dispute that

 6   Mr. Wisner committed malpractice when he performed those

 7   ungloved genital exams every time he did it nine times?

 8   A.   Yes.

 9   Q.   Any question in your mind?

10   A.   None whatsoever.

11   Q.   Malpractice?

12   A.   Absolutely.

13   Q.   Dr. Kelley, do you have an opinion as to whether or not

14   those deviations from the standard of care with respect to the

15   ungloved genital exams arose from the scope of Mr. Wisner's job

16   at the VA?

17   A.   None.

18   Q.   All right.  What's your opinion?

19   A.   Well, my -- obviously his scope of practice was to do

20   physical exams, and a component of the physical exam is give a

21   genital exam, and so he is -- he has the authority.  He is

22   authorized and it is in his purview to do genital exams, so

23   none whatsoever that it occurred under those circumstances.

24   Q.   And it arose out of the scope of his job duties?

25   A.   Absolutely.

16-2627 Leininger v USA et al  7.7.20 Vol. 2          282

1    Q.  All right.  I want -- I want to talk about your review of

2    Mr. Wisner's care pertaining to Mr. Leininger.  In addition to

3    conducting the ungloved genital exams on nine separate

4    occasions, did you identify additional deviations from the

5    standard of care by Mr. Wisner?

6    A.  Well, as part of the genital exam, one was the length of

7    time it took to do the genital exam and the other thing was the

8    disrobing techniques that he was using.

9    Q.  All right.  And we'll get into that in more detail.

10       Did you set forth your opinions in a written report?

11   A.  Yes.

12   Q.  We've marked it as Exhibit 161.  I don't intend to offer it

13   but I am handing it to you in the event you need to refer to

14   it.  Okay.

15       I'd like to talk to you about the first time -- or at least

16   the first progress note that we have dated July 13th, 2012.

17   It's marked as Exhibit 197.  Do you recognize it?

18   A.  I do.

19   Q.  You consider this progress note as well as the other eight

20   progress notes that were authored by Mr. Wisner; is that

21   correct?

22   A.  Correct.

23       MR. KILGORE:  Your Honor, in an effort to save time,

24   we've marked each of the progress notes.  They're Exhibits 197,

25   199, 200, 201, 202, 203, 204, 205 and 206 are each of the

 1  progress notes that we've marked as exhibits.  I believe

 2  they're admitted by stipulation and I offer them now and I move

 3  to admit them now.

 4          THE COURT:  Is there objection to any of those

 5  exhibits, Ms. Haston?

 6          MS. HASTON:  No objection.

 7          THE COURT:  All right.  Received are 197, 199, 200,

 8  201, 202, 203, 204, 205, 206.

 9  BY MR. KILGORE:

10  Q.  All right.  Dr. Kelley, directing your attention to

11  Exhibit 197, this is the office note dated July 13th, 2012,

12  authored by Mark Wisner; is that correct?

13  A.  That's correct.

14  Q.  All right.  I want to talk to you generally about the

15  format of this office note and what we're seeing in terms of

16  the way in which the medical care is documented in this office

17  note and let you kind of walk us through it.

18      It looks like that at the -- towards the top of the

19  page that it has a date and time for various vitals that were

20  taken at this office visit; is that right?

21  A.  That's correct.

22  Q.  Things like temperature, pulse, respirations, BP; is that

23  right?

24  A.  That's correct.

25  Q.  And walk me through --

16-2627 Leininger v USA et al  7.7.20 Vol. 2                284

1   A.  Sure.

2   Q.  -- underneath that.

3   A.  Underneath that it looks to me as if that's the allergies,

4   things that he has reacted to in the past.

5   Q.  And what are you referring to?

6   A.  It says hydrocodone/ibuprofen, intravascular contrast media

7   and methadone appear to be allergies.

8   Q.  Okay.

9   A.  And then you've got his current medication list, which is

10  diazepam, and that medication name below it is the trade name

11  Seroquel.  Diazepam is used for a variety things.  It can be

12  used for anxiety.  It can be used for muscle spasms.  Even in

13  some cases a real severe dizziness you can use diazepam.  And

14  the Seroquel is used for depression, bipolar, even

15  schizophrenia, anxiety, a whole host of psychiatric conditions.

16  Q.  Is diazepam a narcotic?

17  A.  It is a narcotic and it's a benzodiazepine.

18  Q.  Okay.

19  A.  Then the active problems below that, this outlines all the

20  different problems that is currently going on with

21  Mr. Leininger.  And then below that it looks like they have a

22  notation for procedures, and it looks like a procedure had been

23  done.

24  Q.  And let me -- let me stop you right there.

25  A.  Sure.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    285

1   Q.  In the active problem list in the -- in that list of

2   things, there's low back pain; is that right?

3   A.  That's true.

4   Q.  There's also down below PTSD; is that right?

5   A.  That's true.

6   Q.  Attributes a PTSD date of diagnosis of October 19th, 2009,

7   at least with respect to this note; is that correct?

8   A.  That's correct.

9   Q.  Go on.

10  A.  And then, as I was saying, he had an epidural injection, so

11  he's got the little spot there for procedures.  And then

12  talking about vaccines and immunizations, that's a pneumococcal

13  vaccine.

14  Q.  And what is -- go ahead.

15  A.  Oh, and then next is the HPI.  And the HPI is history of

16  present illness, and that's where you describe what the reasons

17  is they're in for, their evaluation.  If they're having back

18  pain, you would describe the back pain.  If they're having

19  teeth pain, you would describe the teeth pain and such.

20  Q.  And in this instance it was tooth pain and back pain; is

21  that correct?

22  A.  I believe so.

23  Q.  Okay.  Then going on to the next page.

24  A.  And then under the review of systems, you take each -- with

25  review of systems you look at the different systems of the

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    286

1    body.  Sometimes you do a more focused one, like in this case

2    it's really talking about the areas of the body.

3        Then they pertain to what -- the condition in the HPI, but

4    sometimes the review systems is much more extensive when you

5    start -- start basically head to toe looking at eyes, ears,

6    nose, mouth, heart, lungs, abdominal cavity, genitalia,

7    musculoskeletal exams and such, and you describe what symptoms

8    they're having as relates to those systems.

9        Then below is the physical exam, and the physical exam is

10   broken down into all the various areas very similar to what you

11   do with your review of systems.  In this case they started with

12   a mental status exam, and then working their way through skin

13   and -- HENT stands for head, ears -- head, eyes, ears, nose,

14   and throat.  Then you have lungs, heart, then gastrointestinal

15   the GI.  You have extremities.  Then you have the neuro --

16   neurologic system.

17   Q.  Okay.  Page 3.

18   A.  And then talking about the vascular system, which is the

19   pulses, and psychiatric.

20       And then below that is the assessment and planning.  The

21   assessment and plan is where we develop our differential

22   diagnosis.  We put down what we think the condition that

23   they're suffering is from.  And then the plan obviously is how

24   we plan to address it, treat it, work it up, and such.

25   Q.  All right.  And then down below is there a place for

1   physician orders?

2   A.   Yeah.  They've got some basic orders here.  I suspect he

3   could probably -- I'm not familiar with the VA computer system,

4   but these are basic laboratory work that he could quickly click

5   on but there's other -- he could probably add additional blood

6   work if he needed to, same thing with the imagining and the

7   same thing with consults.

8   Q.   And then is there same place for return to clinic or

9   follow-up?

10  A.   It's right below the consults is return to clinic.

11  Q.   Now, do all of Mr. Wisner's progress notes follow this

12  general format, although the information contained therein

13  might be different in the various notes?

14  A.   Yeah, this is a pretty standard format for all clinicians.

15  Q.   All right.  Now, is -- is the -- the categories, the

16  numerous categories and sections in this progress note, is it

17  significant for you in your opinions that Mr. Wisner was

18  performing all of these functions in the course of a clinical

19  visit with Mr. Leininger?

20  A.   Yeah, it's significant because it's part of the scope of

21  practice.

22  Q.   Okay.

23  A.   It's fundamental according to what he does, so...

24  Q.   He wasn't only performing a genital exam at this visit, he

25  was looking at all these other areas for the visit --

1   A.  Yes.

2   Q.  -- right?

3   A.  Right.

4   Q.  We know he did a genital exam at this visit because it's an

5   undisputed fact; right?

6   A.  Correct.

7   Q.  All right.  Now, do you have an opinion about the fact

8   he -- just the fact he did a genital exam on this visit, not

9   the way he did it, how long he did it, all those other issues,

10  but the fact he did a genital exam at this visit, do you have

11  an opinion whether or not that was clinically indicated or

12  appropriate?

13  A.  I do.  And my opinion is in this case, since he's doing a

14  physical, I think it's absolutely appropriate to do the exam.

15  Q.  If he's doing a head to toe physical, you don't take issue

16  with the fact that he did a genital exam at this visit but you

17  may have other criticisms, am I right?

18  A.  Correct.

19  Q.  All right.  Now, with respect to the assessment and plan,

20  we saw from the first page of this -- of this progress note

21  that Mr. Leininger was, at that time when he came in, taking

22  diazepam, 2 milligram, and the other medication that I can't

23  pronounce but you described to us; is that right?

24  A.  Correct.

25  Q.  What's the other medication?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    289

1   A.   Seroquel.  That's what I call it too.

2   Q.   Okay.  Fair enough.

3        Now, in looking at Mr. Wisner's assessment and plan under

4   section A/P, the first thing is that Mr. Wisner notes is,

5   "Periodontitis, will use oxycodone 5 milligram for pain and

6   start pen VK, 500 milligram BID.  Needs to be seen by a dentist

7   for work-up."

8        Did I read that correctly?

9   A.   Correct.

10  Q.   Okay.  Now, what's -- what's the pen VK?

11  A.   Pen VK, it's penicillin.

12  Q.   Okay.  And oxycodone here, Mr. Wisner is introducing

13  oxycodone 5-milligram for the periodontitis?

14  A.   Correct.

15  Q.   What is periodontitis?

16  A.   It's inflammation of the gums and the teeth.

17  Q.   Appropriate use of oxycodone?

18  A.   If he was -- if he was in pain that would be appropriate.

19  Q.   Okay.  Now --

20  A.   And I mean -- let me interject.  Appropriate for a short

21  period of time.  This is not a chronic and -- medication to

22  treat periodontitis.

23  Q.   And when you say a short period of time to treat that

24  condition, what's short to you when you tell us that?

25  A.   For pain medications in general, you want to do it as short

1    as possible because of the habit-forming nature of the

2    medications.  If this was something he could get into a dentist

3    in a few days, then I think three or four days would be fine.

4    If he's going beyond that, then really he needs to be on --

5    look at something else to take longer term.

6    Q.  All right.  Mr. Wisner's assessment and plan for

7    Mr. Leininger in No. 2, it states, "DDD lumbar spine.  Will

8    give a trial of --"

9    A.  Tizanidine.  It's a muscle relaxer.

10   Q.  Okay.  "Four milligrams TID PRN and diazepam 10-milligram

11   BID for spasms only."  Did I read that right?

12   A.  Correct.

13   Q.  All right.  So now is that that -- that script for

14   diazepam, is that an increase from what he was taking when he

15   walked in the door that day --

16   A.  Yeah.

17   Q.  -- according to your reading of the note?

18   A.  Yeah, it's a 20-fold -- or 10-fold increase, I should say.

19   Q.  He was on diazepam 2 milligram?

20   A.  Yeah, 10 twice a day.

21   Q.  Okay.  And then Mr. Wisner says also, "Oxycodone

22   10-milligram TID and renewed a narcotics agreement."  Did I

23   read that correctly?

24   A.  Correct.

25   Q.  All right.  Now what is TID?

1    A.   That means three a day.

2    Q.   Okay.  Did you have an opportunity to review prescription

3    records in the VA records?

4    A.   Correct.

5    Q.   Now, do you know -- Mr. Wisner said, well, he needs to take

6    oxycodone 5-milligram for his periodontitis, and then he needs

7    to take oxycodone 10-milligram for his lumbar spine?

8    A.   Correct.

9    Q.   All right.  Now, did you -- were you able to discern how he

10   was writing that script for oxycodone given that -- that

11   disparity?

12   A.   I did.  First of all, this is -- the way he wrote this

13   is -- if he explained this to the patient, I could understand

14   the patient being completely confused by this, because what he

15   did in the actual script was he wrote it for 5 milligrams of

16   oxycodone, two tablets three times a day.

17        And so I could easily see a patient going, well, do I take

18   the oxycodone 10 three times a day and I still have this tooth

19   pain, so can I take an extra oxycodone 5 in between, which

20   would be -- which would be too much medication.

21        So the way this is -- the way he describes it here and the

22   way the script is written appropriately, but the assessment and

23   plan here isn't described very well.

24   Q.   But, by virtue of this, after Mr. Leininger walked in the

25   door that day, he left with a direction to take oxycodone

1   30 milligrams of it a day as he needed?

2   A.   Yep.

3   Q.   Okay.  All right.  I want to talk to you about some of the

4   other progress notes.  Exhibit 99 -- or 199, we're handing it

5   to you now.  It's dated July 31st, 2012.  Same general format;

6   is that right?

7   A.   Correct.

8   Q.   All right.  Now, on the first page, does this reflect the

9   increase in the diazepam prescription from the previous visit?

10  A.   It reflects the dose increase.

11  Q.   Okay.  And then it reflects the oxycodone HCL 5-milligram

12  tab; is that right?

13  A.   Correct, which I discerned in the medication record was

14  meant to be two tablets.

15  Q.   Okay.  Now, in this particular note -- or office note, what

16  did the assessment and plan indicate here?

17  A.   Hypertension, hydrochlorothiazide, that's what the HCTZ

18  stands for, in order -- and order blood pressure cuff.

19  Follow-up scheduled appointment low back pain stable.

20  Q.   All right.  Now, in reviewing this office note, do you have

21  an opinion whether or not Mr. Wisner, just the fact he

22  performed it, the fact that Mr. Wisner performed a genital exam

23  at this visit, did he deviate from the standard of care?

24  A.   Yes.

25  Q.   All right.  And why?

1   A.   He has -- there's no -- no -- it wasn't necessary at this

2   time.   He just saw this gentleman 18 days ago.   Chances of

3   something changing in that short amount of time is pretty

4   small.   So unless the patient had a clinical complaint, which

5   he did not, otherwise there was no -- no need whatsoever to do

6   that exam.

7   Q.   All right.   Exhibit 200, this is dated August 23rd, 2012;

8   is that correct?

9   A.   Correct.

10  Q.   All right.   And with respect to the medications in this

11  office note, does it reflect the diazepam 10-milligram and

12  oxycodone 5-milligram?

13  A.   It does.

14  Q.   And if we go to the assessment and plan in this office

15  note, the first -- the first paragraph here states, "Right

16  shoulder impingement.   Will get another plain film on the joint

17  today.   Continue with tizanidine 6-milligram PRN and will

18  switch to morphine SA 15-milligram daily up to TID PRN."

19  A.   Yes.

20  Q.   All right.   Now, what is morphine SA 15-milligram?

21  A.   It's also a narcotic opioid medication, and looking at this

22  as increase or escalation of the pain medications that he's

23  taking.

24  Q.   All right.   And what does TID mean?

25  A.   Three times a day.

1   Q.   PRN?

2   A.   As needed.

3   Q.   Morphine SA 15-milligram, risk of dependency?

4   A.   Very high.

5   Q.   Risk of abuse?

6        MS. HASTON:  Objection, Your Honor.

7        THE COURT:  What's the objection?

8        MS. HASTON:  This is beyond the scope of the report

9   the expert provided.

10       THE COURT:  Mr. Kilgore.

11       MR. KILGORE:  Your Honor, he has an entire section on

12  -- on prescriptive practices.

13       THE COURT:  Look, here's what I'm going to do:  I'm

14  not going to -- I'm not going to stop us here and get the

15  expert's report out and compare this to that.  Ms. Haston, you

16  can preserve this issue and present it post trial if you can

17  show that the opinion that's being offered here exceeds the

18  opinions disclosed under Rule 26.  If it is, I'll strike the

19  opinion and disregard them.

20       MS. HASTON:  Understood.  Thank you, Your Honor.

21       THE COURT:  Thank you.

22  BY MR. KILGORE:

23  Q.   Okay.  Exhibit 201.  This was -- I'm sorry --

24  A.   I'm sorry, Mr. Kilgore.

25  Q.   Did you have something else?

 1   A.   This was August 23rd, and I believe he also did a genital

 2   exam this day.

 3   Q.   I'm sorry.  Did it --

 4   A.   And this was -- so my opinion, in regards to performing the

 5   genital exam at this time again, I think it deviated from the

 6   standard of care.  There's no necessity whatsoever to do a

 7   genital exam at this time.  He had done one within the last

 8   couple of months.  Gentleman's not having any complaints.

 9   There's no -- serves no -- no clear medical purpose at this

10   time.  So...

11   Q.   Thank you.

12        Exhibit 201.

13   A.   Thank you.

14   Q.   And this is the office note dated October 9th, 2012; is

15   that correct?

16   A.   Correct.

17   Q.   All right.  What does it reflect with respect to the

18   medications?

19   A.   What you're seeing is that he's still taking the diazepam,

20   he's still taking oxycodone, and now he is taking testosterone.

21   Q.   Was there -- was there something noted in this progress

22   note by Mr. Wisner related to the testosterone?

23   A.   Yeah.  It says testosterone levels -- "will check

24   testosterone levels," is what it says.

25   Q.   All right.  Does it indicate hypogonadism?

1   A.   It does.

2   Q.   And what is that condition?

3   A.   That is where your testicles aren't producing enough

4   testosterone.

5   Q.   All right.  And with respect to the fact that Mr. Wisner

6   performed a genital exam at this visit, do you have an opinion

7   just to whether or not the fact that he did it deviated from

8   the standard of care?

9   A.   You know, in this case I don't think he deviated from the

10  standard of care in the aspect of doing it because he's looking

11  at starting this gentleman on testosterone therapy.  It had

12  been a few months.  It's discretionary.  Personally, I would

13  not have done it at that time, but I could -- I can make a

14  medical justification for it at this visit at least.

15  Q.   Okay.  Exhibit 202, this is the progress note dated January

16  9th, 2013; is that correct?

17  A.   Correct.

18  Q.   And what drugs are reflected -- or narcotics are reflected

19  in this office note?

20  A.   He's on, again, diazepam.  He's also continuing on the

21  oxycodone, and he's -- you also see tramadol down here too.

22  Q.   What is tramadol?

23  A.   Tramadol is also a narcotic pain medication.

24  Q.   Tramadol a risk of dependency?

25  A.   It's not as high as, like, the oxycodone but there's

 1  definitely risk.

 2  Q.  Okay.  And the assessment and plan on page 3, does it

 3  indicate hypogonadism?

 4  A.  It does.

 5  Q.  All right.

 6  A.  And at this point they want to stop the testosterone gel

 7  and switch him to the injectable form of testosterone.

 8  Q.  All right.  Injectable form of testosterone more

 9  aggressive, different than the gel?

10  A.  It's -- from the standpoint of personal preference.  From a

11  medical standpoint, you find that the gel provides a much more

12  steady state throughout the body, meaning that you're going to

13  get the same response hour by hour throughout a 24-hour period.

14     The injection, you get this huge bolus of testosterone, and

15  over a week- to two- to four-week period, it really starts to

16  drop down.  You see these big peaks and big valleys.

17  Truthfully, it's cheaper to go on the injectable form but the

18  results tend to be a lot more mixed as far as the blood work as

19  a result and even how some guys feel.  So...

20  Q.  All right.  And did you -- did you observe varying levels

21  of -- testosterone levels in Mr. Leininger's labs?

22  A.  In the blood work, yes.

23  Q.  All right.  And then No. 2, "DDD lumbar spine.  Will change

24  his oxycodone to 10 milligrams and stop the Tylenol."

25  A.  Correct.

1   Q.  Did I read that correctly?

2   A.  Yes.

3   Q.  What's DDD?

4   A.  Degenerative disc disease.

5   Q.  All right.  And so this oxycodone, at least according to

6   this, indicates an increase in the oxycodone prescription from

7   5 milligrams to 10 milligrams; is that right?

8   A.  Yeah.

9   Q.  All right.  Now, okay, genital exam at this.  He did it

10  ungloved.  That deviated from the standard of care; right?

11  A.  Right.  Just talking about doing -- the visit, again, we're

12  talking, you know, you've got about three months between visits

13  here.  He is changing medication from a gel to an injectable,

14  again, discretionary.  Personally, I wouldn't do it but I'm not

15  going to argue with him having done it at that time.

16  Q.  Okay.  All right.  Exhibit 203 --

17  A.  Thank you.

18  Q.  -- this is the progress note for July 30th, 2013?

19  A.  Correct.

20  Q.  All right.  And, again, if we look at the assessment and

21  plan on page 3 --

22  A.  Yes.

23  Q.  All right.

24  A.  Would you like me to review the meds first?

25  Q.  You can just tell us what the meds are.

1   A.  Still on the diazepam.  Taking the oxycodone.  It's written

2   as five but I believe he is taking two tablets consistently,

3   and he's on the -- still on the tramadol and as well as the

4   testosterone.

5   Q.  All right.  And then in the assessment and plan, again,

6   says, "DDD L-spine.  Will increase oxycodone 10 milligrams to

7   QUID-PRN;" is that right?

8   A.  Right.

9   Q.  What's QID?

10  A.  QID stands four times a day.

11  Q.  This does stand for an increase in the oxycodone, an

12  elevation in it.  He was taking 10 milligrams three times a day

13  and now he's taking it four times a day?

14  A.  Correct.

15  Q.  Okay.  Significant increase from 30 milligrams to

16  40 milligrams a day?

17  A.  Yeah, that is a significant increase.  I mean, you're

18  looking at a -- you know, 30 percent increase there, so yes.

19  Q.  Propriety of the general exam, the fact he did it on this

20  visit, what's your opinion?

21  A.  The act of doing it, again, in a situation like this, I

22  think it was appropriate to do it because we're talking six

23  months between visits and that would fall within the standard

24  of care to monitor somebody on testosterone therapy, so...

25  Q.  Okay.  Exhibit 204, all right, what is this progress note?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    300

1       This is dated August 22nd, 2013.  What does it reflect with

2   respect to the medications?

3   A.   Again, diazepam 10, 10-milligram tabs, testosterone and the

4   tramadol.  Those are the highlights.  The other ones are just

5   maintenance meds.  And then the -- going to the --

6   Q.   You want to talk about the assessment and plan?

7   A.   Sure.  So severe -- "severe degenerative joint disease of

8   lumbar spine pending RFA."  That's looking at a radio frequency

9   ablation is what they were talking about there, which is a -- a

10  way of basically burning the nerves as they come off the spine

11  to help alleviate pain.  Let me think.  Yeah, I think that's

12  it.

13  Q.   All right.  All right.  Did I ask you about the general

14  exam on this visit?

15  A.   No.  But in this one, since, again, we are looking at a

16  time frame of basically not even a month between, I would -- he

17  deviated from the standard of care in doing a general exam at

18  this time.  There's no complaint and really no medical

19  necessity to do that.

20  Q.   All right.  Exhibit 205, dated August 28, 2013, same

21  medication?

22  A.   Same medications.  Those are -- have not changed.

23  Q.   All right.  The fact that he did a genital exam at this

24  visit, deviate from the standard of care the fact that he did

25  it?

 1  A.  It did.  Six days away from doing it last time, there's

 2  absolutely no clinical indication for doing this unless he had

 3  complaints, which he did not.

 4  Q.  Exhibit 206, Exhibit 206 dated February 25th, 2014.

 5  Medications the same?

 6  A.  Same.

 7  Q.  The fact that he did a genital exam at this visit?

 8  A.  This is this one.  Yeah, I -- I don't see an indication to

 9  do it at this time either.

10  Q.  Okay.

11  A.  So -- so I would say, no.  I mean, we're talking

12  actually --

13  Q.  This is February 25th, 2014.

14  A.  My apologies.  He had -- I got the same exhibit twice.  I'm

15  looking at the date going, "Wait a second.  Hold on."  Okay.

16  So I'm now looking at -- now, my apologies.  Looking at

17  February 25th.  The last one was August 28th.  This is February

18  25th.

19       On the August 28th, I do have issue with doing a genital

20  exam at that time as deviation of standard of care.  There's no

21  purpose in doing it six days after his last exam.

22       This current one on February, I actually do not have an

23  issue with him doing a genital exam.  I think it was

24  appropriate to do the actual exam because it had been six

25  months since the last evaluation and he had been on

1   testosterone.  So...

2   Q.   Okay.  Now, in fairness to Mr. Wisner, if you look at the

3   assessment and plan on this office note on page 3, No. 2 --

4   A.   Yes.

5   Q.   -- Wisner states, "DDD L-spine.  Will wean off oxycodone.

6   Start with two tabs four times a day for seven days, then two

7   tabs," and on and on?

8   A.   Yes.

9   Q.   Okay.  So at this point for the first time after two years

10   Mr. Wisner is now talking about trying to wean him off

11   oxycodone?

12   A.   Yes.

13   Q.   All right.  Is that necessary when you -- you need to wean

14   a patient off, you can't just stop cold turkey?

15   A.   You don't want to abruptly stop this medication at all.

16   Withdrawal effects can be truly life-threatening if you stop it

17   abruptly.

18   Q.   All the deviations you talked about that section arise from

19   the scope of Mr. Wisner's job duties at the VA?

20   A.   Correct.

21   Q.   All right.  I want to talk about some additional aspects of

22   the genital exams.  Did you identify additional deviations from

23   the standard of care concerning the genital exams Mr. Wisner

24   performed on Aaron Leininger?

25   A.   I did, the duration and his disrobing techniques.

16-2627 Leininger v USA et al  7.7.20 Vol. 2

1  Q.  All right.  What is the standard of care on the duration of

2  genital exams require?

3  A.  One thing physicians, physician assistants, nurse

4  practitioners, healthcare providers who are involved in these

5  intimate exams, that it is a sensitive area, it is intimate,

6  and -- and you want to do a thorough exam but you also want to

7  make it as brief as possible out of the sensitivity toward the

8  patient.

9      So generously a normal testicular exam genital exam, hernia

10  exam, that whole combination of stuff together and together for

11  one exam, 30 seconds to a minute would be well within the

12  standard of care.  And a minute is, again, on the generous end

13  of things.

14  Q.  All right.  And what information did you receive concerning

15  the duration of genital exams that Mr. Wisner performed on

16  Aaron Leininger?

17  A.  You know, as I said, have you a -- there's a fine line

18  here.  He's got that minute 30 second time frame.  What

19  Mr. Leininger expressed to me was that Mr. Wisner was taking

20  two to three minutes to do those exams.

21      Now, there are -- there could be times where going beyond

22  that minute is important, and that's where the fine line is.

23  And the importance of that is that suppose you actually find

24  something and there is an abnormality there.

25      And I've done this in my own clinical practice, you notice

1    a testicular mass on one testicle and on the other side there's

2    nothing.  And you're going, "Am I feeling it correctly here?

3    Am I feeling it correctly here?  Do I need to make sure I turn

4    it to make sure I have it at the right angle to feel it here?"

5         During the whole process I'm doing that, I'm actually

6    talking to the patient, I'm explaining to the patient, I'm

7    educating the patient on exactly what I'm doing and why I'm

8    doing it and why it's taking so long.

9         Without that education, without that explanation, there is

10   a comfort level with the patient starts to -- diminishes really

11   quickly.  It's not for just a fear of, "oh, my goodness, do I

12   have something," than beyond the point of, "hey, this isn't

13   what I'm -- you know, this isn't a normal experience for me."

14   So there is a fine line there.  But once that line is crossed,

15   I mean, that is a clear deviation of the standard of care.

16   Q.  All right.  And did Mr. Leininger receive any such

17   explanation from Mr. Wisner when the -- the time of the genital

18   exams was excessive?

19   A.  No.

20   Q.  And -- and is it your -- your view and opinion that

21   Mr. Wisner did deviate from the standard of care in conducting

22   unnecessarily long genital exams on Mr. Wisner at every visit,

23   all nine visits?

24   A.  Yes.

25   Q.  Okay.  Deviations arise from his -- the scope of his job

1    duties at the VA?

2    A.  Yes.

3    Q.  All right.  You also had mentioned disrobing practices.

4    And what did you glean and what is your opinion with respect to

5    the disrobing practices employed by Mr. Wisner?

6    A.  Again, because we're dealing with a sensitive area of the

7    -- of the human body, healthcare providers have -- are trained

8    to be of the utmost respect.  They are trained to be sensitive

9    to these areas, to respect privacy.  Standard of care is if you

10   have somebody who needs to disrobe and to examine those areas,

11   you -- you know, you or your staff would provide them with a

12   gown or a drape, ask them to disrobe.  You know, obviously

13   explaining to them why they need to disrobe.  Then you would

14   leave the room, allow them time to change, knock on the door,

15   say, "Hey, is it okay for me to come in?"  And then come in and

16   do the -- do the exam.

17        The fine line here is that, you know, when -- when

18   Mr. Wisner is standing there or sitting there and observing

19   these -- these gentlemen disrobe time after time after time

20   without giving them any sort of privacy, that's -- that's --

21   it's a fine line.  But, again, it's a deviation from the

22   standard of care.  We're trained to be respectful in that

23   situation and there is a definite, you know, disrespect towards

24   a patient when you do that.

25   Q.  A patient coming in to see a medical practitioner like

1    Mr. Wisner, there's a difference in -- in knowledge on the

2    subject matter and expertise; right?

3    A.  Oh, absolutely.

4    Q.  The patient comes in knowing nothing about medicine.

5    PA Wisner has a great deal more knowledge than the patient;

6    right?

7    A.  Correct.

8    Q.  Okay.

9             MS. HASTON:  Objection.

10            THE COURT:  Excuse me, there was an objection.  What's

11   the objection?

12            MS. HASTON:  Leading.

13            THE COURT:  Mr. Kilgore, it is.  I'll ask you to

14   rephrase, please.  Sustained.

15            MR. KILGORE:  Yeah.

16   BY MR. KILGORE:

17   Q.  Dr. Kelley, is there a difference in medical knowledge

18   between Mr. Wisner and a patient like Aaron Leininger?

19   A.  Yes.

20   Q.  What is that difference?

21   A.  Mr. Wisner is a trained healthcare professional.  And while

22   he may have some very intelligent patients out there, the

23   assumption is going to be the vast majority of time he's going

24   to be much more knowledgeable than the patient is.

25   Q.  And given that dynamic of -- of a practitioner-patient

1    relationship such as that, are patients vulnerable -- in a

2    vulnerable position when they come in and undergo physical

3    exams?

