```
 1                 UNITED STATES DISTRICT COURT
                       DISTRICT OF KANSAS
 2

 3   AARON LEININGER,
                                    Case No. 16-2627
 4     Plaintiff,                   Circuit No. 21-3031

 5     v.
                                    Kansas City, Kansas
 6   UNITED STATES OF AMERICA       Date:  07/08/2020
     and MARK E. WISNER,
 7                                  Volume 3
       Defendants.                  (Pages 491-753)
 8
     ........................
 9

10

11                  TRANSCRIPT OF BENCH TRIAL
                            Via Zoom
12
             BEFORE THE HONORABLE DANIEL D. CRABTREE
13            UNITED STATES DISTRICT COURT JUDGE

14   APPEARANCES:

15   For the              Daniel A. Thomas
     Plaintiff:           Michael S. Kilgore
16                        Humphrey, Farrington & McClain
                          221 West Lexington Avenue
17                        Suite 400
                          Independence, MO 64050
18

19   For the United       Lawrence Eiser
     States of America:   Sarah Haston
20                        U.S. Department of Justice
                          Civil Division, Torts Branch
21                        Benjamin Franklin Station
                          P.O. Box 888
22                        Washington, DC 20044

23

24   _____
          Proceedings recorded by machine shorthand, transcript
25   produced by computer-aided transcription.
```

1                          I N D E X

2

     Plaintiff's Witnesses:                              Page

3

     AARON L. LEININGER
4      Direct Examination By Mr. Thomas                   497
       Cross-Examination By Mr. Eiser                     543
5      Redirect Examination By Mr. Thomas                 623
       Recross-Examination By Mr. Eiser                   659
6      Further Redirect Examination By Mr. Thomas         661

7

     Motion for Judgment as Matter of Law                666

8

9    Defendant's Witnesses:

10   JEFFREY G. NICHOLSON, PA-C, Ph.D., M.Ed., MPAS
       Direct Examination By Ms. Haston                   673
11     Voir Dire Examination By Mr. Kilgore               689
       Direct Examination - Continued By Ms. Haston       692
12     Cross-Examination By Mr. Kilgore                   707
       Redirect Examination By Ms. Haston                 743
13     Recross-Examination By Mr. Kilgore                 748

14

15                        E X H I B I T S

16   Plaintiff's
     Exhibits              Offered            Received
17
            25           643, 663           643, 663
18         187               612                 612
           192               516                 516
19         194               517                 517
           195               523                 523
20         240           507, 663                663

21

22

23

24

25

```
 1                        E X H I B I T S

 2                          (continued)
          Defendant's
 3        Exhibits              Offered           Received

 4           406                  688                692
             423                  664                665
 5           424                  664                665
             425                  664                665
 6           426                  664                665
             427                  664                665
 7           428                  664                665
             429                  664                665
 8           430                  664                665
             431                  664                665
 9           432                  664                665
             433                  664                665
10           434                  664                665
             435                  664                665
11           436                  664                665
             437*             577, 664           578, 665
12           438                  664                665
             439                  664                665
13           440                  664                665
             441                  664                665
14           442                  664                665
             443                  664                665
15           444             605, 664                665
             445                  664                665
16           446                  664                665
             447                  678                678
17

18    * Denotes demonstrative purposes only.

19

20

21

22

23

24

25
```

1          (Court called to order 8:45 a.m.)

2              THE COURT:  So everyone -- plaintiffs are ready to go?

3              MR. KILGORE:  Yes, we are.  Your Honor, I would like

4     to make a very brief record, if I could, regarding an exhibit

5     yesterday with the court's indulgence.

6              THE COURT:  All right.  Let me make sure -- let me

7     make sure the defendant is all prepared set up to go.  Are you?

8              MS. HASTON:  Yes, Your Honor.

9              THE COURT:  All right.  Mr. Kilgore.

10             MR. KILGORE:  Yesterday, during the direct exam of

11    Dr. Kelley, I introduced Plaintiff's Exhibit 82.  If the court

12    will recall, that was the constituent letter -- or the letter

13    that -- that Congressman Graves sent on behalf of a

14    constituent.  It referred to complaints about a nurse.  That --

15    that letter was -- was produced in this litigation as a

16    complaint that we requested.  It was used, Your Honor, in the

17    deposition of Rudy Klopfer, and Dr. Klopfer gave us no

18    indication in his testimony that it wasn't regarding

19    Mr. Wisner.  That's always been our understanding.

20             Based on Ms. Haston's representations yesterday,

21    Mr. Thomas took it upon himself to actually get in contact with

22    the attorney that represented that constituent.  What we

23    learned from that conversation last night was that the

24    constituent had complaints about both a nurse at the facility

25    and complaints about Mr. Wisner.  However, the attorney

1   confirmed that the letter that was produced in this litigation

2   concerned a nurse and not Mr. Wisner.

3          So I wanted to clarify the record in that regard,

4   advise the court that, you know, based on our diligence last

5   night that's what we learned.  It's the first time we learned

6   that in this litigation.

7          THE COURT:  And thank you very much, Mr. Kilgore.  Do

8   you -- do you propose any other clarification besides your

9   statement amplifying what Exhibit 82 is about and is not about?

10         MR. KILGORE:  That was my intent, simply to make a

11  record of that, Your Honor.  Beyond that, I would leave it to

12  the court in terms of if you deemed anything else -- additional

13  record is necessary, but that's the record I wanted to make.

14         THE COURT:  Thank you very much.  Mr. Eiser,

15  Ms. Haston, do you contend any additional amplification or

16  clarification is warranted?

17         MR. EISER:  No, Your Honor.  As a matter of fact,

18  we've had too much amplification.  We explained that to them

19  last night.  There was no reason to be calling and now

20  introducing it.  Turns out he did have another complaint.  Very

21  subtle and sly by plaintiff's attorney.  We explained that note

22  says it's a complaint about a nurse.  So how they came to the

23  conclusion it was about Mr. Wisner is beyond us.  But if

24  they're withdrawing it, they're withdrawing it.  We appreciate

25  that.

 1          THE COURT:  I think the exhibit -- let me suggest

 2    this:  I don't think -- I don't -- I'm not interested in really

 3    trying to sort out the wherefores and the heretos and how the

 4    cow ended up eating which cabbage.  But I think Exhibit 82 has

 5    been received.  I'm not suggesting it be struck from the

 6    evidence, but with the clarification, the understanding that

 7    that letter concerns a nurse and not Mr. Wisner, I'll just move

 8    forward with the fact finding with that understanding clearly

 9    in my mind.

10          MR. EISER:  Thank you, Your Honor.

11          MR. THOMAS:  Thank you, Your Honor.

12          THE COURT:  Just an update on time, the plaintiff has

13    8 hours and 4 minutes left.  The defendant has 14 hours,

14    rather, and 54 minutes, left.

15          So with that I think we're ready for the plaintiff to

16    call his next witness.

17          MR. THOMAS:  Yes, Your Honor, plaintiff calls

18    Mr. Aaron Leininger.

19          THE COURT:  Mr. Leininger, is he seated in the witness

20    chair or proceeding there now?

21          MR. THOMAS:  He's -- he's outside in the hallway, Your

22    Honor.  We're bringing him in right now.

23          THE COURT:  All right.  Thank you.

24          Mr. Leininger, can I ask you to raise your right hand

25    to accept the oath from the deputy clerk.

```
 1                    AARON L. LEININGER,
 2  called as a witness on behalf of the Plaintiff, having first
 3  been duly sworn, testified as follows:
 4       (Interrupting phone line speaker.)
 5           THE COURT:  Someone is on the line, doesn't have their
 6  line muted or contact muted.
 7           Mr. Leininger, I didn't hear your response to the
 8  oath.
 9           THE WITNESS:  I do.
10           THE COURT:  Thank you very much.
11           Mr. Thomas.
12                    DIRECT EXAMINATION
13  BY MR. THOMAS:
14  Q.  Aaron, if you want, you can leave your mask on, or if
15  you're more comfortable, you can take it off, okay.  And when
16  you talk, you'll be talking to the camera there.  Okay?
17       Could you, please, introduce yourself.
18  A.  Aaron Lee Leininger.
19  Q.  How old are you?
20  A.  Fifty-one.
21  Q.  Where did you grow up?
22  A.  Kansas City, Kansas.
23  Q.  Are you nervous right now?
24  A.  A little bit.
25  Q.  All right.  We'll try -- we'll try to do -- make this as
```

```
1    painless as possible.  I want the court to get to know a little
2    bit about you.  What kind of things did you like doing as a
3    teenager?  Did you play sports?
4    A.   Played football, basketball, hacky sack.
5    Q.   Bowling?
6    A.   Bowling.
7    Q.   Did you go fishing?
8    A.   Fished a lot.
9    Q.   Did you hunt?
10   A.   Hunt.  Anything out -- most outdoors things.
11   Q.   Are you currently married?
12   A.   Yes.
13   Q.   And you're married to Mary; is that right?
14   A.   Correct.
15   Q.   How long have you been married?
16   A.   We've been married 15 years.
17   Q.   Do you have any children?
18        You've been married 16 years.  How long have you been
19   together?
20   A.   Twenty-two -- 22 years.
21        Do I have any children?  I have four through our marriage.
22   Q.   Did you raise them as their own?
23   A.   Yes, I did.
24   Q.   Where do you currently work?
25   A.   Blue Beetle Wildlife Control.
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    499

1   Q.   And how long have you worked there?

2   A.   About 16 months.

3   Q.   What's the strangest -- what do you do there at Blue Beetle

4   Wildlife Animal Control?

5   A.   I retrieve, well, people say nuisance wildlife out of

6   people's homes, out of their attics, catch animals, raccoons

7   and opossums that are tearing up property, mostly do that, tree

8   snakes.

9   Q.   I understand some people understandably call them

10  nuisances, but do you see them a different way?

11  A.   I don't see them as a nuisance, no.

12  Q.   Do -- you have an affection for animals; is that right?

13  A.   Correct.

14  Q.   What's the strangest animal nuisance call you ever had to

15  deal with?

16  A.   Strangest was rescuing an owl.

17  Q.   Rescuing an owl?

18  A.   Yeah.

19  Q.   Do you enjoy your job?

20  A.   Yes, I do.

21  Q.   Why do you enjoy this job as opposed to other jobs you've

22  had in the past?

23  A.   I get to work with animals.

24  Q.   Do you like working with animals better than people?

25  A.   Definitely, yes, I like to work with animals better than

1    people.

2    Q.   And why is that?

3    A.   I trust animals.  I know what they're going to do.

4    Q.   Do you have a hard time trusting people?

5    A.   Yes.

6    Q.   After -- I want to talk about when you served in the Army.

7    How high did you get in high school?

8    A.   11th grade.

9    Q.   And were you -- were you told you were going to have to

10   repeat the 11th grade?

11   A.   Yes.

12   Q.   And so then what did you decide to do?

13   A.   I dropped out and got my GED.

14   Q.   And then what did you do?

15   A.   Then I joined the military.

16   Q.   And what branch did you serve?

17   A.   Army.

18   Q.   Why did you choose the Army?

19   A.   It was the easiest one to get into.

20   Q.   I hear you, brother.

21        Have any other family -- members of your family served in

22   the military?

23   A.   Yes.  I've had a father, his father, my uncle.

24   Q.   Your dad, your grandfather, and your uncle?

25   A.   (Witness nods head.)

16-2627 Leininger v USA et al   7.8.20 Vol. 3                501

1  Q.  All of you have a history of military service in your

2  family?

3  A.  Yes.

4        THE COURT:  Mr. Thomas, I'm sorry to interrupt.  This

5  is Dan Crabtree.  The camera set-up seems different to me

6  today.  I can barely see Mr. Leininger.  I can -- it's pretty

7  distant from him, and maybe it's the way the camera's

8  positioned, but I'd just like to be able to see him more

9  directly.  Is it possible for it to be a little bit closer?

10        MR. THOMAS:  We're working on that right now, Your

11  Honor.

12        THE COURT:  Thank you very much.  I'm sorry to

13  interrupt.

14  BY MR. THOMAS:

15  Q.  What year did you join the Army?

16  A.  1988.

17  Q.  What was your favorite thing about being in the Army?

18  A.  Structure.  You have to learn things and there was a lot of

19  discipline in it.

20  Q.  You knew what was expected of you?

21  A.  Yes, I knew what was expected of me.

22  Q.  Where to be and at what time?

23  A.  Yeah.

24  Q.  Where did you do your basic training?

25  A.  Fort Benning, Georgia.

```
1   Q.  What year -- when were you discharged?

2   A.  1991.

3   Q.  Was that an honorable discharge?

4   A.  Yes, it was.

5   Q.  Were you ever deployed?

6   A.  Yes.

7   Q.  When was that?

8   A.  August of '90.

9   Q.  And how long were you there?

10  A.  Ten, nine months.

11  Q.  Ten, nine months.  Was that part of Operation Desert Storm?

12  A.  Yes.

13  Q.  What countries were you sent to?

14  A.  First, I was sent to Saudi Arabia.

15  Q.  And then where?

16  A.  And then into Iraq.

17  Q.  What about Kuwait?

18  A.  I was on the backside of Kuwait.

19  Q.  What was your unit when you were sent to --

20  A.  The 29th Infantry Division, 3-7 Infantry out of

21  Fort Stewart, Georgia.

22  Q.  What was your company?

23  A.  Echo.

24  Q.  Echo, that's E Company; right?

25  A.  Yes.
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3

```
1    Q.  Who was the first on the ground?

2    A.  Pretty much we were.

3    Q.  Did you see combat?

4    A.  Yes.

5    Q.  What was your job or specialty when you were in the war

6    zone?

7    A.  To kill people.

8    Q.  What were your orders as far as killing?

9    A.  We were told to kill anybody in certain zones:  men, women,

10   children.

11   Q.  What if they were waving an American flag?

12   A.  We were still supposed to kill them.

13   Q.  And that's what you were ordered to do?

14   A.  Yes.

15   Q.  Were you fired upon --

16   A.  Yes.

17   Q.  -- by enemy soldiers?

18       I'm not going to go into detail, but did you return fire?

19   A.  Yes.

20   Q.  Do you remember an area in Iraq called the Highway of

21   Death?

22   A.  Yes.

23   Q.  Can you tell the court, were you there at the Highway of

24   Death?

25   A.  We were on the outskirts of it, yes.
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3                504

1   Q.  Can you tell the court what the Highway of Death is to us

2   veterans?

3   A.  It -- it -- it was a gory place.

4   Q.  Gory.  Okay.

5       Was it some of the heaviest fighting there?

6   A.  It was the largest fighting.  It was the heaviest fighting.

7   It was the most casualties taken, civilian and military.  It

8   was the spot that people were trying to flee Kuwait or enter

9   Kuwait, most, and were trying to flee, whether it be the

10  Republican Guard or civilians that lived there, but everybody

11  that was there died whether civilian or not.

12  Q.  Is there any particular experience that stayed with you

13  from the Highway of Death?

14  A.  Man and his daughter waving the American flag as they were

15  rolling -- driving past us and getting shot in front of us --

16  in front of me.

17  Q.  Your unit mowed them down?

18  A.  Yes.

19  Q.  Right in front of you?

20  A.  Yes.

21  Q.  How old was this little girl do you think?

22  A.  Five, six.

23  Q.  When you weren't in the combat -- or when you weren't

24  actively receiving or returning enemy fire, what was another

25  job duty you had?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    505

1    A.   Stacking bodies.

2    Q.   Dead bodies?

3    A.   Yes.

4    Q.   Why were you stacking dead bodies?

5    A.   Because they could be picked up or disposed of later on.

6    It wouldn't be out polluting everything, doesn't spread disease

7    if we keep them altogether.  We have other groups that come in,

8    either burn the bodies or bury them.

9    Q.   Do you have any memories from that?

10   A.   Yes.

11   Q.   What memories do you have?

12   A.   This is about the bodies and bloated on the ground.

13   Q.   Do you ever find yourself still thinking about combat 25,

14   almost 30 years later?

15   A.   Yes.

16   Q.   I know you don't like to talk about it, but we kind of have

17   to for this case.  You understand?

18   A.   (Witness nods head.)

19   Q.   Is that a "yes?"

20   A.   Yes.

21   Q.   Okay.  Back when you were coming out of war, Desert Storm,

22   was PTSD something -- something the guys and the veterans

23   talked about?

24   A.   No.

25   Q.   Was it something that was even talked about at -- at the --

1    the med clinics?

2    A.   No.

3    Q.   Was it something that was even talked about when you first

4    rotated out and saw the VA in those early days?

5    A.   No.

6    Q.   It's only been since Operation Enduring Freedom Iraq,

7    Operation Iraqi Freedom there has been such an emphasis on this

8    in veteran healthcare; is that right?

9    A.   Yes.

10   Q.   When you went off to war, did you go there for the glory

11   and medals?

12   A.   No.

13   Q.   Were you looking for any kind of recognition?

14   A.   No.

15   Q.   Did you just want to do your job?

16   A.   Yes.

17   Q.   And serve your country?

18   A.   Yes.

19   Q.   Were you hoping to come home a famous war hero?

20   A.   No.

21   Q.   Do you even talk to people about your time in country?

22   A.   No.

23   Q.   Have you ever looked at your war records?

24   A.   Yeah.

25   Q.   Okay.  When's the last time you looked at them?

1          THE COURT:  We're getting some interference from one

2     of the call-in lines.  It's 816 number ending in 5050.  If that

3     would be muted, that would improve sound quality.

4          (Court reporter interruption.)

5          THE WITNESS:  When was the last --

6          MR. THOMAS:  What was the last question?

7          THE COURT:  The last question, "Have you ever looked

8     at your war records?"

9          The answer was, "Yeah."

10         The question was, "Okay.  When's the last time you

11    looked at them?"

12         And then we did not hear his answer on this end of the

13    -- of the video.

14         THE WITNESS:  It's been a long time.

15    BY MR. THOMAS:

16    Q.  I want to hand you what we've marked as Exhibit 240.  We're

17    not going to go through this whole thing.

18         MR. THOMAS:  Your Honor, Exhibit 240 are records from

19    the National Personnel Records Center.  We would like to offer

20    them into evidence.

21         THE COURT:  Is there any objection to 240?  From the

22    defendants is there objection to 240?

23         MR. EISER:  I don't know that we've been provided

24    that.  The amended list of exhibits only goes up to 239.  Is

25    this something new?  I apologize, Your Honor.

1          THE COURT:  That's all right.  My list stops at 239 as

2    well.

3          MR. THOMAS:  We sent it via High Tail to defense

4    counsel yesterday and it's actually in the documents that they

5    provided to us.  Ms. Haston is the recipient on the very first

6    page and I believe it might even be part of their giant

7    exhibits that they offered.

8          THE COURT:  Let's do this -- these are military

9    records?

10         MR. THOMAS:  Yes, they are, Your Honor, from the

11   National Archives sent to Ms. Haston on August 24th, 2018.

12         THE COURT:  I take it the defendant does not have

13   their hands on the -- the exhibit; is that right, Mr. Eiser?

14         MR. EISER:  Not at the moment, Your Honor.

15         THE COURT:  All right.  So, Mr. Thomas, can you

16   proceed with your examination and then return to hear the

17   position on Exhibit 240 once counsel has their hands on it?

18         MR. THOMAS:  Okay.  Do you want me to come back to

19   this line of questioning, Your Honor, or continue with the line

20   of questioning and come back to a ruling on its admission and

21   admissibility?

22         THE COURT:  Well, so these -- Mr. -- Mr. Eiser, let me

23   suggest this -- Ms. Haston, I should say, whoever from your

24   side of the room, I wouldn't expect there is going to be

25   significant controversy about testimony concerning the

```
 1   plaintiff's military service.  Do you object to proceeding

 2   using the exhibit pending ruling on admission?

 3              MR. EISER:  No, Your Honor.

 4              THE COURT:  All right.  That help, Mr. Thomas?

 5              MR. THOMAS:  It does, Your Honor.  And one last

 6   question, Your Honor, again, understanding that there is no

 7   ruling yet on admissibility, may we publish so that the court

 8   can see the sections we're referencing?

 9              THE COURT:  Any objection to that?

10              MR. EISER:  No, Your Honor.

11              THE COURT:  Okay.  Yeah, so, Mr. Thomas, you can

12   proceed on the premise that the exhibit will be received.  I

13   don't know that that's where the outcome will be.  But if it

14   isn't the outcome, then we'll come back and deal with the

15   issue.  That make sense?

16              MR. THOMAS:  Yes, it does, Your Honor.

17              Okay.  Let's go ahead and pull up the first page,

18   Scott.  Stay on the first page there.

19   BY MR. THOMAS:

20   Q.  And if it's easier, you can look at the computer,

21   Mr. Leininger, because we'll pull up the parts that we're going

22   to show you.  You see this is from the National Personnel

23   Records Center, also known as the National Archives; correct?

24   A.  Yes.

25   Q.  And it's dated August 24th, 2018?
```

510

16-2627 Leininger v USA et al   7.8.20 Vol. 3

1    A.  Yes.

2    Q.  To the Department of Justice, care of Sarah Haston?

3    A.  Yes.

4    Q.  It says, Thank you -- "Dear recipient, thank you for

5    contacting the National Personnel Records Center.  We are

6    pleased to respond to your request for separation documents,

7    personnel records, and medical records by providing you the

8    enclosed documents."

9         Did I read that correct?

10   A.  Yes.

11   Q.  Let's go to the DD214.  Can you tell the court what a DD214

12   is?  You don't have to give an official --

13   A.  It's a discharge from the military.

14   Q.  Now, the DD214 is it -- it's the status of things at the

15   time you're discharged?

16   A.  Yes.

17   Q.  Often times the record is amended later on as it's

18   determined you're eligible for other awards medals and --

19   A.  Right.

20   Q.  So let's see -- and by the way, are DD214s -- well, never

21   mind.

22        It says here that your rank was E4?

23   A.  Yes.

24   Q.  Were you a non-commissioned officer?

25   A.  Yes.

1   Q.   And there it's got your unit, Echo Company, 3-7 Infantry
2   Division; correct?
3   A.   Yes.
4   Q.   It says that your primary specialty was heavy antiarmor
5   weapons and infantryman; correct?
6   A.   Yes.
7   Q.   For foreign service it says you spent one year, six months
8   and 28 days on foreign soil; is that correct?
9   A.   Yes.
10  Q.   Under your decorations, medals, badges, and campaign
11  ribbons, it says you earned Army Service Ribbon?
12  A.   Yeah.
13  Q.   National Defense Service Medal?
14  A.   Yes.
15  Q.   Army Lapel Button?
16  A.   Yes.
17  Q.   The Southeast (sic) Asia Service Medal?
18  A.   Yes.
19  Q.   With two Bronze Service Stars?
20  A.   Yes.
21  Q.   And you never even told me you had two Bronze Service
22  Stars.
23  A.   I don't talk much about my service at all.
24  Q.   I had to ask you why you never told me that, didn't I?
25  A.   Yes.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                512

1    Q.   You earned your parachutist badge?

2    A.   Uh-huh.

3    Q.   Is that "yes?"

4    A.   Yes.

5    Q.   That means earning your wings?

6    A.   Yes, it is.

7    Q.   That's a coveted thing for infantrymen; right?

8    A.   Yes.

9    Q.   And the Southeast Asia Service Medal, that's in regards to

10   Iraq, Saudi Arabia, and Kuwait; correct?

11   A.   Yes.

12   Q.   Or Southwest Asia -- excuse me, Southwest Asia.  Southeast

13   Asia would have been Vietnam; right?

14   A.   Right.

15   Q.   You earned Overseas Service Ribbon; correct?

16   A.   Yes.

17   Q.   You were a sharpshooter with the rifle.  You got a

18   sharpshooter badge; correct?

19   A.   Yes.

20   Q.   You were rated as an expert and earned the expert badge

21   with a grenade?

22   A.   Yes.

23   Q.   And there it says at the bottom, in case there's any doubt,

24   that your discharge was honorable.  That's all -- the

25   all-important thing for our veterans is that we get that

1   honorable discharge; right?

2   A.   Yes, it is.

3   Q.   Now, here's the thing about your DD214.  As I was going

4   through your personnel record, I noted that there are

5   additional medals that weren't on there but are in your

6   personnel file.

7   A.   Right.

8   Q.   Is that uncommon?

9   A.   That, I don't know.

10  Q.   Okay.  It's not.

11  A.   Probably not.

12  Q.   Well, so if you go down here, let's go to the next section

13  on his -- it's Part 2 of his personal qualification file, and I

14  think --

15          MR. THOMAS:  Let's go down -- go to the bottom ones,

16  Scott.  I should have had you highlight all those on the

17  bottom.

18  BY MR. THOMAS:

19  Q.   You also earned the defense of Saudi Arabia medal?

20  A.   Yeah.

21  Q.   You also earned the Liberation and Defense of Kuwait medal?

22  A.   Yes.

23  Q.   That was given to all soldiers and Marines who took part in

24  liberating -- liberating Kuwait in active combat from the Iraqi

25  Republican Guard; right?

16-2627 Leininger v USA et al   7.8.20 Vol. 3          514

```
 1   A.   Yes.

 2   Q.   Another page that you earned that's not on there is the tow

 3   gunner badge; right?  You see it under there?

 4          MR. THOMAS:  It's under there a little bit more,

 5   Scott.

 6   BY MR. THOMAS:

 7   Q.   You there?

 8   A.   Yes.

 9   Q.   What's a tow gunner?

10   A.   A tow missile.  I'm the one who fired it.

11   Q.   What's it fired at?

12   A.   Tanks.

13          THE COURT:  Thank you.

14          MR. THOMAS:  I'm sorry.  If you go on to the next

15   section, Scott.

16   BY MR. THOMAS:

17   Q.   What's hazard pay?

18   A.   That's an extra merit we're allotted for being in a

19   hazardous duty situation.

20   Q.   Do you know -- do you remember what a forward element is?

21   A.   Excuse me?

22   Q.   We call it a forward element in the Marines.

23   A.   No.

24   Q.   Combat zone?

25   A.   Oh, combat zone, yeah.
```

1   Q.  It says here, according to your personnel record, that you

2   earned duty imminent danger pay; area, Southwest Asia; and then

3   it uses military dates; right?

4   A.  Yes.

5   Q.  And military date is year then month then day; right?

6   A.  Right.

7   Q.  It's hard to remember that.

8       So this -- you were in a combat zone receiving and

9   returning enemy fire from August 27th, 1990, to March 24th,

10  1991; is that correct?

11  A.  Right.

12  Q.  I found another medal in your personnel file.

13      MR. THOMAS:  If we could go -- not that one.  Skip

14  that one.

15  BY MR. THOMAS:

16  Q.  You never told me about this one, Aaron.  You earned the

17  Army Achievement Medal?

18  A.  Right, yes.

19  Q.  And it says you earned it for meritorious service?

20  A.  Yes.

21  Q.  Do you even have your medals anymore?

22  A.  No, I do not.

23      MR. THOMAS:  We can be done with that exhibit, Scott.

24  BY MR. THOMAS:

25  Q.  Aaron, as a result of serving your country overseas, you do

16-2627 Leininger v USA et al   7.8.20 Vol. 3          516

1   have some service-related injuries; correct?

2   A.   Yes.

3   Q.   Okay.  And you currently have a disability rating; is that

4   correct?

5   A.   Yes.

6   Q.   I'd like to hand you what's been marked as Exhibit 192.

7           MR. THOMAS:  Your Honor, we'll offer that into

8   evidence.

9           THE COURT:  The offer is of Exhibit 192.  Is there

10  objection?

11          MR. EISER:  No, Your Honor.

12          THE COURT:  192's received.

13          MR. THOMAS:  Permission to publish?

14          THE COURT:  Of course.

15  BY MR. THOMAS:

16  Q.   Sir, this is a letter written to you from the Department of

17  Veteran Affairs from September 1st, 2009; correct?

18  A.   Yes.

19  Q.   And if you go to the next page, you will see that they

20  determined that you had patella femoral syndrome to the right

21  knee with patella femoral degenerative change and assigned that

22  10 percent disability; correct?

23  A.   Yes.

24  Q.   They also noted -- and that was service connected; right?

25  A.   Yes.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                517

1    Q.  You can't get that just because you hurt your knee later

2    on; right?

3    A.  No.

4    Q.  They determined that your gastroesophageal reflux disease

5    was also service related; is that correct?

6    A.  Yes.

7    Q.  I want to point out a couple of things going back to --

8        Well, let's move on to the next one.  We're going to hand

9    you what's been marked as Exhibit 194.

10            MR. THOMAS:  Your Honor, we offer 194 into evidence.

11            THE COURT:  Objection to 194?

12            MR. EISER:  No, Your Honor.  No objection.

13            THE COURT:  194's received.

14            MR. THOMAS:  Permission -- we request permission to

15   publish, Your Honor?

16            THE COURT:  You may.  And once it's admitted into

17   evidence, you may proceed without leave.

18            MR. THOMAS:  Oh, thank you very much, Your Honor.

19   Sorry about that.

20            THE COURT:  That's quite all right.  I understand why

21   you check.

22   BY MR. THOMAS:

23   Q.  This is a letter -- another letter from the Department of

24   Veteran Affairs; is that correct?

25   A.  Yes.

1   Q.   And it's dated February 24th, 2011?

2   A.   Yes.

3   Q.   And it's a rating decision; correct?

4   A.   Yes.

5   Q.   And it says, "Since our last review of your claim, we

6   received additional medical evidence on November 9, 2010;"

7   correct?

8   A.   Yes.

9   Q.   The decision says, "Service connection for posttraumatic

10   stress disorder is granted with an evaluation of 30 percent

11   effective October 6th, 2008;" correct?

12   A.   Yes.

13   Q.   That means they backdated it; right?

14   A.   Yes.

15   Q.   If you go to the next page, they give you the reasons for

16   their decision?

17   A.   Right.

18   Q.   At the top it says your claim folder has been received and

19   reviewed in its entirety; correct?

20   A.   Yes.

21   Q.   It says, "During the course of your pending appeal, the

22   regulations regarding entitlement to service connection for

23   posttraumatic stress disorder have changed as follows

24   pertaining to," and it gives the Code of Federal Regulation;

25   correct?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    519

1   A.   Right.

2   Q.   It says, "Service connection for posttraumatic stress

3   disorder requires medical evidence diagnosing the condition in

4   accordance with 84.125A of this chapter, the length established

5   by medical evidence between the current symptoms and an

6   in-service stressor and credible supporting evidence that the

7   claimed in-service stressor occurred."

8        Did I read that right?

9   A.   Yes.

10  Q.   It goes on that, "The evidence must establish that he

11  engaged in combat with the enemy and that the stressor is

12  related to that combat;" right?

13  A.   Yes.

14  Q.   Go down to the bottom.  It says, "The VA has contracted and

15  confirms that the claimed stressor is adequate to support a

16  diagnosis of posttraumatic stress disorder and that the

17  veteran's symptoms are related to this claimed stressor."

18       Did I read that correct?

19  A.   Yes.

20  Q.   We're going to continue on with this one.  It says, "Based

21  on a review of your claim folder, service connection for

22  posttraumatic stress disorder has been established directly

23  related to your military service."

24       Did I read that correct?

25  A.   Yes.

16-2627 Leininger v USA et al  7.8.20 Vol. 3        520

1  Q.  It says, "Your United States Army personnel records

2  indicate that you served in Saudi Arabia, Southwest Asia from

3  August 27, 1990, through March 24, 1991."

4      Did I read that correct?

5  A.  Yes.

6  Q.  You received imminent danger for this service.  Your

7  military occupational specialty was heavy anti-air weaponry.

8      Did I read that right?

9  A.  Yes.

10  Q.  The comments that you noted:  That you watched a young girl

11  die as a result of being shot by U.S. troops.  You stated that

12  you picked up bodies dead after combat.  You indicated that you

13  had orders to kill even if the person posed no threat.  And

14  that a VA mental health consultation conducted on October 21st,

15  2008, reiterates the killing of the little girl and her father;

16  right?

17  A.  Yes.

18  Q.  And when you told that person back in 2008 that story, were

19  you asking for disability benefits?

20  A.  No.

21  Q.  Were you trying to get help?

22  A.  Yes.

23  Q.  The comments that there was a -- a PTSD examination,

24  another one on November 9, 2010?

25  A.  Yes.

1   Q.  And at the time the examiner did not have your claims

2   folder available for review at the time the exam was conducted,

3   so we provided your claim folder to the examiner so she could

4   review the evidence of record in its entirety.

5        Did I read that correct?

6   A.  Yes.

7   Q.  It says the examination indicates that you received ongoing

8   medical care at Leavenworth, Kansas VA Medical Center, that you

9   are prescribed medication and you intend -- and that you attend

10  individual psychotherapy sessions.  You stated to the examiner

11  that you stopped taking your medication, although you had

12  change in mood since you stopped taking your prescribed

13  medications.  Did you say that?

14  A.  Yes.

15  Q.  During the examination, they noted that you displayed hand

16  ringing, repetitive actions, restlessness, and tenseness, that

17  your attitude toward the examiner was cooperative, that you

18  were tense throughout the examination, you were agitated and

19  depressed.  You had attention disturbance, that you were easily

20  distracted, and that you were prescribed medication to help

21  with concentration, attention, memory, and social interactions;

22  is that correct?

23  A.  Yes.

24  Q.  They noted that you do not have inappropriate behavior and

25  you do not have homicidal or suicidal thoughts at the time; is

16-2627 Leininger v USA et al   7.8.20 Vol. 3                522

1    that right?

2    A.   Yes.

3    Q.   They talked about the fact that you discussed the killing

4    of the father and the girl, again, with the VA examiner in 2010

5    and then you felt intense fear, helplessness, and a feeling of

6    horror?

7    A.   Yeah.

8    Q.   Do you still have those feelings?

9    A.   Yes.  Yes, I do.

10   Q.   Talked about your problems with sleep.  When did the

11   problems with sleep start?

12   A.   1991.

13   Q.   After the war?

14   A.   Yeah.  Yes.

15   Q.   As a result of a complete review of your -- your military

16   file and your medical file, they granted you 30 percent

17   disability for PTSD as a result of the trauma you experienced

18   in combat; is that correct?

19   A.   Yes.

20   Q.   And then even though you didn't ask them too, about eight

21   months later they increased your PTSD rating from 30 percent to

22   50 percent; is that right?

23   A.   Yes.

24   Q.   I'll hand you what I've marked as Exhibit 195.

25        MR. THOMAS:  We'll offer it into evidence.

1          THE COURT:  Any objection to 195?

2          MR. EISER:  No, Your Honor.

3          THE COURT:  It's received.

4    BY MR. THOMAS:

5    Q.  This one you just go to the -- this one's dated August 10,

6    2011.  It's from the VA; correct?

7    A.  Yes.

8    Q.  And you will see that they decided the evaluation for PTSD,

9    which is currently 30 percent disabling, is increased to

10   50 percent effective June 28, 2011.  Now, in between that last

11   exhibit and this exhibit, you were hospitalized, weren't you?

12   A.  Yes.

13   Q.  You were -- you were institutionalized at a psychiatric

14   unit at the VA; correct?

15   A.  Yes.

16   Q.  Do you remember calling your wife and telling her that you

17   thought you needed help?

18   A.  Yes.

19   Q.  Before you went in?

20   A.  Yes, I do.

21   Q.  And so now your total disability from the VA is 60 percent;

22   is that correct?

23   A.  Yes.

24   Q.  Fifty percent for the posttraumatic stress and the other

25   10 percent for the -- for your knee and your GERD; is that

16-2627 Leininger v USA et al   7.8.20 Vol. 3                524