4    A.   Yes.

5    Q.   And particularly when they undergo genital exams --

6    A.   Correct.

7    Q.   -- are they vulnerable?

8    A.   Yes.

9    Q.   Did you identify any deviations from standard of care

10   concerning any comments that Mr. Wisner made to Aaron

11   Leininger?

12   A.   Yes.  You know, as part of our medical training and as we

13   reviewed in the clinic note, you have history of present

14   illness where you take -- ask questions and elicit information

15   from patients to help you formulate your plan, and you also

16   have a review of systems that you will do checklists of saying:

17   Do you have this, this, and this wrong?  Do you have blood in

18   your stool?  Do you have chest pain?  Do you have shortness of

19   breath?  And those are all routine things.

20        And it's absolutely appropriate and routine, just as an

21   example in a patient who's got erectile dysfunction, to ask

22   them do you have -- do you have trouble obtaining an erection?

23   Do you have trouble maintaining an erection?  Do you have a --

24   is your sexual partner interested in having intercourse?  I

25   mean, those are all valid, appropriate medical questions.

16-2627 Leininger v USA et al  7.7.20 Vol. 2

1        Again, the fine line here, the deviation is when, instead

2    of asking appropriate questions, there becomes more of a

3    commentary about the patient, in Mr. Leininger's case, you

4    know, commentary from Mr. Wisner about, you know,

5    Mr. Leininger, you look -- you know, you look really well

6    endowed.  You know, your significant other must be a very lucky

7    person, must be very satisfied with you as a result.

8        And, again, you can see there is a subtle difference, but

9    there is a distinct difference between asking those clinically

10   relevant, important questions that help you make determinations

11   of how to manage and treat a patient versus those more the

12   commentary kind of -- kind of remarks towards patients.  And,

13   again, patients are very sensitive to that.

14       That is -- you talk about the provider-patient

15   relationship, it's -- it's a cherished thing.  And when you --

16   you deviate from the standard of care, you cross that line when

17   you start asking not even truly -- not even asking, you're just

18   commentating on that patient in that form.

19   Q.  Okay.  What sorts of comments?

20   A.  Again, just like I'll reiterate, the comments were

21   two-fold.  One was the size of his penis and how well endowed

22   he was, and the other was because of that endowment his spouse

23   must be very satisfied with his performance.

24   Q.  All right.  And in that regard he deviated from the

25   standard of care?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    309

1    A.   Correct.

2    Q.   Now, in relation to -- based on your review of these office

3    notes and the information that's contained in there and the

4    various aspects of the -- of the clinical visit that is

5    performed by Mr. Wisner, in relation to the total time that is

6    expended in each exam, how much time was consumed by

7    unnecessary or excessive genital exams?

8    A.   Small, very small.  I mean, we're talking, you know, two to

9    three minutes.  So...

10   Q.   Okay.

11   A.   I mean, you've got an office visit that could be 30 to

12   60 minutes long, so small fraction.

13   Q.   All right.  Even if genital exams were not medically

14   indicated or necessary in those instances, can the genital exam

15   still serve a medical purpose?

16   A.   Yes.

17   Q.   How?

18   A.   So it's -- even though they may not need that exam, there

19   is still a possibility that in those short time frames between

20   exams that perhaps Mr. Wisner does find some sort of pathology:

21   suppose there is a rash that hadn't been there before, suppose

22   there was a mass on the testicle that wasn't there before.

23   There is that possibility.

24   Q.   Okay.  Last question and I think -- I expect that everybody

25   will want to take a break.

1          Can genital exams deviate from the standard of care and

2     still serve a medical purpose similar to the question I just

3     asked you?

4     A.   Yes.

5     Q.   Your answer?

6     A.   Yes, absolutely.  I mean, there's -- suppose -- again, the

7     remote chance he had a testicular mass and then you found that

8     testicular mass, there would be a great deal of benefit to the

9     patient to have that treated and worked up and evaluated, so...

10         MR. KILGORE:  Your Honor, I'm happy to go on, but I

11    suspect maybe others would prefer I take a break, so I will do

12    so.

13         THE COURT:  Yeah, I've been -- yeah, I could see we're

14    nearing a passage in your examination and was hoping we could

15    wrap up the subject.  I think we have.  It's about five till

16    the hour.  Let's plan to be back in place and ready to resume

17    the examination at ten after the hour.  All right.  See you

18    then.

19         (Recess.)

20         THE COURT:  All right.  Counsel, I'm back online, tell

21    me, it looks -- the pictures are small at this point but it

22    looks like, Mr. Kilgore, you're ready to resume and Dr. Kelley

23    is in position.

24         MR. KILGORE:  Yes, sir.  Yes, sir.

25         THE COURT:  And, Ms. Haston, from your room are you

1   all set to go?

2        MS. HASTON:  Yes, Your Honor.

3        THE COURT:  All right.  Very well, I'll go ahead and

4   return to the examination.  You may proceed, Mr. Kilgore.

5   BY MR. KILGORE:

6   Q.  Dr. Kelley, just a couple more things on the -- on the

7   medications.  With respect to drugs like oxycodone, you know,

8   how long does it take to develop dependency on drugs of that

9   nature?

10  A.  It can be an incredibly short time frame.  It can be as

11  little as a few days.

12  Q.  I want -- I want to hand you Exhibit 20 --

13       And one more question with respect to the prescriptions and

14  the genital exams.  Did Mr. Leininger indicate to you any

15  connection between the prescriptions that Mr. Wisner was

16  providing and the performance of genital exams?

17  A.  He expressed to me that he -- he felt that in order to get

18  his prescriptions, he had to have a genital exam performed.  So

19  he correlated medication refill, drop my drawers.

20  Q.  And did he indicate to you that that would occur when he

21  was going in for the clinical visits with Mr. Wisner?

22  A.  Correct, specifically with Mr. Wisner.

23  Q.  Exhibit 20, do you recognize it?

24  A.  Yes.

25  Q.  All right.  And what is it?

16-2627 Leininger v USA et al  7.7.20 Vol. 2

312

1   A.   It's a memorandum interview of Dr. Ray.

2   Q.   You considered this in your report; is that right?

3   A.   Correct.

4         MR. KILGORE:  Your Honor, I -- I offer Exhibit 20.

5         THE COURT:  Any objection to 20?

6         MS. HASTON:  No objection.

7         THE COURT:  Twenty is received.

8   BY MR. KILGORE:

9   Q.   All right.  Dr. Kelley, this is a memorandum of interview.

10  The date on it is January 26, 2015.  The interviewee is

11  Dr. Ray; is that correct?

12  A.   Correct.

13  Q.   And the second paragraph it indicates, "Dr. Ray is an

14  anesthesiologist and the only pain management physician on

15  staff at VAMC Leavenworth serving in that capacity for the past

16  five-and-a-half years.  She had occasion to treat veteran

17  patient DM noting his first visit was in July 21st, 2014;" is

18  that correct?

19  A.   Correct.

20  Q.   All right.  I want to direct your attention to the second

21  page of this exhibit.  In this -- this paragraph of the

22  memorandum of interview states, "I asked Dr. Ray about him,

23  primary care provider, PA Mark Wisner.  Dr. Ray said she had

24  many patients referred to her by Wisner.  She thought Wisner

25  was 'generous' in prescribing narcotics, but added that he was

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    313

1    from a different generation of providers who had fewer pain

2    management options at their disposal."

3        Did I read that correctly?

4    A.  Correct.

5    Q.  It also states, "She did, however, find it particularly

6    unusual for a physician assistant to prescribe such high doses

7    of narcotic pain medications."

8        Did I read that correctly?

9    A.  Correct.

10   Q.  She added that, "Narcotic pain management over a long time

11   frame will often worsen patient's pain tolerance."  Did I read

12   that correctly?

13   A.  That's true.

14   Q.  Dr. Ray stated that, "Wisner's patients seemed to like him

15   and noted him as thorough, caring, and quick to follow up."

16       Did I read that correctly?

17   A.  Correct.

18   Q.  All right.  Now, did you consider this, Dr. Kelley, in

19   forming your opinions in this case?

20   A.  I did.

21   Q.  Is it -- is it significant to you?

22   A.  It is significant to me.

23   Q.  Why is it significant to you?

24   A.  Well, I think having a pain management specialist who all

25   she deals with is pain every day refer to "generous"

1    prescribing of narcotics is a -- is a huge red flag.  This is

2    -- you know, we -- you've got a situation here where, you know,

3    Mr. Wisner has, obviously with this patient too, prescribed

4    large volumes of -- of narcotic medications to these gentlemen,

5    and it's -- again it speaks to how sometimes you can hook

6    people into coming back; they've got to get refills.  They've

7    got to see you.  So it's a very important component to this.

8    The standard of care is you don't give narcotic refills more

9    than three months, and so you've got to see these people back

10   at least on some sort of regular basis.

11   Q.  All right.  She's a physician on staff at VA Leavenworth;

12   right?

13   A.  Correct.

14   Q.  Her job is to -- is to manage pain of patients and

15   prescribe narcotics and opioids?

16   A.  That's her primary job.

17   Q.  All right.  And that's what she does and she viewed

18   Dr. Wisner's prescription practices as generous?

19   A.  Yes.

20   Q.  All right.

21   A.  I would concur.

22        MR. KILGORE:  Your Honor, I have an exhibit that I

23   need to make a record on.  It's Exhibit 241.  It is a -- it is

24   an exhibit that we put together last night that we e-mailed to

25   defense counsel this morning.  And the reason that we did so

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    315

 1    was out of efficiency and trying to wrangle the 2,000 pages of

 2    document -- of VA records that were contained in Exhibits 413

 3    and 414 which were offered yesterday and I believe admitted

 4    from defendants, the VA records.  I think it's all the VA

 5    records.

 6              And, additionally, the defendants had offered

 7    Exhibit 421.  And if you recall, that was all the -- the health

 8    summaries that they had put together out of those exhibits that

 9    identified dates that they referred to as contacts between

10    Mr. Leininger and VA Leavenworth.

11              What we did in Exhibit 241 is we tried to put together

12    the progress notes that were -- that cover the contacts that

13    were contained in Defendant's Exhibit 421.

14              THE COURT:  So let me make sure I follow it.  It

15    sounds like that Exhibit 241 is a compilation of certain

16    excerpts from Exhibits 213 and 214 (sic)?

17              MR. KILGORE:  413 and 414.

18              THE COURT:  I'm sorry, 413 and 414.  Is that -- but am

19    I correct -- with that numbering correction, am I right about

20    what is in 241?

21              MR. KILGORE:  Yeah, it's progress notes that come from

22    413 and 414, yes.  They're already in evidence really.

23              THE COURT:  All right.  So defendants -- defendant, do

24    you have an objection to these, to Exhibit 241?

25              I assume you're offering it now?

```
 1              MR. KILGORE:  I'll offer it.  Yes, Your Honor.

 2              MS. HASTON:  Your Honor, we received this exhibit

 3    right as the trial is beginning today, so I haven't had a

 4    chance to look through it.  But we -- I take Mr. Kilgore's word

 5    these came from the medical records, so we would not object to

 6    the exhibit but we object to the witness testifying about this

 7    as beyond the scope of his opinions provided in his report.

 8              THE COURT:  Well, let's deal with the exhibit first.

 9    Based on counsel's representation of what 241 consists of, it

10    is received.  In terms of the anticipated questioning about 241

11    or related material, I don't know how to rule that at this time

12    because I haven't heard the questions.  So Exhibit 241 is

13    received and we'll go from there.

14              MR. KILGORE:  Thank you, Your Honor.

15    BY MR. KILGORE:

16    Q.  Dr. Kelley, considering the narcotic prescriptions that

17    Mr. Wisner prescribed to Aaron Leininger for the two years that

18    he was seeing him and up until February 2014, do you have a

19    medical opinion as to whether or not Mr. Leininger would have

20    developed -- developed a dependency on those opiates and

21    narcotics as of February of 2014?

22    A.  Yes.

23              MS. HASTON:  Objection.

24              THE COURT:  Hold on just a second.  There was an

25    objection.  I think the medium kept it from being asserted
```

 1    before the witness answered.  So, Ms. Haston, what's the

 2    objection?

 3         MS. HASTON:  This is beyond the scope of the report

 4    that this witness provided.

 5         THE COURT:  Your position is that this is an

 6    undisclosed opinion?

 7         MS. HASTON:  Correct, yes, Your Honor.

 8         THE COURT:  Mr. Kilgore.

 9         MR. KILGORE:  Your Honor, I mean, Dr. Kelley's report

10    discusses at length the prescription practices of Mr. Wisner

11    and -- and the issue of dependency is in that report.  Whether

12    or not he stated it exactly the way I stated it, I will not

13    represent that to the court.  But, nonetheless, I think it's --

14    it's encapsulated in his overall opinions.

15         THE COURT:  I didn't know this objection was coming.

16    I'm going to have to take a look at Rule 26.  I'm going to

17    reserve ruling on it.  If this opinion is not in Dr. Kelley's

18    report, I suspect I'm going to double-check this against the

19    rule.  I suspect that this is not a permissible opinion.

20         We'll go ahead and hear his testimony on it and come

21    back to this issue, but I -- but I think Ms. Haston is right,

22    Mr. Kilgore.  Rule 26 explicitly requires that the opinions to

23    be given be disclosed in the report.  I'll verify my memory and

24    we'll come back to this issue.

25         MR. KILGORE:  Okay.

1  BY MR. KILGORE:

2  Q.  With respect to Exhibit 241, would it surprise you,

3  Dr. Kelley, if -- if Aaron Leininger returned to the VA after

4  he stopped seeing Mr. Wisner?

5  A.  It wouldn't surprise me one bit.  You know, Mr. Leininger,

6  after two years of taking these narcotics, was dependent upon

7  them.  And, in looking at Exhibit 241, and the notes, I've seen

8  these notes before, and the bulk of this is you've got several

9  emergency room visits that he -- he did for cellulitis, some

10  for back pain, but they seem to all center around -- the

11  majority of them center around getting refills for his narcotic

12  prescriptions.

13      There were some office notes, too, there.  And those,

14  again, seem to center around back pain and the -- the need to

15  get additional scripts for narcotics.  As I recall, I think

16  there was one referral in here to a mental health professional

17  for PTSD, and that's kind of the bulk of what's -- I guess

18  what's in here if that summarizes it for you.

19  Q.  Okay.  All right.  Thank you.

20      THE COURT:  Mr. Kilgore, before we leave this general

21  subject matter, I didn't want to delay proceedings further.

22  Rule 26 -- Rule 26(a)(2)(B) is explicit on this point and it

23  requires for an opinion -- for a witness who will be testifying

24  as an expert that the report -- that that witness provide a

25  report.  It must contain, in the words of the rule, "a complete

1    statement of all opinions the witness will express and the

2    basis and reasons for them."

3         Based on your acknowledgement, it appears that this

4    opinion about chemical dependency -- that the plaintiff

5    developed a chemical dependency was not an opinion that was

6    disclosed in Dr. Kelley's report.  If that is correct, I am

7    planning to strike the opinion.  Is there a dispute about

8    whether that opinion was disclosed in Dr. Kelley's report?

9         MR. KILGORE:  I mean, Your Honor, in -- in

10   Dr. Kelley's report he states there were multiple examples of

11   inappropriate prescribing performed by Mr. Wisner.  For

12   instance, Dr. Ray, the VA pain physician, informed

13   Investigator Baker she had many patients referred to her by

14   Mr. Wisner, and Mr. Wisner was generous in prescribing

15   narcotics, and she found it particularly unusual for a

16   physician assistant to prescribe such high doses of narcotics.

17   That's obviously the document we just went over.

18        Mr. Wisner also agreed that he had overprescribed

19   medication to his patients and not met the appropriate standard

20   of care and had committed repeated acts of professional

21   incompetency on patients at the VA.  You know, that all centers

22   around Mr. Wisner's prescription practices and overprescribing

23   medications to these patients.

24        THE COURT:  But coming back to my question:  Does

25   Mr. Kelley's report identify that he plans to render an opinion

 1   at trial that the plaintiff developed a dependency on the

 2   narcotics that were prescribed by Mr. Wisner?

 3            MR. KILGORE:  I mean, insofar as he comments on the

 4   fact that the prescriptions were excessive, Your Honor, that's

 5   what I have to offer to you at this point in time.

 6            THE COURT:  All right.  And I certainly -- I think he

 7   has testified about his opinion on excessiveness and

 8   generosity, and that was done without objection.

 9            The different question though is did the witness

10   disclose an -- that he planned to provide an opinion that the

11   plaintiff had developed a chemical dependency on the narcotics.

12   From your answer, I take it he has not, and so I am striking

13   that opinion from the record.  The objection is sustained.

14   BY MR. KILGORE:

15   Q.  All right.  Dr. Kelley, is practitioner impairment a

16   recognized cause of standard of care violations?

17   A.  It is.

18   Q.  Does the field of primary care medicine recognize the need

19   to anticipate and address provider impairment?

20   A.  It does.

21   Q.  What are some typical examples of impairment?

22   A.  Well, you can have physical impairment.  You can have

23   chemical impairment.  You can have emotional impairment.  And

24   examples are:  Suppose you have a surgeon who's got a tremor.

25   They're obviously physically impaired to do those procedures

16-2627 Leininger v USA et al  7.7.20 Vol. 2

 1  and they'll have to remove themselves from the clinical

 2  environment or from those kind of procedures.

 3       You can have people who are depressed, burned out.  Those

 4  can have effects on provider's judgment and objectivity.  And,

 5  as a provider, we're trained to recognize these things within

 6  ourselves and within our colleagues.  So you want to -- you

 7  have to, by the standard of care, remove yourself from the game

 8  in that situation.

 9       We all -- the ones we always hear about too are always, you

10  know, drug, alcohol addiction, even -- even sex addiction can

11  cause people to -- providers to be impaired in their ability to

12  care for folks.

13  Q.  Impairment can take various forms, but anything that can

14  cloud the judgment and objectivity of the practitioner?

15  A.  Correct.

16  Q.  I want to hand you what's been marked as Exhibit 129.  Do

17  you recognize this document?

18  A.  Yes.

19  Q.  All right.  Did you review and consider it in forming your

20  opinions?

21  A.  Yes.

22  Q.  Did you cite it in your report?

23  A.  Yes.

24  Q.  And it's a consent order for surrender filed February 10th,

25  2015, by the Kansas state Board of Healing Arts; is that right?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    322

1   A.  Correct.

2   Q.  All right.  Now, the state Board of Healing Arts, Healing

3   Arts, whether it be Kansas or Missouri, do those boards, are

4   they charged with the -- with the responsibility to -- to

5   address deviations by medical practitioners?

6   A.  Yes.

7   Q.  And with respect to this particular consent order, it's

8   between the Kansas State Board of Healing Arts and Mark E.

9   Wisner, PA; is that correct?

10  A.  Correct.

11  Q.  He's the licensee?

12  A.  Correct.

13  Q.  They're the board?

14  A.  Right.

15  Q.  I want to direct your attention to page 5 of this exhibit.

16       MR. KILGORE:  And while we're getting there, Your

17  Honor, I offer Exhibit 129 into evidence.

18       THE COURT:  Any objection to 129?

19       MS. HASTON:  No objection.

20       THE COURT:  Received.

21  BY MR. KILGORE:

22  Q.  Dr. Kelley, on page 5, paragraph 19.  It states, "On or

23  about January 28, 2015, board Special Investigator II, Sharon

24  Schiesser, received a letter from licensee which states, 'I am

25  an impaired practitioner and not capable of patient care and I

16-2627 Leininger v USA et al  7.7.20 Vol. 2

323

1  voluntarily surrender my license 15-00385 permanently.'"  Did I

2  read it correctly?

3  A.  Correct.

4  Q.  All right.  So, by virtue of this document, Mr. Wisner

5  admitted that he was an impaired practitioner; is that right?

6  A.  Correct.

7  Q.  I want to direct your attention to page 9.

8     Paragraph 29 states, "Licensee violated K.S.A. 65-28a05(a)

9  by committing repeated acts of unprofessional conduct with

10 patients at the Dwight D. Eisenhower VA Medical Center in

11 Leavenworth, Kansas."

12    Did I read that correctly?

13 A.  Correct.

14 Q.  This is a finding by the Kansas Board of Healing Arts to

15 that effect; is that right?

16 A.  Correct.

17 Q.  Paragraph 30, "Licensee violated K.S.A. 65-28a05(a) as

18 further defined by K.A.R. 100-28a-8(e) when he willfully and

19 repeatedly violated the Physician Assistant Licensure Act, the

20 Pharmacy Act of the State of Kansas, or the Uniform Controlled

21 Substances Act, or any regulations adopted pursuant to these

22 acts by repeatedly sexually assaulting his patients, having

23 inappropriate sexual contact with his patients, making

24 inappropriate sexual comments to his patients, overprescribing

25 to his patients, and not meeting the appropriate standard of

16-2627 Leininger v USA et al  7.7.20 Vol. 2     324

```
 1  care."
 2       Did I read that correctly?
 3  A.   Yes.
 4  Q.   Is it significant for your opinion?
 5  A.   Yes.
 6  Q.   Why?
 7  A.   Well, it clearly outlines exactly what he was doing.  He
 8  admits that he was sexually assaulting patients.  He was
 9  overprescribing patients.  He was making inappropriate sexual
10  comments and inappropriate sexual contact.  I mean, he -- he
11  admits it all right there.
12  Q.   All right.  And not meeting the appropriate standard of
13  care?
14  A.   Correct.
15  Q.   In his scope of his -- his role as a physician's assistant?
16  A.   Correct.
17  Q.   On page 11, paragraph 38 states, "Licensee violated K.S.A.
18  65-28a05(c) as further defined by K.A.R. 100-28a-7(b) by
19  repeated instances involving patients one through seven in
20  which he failed to adhere to the applicable standard of care to
21  a degree that constitutes ordinary negligence when he
22  repeatedly performed unnecessary genital and testicular
23  examinations, overmedicated patients, failed to wear gloves,
24  and did not refer patients as needed."
25       Did I read that correctly?
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2

1   A.  Yes.

2   Q.  All right.  A finding by the Board of Healing -- the Kansas

3   State Board of Healing Arts that in those ways Mr. Wisner

4   deviated from the standard of care in a way that constituted

5   ordinary negligence, that was the finding of the Kansas Board

6   of Healing Arts?

7   A.  Correct.

8   Q.  Significant for your opinions?

9   A.  Yes.

10  Q.  Why?

11  A.  Again, outlines all of his discretions and indiscretions

12  there.  I mean, unnecessary genital exams we've talked about,

13  testicular exams.  Failed to wear gloves.  Did not refer

14  patients as need.  And, you know, the overprescription --

15  overprescribing of medications, in my opinion, relates to those

16  -- to the narcotic medications that he was overprescribing.

17  Q.  All right.  Now, given that Mr. Wisner admitted that he was

18  an impaired practitioner, given that -- that the Kansas Board

19  of Healing Arts found that he was an impaired practitioner, did

20  Mr. Wisner violate the standard of care in failing to remove

21  himself from clinical practice before he saw Mr. Leininger?

22  A.  Absolutely.  The thing is, as providers we are trained to

23  self-examine.  I mean, the mantra "you got to take care of you

24  before you can take care of anybody else" is imperative to a

25  healthcare professional.  If you don't have your ducks in a

 1    row, if you don't have your house in order, you're not going to

 2    do a good job.

 3         And so as Mr. Wisner, you know, describes his -- this

 4    sexual curiosity, that sexual curiosity impaired his ability to

 5    have appropriate judgment, it impairs his objectivity, it

 6    lowered his inhibition to make inappropriate comments and such.

 7    So it's clear to me when you recognize, which he did, he said

 8    it, I had this sexual curiosity, you need to get help and you

 9    need to get out of the game.

10    Q.   Okay.  All right.  In discussing Mr. Wisner's sexual

11    curiosity in forming your opinions, did you consider his intent

12    as he expressed it concerning these genital exams?

13    A.   Yes.

14    Q.   All right.  And what did you glean from the documents you

15    reviewed?

16    A.   You know, we're dealing with a situation of mixed motives

17    here.  Mr. Wisner clearly has said he is a very thorough guy

18    but he has this sexual curiosity that just is driving him to

19    explore other areas.  The thoroughness, he's trained to be

20    thorough.  He's a military guy.  I get it, he's got -- in the

21    military.  You got -- if it's a box, you got to check it.  If

22    it's a blank, you got to fill it in.  If it's an I, you got to

23    dot it.  If it's a T, you got to cross it.  That's the way

24    they're trained; same thing over and over again, do it to the

25    nth degree.  I get it.

1        But where he deviates from the standard of care, this fine

2   line, he starts exhibiting this sexual curiosity, and that

3   sexual curiosity starts to exhibit itself in, "hey, I want to

4   palpate these -- this genitalia but I want to do it without

5   gloves, I want to get a real feel for what it's like.  I want

6   to -- I'm going to do this a little longer because I'm curious

7   how he looks compared to how another gentleman looks.  I'm

8   going to make comments that satisfy my sexual curiosity."  When

9   you cross that fine line, that's when the deviation from the

10  standard of care occurred.

11  Q.   Can the genital exams still serve a medical purpose

12  regardless of his intent?

13  A.   Yes.

14  Q.   Why?

15  A.   Again, it goes back to what I said.  I mean, suppose the

16  patient had -- had folliculitis or an infection down there that

17  he had -- you know, not noticed.  Suppose he had a -- a

18  testicular mass again, or suppose he had an epididymal cyst.

19  These are all things that are hypothetically could miraculously

20  develop, but, you know, it's the risk benefit in this case.

21  You get the risk of doing perpetual harm by redoing these exams

22  over and over again versus the small benefit to find something

23  that wasn't even there even a few days ago.

24  Q.   Okay.  Well, did you consider the fact that Mr. Wisner was

25  convicted of criminal acts related to the medical care he

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    328

1   provided at the VA?

2   A.   Yes.

3   Q.   All right.  Does the fact that he was convicted of criminal

4   acts impact your opinions concerning his deviations from the

5   standard of care for your assessment of the scope of his job

6   duties in employment?

7   A.   No, not at all.

8   Q.   Why not?

9   A.   So it's interesting.  In thinking about this as I was going

10   through all the records and such, you know, there are examples

11   in my mind -- and I'll give you these examples in a moment --

12   of situations in which you can simultaneously have a breach in

13   the standard of care and a criminal act occur at the same time.

14        First example I'll give you again, I think it's probably

15   well-known to anybody, is the physician Dr. Conrad Murray.

16   Dr. Murray was the physician who cared for Mr. Michael Jackson.

17   He was the physician that was giving Michael Jackson a very

18   powerful hypnotic called propofol.  Mr. Jackson had troubles

19   with sleep and he was using this to sleep.  This medication is

20   only indicated in a surgical setting and a well-controlled

21   environment where you have careful monitoring of the patient.

22   It is not ever, ever been prescribed as a sleep aid.  And so

23   regrettably Mr. Jackson expired from getting too much propofol.

24        Well, you can clearly see, and the Board of Healing Arts in

25   California saw, that there was a breach of the standard of care

 1   in how he was using this drug but there was also a conviction

 2   for manslaughter, a criminal conviction.  So you can see where

 3   those two things can easily co-exist in the same situation.

 4        Let me give you another one.  And, again, this is one I

 5   think is well-known to a lot of us, Dr. Larry Nassar.

 6   Dr. Nassar is the former Michigan State trainer-family

 7   physician who also was the trainer and sports medicine

 8   physician for the U.S.A. Gymnastics.  Well, Mr. Nassar, as a

 9   lot of us may recollect, he was -- took care of actually

10   hundreds of girls over about a 20-year period.  He would take

11   his ungloved hand and penetrate prepubescent girls' vaginas and

12   rectum and under this guise of osteopathic manipulation for

13   their sport -- sports medicine treatments.

14        Clearly, under the State of Michigan this was recognized as

15   a standard -- a deviation from the standard of care.  And

16   clearly this gentleman allowed his sexual curiosities of

17   prepubescent girls overshadow his judgment in managing and

18   treating them, and so he lost his license as a result of.  And

19   as we all are aware too, he ended up being criminally convicted

20   and will spend the rest of his life in jail.

21        So, in my mind, when I was looking at Mr. Wisner, those two

22   scenarios, stark as those are, keep coming into my mind about

23   that co-existence about here's your standard of care and here

24   is your, you know, criminal activity, you know, same situation

25   but two wholly separate things to consider.

16-2627 Leininger v USA et al  7.7.20 Vol. 2

330

1   Q.  Criminal convictions do not foreclose deviations from the

2   standard of care --

3   A.  Yes.

4   Q.  -- in your view?

5       Okay.  You mentioned this fine line between a proper

6   genital exam and improper genital exam and how that fine line

7   can be crossed to result in a deviation of the standard of

8   care.  Given -- given the -- that fine line and the nature of

9   those types of exams like a genital exam, does the field, the

10  primary care of medicine, recognize the potential for

11  deviation, recognize the potential that that line can be

12  crossed given the nature of the exams?

13  A.  Yeah.  Absolutely.  And a good example of that is that, in

14  opposite sex intimate exams, you will have a chaperone in with

15  you and that's just -- that's the standard of care if you're

16  going to have someone with you to make the patient feel

17  comfortable, to make you feel comfortable, and make sure

18  everything is copacetic, so...

19  Q.  Chaperones are -- are practice -- are the practice when the

20  physician and the patient are of different sexes?

21  A.  Correct.

22  Q.  But for the very reason that a practitioner's sexual

23  curiosity can cause that physician to cross the line and

24  deviate from the standard of care?

25  A.  Yes.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    331

1   Q.   Given that, does the standard of care require that

2   employers be watchful for any sign or indication of deviations

3   when it comes to sensitive exams like genital exams?

4   A.   Absolutely.

5   Q.   Did you consider VHA directives concerning the VHA policies

6   for recording and tracking sexual assaults and sexual

7   misconduct?

8   A.   Yes.

9   Q.   I want to hand you what's been marked as Exhibit 27.

10  Dr. Kelley, do you recognize this document?

11  A.   Yes.

12  Q.   It's VHA Directive 2012-026 dated September 27th, 2012; is

13  that correct?

14  A.   Yes.

15  Q.   It's entitled Sexual Assaults and Other Defined Public

16  Safety Incidents in Veterans Health Administration VHA

17  Facilities?

18  A.   Yes.

19  Q.   Is that the title of the document?

20  A.   Correct.

21  Q.   All right.  Did you consider it?

22  A.   Yes.

23          MR. KILGORE:  Your Honor, I -- I offer Exhibit 27.

24          THE COURT:  Any objection to 27?

25          MS. HASTON:  Your Honor, we would object in that the

16-2627 Leininger v USA et al  7.7.20 Vol. 2                332

1    exhibit is irrelevant to any issues in this lawsuit.

2             THE COURT:  Mr. Kilgore, please.

3             MR. KILGORE:  Your Honor, it goes to the same issue

4    that we've been talking about.  We've been down this road

5    whether the conduct was fairly foreseeable by the VA.  This is

6    their policy on tracking those complaints and it's directly

7    relevant to whether or not the VA should have fairly foreseen

8    Mr. Wisner's conduct.

9             THE COURT:  The objection's overruled.  27's received.

10   BY MR. KILGORE:

11   Q.  Dr. Kelley, I want to direct your attention to page 5 of

12   this exhibit.  Paragraph (f) pertains to the responsibilities

13   of the facility director, and it states, "The facility director

14   is responsible for:

15        No. 1.  Ensuring there is a written and established policy

16   consistent with this directive implemented by December 31,

17   2012.  This includes maintaining a centralized and

18   comprehensive policy on the reporting and tracking of sexual

19   assaults, sexual assault incidents, and other public safety

20   incidents.  See subparagraph 2c(3)."

21        Did I read that correctly?

22   A.  Yes.

23   Q.  Okay.  Now, did you consider this in -- in your opinion?

24   A.  Yes.

25   Q.  All right.  Now, did you -- you've reviewed numerous

1   reports of -- of sexual misconduct by patients concerning

2   Mr. Wisner; correct?

3   A.   Correct.

4   Q.   In the course of that review, what did you find pertained

5   to whether or not VA Leavenworth complied with this policy?

6   A.   Didn't seem to me that they complied at all.

7   Q.   Okay.  And why is that?

8   A.   Well, there is multiple instances where people report to

9   one individual, report to another individual, but there did not

10  seem to be any cross communication.  There was -- everything

11  seemed to be in, like, their separate silos.  There wasn't a

12  central repository where you could review complaints and -- and

13  highlight if there had been, you know, a similar complaint

14  previously.

15  Q.   All right.  I want to hand you what we've mark as

16  Exhibit 61.  Dr. Kelley, do you recognize that document?

17  A.   I do.

18  Q.   What is it?

19  A.   It's the abuse, negligent, or exploitation policy.

20  Q.   Now, this -- this policy, it's dated February 10th -- or

21  February 5th, 2010; correct?

22  A.   Correct.

23  Q.   But this policy pertains specifically to the VA of Eastern

24  Kansas Healthcare System; is that right?

25  A.   Correct.

334

1    Q.  Did you consider it?

2    A.  Yes.

3    Q.  All right.

4         MR. KILGORE:  Your Honor, I offer Plaintiff's

5    Exhibit 61.

6         MS. HASTON:  Objection.

7         THE COURT:  What's the objection?

8         MS. HASTON:  Relevance.  There's also no claim for

9    failure to report in this case.

10        THE COURT:  Mr. Kilgore, are we the same issue, is

11   this the foreseeability argument you've made before?

12        MR. KILGORE:  Yes, sir.

13        THE COURT:  All right.  The objection's overruled.

14   61's received.

15   BY MR. KILGORE:

16   Q.  All right.  Now, Dr. Kelley, it's dated February 5th, 2010,

17   and this is a -- this is a policy that was in place at the VA

18   Eastern Kansas Healthcare System.  The purpose of this was to

19   maintain a policy, procedure, and responsibility for

20   identification, protection, and referral of abuse or suspected

21   abuse victims that are recognized in the VA Eastern Kansas

22   Healthcare System, EKHCS, and to ensure the same level of care

23   is applied throughout the system while protecting the patient's

24   rights, dignity, and well-being?

25   A.  Correct.

16-2627 Leininger v USA et al   7.7.20 Vol. 2                    335

1   Q.  Did I read that correctly?

2   A.  Right.

3   Q.  And so this is a policy that Leavenworth VA was recognizing

4   the potential for patient abuse; correct?

5   A.  Correct.

6   Q.  And beyond -- beyond the specific policy, healthcare

7   provider abuse is a -- it's a known risk in the healthcare

8   community, isn't it?

9   A.  That's true.

10  Q.  I want to show you what's been marked as Exhibit 63.  This

11  is a -- another VHA Policy, Department of Veterans Affairs'

12  VA Eastern Kansas Healthcare System, dated May 21st, 2013.

13  Again, it's a policy that applies specifically to

14  VA Leavenworth; is that correct?

15  A.  Correct.

16  Q.  Did you consider it?

17  A.  Yes.

18          MR. KILGORE:  Your Honor, I offer Exhibit 63.

19          MS. HASTON:  Objection.  Relevance.

20          THE COURT:  Objection's overruled.  63's received.

21  BY MR. KILGORE:

22  Q.  Dr. Kelley, I want to direct your attention to the

23  definitions, and it states, "Patient abuse includes acts

24  against patients that involve physical, psychological, sexual,

25  or verbal abuse.  Employee 'intent' to abuse is not a

16-2627 Leininger v USA et al  7.7.20 Vol. 2          336