```
1   right?
2   A.  Yes.
3   Q.  Mr. Leininger, what kind of -- I'm going to switch gears
4   now.  What kind of insurance do you have?
5   A.  I don't know the name of it.  It's through my work.
6   Q.  You have insurance through your work at Blue Beetle?
7   A.  Yes.
8   Q.  And how long have you had that?
9   A.  About a year.
10  Q.  Do you also have VA benefits?
11  A.  Yes, I do.
12  Q.  Do you use them?
13  A.  No, I don't.
14  Q.  I want to talk about your employment history a little.  At
15  the time of your deposition in this case, you weren't working
16  at Blue Beetle; you were working at Estes Express?
17  A.  Yes.
18  Q.  As a dock worker; is that correct?
19  A.  Yes.
20  Q.  You drove a forklift where you were unloading and loading
21  trucks and trailers; right?
22  A.  Yes.  Yes, I was.
23  Q.  From 2015 to 2016, you worked at a company called KC Wood.
24  A.  Yes.
25  Q.  And what did you do for them?
```

1    A.   I was a trim carpenter.

2    Q.   Trim carpenter?

3         THE COURT:  I couldn't hear the -- okay.  Trim

4    carpenter, was that the answer?

5         THE WITNESS:  Trim carpenter, yes.

6         MR. THOMAS:  T-R-I-M.

7         THE COURT:  Thank you.

8    BY MR. THOMAS:

9    Q.   Did you have health insurance with KC Wood?

10   A.   No, I did not.

11   Q.   Why did you leave KC -- how -- did -- why did -- why did

12   you leave KC Wood?

13   A.   Getting too old for that kind of work, needed easier work.

14   Q.   Were you having problems with -- with focus as well?

15   A.   Tons of -- I -- yeah.  Yes, I was.

16   Q.   Did you have concern about operating heavy machinery?

17   A.   Yes, I did.

18   Q.   And this would have been after you saw Mark Wisner;

19   correct?

20   A.   Yes, it was.

21   Q.   You also from 2016-2017 worked in a different line of work

22   -- well, strike that.

23        You worked for a different company called Furniture Medic;

24   is that correct?

25   A.   Yes.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    526

1    Q.   What did you do for Furniture Medic?

2    A.   Repaired furniture.

3    Q.   Did -- did they give you health insurance?

4    A.   No, they did not.

5    Q.   Why did you leave Furniture Medic?

6    A.   I was terminated.  I was having too much -- just couldn't

7    concentrate and couldn't focus to be there.

8    Q.   Was this after the events involving Mark Wisner?

9    A.   Yes, it was.

10   Q.   There was a time you were -- you worked for a buddy kind of

11   self-employed doing construction in Colorado Springs; is that

12   right?

13   A.   Yes, it is.

14   Q.   What time period was that?

15   A.   From the beginning of 2016.

16   Q.   Okay.  And what was that buddy's name?

17   A.   Rodney Steiner.

18   Q.   How were you paid?

19   A.   Cash.  We split the checks on the job.  We were co-owners.

20   Q.   Did you -- did Mr. Steiner provide you health insurance?

21   A.   No.

22   Q.   From 2011 to 2013, you worked for a company called

23   84 Lumber?

24   A.   Yes.

25   Q.   And what did you do for them?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                527

1   A.   I was their lead carpenter.

2   Q.   And did you have healthcare through 84 Lumber?

3   A.   No, I did not.

4   Q.   There was a time where you were self-employed in

5   construction in West Virginia; is that correct?

6   A.   Yes.

7   Q.   2010 through 2011?

8   A.   Yes.

9   Q.   Did you have health insurance when you were self-employed?

10  A.   No.

11  Q.   Do you -- was there a time that you had Tricare?

12  A.   Yes, there was.

13  Q.   When was that?

14  A.   The year following the incident with Wisner, so it would

15  have been 2015 to 2016 roughly.

16  Q.   How long did you have it?

17  A.   For a year.

18  Q.   And do you have it anymore?

19  A.   No.

20  Q.   Why not?

21  A.   I was told by someone at the VA that I no longer was

22  eligible for it, that they could provide the care I need.

23  Q.   They didn't want to pay for you to go to outside doctors,

24  they wanted you to come to the VA where you would get your care

25  for free; is that right?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    528

1   A.  Yes.

2   Q.  Do you currently have health insurance?

3   A.  Yes, I currently do.

4   Q.  How much do you have to pay for it?

5   A.  About 170 a month.

6   Q.  Is it as good, does it cover everything like you had when

7   you were using your VA benefits?

8   A.  Oh, no.

9   Q.  Do you have a deductible?

10  A.  Yes.

11  Q.  Are you supposed to have free healthcare through the VA?

12  A.  Yes.

13  Q.  You've earned that?

14  A.  Yes.

15  Q.  As a combat veteran?

16  A.  Yes, sir.

17  Q.  According to the VA records that are in evidence in this

18  case, it's been about three-and-a-half years since you've been

19  to the VA.  Why haven't you gone back?

20  A.  I have lost faith and trust in the VA.  I just -- I don't

21  trust it there.  It makes me uncomfortable to even go to them.

22  Q.  Do you have worries about being able to take care of

23  yourself in the future?

24  A.  Yes, I do.

25  Q.  Do you have worries about the high cost of healthcare?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                        529

1   A.  Yes, sir.  Yes, I do.

2   Q.  Do you have worries about the high cost of healthcare

3   insurance?

4   A.  Yes.

5   Q.  I'm going to ask you some questions and we'll just take it

6   as it comes, and I apologize, but we've got to ask you some

7   questions, okay, about Mark Wisner.

8   A.  Yes.

9   Q.  The records indicate that you saw him from approximately

10  July '13, 2012 to February 25th, 2014.

11  A.  Yes.

12  Q.  Does that sound right?

13  A.  Yes.

14  Q.  Now, the records say that you saw him approximately nine

15  times.  Does that sound right?

16  A.  Yes.

17  Q.  Every time you saw Mr. Wisner, was it at the VA OIF-OEF

18  clinic?

19  A.  Yes.

20  Q.  Was it in an exam room?

21  A.  Yes.

22  Q.  Was it behind closed doors?

23  A.  Yes.

24  Q.  Was there anybody else in the room?

25  A.  No.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                   530

1    Q.   These exams take place during regular clinic hours?

2    A.   Yes.

3              MR. EISER:   Objection.   Leading.

4              THE COURT:   Overruled.

5    BY MR. THOMAS:

6    Q.   Was there ever any exams at night or on the weekends?

7    A.   No.

8    Q.   Were these scheduled appointments?

9    A.   Yes.

10   Q.   Who did you believe Mr. Wisner was when you first started

11   treatment with him?

12   A.   My new physician, my new doctor.

13   Q.   You thought he was a doctor?

14   A.   Yes.

15   Q.   What were some of the reasons that you would go to the VA

16   clinic?

17   A.   Sore tooth, back pain.

18   Q.   You have high blood pressure?

19   A.   High blood pressure.

20   Q.   Do you have shoulder pain?

21   A.   Yes.

22   Q.   You have disability for your knee.   Do you have joint and

23   knee pain?

24   A.   I have -- yes, I do.

25   Q.   Have you also sought help for smoking cessation?

1   A.  Yes, I have.

2   Q.  There were times you had to go there for work release

3   documents?

4   A.  Yes.

5   Q.  Do you have an extensive history with dental issues?

6   A.  Yes.

7   Q.  Did Mr. Wisner touch your genitals during every visit?

8   A.  Yes, he did.

9   Q.  Did he make inappropriate and sexualized comments about

10  your genitals?

11  A.  Yes.

12  Q.  Did he make comments that were inappropriate about your sex

13  life?

14  A.  Yes.

15  Q.  Did he make comments about the size of your penis?

16  A.  Yes.

17  Q.  I'm sorry.  I'm sorry.

18      Did he make inappropriate comments about your semen?

19  A.  About my what?

20  Q.  Semen.

21  A.  Yes.

22  Q.  How long did the exam take place?

23  A.  How long what?

24  Q.  How long did the exams last usually?

25  A.  Half hour.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    532

1   Q.   No, no, no, no --

2   A.   Oh.

3   Q.   -- the genital exam.

4   A.   Oh, the genital exam, couple minutes.

5   Q.   Okay.  Did he ever wear gloves?

6   A.   No.

7   Q.   Now, at the time -- not now, but at the time did you know

8   that these genital exams were illegitimate?

9   A.   No.

10  Q.   He does it at least nine times; right?

11  A.   Yes.

12  Q.   Did you think he was a doctor?

13  A.   Yes.

14  Q.   Did he outrank you?

15  A.   Yes.

16  Q.   What was his rank?

17  A.   He was a chief warrant officer, so I really don't know.

18  Q.   Okay.  But he's an officer; right?

19  A.   Yes.

20  Q.   You were enlisted?

21  A.   Yes.

22  Q.   If you saw him in uniform, what would you have to do?

23  A.   Salute him.

24  Q.   Are we allowed to question orders in the military?

25  A.   No.

16-2627 Leininger v USA et al   7.8.20 Vol. 3

533

1  Q.  Do we question officers?

2  A.  No.

3  Q.  Do we question doctors?

4  A.  No.

5  Q.  Did doctor -- or excuse me.  Did Mr. Wisner tell you that

6  these genital exams were medically necessary?

7  A.  Yes.

8  Q.  Did he threaten to withhold your pain medications?

9  A.  Yes.

10  Q.  Did you think it was part of the medical exam?

11  A.  Yes, I did.

12  Q.  Do you think that now?

13  A.  Yeah.

14  Q.  No -- I mean, let me ask you a different way.

15      When did you -- was there a point in time where you

16  realized that you had been a victim of Mr. Wisner's?

17  A.  I don't think that it -- no, I don't think that it was part

18  of the exam now, no.

19  Q.  Okay.  When did you realize this?

20  A.  After Kerry Baker had sent out the letters asking us in

21  general if there was somebody at the VA that we had a -- that

22  we believed was acting inappropriately.

23  Q.  That was Kerry Baker from the VA's OIG office?

24  A.  Yes.

25  Q.  And that's when you realized, you put two and two together?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                534

1   A.   Yes.

2   Q.   How did it feel to learn that Mr. Wisner had been sexually

3   molesting veterans at the VA clinic?

4   A.   That I wasn't crazy; that it wasn't just me.

5   Q.   Have there been -- did that also cause you some problems

6   realizing then that you were a victim of sexual trauma?

7   A.   Yes.

8   Q.   Do you have problems with anger?

9   A.   Yes, I do.

10  Q.   Do you have problems trusting people?

11  A.   Yes, I do.

12  Q.   Do you have problems with isolation?

13  A.   Yes.

14  Q.   What do you do?  How do you isolate?

15  A.   I just go to my room where nobody can bother me and stay

16  there.

17  Q.   Do you feel shame?

18  A.   Yes.

19  Q.   Do you feel embarrassment?

20  A.   Yes.

21  Q.   Do you feel guilt?

22  A.   Yes.

23  Q.   Do you feel depression?

24  A.   Yes.

25  Q.   I'm sorry, I -- we got to make this record, okay?

```
 1        Do you feel anxiety?
 2   A.  Yes.
 3   Q.  Do you feel low self-esteem?
 4   A.  Yes.
 5   Q.  Do you experience self-doubt?
 6   A.  Yes.
 7   Q.  Do you have nightmares --
 8   A.  Yes.
 9   Q.  -- about Wisner?
10   A.  Yes.
11   Q.  Are you lonely?
12   A.  Excuse me?
13   Q.  Are you lonely?
14   A.  Yes.
15   Q.  Do you feel like you can trust anybody?
16   A.  No.
17            MR. EISER:  Objection.  Leading.
18            THE COURT:  Overruled.  It does not suggest the
19   answer.
20   BY MR. THOMAS:
21   Q.  Do you like to be touched?
22   A.  No.
23   Q.  Do you hang out with friends anymore?
24   A.  Nope.
25   Q.  Do you even go out anymore?
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    536

1   A.  Nope.

2   Q.  Have you had thoughts of hurting yourself since the events

3   with Wisner?

4   A.  I have.

5   Q.  Do you remember a time where you almost went through with

6   it?

7   A.  Yes.

8   Q.  Can you just explain -- explain that, please.

9   A.  I had a loaded gun and I was going to shoot myself, just

10  got to the bottom of the barrel.

11  Q.  Because of what this man did to you?

12  A.  Yes.

13  Q.  And you couldn't handle the feelings that you were feeling?

14  A.  I couldn't handle it and had no -- I don't talk.  So I

15  didn't want to talk to my wife about it.

16  Q.  Thank God you didn't do it, but why didn't you?

17  A.  Just not letting him rule me.

18  Q.  Did Mark Wisner prescribe you oxycodone?

19  A.  Yes, he did.

20  Q.  Did he prescribe you diazepam?

21  A.  Yes, he did.

22  Q.  Did he prescribe you testosterone?

23  A.  Yes, he did.

24  Q.  Did he try to prescribe you erectile dysfunction

25  medications?

16-2627 Leininger v USA et al   7.8.20 Vol. 3          537

```
 1   A.  Yes.
 2   Q.  Did you ever ask him for that medication?
 3   A.  No.
 4   Q.  When he first started you on testosterone, did you ask him
 5   to do that?
 6   A.  No.
 7   Q.  When he first started putting you on oxy, did you ask him
 8   to do that?
 9   A.  No.
10   Q.  When he first started putting on you diazepam, did you ask
11   him to do that?
12   A.  No.
13   Q.  Do you remember a time asking him if the genital exam was
14   even necessary?
15   A.  I had asked, yes.
16   Q.  You asked him one time?
17   A.  I'm not sure if it's -- I'm pretty sure it's probably more
18   than one, but I know of one.
19   Q.  What did he tell you?
20   A.  It was necessary and it was necessary for me to get my
21   medication.
22   Q.  Now, the defendant's mentioned at some point this week that
23   you never told Kerry Baker about Mark Wisner threatened to
24   withhold medication.  Is it true you didn't tell Agent Baker
25   that?
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    538

1  A.  No, I didn't tell him that.  The --

2  Q.  Why not?

3  A.  Most important thing at the time is what he was doing to

4  us, what I felt was most important.  That's something I felt

5  was most important.

6  Q.  Did Agent Baker even ask you anything about prescription

7  drugs?

8  A.  Never asked about that.

9  Q.  Was the whole inquiry about inappropriate genital exams?

10  A.  Yes, it was.  There was no reason to bring that even up.

11  Q.  Now, defendants have noted, and they had an exhibit that

12  shows, that you have actually had contact with the VA even

13  since Mark Wisner was removed --

14  A.  Uh-huh.

15  Q.  -- is that accurate?

16  A.  Yeah.

17  Q.  This is an exhibit they offered into evidence or they

18  used -- maybe I offered it -- but it's Defendant's Exhibit 421.

19  This is supposedly a summary of visits you had after Wisner,

20  but it's actually not.

21      Anyhow, out of these 20-21 visits or contacts you had,

22  would it surprise you to know that 11 of them were visits to

23  the emergency room?

24  A.  No, that doesn't surprise me.

25  Q.  Why were you going to the emergency room?

16-2627 Leininger v USA et al   7.8.20 Vol. 3          539

1    A.  Well, number one, I had things on, and it was three

2    medication, and I didn't have the money to pay for medication,

3    no insurance to get it.

4    Q.  Did Wisner have you addicted to opiates?

5    A.  Yes, he did.

6    Q.  And when he was gone, you didn't have a way to get them

7    anymore, did you?

8    A.  No.

9    Q.  And isn't it true that almost all of these post Wisner

10   contacts or visits were you trying to get your pain pills?

11   A.  Yes.

12   Q.  Are you taking these medications today?

13   A.  No.

14   Q.  After the war, there was a time where you turned to

15   alcohol; is that true?

16   A.  Yes.

17   Q.  It's not uncommon.  How long has it been since you've been

18   sober from alcohol?

19   A.  Fifteen years.

20   Q.  And there was also a time after the war that you

21   experimented with methamphetamines?

22   A.  Uh-huh.

23   Q.  I shouldn't say experimented.  You were addicted to them;

24   is that fair?

25   A.  Yes.

1   Q.   How long has it been since you've used methamphetamines?

2   A.   Twelve years.

3   Q.   Twelve years.

4   A.   I'm not sure the exact time.  It's been a long time.

5   Q.   Do you have a primary care doctor today?

6   A.   No.

7   Q.   Why not?

8   A.   I don't trust doctors.

9   Q.   Do you have medical conditions that you need for which you

10   need medical care?

11   A.   Yes, I do.

12   Q.   You believe that the experience you had with Mr. Wisner

13   made your PTSD worse?

14   A.   Yes.

15   Q.   How?

16   A.   Just adds more anxiety and a lot of PTSD is anxiety and

17   other things.

18   Q.   Was there a time when you tried to get help for your PTSD

19   through the VA?

20   A.   Yes.

21   Q.   Do you remember somebody named Dena White?

22   A.   Yes, I do.

23   Q.   Tell me about Dena White.

24   A.   She was great.  She helped me do a lot of things.  She

25   helped me start understanding some of the nightmares I was

541

1   having and the feelings I was having.

2   Q.   Why did you stop seeing Dena White?

3   A.   I don't -- I believe it's when we moved.

4   Q.   Do you want treatment for your PTSD?

5   A.   Yes.

6   Q.   Do you want things to be better?

7   A.   Yes, I do.

8   Q.   But do you think you could ever trust the VA again?

9   A.   No.

10  Q.   The United States has state -- said this week that even if

11  the court were to award you damages for the healthcare you need

12  that you won't go get it, you won't use the money to get it,

13  the healthcare you need.   Is that true?

14  A.   No.

15  Q.   Dr. Peterson has recommended that you be on at least four

16  medications for the rest of your life.  Did you know that?

17  A.   No.

18  Q.   He says it may change with new drugs and medical

19  advancements, but as of now at least four.  If the court awards

20  damages that would allow you to pay for these medications, are

21  you willing to take your medications?

22  A.   Yes.

23  Q.   Are you?

24  A.   Yeah.

25  Q.   Dr. Peterson has this --

16-2627 Leininger v USA et al   7.8.20 Vol. 3                 542

1       The events involving Wisner affected your marriage?

2    A.  Definitely.

3    Q.  Do you have a romantic relationship with your wife?

4    A.  Not in a while.

5    Q.  Has there been strain in the relationship because of your

6    isolation?

7    A.  Yes.

8    Q.  Dr. Peterson has recommended 150, 150, Aaron, couples

9    therapy sessions with a specially-trained marriage counselor.

10   If the court awards you damages enough to pay for this therapy,

11   can you commit to the court that you will use that money to get

12   that therapy?

13   A.  Yes.

14   Q.  Dr. Peterson has recommended extensive psychiatric

15   treatment for you for your PTSD from war, your PTSD from

16   Wisner, for your major depression from the war and your major

17   depression from Wisner.  Do you understand that?

18   A.  Yes.

19   Q.  He's recommended that you go receive intense psychiatric

20   treatment once a month for two to four years.  You understand

21   that?

22   A.  Yes.

23   Q.  And then if you have shown progression, you can cut back to

24   four times a year, but that has to be for the rest of your

25   life?

16-2627 Leininger v USA et al   7.8.20 Vol. 3          543

1   A.  Right.

2   Q.  You understand that?

3   A.  Yes.

4   Q.  If the court awards you damages enough to pay for this

5   therapy, can you commit to the court that you will get the help

6   you need?

7   A.  Yes.

8           MR. THOMAS:  No further questions.

9           THE COURT:  Cross-examination.

10          MR. EISER:  Thank you, Your Honor.

11                         CROSS-EXAMINATION

12  BY MR. EISER:

13  Q.  Good morning, Mr. Leininger.

14  A.  Good morning.

15  Q.  After your -- -- after your discharge from the Army in

16  1991, you moved in with your mother in Chicago for a year; is

17  that right?

18  A.  Yes.

19  Q.  And during that time, you worked and drank alcohol and kept

20  to yourself; right?

21  A.  No, didn't keep to myself.  I worked and drank alcohol.

22  Q.  Okay.  And you had nightmares and difficulty sleeping;

23  correct?

24  A.  Yes.

25  Q.  And then you told us you became a bit of a loner; is that

1   right?

2       You traveled the United States for a few years in the early

3   '90s?

4   A.   Yeah.  Yes.

5   Q.   Went to Arizona, Kentucky, West Virginia, and Colorado and

6   then back to Kansas; is that right?

7   A.   Yes.

8   Q.   And you had drug and alcohol addiction problems during that

9   time; is that right?

10  A.   Yes.

11  Q.   And you were having your PTSD symptoms that we've heard

12  about this morning; is that right?

13  A.   Yes.

14  Q.   Sleep disturbance, night terrors, anxiety, social

15  isolation; correct?

16  A.   Yes, not so much the social isolation.

17  Q.   Okay.  I'm going to -- go ahead, I want to show you an

18  exhibit.  It comes from the United States Exhibit 413.  It's

19  page 16958.  Can you see that on your screen, sir?

20  A.   Yes.

21          THE COURT:  I'm sorry, what's the exhibit number?

22          MR. EISER:  It's from U.S.A. Exhibit 413, and I would

23  propose identifying it separately and we would mark it as --

24  produce it to the court after the examination has concluded.

25  Is that acceptable, Your Honor?

```
 1              THE COURT:  Well, we need to have a number on it in
 2   the record if the witness is asked about it.  So what number
 3   will it become?
 4              MR. EISER:  U.S.A. 423.
 5              MR. THOMAS:  Did you say 16958?
 6              MR. EISER:  Yeah.  Roll down to make sure that's
 7   right.  Went too far.  Yeah, there it is, yes.  Back up to the
 8   top.
 9   BY MR. EISER:
10   Q.  All right.  You first treated at the Eastern Kansas VA on
11   September 30th, 2008; is that right?
12   A.  Yes.
13   Q.  And on this first visit you saw Dr. Mary Fitzgerald?
14   A.  Yes.
15   Q.  Do you see that?
16   A.  Yes.
17   Q.  And let's review the medical problems that you've told them
18   about at that time.  This is 2008.  You had low back pain,
19   sciatica, asthma, peptic ulcer disease, GERD, severe anxiety,
20   and insomnia; is that correct?
21   A.  Yes.
22   Q.  And you also told them about the mental health problems you
23   were having?
24   A.  Yes.
25              MR. EISER:  I think that might be the next page.
```

```
1          THE COURT:  And so that it's clear, and it may already

2   be, but just to be careful, Mr. Eiser, the exhibit that you're

3   displaying now is Exhibit 423?

4          MR. EISER:  U.S.A. 423 yes, Your Honor.

5          THE COURT:  And, Mr. Thomas, just to be clear to you,

6   is there any objection to the United States receiving the same

7   courtesy you did, and that is to examine about the exhibit

8   pending your response to the motion to admit it?

9          MR. THOMAS:  Yes, Your Honor, that's fine.

10         THE COURT:  All right.  Thank you.  Please proceed,

11  Mr. Eiser.

12         MR. EISER:  Okay.

13  BY MR. EISER:

14  Q.  Regarding your mental health, you told them you had

15  anxiety, stress, memory loss, wound up having problems with

16  depression, insomnia at times, 17 years; is that right?

17  A.  Yes.

18  Q.  You've noted that you had worries about everything:  bills,

19  health, anything that has to be addressed is a problem and you

20  told them; is that right?

21  A.  Yes.

22  Q.  And you told them your mental health problems led you to

23  abusing illicit drugs; is that right?

24  A.  Yes.

25  Q.  Okay.  Dr. Fitzgerald referred you for mental health
```

1   treatment at the VA; correct?

2   A.  Yes.

3   Q.  Okay.  Next.  All right.  You began your mental health

4   treatment on January 16th, 2009?

5            MR. EISER:  I'm sorry, Your Honor, I should have

6   identified.  We're now showing from U.S.A. 413, page 16915, and

7   we'll identify this as U.S.A. 424.

8            THE COURT:  Do you really want to mark it separately?

9   413 is in.  You don't need to mark it separately to question

10  him.  I mean, if you want to, you can.  I'm just trying to

11  simplify things for you.

12           MR. EISER:  I think we'd like to have them separate if

13  that's okay.

14           THE COURT:  It's your examination.  So this is going

15  to be Exhibit 424?

16           MR. EISER:  Yes, Your Honor.

17           THE COURT:  Mr. Thomas, any objection to proceeding on

18  Exhibit 424 pending its offer?

19           MR. THOMAS:  No, Your Honor.  And just for efficiency,

20  I would have no objection moving forward with the same process

21  for any other future exhibits they're going to use in this

22  fashion.

23           THE COURT:  Thank you.

24  BY MR. EISER:

25  Q.  All right.  You began your mental health treatment on

 1    January 16, 2009, with a nurse practitioner by the name of --

 2    at this time her name was Dena Ridenour; is that right?

 3    A.  I guess.

 4    Q.  Okay.  And you told her about your mental health problems

 5    that you were having.  You told her, "I'm just not functioning

 6    right;" is that correct?

 7    A.  Yes.

 8    Q.  Okay.  And you reported to her a long history of nightmares

 9    that occur nightly.  They're all combat related.  "He wakes

10    frequently due to the nightmares and then has to walk around

11    the house to settle down.  He verbalizes intrusive thoughts and

12    avoid behaviors and he startles easily at loud noises."  Is

13    that what you told her?

14    A.  Yeah.

15    Q.  And you also told her about 17-year history of explosive

16    anger and rage; is that right?

17    A.  Yes.

18          MR. EISER:  Now, roll that down.

19    BY MR. EISER:

20    Q.  Okay.  She reviewed your treatment options and prescribed

21    some medication to address those problems; is that right?

22    A.  Yes.

23    Q.  Okay.  Next one.  Now we're looking at U.S.A. 413

24    page 169861.

25          THE COURT:  I'm sorry to interrupt you.  The camera

```
 1   has gotten jostled and I can't see the witness any longer; I
 2   can only see a portion of his torso.
 3           While we're adjusting that, Mr. Eiser, so this is --
 4   is this, again, another excerpt from 413?
 5           MR. EISER:  Correct, Your Honor, we'll identify it as
 6   U.S.A. 425.
 7           MR. THOMAS:  Could I ask for the page number again?
 8           MR. EISER:  16861.
 9           Can I proceed, Your Honor?
10           THE COURT:  You may.
11           MR. EISER:  Thank you.
12   BY MR. EISER:
13   Q.  All right.  You followed up with Dena White on June 19th of
14   2009; is that right?
15   A.  Yes.
16   Q.  And you were following up on your psychotropic medications?
17   A.  Yes.
18   Q.  All right.
19           MR. EISER:  Pull that down.
20   BY MR. EISER:
21   Q.  And she --
22           MR. EISER:  Keep going.
23   BY MR. EISER:
24   Q.  All right.  Now, she reported that you said things have
25   been strange lately.  I haven't been sleeping.  I've been
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3                550

1    seeing a lot of car accidents in the road lately.  That you

2    reported that you have been stressed.  Everything stressed

3    about money, work, feelings of aggression, et cetera.  "He has

4    witnessed many accidents lately and this has brought back

5    memories of time in the service.  He is somewhat disjointed

6    today with his description about how he is feeling and it is

7    difficult to put this together.  He doesn't want any medication

8    changes but yet isn't happy with his stress level.  I again

9    explained that therapy is an option for him to learn new ways

10   of coping with the -- or decreasing his level of stress."  Is

11   that accurate that's what she said?

12   A.   Yeah.

13   Q.   Okay.  Now, she had been encouraging you to get therapy

14   previously; is that right?

15   A.   I'm not sure she was encouraging me.  I thought she was my

16   therapist.

17   Q.   Okay.  You continued to be seen at the VA Mental Health

18   clinic for psychotropic medications for the next couple of

19   years; is that right?

20   A.   Yes.

21        MR. EISER:  Go to the next one.  I'm going to go to

22   page -- U.S.A. 413, page 16665.  We'll identify it as U.S.A.

23   426.

24        MR. THOMAS:  166...

25        MR. EISER:  Pull that down.

16-2627 Leininger v USA et al   7.8.20 Vol. 3          551

1    BY MR. EISER:

2    Q.  On June 14th of 2011, Ms. Ridenour notes, "Veteran was

3    again scheduled in this clinic and was again a no-show.  Please

4    do not schedule this veteran in my clinic.  He will need to be

5    scheduled at a 60-minute appointment in the Resident's Clinic

6    in the future."  Is that true that you had made appointments on

7    multiple times and not shown up for them?

8    A.  It's possible I had to work at the time.

9    Q.  Okay.  And do you recall her telling you that -- or the VA

10   telling you you needed to see the Resident's Clinic before they

11   would schedule you in the mental health providers?

12   A.  Yes.

13   Q.  Now, you said -- you said --

14       Missed a lot of appointments and you said it was because of

15   work; is that correct?

16       MR. THOMAS:  Objection.  Mischaracterizes his

17   evidence.  He said he missed that appointment.

18       THE COURT:  The objection's overruled.  It's not an

19   appropriate objection.  This is cross-examination.  You may

20   answer the question.

21       THE WITNESS:  Yes.

22   BY MR. EISER:

23   Q.  The exhibit we're looking at says again a no-show.  So you

24   had been a no-show at more than one appointment; right?

25   A.  Yes.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                552

1   Q.  Okay.  And the records that we have reflect two different

2   types of failed appointments.  Appointments that are canceled

3   by the patient and appointments that are no-shows, the patient

4   just doesn't show up for the appointment.  So while you say you

5   had to have work and that's why you were remember missing

6   appointments, why weren't you calling to cancel the

7   appointment?

8   A.  A lot of times I was outside of service.

9   Q.  Service of what?

10  A.  Cell phone service.

11  Q.  Okay.  All right.  Next -- next is from U.S.A. 413

12  page 16655.  We'll identify it as U.S.A. 427.  Now, later that

13  month on June 28th of 2011, you had a serious mental health

14  episode in which you were -- felt an urge to kill someone.  Do

15  you remember that?

16  A.  Yes.

17  Q.  And you called an ambulance and were taken to the

18  VA Hospital for intensive inpatient psychiatric treatment; is

19  that right?

20  A.  Yes.

21  Q.  What symptoms were you having at that time in -- in -- on

22  June 28th of 2011?

23  A.  Lack of sleep, paranoia, just schizophrenic.

24  Q.  What do you mean by schizophrenic?

25  A.  I was just -- I couldn't -- everything was -- I couldn't

1    focus on anything.  I just felt not myself.

2    Q.   Okay.  We saw that in an earlier note that you didn't feel

3    yourself but you didn't get hospitalized.  What was different

4    this time that you called an ambulance and had yourself taken

5    to a hospital?

6    A.   Because I hadn't slept in days and I was getting very -- I

7    was hallucinating a lot and just I didn't want to hurt anybody.

8    Q.   So hallucinating what?  What were the hallucinations?

9    A.   Of combat situations.

10   Q.   Okay.  Now, did you have other stressors going on in your

11   life at that time in June of 2011?

12   A.   I -- nothing more than usual.

13   Q.   Your -- your wife testified yesterday that she had gone

14   back to West Virginia at the time; is that right?

15   A.   Yeah, she went back because her mother was dying.

16   Q.   Okay.  Were you employed at that time in June of 2011?

17   A.   At that time, no, I was not.

18   Q.   Okay.

19   A.   I had been laid off.

20   Q.   Have you ever been hospitalized -- I'm sorry, go ahead.

21   A.   I said I had been laid off.

22   Q.   Okay.  All right.  So you're laid off.

23        Your wife is back in West Virginia.  Had you ever been

24   hospitalized before with mental health problems before June of

25   2011?

16-2627 Leininger v USA et al   7.8.20 Vol. 3          554

1   A.   No.

2   Q.   So would you say this is the low point in your symptoms,

3   your mental health symptoms?

4   A.   Yeah.

5   Q.   Now, the -- the problems we described just that you were

6   having, this is June of 2011, this -- this is your mental

7   health condition before you ever had any encounters with

8   Mr. Wisner the following year; is that correct?

9   A.   Yep.

10  Q.   All right.  Next exhibit is from U.S. Exhibit 413 page --

11  pages 16571 to 16574 and we'll identify it as U.S.A. 428.

12          MR. EISER:  Do you have that up?  This is -- go to the

13  top of it.

14  BY MR. EISER:

15  Q.   From our records this appears to be your first encounter

16  with Mr. Wisner and it's dated July 13th of 2012.  Does that

17  sound accurate to you?

18  A.   Yes.

19  Q.   Okay.  At this visit you went over your medical history.

20  Again, we have these problems -- quite a few medical active

21  problems.  You had problems with low back pain, sciatica, the

22  bipolar disorder, attention deficit, hyperactivity disorder,

23  hyperlipidemia, osteoarthritis involving the spine,

24  intervertebral disc disease, hypertension, GERD, peptic ulcer

25  disease, joint pain, PTSD, parasomnia, insomnia, narcolepsy

16-2627 Leininger v USA et al   7.8.20 Vol. 3                555

1    without cataplexy and homicidal ideation.  Is that correct

2    those were your active problems?

3    A.   Yes.

4    Q.   With your first encounter with Mr. Wisner?

5    A.   Yes.

6    Q.   And you describe all these active problems in your history.

7    This is before he ever touched you; is that accurate?

8    A.   Yes.

9    Q.   Your complaints for this visit though were tooth and back

10   pain; is that right?

11           MR. EISER:  Go back up to the top.  All right.  Roll

12   down to the bottom.

13   BY MR. EISER:

14   Q.   Let me -- let me just read from the exhibit.  It says,

15   "Current Medical Issues:

16       Dental pain with advanced disease, pain is chronic and

17   sharp, unable to eat solid food.  Has not seen a dentist for

18   some time.  Low chronic -- low chronic back pain, dull to sharp

19   intensity, some radiation down the right posterior thigh to

20   midthigh.  No burning sensations.  Needs refills of medications

21   and has elevated lipids not treated from last visit."

22       Has he accurately noted what you told him and the state of

23   your health at that time?

24   A.   Yes.

25   Q.   Okay.  So when he says, "Needs refills of medication," you

16-2627 Leininger v USA et al   7.8.20 Vol. 3                556

1   were on medication -- medications before you ever saw Mark

2   Wisner?

3   A.   Yeah.

4   Q.   Do you know what those medications were?

5   A.   No.  Blood pressure, I know, is one of them.

6   Q.   Okay.  Now, you don't -- you don't recall any inappropriate

7   comments on this visit; is that right?

8   A.   I don't recall, no.

9   Q.   Okay.

10          MR. EISER:  Go forward a little bit more.  Hold on.

11  All right.

12  BY MR. EISER:

13  Q.   At this time you were suffering from erectile dysfunction;

14  is that right?

15  A.   No.

16  Q.   Say again, I didn't hear you.

17  A.   No.

18  Q.   Okay.  Do you see that he's noted that you've got erectile

19  dysfunction and he's going to try you on a trial of sildenafil.

20  Do you see that?

21  A.   Yeah.

22  Q.   Did you get that prescription filled?

23  A.   I don't know.  I probably did because it was given to me

24  and I thought I needed it.

25  Q.   Now, I think you said this on direct, at the time that

1    Mr. Wisner conducted his genital exam on this, your first

2    visit, you didn't have any problem with it; is that right?

3    A.   Right.

4    Q.   And you made no complaints to anyone after this first visit

5    in July of 2012; is that right?

6    A.   Right.

7    Q.   Go to page 16561 from U.S.A. 413.  This will be U.S.A. 429.

8    Now, your next visit --

9         MR. THOMAS:  I'm sorry, what was that -- I was asleep

10   at the wheel.  What was that number?

11        MR. EISER:  Okay.  429 is 16561 to 16564.  If you roll

12   it forward.  All right.

13   BY MR. EISER:

14   Q.   All right.  This record, this again was a visit with

15   Mr. Wisner and it's dated July 31st, 2012.  This record states

16   that you were there to get a work release and had elevated

17   blood pressure.  Do you see that?

18   A.   Yes.

19   Q.   What was the work release that you needed?

20   A.   I don't remember.

21   Q.   Okay.  This -- do you -- it says to perform a work test.

22   Do you know what the work test was?

23   A.   No.

24   Q.   Do you recall if you were working at this time in July of

25   2012?

1    A.  Yeah, I was working.

2    Q.  Do you know where?

3    A.  I don't remember.

4    Q.  Now, you don't recall -- I mean, you don't recall a genital

5    exam on this visit except that you think you got a genital exam

6    on every visit; is that accurate to say?

7    A.  Yes.

8    Q.  Okay.  And you don't recall him saying anything

9    inappropriate during the visit; is that right?

10   A.  Not this visit, no.

11   Q.  And there was nothing about this visit that made you feel

12   uncomfortable at the time; is that correct?

13   A.  No.

14   Q.  Okay.  What's not correct about that?

15   A.  What?

16   Q.  Okay.  Let me -- we had a double negative there.  Let me

17   start over.

18        There was nothing about this visit that made you feel

19   uncomfortable at the time; is that right?

20   A.  Right.

21   Q.  And, again, you made no complaints to anyone after this

22   visit about anything that happened during the encounter; is

23   that right?

24   A.  Right.

25   Q.  Okay.  All right.  I'm going to identify -- we'll go to

1    U.S.A. 430, which is from U.S.A. 413, pages 16546 to 16550,

2    which is your next visit with Mr. Wisner.  Now, it appears the

3    next visit was August 23rd of 2012.  Does that sound right to

4    you, sir?

5    A.  Yes.

6              MR. THOMAS:  I'm so sorry, I'm trying to write and

7    flip through the notebook at the same time and I didn't get the

8    numbers.  I'm so sorry to interrupt.

9              MR. EISER:  I'm sorry, I was trying to watch.  I'll

10   wait until you get your pen.  16546 to 16550.

11   BY MR. EISER:

12   Q.  Now, again, this visit appears to be August 23rd of 2012.

13   Does that sound right?

14   A.  Yes.

15   Q.  Okay.  It notes that, "The patient needs testosterone.  He

16   was seen in the clinic," and that you needed testosterone.  Do

17   you recall that?

18   A.  I don't recall it, but yeah.

19   Q.  Okay.  And you don't recall any -- any inappropriate

20   comments at this particular visit; right?