```
 1    requirement for patient abuse.  The patient's perception of how

 2    he/she was treated is an essential component of the

 3    determination as to whether a patient was abused."

 4         Did I read that correctly?

 5    A.   Yes, you did.

 6    Q.   Now, we're going to go over some patient complaints, but

 7    according to the -- to the VA policy for Leavenworth, Kansas,

 8    the patient's perception of how they are treated by a provider

 9    is required to be considered; correct?

10    A.   Absolutely.

11    Q.   Irrespective of the intent of the employee that's involved;

12    correct?

13    A.   True.

14    Q.   In this requirement, it is specific to the situation that

15    we have here where Mr. Wisner is abusing patients or patients

16    are reporting abuse by Mr. Wisner; correct?

17    A.   Correct.

18              MS. HASTON:  Objection.  Leading.

19              THE COURT:  What is the objection?  Sustained.  Please

20    rephrase the question.

21    BY MR. KILGORE:

22    Q.   Dr. Kelley, this policy's applicable to this situation

23    here, is it not?

24    A.   It is.

25    Q.   All right.  This goes on to state, "Patient abuse includes,
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2

1   but is not limited to, acts of unkindness, mistreatment,

2   unwelcomed teasing, threatening behavior, speaking harshly,

3   rudely or irritably to a patient, indifference, rude gestures,

4   rough handling, physical assault, sexual acts or overtures,

5   violence of any kind toward a patient, intentional omission of

6   patient care (neglect), taking or borrowing patient property,

7   including money, for personal use or for the unauthorized use

8   of other patients, financial relationships with patients,

9   et cetera."

10      Did I read that correctly?

11  A.   Correct.

12  Q.   Does the conduct of Mr. Wisner fall under that definition?

13  A.   Yes.

14  Q.   Okay.  This exhibit sets forth the procedures that are to

15  be employed.  No. 4, policy states, "Regardless of position or

16  discipline, the employee who witnesses or who is the first to

17  become aware of the incident will initiate and complete an

18  electronic incident report or report of contact.  Any incident

19  or allegation of a criminal nature will also be reported to

20  EKHCS police."

21      Did I read that correctly?

22  A.   Yes.

23  Q.   Procedure B, "The supervisor of the area/function in which

24  the incident occurred or the employee who initially reports or

25  witnesses the incident will ensure the incident is forwarded to

1    the chief of quality management within 24 hours."

2        Did I read that correctly?

3    A.   Yes.

4    Q.   Procedure C, "Chief of quality management will review the

5    incident, gather any additional information, and forward to the

6    chief of staff and director for determination of investigation

7    commencement."

8        Did I read that correctly?

9    A.   Correct.

10   Q.   All right.  Going on to the next page.  Procedure E, "The

11   chief of staff will review the report, develop any additional

12   medical facts as necessary, determine the need for an

13   administrative investigation, and forward the report (with

14   documented comments and recommendation -- recommendations as to

15   what constituted initiating the board) to the director."

16       Did I read that correctly?

17   A.   Correct.

18   Q.   All right.  And then, finally, Procedure F, "The director,

19   associate director, chief of staff, associate director of

20   patient care services, deputy chief of staff and assistant

21   director will review the facts presented, document comments and

22   recommendations as to what constitutes initiating the board,

23   and, if appropriate, direct that an administrative

24   investigation be conducted."

25       Did I read that correctly?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    339

1    A.   Correct.

2    Q.   All right.  In your review of the materials in this case,

3    did Leavenworth VA comply with this procedure?

4    A.   No.

5    Q.   Why not?

6           MS. HASTON:  Objection.

7           THE COURT:  What's the objection?

8           MS. HASTON:  Relevance.

9           THE COURT:  Mr. Kilgore.

10          MR. KILGORE:  Same -- same reason, foreseeability,

11   Your Honor.

12          THE COURT:  Objection's overruled.

13          THE WITNESS:  Could you repeat the question?

14   BY MR. KILGORE:

15   Q.   Yeah.  I mean, did -- you just testified that in your view

16   the Leavenworth VA did not comply with this policy.  Are there

17   reasons why that is your view?

18   A.   Oh, well, it's -- I mean, honestly the policy spells out

19   really well what needs to transpire.  You know, information was

20   -- investigations were not done for the vast majority of the

21   complaints that he had.  This did not get up the chain of

22   command as it should have to be viewed, these complaints.  So,

23   I mean, it -- just its clear reading this and knowing all the

24   complaints that occurred that no one -- rarely did they do what

25   they should have done all the way through.  It's rare.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                340

1    Q.  Okay.  All right.

2         MR. KILGORE:  Your Honor, I'm at a perfect stopping

3    point.  I have a couple of subjects to -- to address when we

4    return.  But if the court deems it appropriate, I'm at a great

5    stopping point.  If not, I'm happy to go forward if the court

6    prefers that I do.

7         THE COURT:  Yeah, let's try to push through to 12:30

8    in the interest of trying to make our afternoon a little more

9    tolerable.  And if we get to 12:30 and you're at a perfect

10   stopping point, we'll take a break then.  And if you get there

11   before, we'll start the cross.

12        MR. KILGORE:  Okay.  Very good.

13   BY MR. KILGORE:

14   Q.  We've talked about this, we've alluded to it.  Dr. Kelley,

15   did you review patient complaints concerning Mr. Wisner?

16   A.  Yes.

17   Q.  How far back did the patient complaints go?

18   A.  I believe as early as late 2011.

19   Q.  Okay.  And overall what are those -- those patient

20   complaints indicate to you overall?

21        MS. HASTON:  Objection.  Relevance.

22        THE COURT:  This -- Mr. Kilgore, this is review of

23   complaints by people other than the plaintiff; correct?

24        MR. KILGORE:  That's correct, Your Honor.

25        THE COURT:  And do you want to address the relevance?

16-2627 Leininger v USA et al  7.7.20 Vol. 2          341

```
1          MR. KILGORE:  Yeah and I can -- I can withdraw it.  It
2   goes to foreseeability, Your Honor.  I can go into the
3   complaints, but it goes to foreseeability; that's -- that's the
4   reason for my question.
5          THE COURT:  And do the -- the complaints -- I guess I
6   don't know enough about the complaints to really apprehend why
7   they assist the foreseeability and that -- so can you lay a
8   little background on that?
9          MR. KILGORE:  Yeah, I -- and -- and I appreciate that
10  and I'll -- I'll get more specific.
11  BY MR. KILGORE:
12  Q.  I want to hand you first Exhibit 32, Dr. Kelley.  Do you
13  recognize this document?
14  A.  Yes.
15  Q.  All right.  It's an e-mail from Ani Desai dated February
16  17th, 2012, to Mark E Wisner copying Daniel Cline, the subject
17  of it is privileges.  Did you consider this e-mail?
18  A.  Yes.
19          MR. KILGORE:  Your Honor, I offer Plaintiff's
20  Exhibit 32.
21          MS. HASTON:  We object as irrelevant, Your Honor.
22          THE COURT:  I -- look, it's a bench trial, I'm doing
23  my best to try to understand the story as it emerges.  I think
24  that a number of these exhibits that have been offered already
25  have informed the foreseeability question, so I'm going to
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2                342

1    overrule the objection.  Also overruling it because the witness

2    has testified it did -- he did consider it as part of

3    formulating his opinions.  The objection's overruled.

4    BY MR. KILGORE:

5    Q.  Dr. Kelley, who is Anil Desai?

6    A.  He was the service line manager in the medicine department.

7    Q.  Daniel Cline we've mentioned before.  He was?

8    A.  His supervisor -- Mr. Wisner's direct supervisor.

9    Q.  Okay.  All right.  This e-mail -- and it's to Mr. Wisner --

10   it states, "Mark, it was brought to my notice by quality

11   management that at least on two occasions you carried out knee

12   arthrocentesis or knee injections."

13       Did I read that correctly?

14   A.  Correct.

15   Q.  "A review of your privileges indicate that you had not

16   requested those privileges, so you do not have approved

17   privileges to carry the procedure out."

18       Did I read that correctly?

19   A.  Correct.

20   Q.  "I would recommend that you do not carry out any procedures

21   that you do not have privileges for."  Did I read that

22   correctly?

23   A.  Correct.

24   Q.  All right.  Now, Mr. Wisner, we've clearly established he

25   had privileges to conduct physical exams and general exams;

1   right?

2   A.  Correct.

3   Q.  All right.  So now why -- why is this Exhibit 32, assuming

4   it is, tell me if it's not significant, but is it significant

5   to you?

6   A.  It is.

7   Q.  All right.  Why?

8   A.  Two aspects of it.  First of all, he's performing

9   activities outside of his scope of practice.  I mean, he's

10  willfully doing procedures that he's not been -- well, whether

11  he's trained or not, he does not have privileges to do.  That's

12  the first thing.

13      Second thing is I look at Dr. Desai's comment, "I would

14  recommend."  That is -- that's not a very -- I mean, this is --

15  if he's acting outside his scope of practice, I mean, it's not

16  "I would recommend," it's like "you cannot do this," period.

17  "I would recommend that you do not carry it out," it doesn't

18  explicitly saying don't ever do it again.  He should, frankly,

19  never do it again.

20      Now, he could follow that up with, you know, Mr. Wisner if

21  you wanted to, you know, "I'm happy to help you get additional

22  training.  And if you meet certain certifications, we'd be

23  happy to add that to your -- your list of procedures."  But it

24  just -- it was a very, very nice way of putting it without a

25  lot of force behind it.

1    Q.  All right.  The response was insufficient in your reading?

2    A.  Yes.

3    Q.  All right.  Exhibit 29, do you recognize this document?

4    A.  I do.

5    Q.  All right.  Is it a Report of Contact dated February 21st,

6    2012?

7    A.  Yes.

8    Q.  All right.  And the nomenclature report of contact, do you

9    have an understanding as to what that is generally as the VA

10   utilized them?

11   A.  Sorry, my -- I was honing to get -- is it up here or on the

12   screen?  I'm just having a hard time seeing it if it's

13   highlighted.  Point that out again, the point of...

14   Q.  The report -- the title of the document.

15   A.  Oh, report of -- I'm sorry, yes, the Report of Contact.

16   Thank you.  I'm further down the line.  Yeah, I see.

17   Q.  The Report of Contact?

18   A.  Yes.

19   Q.  Is that one of the forms utilized to report patient

20   complaints at the VA?

21   A.  Yes.

22   Q.  All right.  And this one says Richard Lawrenz took the

23   information?

24   A.  Correct.

25   Q.  All right.  Is he -- is he a patient advocate?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                 345

 1   A.  I believe that's what he does, yes.

 2   Q.  Now, I want to read what was reported.

 3       And -- and you considered this; right?

 4   A.  Yes.

 5   Q.  Cited it; right?

 6   A.  Yes.

 7   Q.  All right.

 8            MR. KILGORE:  Your Honor, I offer Plaintiff's

 9   Exhibit 29.

10            MS. HASTON:  Your Honor, same relevance objection.

11            THE COURT:  Mr. Kilgore, I have not got the exhibit in

12   front of me, so I'm hard-pressed to address how this is

13   relevant just based on the buzz word "foreseeability."  What's

14   the content of the exhibit you plan to go into and what about

15   it pertains to a foreseeability issue in the trial?

16            MR. KILGORE:  Yeah, this particular exhibit, Your

17   Honor, is a report by a veteran patient of Mr. Wisner

18   indicating that he was uncomfortable with the conversation that

19   Mr. Wisner made and -- and goes into some detail about those

20   comments and it -- it involves a procedure and some things that

21   Mr. Wisner said that was quite egregious.

22            THE COURT:  Is the conversation you're hoping to

23   establish through the exhibit go to the genital examinations or

24   of a sexual content?

25            MR. KILGORE:  It's the exam -- the exam is a different

1   procedure.  It involves a rectal scope.  It involves comments

2   by Wisner, and it involves a request by the patient for another

3   procedure and sexualized comment.

4          THE COURT:  And, Ms. Haston, in light of that, help me

5   understand why that isn't relevant to an issue in this case,

6   because it sure seems like it is.

7          MS. HASTON:  Well, Your Honor, there's no allegation

8   in this case that Mr. Wisner performed improper rectal exams on

9   this plaintiff.  Additionally, the foreseeability test, as the

10  United States understands it, applies to the nature of the job.

11  So any specific conduct of Mr. Wisner and whether that was

12  foreseeable, we maintain, goes towards a negligent supervision

13  claim and not a simple medical malpractice claim predicated on

14  Mr. Wisner's conduct.

15         THE COURT:  Yeah, I think I -- I understand your

16  position better, but I'm not persuaded by it.  The definition

17  of rule -- of relevant evidence in the Federal Rules of

18  Evidence is a more forgiving one than your objection supposes,

19  and so I'm overruling the objection.  Exhibit 29 is received.

20  BY MR. KILGORE:

21  Q.  And, Dr. Kelley, I'd like to direct your attention to the

22  issue text -- the issue reported by this patient.  It states,

23  "This veteran and girlfriend came to my office in reference to

24  his visit with his PCP.  He was uncomfortable with some of the

25  conversation the doctor made during the visit.  He states that

16-2627 Leininger v USA et al  7.7.20 Vol. 2

 1   he can't remember all of what went on but what he -- but what

 2   he can remember he was really upset about."

 3       Did I read that correctly --

 4   A.  Yeah.

 5   Q.  -- even though I'm having trouble seeing it?

 6       "He states that the doctor made a statement that the

 7   veteran was so easy he could make -- he could make pictures and

 8   post them on Facebook."

 9       Did I read that correctly?

10   A.  Yes.

11   Q.  "At one point the doctor asked if he was gay.  At another

12   point the doctor asked him if he had ever been violated, and

13   then said, 'Okay, I guess I just did.'"

14       Did I read that correctly?

15   A.  Yes.

16   Q.  Okay.  "The doctor used a scope to do a rectal exam for

17   possible hemorrhoids.  He was embarrassed to say this in front

18   of the girlfriend, who was not in the room during his exam, as

19   seen by his blushing flushed face.  He was so uncomfortable I

20   suggested that he could change providers if he wanted as he had

21   voiced not returning to the VA.  I called medicine service and

22   had him changed to the panel of Dr. Sumulong."

23       Did I read that correctly?

24   A.  Yes.

25   Q.  All right.  Now, did you consider this?  You did; right?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                348

1   A.   Yes.

2   Q.   Why is it significant, if it is?

3   A.   Well, it's significant because, again, it speaks to his

4   inappropriate comments that deviate from the standard of care.

5   Q.   Okay.  And clearly whatever transpired, I mean, this

6   veteran describes it to the patient advocate, but this patient

7   perceived it as something that was -- caused him embarrassment,

8   right, caused his face to blush and caused him -- he was so

9   uncomfortable that the patient advocate suggested he could

10  change providers; correct?

11  A.   Correct.

12  Q.   All right.

13          MS. HASTON:  Objection.

14          THE COURT:  Hold on just a second, there is an

15  objection.

16          MS. HASTON:  Leading.

17          THE COURT:  What's -- I didn't hear the second.

18          MS. HASTON:  Leading and he's asking for the mind-set

19  of this veteran, which he does not know.

20          THE COURT:  Yeah, I'm going to sustain the objection,

21  the leading objection.  And, Mr. Kilgore, I would ask you --

22  I'm going to strike the answer.  I would ask you to proceed by

23  open-ended direct examination questions.

24          MR. KILGORE:  All right.  Thank you, Your Honor.

25  BY MR. KILGORE:

16-2627 Leininger v USA et al  7.7.20 Vol. 2                349

```
 1   Q.  All right.  Was -- was it -- was it significant to you that
 2   this veteran was offered a change of providers?
 3   A.  Yes.
 4   Q.  And based on -- based on the way he appeared to this
 5   patient advocate?
 6   A.  Correct.
 7   Q.  All right.  The resolution of this issue, "This issue will
 8   be sent to peer review and heads-up to medicine service over
 9   the comments and will be subsequently closed out."
10       Did I read that correctly?
11   A.  Correct.
12   Q.  All right.  And this is a report that the VA received in
13   February of 2012; is that right?
14   A.  Correct.
15   Q.  All right.  Now, you had mentioned a report of a complaint
16   back in 2011, didn't you?
17   A.  Yes.
18   Q.  All right.  Did you consider it in your opinions and
19   report?
20       Do you recall what that complaint involved?
21   A.  I believe -- I believe that complaint involved him not
22   washing his hands and I believe it related to genital exam.
23   Q.  Okay.  And him, Mr. Wisner, not washing his hands after a
24   genital exam?
25   A.  Correct.
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    350

```
 1   Q.  That's a patient report dated back in 2011?

 2   A.  Yeah, I think it was Dawn Clouse was the person who -- the

 3   patient advocate who dealt with it.

 4   Q.  All right.  I want to hand you Plaintiff's Exhibit 56.

 5   A.  Thank you.

 6   Q.  Do you recognize this document?

 7   A.  Yes.

 8   Q.  All right.  It has a report date of March 30th, 2012; is

 9   that correct?

10   A.  Correct.

11   Q.  Pertains to the facility at Eastern Kansas HCS Kansas;

12   correct?

13   A.  Correct.

14   Q.  Has an incident date of March 28th, 2012; is that correct?

15   A.  Correct.

16   Q.  All right.  This is a -- another report by a veteran

17   concerning the care that he received from Mr. Wisner; is that

18   correct?

19   A.  Correct.

20   Q.  And you considered it?

21   A.  Yes.

22           MR. KILGORE:  Your Honor, I offer Plaintiff's

23   Exhibit 56.

24           MS. HASTON:  Your Honor, relevance objection.

25           THE COURT:  Mr. Kilgore, I don't know the content of
```

 1   the exhibit; I don't have it in front of me.  Can you summarize

 2   where you're headed with this?

 3           MR. KILGORE:  Yeah, Your Honor, this is a report by --

 4   by a veteran who was actually admitted to the Acute Psychiatry

 5   Unit at the VA and reported being sexually assaulted by -- by

 6   Mr. Wisner.  It's been referred to in opening, and the veteran

 7   reports specifically what Mr. Wisner did and expresses a desire

 8   to harm Mr. Wisner as a result.

 9           THE COURT:  And this is, as I understand it, a report

10   received in late March of 2012?

11           MR. KILGORE:  That is correct, Your Honor.

12           THE COURT:  Yeah, I'd -- I don't understand the

13   objection.  I think it's -- I'm overruling it.  It's received.

14   BY MR. KILGORE:

15   Q.  All right.  Dr. Kelley, "This veteran reports on March

16   29th, 2012, a 33-year-old male veteran was being seen by a

17   behavioral health provider, and during the visit it was

18   determined the veteran would be admitted to the Acute

19   Psychiatry Unit."

20       Did I read that correctly?

21   A.  Correct.

22   Q.  "While being escorted to the Emergency Department, he

23   stated that he was sexually assaulted by his VA primary care

24   provider on March 28th, 2012 at 10:00 a.m. during an

25   examination."

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    352

1       Did I read that correctly?

2   A.   Correct.

3   Q.   "The patient stated the provider put his hand down his

4   underwear to his groin area without letting him know what he

5   was going to do and later grabbed his bottom and moved him out

6   of the way."

7       Did I read that correctly?

8   A.   You did.

9   Q.   All right.  Now, this goes back to what you were talking

10  about earlier with this fine line, right, with genital exams?

11  A.   Correct.

12  Q.   And here you have --

13          MS. HASTON:  Objection.

14          THE COURT:  What's the objection?

15          MS. HASTON:  Leading.

16          THE COURT:  I think it's preliminary.  I'm overruling

17  the objection.  You may proceed.

18  BY MR. KILGORE:

19  Q.   All right.  And in this situation this is a patient

20  reporting that Mr. Wisner put his hands down his pants -- down

21  in his underwear without letting him know what he was going to

22  do; correct?

23  A.   Well, there's a -- a fine line between doing a prolonged

24  genital exam, but this is -- I mean, he put his hands down the

25  guy's pants, I mean, it's -- that's the assault.  The other is

353

```
 1   an assault too, but this is -- I mean, this is egregious
 2   assault.
 3   Q.   Okay.  It goes on to state, "He stated he was going to
 4   press charges against the doctor.  Once he arrived at the
 5   Emergency Department, he stated that he was homicidal towards
 6   the provider he saw the day before and that the -- and that
 7   provider should be kept out of there.  VA police were notified
 8   to interview the veteran."
 9        Did I read that correctly?
10   A.   Correct.
11   Q.   Is it significant to you that this patient of Mr. Wisner's
12   expressed that he was homicidal towards Mr. Wisner?
13   A.   It is.  I mean, he drove the guy mad in assaulting him.
14   Q.   "This particular patient states patient is an Army National
15   Guard veteran of the Persian Gulf war who served from 1998 to
16   2006;" correct?
17   A.   Correct.
18   Q.   "VA police contacted and interviewed the provider in which
19   the allegations were made;" is that correct?
20   A.   Correct.
21   Q.   And then going down it states, "During the examination, the
22   veteran was asked --"
23        Well, I should say, this -- this is what they have
24   attributed Mr. Wisner saying; is that right?
25   A.   Correct.
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2                 354

1   Q.  Okay.  And it states, "During the examination, the veteran

2   was asked to undress, which he complied and did not vocalize

3   that he did not agree to an examination.  The patient had a

4   physical and abdominal check and visual check of his genital

5   and there was no evidence of trauma."  That's information

6   attributed to what Mr. Wisner said; correct?

7   A.  Correct.

8   Q.  So he's a patient expressing homicidal feelings towards

9   Mr. Wisner and this is what Mr. Wisner said in response;

10  correct?

11  A.  Correct.

12  Q.  All right.  I want to go to the second page of the exhibit.

13  Now, right here in the middle of the page it says -- right

14  above actions it says, "Media interest no;" correct?

15  A.  Correct.

16  Q.  It says, "Actions none."  Did I read that correctly?

17  A.  Correct.

18  Q.  And then -- down below it says, "Final action level:

19  Facility.  Issue status for allegations:

20  Closed-unsubstantiated."  Correct?

21  A.  Correct.

22  Q.  "Has the OIG been notified?  No."  Correct?

23  A.  Correct.

24  Q.  Okay.  Up above comments, "Police conclusion was that no

25  sexual assault occurred;" correct?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    355

1   A.  Correct.

2   Q.  All right.  I want to hand you what's been marked as

3   Exhibit 40.  Did you review this document?

4   A.  Yes.

5   Q.  All right.  Now, this as report from the Department of

6   Veterans Affairs' VA Police Eastern Kansas, Leavenworth

7   Division Investigative Report.

8       Did I read that correctly?

9   A.  Correct.

10  Q.  The date is -- on this report is March 29th, 2012; is that

11  correct?

12  A.  Correct.

13  Q.  Now, in fairness, is this report pertaining to the same

14  patient complaint that we just went over in Exhibit 56?

15  A.  Yes.

16  Q.  Okay.  But this is the report from the VA police; correct?

17  A.  Correct.

18  Q.  Concerning the same incident?

19  A.  Correct.

20      MR. KILGORE:  Your Honor, I offer Plaintiff's

21  Exhibit 40.

22      THE COURT:  Your objection to 40?

23      MS. HASTON:  Your Honor, we simply object that it's

24  incomplete, that the entire VA police file should be considered

25  if this exhibit is considered.

1        THE COURT:  Well, certainly you will have a chance, if

2   you believe that the document violates the Rule of

3   Completeness, you can -- you can request that the remainder of

4   the file be placed in evidence or even take that up during your

5   -- your cross, but that's not a basis for exclusion of the

6   exhibit, so Exhibit 40 is received.

7   BY MR. KILGORE:

8   Q.  All right.  Dr. Kelley, the first section it has Incident

9   Synopsis.  It states, "VA police were contacted to go to the

10  ER non-emergent about a patient-to-employee threat.  While

11  questioning the patient, he stated that he was sexually

12  assaulted by a doctor yesterday around 10:00 a.m. in the exam

13  room."

14       Did I read that correctly?

15  A.  Correct.

16  Q.  Okay.  I'm going to on to page 2, Investigation.  "On 29,

17  March, 2012, at 14:30 hours, police were called to go to the

18  emergency room of the hospital for an incident, but it was not

19  an emergency.  I made contact with RN Robinson.  She said that

20  while asking questions to D -- to D" --

21       THE COURT:  It appears, Mr. Kilgore, that the exhibit

22  contains the name of a -- potentially a patient.  Do you -- do

23  you want to remove that and redact it and reformat the exhibit?

24       MR. KILGORE:  Yes, Your Honor.  We had intended -- and

25  I think we're doing it right now.  It was -- it was -- we

1    intended to.  It was one that we missed.

2           THE COURT:  While this is going on, we have not

3    discussed how actually we're going to get custody of the

4    exhibits that are received in evidence to be reflected in the

5    record of the trial, but that is something I want to take up.

6    Particularly what sharpens my attention on it, of course, is

7    the revision of this exhibit from what was disclosed in a way

8    that I think is appropriate.  But we've got to make sure that a

9    reviewing court has exactly what was admitted as exhibits.

10   And, counsel, we'll take that up when you -- it would normally

11   be easier when we're all in the same courtroom.  It's a little

12   more challenging when we're in this format.

13   BY MR. KILGORE:

14   Q.  All right.  Picking up where I left off, it states, "I made

15   contact with RN Robinson.  She said that while asking questions

16   to (name intentionally omitted by counsel) he stated he was

17   suicidal and homicidal.  And if Dr. Wisner comes down here, I

18   am going to hurt him."

19         Did I read that correctly?

20   A.  Yes.

21   Q.  "According to his statement, said that he took his pants

22   off and Dr. Wisner put his hand down his underwear to his groin

23   area.  Stated that Dr. Wisner did not tell him that he was

24   going to do that."

25         Did I read that correctly?

358

1   A.   Correct.

2   Q.   "I asked when did this incident occur, and he stated

3   yesterday, March 28, 2012, around 10:00 hours in an examination

4   room at the hospital."

5        Did I read that correctly?

6   A.   Correct.

7   Q.   All right.  Now, again is it significant to you,

8   Dr. Kelley, that this patient is reporting suicidal and

9   homicidal ideas if Dr. Wisner comes into contact with him?

10  A.   Yes, absolutely.  He's visibly and vehemently upset.

11  Q.   All right.  Is it significant to you that both the VA and

12  the VA police had knowledge of this in March of 2012?

13  A.   Yes.

14  Q.   Why?

15  A.   Well, it's -- again, it's pretty early, in the course of

16  when things started to -- Mr. Wisner started to engage in some

17  of his activities, and in this, as we both know, lasted for

18  another two-and-a-half years.  So there's opportunities like

19  this to intervene.  I know they did an investigation.  But --

20  but again, if you take this as an isolated incident, it could

21  be a one-off.  But I think as we'll see there are repetitive

22  incidents of multiple complaints, red flag after red flag after

23  red flag.  So -- and I, when you look at this in totality with

24  everything else, it really brings to light there's no question

25  an identifiable pattern here.

1          MR. KILGORE:  Scott, can you go to page 3?

2   BY MR. KILGORE:

3   Q.   And then there's some notes, March 30th, 2012, 11:38 a.m.

4   from the investigator.  "On March 30th, 2012, at approximately

5   6:15 hours, I became aware of this report from an e-mail

6   prepared by Lieutenant Boyd.  Upon review of the case, I faxed

7   a complete copy to SA Greg Billingsley OIG Economic Loss,

8   confirmation of OIG receiving the fax was received at

9   8:21 hours.

10         At 9:05 hours SA Billingsley contacted me and advised he

11   had reviewed the case.  SA Billingsley asked me several

12   questions about the investigation, advised that OIG declined

13   further investigation and recommended the case be sent for

14   administrative review.  At this time I recommend the case be

15   closed."

16         Did I read that correctly?

17   A.   Correct.

18   Q.   What's your understanding of this administrative review

19   that they were sending it for?  Do you know?

20   A.   Well, my suspicion reading this is that it was going to be

21   looked at by peer review and have his colleagues and his

22   supervisors evaluate, look at this, which would have been

23   invaluable.  This is something that even a year later you would

24   remember if you saw another complaint along these lines.  It's

25   something you don't forget --

16-2627 Leininger v USA et al  7.7.20 Vol. 2                360

1   Q.  All right.

2   A.  -- if you saw this.

3   Q.  I mean, this is -- this is the third complaint that we've

4   discussed already up to March of 2012.  I think there's another

5   one before then we'll get to.  But simply based on these

6   complaints, what's the standard of care require in terms of

7   addressing Mr. Wisner's conduct?

8   A.  Well, I mean, you need to sit down with him and have a --

9   have a frank conversation.  The other -- the other aspect of

10  this is that I think Dr. Cline even said in his deposition that

11  if Mr. Wisner had two complaints that he should be taken out of

12  the work -- taken out of work at that point in time.  So --

13  he's already had two complaints and he's still working.

14  Q.  So even according to Dr. Cline --

15  A.  His super- --

16  Q.  -- his supervisor, at this point there's sufficient

17  complaints he should have been removed from patient care?

18  A.  According to his supervisor, yes.

19  Q.  Now, one thing about this police report, it refers to

20  PA Wisner as Dr. Wisner, doesn't it?

21  A.  Correct.

22  Q.  Okay.  And when they talk to PA Wisner, and apparently

23  thinking he's a doctor, Wisner, again, offers this explanation

24  about this patient coming in and that, "He," the patient,

25  "complied and did not refuse or vocalize that he did not agree

1   with the examination;" correct?

2   A.  Correct.

3           MS. HASTON:  Objection.

4           THE COURT:  What's the objection?

5           MS. HASTON:  Leading and narrative from Mr. Kilgore.

6           THE COURT:  Well, it probably is.  I'm sure that

7   Mr. Kilgore can rephrase it.  Will you rephrase, please.

8   Sustained.

9           MR. KILGORE:  I will.

10  BY MR. KILGORE:

11  Q.  Dr. Kelley, in the top photograph, if you can see it on

12  page 3 where it refers to Dr. Wisner and their contact with

13  Dr. Wisner, does -- does PA Wisner offer an explanation for the

14  complaint?

15  A.  He does.

16  Q.  What does he say?

17  A.  Dr. Wisner stated that at no time did he touch the

18  patient's penis, scrotum, or rectum.

19  Q.  And what does he say about that?

20  A.  He says, "The patient did not refuse any of the exam and as

21  noted in the records."

22  Q.  Okay.  All right.  They think he's a doctor.  Wisner says,

23  "Didn't refuse this medical exam."  And, at least according to

24  James Dyson, the recommendation was to close the case; correct?

25  A.  Correct.