21   A.  No.

22   Q.  And at the time of the visit, you did not believe that

23   Mr. Wisner touching your genitals was in any way inappropriate?

24   A.  No.

25   Q.  You believed it was part of the medical exam; correct?

16-2627 Leininger v USA et al   7.8.20 Vol. 3        560

```
 1   A.  Correct.

 2   Q.  And you do recall discussing erectile dysfunction with

 3   Mr. Wisner at some point; correct?

 4   A.  I don't remember bringing it up, no.  Discussing it?  I

 5   don't really remember discussing it with him.

 6        MR. EISER:  Roll that down.

 7   BY MR. EISER:

 8   Q.  At this visit he prescribed Viagra for you according to the

 9   records.  Is that accurate that he prescribed Viagra for you?

10   A.  Yes.

11   Q.  Did you get that prescription filled?

12   A.  Yes.

13   Q.  Okay.  Now, again, you made no complaints to anyone after

14   this visit about anything that happened during the encounter;

15   is that right?

16   A.  Right.

17   Q.  And even today you don't know and can't say that his

18   touching of your genitals at this point was inappropriate; is

19   that right?

20   A.  Right.

21   Q.  Next exhibit is -- this we're going to mark -- identify as

22   U.S.A. 431 will be from 413 pages 16535 through 16539.

23        MR. EISER:  You got that up?

24        THE COURT:  Will this be a new exhibit?

25        MR. EISER:  Yes, Your Honor.
```

```
 1              THE COURT:  And what number will it --

 2              MR. EISER:  U.S.A. 431.  May I proceed?

 3              THE COURT:  Sure.

 4  BY MR. EISER:

 5  Q.  All right.  This next visit is October 9, 2012; is that

 6  right, sir?

 7  A.  Yes.

 8  Q.  Now, at this is --

 9              MR. EISER:  Roll it down some.

10  BY MR. EISER:

11  Q.  You were seeing him for joint pain; is that accurate?

12  A.  Yes.

13  Q.  And, again, you don't recall anything about this

14  appointment; is that right?

15  A.  Right.

16  Q.  But you believe he touched your genitals; is that accurate?

17  A.  Yes.

18  Q.  But you didn't believe that his touching of your genitals

19  was inappropriate at the time; correct?

20  A.  Correct.

21  Q.  You don't recall him saying anything inappropriate during

22  this exam; is that right?

23  A.  No.

24  Q.  And you didn't complain to anyone after this visit;

25  correct?
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3          562

1   A.   No.

2   Q.   All right.  We're going to put up page 16525 to 16529.  We

3   will identify it as U.S.A. 432.  It appears the next visit that

4   you had with Mr. Wisner was on January 9th of 2013; is that

5   accurate?

6   A.   Yes.

7            MR. EISER:  Okay.  Roll it forward.

8   BY MR. EISER:

9   Q.   The record references an MRI of your knee and you switching

10  from a testosterone gel to testosterone injections.  Do you

11  recall that?

12  A.   Yes.

13  Q.   Why -- why were you, if you know, getting testosterone

14  injections?

15  A.   I don't recall.

16  Q.   Okay.  How did it make you feel to get those injections?

17  A.   Really no different.

18  Q.   Okay.  Now, and again at this time you don't recall him

19  touching your genitals at this visit other than you think he

20  did at every visit; is that accurate?

21  A.   Yes.

22  Q.   And at the time it was happening, you didn't think it was

23  inappropriate for him to touch you there; is that right?

24  A.   Right.

25  Q.   He didn't say anything inappropriate at the time of this

16-2627 Leininger v USA et al   7.8.20 Vol. 3                563

1   visit; correct?

2   A.   Not that I know of.

3   Q.   And you did not report anything that Mr. Wisner did to

4   anyone after the visit; correct?

5   A.   Correct.

6   Q.   Or even talk with anybody about it; correct?

7   A.   Correct.

8   Q.   We're going to go to page 16483 to 16488, which we will

9   identify as U.S.A. 433, which appears to be your next visit on

10  July 30th of 2012 -- oops, July 30th of 2013; is that accurate,

11  sir?

12  A.   Yes.

13  Q.   This record says you complained of tooth pain, back pain

14  and swelling in your face; is that accurate?

15  A.   Yes.

16  Q.   At this visit Mr. Wisner increased your prescription for

17  oxycodone.

18         MR. EISER:   Roll that down.

19  BY MR. EISER:

20  Q.   Do you recall him prescribing oxycodone at this visit or at

21  any time?

22  A.   Yes.

23  Q.   Okay.  And do you recall filling the prescription for

24  oxycodone?

25  A.   Yes.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                              564

1   Q.  And, again, at this visit you didn't think there was

2   anything inappropriate about Mr. Wisner touching your genitals;

3   is that accurate?

4   A.  Correct.

5   Q.  And you don't recall him saying anything inappropriate

6   during this visit; is that right?

7   A.  Correct.

8   Q.  And this July 2013 visit was an annual check-up, so really

9   even today you didn't think it was inappropriate for him to

10  touch your genitals during this July 2013 visit; is that right?

11          MR. THOMAS:  Your Honor, may I ask -- object.  I

12  thought this has been stipulated.  The United States in the

13  pretrial order stipulated that he inappropriately touched him

14  nine times, and each and every time was medically not necessary

15  and medically inappropriate.  So then the question is

16  irrelevant unless they're changing their stipulation.

17          THE COURT:  Mr. Eiser, what's your view on this

18  objection?

19          MR. EISER:  The question is directed to his mental --

20  his reactions, his -- the extent to his damages, his mental

21  health problems or damages, both then and today.

22          THE COURT:  So the objection is to relevance,

23  Mr. Thomas?

24          MR. THOMAS:  Yes, Your Honor.

25          THE COURT:  I'm sorry, Mr. --  I'm going to overrule

1   the objection.  I think the damage claim puts this fairly in

2   play even if there is a stipulation as you recite.  So the

3   objection's overruled.

4          MR. EISER:  All right.  Go to page 16467 through

5   16470, which we will mark as U.S.A. 434.

6   BY MR. EISER:

7   Q.  It appears your next visit in which you encounter

8   Mr. Wisner was August 22nd of 2013; is that right?

9   A.  Yes.

10          MR. EISER:  Okay.  Roll that forward.

11   BY MR. EISER:

12   Q.  It notes complaints about back pain.  And you believe he

13   touched your genitals during this visit but did not think it

14   was inappropriate at the time; is that right?

15   A.  Yes.

16   Q.  And, again, you made no report or complaint to anyone at

17   the time?

18   A.  Right.

19   Q.  All right.  Go to page 16460 to 16463 which we will

20   identify as U.S.A. 435.

21          MR. THOMAS:  Can I get those numbers again?  I'm so

22   sorry.

23          MR. EISER:  16460 to 16463 will be U.S.A. 435.

24   BY MR. EISER:

25   Q.  All right.  It looks like your next visit was on August

1    28th of 2013.  Does that sound right, sir?

2    A.  Yes.

3         MR. EISER:  And roll that forward.

4    BY MR. EISER:

5    Q.  On this visit you had complaints of shoulder pain and you

6    did have shoulder pain at some time in 2013; is that right?

7    A.  Yes.

8    Q.  Okay.  Now, this was a work-related injury for which you

9    sought and received workers' compensation.  Do you recall that?

10   A.  Yeah.  Yes.

11   Q.  And, again, you believe he touched your genitals but don't

12   specifically recall it at this visit; is that accurate?

13   A.  Yes.

14   Q.  Okay.  And, again, you didn't think there was anything

15   inappropriate about the -- about it at the time; is that

16   accurate?

17   A.  Correct.

18   Q.  Thought it was part of the exam; right?

19   A.  Right.

20   Q.  And you don't recall him saying anything inappropriate

21   during this visit; correct?

22   A.  Correct.

23   Q.  And you didn't report or say anything to anybody after this

24   exam about it; is that right?

25   A.  Right.

1   Q.  All right.  Go to 16424 to 16428 which we will identify as

2   U.S.A. 436.  This appears to be your next visit.  That would be

3   February 25th of 2014.  Does that sound accurate, sir?

4   A.  Yes.

5   Q.  Okay.  At this visit you had complaints:  low back, hip and

6   right shoulder pain; is that right?

7   A.  Yes.

8   Q.  And, again, you believe he touched your genitals and you

9   did not think it was inappropriate at the time; is that right?

10  A.  Right.

11  Q.  And you did not report any problems after this visit nor

12  talk to anyone about it; is that right?

13  A.  Right.

14  Q.  This is the last record of any visit that you had with

15  Mr. Wisner that we have.  Do you know of any other visits you

16  had in which you encountered Mr. Wisner?

17  A.  No.

18  Q.  Okay.  Do you recall telling either Dr. Peterson or

19  Dr. Abrams, when they were meeting with you, that you recalled

20  during that interview that you felt uncomfortable and asked

21  your wife to come to a visit because of how uncomfortable you

22  were from Mr. Wisner touching your genitals?  Do you recall

23  that?

24  A.  Yes.

25  Q.  Is that accurate?

16-2627 Leininger v USA et al   7.8.20 Vol. 3      568

1      Did you feel uncomfortable and ask your wife to come to the

2   exam because you felt uncomfortable?

3   A.  Yeah.

4   Q.  Okay.  Do you know when you told her?

5   A.  No.

6   Q.  It would obviously have had to have been before the last

7   visit; is that right?

8   A.  Yes.

9   Q.  Do you know if it was after your first visit that you said

10  to your wife, "This makes me uncomfortable.  Why don't you come

11  with me?"

12  A.  No.

13  Q.  It was some time between the first and the last encounter;

14  is that right?

15  A.  Yes.

16  Q.  And why -- why is it you were asking her to come to your

17  appointments?

18  A.  I just felt more comfortable with her there.

19  Q.  Okay.  You told the psychiatrist who talked to you that

20  after she -- the -- when she came to the appointment, he didn't

21  do a genital exam.  Do you recall saying that?

22  A.  Yeah.

23  Q.  Okay.  And do you believe it's because she was there?

24  A.  Yes.

25  Q.  Okay.  But you're not sure which visit that was?

1    A.   No.

2         MR. THOMAS:  It's -- again, Your Honor, there's been a

3    stipulation that each and every visit there was a genital exam.

4    This was sorted out pretrial.

5         THE COURT:  So what's the objection?

6         MR. THOMAS:  Relevance and it goes -- it's a violation

7    of the pretrial order.

8         THE COURT:  Mr. Eiser, you want to respond?

9         MR. EISER:  Your Honor, to get around the statute of

10   limitations defense, plaintiff's counsel has come up with this

11   argument that he didn't know he was being harmed while he was

12   being harmed.  He just admitted that he knew something was up.

13   We can call it harm.  We can call it discomfort.  And it was

14   before his last visit, so, as you decide the statute of

15   limitation issues, you have to decide whether when a reasonable

16   person would know he had been harmed and that his harm was

17   caused by an employee of the government.  This goes directly to

18   that defense.

19        MR. THOMAS:  I didn't mean to talk, Your Honor, but I

20   would like to respond.

21        THE COURT:  Go ahead.

22        MR. THOMAS:  And I will say this:  The witness is on

23   the stand and I think there needs to be argument on this and

24   it's 10:30, and some courts don't like it when there's

25   extensive argument about an issue in front of a witness.  I'm

1    prepared to proceed with the argument but I don't want it to

2    look like I'm trying to influence the testimony.

3         THE COURT:  Well, we do -- we do need a recess.  I'm

4    not sure we need extensive argument on this, but we -- we

5    are -- having started earlier, we're a little behind in our

6    timeline here.  So it's about 10:35, let's take our recess

7    aiming to resume at ten until the hour with Mr. Leininger out

8    of the room and I'll hear from you briefly.  I don't think this

9    needs to be extensive and we'll pick up then.

10        And then once we finish -- we -- we can do that when

11   we come back.  Well, let's go ahead and do it now because we're

12   up to the subject and I'll think about it over the recess.  So

13   once Mr. Leininger has cleared the room we can talk about the

14   defendant's objection -- or the plaintiff's objection.  I'm

15   sorry.

16        MR. THOMAS:  Yes, Your Honor.  It's not -- number one,

17   that's not an accurate characterization of our defense that

18   we've created.  The fact of the matter is that approximately

19   90 -- 90 of the hundred victims never came forward until after

20   Kerry Baker's letter.  I didn't fabricate that and I don't

21   appreciate the insinuation that I did.  It has been stipulated

22   that it happened nine times.  It's in the pretrial order.

23        And so now they're going against the representations

24   they made to this court as officers of the court in -- in the

25   pleading.  And so they're trying to argue that there was a time

1    where he didn't actually touch his genitals.  That's literally
2    what he just said:  he didn't touch your genitals at this exam.
3            THE COURT:  All right.  Have you finished your
4    argument on the point?
5            MR. THOMAS:  Yes, Your Honor.
6            THE COURT:  Mr. Eiser, I'll hear from the defendant.
7            MR. EISER:  Your Honor, as counsel said, we stipulated
8    because that's what they claim in the case and we don't want to
9    challenge this witness's credibility on what happened to him
10   because we all know it happened.  The issue here is to what
11   extent he was harmed and at what time he knew he was harmed,
12   and it's a legal defense.  I don't know how to explain it to
13   counsel any clearer.
14           MR. THOMAS:  I think the question can be:  Did you
15   know you were harmed at this time?  But that's not what the
16   question was.  The question was whether or not he touched his
17   genitals at this time.  I haven't objected one bit.
18           He is asking every single visit did you know that
19   something inappropriate happened at this time?  Did you know
20   that he had been harmed at this time?  I never objected to any
21   of those, not one single time.  I think that's fair game.
22           MR. EISER:  Your Honor, we're not -- we're not
23   disagreeing with the facts.  We're talking about damages here.
24   The gentleman on direct could and still to this day can explain
25   in detail about the seeing the little girl and the -- and her

1    father get killed, the details; he can't -- they can't leave

2    him.  But he just explained, "I don't remember any of this.  I

3    don't remember him touching my genitals.  I don't have" -- I --

4    so to that extent we're talking about whether he was harmed and

5    when he was harmed or when he knew he was harmed.

6              MR. THOMAS:  I don't think the question --

7              THE COURT:  All right.

8              MR. THOMAS:  Sorry, Your Honor, I apologize.

9              THE COURT:  I think I understand the positions.  I'm

10   going to think about it over the break and I'll come back.

11   We'll plan to be back -- let's make it at ten -- well, ten

12   until the hour.  I'll rule on this issue and then we'll go from

13   there.  We'll get the witness back in the room after the

14   ruling.  All right.

15             MR. EISER:  Thank you.

16             THE COURT:  Thank you.

17        (Recess.)

18             THE COURT:  We're on the record -- on the record of

19   counsel but outside the presence of Mr. Leininger.  Let me

20   sound check, make sure everyone is here.

21             MR. THOMAS:  Yes, but Mr. Leininger not in the room.

22             THE COURT:  And from the defendants everybody

23   broadcasting there?

24             MR. EISER:  Yes, Your Honor.  Thanks.

25             THE COURT:  I'm overruling the plaintiff in this light

```
1   of questioning -- line of questioning.  Here's the reason for
2   my ruling.  We have a claim by -- a damage claim by a plaintiff
3   that includes a claim for what I'll call exacerbated PTSD.  And
4   I think from my perception of the evidence, it is not disputed
5   that Mr. Leininger had experienced and sustained PTSD before
6   any connection to the wrongdoing by Wisner.
7           I don't take the line of questioning to challenge
8   whether or not there was wrongdoing committed by Wisner --
9   Mr. Wisner but to go to the legitimate damage question of how
10  significant did the conduct that the plaintiff claims in their
11  damage claim caused additional or new PTSD, and I think it's an
12  appropriate line of inquiry for how the plaintiff perceived it
13  and when.  So the objection's overruled.
14          All right.  With that are we ready to resume with the
15  cross-examination?
16          MR. EISER:  Yes, Your Honor.
17          THE COURT:  All right.  Mr. Leininger is back on the
18  -- on the witness chair.  Mr. Leininger, you are you able to
19  see and hear me all right?
20          THE WITNESS:  Yes.
21          THE COURT:  All right.  Thank you for your patience
22  with us.
23          Mr. Eiser, you may resume your examination.
24          MR. EISER:  Thank you, Your Honor.
25  BY MR. EISER:
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3                   574

1    Q.  All right.  Mr. Wisner -- I'm sorry.  Mr. Leininger, you

2    talked about this on direct.  You didn't believe that Mark

3    Wisner had conducted himself inappropriately toward you until

4    you received a letter from Kerry Baker, the investigator from

5    VA's Officer of Inspector General; is that right?

6    A.  Yes, I did not believe, no.

7    Q.  Okay.  Up -- all right.  And that would -- that would have

8    been in -- that would -- you received that letter August 15,

9    2014; is that right?

10   A.  Yeah.

11   Q.  Now, it was only then after you got that letter that --

12   after you had been told there was an investigation into

13   Mr. Wisner that you first believed that Wisner had touched you

14   inappropriately and made inappropriate comments; is that right?

15   A.  Yes.

16   Q.  Okay.  Exhibit 400 --

17         MR. EISER:  Did this go into evidence already?  U.S.A.

18   Exhibit 400 is already in evidence.

19   BY MR. EISER:

20   Q.  Sir, this is the administrative claim that was filed on

21   your behalf; is that right?

22   A.  Yes.

23   Q.  Okay.  And you see on the exhibit the date stamp showing

24   the administrative claim initiating this FTCA action was

25   received by the VA on February 18th of 2016; is that right?

1   A.   Yes.

2   Q.   Now, you told Dr. Abrams -- do you remember seeing

3   Dr. Abrams, the psychiatrist for the United States that you had

4   to sit through an interview with?

5   A.   Yes.

6   Q.   Okay.  Now, you told him that you brought your wife with

7   you the last time you saw Wisner?

8   A.   Yes.

9   Q.   Is that right?

10  A.   Yes.

11  Q.   Okay.  And you told him that you know it was your last

12  visit because Wisner was terminated shortly after that; is that

13  right?

14  A.   Yes.

15  Q.   And you told your wife to come with you because you didn't

16  trust Mr. Wisner; correct?

17  A.   I did not say trust.

18        MR. THOMAS:  What page are you reading from?

19        MR. EISER:  Go to page 74 of the IME transcript,

20  page 13.

21        MR. THOMAS:  IME, 74.

22        MR. EISER:  74.

23  BY MR. EISER:

24  Q.   There is a transcript of your IME.  The question, line 9:

25  "So what exactly did Mr. Wisner do that's affected you for the

```
 1    rest of your life?"
 2        Your answer:  "He violated my trust as a doctor in a way
 3    that affects me the rest of my life that I don't like.  I'm
 4    afraid of doctors, and, again, I don't like to -- the physical
 5    contact like I used to with my wife.  So all these things
 6    affecting me, they are going to affect me.  They keep affecting
 7    me."
 8             MR. EISER:  I just read the wrong thing.  That's 73.
 9    Page 74, line 13.
10             MR. THOMAS:  Can you give me a moment because I don't
11    think our transcript --
12             MR. EISER:  It's on the screen.  IME transcript,
13    page 74, line 13.
14    BY MR. EISER:
15    Q.  Dr. Abrams asked you, "Did you tell Mary, your wife, I want
16    you to come with me to this appointment because I don't trust
17    this PA?"
18        And your answer was, "That's pretty much the words.  I just
19    told her, I said, 'I don't want him doing these physical exams
20    on me or whatever they are.  I just don't want -- I don't want
21    staff and I'd rather have you with me.'"
22        Do you remember telling her that?
23    A.  Sure.
24    Q.  And what you told him, was that accurate?
25    A.  Yeah.
```

1   Q.  Okay.  You told her exams made you uncomfortable; is that

2   right?

3   A.  Yeah.

4   Q.  Okay.  And you told her this because you wanted her to come

5   with you to your last exam; correct?

6   A.  Correct.

7   Q.  All right.

8           MR. EISER:  Put up the -- all right.  We just went

9   through -- hold on a second, don't put it up yet.

10  BY MR. EISER:

11  Q.  We just went through all of your visits with Mr. Wisner and

12  the OIG and the ad claim, and I'm going to put up a chart that

13  shows the dates that we just talked about.

14          MR. EISER:  This is -- this would be Exhibit 437, Your

15  Honor.  We'd ask that this be admitted.

16          THE COURT:  So this is a demonstrative exhibit -- this

17  is a demonstrative chart or visual aid intended to display,

18  according to the government's view of the evidence, the times

19  when Mr. Leininger saw Mr. Wisner; is that correct?  I want to

20  make sure I understand it.

21          MR. EISER:  Yes, Your Honor.

22          THE COURT:  All right.  Is there objection to use of

23  Exhibit 437?

24          MR. THOMAS:  I don't object to its use, however, as a

25  demonstrative exhibit.  It's not admissible as substantive

```
 1   evidence but, of course, the court can get a copy of it and so
 2   that there is a record of what was used.  But it is not -- I
 3   don't think it can be admitted as substantive evidence as was
 4   the case with our demonstrative.
 5           THE COURT:  Yeah, I don't think the United States --
 6   Mr. Eiser, can correct me if I'm mistaken -- I don't think it's
 7   being offered as actual evidence but instead as a visual aid in
 8   a nature of demonstrative.
 9           You may proceed with it Mr. Eiser.  I do want it to be
10   in the record and I'd like to have it to make sure it's
11   included.
12           MR. EISER:  Thank you, Your Honor.
13           MR. THOMAS:  They're doing the tornado tests right
14   now.  I don't know if that's causing problems with the audio.
15           THE COURT:  Not so far.  I can hear it here too but
16   doesn't seem to be an actual tornado.  So, Mr. Eiser, let's go
17   ahead.
18           MR. EISER:  Thank you, Your Honor.
19   BY MR. EISER:
20   Q.  Mr. Leininger, I want to be clear on when it was that you
21   knew that what Mr. Wisner was doing was wrong and you felt
22   uncomfortable.  Now, you've told the court today that it was at
23   every visit.  That would go back to July of 2012.  And you told
24   Mr. -- Dr. Abrams that it was before your last visit, which
25   would have been February 25th of 2014.  Which is it?
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3                579

```
 1          MR. THOMAS:  Objection.  Form.  Also compound question
 2   and misstates the testimony.
 3          THE COURT:  I'm going to sustain the objection to the
 4   form.  It is compound and unfairly complex.  The objection's
 5   sustained.
 6          MR. EISER:  Apologize, Your Honor.
 7   BY MR. EISER:
 8   Q.  Your last visit with Dr. Wisner was February 25th of 2014,
 9   and you've told us that you knew -- you felt uncomfortable some
10   time before that visit sufficiently to ask your wife to come;
11   is that right?
12   A.  Felt uncomfortable, yes.
13   Q.  Okay.  Well, you told -- on direct you said that
14   Mr. Wisner, during one visit, threatened to withhold your pain
15   medicine.  Do you remember that testimony?
16   A.  Yes.
17   Q.  Do you know which visit that happened at?
18   A.  I do not know which visit, no.
19   Q.  Okay.  But, I mean, threatening to withhold your pain
20   medication, what was he threatening?  What did -- what did he
21   say you should do or he would withhold your pain medication?
22   A.  He has to perform the exam or I do not get my pain
23   medication.
24   Q.  Okay.  Now, you knew that was wrong; right?
25          MR. THOMAS:  Objection.
```

```
1              THE WITNESS:  I did not know.

2              THE COURT:  What's the objection?

3              MR. THOMAS:  He already answered.

4    BY MR. EISER:

5    Q.  In your experience, do medical providers make threats

6    during exams?

7    A.  I have no -- come across that many.  I don't go to the

8    doctors that often to even know.

9    Q.  All right.

10   A.  I'm not a professional.

11   Q.  Okay.  All right.  Now --

12             MR. EISER:  You can take that down.

13   BY MR. EISER:

14   Q.  You say -- you still have VA medical benefits for life;

15   right?

16   A.  Yes.

17   Q.  Okay.  You say you cannot return to the VA for treatment

18   and your lawyer says you need a gold-plated health insurance

19   policy; is that right?

20             MR. THOMAS:  Objection.  Argumentative.

21             THE COURT:  Overruled.  It's cross-examination.

22             THE WITNESS:  I don't remember saying gold-plated.

23   BY MR. EISER:

24   Q.  Okay.  But you -- you say you -- you say you can't return

25   to the VA; is that right?
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3         581

```
 1   A.  Right.
 2   Q.  Okay.  You could but you find it emotionally difficult; is
 3   that right?
 4   A.  Yes.
 5   Q.  Okay.  Now, on direct you talked about getting mental
 6   health treatment from a mental health provider at the VA by the
 7   name of Dena Ridenour White.  Do you remember that testimony?
 8   A.  Yep.
 9   Q.  Pardon me?
10   A.  Yes.
11   Q.  Okay.  And she helped -- you testified on direct that she
12   was helping you with her mental health treatment for you;
13   correct?
14   A.  Yes.
15   Q.  Okay.  Now, you said you stopped going to get that
16   treatment at the VA because she moved; is that right?
17   A.  I'm -- I moved.
18   Q.  You moved.  Okay.
19       Where did you move to?
20   A.  West Virginia.
21   Q.  Did you get mental health treatment there from the VA?
22   A.  No, I did not have a VA close to go to.
23   Q.  Now, you're aware Mr. Wisner's in prison; right?
24   A.  Yes.
25   Q.  But with that knowledge, it still makes it difficult for
```

1   you to go into the VA to get treatment; is that your testimony?

2   A.   Yes.

3   Q.   Any VA anywhere; is that your testimony?

4   A.   Any -- anywhere.

5   Q.   Okay.  Now, you say you cannot return to the VA for

6   treatment, but we'll put up U.S.A. Exhibit 421.  Your attorney

7   showed you this on direct.  The VA health summary shows that

8   you had about 70 contacts and more than 20 in-person visits

9   with your VA medical providers between June 2014 and June 2017;

10  is that accurate?

11  A.   Yes.

12  Q.   All right.

13       MR. EISER:  All right.  Roll forward to October 2nd,

14  2014, and go down toward the bottom.

15  BY MR. EISER:

16  Q.   Now, Dr. Peterson testified that you have -- that you told

17  -- that his opinion that you can't return to the VA was based

18  in part on you telling him that you hadn't been there at all

19  for five years.  But you had been there; isn't that right?

20  A.   Yeah.

21  Q.   Why would you tell Dr. Peterson you hadn't been back to the

22  VA when you had been back more than 20 times?

23  A.   Because it -- in the time frame, it was many years since

24  I'd been there.  I didn't know the exact time.

25  Q.   Okay.  Does it surprise you that you had been back to the

1   VA more than 20 times, had more than 70 contacts for it in the
2   years 2014 to 2017, the three years immediately after your
3   encounters with Wisner?  Does that a surprise to you?
4   A.   No.
5   Q.   So you knew you had been back?
6   A.   No, I never said I hadn't.
7   Q.   Well, Dr. Peterson says you told him you hadn't been back?
8   A.   I hadn't been back in the five years, but it wasn't --
9   maybe wasn't five years.  I just said amount of time.
10  Q.   All right.
11  A.   It had been a few years.
12  Q.   All right.  You see on the summary October 2nd, 2014, you
13  saw Dr. Colleen McMamaman and she listed a diagnosis there,
14  this is -- and one of them is the posttraumatic stress
15  disorder.  Do you recall talking to Dr. McMamaman about your
16  PTSD symptoms?
17  A.   No.
18  Q.   Okay.  Go to page 16347 -- not on this one the next --
19  U.S.A. 413.  Okay.  Now, what I have up is page -- U.S.A.
20  16347, which we will mark for identification as U.S.A. 438.
21          THE COURT:  Is this an excerpt of Exhibit 413?
22          MR. EISER:  I'm sorry, Your Honor, I didn't hear you.
23          THE COURT:  Is this an excerpt from Exhibit 413?
24          MR. EISER:  It is.  It also is included within
25  Plaintiff's Exhibit 241.

16-2627 Leininger v USA et al   7.8.20 Vol. 3        584

1          THE COURT:  Okay.  All right.

2    BY MR. EISER:

3    Q.  Now, is it accurate you saw this Dr. McMamaman on October

4    2nd, 2014?

5    A.  Yeah.

6          MR. EISER:  Okay.  Go to page 4 of this, Seth.

7    BY MR. EISER:

8    Q.  Okay.  And she notes regarding your PTSD, "It is unclear as

9    to which diagnosis under psych is the most accurate.  Will

10   refer him to" -- I don't know -- it's behavioral health --

11   what's -- "the Behavioral Health Unit for further evaluation

12   and to help muddle through the multiple diagnoses since he is

13   not on any medications and per patient only has issues with

14   anger."

15       Is that right that you told Dr. McMamaman on October 2nd of

16   2014 you only had issues with anger?

17   A.  I don't know.

18   Q.  Dr. McMamaman notes, "The patient is advised to keep all

19   follow-up appointments."  Was that a problem for you to keep

20   your follow-up appointments?

21   A.  Yeah.

22   Q.  All right.  I'll give -- -- now, you told her about your

23   knee pain, your tobacco use problem, your low back pain, the

24   PTSD, but you didn't say anything to Dr. McMamaman about

25   Mr. Wisner and your encounters with him that had happened just

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    585

1   a few months before; is that right?

2   A.  Right.

3   Q.  I didn't hear you, sir.

4   A.  Yes.

5   Q.  All right.  You're in the Behavioral Health Unit.  These

6   are the people who treat mental health problems and mental

7   health conditions.  She's dealing with PTSD, but she's dealing

8   with the PTSD that you've suffered from since your military

9   service; is that right?

10  A.  Right.

11  Q.  All right.

12       MR. EISER:  All right.  Go to page 16 -- the next

13  exhibit.  This is also from U.S.A. 413, page 16336, which we'll

14  identify as U.S. Exhibit 439.

15  BY MR. EISER:

16  Q.  Now, Dr. McMamaman recommended that you be seen by a

17  psychiatrist Dr. Jose Menendez and you made that appointment on

18  October 27th of 2014; is that right?

19  A.  I guess.

20  Q.  All right.  Well, let's go through it.  "History of Present

21  Illness Chief Complaint:  The patient has long history of

22  treatment for PTSD with a very, very diagnostic profile to

23  include substance abuse, alcohol abuse, PTSD, bipolar 1 and 2

24  and ADHD.  He has a history of psychotropic treatment which

25  follows the diverse diagnostic picture.  He has been treated by

16-2627 Leininger v USA et al   7.8.20 Vol. 3          586

1   the VA as well as a private physician in this area and in

2   West Virginia."

3       Did you get treatment in West Virginia for treatment of

4   your PTSD symptoms, sir?

5   A.  I don't recall.

6   Q.  "Mr. Leininger is referred to this clinic by Dr. McMamaman

7   due to the diagnostic diversity and his current

8   medication-free-status."

9       Is that accurate that you're not on any medications in

10  October of 2014?

11  A.  Yes.

12  Q.  So this would be some eight, seven months after your last

13  visit with Mr. Wisner you're clean --

14  A.  Yes.

15  Q.  -- is that right?

16  A.  Yes.

17  Q.  Back to her note.  "Patient is having increasing issues

18  with focusing, anxiety, PTSD symptoms and difficulty

19  controlling the changes in mood.  His presentation is

20  reminiscent of a person who has experienced some physical or

21  emotional trauma.

22      In the course of this interview, he was able to reveal that

23  he has -- he had been a youth who seemed to get into trouble,

24  though he denies any issues -- any issues of any abuse.

25      Immediately -- he stated that he had been expelled or

 1    suspended from high school necessitating use of a GED.

 2    Immediately after obtaining this, he entered the military and

 3    served three-and-a-half years in Iraq where he experienced the

 4    trauma which he repeats in his memory.  He stated that the most

 5    evident recurrent experience has to do with the smells and

 6    sights of dead children's bodies being burned, the witnessing

 7    of a father and daughter being shot by our troops after

 8    entering a restricted zone.

 9        Veteran reported current symptoms of posttraumatic stress

10    disorder, including recurrent and intrusive distressing

11    recollections of dreams, intense psychological distress and

12    exposure to queues, avoidance of thoughts, feelings of

13    conversations -- avoidance of activities, places, or people

14    that arouse recollections, markedly diminished interest or

15    participation in activities, feeling of detachment or

16    estrangement, restricted range of affect, difficulty falling or

17    staying asleep, irritability or outburst of anger,

18    hypervigilance and an exaggerated startle response."

19        Now, you told Dr. Menendez all these problems but you

20    didn't tell him anything about any adverse consequences that

21    you were suffering from your encounters with Mr. Wisner; is

22    that right?

23    A.   I'm assuming.

24    Q.   Do you have a recollection of telling Dr. Menendez at this

25    psychiatric consultation that, in fact, you did tell him about

1    problems that you were having from Mr. Wisner?

2    A.   I don't recall.

3    Q.   Now, Dr. Menendez told you to return in a few weeks for

4    further treatment.

5            MR. EISER:  Pull 16340.  No, this thing.  Just rolled

6    it forward.

7    BY MR. EISER:

8    Q.   Okay.  The record reflects that you should return for

9    consultation in two weeks.  And do you recall that Dr. Menendez

10   saying, "Come back for another consultation in two weeks?"

11   A.   No.

12   Q.   Okay.  You did make an appointment, though, about two weeks

13   later --

14           MR. EISER:  Put up 17851 health summaries.  Roll it

15   down to November 12th, 2014.  There you go.

16   BY MR. EISER:

17   Q.   Do you see that in the health summaries that you had an

18   appointment at the Behavioral Health Clinic on November 12th,

19   2014?  Do you see that?  Do you remember making that

20   appointment?

21   A.   No.

22   Q.   The note says that you canceled it.  Do you remember

23   cancelling it?

24   A.   No.

25   Q.   All right.  That appointment with the Behavioral Health

589

1    Unit was rescheduled to December 2nd, 2014.  Do you see that

2    noted on the exhibit that we have showing?

3    A.   Yes.

4    Q.   And it records that you were a no-show for the rescheduled

5    appointment.  Do you recall that, having this appointment and

6    not showing up for it?

7    A.   Nope.

8    Q.   All right.  Go to the next exhibit which will be U.S.A. 440

9    for identification, and it's a page from 413, page 17851 from

10   the health summary.  He and you made an appointment --

11         MR. EISER:  I'm sorry, wrong -- 17851, which we have

12   just talked about is already in evidence.  That's not

13   U.S.A. 440.  All right.  Do you have 16167?  Okay.  No, the

14   next one.  Previous.  Turn it.  All right.

15   BY MR. EISER:

16   Q.   "From our review of the records, we could find no further"

17   -- wait a minute, here we go.  "We could find no further" --

18         MR. THOMAS:  Can I get the page number?

19         MR. EISER:  I'll get it for you in a minute but I'm

20   taking that down.

21         No, no, take it down.  I haven't identified it yet.

22   BY MR. EISER:

23   Q.   "From our review of the records, we could find no further

24   appointments by you with the Behavioral Health Unit;" is that

25   accurate?

16-2627 Leininger v USA et al   7.8.20 Vol. 3        590

1    A.   Yeah.

2    Q.   Okay.  Now, put up -- this is page 16167.

3         THE COURT:  What exhibit are we in?

4         MR. EISER:  Right now we're going -- I'm going to

5    identify this.  This is from U.S.A. 413.  It's page 16167.

6    It's the note dated July 7th, 2016, and we will mark it for

7    identification as U.S.A. 440.

8         THE COURT:  Four what?

9         MR. EISER:  I'm sorry, Your Honor, I didn't hear you.

10        THE COURT:  We didn't hear what exhibit this is going

11   to be.

12        MR. EISER:  Four-forty.

13        THE COURT:  All right.

14   BY MR. EISER:

15   Q.   Now, we could find no records of any visits to the

16   Behavioral Health Unit after the appointment you had with

17   Dr. Menendez.  However, there is this note dated July 7, 2016,

18   when the VA called you to follow up.  Do you recall that the VA

19   called you on July 7th of 2016 to find out your status?

20   A.   Vaguely.

21   Q.   Okay.  And they wanted to find out if you wanted some

22   therapy; is that right?

23   A.   Yes.

24   Q.   And you told them that you had at that time, July 2016, you

25   told them you had lost faith in the VA at that time; is that

1  right?

2  A.  Yes.

3  Q.  Now, this would have been more than two years since your

4  last encounter with Mr. Wisner; correct?

5  A.  Yes.

6  Q.  And it would have been after your lawyer filed your

7  administrative claim initiating this action in February of

8  2016; correct?

9  A.  Yes.

10  Q.  And after this, on July 18th, 2016, you sought mental

11  health treatment at the Behavioral Health Unit at a place

12  called TriWest Healthcare Alliance in Kansas City.  Do you

13  recall that, sir?

14  A.  Yes.

15         MR. EISER:  Okay.  Put up the next exhibit.  Okay.

16  What we're showing, Your Honor, is from U.S.A. 413.  It's

17  page 18119 and we will mark it for identification as U.S.A. --

18  what are we up to?  Four-forty-one.

19  BY MR. EISER:

20  Q.  Do you recall going to the -- I believe you said you did.

21  Do you recall going to the Midwest --

22         MR. EISER:  Can you enlarge that?

23  BY MR. EISER:

24  Q.  Do you recall going to the Midwest Health Alliance in July

25  of 2016?

1    A.   Jennifer Newcomer, yes.

2    Q.   Yes.

3         Okay.  Now, this treatment was paid for by the VA Choice

4    Program; correct?

5    A.   Yes.

6    Q.   Okay.  What is that?

7    A.   I don't know.

8    Q.   Okay.  Do you recall speaking to the VA employees and

9    having them explain to you how it is that through the Choice

10   Program you can go to private doctors but the VA will pay for

11   it?

12   A.   I didn't have anybody explain it to me, no.

13   Q.   How did you get in the program?  Did you apply for it?

14   A.   No, they had given it to me.

15   Q.   Okay.

16   A.   Told them I didn't want to seek healthcare there.

17   Q.   Okay.  And so they set you up with the Choice Program; is

18   that right?