```
 1            THE COURT:  Mr. Kilgore, maybe -- I know I've put you
 2    off, but maybe this is an appropriate time for us to take our
 3    lunch recess.
 4            MR. KILGORE:  Thank you, Your Honor.
 5            THE COURT:  Did you want to finish -- do you have
 6    additional questions or a question or two to finish up with
 7    this exhibit?
 8            MR. KILGORE:  No, I don't.  I'm okay.  Thank you.
 9            THE COURT:  All right.  We'll go ahead and take our
10    lunch recess here planning to resume at 25 until the hour,
11    one o'clock, two o'clock in the east.  Plan to see you then.
12    Thank you, counsel.
13        (Recess.)
14            THE COURT:  All right.  Good afternoon, everyone.  Let
15    me make sure from sound and sight standpoint I'm visible.  How
16    about in the plaintiff's room?
17            MR. KILGORE:  Yes, Your Honor, both sound and you're
18    visible.
19            THE COURT:  And, Ms. Haston, on your side of the
20    caption?
21            MS. HASTON:  Yes, Your Honor.  Both sound and visual.
22            THE COURT:  Good.  Ms. Greiner, I want to make sure
23    we're broadcasting to you.
24            COURT REPORTER:  Yes.
25            THE COURT:  All right.  I assume -- I'm trying to
```

1    manage my image -- views here.  I assume Mr. -- Dr. Kelley is

2    back in the witness chair?

3            MR. KILGORE:  He is, Your Honor.

4            THE COURT:  I see him going there now.

5            All right.  Mr. Kilgore, you may proceed.

6            MR. KILGORE:  Thank you, Your Honor.

7    BY MR. KILGORE:

8    Q.  Dr. Kelley, I'd like to hand you what's been marked as

9    Exhibit 66.  Do you recognize this document?

10   A.  I do.

11   Q.  Do you consider it?

12   A.  Yes.

13   Q.  Is it another report of contact and this one's dated May

14   4th, 2016?

15   A.  Yes.

16   Q.  All right.  In this particular report, it's another report

17   where a patient is reporting the fact that he felt

18   uncomfortable with Mr. Wisner's exams; is that correct?

19   A.  Correct.

20   Q.  And that he reported it to Ms. Clouse, the social worker at

21   the VA?

22   A.  Yes.

23           MR. KILGORE:  Your Honor, I offer Exhibit 66.

24           THE COURT:  Objection to 66.

25           MS. HASTON:  Your Honor, again, relevancy objection.

1           THE COURT:  And I can't yet see the exhibit.  Can you

2    just give me the theory of the relevance, Mr. Kilgore?

3           MR. KILGORE:  Yeah, it's right in line with what we've

4    been doing in this line of questioning.  This particular one,

5    it's a patient report reporting that he never felt

6    uncomfortable with Mr. Wisner's exams and the fact that he

7    reported it to Dawn Clouse, who's a social worker at the VA, in

8    2012.

9           THE COURT:  And so it's a report of -- in 2012 but the

10   document itself is dated May of 2016?

11          MR. KILGORE:  That's correct, Your Honor.  This

12   particular contact occurred on May of 2016 in which the patient

13   is -- is voicing a complaint and concern that he had earlier

14   reported in 2012 to the social worker, Dawn Clouse, about

15   the --

16          THE COURT:  And so -- I'm sorry, I didn't mean to

17   interrupt you.  So the evidence you intend to elicit would

18   contend that the patient veteran made a complaint back in 2013?

19          MR. KILGORE:  Earlier than that, in 2012.

20          THE COURT:  All right.  The objection's overruled.

21   You may proceed.

22   BY MR. KILGORE:

23   Q.  Dr. Kelley, I'd like to direct your attention to what was

24   reported in this exhibit.  We have redacted the names involved.

25   "The patient came into the director's office while I was there.

1   I introduced myself and asked if I could help him.  We went

2   over to my office where the patient proceeded to tell me a

3   plethora of stories about him and Mr. Wisner, a former employee

4   of VA EKHCS."

5       Did I read that correctly?

6   A.  Correct.

7   Q.  This reported conduct goes on to state, "His biggest

8   concern was he stated in 2012 he told social worker, Dawn

9   Clouse, that he felt uncomfortable with Mr. Wisner's exams.

10  Patient stated Ms. Clouse told him he had nothing to worry

11  about.  Later in 2012 patient stated he told Ms. Clouse

12  Mr. Wisner was inappropriate during his exams and he demanded a

13  new provider.  Patient was given a new provider.

14      When the story broke on Mr. Wisner, the patient said he

15  asked for copies of his records.  He noted that Ms. Clouse was

16  always extremely thorough in her progress notes with the two

17  exceptions of the times he spoke negatively about Mr. Wisner."

18      Did I read that correctly?

19  A.  Yes.

20  Q.  Significant for your opinions?

21  A.  Yes.

22  Q.  For the same reasons we've discussed previously?

23  A.  Yes.

24  Q.  All right.  I'd like to hand you what's been marked as

25  Exhibit 82.  Do you recognize this document?

1    A.   I do.

2    Q.   And on the first page of this document, it's actually a

3    letter that's dated December 6th of 2012, and it's from the

4    Department of Veterans Affairs' VA Eastern Kansas Healthcare

5    System; is that correct, Dr. Kelley?

6    A.   Correct.

7    Q.   And the letter is directed to the Honorable Sam Graves,

8    Member United States House of Representatives.

9         Did I read that correctly?

10   A.   Yes.

11   Q.   All right.  And in this letter the letter is signed by Rudy

12   Klopfer from the VA CM.  And do you know who Mr. Klopfer is?

13   A.   Director of the Veterans Administration in Kansas

14   Healthcare System, so...

15   Q.   All right.  And in this letter Mr. Klopfer is acknowledging

16   receipt of a letter from Congressman Graves on behalf of one of

17   Congressman Graves' constituents voicing concern about the care

18   that he received from Wisner at the Leavenworth VA; correct?

19   A.   Correct.

20            MS. HASTON:  Objection, Your Honor.

21            THE COURT:  What's the objection?

22            MS. HASTON:  It's misleading for one.  It's also

23   irrelevant.  This is not a document about Mr. Wisner.

24            THE COURT:  I don't -- I have not yet seen the exhibit

25   because it's not in evidence.  Certainly if this is not shown

1   to be germane to an issue in this case, you may renew the

2   objection, but I don't think that -- the exhibit has not

3   offered yet, so I think the objection is premature and I

4   overrule it.

5          MR. KILGORE:  Okay.  And, Your Honor, if I may, just

6   address -- okay.  All right.

7   BY MR. KILGORE:

8   Q.  Is that correct, Dr. Kelley?

9   A.  Yes.

10  Q.  And if you go -- this -- this response to Congressman

11  Graves states, "This is in response to your letter on behalf of

12  your constituent who contacted you regarding patient abuse."

13     Did I read that correctly?

14  A.  Yes.

15  Q.  "Mister [name intentionally omitted by counsel] was

16  contacted by staff to review his complaint.  The VA Eastern

17  Kansas takes seriously any allegations of patient abuse.  The

18  issue is currently under review for appropriate action."

19     Did I read that correctly?

20  A.  Correct.

21         MR. KILGORE:  Your Honor, I offer Plaintiff's 82.

22         THE COURT:  I'm catching up with you.  I thought we

23  were in a discussion about Exhibit 66.  Instead it's about 82?

24         MR. KILGORE:  Yeah, it is, it's Exhibit 82, Your

25  Honor.  Sixty-six I thought was admitted.

1      THE COURT:  Maybe I'm not keeping up with you.  I'll

2  double-check you on 66 in a moment.

3      All right.  Is there objection to Exhibit 82?

4      MS. HASTON:  Yes, Your Honor.  Relevance.  This is not

5  a document about Mr. Wisner.

6      THE COURT:  Mr. Kilgore, do you want to be heard on

7  that?

8      MR. KILGORE:  Judge, the -- the document, both the

9  letter from Congressman Graves in the exhibit and the letter in

10  response to Congressman Graves' request, refers to a patient by

11  name at -- complaining of the care that he received from one of

12  the providers at the VA.  This document, judge, the way we got

13  this -- and it refers to a nurse at the facility, the original

14  letter.  We received this document in response to our request

15  for production concerning Mr. Wisner from the VA.  They

16  produced it to us.  We understand it to be, and certainly based

17  on our request -- if their request -- if the -- if the -- if it

18  was responsive to our request, this was referring to

19  Mr. Wisner.

20      THE COURT:  And you don't -- just to get to the chase

21  here, you don't contend that it explicitly references this

22  particular plaintiff of this case?

23      MR. KILGORE:  That's correct, Your Honor.

24      THE COURT:  Okay.  Ms. Haston, I'm back to you and

25  your objection.  Why -- if it -- if this is offered on the

1   issue of foreseeability, and I trust it is given the path we've

2   gone down over the last hour or so of evidence, why does it

3   matter whether it references -- which -- which veteran, which

4   patient it references so long as it is a complaint about the

5   conduct of Mr. Wisner?

6           MS. HASTON:  Your Honor, because the United States

7   maintains that this is not a complaint about Mr. Wisner.  This

8   is a complaint about a nurse.

9           THE COURT:  Certainly you can try to make that point

10  and you may win that factual dispute.  But, in terms of the

11  relevance decision, the threshold under the definition of

12  relevant evidence doesn't require the proponent of the exhibit

13  to win the fight on what the document is about.  It simply

14  requires it to provide evidence that's sufficient to support a

15  finding that tends to establish something that is germane to

16  the case.  I'm going to overrule the objection and admit 82.

17  BY MR. KILGORE:

18  Q.  Dr. Kelley, is this -- is this significant to you that a

19  United States congressman is -- is taking the time to request

20  an investigation --

21  A.  Yes.

22  Q.  -- on behalf of one of his constituents --

23  A.  Correct.

24  Q.  -- concerning the care that that constituent received at

25  Leavenworth VA?

```
 1    A.  Correct.

 2    Q.  Why is it significant?

 3    A.  Again, it speaks to -- again, it speaks to --

 4        I thought there was an objection.

 5        It speaks to the red flag.  I mean, it's another red flag.

 6    It's another indication that something's amiss.

 7    Q.  All right.  I want to hand you Plaintiff's Exhibit 55.

 8    This Exhibit 55, it's entitled Report of Employee Involved, and

 9    it identifies the employee as Mark E. Wisner PA; is that

10    correct?

11    A.  Correct.

12    Q.  The date of the Report of the Employee Involved is -- is

13    April 2nd, 2013; is that correct?

14    A.  Correct.

15    Q.  And in this document is the veteran calling in reference to

16    wanting a new PCP?

17    A.  Correct.

18    Q.  And does he -- does he indicate that he does not feel that

19    the PCP Mark Wisner, has his best interests at heart?

20    A.  Correct.

21    Q.  Okay.  Does he also reference a statement made by Mark

22    Wisner to him --

23    A.  Yes.

24    Q.  -- that he found troubling?

25    A.  Yes.
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    371

1   Q.  All right.  Did you consider it?

2   A.  Yes.

3   Q.  All right.

4       MR. KILGORE:  Your Honor, I offer Plaintiff's

5   Exhibit 55.

6       THE COURT:  Defendant do you have any objection?

7       MS. HASTON:  Yes, relevance, Your Honor.

8       THE COURT:  Yes, I just would direct your relevance

9   objections to the definition of relevant evidence under

10  Rule 401.  It does not require the plaintiff to win the factual

11  contact.  It requires the proponent of the exhibit to show that

12  if the exhibit or the offered testimony has any tendency to

13  make a fact more or less probable than it would be without the

14  evidence.  I conclude that this exhibit satisfies that standard

15  and overrule the Objection.  55's received.

16  BY MR. KILGORE:

17  Q.  Dr. Kelley, does the issue text in this Report of Employee

18  Involved state, "This veteran calls in reference to wanting a

19  new PCP.  He states that he recently moved back into the area.

20  He had Mark Wisner for his PCP before and was reassigned to

21  him."

22      Did I read that correctly?

23  A.  Correct.

24  Q.  It goes on to state, "However, he does not feel that the

25  PCP has his best interests at heart and seeks another one.  In

16-2627 Leininger v USA et al  7.7.20 Vol. 2          372

```
 1    reference to wanting an increase in pain medication, he was
 2    told that he could put more pain medication up his rear and it
 3    wouldn't do any good."
 4         Did I read that correctly?
 5    A.   Correct.
 6    Q.   It goes on to state, "He took offense at that.  He was told
 7    to stop his oxycodone cold turkey and knows that isn't right."
 8    Did I state that correctly?
 9    A.   Right.
10    Q.   Significant?
11    A.   Yes.
12    Q.   Same reasons?
13    A.   Yes.
14    Q.   Okay.  Dr. Kelley, I want to hand you Plaintiff's
15    Exhibit 99.
16         THE COURT:  Let me interrupt for a moment,
17    Mr. Kilgore.  When we -- I left you hanging about Exhibit 66.
18    I did overrule the objection but I never said the exhibit was
19    received.  Sixty-six was received -- is received now.
20         MR. KILGORE:  Thank you, Your Honor.
21         THE COURT:  I'm sorry to interrupt.  So you're moving
22    on now to Exhibit 99?
23         MR. KILGORE:  That's correct, Exhibit 99.
24         THE COURT:  Thank you.  I'm sorry to interrupt.
25         MR. KILGORE:  Thank you.
```

1    BY MR. KILGORE:

2    Q.  Dr. Kelley, Exhibit 99 is another report of contact dated

3    September 20th, 2013; is that correct?

4    A.  Correct.

5    Q.  All right.  Information taken by Richard Lawrenz.  Saw his

6    name before?

7    A.  Correct.

8    Q.  He's a patient advocate?

9    A.  Yes.

10   Q.  This is another report of contact in which a veteran is

11   requesting a new PCP; is that correct?

12   A.  Correct.

13   Q.  All right.  And it references specifically Mark Wisner; is

14   that correct?

15   A.  Correct.

16          MR. KILGORE:  Your Honor, I offer Plaintiff's 99.

17          THE COURT:  Ms. Haston.

18          MS. HASTON:  Your Honor, same relevancy objection.

19          THE COURT:  All right.  Overruled.  Exhibit 99's

20   received.

21   BY MR. KILGORE:

22   Q.  Dr. Kelley, the issue text for this report of contact

23   states, "This veteran comes to my office wanting a new PCP.  He

24   will not go into any detail but states he would be more

25   comfortable with someone else."

1       Did I read that correctly?

2    A.   Correct.

3    Q.   All right.  Going down to the resolution.  "I left a

4    message for Sue Anne Breedlove of medicine service to reassign

5    him and let me know who it was so that I could contact the

6    veteran back."

7       Did I read that correctly?

8    A.   Correct.

9    Q.   It goes on to state, "I went to Mark Wisner to see why the

10   veteran would seek another provider."

11      Did I read that correctly?

12   A.   Correct.

13   Q.   All right.  It states, "He thinks that the veteran is

14   wanting narcotic intervention and he told the veteran that his

15   condition did not warrant it."

16      Did I read that correctly?

17   A.   Correct.

18   Q.   All right.  And then going down to the -- to the bottom,

19   the last paragraph, the last sentence there, 9/26 is the date

20   and it states, "Issue closed out."

21      Did I read that correctly?

22   A.   At the very end, yes.

23   Q.   Okay.  The full text, "I checked with medicine service to

24   find that they hadn't yet made a decision on changing PCP

25   policy, so they went ahead and changed his provider.  I looked

1   at CPRS to see that the provider was Dr. Sumulong.  I left a

2   message on the veteran's phone to that effect.  Issue closed

3   out."

4   Did I read that correctly?

5   A.  Correct.

6   Q.  All right.  Significant again?

7   A.  Yes.

8   Q.  All right.  Same reasons?

9   A.  Generally.  The other thing is I don't see where they

10  actually contacted him.  They just changed the PCP.  So no one

11  really took the extra step to figure out why he wanted -- he

12  wanted to change.  I think that's -- again, it's a gap in their

13  -- in their process.  They should have sought him out to have

14  that discussion.

15  Q.  What you're referring to is the fact that this particular

16  veteran wanted a new PCP, that the VA should have followed up

17  with the veteran to figure out why?

18  A.  Exactly.

19  Q.  Okay.  All right.  I want to hand you Exhibit 100.  This is

20  another report of contact.  It's dated February 12th, 2014.

21  It -- again, this is another report where a veteran is calling

22  wanting a new PCP; is that correct?

23  A.  Correct.

24  Q.  The information was taken by Richard Lawrenz once again; is

25  that correct?

1   A.  Correct.

2   Q.  And there's handwritten notes on here that say Mark Wisner;

3   is that correct?

4   A.  Correct.

5   Q.  All right.  Did you consider it?

6   A.  Yes.

7   Q.  All right.

8         MR. KILGORE:  Your Honor, I offer Plaintiff's 100.

9         MS. HASTON:  Your Honor, relevancy.

10         THE COURT:  Same -- same theory of objection,

11   Ms. Haston?

12         MS. HASTON:  Yes, Your Honor.

13         THE COURT:  Yeah, I'm overruling the objection.

14   Exhibit 100's received.

15   BY MR. KILGORE:

16   Q.  Dr. Kelley, the issue text for this report of contact

17   states, "This veteran calls in reference to wanting a new PCP.

18   He states that the PCP told him that the pharmacy didn't send

19   narcotics by UPS anymore.  They were set up for window pick-up

20   and he didn't know about it.  He called pharmacy today and they

21   will be overnighted to him."

22       Did I read that correctly?

23   A.  Correct.

24   Q.  Is it significant to you that a veteran seeing Mr. Wisner

25   wanted his -- his -- his prescriptions, narcotics sent to him

1    by UPS?

2    A.   Yes.

3    Q.   Why?

4    A.   Well, I mean, again, there must be a significant quantity

5    of that sent by UPS.  So to me it says that -- that he wanted

6    -- he wanted to pick up the narcotics himself; he didn't want

7    to trust them coming through the United States Postal Service.

8    Q.   And what about going to the clinic to see Mr. Wisner?

9    A.   Well, the other thing, you have an interpretation, you're

10   correct, that he doesn't want to see Wisner; he just wants to

11   be able to pick up the meds.

12   Q.   All right.  I want to hand you Exhibit 76, another report

13   of contact dated February 20th, 2014 that refers to a veteran

14   reporting that in January -- well, he reported in January.  It

15   looks like that he had had recent medical visits with Mark

16   Wisner, PA and he reported having testicular exams in a

17   two-week time frame and that he was "creeped out by it."  Is

18   that a fair summary of what's reported here?

19   A.   Yes.

20   Q.   All right.  Did you consider it?

21   A.   Yes.

22   Q.   All right.

23        MR. KILGORE:  Your Honor, I offer Plaintiff's 76.

24        MS. HASTON:  Your Honor, the same relevancy objection.

25        THE COURT:  All right.  The objection's overruled.

16-2627 Leininger v USA et al  7.7.20 Vol. 2    378

1   Seventy-six is received.

2   BY MR. KILGORE:

3   Q.  Dr. Kelley, on this report of contact it states, "On

4   January 23rd, 2014, veteran was seen by this SW for an

5   individual psychotherapy session.  Mr. S discussed feeling

6   uncomfortable with his medical care at the Leavenworth VAMC

7   thus far, specifically with his recent medical visits with Mark

8   Wisner PA.  Veteran reports having two testicular exams in a

9   two-week time frame and he was ensure of the medical necessity

10  of these exams.  He reports the medical visits made him feel

11  'creeped out' and he wasn't sure if he wanted to continue his

12  medical care at this facility."

13      Did I read that correctly?

14  A.  Yes.

15  Q.  All right.  Is that significant to you that a patient

16  reports feeling creeped out by Mr. Wisner's testicular exams?

17  A.  Well, I think it -- not only that is significant but also

18  the fact he had two testicular exams two weeks apart, that

19  speaks to the increased frequency we discussed earlier.

20  Q.  Is it nearly identical to the course of treatment to some

21  of the -- the office visits, clinic visits for the plaintiff in

22  this case?