19   A.   Yes.

20   Q.   Okay.  And through that program, which is paid for by the

21   VA, right, you didn't have to pay for this treatment?

22        Can you -- I did not hear you.

23   A.   I didn't have to pay for them, no.

24   Q.   And you're aware that this program is still available to

25   you; right?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    593

```
1    A.  No, I'm not aware of that.

2    Q.  Okay.  Have you looked into it?

3    A.  I did and I was told it was done.

4    Q.  Have you heard any speeches by President Trump in the last

5    few months?

6    A.  Some.

7    Q.  He talks about that is one of his major accomplishments,

8    that he got the VA Choice Program out there for veterans.

9    You've never heard that?

10            MR. THOMAS:  Foundation.

11            THE WITNESS:  Yeah.

12            THE COURT:  Hold on just a second.  There's an

13   objection.  I didn't -- did you object to foundation.

14            MR. THOMAS:  Yeah.  Foundation as to what President

15   Trump said at a given time.  I don't have any way to verify any

16   of this.

17            THE COURT:  That's not a foundation objection.  It's

18   overruled.

19            MR. THOMAS:  Relevance.

20            THE COURT:  Overruled.

21   BY MR. EISER:

22   Q.  You said you have not looked into this; is that right?

23   A.  No, I haven't heard anything about it.

24   Q.  All right.  I'll suggest to you, after this is over, it's

25   now called the Veterans Community Care Program.  Have you ever
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3                594

1    heard that?

2    A.   No.

3    Q.   All right.  All right.  Now, your first visit was with

4    licensed social worker named Jennifer Newcomer and you mention

5    that you do recall this; is that right?

6    A.   Yes.

7    Q.   And you told her about your problems with PTSD, depression,

8    and insomnia; is that right?

9    A.   Yes.

10   Q.   All right.

11        MR. EISER:  Go to page 2 of that exhibit.  Okay.  Go

12   to page 2 of the exhibit.  I'm going to come back to that.  Go

13   back up.

14   BY MR. EISER:

15   Q.   Okay.  In the initial assessment she says that you came to

16   one visit on July 18th of 2016, and didn't make another

17   appointment for another session.  Your phone number is

18   disconnected and Ms. Newcomer attempted to call you three times

19   with the last call being that day which was --

20        MR. EISER:  Help me out?  Is it above that?  Go up a

21   little bit.

22   BY MR. EISER:

23   Q.   -- which was August 24, 2016.  Is that accurate that you

24   didn't make another appointment after your initial evaluation

25   with Ms. Newcomer?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                595

1    A.  Yep.  Yes.

2    Q.  Okay.  Why is that?

3    A.  She was not a doctor.

4    Q.  Okay.  But she was -- she was recommending that you get

5    there to be with a doctor; is that right?

6    A.  No, it wasn't.  She was recommending me spend time talking

7    to her.

8    Q.  All right.  And you didn't want to talk to her?

9    A.  No, I did not.

10   Q.  Okay.  You said you got benefit from talking to Dena White.

11   And she's not a doctor; right?

12   A.  Dena White happened before this.

13   Q.  All right.  And so after Mr. Wisner you can't get treatment

14   from anyone at the VA, and outside the VA you can't get it from

15   anybody who's not a psychiatrist; is that -- or help me

16   understand.

17   A.  Yeah, that is exactly correct.

18   Q.  Okay.  You can't just see a counselor for -- see if --

19   A.  No, I'm not having that.  I want somebody who's going to do

20   something for me and help me out.

21   Q.  You did tell Ms. Newcomer you do have a current lawsuit

22   against a VA doctor; correct?

23   A.  I don't remember.  Probably.

24   Q.  Okay.

25              MR. EISER:  Roll forward.

```
1   BY MR. EISER:
2   Q.   Now, Ms. Newcomer recommended that you schedule individual
3   counseling sessions to address your PTSD.  Do you recall that?
4   A.   Yes.
5   Q.   Okay.  And she also recommended a psychiatric reevaluation
6   with a psychiatrist for medication management to address your
7   depression; is that right?
8   A.   I don't -- I don't know.  I don't remember.
9   Q.   And she recommended that you complete a sleep study to
10  address your sleep disturbance.  Do you recall her recommending
11  that?
12  A.   I do not.
13  Q.   Okay.  Well, we see three recommendations there.  You
14  didn't do any of those three things; is that right?
15  A.   No, I did not.
16  Q.   Why not?
17  A.   Because I did not wish to see that woman again.
18  Q.   And it's because she wasn't a doctor; is that it?
19  A.   That is correct.  I did not have a choice on who I got to
20  see; that was chosen for me.
21  Q.   And you never made another appointment there at TriWest
22  Healthcare in their Behavioral Health Unit; right?
23  A.   Right.
24  Q.   A month later, on August 18, 2016, you went to the
25  University of Kansas Physicians for treatment; correct?
```

1    A.   Yes.

2    Q.   Okay.

3            MR. EISER:  Put up 66026.  All right.

4            THE COURT:  What exhibit is this?

5            MR. EISER:  This will be U.S.A. 442, Your Honor.  It

6    comes from U.S.A. Exhibit 418, page 66026.

7            THE COURT:  Wait a minute.  This is now an excerpt of

8    not 413 but 418?

9            MR. EISER:  Correct, Your Honor.

10           THE COURT:  Is this the first one that's been

11   excerpted from 418?

12           MR. EISER:  Yes, Your Honor.

13           MR. THOMAS:  Can I get the Bates numbers again?  I had

14   to get 418 out.

15           MR. EISER:  66026.  Your Honor, just -- you just said

16   is this the first one not in 413.  The previous exhibit, 441,

17   is -- is included in 413 but it was outside of the VA because

18   the VA was paying for it, they get copies of the -- of the

19   record from the private physician.  So I wanted to be clear.

20           THE COURT:  Yeah, I'm just only worried about our

21   record, which I think at this point is kind of a hash.  I

22   didn't realize you were going to excerpt so many aspects of 413

23   and, in my judgment, complicate our record.  Now we're

24   excerpting out of another exhibit that you did mark and

25   identify before trial.  Are we going to do as much of that with

```
 1    418?
 2            MR. EISER:  No, Your Honor, four other excerpts.  I
 3    was -- I apologize.  Mr. Thomas held up those notebooks and I
 4    -- it convinced me we should excerpt them and put them in one
 5    at a time.
 6            THE COURT:  Yeah, I -- and that would have been fine
 7    with me.  I think they should have been marked and submitted
 8    before, but we'll make the best of it.  We are where we are.
 9            So this excerpt from Exhibit 418 is now marked.  Is
10    there an exhibit with a sticker on it that says 442 on it?
11            MR. EISER:  That will be submitted today.
12            THE COURT:  All right.
13            MR. EISER:  All right.
14    BY MR. EISER:
15    Q.  The exhibit that's up, 442, is a record of, I believe, your
16    first visit there on August 18th of 2016, and you were assigned
17    to Dr. Laurel Witt; is that accurate?
18    A.  Yes.
19    Q.  Okay.  Now, first, Dr. Witt took a medical history from
20    you.
21            MR. EISER:  Roll forward a little bit.
22    BY MR. EISER:
23    Q.  And she notes you're transferring care here from the VA
24    through the Choice Program.  Do you see that?
25    A.  Yes.
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    599

1    Q.  So VA is paying for this care; is that right?

2    A.  Yes.

3    Q.  All right.

4         MR. EISER:  Now, do you have 66026?

5    BY MR. EISER:

6    Q.  Wait right there.  On August 18th of 2016, did you tell

7    Dr. Witt that you were sexually active as of that time?

8    A.  Yes.

9    Q.  Did you tell her that you were having any problems with

10   sex?

11   A.  No.

12   Q.  All right.

13        MR. EISER:  Roll down.  Okay.  Go back up to the top.

14   The top, yeah.

15   BY MR. EISER:

16   Q.  Now, you told Dr. Witt about your PTSD symptoms that you

17   were having in 2016; is that right?

18   A.  Yes.

19   Q.  But you didn't tell her at this -- this first visit or any

20   time through your treatment at UK (sic) Physicians about any

21   encounter with Mr. Wisner; is that right?

22   A.  Right.  She's not a psychologist.

23   Q.  Okay.  Now, they did ask whether or not you were having

24   psychological symptoms; right?

25        MR. EISER:  Roll that down.

16-2627 Leininger v USA et al   7.8.20 Vol. 3      600

1           THE WITNESS:  I do not remember.

2           MR. EISER:  Okay.  Keep going.  Keep going.  Next

3   page.  Roll that up a little bit.  All right.  All right.  Go

4   to the next exhibit which would be 418, 66042 which we'll mark

5   as U.S.A. 443.

6           MR. THOMAS:  I'm sorry, what was the number of this

7   one?

8           MR. EISER:  From 418 -- from 418, page 66042.  Stay at

9   the top.

10  BY MR. EISER:

11  Q.  All right.  Mr. Leininger, you returned to Dr. Witt on

12  September 2nd, 2016, with complaints related to your PTSD; is

13  that right?

14  A.  I guess.

15          MR. EISER:  Roll down.

16  BY MR. EISER:

17  Q.  All right.  Okay.  You told her that you had the PTSD,

18  insomnia, night terrors, not doing well currently.  Six days

19  ago witnessed a fatal motorcycle accident on the highway.  He

20  was the first to respond along with another woman whom he did

21  not know.  He and the woman had to stabilize the motorcyclist

22  placing tourniquets, et cetera."  Do you remember that, sir?

23  A.  Yes.

24  Q.  And you remember telling Dr. Witt that on August --

25  A.  I don't remember talking to her about it, no; but I

1    remember it.

2    Q.  Okay.  She notes, "After this motor vehicle accident, he

3    did not sleep for four nights.  Finally slept Wednesday night

4    through the next day but did not sleep again last night.  He is

5    worried he is having psychosis symptoms return.  Not hearing

6    voices but feeling passive homicidal thoughts creeping back.

7    When asked, he denies active" -- what's HI?  I'm not sure what

8    HI is.  "-- and he says that he has no targets for his anger or

9    HI," homicidal ideation.  "Now, he thinks that fixing his sleep

10   is the most important thing.  In the past Seroquel has worked

11   very well for this.  Again, he does have a therapist through

12   the VA."

13        Is that right, you had a therapist through the VA?

14   A.  What's that?  I had a therapist through the VA?

15   Q.  Let me do it this way:  She -- Dr. Witt wrote down that you

16   have a therapist through the VA.  Did you tell her that?

17   A.  I don't believe so.  I don't know.

18   Q.  Okay.

19   A.  At that time I didn't.

20   Q.  Okay.  She says, "He has a therapist through the VA who he

21   sees regularly and who he plans to call later today.  Do you

22   recall telling her that?

23   A.  I don't recall telling her that.

24   Q.  Okay.  But you didn't have a therapist at the VA in

25   September of 2016, did you?

1   A.  I don't believe so.

2   Q.  Okay.  She notes, "He never started on the venlafaxine or

3   the clonidine -- clonidine because you had difficulties

4   obtaining these meds through the VA insurance.  He says it may

5   be easier if I give him a printed prescription for these and

6   his other medicines.  Still, of course, waking up nightly in

7   cold sweats with night terrors.  Very supported by his wife he

8   says."

9        Now, Dr. Witt strongly encouraged you to accept her

10  recommendation that you see a mental health doctor by the name

11  of Dr. Stephenson who was there in the clinic at the time.  Do

12  you recall that?

13  A.  No.

14          MR. THOMAS:  Where are you reading from?

15          MR. EISER:  Roll to 66024, two pages forward.

16          MR. THOMAS:  So we're on a new document or new

17  exhibit?

18          MR. EISER:  Same document.  Same document.  I'm

19  reading from the last page 66044.

20  BY MR. EISER:

21  Q.  Dr. Witt notes, "See the history and physical for details

22  of recent traumatic experience.  This is the setting of

23  long-term PTSD related to combat experience.  Unfortunately, he

24  was not able to start his medicines after our last appointment

25  due to insurance issues through the VA program.  Given his

1    experience this week and its ensuing sleep disturbance and

2    related pseudo-psychotic sensations, I strongly urged him to

3    accept a warm hand-off today to Dr. Stephenson who is in

4    clinic."  Do you recall that, sir?

5    A.   No.

6    Q.   If she -- if it's accurate and she did offer that day for

7    you to see a psychiatrist, a medical doctor, do you know why

8    you wouldn't have gone?

9    A.   Probably due to work.

10   Q.   All right.  She notes that you declined to see the

11   psychiatrist and told her you had a therapist and would call

12   her.  Do you recall that, sir?

13   A.   No.  This is Newcomer or whatever?

14   Q.   No, sir, this is Dr. Witt at the University of Kansas

15   Physicians.  Does that refresh your memory?

16   A.   I know who she is; and, no, I don't remember that.

17           MR. EISER:  Do you have 66191?  Is it part of this one

18   or a separate one?  Okay.  Go back up to the top.

19   BY MR. EISER:

20   Q.   On June 20th of 2017, did you tell Dr. Witt at the

21   University of Kansas Hospital Physicians that you have a

22   history of insomnia secondary to back pain and PTSD and his

23   PTSD is well managed at this -- with Effexor?  Do you remember

24   telling her that?

25   A.   No.

 1            MR. THOMAS:  I'm so sorry, is this the same exhibit?

 2            MR. EISER:  No, this is -- is this the same exhibit we

 3   were on?  It's a different one.  I'm sorry, it's page 66191

 4   from 418.

 5            MR. THOMAS:  66191?

 6            MR. EISER:  Yes.

 7            MR. THOMAS:  What's the exhibit number, please?

 8            MR. EISER:  It's U.S.A. 418.

 9            THE COURT:  Here's where we are:  We're going to take

10   our lunch recess.  This is -- this is not a deposition where we

11   should be, for the first time, getting our exhibits together

12   and sticking an exhibit sticker on them.  This is a trial.  The

13   exhibits should have been marked pretrial.  If they were going

14   to be excerpted for convenience, that should have been done not

15   real-time during an examination but beforehand so that all this

16   byplay back and forth about what record you're showing the

17   witness wouldn't consume time and wouldn't require the court

18   reporter to write all this.  So we're going to go ahead and

19   take our lunch recess and try to get this organized so that we

20   can go forward after lunch in a more efficient way.

21            And my request would be that you get your exhibits,

22   you get stickers on them, you get them identified with

23   plaintiff's counsel so that we can -- when we resume this

24   afternoon we can have a meaningful and efficient discussion

25   about whatever you want to ask him, which is fair game for

16-2627 Leininger v USA et al   7.8.20 Vol. 3         605

 1   cross-examination but it's not fair to go about it in this

 2   fashion.

 3           So I'll plan to see you at a quarter until the hour

 4   and we'll resume then.  Thank you very much.

 5      (Recess.)

 6           THE COURT:  All right.  Good afternoon, everyone.

 7   We're back on the record.  It looks like the witness is in

 8   place.  Mr. Eiser, Mr. Thomas, all ready to go forward?

 9           MR. THOMAS:  Yes, Your Honor.

10           MR. EISER:  Yes, Your Honor.

11           THE COURT:  All right.  Very well, you may proceed

12   with your examination of the witness.

13           MR. EISER:  All right.  Put back up 6619.  All right.

14   We left off on page 66191 which comes from U.S.A. pre-marked

15   418 and we're now identifying it as U.S.A. 444.  It's been

16   provided over the break.  And, Your Honor, we will provide an

17   updated exhibit list to the clerk at the end of the day.

18           THE COURT:  Thank you very much.

19           MR. EISER:  All right.  Can we move into evidence

20   Exhibit 444?

21           THE COURT:  Please.

22   BY MR. EISER:

23   Q.  Mr. Leininger, as we were speaking about it, on your visit

24   with Dr. Witt at the University of Kansas Hospital Physicians

25   on June 20th, 2017, you told her that your PTSD symptoms at

16-2627 Leininger v USA et al   7.8.20 Vol. 3          606

1    that time were well-managed with Effexor; is that right?

2    A.   I don't know.

3    Q.   Do you have any -- she's noted in here in her medical

4    records.  Do you have any documents or evidence that would say

5    that's wrong?

6    A.   No.

7    Q.   All right.

8          MR. EISER:  Go to the next one.

9    BY MR. EISER:

10   Q.   This is U.S.A. now identified as 445 which comes from

11   U.S.A. 418, page 66240, and I want you to -- you returned to

12   Dr. Witt on September 20th, 2017 for another medication refill.

13   Do you recall that?

14   A.   No.

15   Q.   Okay.  She notes --

16          THE COURT:  Is -- I'm sorry, is this 445 for frank or

17   nine.

18          MR. EISER:  Four-forty-five.

19          THE COURT:  Thank you.

20   BY MR. EISER:

21   Q.   She notes that you are -- you told her you're not

22   interested in -- in a new psychologist at this time; is that

23   accurate?

24   A.   I have no idea.

25   Q.   Do you remember having conversations with Dr. Witt in

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    607

```
 1   September of 2017 about a psychologist, seeing a psychologist?

 2   A.  I don't remember.

 3   Q.  Do you ever recall Dr. Witt encouraging you to see a

 4   psychologist?

 5   A.  I do not.

 6   Q.  Okay.  She also notes that things are actually going pretty

 7   well right now.  Is that accurate, things were going pretty

 8   well in assessment of 2017?

 9   A.  I do not remember.

10   Q.  Do you recall telling her that your trial with the military

11   as a plaintiff is finally going to trial?  Do you remember

12   telling her that?

13   A.  I don't know.

14   Q.  Next exhibit is U.S.A. 446, which is Bates number 66258,

15   comes from U.S.A. 418.  Now, your last contact with Dr. Witt

16   and University of Kansas Physicians group is November 3rd of

17   2017 when you were told they would no longer provide you with

18   narcotics because you had breached your opioid contract.  Do

19   you recall that?

20   A.  Vaguely.

21   Q.  What do you recall about it?

22   A.  Just that they were no longer going to provide me with it.

23   Q.  Okay.  What is an opioid contract?

24   A.  I don't remember what it exactly states.

25   Q.  Is it an agreement where you agree to abide by certain
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3          608

1   terms to receive opioids?

2   A.   Yes.

3   Q.   And you signed it?

4   A.   Yes.

5   Q.   Okay.  And she notes here that you breached that contract

6   three times.  Do you recall that?

7   A.   No.

8   Q.   Do you recall her telling you that we would not be

9   refilling your narcotics any longer?

10  A.   That, I do.

11  Q.   Okay.  Now, this was -- you didn't return to Dr. Witt or

12  the University of Kansas Physicians after this November 3rd,

13  2017, contact; is that right?

14  A.   Right.

15  Q.   Later that month on November 21st of 2017, you sought

16  treatment from Dr. William King at Providence Medical Group.

17  Do you recall that?

18  A.   I don't remember.

19  Q.   You don't recall going to Providence Medical Group and

20  Dr. William King --

21          MR. THOMAS:  Is this a new document?

22          MR. EISER:  It's a new question.  Take that one down.

23  BY MR. EISER:

24  Q.   Do you -- Mr. Leininger, do you recall going to Providence

25  Medical Group, Dr. William King, November 21st of 2017?

16-2627 Leininger v USA et al   7.8.20 Vol. 3          609

1    A.  I don't recall the dates.

2    Q.  Okay.  I'm going to show you Plaintiff's Exhibit 187.

3          MR. EISER:  Skip ahead to page 12.  Go -- it's near

4    the bottom.  These are in reverse order.  Is that -- no,

5    page 12.  Yeah, that's it.  Okay.  Make -- you're on it.  Okay.

6    Make it a little bit bigger.

7    BY MR. EISER:

8    Q.  All right.  The record from Providence Medical Group --

9          MR. EISER:  Go to the top so we can see the date.

10   BY MR. EISER:

11   Q.  Okay.  The record we got from Providence says on November

12   21st of 2017, you saw Dr. King and he says, "Patient here to

13   establish care."  Does that refresh your memory that you saw

14   Dr. King at Providence Medical Group on November 21st of 2017?

15   A.  Again, date-wise, I don't know.  I know I seen Dr. King.

16   Q.  Okay.  Do you see on his record there that it says that you

17   were there on November 21st of 2017?

18   A.  Oh, yes.

19   Q.  Is that -- is that accurate?

20   A.  I -- I don't know.  I guess so.

21   Q.  You don't disagree with it; is that right?

22   A.  No.  No.

23   Q.  Now, this is approximately less than three weeks from your

24   last contact with Dr. Witt that we just went through in which

25   they said you've had -- they wouldn't treat you -- or wouldn't

1   prescribe narcotics for you anymore.  Remember we just went

2   through that?

3   A.   Yes.

4   Q.   And that was November 3rd of 2017?

5   A.   Yes.

6   Q.   Now, when you started with Dr. King, you told them,

7   "Patient here to establish care.  He has been seen at KU and

8   due to insurance he declines to go back.  VA has pending

9   lawsuit, so he does not go there either."  Well, we just

10   established -- you didn't stop going to KU because of

11   insurance, you stopped because they cut you off; is that

12   accurate?

13   A.   No.

14   Q.   Why did you stop?  Why did you tell Dr. King that you

15   stopped going because of insurance?

16   A.   That was because of the insurance that I was given through

17   the VA to go to KU had lapsed.  I had no more insurance to go

18   to KU.

19   Q.   All right.  You told Dr. King and Providence Medical Group

20   that "VA has a pending lawsuit, so he does not go there

21   either."  Is that accurate you told them that?

22   A.   Oh, no, I don't know if I did or not.  My wife --

23   Q.   They recorded it -- sorry.  Go ahead, sir.

24   A.   My wife also went with me.

25   Q.   Okay.  They've recorded that you said, "The VA has pending

```
1   lawsuit, so he does not go there."  Do you have any

2   information, evidence, documents that would contradict what

3   they've reported you said there?

4   A.   No.

5   Q.   Does it sound accurate to you?

6   A.   I don't recall, so I couldn't tell you.

7   Q.   All right.  So at the time you went to the UK Physicians.

8   You had health insurance provided to you; correct?

9   A.   UK Physician?  I never saw a UK Physician.

10  Q.   Dr. Witt?

11  A.   KU physician, yes.

12  Q.   Okay.  And you still had insurance at this time when you

13  were with Providence Medical Group in November of 2017; right?

14  A.   Not through Tricare, no.

15  Q.   What insurance did you have?

16  A.   Personal.

17  Q.   Okay.

18       MR. EISER:  Go to that same exhibit.  Put it back up

19  and then go to page 00023.  It's at the bottom.

20     (Conferring with IT support.)

21       MR. EISER:  Twenty-three.  We were on 12.  They go

22  forward.  Twenty-three.  It's not -- don't go by that page

23  thing.  Go by the Bates number at the bottom.  See that PMG003?

24  Go all the way down to PMG023.

25  BY MR. EISER:
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3          612

1    Q.   Okay.  So this insurance that you had when you went to go

2    see Dr. King at Providence Medical Group was Cigna; is that

3    right?

4    A.   Yes.

5    Q.   And that's provided through your employer?

6    A.   Yes.

7         MR. EISER:  Your Honor, we've been going through this.

8    It's not in evidence, and I apologize, may I move into evidence

9    Plaintiff's Exhibit 187, it's the entire exhibit not excerpted.

10        THE COURT:  Is there objection to 187?

11        MR. THOMAS:  No, Your Honor.

12        THE COURT:  One hundred eighty-seven's received.

13        MR. EISER:  Go up to page 00012 again.

14   BY MR. EISER:

15   Q.   When you saw Dr. King, they took a medical history and you

16   told them about your back surgery in 2010; right?

17   A.   Yeah.

18   Q.   I can't hear you, sir.

19   A.   Yes.

20   Q.   And you told them about your soldier -- shoulder surgery in

21   2013; correct?

22   A.   Yes.

23        MR. EISER:  Go back up a little bit.  Up the other

24   way.  Go down some, sorry.  Keep going.  Keep -- down some more

25   to the next page.  Down.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    613

1   BY MR. EISER:

2   Q.   All right.  Dr. King is treating you for -- his assessment

3   is disc disease, degenerative lumbar -- lumbosacral, adult BMI,

4   insomnia, depression, tobacco abuse, hypertension, and chronic

5   pain syndrome; is that right?

6   A.   I'm -- yeah.

7   Q.   And you told -- you told him about that.  This is a new

8   doctor, so you told him about that; right?

9   A.   Actually, he's not a new doctor; I've used him before in

10  the past.

11  Q.   Okay.  When did you use him before?

12  A.   It had been years before.

13  Q.   Before --

14  A.   Date --

15  Q.   I'm sorry, sir, what did you say?

16  A.   I'm not sure of the dates.

17  Q.   Okay.  Would it have been before or after you saw Mark

18  Wisner?

19  A.   Long before.

20  Q.   Okay.  All right.  The problems that we have listed there,

21  those are all problems you suffered from long before you saw

22  Mark Wisner in 2014; isn't that right?

23  A.   Not all of them, no.

24  Q.   All right.  Dr. King prescribed a number of medications for

25  your various ailments including oxycodone; correct?

16-2627 Leininger v USA et al    7.8.20 Vol. 3                614

1    A.  Yes.

2    Q.  Is that a medication that you've had problems with in the

3    past?

4    A.  Excuse me?

5    Q.  Had you had problems with oxycodone in the past?

6    A.  I don't understand "problems."  I had taken it in the past.

7    Q.  I -- I'm sorry, I can't hear you, sir.

8    A.  I said I've taken it in the past.  I don't understand what

9    you mean by "problems."

10   Q.  Did you have any problems taking it?

11   A.  No.

12   Q.  Now, we've just went through all of the problems.  We also

13   have Dr. King.  You also told him about the insomnia and the

14   depression.

15          MR. EISER:  Roll that down a little bit.

16   BY MR. EISER:

17   Q.  Is that right?

18   A.  What now?

19   Q.  I'm just looking at the treatment record and it notes that

20   he's treating you for your insomnia and depression; is that

21   right he was?

22   A.  Yeah.

23   Q.  Okay.

24          MR. EISER:  Roll it down one more page.

25   BY MR. EISER:

1    Q.  And your hypertension; is that right?

2            MR. EISER:  Keep going.

3            THE WITNESS:  Yes.

4    BY MR. EISER:

5    Q.  All right.  Now, in this first visit with Dr. King, in

6    November of 2017, you never mentioned anything about Mr. Wisner

7    or any problems that you were having as a result of your

8    encounters at the VA; is that accurate?

9    A.  I did not -- I don't remember any of that.

10   Q.  I'm sorry, you don't remember telling them anything about

11   Mr. Wisner or exacerbation of your PTSD; is that right?

12   A.  Right.

13   Q.  If that's accurate that you didn't tell Dr. King that you

14   were having any exacerbation of your PTSD symptoms, why would

15   that be?

16   A.  He's not a psychologist.  He's not a psychiatrist.

17   Q.  Okay.  Well, you told him about your depression and your

18   anxiety; right?

19   A.  I told him I had them.  I did not tell him why.

20   Q.  Okay.  All right.  You went back to Dr. King --

21           MR. EISER:  You can roll page 8 on that set.

22   BY MR. EISER:

23   Q.  All right.  You returned to Dr. King in January of 2018 to

24   follow up on your medication for your back pain.

25   A.  Uh-huh.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                616

1    Q.  Do you recall that, sir?

2            MR. THOMAS:  What page?

3            MR. EISER:  Page -- your Bate's page 8.

4            THE WITNESS:  I don't recall the time.

5    BY MR. EISER:

6    Q.  Okay.  He records that you told him you hurt your right

7    shoulder earlier in the week and were having pain lifting,

8    pulling, and pushing; is that accurate?

9    A.  I don't know.

10   Q.  Okay.

11           MR. EISER:  Can you roll it up to page 5?

12   BY MR. EISER:

13   Q.  Okay.  You went back to Dr. King on May 10th of 2018 with

14   complaints of back and neck pain following a motor vehicle

15   accident.  Do you recall that?

16   A.  Yeah.

17   Q.  Okay.  And he notes that you also wanted to discuss your

18   pain medicine as your drug scan was "inconsistent for his

19   oxycodone."  Do you recall that, sir?

20   A.  I do.

21   Q.  What do you recall about it?

22   A.  I don't remember the specifics.  It's a long time ago.

23   Q.  Okay.

24           MR. EISER:  Go to page 18 on this set.  Is that -- I'm

25   not interested in how they're numbered.  The Bates number at

1  the bottom; is that 18?  Yeah.  Go ahead.  Eighteen.  Move that

2  down a little bit.  No, no, I want it down.  Down so I can read

3  what it says.

4  BY MR. EISER:

5  Q.  All right.  From this record it appears you had a drug

6  screen on March of 2018 and at that time you had been

7  prescribed some opioid medications, oxycodone or -- oxycodone,

8  oxymorphone.  And when the doctor's office did the drug screen,

9  they found you hadn't taken the oxycodone or oxymorphone.

10          MR. EISER:  Roll that forward.

11  BY MR. EISER:

12  Q.  It says on April 12th they had a conversation with you --

13  actually, they had a conversation with Mary Leininger and she

14  says her pain was uncontrollable and she had been taking his

15  meds.  Do you recall this event now, sir?

16  A.  If it was a conversation with my wife, no.

17  Q.  You didn't talk to her about it?

18  A.  No.

19  Q.  Did you tell Dr. King's office that the reason the

20  oxycodone didn't show up in your drug test was because your

21  wife was taking those pills?

22  A.  I don't recall ever saying that.

23          MR. EISER:  All right.  Go all the way up to page 2.

24  BY MR. EISER:

25  Q.  All right.  You went back to Dr. King on September 10th of

16-2627 Leininger v USA et al   7.8.20 Vol. 3                618

1    2018.  You were having chronic problems with back pain but you

2    also were suffering from what they termed a severe episode of

3    recurrent major depressive disorder as a result of your

4    daughter's suicide.  I apologize for bringing this up.  Do you

5    recall telling them that?

6    A.   Yes.

7            MR. EISER:  Roll that forward.  There it is.  Roll it

8    down a little further.

9    BY MR. EISER:

10   Q.   Now, you told -- you told Dr. King that -- that the suicide

11   had -- was upsetting and had disrupted your sleep.  Do you

12   recall that?

13   A.   Yes.

14   Q.   Okay.  What other -- did the suicide affect any of the

15   other symptoms that you have been suffering from in the past?

16   A.   Amplified every one of them.

17   Q.   Dr. King prescribed you some mood medications to address

18   your depressive disorder; isn't that right?

19   A.   I don't know what was prescribed.

20   Q.   Okay.  Well, obviously you could talk to Dr. King about

21   your mental health problems to get treatment for them.  That's

22   why you told him about the problems you were having since your

23   daughter's suicide; isn't that right?

24   A.   Well, yeah, he knew our daughter and he knew -- we'd been

25   going -- my wife had been going to him for 15 years.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                619

1   Q.  Right.  And you knew you could get treatment for it, mental

2   health conditions, from him; right?

3   A.  No.

4   Q.  Well, you're telling him about your mental health

5   conditions and he's treating it with medication; right?

6   A.  He's treating it with a Band-Aid.

7   Q.  Yes, sir.

8       Okay.  And this is -- that treatment is fully paid by your

9   insurance through Cigna; is that right?

10  A.  Not completely, no.

11  Q.  Okay.  You had to pay a co-pay?

12  A.  Yes.

13  Q.  Now, as you just explained, you expressed your mental

14  health problems with Dr. King and he's treating them.  You call

15  it a Band-Aid but he's treating it.  But at no time during the

16  time you were treating with Dr. King did you ever tell him

17  anything about being a victim of sexual assault at the VA in

18  2012 to 2014; correct?

19  A.  No.

20  Q.  Nor did you ever seek any mental health treatment for

21  problems related to that sexual assault; is that right?

22  A.  Not through Dr. King, no.

23  Q.  Now, since your last visit with -- your last encounter with

24  Mark Wisner over six years ago, you have received no mental

25  health treatment for any of the problems you claimed were

1   caused by Mr. Wisner; is that right?

2   A.   I have started to, but from people that were provided to me

3   through the VA.

4   Q.   All right.  They were dealing with your PTSD symptoms; is

5   that right?

6   A.   Yes.

7   Q.   But you never told them that they were related to a sexual

8   assault by a -- by Mark Wisner; correct?

9   A.   I never got a chance to.  I never got to pick the person I

10   wanted to go see.

11   Q.   Okay.  Now, during the last six years, we've been through

12   it, you had access to VA Choice Program and for a significant

13   portion of that time you had private health insurance through

14   Cigna; isn't that right?

15   A.   Yes.

16   Q.   And even though you had that insurance available to you,

17   you still sought no mental health treatment for the problems

18   you claim to have suffered as a result --

19   A.   I was told --

20   Q.   -- with Mr. Wisner?

21   A.   I was told -- I was told it was for medical.

22   Q.   Let me ask the question again.  We established that you had

23   VA Choice and Cigna for a period of time in the six years since

24   you saw Mr. Wisner.  But despite having that insurance, you

25   have not sought any mental health treatment for the problems

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    621

```
 1    you claim to have been suffered -- to have suffered as a result
 2    of your encounters with Mr. Wisner; isn't that accurate?
 3    A.   That's accurate.
 4    Q.   Now, your attorney talked about this on direct.  You have
 5    received from the VA what is known as a disability rating; is
 6    that right?
 7    A.   Yes.
 8    Q.   Okay.  We -- I believe you said 10 percent for your knee,
 9    10 percent more was added for GERD in 2008; correct?
10    A.   Yes.
11    Q.   And then you sought an increase in 2009 for insomnia; is
12    that right?
13    A.   I did not ask for an increase, no.
14              MR. EISER:  Go to page 35 of his deposition
15    transcript.  Deposition, not the IME transcript.
16         (Conferring with IT.)
17    BY MR. EISER:
18    Q.   Do you remember giving a deposition in this case?
19              MR. THOMAS:  Objection.  Improper use of a deposition.
20              THE COURT:  I don't know if it is yet or not.
21    Overruled.
22    BY MR. EISER:
23    Q.   Well, I thought you said you did not seek --
24         I mean, I said you sought an increase in 2009 for insomnia.
25    You said you didn't seek it.  Is that your testimony?
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    622

1    A.  I did not ask for it.  They gave it to me after a stay at

2    the VA psychiatric ward.

3              MR. EISER:  Put up 3513.

4    BY MR. EISER:

5    Q.  This is 2009, sir, so it's before the hospitalization.

6    This is when they just increased -- or, well, I asked you at

7    your deposition -- or I didn't, my co-counsel did.

8              MR. EISER:  Is that 35?  I withdraw the question.  I

9    apologize, Your Honor.

10             MR. THOMAS:   Thank you.

11   BY MR. EISER:

12   Q.  On February 24th of 2011, you received a disability rating.

13   You went through this on direct.  You received a disability

14   rating of 30 percent for PTSD dating back to 2008.  Do you

15   recall that?

16   A.  Yes.

17   Q.  Okay.  And as a result of that, you were paid a certain --

18       As a result of your disability rating, you were paid a

19   certain amount of money every month from the VA; isn't that

20   right?

21   A.  Yes.

22   Q.  Okay.  Now, you sought an increase in the rating and

23   payment for PTSD and after you called an ambulance on June

24   28th, 2011, and went to the hospital because of major psychotic

25   episode, your PTSD rating was increased; is that right?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                623

1    A.  Yes.

2    Q.  Okay.  Your disability rating was increased to 60 percent

3    on August 9th of 2011; is that right?

4    A.  Yes.

5    Q.  And that is your current disability rating --

6    A.  Yes, is.

7    Q.  -- correct?

8        Again, that rating of 60 percent disabled due to PTSD, that

9    happened before you ever encountered Mr. Wisner; correct?

10   A.  Yes.

11   Q.  And since that time your PTSD rating has not been

12   increased; correct?

13   A.  Correct.

14   Q.  And you have not sought to have it increased; correct?

15   A.  No, I was told it was the highest you could go with PTSD.

16          MR. EISER:  That's all I have, Your Honor.  Thank you.

17          Thank you, Mr. Leininger.

18          THE COURT:  Redirect for the witness?

19          MR. THOMAS:  Yes, Your Honor.

20                        REDIRECT EXAMINATION

21   BY MR. THOMAS:

22   Q.  Let's start with where we left off.

23          MR. THOMAS:  Scott, can we pull up Exhibit 195,

24   please.

25   BY MR. THOMAS:

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    624

1   Q.  Aaron, you're -- you're a pretty agreeable fellow, aren't
2   you?
3   A.  Yeah.
4   Q.  I noticed this morning and this afternoon you kind of just
5   said yes for a lot of questions defense counsel was asking you
6   and maybe you didn't think about it.  A moment ago he asked
7   you, "And you sought an increase in your PTSD rating?"
8        And you said, "Yes."
9        Do you remember that?
10  A.  I did not seek -- I didn't --
11  Q.  But do you remember saying "yes" to him?
12  A.  Not really.
13  Q.  Well, and that's understandable, too, but you did.  But
14  that's not really how it happened, is it, sir?
15  A.  No.
16  Q.  If you look at -- here at the actual rating, it says, "We
17  accepted notice of your recent hospitalization as a claim for
18  increase without your formal request and have made a decision
19  on your claim."
20  A.  Right.
21  Q.  Did I read that right?
22  A.  Yeah.
23  Q.  They made the decision for you?
24  A.  Correct.
25  Q.  You didn't ask for this?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                625

1   A.   No.

2   Q.   And you certainly didn't ask for the PTSD?

3   A.   No.

4   Q.   He asked you, "You haven't sought to increase it, have

5   you?"

6        And you told him, "That's as high as you go."

7        Right?

8   A.   Yeah.

9   Q.   You have it as bad as it gets?

10  A.   (Witness nods head.)

11  Q.   Is that right?

12  A.   Yes.

13  Q.   It can't get any worse.

14       Mr. Leininger, you kind of remind me of a duck, and I don't

15  mean that as an insult.  You ever watch a duck on a pond and

16  see how it kind of slowly gracefully glides across the pond?

17  A.   Yeah.

18  Q.   But if you look under water, do you see that it's feet are

19  paddling like crazy?

20  A.   (Witness nods head.)

21  Q.   You understand what I'm saying?

22  A.   Yeah.

23  Q.   You don't show your emotion very well, do you?

24  A.   No, I don't.

25  Q.   Is this stuff comfortable to talk about?

16-2627 Leininger v USA et al   7.8.20 Vol. 3     626

```
 1   A.  No, it's not.

 2            THE COURT:  I didn't hear the witness's answer.

 3            THE WITNESS:  No, it is not.

 4   BY MR. THOMAS:

 5   Q.  Is it easy to go in and tell somebody you're a victim of a

 6   sexual assault or a molestation?