23  A.  Yes.

24  Q.  And then it goes on to state, "On February 20th, 2014,

25  veteran was seen for a subsequent individual psychotherapy

```
 1   session by this SW.  Mr. S discussed that he continued to feel

 2   upset about his medical visits with Mark Wisner, PA."

 3        Did I read that correctly?

 4   A.  Yes.

 5   Q.  All right.  All right.  I want to hand you what's marked as

 6   Plaintiff's Exhibit 77.  Dr. Kelley, this is an e-mail from

 7   Daniel Cline to Anil Desai on Thursday March 6th, 2014, and the

 8   subject is post deployment clinic incident.

 9        Did I read that correctly?

10   A.  Correct.

11   Q.  And it refers to one of the patients who had complained of

12   inappropriate genital exams -- genitalia by Mr. Wisner; is that

13   correct?

14   A.  Correct.

15   Q.  And it indicates that the patient had come to the VA in

16   January, January 2nd of 2014, and met with Dawn Clouse, social

17   worker; is that correct?

18   A.  Correct.

19   Q.  Did you consider it?

20   A.  Yes.

21   Q.  All right.

22        MR. KILGORE:  Your Honor, I offer Plaintiff's 77.

23        MS. HASTON:  Same relevancy objection, Your Honor.

24        THE COURT:  Objection's overruled.  77's received.

25   BY MR. KILGORE:
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2          380

1   Q.  All right.  In this e-mail from Daniel Cline, which is

2   Dr. Cline; correct?

3   A.  Correct.

4   Q.  Supervising physician?

5   A.  Yes.

6   Q.  All right.  And Dr. Cline states, "Review of Mr. S-3917 who

7   complained of inappropriate genitalia exam by Mark Wisner."

8       Did I read that correctly?

9   A.  Correct.

10  Q.  "I have reviewed the medical record and discussed the chain

11  of events with Mr. MW and with Dawn Clouse."

12      Did I read that correctly?

13  A.  Correct.

14  Q.  Okay.  "Patient came to the VA on January 2nd, 2014, and

15  met with Dawn Clouse, social worker."

16      Did I read that correctly?

17  A.  Correct.

18  Q.  It goes on to state that Dawn, in her note, relates that,

19  after visiting with the patient, she paged Mr. Wisner regarding

20  the patient but he was unable to call her back until after the

21  patient left.

22      Did I read that correctly?

23  A.  Correct.

24  Q.  It goes on to state she mentions that she gave the

25  patient's phone number to Mr. Wisner.  Mr. Wisner spoke with

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    381

1    patient and an order was entered on 1 -- January 2nd, 2014, by

2    Mr. Wisner for an additional ultrasound with designated history

3    of kidney stones as reason for the test.  He also entered that

4    day a consult for behavioral health for PTSD and an MRI consult

5    for chronic low back pain.

6         Did I read that correctly?

7    A.  Correct.

8    Q.  It goes on to state Mr. Wisner saw the patient on 1/8/14.

9    A history of renal or urinary problems is not documented.

10   Mr. Wisner did do a genitalia exam on this initial visit.  He

11   stated he did not undress the patient but may have tapped on

12   his belt and said, "I need to check down there."

13        Did I read that correctly?

14   A.  Correct.

15   Q.  Now, there's a lot of parallels here with what we've been

16   discussing for some time today.  It's a -- it's another veteran

17   that was sent to behavioral health for PTSD; correct?

18   A.  Correct.

19   Q.  Now, what do you think about this practice that at least

20   occurred here where -- where Dawn Clouse, the social worker,

21   gave Mr. Wisner the patient's phone number to follow up on this

22   complaint?

23   A.  I think it's highly unusual.  That's -- generally you want

24   to do an investigation in what's going on and not put the

25   patient, having to confront their -- the person they're

 1   accusing, in that manner.  They needed to air out their

 2   concerns to the VA Administration first and then the VA

 3   Administration needs to discuss it with Mr. Wisner.  Mr. Wisner

 4   should not be involved in that conversation.

 5   Q.  Is it fair to say that while the report should be

 6   investigated that it should be figured out what occurred in

 7   that -- in that exam, that Mr. Wisner isn't the person to do

 8   it?

 9   A.  Correct.

10   Q.  I want -- I want to hand you what's been marked as

11   Plaintiff's Exhibit 78.  This is -- this is another e-mail from

12   Daniel Cline, Dr. Cline.  It's dated May 7th, 2014.  And this

13   e-mail is to Mark Wisner; is that correct?

14   A.  Correct.

15   Q.  In this e-mail Dr. Cline is advising Mr. Wisner about

16   clinic guidelines; is that correct?

17   A.  Correct.

18   Q.  Now, the top e-mail is dated May 7th, 2014, but there's an

19   e-mail down below from Dr. Cline to Mark Wisner on the same

20   subject of clinic guidelines; is that correct?

21   A.  Correct.

22   Q.  It's dated March 28th of 2014?

23   A.  Correct.

24   Q.  And this is an e-mail that where Dr. Cline is reminding

25   Mr. Wisner about certain guidelines concerning genitourinary

16-2627 Leininger v USA et al  7.7.20 Vol. 2                383

1    exams; is that correct?

2    A.  Correct.

3    Q.  Did you consider it?

4    A.  Yes.

5    Q.  All right.

6           MR. KILGORE:  Your Honor, I offer Plaintiff's 78.

7           THE COURT:  Any objection to 78?

8           MS. HASTON:  Same relevancy objection, Your Honor.

9           THE COURT:  It's overruled.  Exhibit 78's received.

10   BY MR. KILGORE:

11   Q.  All right.  I want to start with the below e-mail.  On --

12   on -- on Friday, March 28th, 2014, Dr. Cline sent this e-mail

13   to Mark Wisner; correct?

14   A.  Correct.

15   Q.  And in this e-mail Dr. Cline states, "This is to review our

16   recent discussion," and then he lists four things; correct?

17   A.  Correct.

18   Q.  The first item states, "Always ask permission to examine a

19   patient, particularly for genitourinary examinations;" is that

20   correct?

21   A.  Correct.

22   Q.  All right.  Now, in terms of the timeline that we've been

23   discussing, you and I started out earlier today I showed you a

24   complaint from 2012 and you correcting me said, well, there was

25   actually one from 2011; right?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    384

1   A.  Correct.

2   Q.  Concerning Mr. Wisner?

3   A.  Yes.

4   Q.  Okay.  So now here we are two years later; correct?

5   A.  Correct.

6   Q.  And Dr. Cline is reminding Mr. Wisner to ask permission to

7   examine a patient; right?

8   A.  Correct.

9   Q.  But not only to ask permission to examine a patient but

10  particularly for genitourinary examinations; correct?

11  A.  Correct.

12  Q.  All right.  Item No. 2, "Ask patients if they would like a

13  chaperone present;" is that what Dr. Cline reminds --

14  A.  Yes.

15  Q.  -- Mr. Wisner of?  Okay.

16      "Carefully chart any interaction, be it phone call,

17  conversations, or office visit."  Another -- another reminder

18  from Dr. Cline?

19  A.  Correct.

20  Q.  And the last item, "Be certain that visits are documented

21  on the correct date.  And if there is an addendum to the exam

22  or visit, it should be attached to the original visit note."

23  Is that what it states?

24  A.  Correct.

25  Q.  All right.  Now, before lunch you testified that even

1   according to Dr. Cline's testimony in -- in this litigation

2   that Mr. Wisner should have been removed from patient care

3   after two complaints, two complaints is enough; right?

4   A.  Correct.

5   Q.  So what is your view, do you believe it's sufficient -- in

6   2014 is it a sufficient response to simply remind Mr. Wisner of

7   these clinic guidelines?

8   A.  Absolutely not.

9        MS. HASTON:  Objection.

10        THE COURT:  What's the objection?

11        MS. HASTON:  Relevance.

12        THE COURT:  The objection's overruled.

13   BY MR. KILGORE:

14   Q.  All right.  I want to hand you Exhibit 80.  Dr. Kelley, I'm

15   almost to the end here of these documents.  Exhibit 80 is a

16   report of contact from May of 2014; is that correct?

17   A.  Correct.

18   Q.  And in this report it concerns a veteran and his best

19   friend who had attended an appointment with Mark Wisner; is

20   that correct?

21   A.  Correct.

22   Q.  And it reports that they were upset about the interactions

23   of -- of this provider both to him and his friend; correct?

24   A.  Correct.

25   Q.  It goes on to describe in explicit detail why interaction

386

1   with Mark Wisner was so upsetting; correct?

2   A.  Correct.

3   Q.  Did you consider it?

4   A.  Yes.

5         MR. KILGORE:  Your Honor, I offer Plaintiff's 80.

6         MS. HASTON:  Your Honor, same relevancy objection.

7         THE COURT:  The ruling is the same.  It's overruled,

8   eighty is received.

9   BY MR. KILGORE:

10  Q.  Dr. Kelley, this offers some explicit detail; is that

11  correct?

12  A.  It does.

13        MR. KILGORE:  Your Honor, I -- there's a couple of

14  these exhibits that are remaining that I do think get explicit.

15  And I mean no disrespect to the court, the counsel or -- or

16  anybody that's listening, in terms of the some of the language

17  that's going to be used in these exhibits, but, nonetheless, I

18  need to make a record of it.

19        THE COURT:  I understand.  You may proceed.

20  BY MR. KILGORE:

21  Q.  All right.  In this issue description it states, "This

22  veteran and a best friend VA -- non-military non-VA come to my

23  office to report his meeting with Mark Wisner today and was

24  upset over the interactions of this provider to him and his

25  friend."

1     Did I read that correctly?

2   A.   Correct.

3   Q.   "He stated that he had a 9:00 a.m. appointment with Mark

4   Wisner.  There had been a conversation about where he may have

5   a tattoo on his body.  Then Mark proceeds to say, 'Do you have

6   one on your penis?'  To which the veteran replied, 'No.'"

7     Did I read that correctly?

8   A.   Correct.

9   Q.   "Mark also mentioned that he must be ambidextrous because

10  he could ejaculate with both hands."

11    Did I read that correctly?

12  A.   Yes.

13  Q.   "The veteran indicated that he could shoot a weapon with

14  both hands; in how he made that association with both hands."

15    Did I read that correctly?

16  A.   Correct.

17  Q.   "The veteran also mentioned that he had a neurostimulator

18  installed and couldn't do an MRI to which Mark allegedly stated

19  that, 'Two fingers up his 'ass' would work just as well.'"

20    Did I read that correctly?

21  A.   Correct.

22  Q.   Mark referred to the veteran as "a stud?"

23  A.   Correct.

24  Q.   There was a time when Mark mentioned that the average male

25  penis is four inches.  Speaking to the veteran, "Drop your

16-2627 Leininger v USA et al  7.7.20 Vol. 2                388

1   pants and let's see who has the bigger one.  I bet you go

2   commando."

3        Did I read that correctly?

4   A.  Correct.

5   Q.  "In doing the privates area, the veteran reports that Mark

6   stretched his testicles and fondled his penis.  With the

7   prostate exam, Mark allegedly fingered all over the buttocks

8   and responded 'that's a nice guy.'"

9        Did I read that correctly?"

10  A.  Correct.

11  Q.  There was also a comment that sounded like, "Even with a

12  body like yours, you couldn't sell it to cover the cost of a

13  script."  And in parenthesis is the word "prescription."

14       Did I read that correctly?"

15  A.  Correct.

16  Q.  It goes on to state, "Mark then asked the friend to drop

17  his pants and stated, 'I would take you as a patient, too.'"

18       Did I read that correctly?

19  A.  Correct.

20  Q.  All right.  And then going on to the second page of this

21  exhibit, and this is the -- the Richard Lawrenz, again, right,

22  the patient advocate where he's stating more information about

23  his -- his interview with the patient.  And he -- and

24  Mr. Lawrenz states, "I did not have to ask why he didn't speak

25  up or leave, but volunteered that he stayed in the examination

```
 1   only to get his medications.  He thought that he would not get

 2   them."

 3       Did I read that correctly?

 4   A.  Correct.

 5   Q.  All right.  The information reported here is -- is -- is

 6   egregious; true?

 7   A.  Correct.

 8   Q.  And does it -- does it represent an escalation in

 9   Mr. Wisner's behavior?

10   A.  Absolutely.  One other comment I want to make, in reviewing

11   this, the thing I noticed and picked up on it too was in

12   regards to Mr. Lawrenz.  Mr. Lawrenz has seen several of these

13   complaints as we've highlighted here, and it's just surprising

14   to me that as these complaints were progressing that someone

15   didn't step forward and say, "Hey, I've seen this mode before,

16   I've seen this issue before."  It just seems like no one ever

17   came forward to speak on the -- on the patient's behalf.

18   Q.  And -- and, Dr. Kelley, does that -- does that refer back

19   or relate to your earlier testimony in which you were

20   expressing the view that there was no centralized reporting

21   system in place at the Leavenworth VA?

22   A.  Correct.

23   Q.  And the fact that, when information was received over and

24   over again, there was a silo effect?

25   A.  Yes.
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2

1   Q.  Patient advocates didn't know what social workers were

2   receiving and vice versa?

3   A.  Correct.

4           MS. HASTON:  Objection.

5   BY MR. THOMAS:

6   Q.  People in the chain --

7           THE COURT:  Excuse me.  What's the objection?

8           MS. HASTON:  Relevance but also leading.

9           THE COURT:  It is leading.  Mr. Kilgore, please

10  proceed with direct examination questions.  The objection's

11  sustained.

12  BY MR. KILGORE:

13  Q.  Were social workers and patient advocates sharing

14  information?

15  A.  No.

16  Q.  Exhibit 65.

17          THE COURT:  Excuse me, Mr. Kilgore, Ms. Haston, I

18  neglected to address your relevance objection.  It's overruled.

19          MR. KILGORE:  And I move to admit -- I move to admit

20  it if I hadn't already, Exhibit 80, I move to admit if I

21  didn't.

22          THE COURT:  I show 80 is in.  But just to be careful,

23  Ms. Haston, do you make the same relevance objection to 80?

24          MS. HASTON:  Yes, Your Honor.

25          THE COURT:  All right.  It's overruled.  Exhibit 80's

1   received.

2   BY MR. KILGORE:

3   Q.  All right.  Dr. Kelley, I have two reports left to talk to

4   you about.  Okay.  I want to hand you Exhibit 65.

5   A.  Thank you.

6   Q.  This is another report of contact; is that correct?

7   A.  Correct.

8   Q.  Dated May 20th, 2014; correct?

9   A.  Correct.

10  Q.  It, again, refers to a -- a veteran reporting information

11  about Mr. Wisner during a VA appointment; is that correct?

12  A.  Correct.

13  Q.  Now, this veteran refers to the fact that -- that at least

14  he felt like he was sexually assaulted during the primary care

15  appointment and that he -- that he's reporting on; is that

16  correct?

17  A.  Correct.

18  Q.  Did you consider it?

19  A.  Yes.

20       MR. KILGORE:  Your Honor, I move for admission of

21  Plaintiff's 65.

22       MS. HASTON:  Same relevancy objection, Your Honor.

23       THE COURT:  All right.  The objection is overruled.

24  It's received.

25  BY MR. KILGORE:

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    392

1   Q.  All right.  In this report of contact, the veteran

2   reports -- "During a walk-in visit on 5/20/2014 veteran

3   reported the following information about allegations he has

4   made against PCM Mr. Wisner last week on 5/15/2014 during the

5   initial VA vesting appointment.  Veteran reported that he was

6   sexually assaulted during his primary care appointment last

7   week.  He reported that his care-giver was with him also and

8   present during the entire visit.  Veteran reported that the

9   provider, Mr. Wisner, while examining his penis, stretched it

10  out and touched him inappropriately."

11       Did I read that correctly?

12  A.  Correct.

13  Q.  He also reported that Mr. Wisner asked his caregiver to

14  drop his pants as well so that Mr. Wisner could measure his

15  penis and see who was bigger.

16       Did I read that correctly?

17  A.  Correct.

18  Q.  "Veteran reported that Mr. Wisner called them both studs."

19       Did I read that correctly?

20  A.  Correct.

21  Q.  "Veteran stated that they did not leave the appointment

22  even though he was sexually assaulted because he needed his

23  pain medication."

24       Did I read that correctly?

25  A.  Correct.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                393

1    Q.  "During this time he stated that, it appeared he and his

2    caregiver had already made reports as he had stated that they

3    had spoken to the VA patient representative, the VA police, and

4    the Leavenworth police.  Veteran confirmed he had made the

5    above reports."

6    A.  Correct.

7    Q.  Did I read that correctly?

8    A.  Right.

9    Q.  Significant?

10   A.  Yes.

11   Q.  Same reasons?

12   A.  Yes.

13   Q.  All right.  Exhibit 102, Dr. Kelley, this is -- this one's

14   titled Other Incident Report; is that right?

15   A.  Correct.

16   Q.  It's dated May 27, 2014?

17   A.  Correct.

18   Q.  Okay.  This is -- this report is concerning another veteran

19   that's reporting conduct by Mark Wisner during a physical exam;

20   is that correct?

21   A.  Correct.

22   Q.  This -- this -- this incident report provides -- it is --

23   it is explicit in its detail of what Mark Wisner said to this

24   veteran, is it not?

25   A.  Correct.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                394

1   Q.  All right.  Did you consider it?

2   A.  Yes.

3   Q.  All right.

4         MR. KILGORE:  Your Honor, I offer Plaintiff's 102.

5         MS. HASTON:  Same relevancy objection.

6         THE COURT:  The objection's overruled for the same

7   reasons articulated earlier.  102's received.

8   BY MR. KILGORE:

9   Q.  All right.  "Event details:  Veteran wishes to remain

10  anonymous.  Veteran reported to Brian Stephens, MA,

11  readjustment counseling therapist for LEA addiction treatment

12  program (my supervisee) that during a physical exam on Tuesday

13  with Mark Wisner, Mr. Wisner pinched the veterans nipples and

14  then asked him if he 'wanted me to fuck him up the ass or did I

15  want to fuck him up the ass.'  This information was then

16  relayed to my supervisor Dr. Schale.  Documentation in CPRS to

17  follow."  Did I read that correctly?"

18  A.  Yes.

19  Q.  This -- this is then before Dr. Wisner was -- was

20  suspended --

21  A.  Correct.

22  Q.  -- from caring for veterans --

23  A.  Correct.

24  Q.  -- at the VA clinic --

25  A.  Correct.

1  Q.  -- in Leavenworth, Kansas?

2  A.  Yes.

3  Q.  All right.  Collectively what do these -- what do these

4  documents demonstrate?

5  A.  I think you can see it -- one, you can see red flag after

6  red flag after red flag, and there's a clearly an identifiable

7  pattern that he is going through, and you see an escalation of

8  his abuse of these -- of these gentlemen.

9       I mean, regrettably this shows a complete disregard for the

10  well-being of these guys.  I mean, there's no -- left hand is

11  not telling what the right hand is doing.  These -- these poor

12  veterans were falling through the cracks left and right.

13  People would get bits and pieces but no one was taking the time

14  to put the information together, and it's -- it's sad.  I mean,

15  it's -- it's tough to listen to that, to be perfectly honest

16  with you.

17  Q.  Okay.  Last topic that I just want to touch on briefly with

18  you.  You -- you had indicated -- you had indicated in your

19  report that these deviations from the standard of care that

20  we've been talking about harmed Aaron Leininger; is that right?

21  A.  Correct.

22  Q.  And we talked a little bit earlier about, you know, how

23  patients are vulnerable during physical exams.  As a medical

24  doctor, can you just briefly tell us why the nature of the --

25  Mr. Wisner's conduct with respect to the plaintiff in this case

1   is harmful in that practitioner-patient relationship?

2   A.  Well, we've talked about it before.  There's a

3   vulnerability there.  There's an inherent power structure with

4   a physician wielding more power than the patient.  And because

5   of that, you have to be cognizant of that power.  You have to

6   be cognizant of not taking advantage of that power.

7       And when you have somebody vulnerable like Mr. Leininger,

8   you're looking at a guy who feels humiliated.  He feels angry.

9   I mean, he's upset.  He has a great deal of distrust now.  He's

10  told me he -- his distrust is such he doesn't want to go to the

11  VA anymore to be managed there.  This is -- this can ruin a

12  person's perception of the healthcare system.

13      And I guess what gets me in the gut is guys like this who

14  experience this, when they really need care, they don't get it

15  and then things get worse.  So a situation like this really has

16  long-range, long-term, you know, consequences.

17  Q.  And for Aaron Leininger, can it result in distrust?

18  A.  Absolutely.

19  Q.  Anger?

20  A.  Yes.

21  Q.  Humiliation?

22  A.  Yes.

23  Q.  Shame?

24  A.  Yes.

25  Q.  Embarrassment?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                  397

1   A.  Yes.

2   Q.  Emotional distress?

3   A.  Yes.

4   Q.  Did you review the deposition testimony of Dr. Michael

5   Leeson?

6   A.  Yes.

7   Q.  What did Dr. Leeson have to say about that subject?

8   A.  He felt exactly as I did, that he can see where patients

9   would have a tremendous amount of distrust in the system.

10  Q.  And can you remind us, who is Dr. Leeson?

11  A.  He's the interim chief of staff of the hospital.

12  Q.  Any doubt that the conduct of Mr. Wisner in this case was

13  foreseeable to the VA?

14  A.  No doubt in may mind.

15  Q.  Was it?

16  A.  Yeah, it was absolutely foreseeable.

17  Q.  Dr. Kelley, have all the opinions you've expressed here

18  today been expressed within and based on a reasonable degree of

19  medical certainty?

20  A.  Yes.

21          MR. KILGORE:  I have no further questions.  Thank you

22  very much.

23          THE COURT:  Cross-examination.

24                      CROSS-EXAMINATION

25  BY MS. HASTON:

16-2627 Leininger v USA et al  7.7.20 Vol. 2            398

1   Q.  Dr. Kelley, my name is Sarah Haston.  I'm an attorney for

2   the United States.  Can you hear me okay?

3   A.  Yes, I can.  Thank you.

4   Q.  Okay.  I'd like to just go over your background to make

5   sure I have this right.  So you're a family physician; is that

6   right?

7   A.  Correct.

8   Q.  And you work in a private practice with three other

9   physicians; is that right?

10  A.  I work with three other physicians, yes.

11  Q.  And do you work in a -- you work in a private practice;

12  correct?

13  A.  Correct.

14  Q.  You worked in that practice essentially your entire career;

15  isn't that right?

16  A.  Yes, and in that -- yes, in that general practice, yes.

17  Q.  And that would be about 22 years; right?

18  A.  Correct.

19  Q.  You're not a physician's assistant; right?

20  A.  No, ma'am.

21  Q.  And you don't currently have any physician's assistants

22  working in your practice; is that right?

23  A.  Not currently.

24  Q.  But you have had physician assistants work in your past;

25  right?

1  A.  Correct.

2  Q.  Of the 22 years that you've worked in that practice,

3  approximately how many years have you had a physician's

4  assistant working there?

5  A.  I would say approximately two to four years.

6  Q.  Two for four years.

7      Okay.  In those two to four years, did you ever have a

8  physician's assistant criminally investigated for sexual

9  assault?

10  A.  No.

11  Q.  Dr. Kelley, you brought up Dr. Larry Nassar on your direct

12  examination with Mr. Kilgore.  Do you remember that?

13  A.  Correct.

14  Q.  And Dr. Nassar is in prison for sexually assaulting female

15  gymnasts; isn't that right?

16  A.  Correct.

17  Q.  More specifically, he conducted ungloved vaginal and rectal

18  examinations on female gymnasts; isn't that right?

19  A.  Correct, as I understand it.

20  Q.  And you suggested -- and you suggested that Dr. Nassar's

21  conduct, although criminal, could be considered a breach of the

22  standard of care?

23  A.  Correct.

24  Q.  But you're not telling the court that Dr. Nassar's ungloved

25  vaginal and rectal examinations on female gymnasts constituted

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    400

1   the practice of medicine; right?

2   A.  Well, he was using it under the guise of medicine.  He was

3   doing osteopathic manipulations.  So he'd been doing this for a

4   number of years, using those techniques.  So he was using it

5   under the guise of medicine.  I wouldn't personally call it

6   medicine, but he was using it as such.

7   Q.  And you're not telling the court that there was a medical

8   purpose for Dr. Nassar's ungloved vaginal and rectal

9   examinations of female gymnasts; right?

10  A.  No, I'm not.

11  Q.  And in this case you've admitted that what Mr. Wisner did

12  to Mr. Leininger, in conducting these ungloved genital

13  examinations, was assault; right?

14          MR. KILGORE:  I object because I think it misstates

15  his testimony.

16          THE COURT:  The objection's overruled.

17          THE WITNESS:  I'm sorry, could you, please -- can you

18  say that again?

19  BY MS. HASTON:

20  Q.  There is no doubt that Mr. Wisner's ungloved, prolonged

21  genital examinations on Mr. Leininger were sexual assault;

22  right?

23          MR. KILGORE:  Your Honor, I'm sorry.  I just object to

24  the extent that it calls for a legal conclusion as to what is

25  criminal, what is not.  What he was talking about is

```
 1    acknowledging -- acknowledging that he had been convicted of

 2    crimes based on the public record.

 3          THE COURT:  Yeah, I'm going to overrule the objection.

 4    You went into this with him at some length.  I think it's fair

 5    game for cross.  Overruled.

 6          THE WITNESS:  So his -- his exam was sexual abuse but

 7    it was also a deviation of the standard of care.

 8    BY MS. HASTON:

 9    Q.  But you're not saying there was a medical purpose to that

10    sexual abuse; right?

11    A.  Well, there could be a medical purpose.  I mean, there

12    could be a -- if he's doing those exams repetitively, he may

13    come across something in those short intervals.  It is a

14    possibility.

15    Q.  Now, Dr. Kelley, you reviewed Mr. Leininger's medical

16    records in this case; right?

17    A.  Correct.

18    Q.  And you interviewed Mr. Leininger in this case; right?

19    A.  Correct.

20    Q.  You never found one instance where Mr. Wisner upon

21    happenstance found some sort of pathology or a medical issue in

22    conducting these prolonged, ungloved medical -- genital

23    examinations; right?

24    A.  To my knowledge, no, he didn't express any.

25    Q.  And you didn't find any in the medical records; correct?
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    402

1    A.   I couldn't, no.

2    Q.   And, Dr. Kelley, you also explained to Mr. Kilgore your

3    opinion that the failure to wear gloves during a genital

4    examination could be a standard of care issue because it

5    potentially exposes a patient to diseases; isn't that right?

6    A.   Correct.

7    Q.   But, in your review of plaintiff's medical records and your

8    interview of the plaintiff, you never found an instance where

9    plaintiff incurred such a disease; right?

10   A.   No.

11   Q.   And you're aware that the plaintiff is not claiming that he

12   contracted such a disease from Mr. Wisner; right?

13   A.   Correct.

14   Q.   Dr. Kelley, if you were performing a genital examination,

15   there's no doubt that you would wear gloves; right?

16   A.   Correct.

17   Q.   Now, Dr. Kelley, you mentioned some comments that the

18   plaintiff told you Mr. Wisner said to him, a comment where

19   Mr. Wisner commented on the endowment of the patient, the size

20   of his penis; correct?

21   A.   Correct.

22   Q.   And you're not suggesting that that comment served a

23   medical purpose; right?

24   A.   No, I'm not.

25   Q.   You also noted that Mr. Wisner commented on the

16-2627 Leininger v USA et al  7.7.20 Vol. 2                403

1   satisfaction of Mr. Leininger's spouse in the context of these

2   exams, but you're not suggesting that comment served a medical

3   purpose; right?

4   A.  No.

5   Q.  Now, Dr. Kelley, you're aware that the plaintiff had

6   multiple exams with Mr. Wisner; correct?

7   A.  Correct.

8   Q.  In fact, I believe you went through nine?

9   A.  Correct.

10  Q.  But you'll agree with me that the report you provided in

11  this case does not speak with any specificity to any particular

12  examination the plaintiff had with Mr. Wisner; right?

13  A.  Not -- not any specific examination, no.

14  Q.  There are no dates mentioned in your report; isn't that

15  right?

16  A.  Correct.

17  Q.  No citations to the medical records in your report; is that

18  right?

19  A.  Direct citation, no.

20  Q.  Now, Dr. Kelley, in your report, you opined that a thorough

21  genital examination takes between 30 seconds to one minute;

22  isn't that right?

23  A.  Correct.

24  Q.  But you mentioned that an examination lasting beyond one

25  minute could potentially reveal some sort of pathology or mass?

1   A.  If you -- if you were -- yes, I mean, if I personally was

2   examining somebody and I was going beyond a minute, I was

3   already -- I'm already looking for something or I think I may

4   have found something.  So if I go beyond that point in time,

5   I'm explaining to the patient what I'm going there, what I'm

6   doing, what's the purpose of me extending this beyond that

7   minute's time frame.  So it is possible you could find

8   something and have to extend it.

9   Q.  And here Mr. Leininger told you that these examinations

10  lasted two to three minutes; right?

11  A.  Correct.

12  Q.  And, again, Mr. Wisner did -- you found no evidence that

13  Mr. Wisner actually found anything in that extra prolonged

14  time; correct?

15  A.  Correct.

16  Q.  Now, Dr. Kelley, you went over a number of documents with

17  Mr. Kilgore involving patient complaints; right?

18  A.  Correct.

19  Q.  None of those complaints were made by Mr. Leininger;

20  correct?

21  A.  Correct.

22  Q.  Okay.  I want to talk to you specifically about Exhibit

23  No. 82.  We know that there's some redactions that were missing

24  in a document.

25          MS. HASTON:  I believe we have a redacted version that

1   we can pull up; isn't that right?

2   BY MS. HASTON:

3   Q.   Okay.  And if we turn to page 7 of this document.

4   Dr. Kelley, this document is referring to the actions of a

5   nurse; right?

6   A.   Correct.

7   Q.   You didn't speak to the patient who made this complaint,

8   did you?

9   A.   No.  My understanding, though, that this was a part of what

10  the VA system sent Mr. Kilgore's firm and -- when they asked

11  for records regarding Mr. Wisner.  So for whatever reason, it

12  seemed to be in their file.

13  Q.   Okay.  And that's what the attorney told you but you don't

14  actually know that this document pertains to Mr. Wisner; right?

15  A.   I -- my assumption is it was, so...

16  Q.   But you don't know that?

17  A.   I don't know 100 percent.

18  Q.   Dr. Kelley, do you recall discussing a VHA Directive 1063

19  with Mr. Kilgore during your direct examination?

20  A.   Yes.

21  Q.   Okay.  And that was marked as Exhibit 59.

22       MS. HASTON:  If we could pull that up, please.  If we

23  turn to page 4 of this document down towards the bottom of

24  this.  I apologize it's page 4 on the document.  It's actually

25  page 5 of the exhibit.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                406

```
1    BY MS. HASTON:

2    Q.  And that paragraph (j), this is a physician assistant.  It

3    says, "A physician assistant is responsible for:

4        Subparagraph (2):  Ensuring that their clinical activities

5    are within their scope of practice and are medically and

6    ethically appropriate."

7        Did I read that correctly?

8    A.  Correct.

9    Q.  You're not suggesting that Mr. Wisner's repeated sexual

10   assaults of Mr. Leininger were medically appropriate, are you?

11   A.  Well, I think there's two aspects to this.  One is I think

12   his ability to do those genital exams and do those physical

13   exams are well within the scope of his practice.

14       And then when he -- when the length of time in which he did

15   those exams and the not using gloves, those were not medically

16   or ethically appropriate, and that's the deviation from the

17   standard of care.

18   Q.  So what I hear you saying is that providing genital

19   examinations would be potentially within a PA's scope of

20   practice, but the way Mr. Wisner performed them on

21   Mr. Leininger, those genital -- genital examinations, were not

22   medically or ethically appropriate; correct?

23   A.  Well, I would not say potentially.  I think they are

24   clearly a part of the scope of practice.  It falls well within

25   their scope of practice, and I think medically and ethically
```

1    they were not appropriate.

2    Q.  And when you say "they" you mean the genital examinations

3    Mr. Wisner performed on Mr. Leininger; correct?

4    A.  Yes.  I'm sorry.  Thank you.

5    Q.  Yep.

6        And, Dr. Kelley, sexually molesting a patient, that's

7    inconsistent with the practice of medicine; right?

8    A.  Correct.

9    Q.  There's never a medical reason to sexually molest a

10   patient; right?

11   A.  No.

12   Q.  You have no doubt that Mr. Wisner's conduct towards

13   Mr. Leininger was intentional; right?

14   A.  I think when you say intentional, again, we're dealing with

15   a situation of mixed motives.  You've got a guy who wants to be

16   thorough.  You got a guy but he's also got this sexual

17   curiosity.  And I think that sexual curiosity, you know,

18   clouded his objectivity, it clouded his judgment.  And I think

19   it over -- overwhelmed his more appropriate intent of good

20   care.  So, I mean, he's an impaired guy.  So did he actually

21   directly intend to do that all the time?  He's impaired.  So

22   his intent was mixed, that's for sure.

23   Q.  But what he did to Mr. Leininger was sexual assault; right?

24   A.  Yes.

25           MS. HASTON:  Okay.  I have nothing further.  Thank

16-2627 Leininger v USA et al  7.7.20 Vol. 2          408

```
 1    you.
 2               THE COURT:  Redirect for the witness.
 3               MR. KILGORE:  Just a few questions.
 4                     REDIRECT EXAMINATION
 5    BY MR. KILGORE:
 6    Q.  Dr. Kelley, you were asked about your practice
 7    specifically --
 8    A.  Yep.
 9    Q.  -- and the number of years you used and utilized your PAs
10    in your practice.  You are familiar with the role of PAs in the
11    field of primary care medicine; right?
12    A.  Absolutely.
13    Q.  And when it comes to issues like auditing records,
14    collaborating with a physician extender, it doesn't really
15    matter whether or not it's an RN or a PA, the issues are the
16    same?
17    A.  Concepts are the same, the processes are the same,
18    absolutely.
19    Q.  And then last thing, I mean, you were asked about the level
20    of detail that you provided with respect to Mr. Leininger's
21    visits -- clinical visits with Mr. Wisner.  And it's undisputed
22    that Mr. Leininger saw Mr. Wisner for nine clinical visits;
23    correct?
24    A.  Correct.
25    Q.  And it's undisputed that at each of those nine visits that
```

1    Mr. Wisner performed a genital exam; correct?

2    A.   Correct.

3    Q.   And it's undisputed that on each of those nine occasions

4    Mr. Wisner did so without using gloves; correct?

5    A.   Right.

6         MR. KILGORE:  I have no further questions.  Thank you.

7         THE COURT:  Recross for the witness.

8         MS. HASTON:  I have nothing further, Your Honor.

9         THE COURT:  All right.  Mr. Kelley, you may step down.

10        May the witness be released?

11        MR. KILGORE:  Yes.

12        THE COURT:  Defendants, any objection from your room?

13        MS. HASTON:  No, Your Honor.

14        THE COURT:  All right.  Very well, thank you.

15        Plaintiff may call his next witness.

16        MR. THOMAS:  Your Honor, do you want us to take a

17   bathroom break or roll right in?

18        THE COURT:  If you're telling me you need one, we'll

19   take one.  If you're prepared to go forward, we'll go forward.

20        MR. THOMAS:  We also have to sanitize our witness box.

21        THE COURT:  Those are good reasons.  Thank you for

22   letting me know.  I couldn't see that going on.  We'll take our

23   15 minutes here and plan to resume at five after 3 o'clock.

24        (Recess.)

25        THE COURT:  All right.  Counsel, we're back on the

```
 1   record, so let me just check signals on a couple things.  Let

 2   me just get a sound check.  Okay.  On the plaintiff's room,

 3   hear and see me?

 4           MR. THOMAS:  Yes, Your Honor.

 5           THE COURT:  All right.  Good.  How about from the

 6   defense side of the caption?

 7           MS. HASTON:  Yes, Your Honor.

 8           THE COURT:  Good.  Thank you very much.

 9           So let me just -- Mr. Thomas, you're standing there.

10   I preempted your attempt to make a short record this morning on

11   an exhibit.  Have we already dealt with that issue later during

12   the direct?