 7   A.  Not by any means.

 8   Q.  And, I'm sorry, I tried not to have to get into this stuff,

 9   but now I think we got to make a record.  They asked you why

10   don't you tell these other doctors that you go to since leaving

11   Wisner what he did to you.  Do you remember that?

12   A.  Yeah.

13   Q.  Actually, they didn't ask you why.  They said you don't

14   tell -- you didn't tell this doctor.  You didn't tell this

15   social worker.  You didn't tell this therapist.  But they never

16   asked you why, did they?

17   A.  No.

18   Q.  Why don't you tell these people.

19   A.  I don't know them.  I don't trust them.

20   Q.  Well, even if you did know them and even if you did trust

21   them?

22   A.  It's not something you want to talk about.

23   Q.  This isn't a new phenomenon.  Have you heard of the cases

24   against Bill Cosby?

25   A.  Yeah.
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3                627

1   Q.  Have you heard about the cases against Jeffrey Epstein?

2   A.  Yes, yeah.

3   Q.  Have you heard about the cases against Dr. Larry Nassar?

4   A.  Yeah.

5   Q.  People don't like to talk about being victims of sexual

6   crimes.  Are you any different?

7   A.  No.

8   Q.  Were you ready to talk about it in 2015?

9   A.  No.

10  Q.  Were you ready to talk about it in 2016?

11  A.  No.

12  Q.  Were you ready to talk about it in 2017?

13  A.  No.

14  Q.  Were you ready to talk about it in 2018?

15  A.  No.

16  Q.  Were you ready to talk about it in 2019?

17  A.  No.

18  Q.  And I'm going to ask, you're probably not ready to talk

19  about it now?

20  A.  No.

21  Q.  And, unfortunately, and I'm very sorry, but because of the

22  questions and how you were treated, I think we got to talk

23  about this a little bit.

24  A.  Okay.

25  Q.  Did Mark Wisner sexually molest you?

1   A.   Yes.

2   Q.   Each -- each and every time you went to see him?

3   A.   Yes.

4   Q.   Did he fondle and play with your genitals extensively -- or

5   for a period of minutes?

6   A.   Yes.

7   Q.   While you had to stand there with your pants down?

8   A.   Yes.

9   Q.   Was it humiliating?

10   A.   Yes.

11   Q.   But you felt you had to do it?

12   A.   Yes.

13   Q.   And now that you know that he wasn't doing this for a

14   medical reason, that he was doing it to get his -- to -- for

15   whatever reason, how does it affect you, Aaron?

16   A.   Many ways:  social, with my wife, family, day-to-day

17   routine.

18   Q.   What goes --

19   A.   Affected every aspect of my life.

20   Q.   What goes through your head?  How does it affect you?

21   A.   I don't want to be around people.  I don't want to be

22   touched.  I don't want to talk to people.

23   Q.   Why not?

24   A.   Just something that's triggered because I don't trust them.

25   Q.   Well, is this easy stuff to talk about?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                     629

1   A.   No, it's not easy stuff to talk about.

2   Q.   How does it affect you and your wife?

3   A.   Affected us deeply.

4   Q.   Explain.

5   A.   We don't talk anymore.  We don't have much relations

6   anymore.  I'm in my own world.

7   Q.   You indicated that it makes you feel depressed.  Why does

8   it make you feel depressed?

9   A.   Because I don't like to treat my wife like that.

10  Q.   Is there any other reason?

11  A.   Yeah, I'm stuck in things I can't get out of.  I'm stuck in

12  a mind frame I can't get out of.  I don't do anything and I

13  have nothing left to even try to do.  I don't know, it's got

14  all kinds of reasons behind it.  I'm depressed because of this

15  jack -- some person took away something from me.

16  Q.   What did he take?

17  A.   My self-esteem, myself of being -- took away pride.

18  Q.   And because you don't like to talk about that, does that

19  mean you're not suffering?

20  A.   No, it doesn't mean I'm not suffering.  It means I'm

21  suffering more.

22  Q.   Victims of sexual perpetrators don't always go out and get

23  treatment right away, do they?

24  A.   No.

25  Q.   Sometimes it can take years; right?

1    A.   Yes.

2    Q.   It hurts, doesn't it, Aaron?

3    A.   Yes.

4    Q.   And how does it feel to have to sit through this man's

5    questioning of you and acting like you hadn't been harmed by

6    what happened to you?

7    A.   It feels ridiculous and hard, demeaning.

8    Q.   It's demeaning?

9    A.   Yes.

10   Q.   You were asked questions about why you didn't tell the

11   psychiatrist at the VA in October of 2014, why didn't you talk

12   to him about what Wisner did to you -- or, no, you weren't

13   asked why; you were told you didn't.

14   A.   Right.

15   Q.   He read the record to you and said you didn't tell this

16   doctor or this person -- I don't even know if it was a

17   doctor -- about what Wisner did to you.  Do you remember that?

18   A.   Yeah.

19   Q.   Why aren't you going to tell people at the VA about what

20   happened to you?

21   A.   It's one of their colleagues is at the VA where it

22   happened.  I've already lost faith in it.

23   Q.   Are you ever going to trust the VA with your health or your

24   life ever again?

25   A.   No.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    631

1    Q.  They had their chance and they blew it, didn't they?

2    A.  Yes.

3    Q.  You earned that healthcare though, didn't you?

4    A.  Yes, I did.

5    Q.  You bled and you fought and you went through hell for this

6    country.  And the one thing you get in return, the one thing

7    you're supposed to get is a lifetime of free healthcare; isn't

8    that true?

9    A.  Yes.

10   Q.  But it's all gone, isn't it, Aaron?

11   A.  Yes.

12   Q.  This -- this attorney from the Department of Justice was

13   firing questions at you and -- and you were saying yes so fast

14   I'm not sure you realized what you were asking.  Do you

15   remember he asked you a question and you literally contradicted

16   yourself?

17   A.  Yeah, I --

18   Q.  He said, well -- let me find it.  First he said, "Well,

19   about Mary coming to that appointment with you, we know that

20   Mary came to you when she came to the appointment.  It had to

21   be -- we know that it had to be before your last appointment."

22       And you said, "Yes."

23       Do you remember that?

24   A.  Yeah.

25   Q.  And then a few minutes later he changed it and he said, "We

16-2627 Leininger v USA et al   7.8.20 Vol. 3          632

1   know that, when Mary came with you to that appointment, it had

2   to be the last time you -- your last visit because you never

3   came back."

4       And then you said, "Yes."

5       Why are you saying yes to this man's questions?

6   A.   I -- people have something on paper or something, I don't

7   know.

8   Q.   But those two statements are in contradiction?

9   A.   Right.  I had no idea.  I just...

10  Q.   Aaron, Mary testified earlier this week that she went to

11  five or six of your appointments.  Do you understand that?

12  A.   Yes.

13          MR. THOMAS:  And did the court reporter get the

14  answer?

15  BY MR. THOMAS:

16  Q.   And that she tried to go in -- she went into the actual

17  office room with you each time.  But every time Wisner came in,

18  she was asked to leave?

19  A.   Yes.

20  Q.   She never was actually in there, according to Mary, when

21  Wisner did his exam?

22  A.   Right.

23  Q.   Now, you told these lawyers, when they deposed you, you

24  thought there was a time when she was in there and that's --

25  they asked you questions about that.  Do you remember?

1   A.  Yes.

2   Q.  Is it possible that you're wrong?

3   A.  It is possible.

4   Q.  Is it possible that Mary has the better memory?

5   A.  It's very possible she does have a better memory.

6   Q.  Did you go home after these visits -- do you remember

7   logbooks in the military, those green things?

8   A.  Yeah.  I didn't go home and write in my logbook.

9   Q.  You didn't go home and put it in your unit logbook, did

10  you?

11  A.  No.

12  Q.  You don't log your doctor visits and whether your wife was

13  there or not there; right?

14  A.  Right.

15  Q.  They started going through these nine visits with you and

16  asked you, "Do you remember if Wisner said X, Y, or Z during

17  this visit?"

18      And you would say, "No."

19      Is that right?

20  A.  Right.

21  Q.  Did he say sexually degrading and inappropriate things to

22  you?

23  A.  Yes.

24  Q.  Did he ask you about your penis size?

25  A.  Yes.

16-2627 Leininger v USA et al   7.8.20 Vol. 3          634

1   Q.  Did he fondle your penis?

2   A.  Yes.

3   Q.  Did he ask you how well you can please your wife with your

4   large penis?

5   A.  He asked me the questions, yes.

6   Q.  Did he ask you how much semen comes out of you because of

7   your large penis?

8   A.  Yes.

9   Q.  Now, do you -- as you sit here today, do you remember the

10  dates of every one of those?

11  A.  No.

12  Q.  But did it happen?

13  A.  Yes, it happened.

14  Q.  And they said, "Well, you didn't know anything was wrong

15  about it at the time."  Do you remember that?

16  A.  Yes.

17  Q.  Why didn't you know that was wrong?

18  A.  He was a doctor.  He was supposedly a doctor.  I was

19  supposed to treat --

20          THE COURT:  I'm sorry to interrupt.  I'm not -- I'm

21  not able to hear the witness.

22          THE WITNESS:  Because he was a doctor or supposedly a

23  doctor.

24  BY MR. THOMAS:

25  Q.  And you asked him at one point, "Look, man, is this

16-2627 Leininger v USA et al   7.8.20 Vol. 3                635

1    necessary?"
2        And he said it could -- "I got to fill your pain
3    medication.  I can't do it unless I do the full exam."
4        Right?
5    A.   Yes.
6    Q.   Now, they -- they brought up this use of the word threat.
7    That's my word because that's how I interpret his actions.
8    A.   Right.
9    Q.   Did he actually threaten you?
10   A.   It was not a threat, no.  We have to do this to get your
11   medication.
12   Q.   I -- when I use the word threat, I'm saying that's the
13   subtext of him saying, "If you want me to fill your
14   prescription, I have to do the full exam."  Is that the way it
15   went down?
16   A.   Yes.
17   Q.   It wasn't a threat, was it, though?
18   A.   (No response.)
19   Q.   You mentioned something to me over lunch.  You used the
20   word doctor roulette.  Do you remember that?
21   A.   Yes.
22   Q.   What were you talking about when you told me doctor
23   roulette?
24   A.   The VA, the doctors changed so frequently, you don't know
25   who you're going to have the next time you go there, therapist,

1   doctors, don't know who you're going to have.

2   Q.   You show up at the clinic and you don't know who you're

3   going to get that day?

4   A.   Right.

5        MR. EISER:  Your Honor, I need to object to this line.

6   Mr. Thomas has just told us that he was speaking to this

7   witness over lunch about his testimony and obviously his

8   testimony was not finished if we were in the middle of his

9   cross-examination.  So speaking to him about his testimony at

10  that time would be inappropriate and I move to strike that

11  question, that answer, and any other further questions on that

12  line.

13       THE COURT:  So let me understand the parameters of

14  your motion to strike.

15       MR. EISER:  Anything having to do with what they

16  discussed about his testimony during the break.

17       THE COURT:  Well, and I don't know what that is.

18       MR. EISER:  Well, all I know is he asked a question.

19       THE COURT:  Your --

20       MR. EISER:  I'm sorry.

21       THE COURT:  I'm sorry.

22       MR. EISER:  All I know is the last question and answer

23  I move to strike that.

24       THE COURT:  About the doctor roulette?

25       MR. EISER:  Yes and the question.

16-2627 Leininger v USA et al   7.8.20 Vol. 3          637

1          THE COURT:  I'll tell you what I'm going to do:  I'm
2    going to let you renew that motion after trial.  The question's
3    already been asked and answered, so it's not -- I don't have an
4    eraser to erase it from the record.  If you believe you can
5    establish that it was an improper communication between a
6    lawyer and his client during the examination, then you can
7    renew it in a motion.  I'll take it up with the case.
8          MR. EISER:  Thank you, Your Honor.
9    BY MR. THOMAS:
10   Q.  You were asked questions -- you were shown a lot of records
11   by this attorney on his cross-examination of you; right?
12   A.  Uh-huh.
13   Q.  A lot of different -- like you were changing healthcare
14   providers, seeing somebody new every other week; right?
15   A.  Yeah.
16   Q.  Is that the way it works at the VA?
17   A.  Yes, it is.
18   Q.  Even if you have Tricare -- even if you have Tricare, who
19   chooses the doctor?
20   A.  They did.
21   Q.  By the way, are you eligible for Tricare now?
22   A.  No.
23   Q.  The Veterans Choice Program that he mentioned, that's a
24   temporary visit-by-visit benefit; right?
25   A.  Yeah.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                     638

1    Q.  He asked you about some of the visits you had had to the VA

2    since Wisner, and one of them he brought up was a visit when

3    you went back for treatment as it relates to your knee.  Do you

4    remember that?

5    A.  Yes.

6    Q.  Do you receive disability benefits from the VA as it

7    relates to your knee; right?

8    A.  Yes.

9    Q.  As a -- because of that, do you have to go back from time

10   to time and get your check-up so you can maintain your

11   disability?

12   A.  I have had to, yes.

13   Q.  Here's another one that you just said yes to.  They said

14   you received Agent Kerry Baker's letter on August 15th, 2014,

15   and you said, "Yes."  Do you remember that?

16   A.  Yes.

17   Q.  Do you have any idea when you received Agent Kerry Baker's?

18   A.  No, I don't know what date.

19   Q.  The letter is dated -- and I don't know about yours, but

20   some of these other letters are dated August 15th, 2014.  So

21   that means that's the date he sent it out to some veterans?

22   A.  Right.

23   Q.  Do you understand me?

24   A.  Right.

25   Q.  I don't know if you were there at that time, but that was

639

```
 1    his first mailing.  Do you know anywhere the mail comes the
 2    same day it's sent?
 3    A.   No.
 4    Q.   Why did you say yes when he asked you that?
 5    A.   Just I knew I had gotten a letter; but I don't know the
 6    date, no.
 7    Q.   They said -- here's another one you said yes to.  "Would it
 8    surprise you that you had 70 contacts with the VA since the
 9    events with Wisner?"
10         And you said, "Yes."
11         Do you remember that?
12    A.   Yeah.
13    Q.   Why did you say yes?
14    A.   It would surprise me.  It doesn't seem like it's in there
15    -- since Wisner, I didn't think I'd been there 70 times.
16    Q.   Well, actually, I think you said -- he said would it
17    surprise you, and I think you actually said, no, like you were
18    -- you were acquiescing that you had had -- or agreeing that
19    you had had 70 contacts?
20    A.   No, I don't think that's what I was -- it surprises me that
21    there are that many visits.
22    Q.   That's just his -- him testifying.
23         You haven't had 70 visits?
24    A.   No.
25    Q.   Okay.  They talked about -- they went over a medical record
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    640

1   you had in 2008 -- and I'm going to get to it probably -- that

2   listed your extensive medical history.  Do you remember that?

3   A.   Yes.

4   Q.   And they were trying to establish that you had this

5   extensive medical history before you saw Wisner; right?

6   A.   Yes.

7   Q.   And, hey, it's actually even more extensive now, isn't it?

8   A.   Yes.

9   Q.   Because in 2010 you had a very serious back surgery; right?

10  A.   Yes.

11  Q.   In 2013 you had a shoulder surgery?

12  A.   Yes.

13  Q.   At the time -- Wisner went over all the ailments at the

14  time you first saw Wisner at the time in 2012 and there were a

15  lot?

16  A.   Yeah.

17  Q.   You were 42 then?

18  A.   Yes.

19  Q.   You're 50 now; right?

20  A.   Yes -- one.

21  Q.   Do people's health generally get better the older they get?

22  A.   No.

23  Q.   And you need healthcare, don't you?

24  A.   Yes.

25  Q.   It's not free in this country?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                 641

1    A.   No, it's not.

2    Q.   And even when you have insurance through Cigna like, thank

3    God, you do now, you pay for it; right?

4    A.   Yeah.

5    Q.   One hundred seventy bucks a month?

6    A.   Yes.

7    Q.   Plus you have your deductibles; right?

8    A.   Yes.

9    Q.   Plus what it's called?  You have to get a certain amount?

10        (Conferring.)

11   BY MR. THOMAS:

12   Q.   You get your deductible then you got co-payments, too;

13   right?

14        Do you have to meet maximum out-of-pocket before you can

15   use the insurance?

16   A.   Yes.

17   Q.   This is all supposed to be free; right?

18   A.   Yes.

19   Q.   But because you can't go back to the VA, you're trying to

20   pay for it now?

21   A.   Yes.

22   Q.   They mentioned some records in 2010 and 2011 where you had

23   canceled appointments or no-showed.  Do you remember that?

24   A.   I remember mentioning it, yeah.

25   Q.   Did you have back surgery in 2010?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                642

1    A.   Yes.

2    Q.   What -- what month?

3    A.   I don't remember what month it was.

4    Q.   After the back surgery, did you have to rehab?

5    A.   Yes.

6    Q.   Was there a time -- were you -- and while you were doing

7    that, were you able to return to work?

8    A.   No.

9    Q.   What happened to all your sick time?

10   A.   I had to use it all -- all my sick time was still

11   available.  I was hurt on the job.

12   Q.   Okay.  Well, do you have the kind of job that you have

13   unlimited sick time?

14   A.   No.

15   Q.   Have you ever had that job?

16   A.   No.

17   Q.   Here's one I want to ask you about.  Now, the United States

18   has stipulated in this case that you had nine visits with

19   Wisner wherein he sexually molested you.  Do you understand

20   that?

21   A.   Yes.

22   Q.   Did you know -- well, do you remember speaking to

23   Agent Baker?

24   A.   Yes.

25        MR. THOMAS:  Your Honor, I'd like to offer Exhibit 25

16-2627 Leininger v USA et al   7.8.20 Vol. 3          643

1   into evidence, which is a memorandum of Baker's interview with

2   several victims including our client.

3          THE COURT:  There's an offer of Exhibit 25.  Is there

4   objection?

5          MR. EISER:  No, Your Honor.

6          THE COURT:  Exhibit 25 is received.

7          MR. THOMAS:  Give me one second, Your Honor.  I sprung

8   this on Scott, so he's trying to pull it up.

9   BY MR. THOMAS:

10  Q.  Well, he's doing it, I'm going to show you -- the last

11  page, page 4.  Page 4 -- oh, one more, very top.  This is all

12  the notes Agent Baker took of his single conversation with you.

13  In here it says that you told him that Wisner was a primary

14  care physician -- "Primary care Leavenworth from 2012 until

15  Wisner's departure.  Patient's complaints were back and knee

16  pain and PTSD, but nearly every appointment was a genital exam

17  for about 20 exams."

18      You told him there were 20, about 20.  We only found

19  records of nine.  Did you know that?

20  A.  I found out this later on, yeah.  That was recent.

21  Q.  Did you know that Mark Wisner admitted to falsifying his

22  medical records?

23  A.  No.

24  Q.  Did you know that he admitted that he didn't always chart

25  patient visits?

16-2627 Leininger v USA et al   7.8.20 Vol. 3          644

1   A.  No.

2   Q.  He did that to avoid detection, did you know that?

3   A.  No.

4   Q.  Did you know that he didn't chart all of his genital exams?

5   A.  No.

6   Q.  Did you know that he admittedly falsified his records?

7   A.  No.

8   Q.  That he would chart patient complaints that weren't

9   actually made?

10  A.  No.

11  Q.  Did you know that he would chart symptoms that weren't

12  actually present?

13  A.  No.

14  Q.  We don't actually know how many times you saw Wisner, so we

15  have records of nine.  We don't actually know.  You understand

16  that?

17  A.  Uh-huh.

18  Q.  We don't actually -- is that a "yes?"

19  A.  Yes, I understand it.

20  Q.  We don't actually know the date of the last one let alone

21  whether or not your wife was there; right?

22  A.  Right.

23  Q.  And -- and defense counsel asks you, "Well, if you asked

24  your wife to come, you must have known something was wrong?"

25      And you said, "No, I was uncomfortable."

1       Do you remember that?

2   A.  Yes.

3   Q.  In your mind, is being uncomfortable and knowing

4   something's wrong the same thing?

5   A.  No.

6   Q.  Explain to me.

7   A.  A lot of things situations are uncomfortable but they're

8   not wrong.  I mean -- I mean, a lot -- this is uncomfortable

9   right now but it's not wrong.

10  Q.  Exactly.

11      And you wanted your wife's support there for something that

12  was going to be uncomfortable?

13  A.  Right.

14  Q.  And back to Wisner's admitted falsification of medical

15  records.  For the record, did you ever ask Mark Wisner to

16  increase your pain pills?

17  A.  No.

18  Q.  But he did it anyway?

19  A.  Yes.

20  Q.  Did you ever ask Mark Wisner for erectile dysfunction

21  medication?

22  A.  No.

23  Q.  But he offered it anyway?

24  A.  Yes.

25  Q.  Did you ever ask Mark Wisner for testosterone?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    646

1   A.  No.

2   Q.  But he offered it anyway?

3   A.  Yes.

4   Q.  And do you understand he's admitted to doing these kinds of

5   things?  Do you understand that?

6   A.  I understand now, yes.

7   Q.  And do you understand the reason he was doing it is he was

8   trying to raise the libido of his victims to make them more

9   pliable?

10  A.  Yeah.

11  Q.  Do you understand that?

12  A.  Yes.

13  Q.  More susceptible to his advances?

14  A.  (No response.)

15  Q.  I'm going to try to ask you some questions.  This -- this

16  -- Exhibit 443.  It was the visit at KU with Dr. Witt.  Do you

17  remember being asked questions about that visit?

18  A.  Yes.

19  Q.  It's the one where they -- where she wrote, "I strongly

20  urged him to accept a warm -- warm hand-off today to

21  Dr. Stevenson."  Do you remember that, or do you remember him

22  asking you questions about that?

23  A.  Yeah.

24  Q.  And it says you declined.  Does that surprise you?

25  A.  No.

16-2627 Leininger v USA et al   7.8.20 Vol. 3          647

1   Q.   Were you ready to talk about this stuff?

2   A.   No.

3   Q.   But the interesting thing is, is because their expert is

4   going to say -- unless he's changed his mind -- that you don't

5   need PTSD treatment, but Dr. Witt, by their own admission, now

6   is saying she strongly recommends it; right?

7   A.   (No response.)

8   Q.   She's not any expert.  She's a doctor from KU?

9   A.   Right.

10  Q.   There was another record of Exhibit 444.  I can't tell

11  whose chart it is, but that's -- that's what the exhibit was,

12  444.  It's a progress note by someone named Evan Glidewell, MS.

13  Do you know who that is?

14  A.   No.

15  Q.   MS doesn't sound like an MD or a DO or Ph.D. to me.  What

16  about you?

17  A.   No.

18  Q.   But it says that your PTSD is well-managed at this with

19  Effexor.  Do you remember that?  Do you remember being asked

20  that?

21  A.   I remember being asked that, yes.

22  Q.   Is your PTSD well-managed?

23  A.   No.

24  Q.   Even Dr. Witt, this person's colleague, said you needed

25  help and she didn't even know about Wisner; right?

16-2627 Leininger v USA et al   7.8.20 Vol. 3          648

1   A.   Right.

2   Q.   She knew you needed help and she has no idea what this man

3   did to you; is that right?  Is that a "yes?"

4   A.   Yes.

5             THE COURT:  Counsel, can I ask you, please, this is

6   redirect examination and it's appropriate for open-ended and

7   not leading questions.  This is not really very useful to me,

8   so I'd ask you to ask questions in conformity with the rule.

9             MR. THOMAS:  Understood, Your Honor.

10  BY MR. THOMAS:

11  Q.   Exhibit 441 was the note that they read to you or they

12  asked you about from TriWest Healthcare.  This is Ms. Newcomer.

13  Do you remember being asked this question?

14  A.   Yes.

15  Q.   And do you remember being told why you didn't want to treat

16  with Ms. Newcomer?

17  A.   Yes.

18  Q.   Let me show you this exhibit.  It's 441.  Do you see her

19  name highlighted?  I think it's highlighted.

20  A.   It's not but it's Jennifer Newcomer, yeah.

21  Q.   Okay.  Over there on the right where it says licensed type,

22  do you see that?

23  A.   Yes.

24  Q.   What does it say there?

25  A.   LSW.

1    Q.   Do you know what that means?

2    A.   It's social worker, licensed social worker.

3    Q.   Did -- and were you willing -- first of all, were you

4    willing to talk about anything regarding Wisner at this time?

5    A.   No.

6    Q.   Were you willing to talk to a social worker?

7    A.   No.

8    Q.   If you do talk about this with anybody, are you going to be

9    comfortable talking to somebody who is a female?  Do you have a

10   preference?

11   A.   I don't know about that.  I don't judge on that.  If

12   they're a doctor and their ability to help and their -- a lot

13   of things about that, what kind of person they are.

14            THE COURT:  You know, I'm having difficulty hearing

15   the witness.  I don't know if he can come closer to wherever

16   the camera and microphone device are or it can be slid to him.

17   I'm not able to follow his testimony.

18            MR. THOMAS:  Slide it closer.

19            THE WITNESS:  Is that better?

20            THE COURT:  Yes.  Thank you.

21   BY MR. THOMAS:

22   Q.   This note, this Exhibit 441 -- excuse me, this Exhibit 441

23   was a progress note that opposing counsel asked you about.  Do

24   you remember that?

25   A.   Remember them asking me about it?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                650

1    Q.  Yes.

2    A.  Yes.

3    Q.  It says that they called you; right?

4    A.  Yes.

5    Q.  And defense counsel asked you this question -- or this all

6    happened after you filed your complaint, your notice of

7    complaint with the VA.  Do you remember that?

8    A.  Yes.

9    Q.  And he showed you this record and made a point of saying

10   this was after you filed your complaint.  Did you call them

11   asking for a therapist or did they call you?

12   A.  They called me.

13   Q.  And is that what it says in the record?

14   A.  Says, "Call veteran."

15   Q.  It says, "Call veteran regarding his interest in

16   psychotherapy;" is that right?

17   A.  Yes.

18   Q.  And then what does it say?

19   A.  Veteran requested non-VA provider.

20   Q.  Why did you request a non-VA provider?

21   A.  Because I don't want to be -- I don't trust the VA.  I

22   don't want to go back to the VA.

23   Q.  But you weren't calling them trying to get a therapist to

24   prove some kind of damages that you don't have; is that right?

25   A.  No.

16-2627 Leininger v USA et al   7.8.20 Vol. 3      651

1   Q.  They asked you questions about -- actually, I asked you and

2   they did too, questions about Ms. Dena White.  Do you remember

3   her?

4   A.  Yes.

5   Q.  And I asked you why you stopped seeing her and you'd

6   indicated that you thought it was because you moved?

7   A.  Yes.

8   Q.  Let me hand you their exhibit again.  It's 426.  What did

9   Ms. White say in her very first sentence here?

10  A.  Veteran again was scheduled in the clinic --

11        THE COURT:  I can't hear the witness.

12        THE WITNESS:  Veteran again was scheduled in the

13  clinic and was again a no-show.

14  BY MR. THOMAS:

15  Q.  It says, "Please do not schedule this veteran in my -- into

16  my clinic;" right?

17  A.  Yes.

18  Q.  She fired you; right?

19  A.  Yeah.

20  Q.  And then is it just two weeks later where you call your

21  wife and you end up in the Psychiatric Unit?

22  A.  Yes.

23  Q.  June 28th, in fact.  That was June 14th, 2011.  Here's --

24  here's Defense Exhibit 427.  Can you see the date on 427 at the

25  very top?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                652

1   A.   Yes.

2   Q.   What's the date?

3   A.   June 28th, 2011.

4   Q.   What were you feeling in June of 2011?

5   A.   Pretty homicidal.

6   Q.   What else?

7   A.   I was depressed.  I couldn't sleep, anxious, multiple --

8   there was -- I can't even express all the feelings.  I was just

9   not there.

10  Q.   And when you're feeling down like that, do you -- do you

11  have a problem going out?

12  A.   Yes.

13  Q.   Making appointments?

14  A.   Yes.

15  Q.   Do you sometimes miss appointments that you should go to

16  because you're stuck in bed?

17  A.   Yes.

18  Q.   Happen quite a bit?

19  A.   Yeah.

20  Q.   You were shown Exhibit 425.  And first and foremost, what

21  does it say at the -- let me make sure you got the right.

22  Okay.  What's the date of this?

23  A.   June 19th, 2009.

24  Q.   And they didn't ask you this, but at the top this is

25  actually a mental health nurse practitioner note; correct?

16-2627 Leininger v USA et al   7.8.20 Vol. 3          653

1   A.  Yes.

2   Q.  So this is a note not from a doctor, this is actually a

3   note from a behavior -- or somebody from the Behavioral Health

4   Department; right?

5   A.  Yes.

6   Q.  And she commented that you had seen many accidents lately

7   and it was bringing back memories of service.

8   A.  Yeah.

9   Q.  Why does seeing accidents make you remember being in

10  service?

11  A.  Just blood and people screaming and total destruction.

12  Q.  When you were doing graves registration or mortuary duty,

13  did you ever have to deal with crashed vehicles?

14  A.  Yes.

15  Q.  Did you have to deal with vehicles that were blown up?

16  A.  Yes.

17  Q.  What did you have to do?

18  A.  Usually we would clear them out of bodies and then blow

19  them up completely.

20  Q.  And does seeing crashed vehicles or accidents remind you of

21  those experiences?

22  A.  Yes.

23  Q.  And is that what was troubling you at this time?

24  A.  Yes.

25  Q.  Continuing, it looks like -- and that last note for the

1    record was by healthcare practitioner -- or I shouldn't assume

2    it's a healthcare practitioner.  It was authored by someone

3    named Dena, D-e-n-a, Ridenour, R-i-d-e-n-o-u-r; is that

4    correct?

5    A.   Yeah, Dena.

6    Q.   There was a separate exhibit made, but I believe it's from

7    the same visit.  No, it's not.  Let me hand you what they've

8    marked as Defendant's Exhibit 424.  This is a note from

9    Miss Ridenour again from the Mental Health Department dated

10   January 16th, 2009; is that correct?

11   A.   Yeah.

12   Q.   As you're explaining and you're going over with her some of

13   the things you witnessed in the war.  She noted that you became

14   tearful?

15   A.   Uh-huh.

16   Q.   And that you report a labile affect.  Is that what it says?

17        Oh, let me see if you're in the right spot.

18   A.   I may not be.

19   Q.   Yeah.  It's not highlighted.

20   A.   Oh, okay.

21   Q.   It's not highlighted.  Were you struggling at this time?

22   A.   Yeah.

23   Q.   Labile, I believe, means your emotions can change quickly.

24   Does that describe how you were feeling?

25   A.   Yes.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    655

1    Q.  You were shown our Exhibit 187, which are some records from

2    Providence Medical Group.  Do you remember that?

3    A.  Yes.

4    Q.  And you were shown a record from January 8th, 2018.  I'll

5    hand it to you.  And the defendant, I believe, showed it to go

6    over what the symptoms were you were -- you had told the doctor

7    at the time and --

8         Do you remember that?

9    A.  Yes.

10   Q.  And he asked you if you had mentioned anything about

11   Wisner.  Do you remember that?

12   A.  Yes.

13   Q.  And you indicated you did not.  Do you remember that?

14   A.  Yes.

15   Q.  Do you remember why you said that?  You told him why not,

16   but do you remember why -- what you told him?

17   A.  Yeah.

18   Q.  And what is that?

19   A.  He's not a psychiatrist.

20   Q.  And, in fact, if you look at that list of -- or of the

21   assessment with all of your conditions, it doesn't mention your

22   wartime PTSD either, does it?

23   A.  No.

24   Q.  But we know you have it?

25   A.  Yeah.

1    Q.   Documented all over the place.

2    A.   (No response.)

3              MR. THOMAS:  I'm done with that exhibit.

4    BY MR. THOMAS:

5    Q.   You were shown a copy of your transcript from your

6    interview with Dr. Abrams, the defense witness.  Do you

7    remember that?

8    A.   Yeah.

9    Q.   And they asked you, "Did you tell Dr. Abrams" --

10        I'm going to come back to that.

11             MR. THOMAS:  I'm just making -- checking off my list,

12   Your Honor.

13   BY MR. THOMAS:

14   Q.   Is -- is talking -- why is it -- it seems that there have

15   been times where you've been able to talk about your wartime

16   experiences and how that has affected you but you have not

17   talked about what Wisner did and how that has affected you with

18   healthcare providers; is that fair?

19   A.   Yeah.

20   Q.   Are those different?

21             THE COURT:  I was not able to hear the witness.

22             THE WITNESS:  Yeah, it's fair.  Well, the other --

23   BY MR. THOMAS:

24   Q.   Explain why you can talk about one but not the other.

25   A.   One took place 30 years ago and I'm starting to learn to

657

```
1   live with it now.
2   Q.  Has the PTSD, the depression, whatever you want to call it,
3   the impact Wisner has on you, has it gotten better over time or
4   worse over time?
5   A.  It's only gotten worse.
6   Q.  You were shown some records from KU where they said you
7   breached your opioid contract.  Do you remember that?
8   A.  Yeah.
9   Q.  You breached it because you weren't taking the opioids they
10  were prescribing you; right?
11  A.  Yes.
12  Q.  It's not because you were taking them too much or you were
13  taking another pill that you shouldn't have; right?
14  A.  Right.
15  Q.  They didn't want you to write you -- these are controlled
16  substances; you understand?
17  A.  Yes.
18  Q.  And do you know why they would not want to write you
19  scripts if you're not going to take them?
20  A.  Yeah.
21  Q.  Why?
22  A.  Didn't know if I was doing something illegal with them.
23  Q.  Right.
24      And did -- opposing counsel said they cut you off because
25  you breached your opioid contract.  Is that true, is that why
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3     658

1   you stopped going to KU?

2   A.   No.

3   Q.   They didn't say you can't come here anymore.  They said

4   we're not going to write you scripts here anymore; right?

5   A.   Right.

6   Q.   Why did you stop going to KU?

7   A.   Because the year was up on my visits.

8   Q.   For Tricare; right?

9   A.   Yes.

10  Q.   And then with Dr. King -- with Dr. King -- oh, it's right

11  there.  The same issue came up with Dr. King, am I right, he

12  was prescribing you pain medicines?

13  A.   Yes.

14  Q.   But when you did your tox screen, it came -- it turned out

15  that you weren't taking them as much as they would -- as much

16  as they had told you; right?

17  A.   Yes.

18  Q.   Why weren't you taking them as much as they told you?

19  A.   I didn't need to take them as much as I was told to.  I

20  didn't want to.

21  Q.   Do you think you should take pain pills if you don't need

22  them?

23  A.   No.

24  Q.   You had a problem with that in the past; right?

25  A.   Yes.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                659

1   Q.  Okay.  So it's not that you did something wrong here or

2   that you were taking too much of it; right?

3   A.  Right.

4   Q.  And you weren't taking a medication or a street drug that

5   you -- that didn't show up on your tox screen either; right?

6   A.  No.

7   Q.  And, in fact, Dr. King apparently was concerned that he was

8   prescribing you pain pills but you were giving them to your

9   wife; is that the way you understood opposing counsel's

10  questions?

11  A.  Yes.

12  Q.  But you didn't do anything wrong; right?

13  A.  No.

14          MR. THOMAS:  Did we find that yet?  No further

15  questions.

16          THE COURT:  All right.  Does the defendant wish to

17  recross?

18          MR. EISER:  One or two questions, Your Honor.

19          THE COURT:  All right.  Please proceed.

20                      RECROSS-EXAMINATION

21  BY MR. EISER:

22  Q.  All right.  Mr. Leininger, I'm sorry if I confused you in

23  my questions, but I'll try to clarify it right now.

24      You didn't understand during the visits with Mr. Wisner in

25  2012 to 2014, you didn't understand that what he was doing was

16-2627 Leininger v USA et al   7.8.20 Vol. 3          660

1    wrong; is that right?

2    A.  Right.

3    Q.  But now, as your attorney just said with the -- the drugs

4    and all the other victims, and you understand that you were the

5    victim on each of these visits of an intentional sexual

6    assault; is that right?

7    A.  Yes.

8    Q.  And while you're being a victim of an intentional sexual

9    assault, you're not receiving medical care; is that right?

10             MR. THOMAS:  Objection, Your Honor.  Objection to

11   the -- object to form and foundation.

12             THE COURT:  What's the objection?

13             MR. THOMAS:  Form, foundation.  He's not an expert

14   witness.  He's not an attorney.

15             THE COURT:  Okay.  Yeah, I'm going to sustain the

16   objection.  You may rephrase it so it's not argumentative, but

17   I'm sustaining the current objection.

18   BY MR. EISER:

19   Q.  I'm just trying to understand --

20             MR. EISER:  Okay.  Thank you, Your Honor.

21   BY MR. EISER:

22   Q.  I'm trying to understand what your understanding is today.

23   And your understanding today is you were the victim of

24   intentional sexual molestation; is that right?

25   A.  Yes.

16-2627 Leininger v USA et al   7.8.20 Vol. 3          661

1   Q.  Okay.  And you weren't the recipient of medical care while

2   you were the victim of intentional sexual molestation; isn't

3   that right?

4   A.  I was under the assumption I was going there for medical

5   care.

6   Q.  Right.  But now you know that's not what you were getting;

7   that's what you've been telling us, isn't it?

8            MR. THOMAS:  Asked and answered.  Argumentative.

9            THE COURT:  It is argumentative.  I'm going to sustain

10  that objection.  I think you've made your point.  I think we're

11  repeating things that don't need to be repeated.