13           MR. THOMAS:  We did not, Your Honor.

14           THE COURT:  Okay.  Why don't we do this, I think you

15   have a -- does it matter for this witness?

16           MR. THOMAS:  No, sir.

17           THE COURT:  Why don't we take it up and not intrude on

18   -- on the witness's testimony.  We'll come back to that and

19   then I just don't want to lose track to that -- of the

20   defendant's objection to the Exhibit 200 according to the

21   defense view exceeded the scope of Dr. Kelley's expert report.

22   Naturally, I don't have that expert report.  At least I'm aware

23   it may have been marked in one of the exhibits.  If you want to

24   direct me to that exhibit number, then we can have a meaningful

25   discussion about the dissidence you claim to exist.
```

1          Ms. Haston, you're up, maybe you know the exhibit

2     number I need to exam.

3          MS. HASTON:  Your Honor, I do not believe --

4     Mr. Kilgore, can correct me if I'm wrong -- I do not believe it

5     was entered into evidence, but I think it's marked as exhibit

6     -- Plaintiff's Exhibit 161; is that right?

7          THE COURT:  Okay.

8          MR. THOMAS:  That's correct.

9          THE COURT:  Okay.  Thanks.  I knew after yesterday's

10    ruling I don't think they offered the report but I will try to

11    get access to a copy of that report and then come back, compare

12    Exhibit 200, and hear from you later.  But we don't need to do

13    that today, I just want to remind you to remind me.

14         All right.  Mr. Thomas, it looks like you're prepared

15    to call your next witness.

16         MR. THOMAS:  I am, Your Honor.

17         THE COURT:  Please.

18         MR. THOMAS:  May it please the court.

19         THE COURT:  Counsel.

20         MR. THOMAS:  Ma'am, can you, please, introduce

21    yourself?

22         THE WITNESS:  My name is Mary Leininger.

23         THE COURT:  Can I ask the witness, please, to raise

24    your right hand to accept the oath from the deputy clerk.

25                        MARY LEININGER,

16-2627 Leininger v USA et al  7.7.20 Vol. 2                412

1   called as a witness on behalf of the Plaintiff, having first

2   been duly sworn, testified as follows:

3           THE COURT:  Mr. Thomas.

4           MR. THOMAS:  Sorry about that, Your Honor.

5           THE COURT:  That's all right, quite all right.  We're

6   still getting used to the new format.  We'll get there.

7           MR. THOMAS:  Yes, sir.

8                    DIRECT EXAMINATION

9   BY MR. THOMAS:

10  Q.  Could you reintroduce yourself?

11  A.  Yes.  My name is Mary Leininger.

12  Q.  And, Ms. Leininger, are you married to Aaron Leininger?

13  A.  Yes, I am.

14  Q.  Where are you from originally?

15  A.  I'm originally from Charleston, West Virginia.

16  Q.  I could have told that even if I didn't know that already.

17      Can you briefly explain to the court what your educational

18  background is?

19  A.  High school dropout.

20  Q.  Okay.  You went up to 10th grade; is that right?

21  A.  Got to 10th grade, yes.

22  Q.  Wonderful.  Are you currently employed?

23  A.  I am.

24  Q.  Where do you work?

25  A.  Minute Mart.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                413

```
 1   Q.   How did you and Mr. Leininger meet?

 2   A.   He was in West Virginia on a assignment for his employer.

     They were opening a new branch out there and we met on

 4   New Year's Eve.

 5   Q.   And what year was that?

 6   A.   '97-'98.  The end of '97, first of '98.

 7   Q.   So it was New Year's Eve, December 31st, 1997 going into

 8   1998?

 9   A.   Correct.

10   Q.   Gotcha.  Okay.  And that was in West Virginia?

11   A.   Yes.

12   Q.   Do you know what a whirlwind romance is?

13   A.   What is that?

14   Q.   Did you fall in love fast?

15   A.   What?  That love at first sight type of deal?

16   Q.   Yes.

17   A.   Yes.

18   Q.   In fact, how -- how quickly did you all move in together?

19   A.   It was, like, right at three months maybe.

20   Q.   Yeah.

21   A.   Yeah.

22   Q.   Did your mom give you grief about that?

23   A.   Yes.

24   Q.   And how long have you been together now?

25   A.   Oh, it will be 23 years this year --
```

1   Q.   I guess --

2   A.   -- this year.

3   Q.   I guess you proved her wrong?

4   A.   I did.

5   Q.   How long have you been married to Mr. Leininger?

6   A.   Fifteen years.

7   Q.   Was he still in the Army when you met?

8   A.   No.

9   Q.   Did he ever talk to you about his time in the Army?

10  A.   No.

11  Q.   Does he like to talk about it?

12  A.   No.

13  Q.   Is it your understanding --

14       Well, do you know if he has what's called posttraumatic

15  stress disorder as a result of his military service?

16  A.   Yes.

17  Q.   And he does have it as far as you know?

18  A.   Yes.

19  Q.   Okay.  What kind of symptoms have you seen --

20       Well, let me ask it a different way.  Have you seen him --

21  have you seen symptoms of that PTSD throughout your marriage?

22  A.   Yes.

23  Q.   And what symptoms have you seen and experienced from

24  Mr. Leininger?

25  A.   In the beginning, heavy alcohol drinking.  When -- right

```
 1   before he moved in, when I were to stay over, there was night

 2   problems, nightmares, night sweats, things like that.  Now he

 3   did inform me not to, you know, abruptly awake him.

 4   Q.  Why did he tell you not to abruptly awake him?

 5   A.  Because he thought -- he was scared that, you know, in his

 6   state of mind that, you know, waking him that sudden, it put

 7   him back into fear mode, I guess, or protect mode to protect

 8   him and --

 9   Q.  Was he -- was he afraid that he could hurt you?

10   A.  Yes.

11   Q.  Were there ever times where you could watch him sleep and

12   tell if he was having a nightmare?

13   A.  Absolutely.

14   Q.  How can you tell?

15   A.  Thrashing and moving and he would, you know, talk in his

16   sleep as -- not like a normal talk like.  You know, "hide

17   here," let's go to this," you know, I mean, he would, like, use

18   "bunker" or things of that nature that I didn't quite

19   understand what he was saying but I kind of figured it had

20   something to do with being in the military.

21   Q.  Did you say jad, J-A-D?

22   A.  Hide.

23   Q.  Hide.  Okay.

24       Has his PTSD gotten worse since you've known him?

25   A.  Worse?  I want to say maybe it was, like, the worst in the
```

 1   beginning, and then at one point he was getting some, you know,

 2   help for that and then it seemed to decrease.  I want to say my

 3   point of view, after he stopped drinking, it helped quite a

 4   bit.

 5   Q.  Okay.  And then after the stuff started coming out about

 6   Mark Wisner, did the PTSD symptoms start coming back?

 7            MR. EISER:  Objection.  Leading.

 8            THE COURT:  Overruled.

 9   BY MR. THOMAS:

10   Q.  We'll get to that in a minute.  Has your husband received

11   medical treatment for his PTSD over the -- over the years?

12   A.  Yes.

13   Q.  Has it been consistent?

14   A.  No.

15   Q.  How would you describe it?

16   A.  Well, again, in the beginning he wanted to help, again,

17   after the alcohol had ceased and then through, you know, his

18   medical treatment.  And it got to the point to where, again, he

19   wanted me to -- I -- to wake him, I would stand afar, I

20   wouldn't -- even married I would stand afar and be like,

21   "honey," you know.

22   Q.  Do you worry about him?

23   A.  I worry about him all the time.

24   Q.  Do you remember an incident in 2011 when he was

25   hospitalized?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                417

1   A.   I remember from what I was told.  I was not in the state at

2   the time.  My mother was passing --

3   Q.   Uh-huh.

4   A.   -- so I was with my mother.

5   Q.   Right.  Let me ask you this:  Did he call you?

6   A.   Yes.

7   Q.   And when he called you, what did he tell you?

8   A.   He was very frantic.  He was very scared.  He said that he

9   was scared to be alone and that, you know, he thought that he

10  needed someone to -- to be there.  And then he said that he had

11  to go on the call.  And then after that is when I got a call

12  from the hospital saying that he was at the -- the Topeka I

13  think is where they took him.

14  Q.   Okay.  Were you surprised to get that call?

15  A.   Very.

16  Q.   Were you worried?

17  A.   Very.  As a matter of fact, I came -- I -- I left mom.  Mom

18  told me, "Go take care of your husband."

19  Q.   Your mother who was dying told you to go and take care of

20  your husband who was being institutionalized?

21       (Court reporter interruption.)

22       THE COURT:  The question that was pending that the

23  court reporter didn't hear the answer to was this question:

24  Your mother was dying.  Told you to go and take care of your

25  husband who was being -- I'm sorry -- yes, who was being

1    institutionalized?

2           THE WITNESS:  Yes.

3    BY MR. KILGORE:

4    Q.  That's just the microphone.  We're going to move it a

5    little closer and I'm going to try to speak up as well.  Okay?

6    A.  Okay.

7    Q.  The defendants have hired an expert named Dr. Abrams who

8    testified that this was all a fake, that Aaron was just trying

9    to get hospitalized so he could get disability benefits.  Do

10   you think that?

11          MR. EISER:  Objection.  Objection.

12          THE COURT:  What is the objection?

13          MR. EISER:  Dr. Abrams hadn't testified.

14          THE COURT:  Well, that's true.  Mr. Eiser, you can --

15   are you contending that he can't ask about an opinion that was

16   expressed in the -- in his deposition?

17          MR. EISER:  Well, what he's talking about we're not

18   intending to bring in; we've said that at the beginning in our

19   opening statement.  So if he wants to bring it out on cross

20   from Dr. Abrams he can, but it's not in evidence.

21          THE COURT:  Mr. Thomas, do we need to go into an

22   opinion apparently is not -- that's apparently is not going to

23   be rendered?

24          MR. THOMAS:  I didn't realize that, Your Honor.  We

25   actually took a trial deposition of him and it was offered.  So

```
 1    I apologize; no need to go into it.
 2            THE COURT:  Okay.  We'll move on.  Thank you very
 3    much.
 4    BY MR. THOMAS:
 5    Q.  Did you believe that this was real?
 6    A.  Absolutely.
 7    Q.  Did you think that he was faking it?
 8    A.  No.
 9    Q.  Does your husband -- well, is your husband in treatment now
10    for his PTSD?
11    A.  No.
12    Q.  Why not?
13    A.  I think he has a fear of -- of talking with one, going back
14    to -- to -- to get -- to get medical help.
15    Q.  In your deposition you were asked a question about if he
16    had ever told you he doesn't want to go back to the VA.  Do you
17    remember that?
18    A.  I do.
19    Q.  Do you remember your husband ever telling you that he
20    didn't want to go back to the VA?
21    A.  He said he didn't want to go back to the VA but I -- I -- I
22    don't know if he meant all in general or just the one in
23    particular.
24    Q.  Sure.
25        Do you think -- how strong was he on that?  Do you think
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    420

 1  you could talk him out of it or was he adamant?

 2  A.  At the time he said it, he was adamant.

 3  Q.  Uh-huh.  And you're able -- are you able to recall when

 4  that time frame was based on some other events in your life?

 5  A.  No.

 6  Q.  Do you remember -- who's Melanie?

 7  A.  Melanie?

 8  Q.  Or do you have a daughter?

 9  A.  Miranda.

10  Q.  Miranda.

11     What year did Miranda graduate from high school?

12  A.  2014.

13  Q.  2014.

14     Does that refresh your memory of when Aaron said he didn't

15  want to go back?

16  A.  Yeah.

17  Q.  Was it around the same time?

18  A.  It was around that area.

19  Q.  Did you know -- he has had to go back several times since

20  then.  Did you know that?

21  A.  I did not.

22  Q.  Did you know he's gone to the emergency room since then?

23  A.  I know he's went to the emergency room, yes.

24  Q.  Have you encouraged him to get treatment for his PTSD?

25  A.  Yes.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                421

1    Q.  How does he respond?

2    A.  I would say now he's a little more apt to want to give it a

3    try.

4    Q.  Does he like to talk about the things that happened to him?

5    A.  No.

6    Q.  Does he like to tell you when things are bothering him?

7    A.  No.

8    Q.  Do you think he needs help?

9    A.  I do.

10   Q.  Is your husband isolated?

11   A.  Very.

12   Q.  What does he do when he gets home?

13   A.  He comes home.  He showers.  He goes to the bedroom to

14   watch TV or play video games.  And then the duration of the

15   day, he'll spend in the room.

16   Q.  Checked out and isolated?

17   A.  (Witness nods head.)

18   Q.  Does he -- is he able to help you around the house?  And

19   you can be honest.

20   A.  He's able to.

21   Q.  Does he?

22   A.  Sometimes.

23   Q.  Doesn't do it very often?

24   A.  No.

25   Q.  Who has to do most of the work?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                422

1    A.   Me.

2    Q.   Does that cause stress in your marriage?

3    A.   Yes.

4    Q.   Do you understand why he isolates?

5    A.   I'm getting a bigger picture of it, yes.

6    Q.   Because he's struggling with the things he's been through?

7    A.   Yes.

8    Q.   How long has it been since you and your husband were able

9    to go out together?

10   A.   We haven't been out on a date probably six years.

11   Q.   Maybe even longer?

12   A.   Probably.

13   Q.   Who was his best friend?

14   A.   Michael Elkins.

15   Q.   How long have they been best friends?

16   A.   Since they were two.

17   Q.   Does he hang out with Michael Elkins anymore?

18   A.   No.

19   Q.   How long has it been?

20   A.   He hasn't.  They've -- a long time, probably six years or

21   so.

22   Q.   Like many PTSD suffers, has your husband struggled with

23   drugs and alcohol?

24   A.   Alcohol.

25        MR. EISER:  Objection.  Leading.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                          423

```
 1              THE COURT:  It's not leading.  It does not suggest the
 2    answer.  It's overruled.
 3              MR. EISER:  Thank you, Your Honor.
 4              THE WITNESS:  Alcohol, yes.
 5    BY MR. THOMAS:
 6    Q.  And you mentioned earlier that was a big problem --
 7    A.  It was --
 8    Q.  -- in the marriage?
 9    A.  -- yes.
10    Q.  Does he drink anymore?
11    A.  No.
12    Q.  How long has it been since he had a drink?
13    A.  Almost 14 years.
14    Q.  Did he ever use illegal drugs in front of you?
15    A.  In front of me, no.
16    Q.  Did you know that at some point he used to use
17    methamphetamine?
18    A.  I did.
19    Q.  How long has it been since he's used methamphetamine?
20    A.  That's been a while, too.
21    Q.  Uh-huh.
22        And there was a time when he was addicted to opiates; is
23    that right?  Or did you know that?
24    A.  I -- well, I didn't know he was having a problem, but I
25    knew he was taking opiates, yes.
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2          424

1   Q.  Does he take any opiates now?

2   A.  No.

3   Q.  Did you and your husband have a practice of going to each

4   other's medical appointments?

5   A.  Yes.

6   Q.  Is that something that you have -- have -- is that

7   something you pushed?

8   A.  I won't say pushed, but yes, I mean, I wanted him with me

9   with mine and I'd like to go with his.

10  Q.  You had some medical issues as a teenager; right?

11  A.  I've had medical issues.  I've had cancer three times.

12  Q.  And who used to go to all your cancer appointments?

13  A.  Aaron.

14  Q.  And why is it that you like to go to his doctor's

15  appointments and you like him to go to yours?

16  A.  Well, you know, when you're going to an appointment if an

17  appointment -- you know, when the doctor's talking to you, you

18  can't grasp everything, especially when you're upset, when you

19  get, you know, bad news or whatnot.  So it's better to have

20  someone else that can hear, you know, what you missed.

21  Q.  Uh-huh.

22  A.  So I would much -- have my husband with me to catch what I

23  didn't and vice versa.

24  Q.  Does he still go to your medical appointments?

25  A.  Absolutely.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                425

1  Q.  And when he goes, does he go in the exam room with you?

2  A.  Yes.

3  Q.  When your husband began treating with Mark Wisner, did you

4  try to go to those appointments with him?

5  A.  Yes.

6  Q.  Did you try to go in the exam room?

7  A.  I would sit in there until the doctor came in, yes.

8  Q.  And then what would happen when Mr. Wisner came in?

9  A.  He would come in and ask me to leave the room so that they

10  can finish their, you know, appointment.

11  Q.  In all the years you've been going to Aaron's medical

12  appointments, is there any other provider that asked you to

13  leave the room?

14  A.  No.

15  Q.  How many times did you go before you stopped going?

16  A.  Maybe four or five times and --

17  Q.  Why did you stop going --

18  A.  I --

19  Q.  -- as it relates to this Wisner character?

20  A.  Well, why would I go if I can't go in with him to hear

21  what's being told to him so that he can have that second ear

22  also.

23  Q.  At the time your husband was seeing Mark Wisner, did he

24  ever tell you what was happening in those rooms?

25  A.  No.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    426

1    Q.   Has he ever told you about it to this day?

2    A.   No.

3    Q.   Has he ever expressed concern to you about it?

4    A.   He didn't express, but I could see that something was wrong

5    or something was off, something was different.

6    Q.   Would you support your husband in getting help with PTSD?

7    A.   One hundred percent.

8    Q.   I asked you if he had ever talked to you about what

9    happened between him and Wisner.  Has he ever talked to you

10   about what he saw and did in the war?

11   A.   He won't talk about that with me.

12   Q.   Have you encouraged him to get help over the years?

13   A.   Absolutely.

14   Q.   At the end of this case, we're going to ask the court to

15   award damages so he can get the help he needs -- he needs.

16   Will you work, if that happens, to making sure Mr. -- your

17   husband gets the help he needs?

18   A.   Absolutely.

19   Q.   Now, one of the things the expert also -- our expert also

20   recommended is that because this has affected your marriage

21   that you get couple's counseling.

22   A.   That would be wonderful.

23   Q.   Okay.  And he's -- he's actually recommended 150 therapy

24   sessions with a marital counselor.  We don't know what the

25   court 's going to do.  But if the court were to provide the

```
 1    money so you could do that, would you do it?
 2    A.   Yes.
 3    Q.   And would you make sure Aaron does it?
 4    A.   Yes.
 5              MR. THOMAS:  No further questions.
 6              THE COURT:  All right.  Cross-examination.
 7                          CROSS-EXAMINATION
 8    BY MR. EISER:
 9    Q.   Ms. Leininger, can you hear me okay?
10    A.   Yes, sir.
11    Q.   Okay.  Good afternoon.
12         I think you said you've been married since 2005; is that
13    right?
14    A.   Yes.
15    Q.   And at the beginning of your relationship, you and your
16    husband did quite a few fun activities, you explained, such as
17    hunting, fishing, camping and canoeing; is that right?
18    A.   Yes.
19    Q.   Okay.  Now, you haven't done any of those outdoor
20    activities for more than a decade; correct?
21    A.   Close to, yes.
22    Q.   I'm sorry, I didn't hear you, ma'am.
23    A.   Yes.
24    Q.   Okay.  So that would be back before 2010; is that right?
25    A.   Before 2010?
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    428

1   Q.  Yeah.  You told us -- this is more than a decade.  This is

2   20- --

3   A.  Well, yeah, more than a decade as far as all the fun

4   activities, yes, but then I was --

5   Q.  Okay.  I'm sorry, go ahead.

6   A.  No, go ahead.  I was -- I was --

7   Q.  All right.  Well, and the -- I guess is there -- is there

8   something different other than -- those all sound like fun

9   activities.  And you were talking about you haven't had any fun

10  activities, and that goes back to 2010; is that right?

11      You have to say yes or no.

12  A.  I'm sorry.  Yes.

13  Q.  What was the answer?

14  A.  Yes.

15  Q.  Okay.

16  A.  Can you not hear me?

17  Q.  I just did.  Thank you.

18  A.  Oh, okay.  Okay.

19  Q.  Now, when -- when you -- I think you just described this.

20  When you met your husband, he suffered from PTSD as a result of

21  his military service; is that right?

22  A.  Yes.

23  Q.  Okay.  And you observed the symptoms that he had; correct?

24  A.  Yes.

25  Q.  And those were night terrors, night sweats, social

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    429

1   isolation; is that correct?

2   A.  Yes.

3   Q.  Okay.  Now, what did you mean when you said social

4   isolation?  He just wanted to keep to himself; is that what you

5   mean?

6   A.  Right.  Yes --

7   Q.  Okay.

8   A.  -- keeping to himself.

9   Q.  And he didn't want to talk to anybody --

10      I'm sorry, go ahead.

11  A.  No, he won't -- he won't talk to me or anyone, as I know

12  of, about anything.

13  Q.  Okay.  And that goes back to his military injury; is that

14  right?

15  A.  I would say, yes.

16  Q.  Okay.  Now, through your observation, you can't tell if his

17  PTSD symptoms have gotten better or worse up to today; is that

18  right?

19  A.  Can you repeat that, please?

20  Q.  To your observation, you can't tell if the PTSD symptoms

21  have gotten better or worse up to today?

22  A.  Correct.

23  Q.  Well, actually, it's the same.  The symptoms are the same;

24  is that right?

25  A.  The same but different.  I don't -- I don't know if that

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    430

```
1   makes sense.

2   Q.  Okay.

3   A.  Maybe some areas is --

4   Q.  Page twenty- --

5   A.  In some areas it's different.

6   Q.  Okay.  And that's how it's always been, goes up and down;

7   is that what you're saying?

8   A.  Yes.

9   Q.  Okay.  Now, you've repeatedly -- I think you've told us on

10  direct you've repeatedly encouraged him to get treatment for

11  his PTSD symptoms; right?

12  A.  Yes.

13  Q.  And he has always refused; is that right?

14  A.  Not necessarily refused me but just said that at that time

15  that he -- he just didn't, you know, think it -- it would help,

16  but that's --

17  Q.  Okay.

18  A.  -- that's not some -- you know, something that I can

19  control.

20  Q.  Okay.  You just mentioned that you attended four or five of

21  your husband's appointments with Mr. Wisner; is that right?

22  A.  Correct.

23  Q.  Okay.  And so you were right outside the room when he came

24  out; is that right?

25  A.  Correct.
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2                431

1   Q.  And he never said anything about what went in the room; is

2   that right?

3   A.  No.  No.

4   Q.  He never -- he never said anything; is that correct?

5   A.  That is correct.

6   Q.  Okay.  And you two just got in the car and headed home; is

7   that how it -- is that what happened?

8   A.  Yes.

9   Q.  Now, in fact, you would -- you asked him how -- you would

10  ask him how the exam went and he would say fine; is that right?

11  A.  That's correct.

12  Q.  And, as you said, from that time to today, he's never told

13  you anything about anything that happened in his appointments

14  with Mark Wisner; is that right?

15  A.  That's right.

16  Q.  You've been married since 2005; is that right?

17  A.  That's correct.

18  Q.  And in that time you've never received any marital

19  counseling; is that right?

20  A.  That's correct.

21  Q.  Okay.  Or couples counseling; right?

22  A.  That's correct.

23  Q.  And you and your husband have never sought to get marital

24  counseling; correct?

25  A.  That's correct.

16-2627 Leininger v USA et al  7.7.20 Vol. 2          432

1   Q.  Now, while all married couples can benefit from counseling,

2   you can think of no particular reason that you and your husband

3   should or would get marital counseling now?

4   A.  I don't think I'm understanding.

5   Q.  Okay.

6   A.  Are you asking me if I think it would be beneficial?

7   Q.  Right.  You told us that -- you think all married couples

8   could benefit from counseling; right?

9   A.  Absolutely.

10  Q.  And based upon that you think you and your husband could

11  benefit from counseling; right?

12  A.  Absolutely.

13  Q.  But you have no particular reason that the two of you would

14  want to go to counseling; is that right?

15  A.  I would -- I want to go to counseling.

16  Q.  Okay.  But you don't have a particular reason other than

17  just the general marital relationship; is that right?

18          MR. THOMAS:  Asked and answered.

19          THE COURT:  Overruled.

20          MR. EISER:  Page 12.

21          THE COURT:  The question is pending.  Where are you,

22  Mr. Eiser?

23          MR. EISER:  Yeah, I'm sorry.

24  BY MR. EISER:

25  Q.  We asked you this at your deposition.  "You can't think of

1    a particular reason that the two of you would benefit from

2    marital counseling other than just the general thought that you

3    had that it would help; is that right?"

4    A.  I think that we would --

5        MR. THOMAS:  Hold on.  Your Honor, I don't think

6    that's appropriate use of deposition for impeachment.  The

7    question has to be phrased exactly like it was in the

8    deposition, and I don't even know what he's reading from.  I

9    heard him say page 12.

10       MR. EISER:  I haven't impeached her.  I was speaking

11   to somebody else.  She hasn't been impeached.  We're not there.

12       THE COURT:  So hold on just a second, everyone.

13       Mr. Eiser, can you ask your question that you want the

14   witness to answer now, please.

15       MR. EISER:  Okay.

16   BY MR. EISER:

17   Q.  You could think of no particular reason that you and your

18   husband should or would get marital counseling; correct?

19   A.  I think it would be very beneficial.

20   Q.  Right.  But you can't think of any particular reason other

21   than that?

22   A.  Other -- other than that to get counseling?

23   Q.  Yes.

24   A.  Well, I think that that would -- that would get us closer

25   together to be able to communicate, to be able to be there for

16-2627 Leininger v USA et al  7.7.20 Vol. 2                434

```
1    one another.

2    Q.  Okay.

3    A.  There's -- there's --

4    Q.  Okay.  And that's what you would get; is that right?

5    A.  Yes.

6    Q.  Okay.

7    A.  I would hope.

8    Q.  Okay.  You mentioned that your -- your husband doesn't talk

9    about his experiences in the war; is that right?

10   A.  That's right.

11   Q.  Okay.  But you also mentioned he doesn't talk much in

12   general about anything.  He keeps to himself; is that right?

13   A.  That's right.

14   Q.  Okay.  Does your husband still have that -- the good job

15   trapping the wild animals?

16   A.  Yes.

17   Q.  Okay.  And he likes that job?

18   A.  He does.

19   Q.  And he's doing well at it?

20   A.  He is.

21   Q.  Okay.  And he has a history of alcohol addiction but he's

22   off alcohol now; is that right?