12           MR. EISER:  Okay.  Thank you, Your Honor.  I don't

13  have any other questions.  But before we dismiss the witness,

14  I'd like to make sure for all that my exhibits that I used have

15  been moved into evidence and admitted.  Can I go through the

16  list or...

17           THE COURT:  Let's -- let's stay as close as we can.

18  I'll let you do that before the witness leaves in case you need

19  to go back to an exhibit, but I just want to conclude the

20  examination of the witness.

21           Mr. Thomas, do you have any final questions for the

22  witness?

23           MR. THOMAS:  I do, Your Honor, and I will keep it

24  brief.

25                  FURTHER REDIRECT EXAMINATION

16-2627 Leininger v USA et al   7.8.20 Vol. 3          662

1    BY MR. THOMAS:

2    Q.  He asked you if you were the victim of a sexual assault;

3    right?

4    A.  Yeah.

5    Q.  Do you know what -- what -- how a sexual assault is

6    actually defined by the law?

7    A.  Not exactly, no.

8    Q.  Do you know what the difference is between a sexual assault

9    versus molestation versus improper medical care is?

10          MR. EISER:  Objection.

11   BY MR. THOMAS:

12   Q.  All right.  Let me ask it this way.

13          MR. THOMAS:  I'll withdraw it.

14   BY MR. THOMAS:

15   Q.  Do you know the difference between sexual assault and

16   molestation?

17          MR. EISER:  Objection, Your Honor.  In -- during the

18   course of his redirect, Mr. Thomason, at the top of his lungs,

19   was saying this was -- you were intentionally sexually

20   molested, and now he's saying something else, "you don't

21   understand what that is."  I think it's improper.

22          THE COURT:  Well, look, it's not helpful.  I mean, you

23   -- you guys are just arguing your case and asking the witness

24   to sit there and endure.  It's really not helpful, but I can

25   sustain the objection.

16-2627 Leininger v USA et al   7.8.20 Vol. 3          663

```
1    BY MR. THOMAS:
2    Q.  Are you a lawyer?
3    A.  No.
4         MR. THOMAS:  No further questions.
5         THE COURT:  Anything else for the witness?
6         MR. EISER:  No, Your Honor.  Thank you.
7         THE COURT:  All right.  Mr. Leininger, you may step
8    down.  So there is the matter of --
9         MR. THOMAS:  Your Honor --
10        THE COURT:  Yes.
11        MR. THOMAS:  -- I just was alerted that I didn't offer
12   a couple of exhibits I used.
13        THE COURT:  Well, we're going to turn to that now, so
14   we'll take these up in sequence.  We're still in the
15   plaintiff's case, so what exhibits does the plaintiff wish to
16   offer that pertain to this witness?
17        MR. THOMAS:  240 and 25, Your Honor.
18        THE COURT:  All right.  Is there objection to 240 or
19   25?
20        MR. EISER:  No, Your Honor.
21        THE COURT:  All right.  Exhibits 240 and 25 are
22   received.  Actually, I show 25 is in already, but it's in a
23   second time.
24        Mr. Eiser, I think you had exhibits you wished to
25   offer?
```

1      MR. EISER:  Yeah.  Yes, Your Honor, I believe most of

2   them are in, but I want to be sure, 423.

3      THE COURT:  Let me get a full list from you and come

4   back and figure out ones we have objections.

5      MR. EISER:  Thank you, Your Honor.  Do you want it

6   now?

7      THE COURT:  Yes, sir.

8      MR. EISER:  Okay.  423 through 436.  Those are all

9   from Exhibit 413 which is in evidence.  Then 438, 439 and 440

10  and 441, which also are from Exhibit 413.

11     THE COURT:  All right.

12     MR. EISER:  Then Exhibit 437, which was the time map

13  demonstrative exhibit showing the visits with Mr. Wisner.

14     THE COURT:  All right.

15     MR. EISER:  And then from 418 also all of these, 442,

16  443, 444, 445 and 446.

17     THE COURT:  And your representation is those are taken

18  -- those are excerpts from Exhibits 418?

19     MR. EISER:  Yeah.  And 418 was not admitted, so these

20  are separate.  And then, finally, the plaintiff -- we put in

21  Plaintiff's 187, Dr. King's records.  I think those were

22  admitted.

23     THE COURT:  I'll double-check.  One hundred

24  eighty-seven has been received.  Does that conclude the

25  defendant's list?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                665

1        MR. EISER:  Yes, Your Honor.  Thank you.

2        THE COURT:  I'll turn to hear the defendant -- or the

3  plaintiff's position, first, on Exhibits 423 through 436,

4  including both 423 and 436.  Any objection?  Any objection to

5  the plaintiff from the range of those exhibits?

6        MR. THOMAS:  I'm sorry, Your Honor, we have no

7  objection to any of the exhibits they offered with the

8  exception of the demonstrative for the reasons we stated

9  earlier.  It can go to the court, but it's not substantive

10 evidence.

11       THE COURT:  All right.  So received as -- received are

12 Exhibits 423 through 436 including both 423 and 436; also

13 received are Exhibits 438 through 441, including 438 and 441;

14 and, finally, Exhibits 442 through 446, including 442 and 446,

15 are all received.

16       I think already the defendant has offered its

17 demonstrative or visual aid Exhibit 437, which will be received

18 to complete the record in the case and available to the court

19 for its review but will -- is not admitted as substantive

20 evidence in the case.

21       Does that conclude the plaintiff's evidentiary matters

22 that pertain to this witness?

23       MR. THOMAS:  From our standpoint, yes, it does, Your

24 Honor.

25       THE COURT:  And does it complete the defendant's

 1  presentation that involves this witness, Mr. Eiser?

 2          MR. EISER:  Oh, yes, Your Honor.  I'm sorry, yes.

 3          THE COURT:  The witness may step down and I -- let's

 4  see where we are.  Mr. Thomas, does the plaintiff have

 5  additional witnesses to present?

 6          MR. THOMAS:  No, Your Honor.  The plaintiff rests.

 7          THE COURT:  Are you resting at this time?

 8          MR. THOMAS:  Yes, I am, Your Honor.

 9          THE COURT:  So we'll turn to the defendant's side of

10  the video screen and hear from you.  What do you have to

11  present at this time?

12          MR. EISER:  Well, we move for judgment -- are you

13  asking about additional witnesses?

14          THE COURT:  So let's -- let's hear your -- your --

15  let's hear your motion and then I will hear your plans for

16  evidentiary presentation should you not succeed on that motion.

17          MR. EISER:  Your Honor, this has been briefed fairly

18  extensively in our summary judgment motion.  Again, you heard

19  it again in the opening statement, we believe, as horrible as

20  what Mr. Wisner did, that there are technical defenses to the

21  FTCA that exclude this court's jurisdiction for this conduct,

22  one of those being that the plaintiff having been harmed in

23  2012, '13 and '14 missed his statute of limitations to file his

24  claim, and you have the timing and events of that in the

25  demonstrative exhibit.

1        Also we have our scope of employment defense in which

2    we contend these are sexual molestations, not -- outside the

3    scope of his employment as a physician assistant.

4        And, more importantly, we have our third defense,

5    which is this is intentional conduct.  This is an intentional

6    battery.  Mr. Thomas' presentation of evidence convinced us

7    more than ever, his explanation with Dr. Kelley, Dr. Peterson

8    -- Dr. Kelley in particular, about the -- the conduct that

9    Mr. Wisner was doing, this was a carefully plotted-out assault

10   on more than a hundred veterans.  There is nothing about this

11   that was unintentional or accidental.  These were intentional

12   assaults, intentional batteries.  And under the FTCA, the

13   United States does not -- that's an exception to the FTCA.

14       I'm going to anticipate Mr. Thomas' response is, well,

15   there's a VA immunity statute that says that -- that brings

16   this back in.  It's an exception to the exception.  But that

17   exception is different than the scope of employment test, and

18   we have briefed that also in our summary judgment that that

19   exception only applies in the context of a doctor who is

20   actually committing -- practicing medicine.  It's an exception

21   to the intentional tort exception for medical care by VA

22   professionals solely -- and, as I said, we briefed this -- in

23   the context of when a -- a medical doctor is providing medical

24   care and fails to get informed consent, for example, he can be

25   -- he -- the VA exception applies.

1        But, as you heard, we -- we've anticipated this in my

2   cross.  Mr. Thomas and I both agree these were intentional

3   sexual molestations, not medical care.  That's a conclusion --

4   as you point out while we were arguing about it, that's a

5   conclusion for you to make.  But when you consider the totality

6   of Mr. Wisner's conduct, the intentionality of it, the careful

7   grooming, the drugging, the -- the comments, the vulnerability

8   of the victims, we -- we fail to see how this can be seen as

9   medical care.  And the -- the VA immunity statute does not

10  bring this back so much that there's jurisdiction for the

11  claim.

12        We -- that's the guts of our motion for judgment at

13  this time.

14        THE COURT:  All right.  I'll hear from the plaintiff.

15        MR. THOMAS:  Yes, Your Honor.  These are the same

16  arguments they've tried twice before.  They tried it on their

17  motion to dismiss.  They tried it on their motion for summary

18  judgment, and they're arguments that the court -- Judge Murguia

19  has repeatedly informed them that they're getting the standard

20  wrong.

21        There is an exception to the VA immunity statute, and

22  there are factors for the court to consider.  And the test, as

23  this court has noted, is not whether it was intentional or

24  whether or not they authorized the conduct, hardly is that the

25  case where an employee authorizes inappropriate or negligent or

16-2627 Leininger v USA et al   7.8.20 Vol. 3          669

1    even intentional conduct.  And the test isn't whether or not

2    they forbid the conduct.  The test is whether it was

3    foreseeable.  The test is whether it was a slight deviation.

4    Okay.  The -- the -- the *O'Shea* factors, which I've already

5    gone over, four of them are not in dispute:  the nature, time

6    and place of the deviation, the time consumed in the deviation,

7    the work for which the employee was hired, the incidental acts

8    -- the freedom allowed the employee in performing his duties.

9          And so the two issues here are the intent.  We -- we

10   have submitted to the court testimony while, yes, Wisner did

11   engage in inappropriate conduct, okay, that you can actually do

12   that and also commit malpractice.  He also told us in his

13   deposition that in his mind his justification was always for

14   thoroughness, always for thoroughness.

15         And then the only other thing -- and this goes again

16   to foreseeability -- is incidental acts reasonably expected by

17   the employer.  They had policies.  They knew healthcare sexual

18   exploitation was an issue among healthcare providers, not just

19   at the VA, with all medical care providers.  Again, see

20   Dr. Larry Nassar.  This is a known thing in America now and the

21   VA knows it and they had a nationwide policy to address it and

22   they had a policy there at the VA in Leavenworth, two policies

23   specific to healthcare sexual exploitation or sexual crimes.

24   So they -- they -- again, they've tried this argument before.

25   I still think it fails for the same reasons Judge Murguia has

1    rejected it twice before.

2         THE COURT:  All right.  So what I'm going to do is I'm

3    going to take a few moments during the recess.  I know we've

4    got to vet and clean the witness station for the next witness,

5    assuming I deny the motion; that is my current thinking.  I do

6    want a few moments to reflect on it.  I'll be candid, or at

7    least somewhat transparent, and I know and you all haven't been

8    around the bend with me as the judge in the case, clearly the

9    conduct at issue here is radically different from the store

10   manager, the Osco store manager in the *O'Shea* case, and so I

11   don't -- the direct guidance of those facts to these facts is

12   not a good fit.

13        But that case does supply what appear to be still the

14   controlling factors under Kansas tort law and I want probably a

15   longer fuse on my evaluation of those factors.  I doubt very

16   much that this is a question that I conclude that, in the words

17   of Rule 50, that a reasonable fact finder would not have a

18   legally-sufficient evidentiary basis to find for the party

19   bearing the burden here, the plaintiff.

20        The malpractice -- the malpractice argument, I mean, I

21   don't -- I had Dr. Kelley's testimony really in kind of two

22   columns.  First of all, I don't think we would have to spend

23   very long to decide that what Mr. Wisner did was malpractice.

24   I know he is a defendant here, but it seems he's become a

25   nominal defendant.  And so the question really is whether

1    Mr. Wisner's conduct properly is charged to the VA.  And I

2    think given what I just said about the *O'Shea* factors, I think

3    that's a much more nuanced analysis than some of the arguments

4    suggest.

5          But I'll take the motion with me.  I'm going to think

6    about it for a few minutes.  I'll give it to you.  I'll give

7    you a ruling in 15 minutes.  I think, Mr. Eiser, you ought to

8    assume we'll go forward with evidence today and have your

9    witness in place and ready to go when we return.

10         Let's see, it's 2:35 in the middle of the country, so

11   let's aim to be ready in the courtroom at ten until the hour.

12   All right.

13     (Recess.)

14         THE COURT:  All right.  Hello everyone, Dan Crabtree

15   back in the presence of counsel.

16         Ms. Greiner, just a sound check, you able to see and

17   hear?  Good.

18         So I decided to deny the defendant's motion.  I'm

19   going to collect my thoughts and submit -- or not submit -- to

20   make explanatory comments on the record either at the end of

21   the day today -- probably first thing in the morning.

22         As I said to you before the break, there are -- there

23   is a legal of complexity or nuance here that has my attention

24   on the liability question, but I am not prepared to decide that

25   on a judgment as a matter of law.  I don't believe that the

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    672

1    record permits that kind of conclusion, so I'm denying the

2    defendant's motion with explanatory comments to follow.

3          All right.  With that, I think we're ready to turn to

4    the defendant's presentation.

5          MR. THOMAS:  Your Honor, can I -- can I ask for a

6    clarification of something, Your Honor?  When you -- may I

7    proceed before the defendant's proceed?

8          THE COURT:  You can.

9          MR. THOMAS:  When you -- well, excuse me.  When the

10   court granted defendant's motion to have expert witnesses, I

11   thought the court order was limited to allowing expert

12   witnesses to watch other experts.  Am I mistaken?

13         THE COURT:  I have to look back at my notes.

14         MR. EISER:  Either way, Your Honor, we don't believe

15   any of our experts watched any non-experts testify unless

16   there's some issue here.

17         THE COURT:  Is there?

18         MR. THOMAS:  Dr. Nicholson, their expert, has been on

19   all day.

20         THE COURT:  Well, that's a question of fact I don't

21   know.  I guess we would have fact finding on that.  But let me

22   turn back to -- well, I don't have my notes with that.  So what

23   I'm going to do is I'm not -- I'm not going to have you sit

24   here while I find in my notes the scope of that ruling because

25   it wasn't teed up in the motions *in limine*.  I got to go back

1    and find that.  I'll do that and I rule -- and if we have a

2    factual dispute about where a witness was, I would need to hear

3    evidence on that.

4           MR. THOMAS:  Yes, Your Honor.

5           THE COURT:  All right.  So with that, the defendant,

6    you may proceed with your first witness.

7           MS. HASTON:  Can you, please, state your name?

8           THE WITNESS:  Jeffrey G. Nicholson --

9        (Court reporter interruption.)

10          THE COURT:  Yeah, can I ask for the deputy clerk to

11   please administer the oath.

12          COURTROOM DEPUTY:  Will you, please, raise your right

13   hand.

14          JEFFREY G. NICHOLSON, PA-C, Ph.D., M.Ed., MPAS,

15   called as a witness on behalf of the Defendant, having first

16   been duly sworn, testified as follows:

17                      DIRECT EXAMINATION

18   BY MS. HASTON:

19   Q.   Mr. Nicholson, can you hear me okay?

20   A.   I can.

21   Q.   Are you currently a physician assistant?

22   A.   Yes, I am.

23   Q.   And how long have you been a physician's assistant?

24   A.   I graduated in 1992, so pretty close to 19 years -- sorry,

25   29 years, 28 years.

1   Q.   Okay.  You said you graduated in 1992.  Can you, please, go

2   over your education for the court.

3   A.   Sure.  My first Bachelor's Degree was from Boston College

4   with a major in biology pre-medicine and then also philosophy,

5   and then I did some other things.  Before I decided to become a

6   PA, I was in the Jesuit seminary for a bit, but I did not get a

7   degree for that.  Then I went to Harvard for a Master's Degree

8   in education because I enjoyed teaching.  And then I decided I

9   wanted to go back in healthcare, and I went to the University

10  of Wisconsin, Madison and I got a Bachelor's Degree there and

11  my Physician Assistant Degree there in 1992.  Subsequent to

12  that, I got a Master's Degree from the University of Nebraska

13  in physician assistant studies.  And then subsequent to that I

14  got a Ph.D. in educational leadership and policy analysis from

15  the University of Wisconsin, Madison.

16  Q.   And, Mr. Nicholson, are you currently employed as a

17  physician's assistant in a clinical setting?

18  A.   Yes, I am.

19  Q.   And where are you employed in a clinical setting?

20  A.   I am currently employed in a number of settings, but my

21  main clinical position is at a place called Emergency Room

22  Services Care On Demand, which is a standalone emergency

23  room/urgent care, and then I also work at the Aurora

24  Psychiatric Hospital providing primary care to the inpatients.

25  I also do some family practice at the urgent care building

16-2627 Leininger v USA et al   7.8.20 Vol. 3                675

1    where I work because we also have an internal medicine

2    physician seeing her own primary care patients there.  And then

3    occasionally I will still do some main emergency room work at

4    the hospitals in the Milwaukee area.  So those are my current

5    three clinical positions.

6    Q.   Okay.  Let's start with the emergency room services,

7    approximately how many hours a week do you work there?

8    A.   I work there -- I -- actually, it's on a monthly basis.  I

9    do ten 14-hour shifts per month.

10   Q.   And then how about at Aurora Psychiatric Hospital, how many

11   hours do you work there?

12   A.   I'll do -- sure.  Two to three days again per month,

13   usually weekends, one or two weekends per month.

14   Q.   I'm sorry, what -- the third place that you mentioned,

15   where was that?

16   A.   Oh, those were various emergency rooms through a particular

17   healthcare system here in Milwaukee, Ascension Healthcare at

18   Elmbrook Emergency Room and St. Joseph Emergency Room, those

19   two.

20   Q.   Approximately what percentage of your time do you spend in

21   clinical practices as a physician's assistant?

22   A.   More than 40 hours per week.

23   Q.   Would that be more than 50 percent of your time?

24   A.   Professional time.

25   Q.   Of your --

16-2627 Leininger v USA et al   7.8.20 Vol. 3                676

1   A.   Yes.  Oh, yes.

2   Q.   Mr. Nicholson, at some point in your career, did you own a

3   clinical business?

4   A.   I did.  I co-owned a clinical business.  It was a family

5   practice clinic and it was called Physician Associates of

6   Wisconsin, and we were open in 2014 and 2015.  And the idea was

7   for myself and other mid-level providers under the supervision

8   of a physician to provide medical care to people who did not

9   have health insurance or who had very poor health insurance and

10  couldn't really afford it or for the co-pays.  We charged $50

11  for any visit and very reasonable prices for things like

12  stitches and -- and minor procedures and that sort of thing.

13  It was very rewarding and I just couldn't keep it going because

14  I didn't have enough help and I was still doing my other main

15  jobs in addition to that.

16  Q.   Okay.  Understood.

17       So do you have any certifications or licenses?

18  A.   Yes, I do.  I have -- I have two PA licenses.  One in the

19  state of Wisconsin and the other is in the state of Florida.

20  I've also been certified by the PA single certifying board.

21  The National Commission on Certification of the Physician

22  Assistants is our only board, and I've been continuously

23  boarded since my graduation in 1992.

24  Q.   All right.  How about do you have any fellowships?

25  A.   Yes, well, as far as -- you mean academic or leadership?

16-2627 Leininger v USA et al   7.8.20 Vol. 3        677

1   Q.   Let's start with academic.

2   A.   I am adjunct clinical faculty at four PA programs.  I am

3   also a clinical preceptor for both physician assistants and

4   nurse practitioners.  I've pretty much always had either a

5   PA -- usually a PA, but sometimes a nurse practitioner as well

6   more recently, work alongside me in all my clinical activities.

7   Q.   Okay.  Any other fellowships?

8   A.   I am a distinguished fellow of the American Academy of

9   Physician Assistants, which is our national professional

10   organization, and I have held numerous leadership positions

11   both on the national level as well as at the state level.

12   Q.   Okay.  Do you have any publications?

13   A.   I have two peer-reviewed research publications.

14   Q.   Do you have any non-peer-reviewed publications?

15   A.   Oh, I have a whole number of articles, small articles and

16   that sort of thing, in our professional organization's

17   newsletters and that sort of thing, multiple of those, but I

18   don't really count those.

19   Q.   If we could pull up Exhibit 423 -- or I'm sorry not 423 --

20   447.  Mr. Nicholson --

21   A.   I --

22   Q.   I'm sorry.

23   A.   I forgot, I also have some smaller peer-reviewed articles

24   in our professional journals.

25   Q.   Okay.  What has been displayed up on the screen, is this a

16-2627 Leininger v USA et al   7.8.20 Vol. 3          678

1   true and accurate copy of your CV?  If you could scroll through

2   a couple of pages so you could see.

3   A.  Yes.  Yeah, let me see if I can get that on.  Right now I'm

4   not -- it's underneath my current -- there it is.  Okay.  Yes,

5   this is my -- this is my current CV.

6          MS. HASTON:  Okay.  If we could move this, and it's

7   United States Exhibit 447.

8          MR. THOMAS:  No objection.

9          MS. HASTON:  Your Honor, I apologize you may be muted.

10         THE COURT:  I am.  I apologize.  So this is an -- this

11  is another new exhibit, 447?

12         MS. HASTON:  Yes, Your Honor.  We sent a copy today

13  with the other previous exhibits.

14         THE COURT:  All right.  It's received without

15  objection.

16         MS. HASTON:  Okay.  You can take it down.

17  BY MS. HASTON:

18  Q.  All right.  Mr. Nicholson, as a physician assistant, have

19  you conducted genital examinations?

20  A.  Yes, I have.

21  Q.  And approximately how many genital examinations have you

22  conducted in your career?

23  A.  Over my 28-year career, I would say probably in the

24  hundreds if not thousands.

25  Q.  All right.  Now, aside from what you've already told us

1    today, what experience or credentials do you have that's

2    relevant to this litigation?

3    A.   Oh, sure.  Let's start, I missed some -- I missed some

4    family practice experience in my history.  I was the director

5    of a family practice clinic at the Medical College of

6    Wisconsin.  I was a primary care provider early on in my

7    profession two years in rural South Dakota.  I was primary care

8    provider every Friday when I was on faculty at the University

9    of Texas PA Program.  Basically PAs are trained as primary care

10   generalists, family practice physicians, and then we branch out

11   from there.  So that sort of raps up my family practice

12   experience besides continuing to do family practice and primary

13   care in my current positions both at Aurora and at the ERS

14   facility.

15        Additionally, I have had numerous leadership positions with

16   the Wisconsin Academy of Physician Assistants, which is our

17   state academy.  I've held board positions there for 15 years.

18   Just about every board position I've rotated through, including

19   president of the Wisconsin PA Academy on two occasions.

20        With regards to the American Academy of Physician

21   Assistants, which is our national professional academy, I've

22   been on the communications committee and I've lectured pretty

23   much every year there at national CME conferences that is

24   sponsored by the American Academy of Physician Assistants.

25        Additionally, I have a fair amount of experience in

1    providing opinions on the standard of care of physician

2    assistants and nurse practitioners.  Since I became president

3    -- not president, excuse me.  Since I became the director of

4    the University of Wisconsin, Madison, PA program in 2001, I

5    have been doing or been asked to do a -- legal case reviews on

6    the standard of care and education and expected knowledge of

7    physician assistants.  I was also author of test questions for

8    a national board exam.  I was also author of questions for

9    Wisconsin licensure.  And I've also testified in the states of

10   California and Arizona on interpreting PA practice regulations.

11   And I've also been involved in the updating of Wisconsin PA

12   practice regulations on several occasions.

13   Q.  Okay.  Thank you.  Mr. Nicholson, what has the United

14   States asked you to do in this case?

15   A.  Well, you folks were very specific in your request that I

16   review Dr. Kelley's report, paragraphs 1 through 5 only,

17   regarding the standard of care of the clinical conduct of Mark

18   Wisner of whether or not he met the standard of care or if the

19   standard of care applied in this situation.

20        MS. HASTON:  Okay.  And if we could pull up

21   Plaintiff's Exhibit 161, which is just a copy of Dr. Kelley's

22   report.  If you could scroll through to page 4, please.

23   BY MS. HASTON:

24   Q.  So, Mr. Nicholson, you did not provide an opinion with

25   regard to whether the Veterans Administration Hospital failed

16-2627 Leininger v USA et al   7.8.20 Vol. 3          681

1   to adequately supervise Mark Wisner; is that correct?

2   A.   That is correct.

3   Q.   Okay.  All right.  And what materials have you reviewed for

4   purposes of evaluating Dr. Kelley's report points one through

5   five?

6   A.   Sure.  I reviewed Dr. Kelley's report, but specifically

7   paragraphs 1 through 5 regarding standard of care clinical

8   issues.  I reviewed the OIG report fairly closely.  I reviewed

9   the complaint.  And then pretty much all of the other

10  documentation, including the medical records and the

11  administrative documents and so on, those I only briefly

12  thumbed through or skimmed.

13  Q.   Okay.  Now, based on your review of these materials and

14  your education and experience, have you formed opinions that

15  you hold to a reasonable degree of medical certainty regarding

16  the conclusions reached in Dr. Kelley's report about

17  Mr. Wisner?

18  A.   I have.

19  Q.   Okay.  All right.  Starting with the first -- and those are

20  opinions you hold to a reasonable degree of medical certainty?

21  A.   Yes.

22  Q.   Okay.  So let's start.  What is your opinion regarding

23  Dr. Kelley's conclusion in his report that Mr. Wisner deviated

24  from the standard of care in his performance of genital

25  examinations on Mr. Leininger?

1   A.   Sure.  First let me say that there's a great deal of

2   Dr. Kelley's report -- all of his reports in paragraphs 1

3   through 5 that I do agree with, okay.  There is no question

4   that the conduct of Mark Wisner was horrendous and shocking and

5   criminal.  We -- we all agree with that.

6        But I believe that if a person is going to look at the care

7   of Mr. Wisner, we have to look at it within the framework of

8   whether or not, when Mr. Wisner committed these criminal

9   activities and performed these clinical actions, that we look

10  at it through the framework of whether or not he was actually

11  conducting medical care.  Was there, in fact, a medical purpose

12  to what he was doing in these situations of egregious behavior?

13       So we look at it from the litmus test or lens of,

14  number one, was there a medical purpose or was there a medical

15  intent for that action or activity, and then, number two, if

16  there was a medical purpose -- a legitimate medical purpose and

17  medical intent, then was the manner in which that activity was

18  performed, did that manner have a medical purpose or was there

19  some other purpose or was there some other intent?

20       My conclusion is that --

21       When Mr. Wisner reached a threshold when of his own

22  admission was beyond the realm of professional care, was he, in

23  fact, practicing medicine?  My conclusion and opinion is that

24  when Mr. Wisner intended to commit criminal activity, he did so

25  not practicing medical care but rather with the intent of

16-2627 Leininger v USA et al   7.8.20 Vol. 3                683

 1     criminal activity and trying not to get caught.  And he used

 2     his circumstance of his position, his employment position as a

 3     PA, he used that as a guise -- that word was even used by

 4     Dr. Kelley -- to perform criminal acts.

 5          Therefore, it is my opinion that the standard of care does

 6     not apply in the situations in which Mark Wisner, by his own

 7     admission, could not help himself and intended to perform

 8     activities for "his own pleasure, satisfy his own sexual

 9     curiosity, and his own urges."

10          Once he passed that threshold, he was, in my opinion, no

11     longer practicing medical care, no longer functioning under the

12     scope of practice of a physician assistant and, therefore, the

13     standard of care litmus test would not apply.

14          Generally speaking, in my experience when we talk about

15     medical malpractice, we talk about errors in clinical judgment.

16     There were no errors in clinical judgment with Mr. Mark Wisner.

17     We have instead intentional criminal activity which, by his own

18     admission, he did and tried to conceal and he wouldn't have

19     stopped had he not gotten caught.

20          That is, in summary, my opinion of -- that the standard of

21     care does not apply in Mark Wisner's situation.  He was not

22     practicing medicine; therefore, you cannot use the litmus test

23     of medical malpractice because there was not medicine being

24     conducted at that time.

25     Q.   Now, Mr. Nicholson, what is the basis of your opinion that

1   there was not medicine being practiced or being administered by

2   Mr. Wisner?

3   A.   The basis for that opinion, first of all, is my own

4   experience as a PA clinician 28 years, a PA educator 20-some

5   years, out of those 28 years -- and a reviewer of medical

6   malpractice cases against PAs since around 2001, about -- about

7   18 years, so I know what the standard of care is for PAs and I

8   know what the standard of care is not, okay.  I know when it

9   should apply and when it should not apply.  That's number one.

10       Number two, I base my -- the basis is on the OIG report

11   that I did read carefully wherein Mr. Wisner -- Wisner makes

12   multiple statements as to his frame of mind when he conducted

13   unnecessary genital exams, ungloved genital exams, ungloved

14   rectal exams and so on, wherein he stated that these were

15   unnecessary.  They were for his own sexual gratification or

16   pleasure.  He used the word "pleasure."  He also used the words

17   "to satisfy his own sexual curiosity."

18       Multiple times he admitted that he knew what he was doing

19   was wrong.  He admitted that he purposefully would not document

20   in the medical chart these genital -- genital exams, many of

21   which did exist, and he admitted that he did not document in

22   the medical record any patients who would come to him that were

23   not on the schedule or who were walk-in patients specifically

24   so that he could hide his criminal activity from his superiors.

25       And then, thirdly, when Mr. Wisner surrendered his medical

1    license voluntarily to the Kansas Board of art -- Healing Arts,

2    he stated that -- and I'll try to paraphrase as best I can --

3    "I am not capable of practicing medicine."  So that to me

4    implies there was a time period when he was not capable of

5    practicing medicine and specifically with specific targeted

6    individuals, his victims, he was not practicing medicine.

7    Therefore, by his own admission, he was not practicing medicine

8    when he committed these horrendous acts and crimes; therefore,

9    the medical standard of care should not apply.

10        And then lastly, the fourth basis for this is because the

11   courts themselves have found that Mr. Wisner guilty of criminal

12   conduct, of criminal activity of sexual assault.

13        So based upon all of those four items, it becomes very

14   clear to me that we have a clear picture of the mindset of

15   Mr. Wisner, of his intent to commit criminal activity, of his

16   intent to conceal criminal activity, and this can hardly,

17   therefore, be considered medical care.  This is not medical

18   care.  This is criminal activity and, in my opinion, it should

19   be judged as criminal activity and not judged as medical care

20   because that threshold of medical care was long, long breached

21   with -- with these victims -- specifically with these victims.

22   Q.  Okay.  Now, Mr. Nicholson, I just want to go back over some

23   of these items.

24        THE COURT:  Can I -- Ms. Haston, can I interrupt you

25   here?  I'm sorry to do this.  I want to address the defendant's

1    objection.  I put you off on this -- or the plaintiff's

2    objection, rather, at the beginning.  And I have gone back I

3    wanted to make sure I was grounded in the actual record.

4         The ruling I made at the beginning of the case was

5    that the defendant's request for an exception to the Rule 615

6    excluding witnesses was that the defendant had made the

7    sufficient showing to allow its experts to listen to their

8    counterpart on the other side of the case and the same would

9    apply on cross.  I take it from the plaintiff's earlier

10   comments there is an accusation that I think it's the current

11   witness has deviated from that rule.  Do you want to be heard

12   on that, Ms. Haston, or do you want to create a factual record

13   that I can make the judgment so we can move on with this issue

14   decided?

15        MS. HASTON:  Your Honor, I apologize.  I did not

16   specifically tell this witness not to log on for today's

17   testimony, so I apologize if he did.  Well, yes, if Mr. Thomas

18   says he was on the call, I won't dispute that.  I can ask

19   Mr. Nicholson now.  Would you like me to, Your Honor?

20        THE COURT:  Yeah, I don't know what the facts are.  I

21   don't know what he has listened to or not listened to, so I

22   don't know whether we have a problem.  That's what I'm trying

23   to find out so we can put this issue to rest one way or

24   another.

25        MS. HASTON:  Understood.

1    BY MS. HASTON:

2    Q.   Mr. Nicholson --

3    A.   Yes.

4    Q.   I'm sorry, have you been on the call today?

5         I'll start this way:  Did you listen to the testimony of

6    Dr. Kelley yesterday?

7    A.   I did listen to the testimony of Dr. Kelley yesterday, yes.

8    Q.   And were you on the call today prior to your current

9    testimony?

10   A.   I would not technically say I was on the call.  I was

11   logged in.  I had everything miniaturized and muted and I

12   worked at my desk.  And, to be honest with you, I went and took

13   a nap.  I had no idea when I was going to be called.  I did not

14   listen in on any testimony today.  I was just keeping an eye on

15   when I was going to be called, that's all.  I heard nothing.

16        THE COURT:  All right.  So Mr. -- Mr. Thomas, do you

17   want to argue the motion based on that?  I think we have the

18   virtual equivalent of a witness looking through the glass door

19   at the back of the courtroom.  Do you believe that presents a

20   problem under the rule?

21        MR. THOMAS:  No, Your Honor.

22        THE COURT:  All right.  With that behind us,

23   Ms. Haston, you may continue your direct examination.  Thank

24   you.

25   BY MS. HASTON:

16-2627 Leininger v USA et al   7.8.20 Vol. 3          688

1   Q.  All right.  Mr. Nicholson, you mentioned that your opinion

2   or your conclusions in this case were based in part on the OIG

3   report.  And so if we could pull up Exhibit 406.  Does this

4   appear to be the first page of the OIG report that you were

5   referring to?

6   A.  Yes, it does.

7   Q.  And it's a multi-page document; is that right?

8   A.  That is -- that is correct.  I received this report in

9   three separate documents.

10  Q.  Okay.  So it looks like the first page of this document is

11  a WIS34893 and the very last page of this document is 35007.

12  Does that sound consistent with the document that you reviewed?

13  A.  It does, although, it's so small on my screen, I can't

14  really see the page numbers.  But overall it does, yes.

15          MS. HASTON:  Okay.  And, Your Honor, the United States

16  previously listed Exhibit 406 and we would offer it at this

17  time.

18          THE COURT:  Is there any objection to 406?

19          MR. KILGORE:  Your Honor, again, I object.  This

20  document there -- it's -- I don't know how many pages it is,

21  but there are things in here involving patients that are

22  unrelated and I don't think there's a showing that it's -- that

23  it's -- that it's relevant.

24          THE COURT:  Ms. Haston, is it your intention to offer

25  the entire report?

1        MS. HASTON:  Yes, Your Honor.  The plaintiff's, in

2   their exhibit list, Nos. 16 through 25, No. 70, No. 120,

3   No. 169 and No. 173 have identified portions of this report,

4   and so we are offering the entire report out of the Rule of

5   Completeness, and we do believe it's relevant and their witness

6   has identified that he relied upon it.

7        THE COURT:  So I -- can you just give a little more

8   foundation on the witness's use of this?  Because I don't

9   believe I heard that addressed in his testimony so far.

10        MS. HASTON:  Sure.

11   BY MS. HASTON:

12   Q.  Mr. Nicholson, did you review this document marked as 406,

13   the OIG report, when you formed your opinions in this case?

14   A.  Yes.  Not only did I review it, but I did rely on it quite

15   substantially because I believe it demonstrates Mr. Wisner's

16   frame of mind in his own words when he conducted these criminal

17   acts with his patients.

18        MR. KILGORE:  Your Honor, may I voir dire the witness

19   on this?

20        THE COURT:  You can.  I assume your voir dire is aimed

21   to assist your objection?

22        MR. KILGORE:  It is, Your Honor.

23        THE COURT:  Please proceed.

24                    VOIR DIRE EXAMINATION

25   BY MR. KILGORE:

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    690

1    Q.  Dr. Nicholson -- is it a doctor?

2    A.  I have a Ph.D.  It would be appropriate to use that in an

3    academic setting.

4    Q.  Okay.  Mr. Peterson (sic), your -- your consideration of

5    Exhibit 406, you -- you considered that in -- in forming your

6    opinions about what Mr. Wisner's intent was; is that what I'm

7    to understand?

8    A.  I -- I think you addressed me as Mr. Peterson; is that

9    correct?  Is -- is there another Mr. Peterson?

10   Q.  Nicholson, I'm sorry.  I apologize.  It's been a long

11   couple days.

12   A.  I understand.  I -- oh, sorry.  Now -- and now my phone is

13   ringing.  I apologize.  Let me get this thing shut off.

14       I believe that what the best way of determining what

15   Mr. Wisner was -- was going on in his mind, when he committed

16   these criminal acts, what you guys are contending is medical

17   malpractice, is found through his interviews with the Office of

18   the Inspector General, Kerry Baker.  And it's very clear, in

19   these documents and in those interviews and especially in the

20   interview of January 27, 2015, where Mr. Wisner admits to what

21   his frame of mind was when he committed these acts with these

22   victims.  And so that -- that, I believe, is quite relevant to

23   my position on whether or not the standard of care applies in

24   this situation, absolutely.

25   Q.  Mr. Nicholson, when did -- when did Mr. Wisner treat the

1   plaintiff in this case, Aaron Leininger?  When did he provide

2   the medical treatment to Aaron Leininger?