23   A.  That's right.

24   Q.  And he has a history of methamphetamine abuse but he's off

25   that now; right?
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2                 435

```
1    A.   That's right.

2    Q.   And he has a history of opioid addiction and abuse and he's

3    off that now; right?

4    A.   Right.

5              MR. EISER:  I have no further questions, Your Honor.

6              Thank you, ma'am.

7              THE COURT:  Redirect for the witness?

8              MR. THOMAS:  If I may, Your Honor.

9              THE COURT:  Please.

10                            REDIRECT EXAMINATION

11   BY MR. THOMAS:

12   Q.   Was that man confusing you?

13   A.   A little bit.

14   Q.   It seems like that.

15        Let's talk about this posttraumatic stress disorder.  You

16   said he had PTSD because of what happened in the war; right?

17        Is that a "yes?"  You got to say out --

18   A.   I'm sorry, yes.

19   Q.   And that it was up and down?

20   A.   Yes.

21   Q.   At the time he started seeing Wisner, were you -- at the

22   time he first started seeing Wisner, was he doing okay?

23   A.   He was.  He was having -- he was having issues, body

24   issues, having pains and something to do with an injury in the

25   military.
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2          436

1  Q.  What about mentally and emotionally, was he doing okay?

2  A.  No, I would say not.

3  Q.  What about after Wisner, did he get worse when the news

4  came out and realized what had happened to him?

5         MR. EISER:  Objection.  Leading.

6         THE COURT:  Sustained.  Please rephrase the question.

7  BY MR. THOMAS:

8  Q.  Did the PTSD -- why don't with -- we don't have to call it

9  PTSD.

10     Was he more withdrawn?

11 A.  Yes.

12 Q.  Was he more isolated?

13 A.  Yes.

14        MR. EISER:  Objection.  Leading.

15        THE COURT:  Overruled.

16 BY MR. THOMAS:

17 Q.  Was he more depressed?

18 A.  Very.

19        MR. EISER:  Objection.  Leading.

20        THE COURT:  It does not suggest the answer.  I'm

21 overruling the objection.

22        MR. EISER:  Thank you, Your Honor.

23 BY MR. THOMAS:

24 Q.  Was he more anxious?

25 A.  Anxious?  You mean like -- yes.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                437

1   Q.  You mentioned that you encouraged him to get help.  I want

2   to make sure we're clear.  That was after Wisner; right?

3   A.  Uh-huh.

4   Q.  But -- but you testified he doesn't want to go back to the

5   VA?

6   A.  Right.

7   Q.  And isn't that why he won't get help?

8   A.  Right.

9   Q.  You were asked if you guys had gotten -- if you've ever

10  done marital counseling.  Do you remember that?

11  A.  Yeah.

12  Q.  Are you wealthy people?

13  A.  No.

14  Q.  Aaron changes jobs quite a bit?

15  A.  He has this last decade close, yes.

16  Q.  Sometimes he has insurance; sometimes he doesn't?

17  A.  Correct.

18  Q.  Can you afford marital counseling?

19  A.  No.

20  Q.  Can you afford 150 marital counseling sessions at a cost of

21  150 to 300 dollars?

22  A.  Absolutely not.

23  Q.  Has -- I asked you questions about how your marriage has

24  been impacted.  Do you remember that?

25  A.  Uh-huh.  Yes.

1    Q.  Wouldn't that be a reason why you want to get marital

2    counseling?

3    A.  Absolutely.

4    Q.  Do you have a romantic relationship with your husband?

5    A.  Not anymore.

6    Q.  Would you like to get help with that?

7    A.  Yes.

8    Q.  And did that start after Wisner?

9    A.  Yes.

10             MR. EISER:  Objection.  Leading.

11             THE COURT:  Well, that one's not.  Certainly there

12   were some that were, but that question was not leading.  The

13   objection's overruled.

14             MR. THOMAS:  No further questions.

15             MR. EISER:  Your Honor, one recross on the redirect.

16             THE COURT:  Please.

17                         RECROSS-EXAMINATION

18   BY MR. EISER:

19   Q.  Ma'am, do you know the dates that your husband had his

20   appointments with Mark Wisner?

21   A.  I'm sorry, I do not know the dates.

22   Q.  Do you know what year?

23   A.  It was before probably 2013 I think maybe.  My daughter was

24   in high school.  It was her high school year.  That whole high

25   school incident was a blur to me, so in that era.

1   Q.  I don't want to upset you.  What's the whole high school

2   incident that you just said?

3   A.  It was just a very big -- it was just a very big deal for

4   the family.  She was the only one who graduated, so it was very

5   big for us, for me.

6   Q.  Right.  You're talking about when she passed in 2013?

7          MR. THOMAS:  Your Honor, this is beyond the scope.

8   This is beyond the scope of my redirect.

9          THE COURT:  It's overruled.  The witness raised it.

10  It's overruled.

11  BY MR. EISER:

12  Q.  I'm sorry, your daughter passed.  Was it 2013?

13  A.  No, my daughter passed in 2018.

14  Q.  '18, okay.

15      The original question was:  Did you know when your husband

16  saw Mark Wisner, what year it was?  Do you know?

17  A.  I'm going to have to -- 2012, 2013.  I'm not specific on

18  the year.  I'm sorry about that.

19  Q.  All right.  Thank you.  Thank you.

20         MR. EISER:  That's all I have, Your Honor.

21         THE COURT:  Anything else for the witness?

22         MR. THOMAS:  No, Your Honor.  May she be excused?

23         THE COURT:  Defense may the witness be released?

24         MR. EISER:  Yes, Your Honor.

25         THE COURT:  All right.  You may step down.  You are

1    free to go.  Thank you.

2            THE WITNESS:  Thank you.

3            THE COURT:  Mr. Thomas, plaintiff may call -- I know

4    you need to do some hygiene work there.  But as soon as you're

5    ready, we'll go straight to your next witness.

6            MR. THOMAS:  Sure.  Your Honor, plaintiffs would like

7    to call Dr. Jack Ward.

8            THE COURT:  All right.  Mr. Ward, if you will pause

9    before taking a seat to accept the oath from the deputy clerk,

10   please.

11           MR. THOMAS:  You have to stand in front of the camera.

12           THE COURT:  I mislead you there.  Actually, you can be

13   seated for purposes of this.  We'll be able to see you that

14   way.

15           Ms. Garrett, please.

16                       JOHN O. WARD, Ph.D.,

17   called as a witness on behalf of the Plaintiff, having first

18   been duly sworn, testified as follows:

19           COURTROOM DEPUTY:  Thank you.

20                       DIRECT EXAMINATION

21   BY MR. THOMAS:

22   Q.  Can you introduce yourself?

23   A.  Sure.  My name is John Orson Ward.

24   Q.  Dr. Ward, first, let me say I am sorry, I didn't realize

25   you had just had surgery.

1   A.  Yeah.  Well...

2   Q.  I am sorry, but we're going to call you out of order and

3   get you out.

4   A.  Sure.

5   Q.  Okay.  I called you doctor.  Are you a doctor?

6   A.  I'm a Ph.D., yes.

7   Q.  What kind of -- you're a Ph.D.  Let me -- let's hand you

8   what we've marked as Exhibit 145 --

9   A.  Sure.

10  Q.  -- which is a copy of your curriculum vitae.

11  A.  I've got a copy of it, sure.

12  Q.  Can you just verify that our copy is a current version?

13  A.  Oh, it is indeed.

14          MR. THOMAS:  Your Honor, we would offer 145 into

15  evidence.

16          THE COURT:  Any objection to 145?

17          MS. HASTON:  No objection.

18          THE COURT:  145's received.

19  BY MR. THOMAS:

20  Q.  Dr. Ward, can you, please, tell the court about your

21  academic training?

22  A.  Sure.  I have a Bachelor's Degree and a Master's Degree in

23  Economics from the University of Toledo in Ohio that I acquired

24  back in 1965 and 1967 respectively.  I went to the University

25  of Oklahoma.  I taught there for three years while I finished a

```
 1   Ph.D. in economics.  I came to the University of
 2   Missouri-Kansas City, Kansas at that time as a professor of
 3   economics, and I also did a wide variety of post doctoral
 4   programs as part of my education.  I completed the Harvard
 5   Educational Management Program.  And in 1978 was the last I
 6   taught at Tufts University and other universities as well.  But
 7   after 1968, my academic career was at University of
 8   Missouri-Kansas City.
 9   Q.  And at the University of Kansas City, you started off as an
10   assistant professor?
11   A.  Yeah.  I was assistant professor and then I rose the -- the
12   ranks to full professor within about seven years, and I became
13   a department chair for probably a period of around 18 years of
14   economics and associate dean of arts and sciences.
15   Q.  As the dean, did you ask have the responsibilities
16   throughout the University of Missouri system?
17   A.  Well, not -- not as the dean.  As the dean -- associate
18   dean, I was in charge of 15 academic programs in schools at
19   UMKC, but I also was on the doctoral faculty for the University
20   of Missouri system and I served on committees and directed
21   doctoral dissertations throughout the Missouri system.
22   Q.  Over the last 50 years now, have you been involved in any
23   particular area of research?
24   A.  Well, I started off in the area of labor economics and
25   human resource economics.  And I worked in South America for
```

1   the Ford Foundation and Rockefeller Foundation for a number

2   years in research programs with the Brazilian government and

3   Columbian government.

4        After I came back, I switched to the field of what's called

5   the law economics and forensics economics, application of

6   economics to issues of litigation both theoretically and

7   practically, and that has been my field since probably around

8   1978.

9   Q.  Now, my outline says to ask you what is forensic economics.

10  Did you just describe it?

11  A.  Yeah, it's the application of economics to issues of

12  litigation, not only theoretically but there is a whole school

13  that I used to teach in the law school, law and economics,

14  looking at how economics interacts with law in determining

15  efficiency.  But then there's what's called forensic economics,

16  which is calculation of damages, liability issues and

17  antitrust, commercial litigation, personal injury, death

18  litigation, employment law and many other areas as well.

19  Q.  Before you became involved in forensic economics, was there

20  a standardized system to assess injuries in assessing damages?

21  A.  Not really.  I was -- early on in this, going back in the

22  1970s, there were a few economists that did this.  I did it as

23  a part-time activity to my role at the university, but it

24  became pretty well a full-time activity by probably the last

25  two decades.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                444

1   Q.   You created the standards?

2   A.   I -- I founded the National Association of Forensic

3   Economics in 1986.  I, along with a number of other economists,

4   put together the association, chartered it, rose to about a

5   thousand members and universities throughout the United States

6   and Europe, and we run programs in Europe.  I do the programs

7   in Europe every year with barristers typically in the United

8   Kingdom and economists from universities and throughout the

9   European Union.

10       And then, in the United States, I founded the National

11  Association of Forensic Economics in 1987.  I was their first

12  president and I was also the founder of their journal, the

13  *Journal of Forensic Economics* in 1988, and that became the

14  national journal in the field.

15       And I was also editor of the *Journal of Law and Economics,*

16  which is another national journal in the -- the work on

17  founding the -- what's called forensic economic abstracts at

18  the University of Berkeley, California, and serve on that

19  board.

20  Q.   You mentioned several journals that you served as the

21  editor on.  Fair to say you published articles on forensic

22  economics?

23  A.   Yeah, I've published seven books refereed.  These would be

24  either co-edited, edited, or authored.  Over the past 40 years,

25  I've published probably around 50 articles and refereed

```
 1   economic and law journals.  Probably another 50 in other

 2   journals outside of that field.  I've published around 18

 3   chapters in books.  It's all contained in my vitae, my resume.

 4   Q.  Are you nationally recognized as an expert in forensic

 5   economics?

 6   A.  Well, I -- you know, we -- we're hesitant to say anyone's

 7   "nationally recognized."  Certainly I'm recognized as a -- as a

 8   forensic economist.  In fact, the national association's

 9   research award each year is named after me and it's given out

10   to the outstanding research in the field.

11   Q.  I'm going to ask you a question and I know you hate it.

12   A.  Sure.

13   Q.  But are you considered the father of forensic economics?

14   A.  Some say that.  I have -- I -- it's -- it's too elderly a

15   term for me but I...

16   Q.  Fifty years?

17   A.  Yeah.

18   Q.  Yeah.

19       As an example, were you called upon to assist the victims

20   of 911 by the special master to help create a compensation

21   fund?

22   A.  Right.  There -- there was -- after the September 11th, the

23   World Trade and Pentagon disaster, the economists, along with

24   attorneys, got together basically to set up a compensation

25   program to avoid litigation for people who -- survivors of
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2                446

1   those who died and those who were injured.  I worked on that

2   and did pro bono work for a number of years.  I worked with the

3   families of September 11th and their advisory board in New York

4   and I -- I contributed, along with Kirk Kruger, one of my

5   associates, to the special master's compensation fund,

6   particularly in the area of household services and family

7   services.

8   Q.   Were you called upon for a special ceremony?

9   A.   Well, I -- yeah, I did a program for the families in

10  Park Avenue -- I don't know what you call -- armory in New York

11  back in around 2002 and recognized people along with

12  congressmen and others who were contributors early on to the

13  field.

14  Q.   Who asked you to do that?

15  A.   The families.  There was an organization called The

16  Families of September 11th.  They were members or family

17  members of those who died and they were represented by an

18  individual who worked with the special master.  And -- and

19  certainly I wasn't the only one; there were many other

20  economists and attorneys who did pro bono work for them.

21  Q.   Who was the special master?

22  A.   The -- gosh, who was the special master?  I'm -- I'm age

23  78.

24  Q.   Don't worry about it.

25  A.   I don't remember.  These things are difficult to remember.

16-2627 Leininger v USA et al  7.7.20 Vol. 2          447

1   Q.  Now, I'll admit we're spoiled because -- in this area

2   because we have you in our backyard.  But because you're

3   nationally known, is it true that people all around the country

4   call upon you to assess damages in cases like this?

5   A.  Well, yes.  I mean, we've been doing this a long time.  I

6   -- in addition to being at the university full-time, I started

7   a corporation called John Ward Economics.  We have four

8   economists, they're all Ph.D.s, and we do work around the

9   United States.  All of our members of our association are

10  either past presidents or vice presidents of the national

11  association.  We work in a wide variety of other capacities:

12  judicial programs, educational programs, and we have a

13  publishing company called Expectancy Data, which publishes

14  original research which is sold to other economists and

15  attorneys throughout the United States.

16  Q.  Do you -- are you called upon to offer this analysis for

17  plaintiffs and defendants?

18  A.  Sure.  I mean, for the -- I took early retirement from the

19  first university in 2003.  I'm professor emeritus.  My work is

20  more part-time and I still do 30-40 cases, if not more, per

21  year, and I work both for defense and for plaintiff.

22  Q.  Were -- did we ask you to calculate economic losses for our

23  client, Aaron Leininger, in this case?

24  A.  Yes, you did.

25  Q.  And, in doing so, did you prepare an expert report?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    448

```
 1   A.  Yes, we did.
 2   Q.  Okay.  We're going to hand you -- I know you've got a copy
 3   of it yourself, but for the record we're going to hand you what
 4   we've marked as Exhibit 148-A.
 5   A.  Okay.
 6   Q.  And can you verify that that is, in fact, your report?
 7   A.  Yes.  It's a report that was done on March 21st, 2019 and
 8   it was updated June 3rd, 2020 for the date of this trial, which
 9   is today.
10   Q.  And is it true to say that you always update your reports
11   just before trial?
12   A.  Sure.  We have to because we use current interest rates to
13   discount all future losses, and so we have to rerun the reports
14   prior to trial.
15   Q.  Now, the methods you used for calculating damages in this
16   case, were they the same methods you utilized for calculating
17   damages for the 911 victims?
18   A.  Well, it's a little bit different, and let me explain why.
19   Normally, in a personal injury death case, you're calculating
20   loss of earnings capacity or future medical costs or losses of
21   services, ability to perform services, a life care plan, things
22   of that sort, and either for plaintiff or for defense.
23       In this case we're looking at something a little bit
24   different.  It involves future medical costs, but what it
25   really involves -- and this would be true for all the various
```

1    plaintiffs in the class -- would be a calculation of the value

2    of the loss of coverage through Veterans Administration for the

3    plaintiff in this case.  In other words, assuming that the

4    plaintiff in this case has lost or is incapable of continuing

5    treatment at the Veterans Administration because of things that

6    happened to him, which he claims he is, what is the value of

7    the loss?  What's the value of the VA medical coverage

8    basically for him?

9        He had upwards of 60 percent cumulative disability rating

10   from the military.  So his VA coverage was totally free.  He

11   paid no co-pay and he paid no deductible, and that's basically

12   the rules of VA for people who have medical disabilities

13   incurred in the military.

14       So and also the VA, unlike other private insurance, covers

15   such things as long-term care.  I can't get long-term care from

16   Medicare and I can't get it from a private insurance company.

17   But if I'm old, Alzheimer's, something goes wrong, I need

18   long-term care, the VA provides it through VA facilities.

19   VA provides for all medications.

20       In many respects, the VA provides far more than you can

21   procure in the open market.  So the question becomes what's the

22   value of that?  What's the value of what he has lost?  What

23   will -- it's not what his future costs will be necessarily,

24   because we don't know that, I don't have a crystal ball.  The

25   question is what's the value of the VA experience, the coverage

1   by VA?

2       So what we did was we looked at what would be the cost not

3   in the past, because if he has medical costs he's incurred that

4   haven't been covered because he didn't have insurance --

5       He's now in a new job.  It's called Little Beetle -- or

6   something of that sort -- Extermination Company.  He has

7   medical insurance with them.  If he has a medical claim, they

8   can pay for that.

9       -- because not having a bad experience with VA and having

10  been able to continue going to VA, it would have been covered.

11  Dr. Peterson's statements with respect to future psychological

12  care would have been covered by VA had he -- had he continued

13  with them.  There are numerous items that Dr. Peterson

14  identified he will need in the future.

15  Q.  Let's get the -- we're going to get to that.

16  A.  Sure.

17  Q.  First of all, are you here to offer any opinions on

18  liability?

19  A.  No.

20  Q.  Okay.  Is it true that you're just here to offer

21  calculations using the standard methods used for injuries that

22  are compensable under the law?

23  A.  Right.  It's a little different because you're looking at

24  the value of VA medical care using as a proxy what it's going

25  to cost in the open market to provide it either through private

1    insurance or through Medicare, Medicaid, including deductibles

2    and including co-pays he will suffer in those programs, because

3    they don't cover all medical costs.

4    Q.  And does that include -- so the opinions you're here to

5    talk about are insurance premiums?

6    A.  Right.

7    Q.  Private health insurance until he's age 65?

8    A.  Until he's 65.

9    Q.  And then Medicare premiums after 65?

10   A.  Right.  In other words, Medicare covers part of it.

11   Part A is free, but the rest of it isn't.  So Medigap,

12   Medicare Part B and Part D all have costs to them.  They have

13   deductibles.  So what we did was we looked at if -- what kind

14   of costs would he likely incur.

15        First, we looked at private insurance.  For that we looked

16   at the Affordable Care Act.  We simply went to the government

17   site, we put in his ZIP code, and we put in what plans were

18   available.  The plan that was the Gold Plan came closest to VA

19   would have been the Cigna plan.  That's what we used.

20        We also used the Affordable Care Act dental plan and vision

21   plan.  We looked at how much that would cost to age 65 at a

22   maximum simply because we don't know what in fact costs he's

23   going to incur.  We do know that if he was with VA, all of

24   those costs would have been covered.

25   Q.  And is that why you did these calculations, to -- if the

 1  court decides to make him whole, you wanted to see that he

 2  could get coverage that he's already earned and would have

 3  otherwise?

 4  A.  Right.  It assumes he can't go back to VA and he shouldn't

 5  be required to go back to VA but he can go elsewhere.  What's

 6  going to be the cost in those alternative programs that will

 7  provide coverage?  Right now he doesn't have it.

 8      Both private insurance and Medicare, Medicaid, Medigap

 9  after age 65 to life expectancy reduced for probability of

10  death, discounted to present value in today's dollars, how much

11  would it cost.  Plus those specific medical costs identified by

12  Dr. Peterson that may or may not be covered by private

13  insurance, there's no way of knowing, and likely they won't be

14  because of the frequency.

15      So Dr. Peterson has medical care, in terms of psychological

16  care, that's going to be ongoing for the rest of his life.

17  There's no -- there is no medical plan that's going to cover

18  all of those for the rest of your life.  So we look at the cost

19  of Dr. Peterson's plan as specified by Dr. Peterson.

20  Q.  Okay.

21  A.  So we add all those costs together --

22  Q.  Before we -- go ahead.

23  A.  -- it gives you a proxy for what he's lost.

24  Q.  Did you do any calculations on non-economic damages?

25  A.  No.  We didn't look at anything:  loss of enjoyment of life

16-2627 Leininger v USA et al  7.7.20 Vol. 2                                 453

```
 1  or loss of ability to work or loss of services.  He has
 2  posttraumatic stress disorder.  It may affect his ability to
 3  work, but we're not -- we were not asked to make any
 4  calculations in the area and we didn't.
 5  Q.  We didn't ask you to do it?
 6  A.  That's right.
 7  Q.  You're not here to offer any pain and suffering
 8  calculations; correct?
 9  A.  No.
10  Q.  That's for the court; correct?
11  A.  That's correct.
12  Q.  Who typical -- who typically gives these kind of damages,
13  these non-economic damages?
14  A.  The trier of fact.  I mean, there are people there are
15  economists who testify as to loss of enjoyment of life and
16  various other measures of non-economic damages.  I don't -- I
17  don't believe that it actually has any validity and we don't do
18  that.  But certainly a trier of fact is going to listen to all
19  of the impacts of an injury on someone and make their own
20  decision, and I have no ability to make that decision for them.
21  Q.  So let's talk about some of the data in your report.  Where
22  do you get your data?
23  A.  Well, the data, first, we're looking at the cost of Cigna.
24  It's all future costs beginning July 8 forward to his life
25  expectancy annually reduced by probability of death.  So it's
```

16-2627 Leininger v USA et al  7.7.20 Vol. 2                454

1   far less than life expectancy.

2       Now, where does it come from?  It comes from the Affordable

3   Care Act.  So if he were to go to the government web page to

4   try to get the best insurance comparable to VA coverage he

5   could get according to the printout, which simply get the

6   printout directly from the government.

7   Q.  What page?

8   A.  It's BLS.gov.  And the plan -- I got a copy of it here --

9   lists all of the plans by ZIP code, and we look at the ZIP code

10  that he is in, which is Kansas City, Kansas.  There is no

11  income constraint because the -- the income constraint is less

12  than $40,000 for -- for VA coverage.  No deductible.  No

13  payment.  So he wouldn't -- he wouldn't have to pay any of

14  those if he went to VA.

15      Also with a disability rating -- his cumulative is

16  60 percent -- he would pay nothing at VA.  But he would pay for

17  private insurance.  So you have to add to the cost of the

18  insurance, which is $746 a month for the Gold Plan for Cigna,

19  which covers most things.  You have to add out-of-pocket

20  maximum, which is $7,200 plus co-pays.

21  Q.  Okay.

22  A.  Of course, the co-pays add up to the 7,200 because that is

23  the maximum.  We look at -- there are ten different plans that

24  are available.  We look at the one that covers the most, which

25  is the Cigna plan.  We also add to it then.

1    For dental premiums, we use the dental plan from Dentegra,

2  which is a plan also on the government web page that is

3  available to him, and vision insurance under VSP products.  All

4  of those would be covered by VA totally with no deductible had

5  he stayed with VA.

6    We're looking at what he's going to have to pay now if he

7  were to meet the deductibles and pay all of the premiums for

8  the insurance for the rest of his life.

9    Now, we project it year-by-year into the future using the

10  -- those insurance companies projections of what costs will be

11  for insurance until age 65.

12  Q.  And what's that website?

13  A.  It's -- it's the same, website BLS.gov.

14    And we also use what's called Moody's Analytics.  It's a

15  national forecasting service, and they look at health insurance

16  costs for 40 years into the future.  I don't think anyone can

17  do that, but nevertheless, we use that as well as to verify the

18  premiums.  The increases are very small, remarkably enough.

19    Discount to present value using current interest rates.

20  You don't use long-term historical average for a cost that's

21  going to occur a year from now.  We use a treasury bond that's

22  going to mature in one year.  Ten years from now, we use a

23  treasury bond today that's going to mature in 10 years.  And so

24  the interest rate used, the real interest rate is exact.  It

25  comes from U.S. Treasury Department.  It's published monthly

16-2627 Leininger v USA et al  7.7.20 Vol. 2                456

1   and we -- that's why we had to update it again for this date of

2   trial.

3       So that takes us up to age 65.  At age 65 we assume he goes

4   on Medicare.  But to get the same coverage, he would have had

5   had he stayed at VA -- because you don't have to leave VA to go

6   to Medicare.  You can stay on VA throughout your entire life.

7   There will be no deductible.  There will be no co-pay, and

8   there would be no premium.  But for Medicare --

9   Q.  And he's earned that?

10  A.  He's earned it, yes.  He was in the military from 1988 to

11  1991 discharge.  He served in Saudi Arabia and Kuwait and --

12  Q.  Iraq.

13  A.  -- and Iraq.  And he did earn it and he had accumulated a

14  number of disability ratings:  10 percent for knees, 10 percent

15  for other psychological issues, posttraumatic stress disorder.

16  So that by the time he went to the VA in more recent years, he

17  was going with a 60 percent disability rating, which means you

18  don't pay.

19      Now, one of the arguments, well, why couldn't he go on

20  Tricare, which is a government insurance program?  Number one,

21  you pay for that just like you pay for the Gold Plan.  Number

22  two, he's ineligible for it.

23  Q.  Let's come back to that.  Let's come back to Tricare.  Did

24  you -- did you have -- did you use any published data from the

25  health insurance marketplace called healthcare.gov?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                  457

1   A.   Yeah.

2   Q.   Okay.  Is that a government website?

3   A.   Sure.  It was established so that people could go into the

4   market and procure health insurance at a reasonable cost.

5   Q.   Did you use data from Medicare.gov?

6   A.   That was the Medicare costs on premiums and maximums that

7   would have to be paid throughout the balance of his life

8   expectancy.

9   Q.   I know I stopped you, I just want to check off a few more

10  things.  Is there any published data or information on the

11  value of being able to get treatment at a VA clinic?

12  A.   No, that's the problem.  I mean, there -- there is no

13  government source, no data I'm aware of that says this is the

14  value for a person of VA care.  But we know what the care is;

15  the care is everything.  It covers all medical costs,

16  hospitalization, drugs, psychological care, dental care for him

17  because of his disability rating.  Now, for someone else it may

18  not cover all those things, but for him it would cover all

19  those things.

20       And the alternative is you -- you can -- the -- there was

21  an economist that did a report for the defense and said, well,

22  he could use Tricare.  Well, he wasn't on Tricare, number one.

23  It was offered to him as part of basically getting out of the

24  VA even though it wouldn't be -- he wouldn't be eligible for

25  it.  There are eligibility requirements for Tricare that he

1    doesn't meet.

2    Q.   Now, he did have it for about a year?

3    A.   Oh, yeah, I understand.  Yeah --

4    Q.   Okay.

5    A.   -- that was a temporary situation.

6    Q.   Okay.  But he does not meet the criteria for Tricare; is

7    that correct?

8    A.   Right.  I can read the criteria, and he doesn't.

9    Q.   Yes, please, do.  What are the criteria?

10   A.   Okay.  Tricare:  You have to be an active duty service

11   member.  He's not.  He served back in 1988.

12        You have to be activated in the National Guard Reserve

13   Guard member.  He's not.

14        You have to be a retired service member.  He never retired.

15   He was discharged.  He didn't serve 20 years and then retire.

16        You have to have a Medal of Honor recipient.  He's not.

17        You have to be a survivor, a widower of former spouses who

18   died in action.  He's not obviously.

19        Retired National Guard, and he's not retired National

20   Guard.

21        So he doesn't meet any.

22   Q.   Where are you -- where are you getting that data?

23   A.   This comes from Tricare.com.

24   Q.   But how did he get it for a year then?

25   A.   Okay.  How do you get it?  Number one, for example, when

1   you get -- when you're discharged from the military as he was

2   back in 1988, you're given Tricare.

3   Q.   '91.

4   A.   '91.   You're given Tricare for a short period of time.

5   Usually it's three years, and that's kind of a bridge.   But

6   after that, you can't get it.

7        Why did he -- why was he offered?   Well, he was -- he was

8   -- he claimed that he was assaulted at VA, he couldn't go back,

9   and I assume they were looking some way to provide care for him

10  and the suggested temporary solution of Tricare.   But it would

11  not be a permanent solution for him because he's not eligible.

12  Q.   And they took it away?

13  A.   My understanding, they took it away, yeah.

14  Q.   And to get -- is Tricare free?

15  A.   No, he paid premiums.   You pay deductibles for Tricare.

16  Q.   Is there any insurance plan out there that comes close to

17  the free care that the VA provide?

18  A.   No.

19  Q.   Is there any healthcare plan out there that comes close to

20  the medical care Aaron Leininger earned by serving his country

21  in a theatre of war?

22  A.   No.   Even -- even our costs under a Gold Plan and premium

23  plans for health insurance to age 65, they don't come up to the

24  standard of VA.

25  Q.   Yeah.   I want to ask you about that.   In his opening

1   statement, the defendant represented that we're trying to get

2   him a -- a lifetime healthcare -- health insurance gold card?

3   A.   He had one.

4   Q.   He had that already?

5   A.   That's right.

6   Q.   He had that and it's been taken away?

7   A.   He had it with VA.

8   Q.   And, in fact, by using your plan, we're actually leaving

9   damages on the table; isn't that true?

10  A.   Sure.  He'll never be able to get someone to cover, I mean,

11  I suppose a long-term care.  Now, you could build into it

12  something we didn't do.  You could put in a premium for

13  long-term care, but we didn't do that.  At his age, it would be

14  very, very expensive, but the VA does it for free.

15  Q.   Now, I want to hand you what we marked --

16       MR. THOMAS:  And, Your Honor, you do not have this

17  yet.  It's a demonstrative that we've created but we did

18  provide it to opposing counsel.  It has been marked as

19  Exhibit 242.  Normally, when Dr. Ward testifies, we write his

20  calculations on a flip chart.  But we can't do that, so I made

21  my own flip chart and I'd like to use it as a demonstrative,

22  Your Honor.

23       THE COURT:  Any objection to that from the defense

24  side of the room?

25       MS. HASTON:  No objection, Your Honor.

```
 1              THE COURT:  All right.  Please.

 2              MR. THOMAS:  Permission to publish, Your Honor?

 3              THE COURT:  You may.

 4    BY MR. THOMAS:

 5    Q.  Dr. Ward, what I -- you'll see on the screen in a minute --

 6    A.  I've got a copy of it.

 7    Q.  Okay.  And if you compare that to the calculation of

 8    damages you provided on page 4 of your report --

 9    A.  Right.

10    Q.  -- I think you'll see that the numbers are exactly the

11    same; is that correct?

12    A.  They are, yes.

13    Q.  Okay.  So, please, explain to the court what Mr. Leininger

14    has lost.

15    A.  Okay.  What -- what Mr. Leininger has lost is access to VA

16    coverage and all of the benefits it would provide throughout

17    his life expectancy.  How do we measure it?  By the proxy for

18    its value.

19        If one can't go to the VA, you can go to the second best,

20    which would be, until age 65, the Gold Plan under the

21    Affordable Care Act under Cigna, which is the most highly-rated

22    program.  And the present value for that for age 52, which he

23    currently is, to age 65, reduced annually by probability of

24    death, along with dental premiums and vision premiums and all

25    the deductibles that he would have to pay, which he wouldn't
```

462

1   have to pay at VA, is $324,247 in present value.  That's what

2   it is.

3   Q.  All right.  So that's -- that's for his care up to age 65?

4   A.  Right.

5   Q.  What about after he turns 65?

6   A.  Right.  And I want to make sure I'm not saying with

7   certainty that's going to be his cost, but that's the value of

8   the VA plan to age 65 as measured by that proxy.

9   Q.  Could it be higher?

10  A.  Huh?

11  Q.  Could it be higher?

12  A.  It could be higher.  It could be lower.  I don't know what

13  it will be, but I know what the value is and that is

14  approximately.

15  Q.  Please continue.

16  A.  Beyond age 65, what we looked at was Medicare premiums

17  including Medigap, which covers the gap, that Part B annual

18  premium.  You get Part A regardless, and that's free, that's

19  basically a hospitalization premium.  Medigap along with

20  Medicare Part B and Part D along with the annual deductibles

21  beginning at age 65 and running to the end of his life and his

22  life expectancy, and our calculation is runs through age 79.5

23  according to the U.S. Public Health Service, and that value is

24  $227,028.

25  Q.  And then the last item of damage you've calculated is his

16-2627 Leininger v USA et al  7.7.20 Vol. 2                463

 1    PTSD life care costs; is that right?

 2    A.   I asked Dr. Peterson, and we were given that, those

 3    elements of annual costs for treatment of posttraumatic stress

 4    disorder by Dr. Peterson.  It came from your office to us.  We

 5    simply put a present value on it.  I don't have any opinion

 6    about it, but the present value of it is $228,213.  That's what

 7    you would have to set aside today to pay for that psychological

 8    counseling for the rest of his life.

 9         Now, the question is why wouldn't that be covered by

10    insurance?  Because insurance has a limited number of visits

11    per year that goes as far less than what Dr. Peterson has in

12    his life care plan.  Dr. Peterson has psychological care every

13    year up to his life expectancy, both posttraumatic stress

14    disorder and other side effects from his experience with the

15    VA, and so it's a different item.

16         Now, could some of it be covered by VA -- by Medicare,

17    Medicaid, or by private insurance?  Some small part possibly.

18    But there's no way to know because you -- you would have to

19    know would it be treated as a pre-existing condition, would it

20    be negated by frequency of use?  And I have no way of knowing

21    any of those things.

22    Q.   And do we get to come back years later and, "Judge, can you

23    re -- change your judgment ruling?"

24    A.   That's its value right now.

25    Q.   That's its value right now.

1      And that also included substantial marital counseling

2   between him and his wife as well; correct?

3   A.   Correct.

4   Q.   And the -- if you add those all up, what is the total value

5   of these items of damages, items of loss?

6   A.   The value of the VA benefits lost along with the PTSD life

7   care costs as measured by its proxy is $779,487 in present

8   value.

9   Q.   I neglected to ask you about *Dollar Value of a Day*.  Do we

10  need to go into that?

11  A.   No.

12  Q.   Doctor, have the opinions you offered today been offered to

13  a reasonable degree of forensic economic certainty?

14  A.   Yes.

15  Q.   Thank you.

16       MR. THOMAS:  No further questions, Your Honor.

17       THE WITNESS:  Sure.

18       THE COURT:  All right.  Cross examination for the

19  witness?