3   A.   He started -- he started his care in 2012 and it -- and it

4   went on for any number of years.  And when these interviews

5   took place, they were about not only Mr. Leininger but they

6   were about his other victims as well.  And so it goes to his

7   mindset when he victimized any number of these young men who

8   happened to meet a specific body style and physique that he

9   intended to prey upon them.  And so --

10  Q.   Are there -- are there any statements in Exhibit 406,

11  Mr. Nicholson, that pertain to his state of mind specifically

12  while he was examining the plaintiff in this case?

13  A.   I believe Mr. Leininger -- yes, there is a paragraph of an

14  interview with Mr. Leininger with a Mr. Baker, and it is

15  consistent with the interviews with all of the other gentlemen.

16  Q.   No, I mean is there an interview of Mr. Wisner concerning

17  his intent when he was examining the plaintiff in this case

18  specifically?

19  A.   He was not asked specifically by Mr. Baker regarding

20  Mr. Leininger, no, not in that specific interview.

21          MR. KILGORE:  Your Honor, I object to it.

22          THE COURT:  And what is the objection?

23          MR. KILGORE:  That it's -- he's talking about this

24  demonstrates the intent and it has nothing to do with the

25  plaintiff in this case.

16-2627 Leininger v USA et al   7.8.20 Vol. 3          692

1        THE COURT:  Well, what rule of evidence does the

2  admission of the exhibit -- do you contend it would violate?

3        MR. KILGORE:  Relevance.

4        THE COURT:  All right.  On that I'm going to overrule.

5  I think the witness has provided sufficient foundation for it

6  to be relevant.  And since that is the objection I'm presented

7  with, I'm overruling it.  I know Rule 703 does permit admission

8  of certain kinds of materials that an expert has relied on.

9  The witness has stated that.  And given the relevance objection

10 being the only one, I'm overruling it.

11             DIRECT EXAMINATION - continued

12 BY MS. HASTON:

13 Q.  Mr. Nicholson, is there anything you found particularly

14 significant contained within the OIG report regarding whether

15 Mr. Wisner deviated from the standard of care as concluded by

16 Dr. Kelley in his report when performing genital exams on

17 Mr. Leininger?

18 A.  Yes.  I mean, specifically we could actually turn to that

19 January 27th interview, but there are at least four or five

20 statements in there that Mr. Wisner made that tell us what his

21 frame of mind was and what his intent was with these -- with

22 these victims.

23 Q.  And you --

24 A.  Yes, go ahead.

25 Q.  I'm sorry, I didn't mean to cut you off.  Continue if you

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    693

1   were still talking.

2   A.   Well, I went through some of them earlier.  And unless

3   you're going to through it up there, I'll try to recap them

4   again.

5        He stated that, first of all, that not many of the genital

6   exams were unnecessary.  And the implication there is that if

7   they were unnecessary, then he was not providing medical care.

8   He stated that -- on one page he stated that he did it for

9   sexual -- out of sexual curiosity not out of gratification, but

10  then on page 3, one page later, he states, yes, he did do

11  unnecessary genital exams for his own sexual pleasure.  Okay.

12       He also stated that -- he implied that he did extended

13  length genital exams.  He admitted that two or three minutes

14  for a genital exam was inappropriate and done for his own

15  sexual pleasure.

16       He admitted that ungloved genital exams was not medical

17  care and was performed with the intent of his own sexual

18  pleasure and in numerous places.

19       And then, additionally, he admitted that what he was doing

20  was wrong.  He knew that all along, and he admitted that he

21  tried to conceal his criminal behavior by not documenting in

22  the patient record multiple genital exams and also patients who

23  did not -- who were not on the schedule so that he could

24  conceal that from his superiors.

25       And then, finally, he also admitted that the only reason he

16-2627 Leininger v USA et al   7.8.20 Vol. 3

694

```
 1   stopped this criminal behavior is because he was caught;
 2   otherwise, he would have continued to do what he did.
 3   Q.   If we can pull up --
 4   A.   That is clearly not -- a person describing how to avoid --
 5   how to perform and avoid detection -- how to perform criminal
 6   activity and avoid detection under the guise of medical care.
 7   Q.   Okay.  And if we could pull up Exhibit 406, please, and
 8   turn to 94 of the document.
 9         MR. KILGORE:  I'm sorry to interrupt.  Page 94, what
10   does that correlate with?  I've got 406 and Bates ranges.  I
11   don't have a page 94.
12         MS. HASTON:  Yes, I apologize.  I was referring to the
13   PDF version.  So it can be pulled up on the Bates number
14   WIS00034986.
15         MR. KILGORE:  Thank you.
16   BY MS. HASTON:
17   Q.   So, Mr. Nicholson, this -- on the top it says Memorandum of
18   Interview.  Did I read that right?
19   A.   Correct.
20   Q.   And the interviewee, that says Mark E. Wisner; is that
21   right?
22   A.   Yes.
23   Q.   Now, for the date of the interview it says 1/23/2015.  Is
24   this the interview that you were referring to?
25   A.   Yes, it is.
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3                695

1    Q.  Okay.  If we could go to the next page of this, so we're

2    turning now to Bates WIS00034987 out of Defendant's

3    Exhibit 406.  And if we look at that top paragraph about middle

4    of the way down, I see Mr. Wisner's name is mentioned a number

5    of times.  Is there something particularly significant in this

6    paragraph?

7    A.  Well, there -- there -- if you would go to the previous

8    page, there's significance on that page that I'd like to point

9    out first off if I could.

10   Q.  Okay.  All right.  Let's go back.  So we are now on --

11   A.  He says, "I started" --

12   Q.  Mr. Nicholson, I'm sorry, I just want to make clear what

13   page we're on for the record.  So we're now on WIS0034986 out

14   of Defendant's Exhibit 406.  What did you find significant on

15   this page?

16   A.  Sure.  So, first of all, if we look at the second to the

17   bottom paragraph, and I'll just quote, "I started by explaining

18   to Wisner that I had contacted about 50 more of his patients."

19   First of all, we know Mr. Leininger was one of those 50, and I

20   would not doubt that he was.

21       "That there have been several more allegations of

22   unnecessary and -- and/or" -- I'm sorry, I'll slow down,

23   "excessive genital examinations.  I specifically cited a

24   patient who had seen Wisner for diabetic consultation.  I asked

25   Wisner if the returning genital exams were necessary or

```
 1    unnecessary.  Wisner agreed that these genital exams were
 2    unnecessary."
 3        That's the key.  Wisner admitted that he fondled the
 4    patient's genitals and did not disagree that he likely stroked
 5    the patient's penis as the patient had alleged.
 6    Q.  Now, Mr. Nicholson, I'd just like to make clear for the
 7    record the patient referred to in this paragraph is not
 8    Mr. Leininger?
 9    A.  That is correct.
10    Q.  Does that --
11    A.  That is correct.
12    Q.  Does that change your opinion?
13    A.  No, it does not.
14    Q.  Why not?
15    A.  This -- this points to his purposeful criminal intent in
16    his clinical interactions with these poor victims.
17        Next page.
18    Q.  Okay.  If we go to the next page, which will be WIS34987
19    out of Defendant's Exhibit 406 --
20    A.  Yes.
21    Q.  -- did you find anything significant on this page when you
22    formed your conclusions that Mr. Wisner was not practicing
23    medicine?
24    A.  Yes.  The very first two sentences, "We next discussed his
25    method of building trust with patients," and that's -- he's
```

1    talking about the -- school patients to get close enough to try

2    to test the physical bounds.  "Wisner admitted that he is not

3    able to stop himself before he touches these young men."  So

4    he's admitting he's got a problem that he feels he is out of

5    control of.

6        And the point I'd like to make here is that he is

7    conducting this criminal activity -- or trying to conduct this

8    criminal activity in other circumstances, other employment

9    circumstances, okay.  So he would have conducted this -- he did

10   try to conduct this activity in other employment circumstances.

11       So he wasn't acting as a teacher in this case, he's acting

12   as a -- someone who has criminal intent which would apply in

13   his position as a PA under the guise of that or under the guise

14   of any physician that would bring him close to the young male

15   bodies that he sought -- so sought after, okay.

16       The other thing that I -- there's several things that I

17   found here also important.  He explained that his method --

18   couple sentences down -- "that his method was simply

19   thoroughness in looking for any irregularities in their

20   genitals.  However" -- here's the clincher -- "he eventually

21   admitted he was making an excuse first of all.  He eventually

22   admitted that he crossed the professional line and was

23   excessive in his genital exam."  Okay.

24       And then you can keep going, "Although -- here's where he

25   contradicts himself -- "although he stated that he never

1    received sexual gratification, he admitted that they were

2    conducted to satisfy his own curiosity, and he ultimately hid

3    behind this "thoroughness" as an excuse to examine their

4    genitals."  And we'll see on the next page that he actually

5    does admit that it was not -- it was to satisfy his sexual

6    pleasure.  So whether you use sexual gratification or sexual

7    pleasure, I would argue they're fairly synonymous, okay.

8         Next --

9    Q.  Mr. Nicholson --

10   A.  Yes.

11   Q.  -- I'm sorry.  Just to stop you there, is it your opinion

12   that a physician's assistant is deviating from the standard of

13   care when they are conducting examinations to satisfy their own

14   curiosity?

15   A.  As I have stated earlier and as I will continue to argue,

16   once he reached the threshold of "crossing the professional

17   line with intent," my argument is that he is consciously and

18   decidedly no longer practicing medical care but purposefully

19   utilizing that position to conduct criminal misconduct, okay?

20   That's no longer medical care and, therefore, the medical

21   standards of care should no longer apply, but criminal activity

22   should apply.  Okay?

23   Q.  Okay.

24   A.  That's -- that's my entire point.  We have to look, again,

25   at that litmus test.  Is there a medical purpose or intent of a

1    medical purpose?  If so, then the standard of care might apply.

2        Then, secondly, if there is one -- we can agree that there

3    was one, for example, a genital exam for the very first time

4    you see a patient for a physical, or if, in fact, like,

5    Mr. Leininger, if, in fact, he was on testosterone and he

6    needed a genital exam once every six months, that's okay.

7        But the manner now in which those exams took place have to

8    be evaluated under the same lens.  Is it two or three minute

9    ungloved genital exam providing medical care?  I would argue,

10   no, it is not.  That was with the intent of sexual pleasure

11   with the intent of sexual gratification.  He had absolutely no

12   intent at that point of providing medical care.  He was simply

13   doing this gratuitously, okay, is my point.

14   Q.  Okay.

15   A.  He did, in fact, as you can read -- as we continue to read

16   on target-specific victims who matched a certain body type, and

17   it is with these victims that I argue he had no intention of

18   providing medical care but he had the intent of crossing the

19   professional line with them in any way that he could to satisfy

20   his deviant sexual urges, his sexual pleasure, and sexual

21   curiosity, okay.

22   Q.  Okay.  Thank you, Mr. Nicholson.

23       So you mentioned this litmus test.  So let's talk

24   specifically about genital examinations and genital

25   examinations as described in Dr. Kelley's report that were

16-2627 Leininger v USA et al   7.8.20 Vol. 3                700

1    performed on Mr. Leininger.  So when is a genital examination

2    clinically justified?

3    A.   Sure.  As Dr. Kelley and I would all -- both agree on, it's

4    justified at a -- at a first time annual physical exam, maybe

5    once annually for a physical exam.  It's justified when a

6    patient comes in with a urogenital complaint such as penile

7    discharge or possible STD or a rash or particular rash, a

8    hydrocele or -- hydrocele, that kind of thing.  It's also

9    justified when a person is placed on testosterone, okay.  It's

10   just like once a year to check for testicular cancers.

11   Q.   Okay.

12   A.   It's not justified when you repeat one ungloved the week

13   after you just did it.  That is not justified.

14   Q.   Outside the examples you just gave us, is there a medical

15   purpose to perform a genital examination?

16   A.   There can be a medical purpose in those circumstances that

17   I just mentioned, okay, yes, there can be a medical purpose.

18   Q.   Out -- I'm talking is there any other medical purpose for

19   performing genital examination other than those circumstances

20   you just identified?

21   A.   No.  I mean, I -- I gave you the bulk of them.  There may

22   be a few others.  I mean, if we look at each case specifically,

23   we could decide -- you know, argue about it, but other than

24   that, no.  And certainly in the case of Mr. Wisner's activities

25   as I read them and perceived them, there was no medical purpose

1   for these additional genital exams and there was no medical

2   purpose for the manner in which they were conducted in the --

3   in which they were conducted.

4   Q.  Okay.  So, Mr. Nicholson, you talked about this litmus test

5   and we just identified when a genital examination could be

6   clinically indicated.  But even if a genital examination is

7   clinically indicated, if a genital examination is performed

8   without gloves, what is -- do you agree with Dr. Kelley's

9   conclusion that Mr. Wisner deviated from the standard of care

10  when he performed ungloved genital examinations on

11  Mr. Leininger?

12  A.  My opinion is that the standard of care would not apply

13  because there is never a clinical indication or a medical

14  reason to perform an ungloved genital exam except -- never,

15  never a medical reason.  And in this case we clearly -- we also

16  have the second piece of that, we know what the reason was.  It

17  was criminal intent, okay.  So --

18  Q.  On what basis --

19  A.  -- it's pretty clear.  It's pretty clear.

20  Q.  I'm sorry, I don't mean to cut you off.

21      What is the basis of your opinion that there is no medical

22  purpose for performing ungloved genital examinations on

23  Mr. Leininger?

24  A.  Because it's not -- it's not medical care.  No one is ever

25  taught that.  My basis is teaching medical students, PA

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    702

1   students, nurse practitioner students.  It's not done.  It is

2   completely unacceptable.  There is never a circumstance where

3   that is acceptable behavior.

4   Q.  Okay.  Mr. Nicholson, what is your opinion regarding

5   Dr. Kelley's conclusions and report that Mr. Wisner deviated

6   from the standard of care in his performance of excessively

7   long genital examinations on Mr. Leininger?

8   A.  Sure.  My answer is pretty much the same outlining, and

9   Dr. Kelley and I both agree, that a minute, a minute-and-a-half

10  would be an accepted length of time to perform a testicular

11  genital exam, not longer than that.  Except under extenuating

12  and unusual circumstances, not longer than.  So there is no

13  medical justification for two- to three-minute genital exams,

14  none.

15  Q.  Okay.  And now how do you respond to Dr. Kelley's

16  suggestion in his report that Mr. Wisner permitted a sexual

17  curiosity regarding his patients to partly influence the

18  thoroughness of the genital exams?

19  A.  I -- I would disagree with Dr. Kelley's characterization of

20  the word "partly," okay.  In my view and in -- in Mr. Wisner's

21  own admission of thoroughness, he did not allow -- he did not

22  allow his sexual urges to partly influence his exams with these

23  targeted, specific body type victims.  He completely out of

24  control allowed his criminal intent to influence how he

25  interacted with these poor, specific body type male victims,

1    okay.

2         I completely disagree with Dr. Kelley that Mr. Wisner had

3    mixed motives.  He did not have mixed motives.  His motives

4    with this subset of young men who fit the description of

5    providing him with sexual arousal was not mixed at all.  He

6    purposefully targeted like a predator to prey on these

7    individuals to conduct criminal activity.  That is not partial

8    and that -- that is not partial and that is not mixed.  It is

9    complete and it is intentional and it is purposeful with a

10   subset of patients who are no longer patients but rather

11   victims when he crosses that professional line.  They're no

12   longer patients they are now a victim.

13   Q.   Now, Mr. Nicholson, what is your -- what evidence do you

14   have of Mr. Wisner's intent?

15   A.   That intent, we just went over it really.  I think it's --

16   it's made very, very clear in the OIG reports and interviews

17   with Mr. Wisner.  He admitted that his intent was "sexual

18   pleasure," I quote that.  It's very clear and he admitted he

19   would not stop unless he got caught.  His intent was not to

20   provide medical care.  His intent was to use the guise of

21   medical care to perform criminal activity on these poor

22   victims, and I think the -- the interviews with him make that

23   very clear.  They make that very clear.

24   Q.   Mr. Nicholson, I just want to be clear, you keep referring

25   to a subset of patients or victims.  Would you consider

1   Mr. Leininger to fall within the category of Mr. Wisner's

2   victims?

3   A.   Yes, absolutely.   Absolutely.

4   Q.   So when you're -- so when you have been talking about

5   Mr. Wisner's intent and his actions towards victims, are you

6   referring to a subset of patients to include Mr. Leininger?

7   A.   Yes, absolutely, because Mr. Wisner made it very clear that

8   he targeted only those that he found sexually attractive, and

9   that would include Mr. Leininger.   Otherwise, he would not have

10   performed these acts on -- sexual assaults, in my opinion, on

11   Mr. Leininger.

12   Q.   Okay.   Now, Mr. Nicholson, I just want to continue on.

13   What is your opinion regarding Dr. Kelley's conclusion in his

14   report that Mr. Wisner deviated from the standard of care when

15   he asked numerous unnecessary questions during their office

16   visits regarding sexual history, practices, and hygiene?

17   A.   Once again, completely inappropriate, not medically

18   indicated, served absolutely no medical purpose when the

19   professional line was crossed serving only his own sexual

20   pleasure, sexual arousal, sexual curiosity.   However you want

21   to phrase it, that's what he was, in fact, doing.   He was --

22   when he did that, he was not conducting medical care.

23   Q.   And what is your basis of your opinion in that regard?

24   A.   Once again, the OIG report, my experience on what -- when

25   the standard of care applies, his admission that he was not

16-2627 Leininger v USA et al   7.8.20 Vol. 3          705

1   conducting medical care, when he could not conduct medical care

2   when he surrendered his license.

3   Q.   Okay.  Is there ever -- strike that.

4        What is your opinion regarding Dr. Kelley's conclusion in

5   his report that Mr. Wisner deviated from the standard of care

6   when he failed to remove himself from caring for Mr. Leininger

7   after experiencing persistent sexual curiosity towards

8   patients?

9   A.   Exactly -- again -- again, it's the same answer.  It shows

10  that he had a willful intent to continue to attempt criminal

11  activity with Mr. Leininger even though he knew what he was

12  doing was wrong that we can pull clearly from the OIG report.

13  He knew what he was doing was wrong.  He continued to use the

14  guise of medicine to get Mr. Leininger behind a closed clinic

15  door so that he could -- he could commit criminal activity

16  there in relative -- in relative privacy and secrecy.

17  Q.   Okay.  And the basis of your opinion in that regard --

18  A.   The basis --

19  Q.   -- that was --

20  A.   Yeah, the basis of my opinion -- for all of these opinions

21  is, again, the four -- the four bases that I outlined at length

22  earlier on:  my professional experience both as a clinician and

23  as a standard of care expert for 18-17 years, as a person who

24  writes regulations and assists in writing board questions and

25  regulations for various states and called upon to help

1  interpret the regulations for the various states, it's the OIG

2  report, it's -- and Mr. Wisner's own statements, and it's his

3  admission of being incapable of providing medical care when he

4  surrendered his license.

5      And I know I'm -- I'm missing some there somewhere.  If

6  there's -- and the fact that he's in jail, that was the last

7  one.  The fact that he's actually in jail for conducting

8  criminal activity.  I mean, it's -- it was already determined

9  to be criminal activity.  It was already determined by the

10  courts that it was not medical care that he was conducting.  It

11  was criminal activity.  So we have that as a basis as well.

12  Q.  Okay.  Now, Mr. Nicholson, just to recap, do you believe,

13  in your medical opinion, that Mr. Wisner deviated from the

14  standard of care with respect to Mr. Leininger as Dr. Kelley

15  suggested?

16  A.  I do not believe he deviated in the standard of care as it

17  is traditionally applied because I don't believe the standard

18  of care applies to Mr. Wisner's criminal activities.  Bottom

19  line, it is not a medical malpractice issue because there was

20  never an intent to provide medical care when the professional

21  threshold or professional line was crossed.  He knew he was

22  crossing it.  He did it anyway.

23  Q.  I have nothing further, Mr. Nicholson.  Thank you.

24      THE COURT:  Mr. Kilgore, cross-examination?

25      MR. KILGORE:  Yes, sir, thank you.

```
1                    CROSS-EXAMINATION
2    BY MR. KILGORE:
3    Q.  Mr. Nicholson, I think you made the statement, as I heard
4    you say, that it's this -- it's -- it's Mr. Wisner's intent
5    that transform these patients into victims; right?
6    A.  (No response.)
7    Q.  You said once he has that intent and he exercises this --
8    the sexual curiosity in these exams, these people are no longer
9    patients, they are victims.  Is that essentially what you said?
10   A.  That is essentially what I said.  They can be described as
11   victims and, in fact, they are victims at that point, that is
12   correct.
13   Q.  Okay.  And then once they're victims, the standard of care
14   for medical malpractice no longer applies according to you?
15   A.  That is correct.  That is --
16   Q.  All right.
17   A.  -- that is my opinion for consideration by the judge, that
18   is correct.
19   Q.  And this -- and this sudden disappearance of the standard
20   of care that you repeat over and over again, this theory ever
21   been peer reviewed?
22   A.  It has not been peer reviewed.
23   Q.  Hadn't, has it?
24   A.  (No response.)
25   Q.  Ever been published in a peer-reviewed article?
```

1    A.   It has not but I would -- I would argue this though.   Just

2    because this -- this framework has not been argued or

3    appreciated by the courts does not mean that the current -- the

4    current system that it -- the current perception by the courts

5    is the valid or correct one.

6    Q.   You're -- and you're unsure because you're not a lawyer,

7    are you?

8    A.   I'm not a lawyer.   But as a clinician, I'm presenting a

9    framework that is very reasonable -- that appears very

10   reasonable and is very reasonable to me as a clinician and to

11   -- and to many others for consideration.

12   Q.   I'm sorry, I don't mean to interrupt you, and I apologize

13   if I am.

14        According to you, as a clinician, that's what you say.   And

15   -- and you, as in your consulting business and your consulting

16   network of folks that you have, you're -- you're used to

17   opining on the standard of care in a manner where it doesn't

18   involve sexual conduct like this; correct?

19   A.   That's -- that's absolutely correct, and that's why this is

20   such an unusual case and why the standard of care doesn't apply

21   in this case, because it is such an unusual case.

22   Q.   I -- I would just ask that you answer my question, okay,

23   make it go quicker.   Okay.

24        But this -- but this notion, though, that -- that -- that

25   the standard of care suddenly disappears, that -- that comes

1   from Jeffery Nicholson; right?

2   A.   It does and it makes sense to me, yes, absolutely.

3   Q.   I understand it makes sense to you and I -- I wouldn't

4   argue that it makes sense to you, but that's -- that's not --

5   that's not the point.  It's not my point.

6        But -- but this -- the fact your contention that the

7   standard of care suddenly disappears comes from no other source

8   in terms of your opinion other than you; right?

9   A.   Yes, but it -- it only disappears when there is an intent

10  not to provide medical care.  When there is --

11  Q.   Okay.

12  A.   -- not to practice medicine --

13  Q.   Okay.

14  A.   -- that's the point.

15  Q.   And we're going to -- we're going to talk about that.

16  We're going to explore that.

17       But you didn't cite anything in your report, right, or

18  identify anything in your deposition that stands for the

19  proposition or states that -- that this -- or supports this --

20  your contention that the standard of care suddenly disappears,

21  did you?

22  A.   That -- that is correct.  I wouldn't phrase it that way,

23  but that is correct.

24  Q.   I'm right about that, aren't I?

25  A.   Yes.  Yes.

16-2627 Leininger v USA et al   7.8.20 Vol. 3

1    Q.  Okay.

2    A.  Not -- there's nothing published.  There's nothing

3    published to this point.

4    Q.  Okay.  Now, let's -- and -- okay.  Now, let's talk about

5    your -- your -- when you say this line that's crossed, and once

6    the line is crossed, the standard of care no longer applies, so

7    I want to -- I want you to walk through this with me.  Okay.

8        Now, when -- when Aaron Leininger -- let's say before he's

9    seen Mr. Wisner, all right, and -- and say an appointment is

10   made for Mr. -- for Mr. Leininger, okay.  At that point he's --

11   he's got an appointment and he's -- he's going to be a patient

12   of Mr. Wisner's, okay.  Do you agree as he's walking in the

13   clinic to go see him, the OEF-OIF clinic to go see Mr. Wisner,

14   he's a patient; right?

15       He's got a scheduled appointment for a medical exam; right?

16   A.  Yes.

17   Q.  Okay.  And then he walks in and he -- and he checks with

18   the -- at the front desk of the clinic.  You know you always

19   have to -- you know this, you got to check in for your medical

20   appointment; right?

21   A.  I know it all too well.

22   Q.  You do, right.

23       So he checks in as a patient; right?  Am I right?

24   A.  Yes.

25   Q.  Okay.  And -- and probably has to fill out some paperwork

1    or whatever, probably a patient questionnaire or something;

2    right?

3    A.   Yes.

4    Q.   Okay.  And then he -- he goes back to the exam room, right,

5    and this -- this all -- all of his contact, all of Wisner's

6    contact with Aaron Leininger, you would agree with me, occurred

7    in an exam room at the OEF-OIF clinic in Leavenworth; right?

8    A.   With this particular patient victim, yes.

9    Q.   Okay.  And that's what we're talking about here today.

10   We're not talking about others.

11       Now, so in every -- every contact between Wisner and the

12   plaintiff in this case occurred in the clinic in the exam room

13   during normal operating hours of the clinic; right?

14   A.   Well, we actually don't know if there were contacts outside

15   of hours because they would not have been documented per

16   Mr. Wisner's own testimony.

17   Q.   Now, well, it's -- it's undisputed in this case, it's

18   undisputed what the visits were.  You don't know this.  I'll

19   tell you that.  But it's undisputed in this case, so we do

20   know.  Okay?

21   A.   Then I will grant you that.

22   Q.   Now, when Mr. Leininger goes back, he's probably escorted

23   back into the exam room to wait for Mr. Wisner; right?

24   A.   Typically.

25   Q.   Typically so.

16-2627 Leininger v USA et al   7.8.20 Vol. 3        712

1        Now, when -- when -- when Mr. Leininger is sitting in the

2   exam room waiting for Mr. Wisner to come in, he's still a

3   patient; right?

4   A.   Yes.

5   Q.   All right.  Now, your -- did you look at the progress notes

6   in this case --

7   A.   I did not.

8   Q.   -- of Mr. Wisner?

9   A.   There was no -- there was no specific progress note

10  referenced by Dr. Kelley for me to opine about, therefore, I

11  did not.

12  Q.   Did the DOJ lawyers not give you the -- the medical records

13  that you're opining on here about the standard of care?

14  A.   I was not asked to opine on the medical records.  I was

15  specifically asked to opine on paragraphs 1 through 5 only of

16  Dr. Kelley's report.

17  Q.   All right.  So I -- I just want to -- I just want to be

18  clear on this.  You have -- sitting here right now, you haven't

19  even looked at Aaron Leininger's medical records, have you?

20  A.   I would disagree with that characterization.  I did thumb

21  through the medical records.

22  Q.   Okay.  You thumbed through them but you didn't -- you

23  didn't read them.  What --

24  A.   I -- I skimmed them as I skimmed the other -- the other --

25  the other gentleman as well that I was asked to review.  Once

713

```
 1   again -- yeah, once again, I was responding to the request that
 2   was the tasks that were given to me --
 3   Q.  I --
 4   A.  -- and I did not believe it was necessary for me to know
 5   those details in those exams if I was going to concede to
 6   Dr. Kelley what he -- what he wrote.  And I do concede that
 7   what Dr. Kelley wrote in terms of the egregious criminal
 8   activity that took place.  I concede all of that.  It's not
 9   necessary for me to look at the medical records to concede
10   Dr. Kelley's report on those points.
11   Q.  Well, yeah, except -- except Dr. Kelley's a medical doctor,
12   isn't he?
13       You know that --
14   A.  Yes.
15   Q.  -- right?  Right?
16   A.  I -- apparently you -- are you having trouble hearing my
17   responses?
18   Q.  I can hear you.
19       And you -- you testified and you talked about this in your
20   -- in your deposition, and I think you've even written articles
21   on it about, you know, physician's assistants don't -- don't
22   opine on -- on the standard of care for a physicians, do they?
23   A.  Again, it's very -- it's very dependent upon the
24   circumstances.  Dr. Kelley, in his testimony yesterday, he --
25   he agreed that the standard of care is the same for both of
```

1    them.  That was his opinion.

2    Q.  Right.  Right.

3        But I'm asking you, you -- you, as a PA, you don't opine on

4    the standard of care for physicians, do you?

5    A.  Typically no.  Some courts will allow it in certain

6    circumstances, but typically no.

7    Q.  Typically no.  All right.

8        And -- and Dr. Kelley, he found that the standard of care

9    applied and was violated; right?

10   A.  That's correct.

11   Q.  Okay.  Let's go back -- let's go back to this other thing I

12   wanted to talk to you about.

13       So when Aaron Leininger goes into the exam room and then

14   Mr. Wisner comes in, you probably had some understanding that

15   there's a number of things done at a clinical visit; right?

16   A.  Right.

17   Q.  Right.

18       I mean, you know, none of these patients walked into the

19   clinic, and Aaron Leininger didn't go into the clinic, and go

20   in an exam room and just get a genital exam; right?

21   A.  Well, I would assume not.

22   Q.  Right.

23       That's -- okay.  So if -- if -- if Mr. Wisner comes into

24   the exam room and sees Mr. Leininger and starts -- first takes

25   his vitals, okay, takes his vital signs, blood pressure,

16-2627 Leininger v USA et al   7.8.20 Vol. 3      715

1   respiration, you know, all those things, that you know well

2   that vital signs is a typical part of the clinical visit;

3   right?

4   A.   Yeah, typically those are not performed by the provider.

5   Those are performed by a nurse or a CNA or a medical assistant.

6   Q.   All right.  But in this case it's Wisner; right?

7        He's the one that comes in -- I mean, is a PA; right?

8   A.   He's the PA, but it's not clear to me that he took his own

9   vital signs, no.

10  Q.   Let's say -- go with me on this.  Let's say that he did.

11  Okay?

12  A.   Okay.

13  Q.   He took the vitals of Aaron Leininger.  At that point Aaron

14  Leininger, he's still a patient; right?

15  A.   Yes.

16  Q.   Standard of care still applies; right?

17  A.   Yes.

18  Q.   Okay.  And then Mr. Wisner talks to him and he takes a

19  history from him; right?

20       He says -- he says, you know, "What -- what surgeries have

21  you had?  What prior procedures?  What health problems do you

22  have?"  Right, he'd do that?

23  A.   Well, yeah, typically -- typically, if you'd like me to

24  explain it to you, unless you want --

25  Q.   No.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                716

1   A.   I'd be happy to explain it all to you.

2   Q.   You haven't been through the records in detail in this

3   case; right?

4        You skimmed them, so I'm not -- I'm not interested really

5   in -- in what you're talking about with -- with things

6   unrelated.

7        But in this case, okay, if -- if Mr. Wisner takes a history

8   from -- from Aaron Leininger, okay -- just assume that for me,

9   okay.  Mr. Leininger is still a patient; right?

10  A.   If the history -- if the history taken does not contain

11  excessive questions about a sexual nature that would have no

12  medical basis, yes, then so far I would agree with you that he

13  is still a patient.

14  Q.   Still a patient?

15  A.   And he is not -- he has not surpassed the professional line

16  of criminal intent.

17  Q.   Okay.  And the -- and the standard of care still applies to

18  you; right?

19  A.   Yes, absolutely.

20  Q.   Now, let's take your example.  If -- say if Mr. Wisner, in

21  taking that patient history from Mr. Leininger, say he makes a

22  -- an offhand sexual comment that's inappropriate, okay.  Let's

23  just assume that happens; right?

24  A.   Okay.

25  Q.   At that point -- okay.  Now, at that point, according to --

1    according to you, the standard of care no longer applies;

2    right?

3    A.   If his intent in asking those questions was to provide

4    himself with sexual arousal or sexual gratification or sexual

5    pleasure, yes, I would agree with that based upon Mr. Wisner's

6    own admission.

7    Q.   Okay.  All right.  So at that point there's a fork in the

8    road.  If Mr. Wisner makes an inappropriate sexual comment,

9    standard of care no longer applies.  If he doesn't -- if he

10   doesn't, then the standard of care still applies and we're

11   still on track; right?

12   A.   Well, I am saying he has -- he has bridged the point of

13   potential criminal activity.

14   Q.   Okay.  Now, so -- so let's say -- let's go with this

15   that -- that Wisner's taking the history from Leininger and

16   Wisner has not made a sexual comment and we're still on track.

17   And then Wisner, he -- he takes the history and then he -- he

18   does a -- a review of systems, okay.  Review of systems.  You

19   know what that is as a PA; right?

20   A.   Yes.

21   Q.   Okay.  Now, what's a review of systems?

22   A.   It's where you ask questions about every major body system

23   as a part of a routine exam.  Typically the full review of

24   systems is done at annual -- annual exams once a year;

25   otherwise, we do a very focused review of systems.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                718

1   Q.  Okay.  And then let's say we make it through that and

2   things are still on track and then at that point Mr. Wisner

3   begins performing the -- the physical exam.  All right.  You

4   with me?

5   A.  I'm with you.  I'm with you.

6   Q.  And so he first he does a -- does a mental status, general

7   assessment of the -- of the veteran just by observation; right?

8       And he -- at that point in time Leininger's still a

9   patient; right?

10  A.  Correct.

11  Q.  Standard of care still applies; right?

12  A.  It would.

13  Q.  All right.  And then he goes on and he does some other

14  things.  He looks at the -- checks out the skin for lesions,

15  sores, and that sort of thing.  Nothing improper, just visually

16  checks Mr. Leininger over.  There's no rashes or anything.  And

17  -- and at that point then Mr. Leininger's still a patient;

18  right?

19  A.  Sure.

20  Q.  Standard of care still applies?

21  A.  Sure.

22  Q.  He goes on.  He does -- he continues the physical exam.  He

23  does the ears, nose, throat, all that stuff.  He listens to his

24  lungs, okay.  Still a patient, standard of care still applies;

25  right?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    719

```
 1    A.   He's -- as long as there is a valid medical reason for the
 2    conduct of the provider, the standard of care would still
 3    apply, yes.
 4    Q.   Okay.  And -- and I'm just going through the progress note
 5    here, okay.  And so we got lungs, we got heart, we got GI.
 6    What's GI?
 7    A.   Gastrointestinal system.
 8    Q.   Okay.  So apparently Mr. Wisner does that and then GU.
 9    What's GU?
10    A.   Genitourinary.
11    Q.   Okay.  And then extremities.  What's that?
12    A.   Arms and legs strength.
13    Q.   We'll come back to the genitourinary.
14         And then neuro?
15    A.   Neurologic exam is typically balance and gait, grip
16    strength, counting backwards by sevens from a hundred, cranial
17    nerves, that sort of thing.
18    Q.   Okay.  Pulses?
19    A.   Pulses, yep, ankles and wrists typically.
20    Q.   Okay.  And so let's -- so Mr. Wisner did all those things,
21    okay, and then he gets the -- the genitourinary exam.
22    All right.  At that point, before he starts the genitourinary,
23    Mr. Leininger's still a patient; right?
24    A.   Correct.
25    Q.   All right.  And the standard of care, according to you,
```

1   still applies?

2   A.   Yes.

3   Q.   Does that --

4   A.   So far everything that you've described has a valid medical

5   purpose in this particular encounter.

6   Q.   Okay.  Now -- now, we get to the genitourinary exam.

7   All right.  And -- and now you -- you've testified -- I think

8   -- and I think you and Dr. Kelley have been pretty consistent

9   on this -- that typically a genitourinary exam lasts about a

10  minute or less; right?

11  A.   Minute, minute-and-a-half, correct.

12  Q.   Okay.  Minute or minute-and-a-half.

13       And I think Dr. Kelley said 30 seconds to a minute.  You're

14  at a minute to minute-and-a-half.  You're a little longer but I

15  guess it's in the range.

16       So now -- so on this occasion, then if Mr. Wisner then

17  begins performing the genital exam and he's -- he's -- let's

18  say it's -- so far, you know, it's clinically indicated, okay,

19  and he's doing the exam properly; right?

20  A.   Is he gloved?

21  Q.   Huh?  We'll made that -- we'll come back to that, okay?

22  I'll get -- we'll talk about it.

23       All right.  And so he's doing the exam properly and then

24  let's say that something -- if he's doing the exam properly,

25  the standard of care still applies, right, if it's indicated?

1    If it's clinically indicated, it still applies; right?

2    A.   Sure.

3    Q.   And Mr. Leininger is still a patient; right?

4    A.   Sure.

5    Q.   And then -- and then in that -- that zero, when he begins

6    the exam up to a minute, let's say, or a minute-and-a-half, if

7    he's conducting the -- the genital exam properly, according to

8    you, Mr. Leininger's still a patient and the standard of care

9    still applies; right?

10   A.   Sure.  Sure.  At this point I don't see any -- any issues

11   of non-medication or of intent to cause harm or anything other

12   than what is typically expected based upon your description so

13   far, assuming --

14   Q.   Okay.

15   A.   -- assuming that -- that the provider is gloved, Mr. Wisner

16   is gloved.

17   Q.   Okay.  And then if -- let's say at -- you said up to a

18   minute and 30 seconds, so I'm going to go with -- we'll go with

19   a minute and 31 seconds, okay.  At a minute and 31 seconds,

20   let's -- let's assume that Mr. Wisner's sexual curiosity --

21   because he's talked about sexual curiosity, didn't he, in all

22   the OIG stuff?

23   A.   He talked both about sexual curiosity and sexual pleasure.

24   Q.   Okay.  Let's use sexual curiosity for purposes right now.

25        If at a minute and 31 seconds Mr. Wisner begins

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    722

1   experiencing some sexual curiosity when he's doing the genital

2   exam, okay, and that sexual curiosity -- I'll even give you

3   sexual pleasure.  That sexual pleasure starts -- starts

4   forming, it's in -- it's in Mr. Wisner's mind, and he continues

5   the genital exam from a minute and 31 seconds up to let's say

6   two-and-a-half minutes, okay, an extra 59 seconds.  All right.

7   And he does so because he's sexually curious and he's getting

8   some type of sexual pleasure from it.  All right.  With me?

9   A.   Yes.

10  Q.   Okay.  So that means that at a minute and 31 seconds Aaron

11  Leininger is no longer a patient, right, according to you?

12  A.   At -- at this point Mr. Leininger has victimized the

13  patient for his own --

14  Q.   Okay.

15  A.   -- sexual pleasure, that is correct he has crossed --

16  everyone would agree, he has crossed the professional boundary.

17  He has crossed the professional line intentionally.

18  Q.   Right.

19       And -- and so at that point then, according to you, Jeffery

20  Nicholson, at a minute and 31 seconds, the standard of care no

21  longer applies to Mr. Wisner in that OEF clinic in that exam

22  room conducting that genital exam on Aaron Leininger; that's

23  your opinion?

24  A.   If Mr. Leininger (sic) had the criminal intent of providing

25  himself with sexual pleasure over and above the normal time

16-2627 Leininger v USA et al   7.8.20 Vol. 3                723

1    limit that is customarily expected for a testicular exam, then,

2    yes, he is no longer conducting medical care.  And because he

3    is no longer conducting medical care, the standard of care

4    should not apply but a criminal standard should apply.

5    Q.   You said -- you said --

6    A.   That is correct.

7    Q.   And you have -- and you have no -- you have no foundation

8    for that opinion other than you say it is so?

9    A.   Well, I went over my four bases.  I'll go overrule my four

10   bases again.

11   Q.   No, I want you to --

12   A.   Then my -- my bases, my foundation, is what I described in

13   detail.

14   Q.   All right.  I want to talk about the OIG report briefly.

15   You would agree with me that -- that, you know, the -- the OIG

16   report that you addressed in your direct exam, this interview

17   that was done by Kerry Baker in January of 2015, this document

18   is -- actually, it's a Memorandum of Interview; right?

19   A.   That's correct.

20   Q.   And so given that it's a Memorandum of Interview, this is

21   Kerry Baker taking down -- or summarizing what Mr. Wisner said;

22   right?

23   A.   This is -- yes, Mr. Baker, I assume, taking notes while he

24   is interviewing Mr. Wisner and jotting down notes to summarize

25   his report, correct.

16-2627 Leininger v USA et al   7.8.20 Vol. 3                724

1   Q.  Okay.  It's not sworn testimony; right?

2   A.  Correct.

3   Q.  All right.  And then you -- you use Kerry Baker's

4   memorandum then to -- to determine Mr. Wisner's intent

5   generally but not specifically related to Aaron Leininger;

6   right?

7   A.  That is correct.  I believe Mr. Leininger would fall into

8   the category of one of those 50 patient/victims described in

9   the report.

10  Q.  I know you do.

11      Now, in your direct exam, you kept -- you kept saying "as I

12  perceive them," you know, "Wisner's intent as I perceived it;"

13  right?

14  A.  Correct.  And I believe as others would perceive it as

15  well.  It's pretty doggone obvious to a layman and all of us if

16  we read those four pages.

17  Q.  Right.

18      Now, you're not -- you're not a psychiatrist; right?

19  A.  Correct.

20  Q.  You're not a psychologist; right?

21  A.  Although I'm not a psychologist, I do work in a psychiatric

22  hospital.

23  Q.  I -- I noticed that.

24  A.  I have a fair amount of psychiatric experience, yeah.

25  Q.  Have you -- have you looked at -- have you looked at any

725

```
1    sworn testimony from Mr. Wisner?