20                    CROSS-EXAMINATION

21  BY MS. HASTON:

22  Q.   Dr. Ward, my name is Sarah Haston.  I'm an attorney for the

23  United States.  Can you hear me okay?

24  A.   Sure I can.

25  Q.   Okay.  Dr. Ward, this is not the only case involving Mark

1   Wisner for which you have provided an economic report for this

2   particular firm; right?

3   A.   That's correct.  We did three of them.

4   Q.   And besides those cases, those three cases, this is not the

5   first time you've worked for this particular firm; right?

6   A.   For the Farrington McClain and Danny Thomason?  No, I've

7   worked with them over the years going back probably -- not with

8   Danny, but with other people in the firm going back 25 years or

9   longer.

10  Q.   Now, your opinions in this case are based on assumptions;

11  isn't that right?

12  A.   Sure.

13  Q.   Your opinion that the plaintiff needs a Gold Plan private

14  health insurance until age 65 and then Medicare coverage for

15  the rest of his life after that, that's based on the assumption

16  that plaintiff cannot return to any VA in the country; is that

17  right?

18  A.   That is correct.  What I was told was that because of his

19  treatment at VA he would not return to VA.  And so if he's lost

20  that coverage, what would be the value of that coverage,

21  period.

22  Q.   And you weren't told that from the plaintiff himself; isn't

23  that right?

24  A.   No.  I mean, I read his deposition.  I looked at he -- what

25  his allegations of what his treatment was at VA.  I was simply

16-2627 Leininger v USA et al  7.7.20 Vol. 2                     466

1   told that would be his opinion.

2   Q.  You didn't interview the plaintiff though; right?

3   A.  No.

4   Q.  You just ran the numbers; is that fair?

5   A.  I just really ran numbers.  I -- I don't have any opinion

6   about liability or the accuracy of Dr. Peterson's costs.  I'm

7   simply running what are their present values.

8   Q.  Okay.  So you didn't review the plaintiff's VA medical

9   records to see if, in fact, he ever returned to the VA after

10  his encounters with Mr. Wisner; right?

11  A.  No.  I was not given my medical records, that's correct.

12  Q.  Okay.  So you didn't review any medical records of the

13  plaintiff?

14  A.  Right.

15  Q.  Okay.  You didn't review any medical bills of the

16  plaintiff?

17  A.  Correct.

18  Q.  You didn't even have the plaintiff fill out a

19  questionnaire; is that right?

20  A.  No, we had the -- we had the plaintiff's deposition where

21  we were able to put together most of that information.  But,

22  no, we didn't have his -- we did not have a questionnaire.

23  Q.  Now, Dr. Ward, you include the maximum annual out-of-pocket

24  costs in your projected economic losses for the plaintiff; is

25  that right?

1    A.   That's correct.

2    Q.   But you're just speculating that the plaintiff would

3    actually hit or even come close to the maximum annual

4    out-of-pocket costs; is that right?

5    A.   No, what I'm -- what I'm -- what I'm measuring is what's

6    the value of the VA coverage.  The VA coverage has no maximum,

7    therefore, it -- looking at a proxy for it, you look at what's

8    the maximum that the Gold Plan would -- would provide or that

9    Medicare, Medigap would provide.  I can't say that he would

10   meet that maximum or exceed it.  I simply know what the number

11   is.

12   Q.   And you've mentioned that the VA is -- provides coverage

13   for much more than private health insurance; right?

14   A.   Oh, sure, it covers many, many aspects of -- of day-to-day

15   life.  It even gets into occupational issues, occupational

16   counseling and so on and so on.  So it goes far beyond just

17   medical care.

18   Q.   You don't know specifically what the VA would cover and the

19   Cigna Gold Plan would not though; right?

20   A.   Well, actually, I do have a printout of what Cigna covers

21   and what it doesn't cover and I do have a copy of everything

22   that the VA plan covers.  The VA plan basically for him,

23   because his income is low, it's below 40,000 a year, it's much

24   lower than that now because he's working for the Blue Beetle

25   Extermination Company, and he has a cumulative disability

1   rating of 60 percent, the VA covers everything.

2   Q.   So you threw in the maximum out-of-pocket annual costs

3   really to fill in any gaps there may be; is that right?

4   A.   Right.

5   Q.   So the cost projected in your report give the plaintiff the

6   most comprehensive healthcare options for his ZIP code

7   regardless of if he'd use it; right?

8   A.   It's the best that you could do exclusive of long-term

9   care, which is not part of the coverage.

10   Q.   Okay.  And because you are trying to provide him the most

11   comprehensive healthcare options, that's why you opine that

12   plaintiff's economic losses in this case also include the costs

13   of private dental insurance?

14   A.   The VA covers dental insurance for veterans who have

15   disabilities, it's covered, as is vision.

16   Q.   And because you're trying to provide him the most

17   comprehensive healthcare options for his ZIP code, that's also

18   why you projected in your report that his economic losses in

19   this case would include the costs of private vision insurance;

20   is that right?

21   A.   Yes, that's correct.

22   Q.   All right.  Dr. Ward, your report on the projected economic

23   losses for the plaintiff --

24   A.   Right.

25   Q.   -- include the costs of Medicare premiums starting at age

16-2627 Leininger v USA et al  7.7.20 Vol. 2                469

1   65; is that right?

2   A.  Yes, it does.

3   Q.  Now, since you never interviewed the plaintiff, you don't

4   know if he would have obtained Medicare coverage at age 65

5   anyway; isn't that right?

6   A.  Well, he could but I -- I don't know if he would have done

7   that, no.

8   Q.  Okay.  All right.  Dr. Ward, let's look at the PTSD life

9   care costs that you projected --

10  A.  Sure.

11  Q.  -- in your report.

12  A.  Sure.

13  Q.  If we could pull up your report at Plaintiff's 148-A.  Do

14  you have a copy of that in front of you?

15  A.  Yes, I do.

16  Q.  Okay.  If we could go to page 6 of that document, please.

17  And, Dr. Ward, I'm turning to page 6.  All right.  So

18  underneath the box that says PTSD life care costs there are

19  four entries; right?

20  A.  Right.

21  Q.  The first is medication?

22  A.  Right.

23  Q.  Then you have two entries for psychiatric PTSD treatment;

24  is that right?

25  A.  Right.

1   Q.   And then marital counseling; right?

2   A.   Yes.

3   Q.   So, first of all, you don't know if the plaintiff actually

4   needs these treatments described in the box captioned PTSD life

5   care costs; right?

6   A.   No.  That's the opinion of Dr. Peterson.  I don't have an

7   opinion.

8   Q.   These numbers -- these treatments simply derive from

9   Dr. Peterson's opinion; right?

10  A.   Correct.

11  Q.   Okay.  Now, the insurance you claim plaintiff needs for

12  life, be it Cigna Gold Plan or Medicare, once he hits age 65 --

13  A.   Sure.

14  Q.   -- that insurance would cover these treatments; correct?

15  A.   I don't know.  For example, if you look at posttraumatic

16  stress disorder treatment, what the doctor has put in here is

17  once a month for basically for life.  Almost all life -- almost

18  all health insurance programs such as Cigna will give you a

19  limited number of access points to psychiatric care.  First you

20  have to be diagnosed as having the psychiatric condition.  And

21  then, secondly, you only have a certain number of access.  It

22  may have been 17 visits over a period of three years or

23  whatever it might be.  He has one every month for life and I

24  don't think there's any health insurance you could buy that

25  would cover that.  I don't know.  But I wasn't asked to do

1    that.  What I was asked to do was calculate the present value

2    of Dr. Peterson's PTSD life care costs.

3    Q.  Understood.

4        And to be fair, Dr. Ward, on your report I'm looking at

5    this page 6 in the table, it shows PTSD treatment until July

6    7th, 2023 being once a month, but then it backs down to

7    every -- looks like quarterly; is that right?

8    A.  Once every three months, right, that is correct.

9    Q.  So you'll -- but you'll acknowledge there is overlap, in

10   terms of the projected costs of treatment that Dr. Peterson

11   claims plaintiff needs on the one hand and the health insurance

12   that you claim the plaintiff needs on the other hand?

13   A.  Yeah, there could be.  I certainly wouldn't deny that.  I

14   don't -- since he -- since he is not at that point of procuring

15   a health insurance plan, I don't know what they would cover.

16   They do cover some limited things such as marital counseling,

17   psychiatric care for limited periods of time, but I don't know

18   if it would cover him.  For example, marital counseling, there

19   are 150 units of it over a lifetime.  I don't know of any life

20   care plan or health insurance plan that provides that kind of

21   coverage.

22   Q.  But the bottom line is you just don't know the extent of

23   the overlap; is that right?

24   A.  That is correct, yes.

25   Q.  And the figures presented in your report regarding PTSD

1   life care costs do not account for any insurance that you claim

2   plaintiff needs; right?

3   A.   Correct.

4   Q.   Now, let's talk about the estimated costs per unit for

5   these treatments and medications under the PTSD life care

6   costs.

7   A.   I have no opinion on that.

8   Q.   Do you -- you have no opinion on the costs?

9   A.   No.  I -- I was given the costs.  I don't have an opinion.

10   Q.   You didn't do any independent research on whether those

11   costs were accurate?

12   A.   No, I did not.

13   Q.   Those costs simply came from Dr. Peterson's report; right?

14   A.   Correct.

15   Q.   You don't know if Dr. Peterson did any independent research

16   to determine whether those figures are accurate; right?

17   A.   That's correct.

18   Q.   Okay.  Dr. Ward, earlier when you were being asked a series

19   of questions by Mr. Thomas, there was some --

20   A.   Yes.

21   Q.   -- discussion of Tricare.

22   A.   Yeah.

23   Q.   And I believe you said he had Tricare but they took it

24   away.

25   A.   Yes.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    473

1   Q.  When you were referring to Tricare, were you -- did you

2   mean to say VA Choice?

3   A.  No, VA Choice is a different program.  To be eligible for

4   VA Choice, you have to be more than 40 miles away from the

5   nearest VA facility, which he isn't, so he's not eligible for

6   it.

7   Q.  So you're not aware of the plaintiff ever receiving

8   benefits under the VA Choice program?

9   A.  Correct.

10  Q.  And, Dr. Ward, you have not opined that plaintiff's

11  economic losses in this case include lost wages or earning

12  capacity; right?

13  A.  No, I don't.  And I --

14  Q.  And that's because -- I'm sorry, I didn't mean to cut you

15  off.

16  A.  No, he has -- he has -- he's continuing to work.  He's

17  trying to work.  I have no basis.  Obviously if someone has

18  PTSD and a 60 percent disability rating, likely it's going to

19  impact their ability to earn.  But he had those disability

20  ratings acquired in the military not -- not simply from his

21  treatment at VA.

22  Q.  Okay.  Now, Dr. Ward, in your direct examination, you and

23  Mr. Thomason talked about plaintiff having lost his VA care.

24  Do you recall that?

25  A.  Right.

1   Q.  He hasn't actually lost that care.  He's still a veteran;

2   correct?

3   A.  Sure.  Could he go back to VA?  Sure, of course he could.

4       That's not the issue.  The issue is that he did go to the

5   VA and he received treatment that led to any number of

6   conditions and situations that resulted in a lawsuit against

7   Dr. -- Mr. Wisner and claims of mistreatment by Mr. Wisner to

8   Mr. Leininger.

9       The question is should he be forced to go?  If he can't go

10  back to -- I mean, there are many -- there are many people that

11  have traumatic accidents or exposures and they can't go back to

12  that former experience in the future.  I don't know if that's

13  the case for him.  I simply have been told that is what the

14  claim is of the litigation, and I'm simply coming up with a

15  number on what the value of the VA coverage is.  Whether it's a

16  loss to them, that's up to the trier of fact, which in this

17  case is the judge.

18  Q.  Understood.

19      And your -- the assumptions you made, in coming up with

20  your report in this case, are based on -- well, you have

21  assumed that the plaintiff could not return to any VA, not just

22  the VA where he saw Mr. Wisner; right?

23  A.  That's what I was asked to assume, correct.

24  Q.  Okay.  All right.

25          MS. HASTON:  I have no further questions.  Thank you.

1      THE COURT:  Mr. Thomas redirect?

2      MR. THOMAS:  If I may, Your Honor.

3                    REDIRECT EXAMINATION

4  BY MR. THOMAS:

5  Q.  You were asked if you interviewed the plaintiff.  Did you

6  need to interview him for this case?

7  A.  No.  We weren't calculating lost earnings capacity or loss

8  of services, no; so we didn't.

9  Q.  We didn't ask you to review medical records?

10  A.  No.

11  Q.  Why didn't -- why didn't you review medical records?

12  A.  That's an issue of liability and I have no opinion about

13  liability.

14  Q.  Are you a medical doctor?

15  A.  No, I'm not.

16  Q.  We didn't give you any medical bills.  Is that because

17  we're not asking the court to award medical bills?

18  A.  I -- I don't know why.  But if you're not, then normally in

19  this kind of a situation if I've got an injury to someone, if

20  there are past medical bills, the plaintiff is capable of

21  presenting those directly; they don't need an economist.

22  Q.  You use -- Ms. Haston said you didn't even have him fill

23  out a questionnaire.

24  A.  No.

25  Q.  What are your questionnaires for?

16-2627 Leininger v USA et al  7.7.20 Vol. 2                476

1   A.  They're lost wages typically.

2   Q.  What else?

3   A.  We have ten different kinds.  Some of them are lost wages,

4   lost services, commercial litigation, lost profits.  There are

5   many different questionnaires that we use, none of which

6   applied in this case.

7   Q.  Okay.  You were asked questions about why you calculated

8   cost for dental care.

9   A.  Right.

10  Q.  First of all, does he currently -- is he supposed to have

11  -- does he currently have dental coverage through the VA?

12  A.  If he went there, he would, yes.

13  Q.  Okay.  But, again, we asked you to do these calculations

14  assuming that he should never have to go back again; right?

15  A.  Right.

16  Q.  And she asked you questions about his -- if you knew he had

17  gone back to the VA since the incidents with Mark Wisner.  Do

18  you remember that?

19  A.  Right.

20  Q.  I'll represent to you that a large number of those were

21  emergency room visits for mouth infections.  That's something

22  that should be covered; right?

23  A.  Sure.

24  Q.  He has vision coverage now; right?

25  A.  You know, he's working for this --

16-2627 Leininger v USA et al  7.7.20 Vol. 2                    477

1    Q.  No, I mean, through the VA?

2    A.  Oh, through VA, sure.

3    Q.  But we're -- we're saying he should never have to go to the

4    VA again, so, please, give us the calculation of what that

5    would be worth; right?

6    A.  Yeah, in a sense you're saying it.  I'm simply saying what

7    the value of that is.

8    Q.  You were asked if -- do you know for a fact that when he

9    turns 65 he's going to apply for Medicare, do you remember

10   that?

11   A.  Yeah, I remember it.  But if he was -- if he was in good

12   standing at the VA and he didn't have a problem going to the

13   VA, he wouldn't have to apply for Medicare; he could stay with

14   the VA for life.

15   Q.  So we asked you to come up with a calculation that would be

16   commiserate with that benefit that he's already earned?

17   A.  Right.  Which would be Medicare with Medigap coverage and

18   part -- Part B and D, correct.

19   Q.  We asked you to try as best you can to match the VA

20   coverage; right?

21   A.  Correct.

22   Q.  But you can't actually do that?

23   A.  No, you can't come up with it all because they're -- all of

24   those private plans have limitations.

25   Q.  We can't make him whole, but this is the best we can do?

1   A.  It's the best I can do.

2   Q.  You were asked if you did independent research on the life

3   care figures that were given to you by Dr. Peterson?

4   A.  Right.

5   Q.  Do you ever do independent research on those figures?

6   A.  No.  I'm not a doctor and I don't presume to express an

7   opinion for life care costs.

8   Q.  I will -- you were asked questions about VA Choice.  What's

9   the difference between Tricare and VA Choice?

10  A.  VA Choice is kind of a stopgap thing.  So, for example, if

11  you've been going to a VA Hospital and suddenly you found

12  yourselves in a position there's not one within 40 miles.  It's

13  actually supplied frequently at a hundred miles and you can't

14  access the VA facility, you can go to a private doctor in a

15  private facility and have temporary coverage.

16      Now, you know, what they want you to --

17  Q.  Temporary?

18  A.  It's temporary, sure.

19  Q.  Right.  And the thing is you have to qualify for it each

20  and every time; right?

21  A.  Right.  That involves the location, your income, and many

22  other things as well.

23  Q.  It's just like you said, a stopgap if you need to go see

24  maybe a specialist outside --

25  A.  Right.

16-2627 Leininger v USA et al  7.7.20 Vol. 2          479

1   Q.  -- of the VA or a doctor who's -- you're more than 40 miles

2   away from the VA or there's some excessive burden; right?

3   A.  Right.

4          MS. HASTON:  Objection.

5          THE COURT:  Excuse me, there is an objection.

6          Ms. Haston?

7          MS. HASTON:  Leading, Your Honor.

8          THE COURT:  It is leading.  Objection sustained.  The

9   answer's stricken.

10  BY MR. THOMAS:

11  Q.  All right.  Well, you tell me in your words how is it --

12  what is it?

13  A.  Choice?

14  Q.  Yeah.

15  A.  It's a stopgap measure.

16  Q.  Is it a long-term insurance?

17  A.  It's not supposed to be, no.

18  Q.  No.

19      And I'll represent to you that there were some references

20  in his medical records to VA Choice --

21  A.  Right.

22  Q.  -- when he saw some doctors at KU?

23  A.  Sure.

24  Q.  Does that in any way impact -- and maybe some other doctors

25  too for that matter.  Does that impact your opinions?

1    A.   No, you're always -- if you're going to a VA facility,

2    you're always eligible for VA Choice.  So, for example, if he

3    was going to the VA Hospital and their rheumatologist

4    specialist in a particular area had just retired and you could

5    go to KU.  They could find you some other private facility to

6    go to as a stopgap.

7         Now, why is it a stopgap?  Because it's used temporarily.

8    VA finds another doctor.  Now you go back to VA, or temporarily

9    or not within 40 miles, now you are.

10   Q.   Doctor, the questions I've asked you on redirect and the

11   answers you've given, have they been offered to a reasonable

12   degree of forensic economic certainty?

13   A.   As best I can do.

14   Q.   Thank you, sir.

15              MR. THOMAS:  I have no further questions.

16              THE COURT:  Ms. Haston, do you have any additional

17   questions for the witness?

18              MS. HASTON:  Nothing further, Your Honor.  Thank you.

19              THE COURT:  All right.  I assume the witness may be

20   released, Ms. Haston?

21              MS. HASTON:  Yes, Your Honor.

22              MR. THOMAS:  Thank you, Your Honor.

23              THE COURT:  Thank you, Dr. Ward.

24              THE WITNESS:  Here are your marked exhibits by the

25   way.

1    THE COURT:  Just to clean up our record a little bit,

2  Mr. Thomas, on the demonstrative that you used with Mr. Ward, I

3  would ask you to submit that to the chambers e-mail account so

4  we'll have a record of it in our set of exhibits.  I get it,

5  it's not real evidence that comes in as -- or comes to the

6  court in that category of demonstrative, but I do want to make

7  sure the record -- and I think you said it has already been

8  provided to defense counsel.

9    MR. THOMAS:  We will do that, Your Honor.

10    THE COURT:  Well, I know there's 15 minutes left on

11  our clock today, but I think by the time you get the station --

12  testifying station you've used cleaned and sanitized for the

13  next witness, we'll be up against it.  Let's try to do this:

14  Let's recapture or 15 minutes in the morning and aim to start

15  at 8:45 so that we won't fall behind.  I know I've allotted you

16  specific time.  We have a little slippage bound to happen on

17  the operational side of things, but we'll plan to do that in

18  the morning.

19    Just let me -- let me raise with you -- and I -- let

20  me find my list of things I want to talk with counsel about.

21  So, Mr. Thomas, you indicated this morning, and I -- I stopped

22  you before you got up ahead of speed, about you wanted to make

23  a record about an exhibit.  Are you prepared to take that up

24  now?

25    MR. THOMAS:  I am, Your Honor.  I'm trying to scroll.

1    It's actually something we filed last night, Your Honor.  I

2    think I found it.  Yes, I found it.  It should be docket --

3    Docket No. 142 on the court's ECF.  I don't know if you have

4    that in front of you, Your Honor.

5          THE COURT:  Is this the response to the motion that

6    was filed last week by the government?

7          MR. THOMAS:  Nope.  This is something totally

8    different related to exhibits and I probably did it

9    incorrectly, but I'm trying to make a clear record for the

10   appellate court and also maybe try to be a little more

11   expedient and save us some time.

12         THE COURT:  All right.  So on the CM/ECF docket, it's

13   Document 142?

14         MR. THOMAS:  Yes, it is, Your Honor.  It's called

15   Plaintiff's Offer of Deposition Exhibits.

16         THE COURT:  Thank you.  I do have it.  I put it to the

17   side because I thought it was something we wouldn't talk about

18   today, but I have it in front of me.

19         MR. THOMAS:  There wasn't a category for me to click

20   on that matched what I was trying to accomplish, so I'm sure

21   I've done it wrong.

22         THE COURT:  I don't think -- I don't think they score

23   anybody on how accurate you get on that description, and

24   sometimes we'll redesignate on the docket if it's something

25   that matters.

16-2627 Leininger v USA et al  7.7.20 Vol. 2                483

1           So tell me what are you trying to accomplish or what

2    should we talking about on docket 142?

3           MR. THOMAS:  Yes, Your Honor.  Typically when we

4    present deposition transcripts to the court or play them for

5    the jury, any exhibits that are covered during the designated

6    testimony we offer either at the conclusion of that deposition

7    or before we rest our evidence.  There are substantial exhibits

8    in those depositions.  We've broken them down by witness and

9    can provide them to the court in -- in -- accordingly broken

10   down by witness.

11          But what I wanted -- what I was going to do originally

12   was, before we rested our case, is stand up and read every one

13   of those into the record and offer them.  That would be

14   laborious and time-consuming and I will do it, but I thought

15   this might be a more efficient way to do it because now there's

16   a record of exactly what we're offering and it corresponds to

17   designated and offered deposition testimony.

18          THE COURT:  All right.  So let me -- I think I'm -- I

19   think I'm following you.  Along with your deposition

20   designations, which I plan to take with the case and rule post

21   trial, you would like -- in effect you're offering the exhibits

22   that are identified in Document 142.  And I would suggest to

23   counsel that those be ruled in the same fashion along with the

24   deposition designations.  Is that what you're suggesting,

25   Mr. Thomas?

1          MR. THOMAS:  Yes, sir.

2          THE COURT:  All right.  What's the defendant's -- do

3    you have a problem with that, from the defense room?

4          MR. EISER:  Your Honor, we haven't had a chance to

5    review whatever he's filed, and -- and my understanding is

6    exhibits have to be admitted through a witness and not just

7    dumped in the courtroom, so I'm not -- but, you know -- so that

8    -- I can't fully respond, but that's my initial reaction.

9          THE COURT:  Well, I'll give you -- okay.  I'll give

10   you a chance to review it.  I mean, I agree with the

11   proposition that where there is a context, the documents,

12   unless they're, I guess, self-authenticating and by their

13   content obviously relevant, can't be just offered.

14          But I do think that when they're offered as part and

15   parcel of a large range of deposition -- deposition

16   designations, and, for instance, just to look at the first

17   entry, it is identified as -- I guess it's identified as

18   Deposition No. 2 in the Baker deposition, that when the ruling

19   is made on whether the passage where Deposition Exhibit 2 is

20   referred to in Mr. -- Mr. Baker or Ms. Baker's deposition, that

21   if the designation sufficiently sets the table for the

22   documents or exhibits to be received, it would be admitted on a

23   ruling post trial.

24          MR. EISER:  Yes, Your Honor.

25          THE COURT:  I'll let you take a look at it overnight.

1    I applaud the effort to try to avoid making a long sort of

2    liturgy of exhibit numbers that the court reporter has to take

3    care -- has to take down, and this strikes me as a more

4    efficient method of dealing with it.  So I'll give you the

5    night to look at this and see what you think, and certainly you

6    may want even post trial to submit objections to the offered

7    exhibits, but we'll talk about that in the morning.  That make

8    sense, Mr. Thomas?

9            MR. THOMAS:  Yes, it does, Your Honor.

10           THE COURT:  Okay.  The only other issue that I'm --

11   I'm sure you're tired of me talking about it, but I -- based on

12   what I read yesterday I view it as an important one, and that

13   is whether the plaintiff in this case is going to be allowed to

14   continue to litigate by initials.  I know there have been many

15   references to that plaintiff by name today, his wife testified,

16   no mystery about what her name is, and so where -- what's the

17   -- what's the plaintiff's position today on that question?

18           MR. THOMAS:  We have been sufficiently terrified by

19   that case, Your Honor, and don't even want to risk it.

20           THE COURT:  It caught my attention, too, and I guess,

21   in terms of my thought about what ought to happen here, is that

22   if this had been raised earlier in the proceedings or if I had

23   noted it when the case came to me on reassignment, I probably

24   would have entered a show cause order and we might have ended

25   up directing -- I might have ended up directing the plaintiff

1    to file amended complaint.

2            We're a little late for that.  We're at the pretrial

3    order stage which has superseded the pleadings.  I guess one --

4    my primary thought about how to address this is to enter a --

5    an amended pretrial order that would substitute the plaintiff's

6    actual name for the initials that have been used to litigate

7    today and to direct the clerk to recaption the case in that

8    fashion.  That's a preliminary thought.  I'll give you a chance

9    to express your views on it.

10           MR. THOMAS:  I was thinking the same thing.  Cases are

11   recaptioned all the time and you don't necessarily have to file

12   an amended complaint, usually through a motion to modify the

13   caption.  And I can represent to the court that I am so moving

14   on the record in that regard but that's what I was thinking.

15           THE COURT:  Yeah and do you have a -- do you have a

16   concern about arranging the entry of a modified -- or, I guess,

17   I'd call it an amended pretrial order through the good work of

18   Judge James that would replace the initials with the

19   plaintiff's actual name?

20           MR. THOMAS:  No, Your Honor.

21           THE COURT:  So from your room, Mr. Eiser, Ms. Haston,

22   your view on how to address this issue?  Do you have a concern

23   about what I've outlined?

24           MR. EISER:  No, Your Honor.  We appreciate your

25   concern.  This is the plaintiff's issue.  However you and the

1    plaintiff want to resolve it's fine.

2         THE COURT:  Yeah, I think it's -- to be candid with

3    you, I -- we looked at this a little deeper and there are cases

4    from around the country which, on an issue like this, are sort

5    of -- I would call them fact dependent and circumstance

6    dependent.  I don't want to raise the idea that this is

7    forbidden.  Certainly the plaintiff might make a showing of a

8    particular case that would permit the case to go forward on

9    this basis.

10        But having heard the plaintiff's position today, I'm

11   going to proceed as I've outlined and ask Judge James to assist

12   with that while we're in trial shortly after that is entered to

13   correct the recaptioning of the case.  And I would just say

14   that that would be the only change in the pretrial order is

15   swapping out initials John Doe for the actual plaintiff's name.

16        So thank you for your attention to that issue.  And

17   with that, I don't plan to bring it up again.

18        MR. THOMAS:  Thank you, Your Honor.  Thank you for

19   your attention, Your Honor.

20        MR. EISER:  Thank you, Your Honor.

21        THE COURT:  Anything else that you -- from a -- from a

22   trial management good for the order kind of commentary that we

23   ought to talk about before we part company tonight?

24        MR. THOMAS:  I would just -- we do intend to rest

25   tomorrow morning, and so I was just going to ask how much time

1    we have left.  I don't know if you -- if you don't know, I can

2    find out in the morning, Your Honor.

3         THE COURT:  I think I'll have to tell you in the

4    morning.  I can't do base 60 math that quickly.  I'm pretty

5    proud of my math facts, but I'm afraid I'd get that wrong.  So

6    if I can defer the question overnight and get my math facts

7    checked, I would be grateful.

8         MR. THOMAS:  Okay.  So other than that no, Your Honor.

9    We think we'll rest in the morning.  We'll put on Mr. Leininger

10   but then we'll rest.

11        THE COURT:  All right.  Mr. Eiser, hearing that trial

12   plan coming that we're nearing the end of the plaintiff's case,

13   do you have comments or looking forward advice on the

14   management of the case and the trial?

15        MR. EISER:  No, Your Honor.  Do you have a particular

16   -- I mean, I don't think we set our sequence of witnesses yet,

17   but we'll get that to the plaintiff tonight.

18        THE COURT:  All right.

19        MR. THOMAS:  Thank you.

20        THE COURT:  And then I would -- I mean, I would plan

21   -- I haven't heard whether you plan to make a motion for

22   judgment as a matter of law.  If you do, I would hear that.  I

23   wouldn't anticipate that it would take a great deal of time to

24   hear and dispose of that issue.  Might even reserve my ruling

25   on it and try to get you to go forward with your evidence so

16-2627 Leininger v USA et al  7.7.20 Vol. 2                489

1    that we don't have people parked out in the hall, if that makes

2    sense to you.  So I think you ought to assume that we'll pass

3    the baton over to your side of the room as soon as the

4    plaintiff testifies and the cross is finished and go forward

5    from there.  All right?

6              MR. EISER:  That's fine.

7              THE COURT:  8:45 work for everybody in the morning

8    just to recapture a little bit of lost time?

9              MR. THOMAS:  So then we should actually be on the Zoom

10   by 8:30.

11             THE COURT:  Yeah, I mean, I don't think anybody's

12   scoring that.  As you saw, I imposed a nine-minute delay today

13   because I couldn't get my technology to work.  I plan to use

14   the laptop tomorrow.  I think it will be easier.  Just give

15   yourself some time to fix a connection problem if we have it.

16   Ms. Garrett will get on by then and we'll aim to start with the

17   plaintiff's next witness at 8:45.

18             MR. THOMAS:  We've been keeping track of Your Honor's

19   time, and you still have plenty, Your Honor.

20             THE COURT:  Well, thanks.  I've talked more than I had

21   intended, but I'm -- as you know, I came to this case late and

22   so I am appreciating your patience with my inquiries that I

23   might not have to ask if I had lived with the case longer.

24             All right.  Thank you all very much we'll go ahead and

25   close the record.  I'll plan to see you in the morning.  Good

1    night, everyone.

2        (Proceedings adjourned to day July 8, 2020, at 8:45 a.m.)

3

4                        CERTIFICATE

5        I certify that the foregoing is a true and correct

6    transcript from the stenographically reported proceedings in

7    the above-entitled matter.

8        DATE:  March 5, 2021

9

10                   /s/Kimberly R. Greiner
                     KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
11                   United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25