2    A.  I have not.

3    Q.  You haven't?

4        Has the DOJ lawyers told you there's been any sworn

5    testimony?

6    A.  I don't -- well, I know he had -- I believe he had a

7    deposition, but that's about the extent of it.

8    Q.  All right.  I want to --

9            MR. KILGORE:  Scott, pull up 238.

10   BY MR. KILGORE:

11   Q.  I want to -- I'm going to --

12           MR. KILGORE:  Your Honor, I want to put up

13   Mr. Wisner's sworn testimony from June 29th of 2020, and on --

14   do you have the page?  Yeah.  Okay.

15   BY MR. KILGORE:

16   Q.  So page 25 to 26.  Now, this is a deposition that was just

17   taken, Mr. Nicholson, June 29th, 2020.  Did you know that?  Did

18   you know he was supposed --

19           THE COURT:  Hold on just a second.  I think Ms. Haston

20   wants to make a statement or an objection.

21           MS. HASTON:  I apologize.  I don't mean to interrupt.

22   I just want to note the United States objects to the use of

23   this deposition testimony, and we previously filed a motion on

24   this exact transcript.

25           THE COURT:  Ms. Haston, I'm aware of that and I know
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3                726

```
 1    that issue is pending.  It emerged late in the case.  The

 2    motion came in.  I think the government or the United States

 3    has now filed its response.  I have not ruled that.  My

 4    inclination is to hear the testimony.  And if your motion to

 5    strike the deposition --

 6            I'm paraphrasing.  I know that's not the exact title

 7    of it, but I think it's the gist of your motion --

 8            -- if the government -- if the United States were to

 9    prevail on that, then this passage, this aspect of testimony

10    from Mr. Nicholson would have to be disregarded.  If I don't --

11    if it doesn't go your way, then the -- the testimony would

12    stay.  Do you have a problem proceeding on that basis?

13            MS. HASTON:  No, Your Honor.

14            THE COURT:  All right.  Mr. Kilgore, you may proceed.

15            MR. KILGORE:  Thank you.

16    BY MR. KILGORE:

17    Q.  Sorry, Mr. Nicholson.  I want to read this testimony.  Can

18    you see it on the screen, too?

19    A.  It is small but I can see it.

20    Q.  I'm going to read it, so -- so ease the difficulty here.

21        So this is a question in this sworn testimony as to

22    Mr. Wisner.

23        Question:  "What did you mean when you told Mr. Baker that

24    your goal or objective was always thoroughness?"

25        Answer:  "The goal was to fulfill the VA requirement and
```

16-2627 Leininger v USA et al   7.8.20 Vol. 3      727

1   basically to document on an initial physical for a comp and pen

2   the completeness of the patient's current medical status and

3   physical stature, and to address their particular complaints

4   which may or may not relate to any combat injury."

5       Question:  "Now, I want to ask you a hypothetical.  This

6   means that I'm not representing this to be a fact, it's just a

7   hypothetical.  Are you with me?"

8       "Yes."

9       "Hypothetically even if your exam lasted too long as it

10  relates to the genitals, was your primary objective still

11  thoroughness?"

12      Answer:  "Yes."

13      "Would the same be true as it relates to a rectal or anal

14  exams?"

15      Answer:  "Yes."

16      "Would you agree that each and every physical that you

17  performed on your patients, your primary intent was to conduct

18  a thorough exam?"

19      Answer:  "Yes."

20      Okay.  You weren't aware of this testimony at all, were

21  you?

22  A.  No, but it doesn't change my opinions one bit.

23  Q.  Because you -- you foresee that Mr. Wisner's intent -- your

24  perception of it was his intent was every time and always and

25  every exam was sexual gratification according to you, Jeff

16-2627 Leininger v USA et al   7.8.20 Vol. 3                728

1  Nicholson; right?

2  A.  With -- with these specific targeted patients, yes.

3  Q.  You -- you were retained in this -- in this case in, I

4  think, May of 2018; is that right?

5  A.  I don't remember the exact date.

6  Q.  I'm going to -- do you -- do you recall how many cases you

7  were retained to offer opinions in related to Mr. Wisner and

8  the VA?

9  A.  I am going to -- it was certainly more than five but less

10  than ten, around that amount.

11  Q.  Okay.  And I want to -- I want to put up Exhibit 244.

12  A.  And Dr. Kelley's reports were identical in every single

13  case.

14  Q.  Well, I appreciate the nonresponsive.  I didn't ask you a

15  question, but all right.

16      Exhibit 244, do you recognize this, their document,

17  Mr. Nicholson?

18  A.  I do.

19  Q.  Okay.  And is this the -- it's the -- the solicitation and

20  contract for your services between you and the U.S. government,

21  is that right, for your work in these -- in this case and

22  perhaps others?

23  A.  Yes, that is what it says.

24  Q.  Okay.  And -- and it looks like it was effective and

25  awarded on May 21st, 2018.  You see that date up top there?

1   A.   It's small but I believe so, yes.

2   Q.   Okay.  And your signature's on it; right?

3   A.   Yes, that is my signature.

4   Q.   Okay.  And I want to -- I want to go to page 4.  And so in

5   this contract between you and the government, the U.S.

6   government is -- is obligated to pay you up to $149,440; is

7   that right?

8   A.   I have no idea how that was determined, but that's what it

9   says, yes.

10  Q.   Okay.  So as of -- as of May 21st, 2018, you -- you

11  recognized that you had at least the potential to earn that

12  amount in this litigation; correct?

13  A.   Well, to be quite honest with you, I don't remember even

14  reading that amount or even looking at that amount.

15  Q.   Okay.  But having looked at it, that looks to be the case;

16  right?

17  A.   Correct.

18        MR. EISER:  Your Honor, the witness doesn't know what

19  this said as he said.

20        THE COURT:  We kind of follow the one riot one ranger

21  rule in the District of Kansas, and so the objections need to

22  come from the lawyer who is handling the witness.

23        MS. HASTON:  Your Honor, we -- we just do not believe

24  the line of questioning into this document is appropriate

25  because the witness does not even know this is.  This is the

1    government's contract.

2          THE COURT:  I'll just save you both some time.  I

3    don't think it's inappropriate because the witness doesn't know

4    the document.  Candidly, I don't find the topic very helpful,

5    but that's up to the questioner.  So your objection is

6    overruled.

7          MS. HASTON:  Thank you.

8          MR. KILGORE:  Okay.  That's all I have on this

9    document.

10   BY MR. KILGORE:

11   Q.  Mr. Nicholson, then at some point after that date then you

12   received materials in the case; is that right?

13   A.  I would assume so, although that document could have come

14   after actually.  I don't recall the actual time.

15   Q.  Well, I have -- I have an e-mail from Mr. Benson sending

16   you the initial materials that's dated May 29th, 2018, about

17   eight days later?

18   A.  Okay.

19   Q.  Is that consistent with your memory?

20   A.  I -- actually, don't have a memory, so I'll have to grant

21   you that.

22   Q.  Okay.  All right.  You -- you founded something called the

23   PA's Expert Network; is that right?

24   A.  That is correct.

25   Q.  Okay.  And you founded it in 2007?

1    A.   That is correct.

2    Q.   Is that -- is that -- is that an expert network?

3    A.   It is an LLC that provides physician assistants and nurse

4    practitioners to attorneys and firms to give medical opinions

5    on the standard of care of a mid-level provider.

6    Q.   Okay.  And you got -- you have, at least in your testimony

7    in your deposition, 70 to 75 PAs in the network?

8    A.   I would say, yeah, probably that.  That plus NPs around

9    that.

10   Q.   That's what I was going to say, 10 to 15 nurse

11   practitioners?

12   A.   Sure.

13   Q.   Also have certified nurse anesthetists, ENTs, and nurses;

14   right?

15   A.   Correct.

16   Q.   And you provided this service and you receive compensation

17   when experts are retained or paid through this service?

18   A.   As -- as a business, I do retain some compensation, that is

19   correct.

20   Q.   Okay.  And you -- you advertise this service obviously;

21   right?

22   A.   I advertise the company through my website, that is

23   correct.

24   Q.   Okay.  Do you have advertisements in *Seek* and other

25   publications?

16-2627 Leininger v USA et al    7.8.20 Vol. 3                    732

1   A.    I have advertisements with *Seek* and the other one that I do

2   authorize is called HG Experts, that is correct, those two.

3   Q.    And then as part of this service, you -- I think you

4   advertised that you -- you can obtain experts for litigation

5   within 36 hours of being called?

6   A.    Typically if I have a -- a specialist PA or nurse

7   practitioner in that clinical specialty, yes, I can do that.

8   Typically if I have one available, yes.

9   Q.    All right.  And then your -- you're also -- you're also

10  involved with the American Academy of Physician Assistants,

11  right, I think you testified to that?

12  A.    That is our national organization, that is correct.  I've

13  held a number of leadership roles in that organization.

14  Q.    Okay.  All right.  And I want to put up Exhibit 227.

15  Exhibit 227, Mr. Nicholson, these are guidelines for the

16  physician assistant serving as an expert witness; is that

17  correct?

18  A.    Yes, these are guidelines which I think I provided to you

19  actually.

20  Q.    I don't know.  We got them off the website.  Either one.

21       But -- but -- and you -- obviously you support these

22  guidelines; right?

23  A.    Yes, and I also ensure that any expert that I provide who

24  is a PA agrees to abide by them.

25  Q.    Okay.  And the -- this guideline in paragraph 7, "An expert

1    must objectively evaluate facts and provide an opinion.  If no

2    opinion can be derived from the available facts, this should be

3    stated to the attorney.  The PA's review of medical facts

4    should be thorough, fair, and impartial and should not exclude

5    any relevant information in order to create a view favoring

6    either the plaintiff or the defendant.  The expert should

7    champion what he or she believes to be the truth."  And you

8    support that guideline?

9    A.   I do.

10          MR. KILGORE:  Go to the next page.

11   BY MR. KILGORE:

12   Q.   Here's another part of the guideline.  "Since experts

13   establish the standards of practice in a given case, care

14   should be exercised to ensure such standards do not narrowly

15   reflect the expert's views to the exclusion of other acceptable

16   choices."  Right?

17   A.   Sure.

18   Q.   And then, lastly, on the next page, "The PA should

19   objectively evaluate the facts and provide an opinion.  The

20   PA's review of medical facts should be thorough, fair, and

21   impartial and should not exclude any relevant information in

22   order to create a view favoring either the plaintiff or the

23   defendant.  The expert should champion what he or she believes

24   to be the truth, not the cause of one party in a dispute."

25   You support that guideline as well; right?

1   A.   I believe that is redundant.  I believe you already showed

2   us that one, but yes.

3   Q.   Did I?

4   A.   Yeah.

5   Q.   All right.  You haven't -- you haven't published anything

6   on the standard of care as it relates to sexual misconduct

7   against healthcare providers, have you?

8   A.   I have not but this case would certainly make a very good

9   -- a very good article.

10  Q.   And you haven't -- you haven't read anything on that

11  subject either, have you?

12  A.   I -- well, on what subject?  I guess you need to be more

13  specific in that question.

14  Q.   Well, I say you haven't -- you haven't read anything on the

15  standard of care as it relates to sexual misconduct against

16  medical care providers, have you?

17  A.   I guess you could -- I -- I've glanced but not thoroughly,

18  correct.

19  Q.   All right.  I think we talked about this, the theories that

20  -- that care -- that there can't be criminal and medical

21  malpractice at the same time, never been subject to peer

22  review; correct?

23  A.   I'll -- we talked about that in the last hour.

24  Q.   Yep.

25       Answer's still correct?

16-2627 Leininger v USA et al   7.8.20 Vol. 3          735

1    A.  I don't recall discussing that in the last hour.  No, I do

2    not.

3    Q.  Can you answer the question?

4    A.  I -- I didn't -- I didn't understand the question.  We did

5    not discuss it, so I -- was there I -- please ask the question

6    again.

7    Q.  Yeah.  The theories that there can't be criminal and

8    medical malpractice at the same time has never been subject to

9    peer review; correct?

10   A.  To my knowledge.

11        MS. HASTON:  Objection.

12        THE COURT:  Hold on.  What's the objection?

13        MS. HASTON:  Beyond the scope of direct.

14        THE COURT:  Overruled.

15        THE WITNESS:  So I guess to my -- I guess if I

16   remember the question properly, to my understanding there's not

17   been any research on that topic as yet, that is correct.

18   BY MR. KILGORE:

19   Q.  Okay.  All right.  In this case you focused on two things.

20   You focused on Dr. Kelley's report and the OIG report; correct?

21   A.  I would say it's fair to say those were the two major items

22   that I examined, that is correct.  I'm not --

23   Q.  You didn't read --

24   A.  Sorry.

25   Q.  You didn't read the VHA directives, did you?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                736

1   A.   Only in terms of what I saw reviewed with Dr. Kelley

2   yesterday during his testimony.

3   Q.   Did you watch his testimony?

4        That was the first time that you had seen the VHA

5   directives; is that right?

6   A.   The VA -- the VA directives were not relevant to the first

7   five paragraphs of Dr. Kelley's report, so I did not review

8   them thoroughly, no, I did not.

9   Q.   And you --

10  A.   And I was not asked to opine -- I was not asked to opine at

11  all on employer responsibilities or duties or supervising

12  physician responsibilities or duties.  I did not cover any of

13  those topics.  I did not read any of those topics.

14  Q.   But you -- but you opine on whether -- well, I'll withdraw

15  that.

16       You -- you didn't even -- you didn't even review the scope

17  of practice guidelines for PAs in forming your opinions, did

18  you?

19  A.   As I read -- I didn't need to.  And, as I saw them

20  yesterday with Dr. Kelley, they're no different than any other

21  clinic that I've been familiar with.  They really don't change

22  my opinion in any way.

23  Q.   And -- and they're -- they're no different -- they're no

24  different than any other clinic because physical examinations

25  are a routine part of a PA's practice; right?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                737

1    A.   When they're conducted in -- with a medical purpose --

2    Q.   Right.

3    A.   -- in a medical manner, then, yes, that is correct.

4    Q.   And -- and so -- so you agree that -- that physical exams

5    are routine, core part of Mr. Wisner's job; right?

6    A.   Absolutely.  They're part of all provider's jobs.

7    Q.   Okay.  Now, you -- you would agree that Mr. Wisner was --

8    was hired at the VA to perform physical exams; right?

9    A.   Yes, that's what PAs do.

10   Q.   Okay.  And -- and you would even agree with me that genital

11   exams are a routine part or a -- a proper part of a physical

12   exam when it's indicated; right?

13   A.   Yes, when it's indicated, that is correct.

14   Q.   And -- and PAs, in clinical practice like this, that

15   conducting genital exams is a routine, core function of the PA;

16   right?

17   A.   Yes.

18   Q.   Do you -- in your opinion, and I think you may have said

19   this, but that Mr. Wisner is an impaired practitioner?

20   A.   It would appear that he is an impaired practitioner but

21   does not preclude that he still has the ability to make

22   intelligent, human decisions.

23   Q.   Okay.  Did you -- did you ever look at -- did you ever look

24   at the consent order that was issued by the Kansas Board of

25   Healing Arts?

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    738

1    A.  You're referring to the order of voluntarily surrender?

2    Q.  Well, let me -- let me pull it up.  That's easier.

3    Exhibit 129, have you seen this document before, Mr. Nicholson?

4    A.  I may have thumbed through it but not carefully, no.

5    Q.  Okay.

6              MR. KILGORE:  Scott, if you can go to page 11.

7    BY MR. KILGORE:

8    Q.  You recognize that this is the order that was issued by the

9    Kansas Board of Healing Arts concerning Mr. Wisner?

10   A.  Yes.

11   Q.  All right.  I'm sorry, I'm not able to read my screen, so I

12   got to get a hard copy.

13       It says, in paragraph 38, Mr. Nicholson, that, "Licensee

14   violated K.S.A. 65-28a05(c) as further defined by

15   K.A.R. 100-28a-7(b) by repeated instances involving patients

16   one through seven in which he failed to adhere to the

17   applicable standard of care to a degree that constitutes

18   ordinary negligence when he repeatedly performed unnecessary

19   genital and testicular examinations, overmedicated patients,

20   failed to wear gloves, and did not refer patients as needed."

21       Did I read that correctly?

22   A.  Yes.

23   Q.  All right.  So you'd agree with me that at least as far as

24   the -- the Kansas State Board of Healing Arts goes, that board

25   disagrees with you; right?

16-2627 Leininger v USA et al   7.8.20 Vol. 3          739

```
1    A.   That board did state that he failed to adhere to the
2    applicable standard of care.  And my argument is that the
3    standard of care was not applicable, so yes --
4    Q.   I know.
5    A.   -- that's my interpretation, that is correct.
6    Q.   Okay.  So the Kansas -- so the State Board of Healing Arts
7    disagrees with you about whether the standard of care applies
8    or not and they -- they go on to say that doing so constitutes
9    ordinary negligence; right?
10              MS. HASTON:  Objection.
11              THE WITNESS:  According to this document however --
12              THE COURT:  Hold on.  Hold on.  There's an objection I
13   think.  Ms. Haston?
14              MS. HASTON:  Yes, Your Honor.  Assumes facts not in
15   evidence.
16              MR. KILGORE:  I put it in evidence.  It's in.
17              THE COURT:  Hold on just a second.  I'm trying to
18   understand the objection before I hear from you, Mr. Kilgore.
19              MR. KILGORE:  I'm sorry.
20              THE COURT:  What -- what does it assume that's not in
21   evidence, Ms. Haston?
22              MS. HASTON:  That the Kansas Board of Healing Arts
23   made a decision that the standard of care does apply to
24   Mr. Leininger.
25              THE COURT:  Well, I think this is fair ground for
```

```
1    cross-examination.  I do understand your point that, at least
2    to my knowledge, Mr. Kilgore, this order does not identify our
3    plaintiff as someone involved.  But I think the -- the question
4    -- I think the question is appropriate for cross-examination of
5    an expert who has rendered opinions as this one has, so I'm
6    overruling the objection.
7              THE WITNESS:  And I really didn't finish my answer.
8              THE COURT:  All right.  I don't even think you had
9    started your answer because I stopped you.  So, Mr. Kilgore,
10   can you restate your question to the witness?
11             MR. KILGORE:  Yeah.
12   BY MR. KILGORE:
13   Q.  I mean, the question is:  It's clear that the Kansas Board
14   -- State Board of Healing Arts disagrees with you with respect
15   to this conduct and whether or not the standard of care applies
16   and that this conduct violated the standard of care and
17   constituted ordinary negligence, disagrees with your -- with
18   your contentions here today; correct?
19   A.  In my -- and my response to that is that this states he
20   failed to adhere to the applicable standard of care.  So this
21   document has the assumption built in that there was an
22   applicable standard of care, and from that framework I
23   understand where they're coming from.  But that is not my
24   opinion.  I -- it is my opinion, as you know, that the standard
25   of care was not applicable to the situations where criminal
```

1    malintent was intended.

2    Q.   All right.  And you -- you also -- you also testified on --

3    on your direct -- and I think on cross too -- that if the

4    provider doesn't wear gloves, the standard of care no longer

5    applies; right?

6    A.   If the provider does not wear gloves with the purpose of

7    something other than medical necessity or medical care, then,

8    yes, that would be, and specifically with malintent, as in this

9    case for personal sexual pleasure, then obviously that's not

10   medical care, that's correct.

11   Q.   Right.  But you say -- but you said -- you said on your

12   direct that if -- if a practitioner fails to wear gloves, that

13   the standard of care doesn't apply to that and -- and because

14   there's no -- there's no medical reason not to wear gloves;

15   right?

16   A.   I certainly cannot think of one.  If someone can come up

17   for a reason of why they wouldn't, then I'm open -- I'm open to

18   listening to that argument for sure.

19   Q.   I understand.  But your testimony is the standard of care

20   doesn't apply when a practitioner doesn't wear gloves during a

21   genital exam; right?

22   A.   Only under those circumstances and framework that I

23   outlined.

24   Q.   Does the standard of care require that a practitioner wear

25   gloves during a genital exam?

1    A.   Typically a genital exam is conducted with gloves, that --

2    that is true.

3    Q.   Does the standard of care require it, Mr. Nicholson?

4    A.   Typically, yes.

5    Q.   It does, doesn't it?

6    A.   Yes.

7    Q.   The standard of care requires that a practitioner wear

8    gloves during a genital exam; correct?

9    A.   Typically, yes.

10   Q.   All right.  I just have I think just one last area.

11        All right.  You -- you had made the -- the mention in your

12   report and I think you did on your direct too about the fact

13   that, in your -- in your view, Mr. Wisner would have sexually

14   abused individuals no matter what job he was in?

15   A.   I think that became pretty clear from his testimony

16   regarding his substitute gym teacher job which he -- which he

17   took and was going to surrender his teacher's license because

18   he couldn't control himself and was impaired what he might do

19   in that situation as well.  The answer is yes.  So the answer

20   is, yes, based upon -- based upon that.

21   Q.   Understood.

22        But you -- you certainly would agree that the only jobs out

23   there that include job duties which require the individual to

24   -- to touch genitalia are medical jobs; right?

25   A.   I think that's a fair statement.

16-2627 Leininger v USA et al   7.8.20 Vol. 3          743

1    Q.  Fair; right?

2    A.  I can't -- well, I can't think of any other -- well, maybe

3    a tattoo artist, maybe some who does hair transplantation.  I

4    mean, there may have been other -- there may be another avenue,

5    absolutely.

6    Q.  Just regular, routine -- regular, routine job duties when

7    it comes to -- to that sensitive, you know, and private areas

8    like that, that's medical professionals, right, they're the

9    ones?

10   A.  I would say that's one of them.  One of them.

11          MR. KILGORE:  All right.  I don't have any further

12   questions.

13          THE COURT:  Ms. Haston, do you wish to redirect?

14          MS. HASTON:  Yes, Your Honor.

15                    REDIRECT EXAMINATION

16   BY MS. HASTON:

17   Q.  Mr. Nicholson, you were asked some questions about what

18   plaintiffs marked as Exhibit 227, The Professional Guidelines

19   for the Physician Assistant Serving as an Expert Witness.  Do

20   you recall that?

21   A.  I do.

22   Q.  And do you believe you complied with those guidelines in

23   serving as an expert witness in this case?

24   A.  Yes, without question.

25   Q.  If we could pull up Plaintiff's Exhibit 161.  Now, you were

1    also asked a number of questions about the medical records,

2    whether you reviewed any specific to Mr. Leininger.  Do you

3    recall that?

4    A.  Yes.

5    Q.  Okay.  In responding to Dr. Kelley's report and forming

6    conclusions based on what Dr. Kelley opined, did you accept as

7    true the description of the genital exams provided in

8    Dr. Kelley's report?

9    A.  I did.  I granted him that, yes.

10   Q.  Flip to page 2.  This is Exhibit 161.  Plaintiff's

11   Exhibit -- I'm just pulling it up.  This first point which you

12   responded to, Dr. Kelley said Mark Wisner deviated from the

13   standard of care in his performance of genital exams, did you

14   accept as true his statement that on nearly every visit

15   Mr. Wisner required the patient to remove his clothing from the

16   waist down so he could exam his genitalia?

17   A.  Yes, I did.

18   Q.  A little further down, "Furthermore, while a genital exam

19   is indicated with a complete physical or if a patient has a

20   specific complaint, it is not appropriate with other types of

21   visits, such as when the patient follows up for a refill of his

22   routine medications."

23       Did I read that correctly?

24   A.  Yes.

25   Q.  Did you accept as true that Mr. Wisner performed genital

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    745

1   examinations on Mr. Leininger for other types of visits such as

2   when he would follow up for a refill of his routine population?

3   A.   Yes.

4   Q.   I'm moving on to the second point.  Towards the bottom it

5   says, "Mr. Wisner never wore gloves while performing his

6   genital exams of Aaron Leininger."

7        Did I read that correctly?

8   A.   Yes.

9   Q.   And, in forming your opinions in this case, did you accept

10  as true that Mr. Wisner never wore gloves while performing his

11  genital exams of Mr. -- of Aaron Leininger?

12  A.   Yes, I accepted that and my conclusion was based upon all

13  the evidence that I read that the intent of not wearing gloves

14  was for sexual pleasure.

15  Q.   Thank you.

16       So now the third point regarding the length of time

17  Mr. Wisner spent on these genital examinations, towards the

18  bottom it says, "Mr. Wisner performed excessively long genital

19  exams upon Aaron Leininger."

20       Did I read that correctly?

21  A.   Yes.

22  Q.   Did you accept as true that Mr. Wisner performed

23  excessively long genital exams on Mr. Leininger when you formed

24  your opinions in this case?

25  A.   Yes, and I would agree that two to three minutes that

16-2627 Leininger v USA et al   7.8.20 Vol. 3                746

1    Dr. Kelley points out here is excessively long.

2    Q.   Okay.  And so you mentioned two to three minutes.  On

3    page 3, towards the top paragraph of the page there, there's a

4    sentence in Dr. Kelley's report that reads, "By taking two to

5    three minutes to do his exam, Mr. Wisner went well beyond an

6    appropriate time frame and," per Dr. Kelley, "deviated from the

7    standard of care."

8         So in forming your opinions in this case, did you accept as

9    true Mr. Wisner took two to three minutes to do his genital

10   examinations of Mr. Leininger?

11   A.   Yes, I did.

12   Q.   Okay.  And now moving on to point 4 of Dr. Kelley's report

13   towards the bottom beginning with, "However, even couched as

14   humor, Mr. Wisner chose to question Aaron Leininger's sexual

15   history on every visit eliciting explicit details as to the

16   patient's current sexual encounters.  There was not a clearly

17   documented reason for asking such repeated probing questions."

18        Did I read that correctly?

19   A.   Yes.

20   Q.   And did you accept those facts as true in forming your

21   opinions in this case?

22   A.   Yes, I did.

23   Q.   Okay.  And, lastly, point five, if we could move to page 4

24   of this document towards the bottom, the very last sentence

25   says, "Mr. Wisner" -- this is again Dr. Kelley's opinion --

16-2627 Leininger v USA et al   7.8.20 Vol. 3                747

```
 1    "deviated from the standard of care when he failed to remove
 2    himself from patient care prior to seeing Aaron Leininger after
 3    recognizing sexual curiosities mixing with his goal of
 4    providing a thorough medical care."
 5       So did I read that correctly?
 6   A.  You did.
 7   Q.  In forming your opinions in this case, did you accept as
 8   true that Mr. Wisner recognized sexual curiosities prior to
 9   seeing Mr. Leininger?
10   A.  Yes.
11   Q.  And so you accepted as true Dr. Kelley's description of the
12   genital examinations that Mr. Wisner performed on
13   Mr. Leininger; is that correct?
14   A.  I did and therefore there was no need for me to look at any
15   specific clinical encounter because I -- it's built into
16   Dr. Kelley's report and I accept them as valid.
17   Q.  And did Dr. Kelley refer to any specific encounter --
18   A.  He did not.
19   Q.  -- in his report?
20   A.  He did not, no.
21   Q.  Okay.  Just a few -- few more questions.  Is there ever a
22   medical purpose to sexually assault a patient?
23   A.  No.
24   Q.  Is there ever a medical purpose to sexually molest a
25   patient?
```

```
 1   A.  No.

 2         MS. HASTON:  All right.  No further questions.  Thank

 3   you.

 4         THE COURT:  Any cross for the witness?

 5         MR. KILGORE:  Just one more question, Your Honor.

 6                       RECROSS-EXAMINATION

 7   BY MR. KILGORE:

 8   Q.  Mr. Nicholson, does the standard of care require that an

 9   impaired practitioner remove themselves from -- from clinic

10   practice and seeing patients?

11   A.  I would say if -- if they recognize their impairment, yes.

12   However, if they still have the intent in making that decision

13   of continuing to practice even though they know they're

14   impaired, that -- that that is, again, criminal behavior,

15   criminal intent.

16         MR. KILGORE:  No further questions.

17         THE COURT:  Anything else for the witness?

18         MS. HASTON:  No, Your Honor.

19         THE COURT:  All right.  May the witness be excused?

20         MS. HASTON:  Yes, Your Honor.

21         THE WITNESS:  Thank you.

22         THE COURT:  I assume plaintiff does not object.

23         MR. KILGORE:  No objection, Your Honor.

24         THE COURT:  All right.  Very well, sir.  You may cease

25   your transmission.
```

1        Let me catch up on my notes.  Just a second here,

2   counsel.  All right.  So tell me a little scouting report from

3   the defendant's side of the caption what we have in store for

4   tomorrow.

5        MR. EISER:  We will call Dr. Alan Abrams, the United

6   States expert psychiatrist, and we're going to talk in a bit

7   about whether we will call Dr. Clark our economist.  We don't

8   -- at this point we're not sure that we'll even need to.  Then

9   we'll rest.

10        THE COURT:  Okay.  All right.  I guess it's a little

11   early to ask you, Mr. Thomas, about whether you plan rebuttal.

12        MR. THOMAS:  I wanted to ask the court's permission,

13   I'm going to make sure I'm clear, I was going to ask

14   Dr. Peterson to listen to the deposition (sic) of his

15   counterpart tomorrow morning so that we could decide if we want

16   to call him to rebut any of the opinions.

17        THE COURT:  You said deposition.  I think you meant

18   his testimony tomorrow.

19        MR. THOMAS:  Yes, sir.  I'm sorry.

20        THE COURT:  That's all right.  I thought that's what

21   you meant.  That was the ruling pretrial that the experts could

22   listen to their opposite number in the case.  I probably

23   expressed it a little more coyly than I should.  If an expert

24   wants to listen to another expert testify, that's permissible.

25   I don't want to try to get into the business of which experts

16-2627 Leininger v USA et al   7.8.20 Vol. 3                750

1    can listen to other experts.  If you're -- if you're a

2    designated expert, you can listen to other designated experts

3    and vice versa.

4             MR. THOMAS:  Thank you, Your Honor.

5             THE COURT:  All right.  Before we part company for the

6    evening, plaintiff, have other case management things we should

7    be aware of or talk about?

8             MR. THOMAS:  No, Your Honor.  I did want to -- the

9    court indicated that it was going to offer some further

10   guidance or comment on the motion for directed verdict and I

11   wanted to address that.

12            THE COURT:  You won the motion.

13            MR. THOMAS:  Sometimes I go looking for trouble.

14            THE COURT:  You want a chance to snatch defeat out of

15   the jaws of victory.

16            MR. THOMAS:  Sometimes I don't know what I'm doing,

17   Your Honor.

18            THE COURT:  I denied the motion.  I'm planning to

19   provide -- I wanted some time to organize my thinking for

20   ruling and not to consume the time of the parties needlessly.

21   I'll do that.  I'm looking forward to doing that in the morning

22   or some time during the morning session tomorrow.

23            MR. THOMAS:  Understood.

24            THE COURT:  Okay.  Anything else, Mr. Thomas?

25            MR. THOMAS:  Oh, yes.  You know, can we find out how

1    much time we have in the morning?

2         THE COURT:  You can.  We'll keep it a secret overnight

3    but we'll do -- it's high math.  We'll work on it overnight,

4    check it with the folks at MIT and get that to you in the

5    morning.

6         MR. THOMAS:  Understood, Your Honor.

7         THE COURT:  And same true --

8         MR. THOMAS:  What time tomorrow?

9         THE COURT:  Well, let me just ask:  Is there any

10   thought that we would finish the evidence tomorrow?

11        MR. EISER:  I would estimate we would.  I don't know

12   what the rebuttal expert testimony's going to be, but I don't

13   expect to be very long with Dr. Abrams.  And, as I said, I

14   think we're going to release Dr. Clark, but we need to talk

15   about it -- I need to talk about it with my supervisors.

16        THE COURT:  Yeah, well, I mean, I'm not -- I'm not

17   going to take back anybody's hours tomorrow.  I think the

18   examinations have been well-intentioned and I'm not -- I'm not

19   going to dock anybody.

20        So, Mr. Thomas, from your perspective, if you were to

21   call Dr. Peterson again -- and please tell your doctors, I -- I

22   developed a habit in the jury setting of never referring to a

23   witness, whether they be an agent, a special agent, an officer

24   or a doctor, anything other than mister or miss, and I may have

25   referred, carrying that habit into this setting, and called a

1   doctor or two mister.  Please ask them not to be offended by

2   that.  It's a habit trying to remain right down the middle of

3   the cases.

4          So, Mr. Thomas, if you do recall -- if you were to

5   recall Dr. Peterson, I know he is local, do you anticipate you

6   could fetch him tomorrow for rebuttal?

7          MR. THOMAS:  Yes, I do, Your Honor.

8          THE COURT:  Well, let's do this:  If it's not a great

9   inconvenience to you all, let's try for 8:45 start time again.

10  I can start sooner than that because I awake at all hours and

11  can come in earlier.  If 8:45 is convenient for everyone, let's

12  aim for that.

13         MR. EISER:  Yes, Your Honor.

14         THE COURT:  All right.  Anything from the defense room

15  of a management, logistical concern we ought to take up?

16         MR. EISER:  No, Your Honor.  Thank you.

17         THE COURT:  All right.  Thank you all for your

18  presentations.  We'll go ahead and close the record and be in

19  recess until the morning.

20      (Proceedings adjourned to July 9th, 2020, at 8:45 a.m.)

21

22

23

24

25

16-2627 Leininger v USA et al   7.8.20 Vol. 3                    753

1                        CERTIFICATE

2         I certify that the foregoing is a true and correct

3    transcript from the stenographically reported proceedings in

4    the above-entitled matter.

5         DATE:  March 5, 2021

6

7                    /s/Kimberly R. Greiner
                     KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
8                    United States Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25