<pre>
 1                 UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS
 2

 3   AARON LEININGER,                  Case No. 16-2627
                                       Circuit No. 21-3031
 4     Plaintiff,

 5     v.                             Kansas City, Kansas
                                       Date:  07/09/2020
 6   UNITED STATES OF AMERICA
     and MARK E. WISNER,
 7                                     Volume 4
       Defendants.                     (Pages 754-902)
 8
     ..........................
 9

10

11                 TRANSCRIPT OF BENCH TRIAL
                         Via Zoom
12
             BEFORE THE HONORABLE DANIEL D. CRABTREE
13              UNITED STATES DISTRICT COURT JUDGE

14   APPEARANCES:

15   For the              Daniel A. Thomas
     Plaintiff:           Michael S. Kilgore
16                        Humphrey, Farrington & McClain
                          221 West Lexington Avenue
17                        Suite 400
                          Independence, MO 64050
18

19   For the United       Lawrence Eiser
     States of America:   Sarah Haston
20                        U.S. Department of Justice
                          Civil Division, Torts Branch
21                        Benjamin Franklin Station
                          P.O. Box 888
22                        Washington, DC 20044

23

24   _____
        Proceedings recorded by machine shorthand, transcript
25   produced by computer-aided transcription.
</pre>

1                          I N D E X

2                                                        Page

3      Rule 52(c) Detailed Decision by the Court         756

4
       Defendant's Witnesses:
5
       ALAN A. ABRAMS, M.D., J.D.
6        Direct Examination By Mr. Eiser               760
         Cross-Examination By Mr. Thomas               817
7        Redirect Examination By Mr. Eiser             875
         Recross-Examination By Mr. Thomas             879
8

9      Plaintiff's Rebuttal Witnesses:

10     STEPHEN E. PETERSON, M.D.
         Direct Examination By Mr. Thomas              884
11

12
                           E X H I B I T S
13
         Plaintiff's
14       Exhibits              Offered         Received

15          129A                895              895
            129B                895              895
16          129C                895              895
            129D                895              895
17          210                 843              843
            248                 849              849
18

19       Defendant's
         Exhibits              Offered         Received
20
            448                 763              763
21

22

23

24

25

 1          (Court called to order 8:49 a.m.)

 2          THE COURT:  Good morning, everyone.  This is Dan

 3   Crabtree.  Let me move around the caption and make sure

 4   everyone is broadcasting this morning.  From the plaintiff's

 5   room is everyone able to see me and hear me all right?

 6          MR. THOMAS:  Yes, we are, Your Honor.

 7          THE COURT:  Good morning.

 8          And from the defendant's room?

 9          MR. EISER:  Yes, we can hear you, Your Honor.

10          THE COURT:  All right.  And, Ms. Greiner, you got all

11   the parties and me and your sound double?

12          All right.  Counsel, good morning.  I do want to

13   just -- before we move to the day's events, I told you I wanted

14   the overnight recess to gather my thoughts about the

15   defendant's Rule 52(c) motion yesterday afternoon, which I

16   ruled against.  I wanted to prepare and extend my rationale and

17   I'm prepared to give you that now.

18          Yesterday the defendant made three arguments why he is

19   entitled to judgment of the plaintiff's evidence.  The

20   arguments were first the statute of limitation bars its claims;

21   second, Mr. Wisner's acts were not within the scope of his

22   employment so the defendant cannot be held vicariously liable;

23   and, third, Mr. Wisner -- Mr. Wisner's acts were intentional.

24          The FTCA does not provide -- does not provide a cause

25   of action for intentional torts and the VA immunity statute

1  does not apply because the acts were taken in furnishing --

2  while furnishing medical care or treatment.

3      When the court reviews and considers and decides a

4  Rule 52(c) motion, as is made here, the court reviews all the

5  evidence thus presented without any presumptions favoring

6  either party.  The court does have discretion to defer rulings

7  until all the evidence has been presented.  But if the court

8  grants the motion, it, of course, must render full findings of

9  fact and conclusions of law.  Yesterday the court advised the

10  parties that it was denying the defendant's motion.  Now the

11  very brief statement of reasons summarizing that rationale.

12      First, the defendant has not yet met its burden to

13  show that the statute of limitation bars plaintiff's claims.

14  At a minimum, plaintiff's last visit with Mr. Wisner fell

15  within the two-year statute of limitations making a claim for

16  Mr. Wisner's actions during that visit timely.

17      The court remains unprepared to hold as a matter of

18  law that the discovery rule does not apply to the balance of

19  plaintiff's claims.  Judgment at the close of the -- close of

20  plaintiff's evidence based on the statute of limitations is

21  unwarranted.

22      Second, the court is not yet prepared to determine as

23  a matter of law that Mr. Wisner's acts were taken outside the

24  scope of his employment.  The court fully understands that the

25  defendant believes this much:  The question isn't whether

1    Mr. Wisner's acts were foreseeable to the VA because of

2    Mr. Wisner's past.  Instead, it is whether his acts were

3    foreseeable from the nature of the employment and the duties

4    pertaining to it.  But this theory, in my judgment, seems to

5    oversimplify the questions about scope of employment, and it

6    ignores the *O'Shea* factors that our circuit has held the Kansas

7    Supreme Court would apply to determine the depth or degree of

8    deviation an employee has taken.

9             This ruling, of course, does not finally reject

10   defendant's theory, but certainly at this stage the court is

11   not prepared to make findings that all evidence about

12   defendant's knowledge of Mr. Wisner's behavior is irrelevant to

13   plaintiff's negligence claim.

14            Third and final -- finally, the evidence still is

15   emerging on whether Mr. Wisner's acts were taken while

16   furnishing medical care or treatment.  Indeed, when the

17   defendant moved for partial judgment, defendant's expert Jeff

18   Nicholson had not yet testified about his theory that

19   Mr. Wisner stopped providing medical care the moment he began

20   taking an action designed to satisfy his own curiosity or

21   sexual pleasure.

22            Judgment is not yet proper on plaintiff's outrage

23   claim as well.

24            To be clear with everyone, the court does not intend

25   for any of these rulings to be final or determinative of the

1   outcome of the case.  The court merely holds that at this stage

2   judgment based on partial findings is unwarranted.  The court,

3   thus, declines to grant the defendant's judgment and enter

4   judgment at the close of evidence.

5        I'll simply add one clarification, really correction.

6   Yesterday, in my preview -- very hurried preview of the summary

7   for my rationale, I believe I ruled -- I referred to Rule 50 of

8   the federal rule -- Rules of Civil Procedure and its standard

9   which, of course, applies at a jury trial.  All I can say, in

10  my defense, is old habits die hard and this is why I wanted the

11  overnight recess to collect my thoughts and organize these

12  comments.  These comments this morning are intended to replace

13  and supersede yesterday's informal and, unfortunately, hurried

14  commentary.  So that's the ruling and the explanation for it.

15       With that I'll simply share the clock findings.  The

16  court's calculation has five minutes and six -- I'm sorry, five

17  hours and six minutes left on the plaintiff's clock and

18  11 hours 35 minutes left on the defendant's side of the

19  caption.  Of course, no party is obligated to use all of their

20  time.

21       All right.  I took over the agenda.  Is there anything

22  we need to take up before we begin our proceedings this morning

23  of defendant's next witness from the plaintiff?

24       MR. THOMAS:  No, Your Honor.

25       THE COURT:  All right.  And in the defendant's room?

 1          MR. EISER:  No, Your Honor.  Thank you.

 2          THE COURT:  All right.  Mr. Eiser, I see you on your

 3    feet; you may call your next witness.

 4          MR. EISER:  Thank you, Your Honor.  The -- the United

 5    States calls Dr. Alan Abrams to the stand.

 6          THE COURT:  All right.  Dr. Abrams, please --  yeah,

 7    let me get the witness sworn in, then I'll turn over to you.

 8          Dr. Abrams, if you'd raise your right hand to accept

 9    the oath from the deputy clerk.

10          THE WITNESS:  Yes, sir.

11               ALAN A. ABRAMS, M.D., J.D.,

12    called as a witness on behalf of the Defendant, having first

13    been duly sworn, testified as follows:

14          THE COURT:  Thank you, sir.  Can I just ask you to say

15    and spell both halves of your name?

16          THE WITNESS:  Yes.  First name Alan, A-L-A-N, last

17    name Abrams, A-B-R-A-M-S.

18          THE COURT:  Thank you, sir.  This is one of the hidden

19    advantages of a Zoom trial.  I see your name now appearing on

20    the Zoom screen and I suspect we could have surmised that you

21    would spell it correctly when you set up your account, but

22    thank you nonetheless.

23          THE WITNESS:  Thank you.

24          THE COURT:  Mr. Eiser, you may proceed.

25                    DIRECT EXAMINATION

```
1    BY MR. EISER:

2    Q.   Doctor, tell us your full name, please.

3    A.   Alan A. Abrams.

4    Q.   And how are you employed, sir?

5    A.   I am self-employed at the present time primarily

6    specializing in forensic psychiatry.

7    Q.   And are you a licensed psychiatrist?

8    A.   I am a licensed physician and surgeon in the state of

9    California and have a specialty in psychiatry.  I am board

10   certified in general psychiatry, addiction psychiatry, forensic

11   psychiatry, and also in preventative medicine, subspecialty

12   addictive medicine.

13   Q.   Without giving your full address, where are you today?

14   A.   I'm in my home office today in San Diego.

15   Q.   In what -- okay.

16        What have you been asked to do by the United States in this

17   case?

18   A.   I was asked to evaluate a substantial number of medical

19   documents and to assess whether Mr. Leininger has suffered any

20   mental damages as a result of his interactions with a

21   Mr. Wisner, a physician's assistant at the Leavenworth VA

22   Medical Center.  And if so, what was the extent of his damages

23   and what sort of therapy or treatment would be needed to remedy

24   those damages.

25   Q.   Thank you.
```

 1      Let's tell this court about your education.  What's your

 2   undergraduate degree and where did you go?

 3   A.   I attended the University of Rochester in Rochester,

 4   New York, majoring in psychology.  I graduated in 1970 with my

 5   bachelor's phi beta kappa.

 6   Q.   And do you have a medical degree?

 7   A.   Yes, I do.

 8   Q.   Where --

 9   A.   I attended the University of California, San Diego School

10   of Medicine, and graduated 1974 with my medical degree.

11   Q.   And following the graduation, did you do a medical

12   internship?

13   A.   Yes.  I did a internship at UCLA Harbor General Hospital.

14   It was a combined internship in medicine and psychiatry.

15   Q.   And following that, did you do a medical residency?

16   A.   Yes.  I did a medical residency and a fellowship in

17   psychopharmacology at the University of California, San Diego

18   in the Department of Psychiatry.  I was the chief resident in

19   my final year, and I finished my residency in 1979.

20   Q.   Are you a member of any medical associations or societies?

21   A.   Yes.  I'm a member of the American Medical Association, a

22   member of the American Association of Addiction Psychiatry, and

23   the American Bar Association, the California Bar Association,

24   and locally the San Diego Society for Psych and Law.

25   Q.   And have you published in -- in the field of psychiatry?

16-2627 Leininger v USA et al   7.9.20 Vol. 4       763

1   A.   Yes, I've written a number of journal articles and also

2   chapters in national textbooks.

3   Q.   Okay.  And are those publications listed in your CV?

4   A.   Yes, they are.

5   Q.   Okay.  I don't want to go through them.  Let me mark --

6   well, your CV has been marked as United States Exhibit 448.  Do

7   you have -- do you have your CV in front of you?

8   A.   I'm well aware of it.

9   Q.   Okay.

10       MR. EISER:  The United States would move the U.S.

11  Exhibit 448 into evidence.

12       THE COURT:  Any objection to 448?

13       MR. THOMAS:  No, Your Honor.

14       THE COURT:  448 is received.

15       MR. EISER:  All right.

16  BY MR. EISER:

17  Q.   Have you held teaching positions --

18  A.   Yes.

19  Q.   -- in your --

20  A.   Since 1979 with occasional interruptions, I have been

21  teaching medical students and psychiatric residents and

22  forensic psychiatry fellows continuously except during the time

23  I was in law school and the time when I was working at the

24  California Medical Facility, a state prison in Vacaville,

25  California.

16-2627 Leininger v USA et al   7.9.20 Vol. 4     764

1  Q.  Okay.  What formal teaching positions have you held?

2  A.  I've been an assistant professor of psychiatry, clinical

3  psychiatrist at the University of California, San Diego since

4  1979, and from 2004 to 2008 I was a clinical professor of

5  psychiatry at Georgetown University, at the same time I was the

6  director of the St. Elizabeth's Psychiatric Residency and the

7  combined St. Elizabeth's Georgetown Forensic Psychiatry

8  Fellowship.

9  Q.  What is your specialty or specialties, Dr. Abrams?

10  A.  I would say my specialties are clinical psychiatry,

11  psychopharmacology, addiction psychiatry, and, of course,

12  forensic psychiatry.

13  Q.  We've talked about this in the case.  What's the difference

14  between forensic psychiatry and clinical psychiatry?

15  A.  Well, clinical psychiatry is designed to treat the

16  patient's reported symptoms, problems, conflicts, behavioral

17  problems and/or substance abuse problems.

18      Forensic psychiatry is instead designed to provide an

19  objective, accurate assessment of the patient in all his or her

20  totality, and then specifically to address the legal questions

21  involved:  whether they are insanity mitigation, competency, or

22  in this case mental health damages.

23  Q.  How -- well, when you do a forensic analysis, are you

24  typically doing that for a -- the patient him or herself or for

25  a third party?

16-2627 Leininger v USA et al   7.9.20 Vol. 4                765

1    A.   It could be either.  For instance, sometimes I'm contacted

2    by a person to assess their mental state if they want to write

3    a will.  Sometimes I'm contacted most often by either the

4    court, a criminal defense attorney, a prosecutor, a judge, or

5    in this case the United States, to perform a forensic

6    psychiatric evaluation.  So most of my work is for third

7    parties.

8    Q.   Okay.  How many forensic analyses of mental health problems

9    with plaintiffs -- I'm sorry.

10        How many forensic analyses of people have you done?

11   A.   Well, I've been practicing for about 41 years since I

12   completed my residency, and during my residency I did some

13   forensic evaluations, but I would say in a typical year I do

14   between 50 and a hundred forensic evaluations.  Of course, when

15   I was in law school, I was much less active in my practice.  So

16   I would estimate somewhere above 2,000 formal forensic

17   evaluations of all sorts:  civil, criminal, and administrative

18   or quasi-criminal.

19   Q.   You mentioned that you went to law school.  How did that

20   come about?

21   A.   Oh, I was doing a fair amount of forensic work and I felt

22   very frustrated when I would go to court and I'd be asked a

23   question and then there would be a sidebar and maybe I'd be

24   allowed to answer, maybe I wouldn't, and it really puzzled me

25   why that was when I thought I had useful information to share

16-2627 Leininger v USA et al   7.9.20 Vol. 4

766

1   with the trier of fact.  And I talked with various people, and

2   including my wife at the time, and I thought I should go to law

3   school if I am going to make forensic psychiatry the center of

4   my practice because I need to know what goes on, particularly

5   the Rules of Evidence, what standards are applied to various

6   court hearings and so on.  And so I applied to the University

7   of California, Berkeley, School of Law, and was accepted and

8   attended.

9   Q.  And did you graduate?

10  A.  Yes.  I graduated in 1992 in the upper five percent of the

11  class and was Order of the Coif, and I was an editor of the *Law*

12  *Review*.

13  Q.  Have you been qualified as -- to testify as an expert in

14  the field of psychiatry in federal courts of the United States?

15  A.  Yes, I have, on several occasions.

16  Q.  And state courts?

17  A.  Yes, and state courts also in various states.

18  Q.  We skimmed over your employment.  Tell the court about your

19  employment in the psychiatric field, how has that progressed

20  after -- after you graduated from your -- after you finished

21  your medical internship?

22  A.  Yes.  So I was employed by the La Jolla, San Diego Veterans

23  Hospital during my residency and during my fellowship and also

24  for the years after graduating from my training.  I had been in

25  private practice since graduating from my training in 1979.

 1      I worked, after I graduated from law school, for the County

 2   of San Diego in its jail system for the County of Riverside,

 3   California in its forensic program and for the State of

 4   California in the prison system as a chief psychiatrist at two

 5   of the state prisons.  I was the chief psychiatrist at

 6   Centinela State Prison from 1979 to 2003 and at the California

 7   Medical Facility in Vacaville, California from 2010 to 2012.  I

 8   was a senior psychiatrist there from 2008 to 2010.

 9      I was employed by the District of Columbia in Georgetown

10   University from 2004 to 2008 for my teaching activities and to

11   establish the forensic psychiatry fellowship.

12   Q.  And in addition to the positions you've talked about, you

13   also had a private practice of psychiatry since '79; is that

14   right?

15   A.  Yes, that's correct.  And at times I have worked what is

16   called locum tenens where the physician or the psychiatrist

17   works for a agency that is contracted with a hospital or an

18   institution to provide services.  So for a number of years I

19   would work about 20 to 40 hours a month in the San Diego County

20   Public Psychiatric Hospital and at other times in state

21   prisons.

22   Q.  Okay.  Do you have experience treating military veterans?

23   A.  Yes, I do.

24   Q.  Can you describe -- is -- is -- the extent of it?

25   A.  Yes.  All through my residency, I was assigned to the

1    San Diego La Jolla Veterans Hospital on the Psychiatric

2    Emergency Room, on the psychiatric treatment -- Inpatient

3    Treatment Units, on the Substance Abuse Inpatient Units.  The

4    year after I finished my residency, I worked at the VA Hospital

5    treating veterans and doing research with psychiatrically ill

6    veterans.

7        Through the course of my career, I have seen a number of

8    veterans who have been allowed to see private psychiatrists

9    either because they needed more treatment than the VA Hospital

10   could perform in its outpatient unit or for some specialty

11   psychopharmacological treatment, and I have seen and treated

12   quite a number of veterans in the jails and prisons.

13   Q.   Have -- have you -- do you have experience treating

14   veterans who suffer from PTSD symptoms?

15   A.   Yes.  With the exception of the veterans I treated as

16   private patients through the third-party payor system, nearly

17   all of the veterans I have treated have had either or both

18   PTSD, substance abuse, substance use disorders, and possibly a

19   third comorbid psychiatric illness.

20   Q.   Do you have experience treating victims of sexual trauma?

21   A.   Yes.  I have evaluated and treated both victims of sexual

22   trauma and perpetrators of sexual trauma.

23   Q.   Okay.  And does that include male patients who experienced

24   sexual trauma?  Do you have experience with that?

25   A.   Yes.  Surprisingly, or unsurprisingly, a number of the

1    prisoners reported sexual trauma, and we set up a program to

2    treat both prisoners who were sexual offenders, prisoners who

3    were victims of sexual abuse, and, of course, a large number

4    who were both.

5    Q.   What materials have you reviewed in -- in reviewing this

6    case?

7    A.   Let's see, I may omit some --

8         (Computerized voice interruption.)

9         THE COURT:  Let's work on the technical interruption

10   here.

11        THE WITNESS:  I'm sorry, I have an Alexa.  You're

12   supposed to say, "Hey, Alexa," but sometimes it hears stray

13   voices.

14        Anyways, I was provided with a very large number of

15   medical records related to Mr. Leininger's treatment at the

16   Leavenworth, Kansas VA Medical Center, the Topeka, Kansas VA

17   Medical Center, the University of Kansas outpatient clinic,

18   primary care clinic I think it was called.  I recently received

19   records from a Dr. King at Provident (sic) Medical Center

20   Group.  I reviewed quite a number of legal records, including

21   in this case Mr. Leininger's legal filings, his interview with

22   a Mr. Kerry Baker, his deposition.  I interviewed Mr. Leininger

23   in person.

24   BY MR. EISER:

25   Q.   We're going to get -- I'm going to talk about the

16-2627 Leininger v USA et al   7.9.20 Vol. 4          770

1    interview, but was there anything else you reviewed in

2    preparing your opinion documents?

3    A.   Yes.   I reviewed a report by a Dr. Stephen Peterson.   And I

4    think that's probably the entirety of the information I

5    reviewed.

6    Q.   Okay.   And, in addition, I think you mentioned you also did

7    an interview -- or you tell me -- you met with Mr. Leininger?

8    A.   Yes.

9    Q.   Tell -- tell me what was the purpose of that and what

10   happened.

11   A.   Well, the Federal Rules of Evidence, as you are well aware,

12   allows for a independent psychiatric examination of a plaintiff

13   in certain cases, civil cases.   And in line with the Federal

14   Rules, I examined Mr. Leininger in April of 2019.   He had

15   missed an appointment set up in December 2018.   I examined

16   Mr. Leininger face-to-face for approximately four hours.   It

17   was video-recorded.   And then I administered the Minnesota

18   Multiphasic Personality Inventory, Second Edition, which took

19   two hours for Mr. Leininger to complete.   It was then scored

20   and interpreted by a computerized service which then produced a

21   report and assessment based on Mr. Leininger's responses.

22   Q.   Okay.   Based on your review of all of these materials, your

23   interview and examination of the plaintiff and your

24   professional education and experience, have you formed an

25   opinion to a reasonable degree of psychiatric certainty that is

1    more probably true than not true regarding what injury

2    Mr. Leininger suffered as a result of his encounters with

3    Mr. Wisner in 2012, '13 and '14?

4    A.   Yes, I have formed an opinion and provided it in a report I

5    did for your office following my -- my IPE and review of all

6    the records.  At the time I did not have plaintiff's records

7    from Dr. King at Provident Medical Group, but those records

8    only further confirmed my opinions.

9    Q.   What is your opinion regarding the injury -- the mental

10   health injury that Mr. Leininger suffered as a result of his

11   encounters with Mr. Wisner?

12        And, in answering that question, of course, we've -- we're

13   accepting that -- that he was, as he says, fondled nine times

14   during 2012, '13 and '14 during visits.  Assuming that to be

15   true, as we are, what injury has he suffered from those

16   encounters?

17   A.   Yes.  As I indicated in my report, I believe the primary

18   injury to Mr. Leininger is that he is angry at Mr. Wisner, but

19   the extent of the damage is objectively minimal.

20   Q.   All right.  Let's go back.  I think to understand that,

21   we've been hearing from -- from the plaintiff during this trial

22   about Larry Nassar and various other horrific events.  And I

23   want to understand how it is that your opinion is that he's

24   only suffered minimally from these encounters.  So let's go

25   back to understand what his condition was previously.  Describe

16-2627 Leininger v USA et al   7.9.20 Vol. 4

772

1   the extent of the plaintiff's mental health status, condition,

2   symptoms before he encountered Mr. Wisner, please.

3   A.   From what the records document, Mr. Leininger was very

4   severely mentally ill in June 2011 such that an emergency

5   psychiatric hospitalization was necessary for the safety of the

6   community.

7       Mr. Leininger was evaluated by a Dr. Wendler in 2010 which

8   documented a very large number of mental health symptoms of a

9   moderate to severe degree.  These symptoms included a reported

10  20-year history of persistent, constant insomnia such that in

11  2011 the insomnia caused him to become psychotic and

12  hallucinate; persistent anxiety, panic attacks, multiple

13  symptoms of PTSD, including reexperiencing and avoidance and

14  intrusive thoughts, depression, and a problem with substance

15  abuse.

16  Q.   All right.  Let's go to --

17       MR. EISER:  I'm going to skip that one.  Go to

18  Exhibit 413.  Okay.

19  BY MR. EISER:

20  Q.   You mentioned -- we're going to put up -- this is

21  U.S.A. Exhibit 413 that's up on the scene.  It's already in

22  evidence.  But you mentioned this exam in 2011 by Dr. Wendler?

23  A.   And I just -- please, pardon me.  I just had cataract

24  surgery and can barely see things, so I'll be leaning right

25  into it.

16-2627 Leininger v USA et al   7.9.20 Vol. 4      773

1  Q.  That's okay.  I'm just going to ask you some questions.  I

2  don't want you to read from the record; we've been doing that

3  all week.  I just want to ask you a couple of questions about

4  it.

5  A.  Sure.

6  Q.  This record reflects this is for a comprehensive

7  psychological examination by a VA staff psychologist?

8  A.  I would call it a compensation examination.

9  Q.  And what's the purpose of that?  What's that for?

10  A.  When veterans apply for a service-connected disability

11  rating, they are seen by a specialist in disability rating at

12  the VA.  This may be a VA employee or a third-party contractor.

13  And the third-party contractor or VA employee provides a

14  recommended assessment of the illness, whether it is service

15  connected or not, and its severity.

16  Q.  And is a -- is a disability rating -- there's a number

17  assigned based on how severely impaired they are, is that how

18  that works?

19  A.  My understanding is that they have a matrix system which

20  looks at occupational interference, social interference, number

21  of hospitalizations, degree of impairment of activities of

22  daily living, and that the VA has matrix to go from the

23  severity of the symptoms and their interference with life to a

24  number that translates to a service-connected disability.

25  Q.  And when -- when they get the disability rating, what is

1    that used for?

2    A.   Once a person has a service-connected disability, whether

3    physical or emotional, that then translates into benefits the

4    veteran is entitled to.

5    Q.   Okay.  Does the VA ever just give a disability rating or

6    does a -- a veteran have to apply for it?

7    A.   Yes, a veteran must file an application for it.

8    Q.   Does the VA ever, in your experience, just increase a

9    disability rating or do you have to apply for it?

10   A.   It depends.  A veteran may automatically get an increased

11   disability rating if, for example, they are hospitalized for

12   21 days in a mental hospital and those records are forwarded to

13   Veterans Affairs.  The veteran, I believe, would automatically

14   receive an increase, but I'm not exactly sure of that.

15          MR. EISER:  Can you go to 16703 on that?

16          MR. THOMAS:  Your Honor, we would ask to strike his

17   opinions on whether a veteran needs to apply for a disability

18   rating in order to get one.  It was undisclosed opinions and

19   it's new opinions.

20          THE COURT:  Mr. Eiser.

21          MR. EISER:  That just -- that just came up.  I mean,

22   it's kind of a central issue in the case that Mr. Leininger got

23   this 60 percent disability rating, you know, eight months

24   before he ever saw Mr. Wisner.  His lawyer comes in here and

25   says he's absolutely wiped out as a result of the encounters

1   with Mr. Wisner but he has never gone to have that PTSD rating

2   increased.  He told us at -- during direct -- which something

3   we never heard -- he said, "Well, that's as much as you can

4   get, 60 percent," you know.  No basis for that.

5          Dr. Abrams treats veterans all the time and he's very

6   familiar with the PTSD rating system.  And in that we did not

7   know that Mr. Leininger was going to come up with that.  I

8   think it's fair for this expert, who has already given a

9   91-page report explaining that whatever injury he suffered here

10  is minimal, that evidence is relevant and it's fair.

11         MR. THOMAS:  If I may.

12         THE COURT:  I want to go back -- I want to go back to

13  the plaintiff.  What's the scope of the request you're making?

14  Are you asking to strike his testimony that what --

15         MR. THOMAS:  I'm asking to strike his testimony

16  regarding:

17         No. 1.  A veteran has to apply for a disability rating

18  in order to get one.  One, it's previously undisclosed.  Two,

19  it's completely inaccurate.

20         No. 2.  The opinion that the veteran has to apply to

21  get a disability rating raised, and now I'm hearing that

22  they're also going to ask him that there's apparently a rating

23  above 60 percent you can get for PTSD.

24         These are issues that have been in the case for four

25  years.  We extensively deposed this expert twice, once for

 1   discovery depo, once for a trial depo.  He has a

 2   91-page report, 91 pages and it's nowhere in there.  This is

 3   inappropriate, surprise testimony.  If I would have known he

 4   was going to do this, I would have had my expert address it.

 5        The other thing is the question at issue that -- that

 6   opposing counsel is bringing up came in response to their

 7   questions, not mine.  I didn't introduce it.

 8        THE COURT:  Well, I'm not even sure what makes you

 9   think this is expert testimony.

10        MR. THOMAS:  The way counsel has just posited it in

11   his explanation that he has extensive experience treating

12   veterans and that he knows how the -- excuse me, the -- the

13   disability rating system works.

14        THE COURT:  This doesn't strike me as expert

15   testimony.  The VA -- the VA system works like it works.  We

16   may have a factual dispute about how it works, but I'm not --

17   I'm not persuaded from anything I've heard that he (A) is

18   offering an expert opinion on that subject that has to be

19   disclosed under the rules.  Doesn't -- I think the witness

20   testified already, Mr. Thomas, that he has worked at a VA

21   facility and has experience with these systems.

22        MR. THOMAS:  He never testified about his experience

23   with disability ratings, Your Honor.

24        THE COURT:  Well, I guess it was implicit and,

25   Mr. Eiser, I can't rule -- I can't -- I'm not going to stop the

1    witness's testimony and go back and rule this issue now.  He's

2    already testified to it.  I'll either strike it from the

3    record --

4         Mr. Eiser, let me just conclude this discussion.  I

5    want to get on with it.  I don't want to get bogged down in

6    this.  But is there any dispute that -- this information about

7    how the VA disability system and its rating works, is there any

8    dispute whether that was in the witness's expert report?

9         MR. EISER:  He -- he -- he describes the comp and pen

10   exam that the plaintiff put in.  He describes the disability

11   rating.  He describes -- he -- off the top of his head he

12   started talking about the evaluation that Dr. Wendler did.  So

13   I -- you know, aside from this one question, I'm not sure what

14   we're even talking about.  He -- all of this, all of the

15   evaluation and the comp and pen and the disability rating is in

16   his report.

17        THE COURT:  Yeah, so the -- the motion, before we

18   leave this subject and go back to the testimony, Mr. Thomas,

19   you're asking to strike the witness's testimony; number one,

20   that a veteran must make application to secure a disability,

21   and, secondly, that it cannot be increased without a

22   hospitalization or an application for an increased disability

23   by the veteran, those -- that's the scope of your motion?

24        MR. THOMAS:  Yes, Your Honor.  And just for the

25   record, from what I've heard from counsel, apparently there's

1    now going to be testimony next that you can get a PTSD rating

2    over 60 percent.  Apparently that's going to be asked next.

3            THE COURT:  All right.  Well, I -- I will -- you can

4    note that objection if the testimony is given, but I just

5    wanted to make sure I had.  I'm going to take the question with

6    me because I think it's on the -- I think it's on the border of

7    even whether it's an expert opinion or not, and, of course,

8    that would affect the question of your motion.  I want to make

9    a thoughtful, law-based decision on it.

10           You may resume, Mr. Eiser.

11   BY MR. EISER:

12   Q.   Dr. Abrams, you just heard that discussion?

13   A.   Yes, I did.

14   Q.   We -- the plaintiff told us yesterday that he never applied

15   to have his disability rating of 60 percent increased after he

16   encountered Mr. Wisner because he said 60 percent disability

17   rating is all you can get for PTSD.  Is that accurate, sir?

18   A.   Let me clarify.  His service-connected disability rating

19   for PTSD was 50 percent and 10 percent for a knee injury.  When

20   Mr. Leininger received his award letter after his

21   hospitalization at the Topeka VA, his inpatient

22   hospitalization, he was given a letter contained in the file

23   labeled VBA, and I can't recall the Bates number off the top of

24   my head.  But in that letter, I believe it was in around August

25   of 2011, it told him he was increased from a 30 percent

1    service-connected PTSD rating to 50 percent because of a

2    inpatient hospitalization less than 21 days.  And if he had

3    been in the hospital for more than 21 days, the rating would

4    have been higher than 50 percent.  So that makes me think

5    Mr. Leininger had gotten bad information since the VA had told

6    him he could have a higher disability rating if his symptoms

7    were so severe he needed to be in a hospital more than 20 days.

8    Q.   Okay.

9    A.   I will add that, in my experience, I have seen quite a

10   number of veterans with 100 percent or more than 100 percent

11   PTSD-related disability.

12            MR. EISER:  Put that up.

13   BY MR. EISER:

14   Q.   I want to ask you about -- we're looking at Dr. Wendler's

15   comprehensive psychological examination in November of 2010.

16   And during that evaluation, she asked about -- the doctor asked

17   plaintiff about his marriage and he -- he says that -- do you

18   -- can you -- I don't want to read it.  Can you read it there?

19   A.   Yes, I can.

20   Q.   I want to ask you how is what he's -- the condition of his

21   marriage relationship then in 2010, how is that significant to

22   your opinions here?

23   A.   Well, I don't know that I can just speak from what

24   Dr. Wendler wrote.  But my understanding is that Mr. Leininger

25   has had difficulties in his romantic and marital relationships,

1   difficulties in his first, second, and third marriages,

2   including episodes of domestic violence.

3   Q.   And have -- in your examination, did your -- did you

4   conclude that -- or you tell me, what was your conclusion

5   regarding his -- how Mr. Wisner's encounters impacted his

6   marital relationship, his current one?

7   A.   Well, it appeared that his first and second marriages ended

8   in divorce.  I noted that he talked about difficulties in his

9   third marriage with Mary in late 2010 and early 2011.  He and

10  Mary were referred for marital counseling, but they only went

11  one time.  They then had a marital separation where Mary left

12  and Mr. Leininger stayed in Kansas.  They apparently

13  reconciled.

14  Q.   Let me stop you.  Let me stop you.  In your interview with

15  Mr. Leininger, did he tell you it was a separation or that she

16  just went home to West Virginia to take care of her ill mother?

17  Did he tell you that?

18  A.   Yes.

19  Q.   Okay.

20  A.   In general, Mr. Leininger's account to me during the IPE

21  was inconsistent with written records.

22  Q.   In what way?

23  A.   Well, the most glaring --

24  Q.   Just on this topic.  I don't want to go on to other topics.

25  So...

1   A.   So on this topic that he indicated they had a perfect

2   relationship until his visits and abuse from Mr. Wisner.   I

3   indicated in my report I did not find that credible.

4   Q.   Why not?

5   A.   Because in 2011 they had a marital separation.   They

6   attended marital therapy only once, which indicated to me there

7   was not a commitment to making the marriage work.   At times in

8   2010, Mr. Leininger expressed to Nurse White that he thought

9   the marriage was over and could not be repaired.   That

10  contrasted with his account of a good relationship, Mary merely

11  going to see her mother in West Virginia.   And I note that in

12  the records it indicated her mother was in Alabama not

13  West Virginia.   But be that as it is, it may be a mistake in

14  the notes, or it -- I don't know how to account for that

15  difference.

16       And Mr. Leininger reported to me that their sex life was

17  awesome prior to his ever encountering Mr. Wisner and estimated

18  that they would have sex up to 13 times per week.   That struck

19  me as unlikely given my experience that:   one, people on

20  chronic opioid medications have marked sexual dysfunction from

21  the physiologic effects of opioids, including the suppression

22  of testosterone production by chronic opioids; two, that

23  Mr. Leininger had severe back pain requiring him to be on

24  chronic high dose opioid medication, including symptoms of

25  nerve damage to his lower body evidenced through tingling and

 1   numbness in his leg, which often causes, due to the nerve

 2   damage, insensitivity in the genital area and a loss of sexual

 3   interest as well as extreme pain due to the motion on the

 4   lumbar spine involved in sexual activity.

 5       And I understand sexual activity doesn't necessarily mean

 6   that the lumbar spine is moving, and we often teach paralyzed

 7   patients how to have sexual relations even though they can't

 8   move.  Nonetheless, it's my experience that most patients with

 9   severe spinal damage, as Mr. Leininger described, have a

10   significant decrease in their sexual activity.

11            MR. THOMAS:  Your Honor -- sorry.  Go ahead, sir.

12            MR. EISER:  Go ahead and finish, Dr. Abrams.

13            THE WITNESS:  Further, though, not his -- no

14   description in the DSM --

15            MR. THOMAS:  Dr. Abrams, just a second; we seem to

16   have lost the judge.

17            THE COURT:  Yeah, I don't know -- I don't know what's

18   happened.  I can hear you but I'm not able to see.  I think I'm

19   just going to reconnect; that seems to be the safest play.

20   I'll be right back.  I can always hear you.  Can you hear me

21   and see me now?

22            MR. EISER:  Yes, Your Honor.

23            THE COURT:  I'm sorry for that.  I was trying to get a

24   closer look at one of the exhibits and I must have done the

25   wrong button.  Please proceed.

1        THE WITNESS:  I was going to say that in the field of

2   sexual pathology, it's accepted as a definition that ten or

3   more orgasms per week is labeled hypersexuality.  So

4   Mr. Leininger's report of 13 orgasms or 13 episodes of sexual

5   intercourse per week prior to his ever meeting Mr. Wisner

6   struck me as highly unlikely because that's a -- defined as an

7   abnormally excessive amount of orgasms.

8   BY MR. EISER:

9   Q.  Okay.

10        MR. EISER:  Put up 427.

11  BY MR. EISER:

12  Q.  I want to ask you about this emergency hospitalization at

13  the end of June of 2011 that you touched on briefly.  What

14  happened there?

15        What objectively, you know, as a psychiatrist looking at

16  the record, what -- what are you looking at here?

17        Why is this gentleman being hospitalized and treated?

18  A.  I think it is standard practice every psychiatrist,

19  clinical office at every mental health hospital, and even every

20  emergency room, that if a person states that they are

21  hallucinating and intending to kill people, they will be

22  hospitalized whether voluntarily or involuntarily.

23  Q.  Okay.

24  A.  Mr. Leininger went to the emergency room at the Leavenworth

25  VA in the early morning hours of June 28 saying he was

 1    hallucinating because he had severe insomnia and that he was

 2    intending to take up arms.

 3    Q.   I'm looking at the record of his hospitalization, and it

 4    says, "Chief Complaint:  I am angry" -- it's a quote.  "I'm

 5    angry at authority because of what they made us do.  I keep

 6    seeing children dying as we opened up on them with

 7    25 millimeters."

 8         Does -- in your view of the records, did Mr. Leininger have

 9    an anger problem psychologically?

10    A.   I think nearly every person I've ever evaluated who's been

11    arrested or investigated by the police for domestic violence or

12    whose partner has reported domestic violence has concurrently

13    also had a more general anger management problem.

14    Q.   Okay.

15    A.   And, in response to your pointing out the chief complaint,

16    I also note this is the very first time in any record that

17    Mr. Leininger talked about having to open up on children with

18    25 millimeters.  He had never reported that before.

19    Q.   Well, he -- okay.  In -- in -- but I want to go back -- and

20    I don't want to go back through all the records.  You -- you

21    saw in the records before this that anger had been a problem

22    for him on a prior occasion -- or continuously in his sort of

23    psychological profile; is that right?

24    A.   Yes, and he talked both with Dr. Wendler and Miss White,

25    and other notes about his irritability and anger.  I believe he

1    spoke with Dr. Wendler about doing reckless things, including

2    fights, and, of course, we have his account of domestic

3    violence.

4    Q.   Okay.

5             MR. EISER:   Put up U.S.A. 441.

6    BY MR. EISER:

7    Q.   As I mentioned, we're going to skip over Mr. Leininger's

8    visits with Mr. Wisner in 2012, '13 and '14 because we're going

9    to accept that he had those visits and that he was fondled

10   during those visits and gross statements were made to him

11   during those visits.

12        And what we're looking at now right there is

13   U.S.A. Exhibit 441.  Can you see that?

14   A.   Yes, I can.

15             MR. EISER:   Roll that up a little bit.  Roll that up a

16   little bit so he can see the top.

17   BY MR. EISER:

18   Q.   All right.  Is -- this is -- U.S.A. 441 appears to be a

19   record from a place called TriWest Health.  And, in your review

20   of the records, is this the first time plaintiff sought

21   treatment for the mental health problems he would have

22   experienced from his encounters with Mr. Wisner?

23   A.   That appears to be the first time he identified having

24   problems related to his interactions with PA Wisner, yes.

25   Q.   Okay.  At the top of the page it says Choice Program.  What

```
 1   is that?
 2   A.   I don't know if that's always been the name, but the VA, in
 3   all the years I've been a psychiatrist, has allowed veterans
 4   who need outside care for one reason or another to have their
 5   payments covered by the VA if the healthcare provider is
 6   willing to accept the VA's schedule of payment.
 7   Q.   Okay.  So this -- this treatment is not paid for by
 8   Tricare; is that right?
 9   A.   My understanding -- when I've seen people through the
10   equivalent of Choice is that it's separate from Tricare.  I
11   would bill the Department of Defense, the VA Administration.
12   Q.   Does the -- the VA Choice Program have a different name
13   now?
14   A.   I believe it does.  From my reading in the newspapers,
15   there was some political issues around expanding it or making
16   it much more easily available.
17            MR. THOMAS:  Your Honor --
18            THE COURT:  Hold on just a second.  Mr. Harris --
19   Mr. Thomas, I'm sorry.
20            MR. THOMAS:  This is new testimony.  Undisclosed
21   opinions.  He said based on his recent reading of newspaper
22   reports.
23            THE COURT:  I agree.  I don't -- I can read the
24   newspapers if it's appropriate to do so.  I think it's hearsay.
25   I'm sustaining the objection.
```

```
 1   BY MR. EISER:
 2   Q.  Okay.  The question was just does the VA Choice Program
 3   have a different name now other than the Choice Program?
 4           MR. THOMAS:  Same objection.
 5           THE COURT:  Overruled.
 6           THE WITNESS:  Yes, it has been changed.
 7   BY MR. EISER:
 8   Q.  Okay.  Do you know the name?
 9   A.  Not off the top of my head.
10   Q.  Okay.  Is it the Veterans Community Care Program?
11   A.  Exactly.
12           MR. THOMAS:  Objection.  Foundation.  Leading.
13           THE COURT:  Sustained.  It is.  Sustained.
14   BY MR. EISER:
15   Q.  All right.  This visit was with a licensed social worker
16   named Jennifer Newcomer, and the plaintiff told her about his
17   problems with PTSD.
18           MR. EISER:  Roll that down.
19   BY MR. EISER:
20   Q.  The listing depression, insomnia, and he does mention that
21   he had a problem with the VA doctor.
22       Now, I want to ask:  The problem -- the -- the condition
23   with PTSD, depression, and insomnia, he suffered that before;
24   right?
25   A.  Yes.
```

1   Q.   Okay.  Now, in the -- how many pages of -- how many pages

2   of records have you looked through in this case altogether if

3   you know?

4   A.   I estimated close to 8,000.  When I was deposed, I believe

5   there were about 20 binders.

6   Q.   Okay.  And in your review of the records, is this record

7   that we're looking at, is that the only reference that you've

8   seen where he mentions a VA doctor and his current lawsuit --

9   or I take that back.  Is there another one?

10  A.   Yes, there is another one.

11  Q.   Okay.  Now, Ms. Newcomer recommended that the plaintiff

12  schedule individual counseling sessions --

13          MR. EISER:  Roll that down to next page.

14  BY MR. EISER:

15  Q.   She recommended individual counseling sessions to address

16  his PTSD, also recommended a psychiatric reevaluation for the

17  medication management to address his depression, and she

18  recommended that he complete a sleep study to address his sleep

19  disturbance.  Did he follow up on any of those recommendations,

20  sir?

21  A.   None of them.

22  Q.   Okay.  The next record we have is in August of 2016 the

23  plaintiff sought treatment from Dr. Laurel Witt at a medical

24  practice called University of Kansas Hospital Physicians,

25  Exhibit 442?

1    A.   Yes.

2    Q.   Did he report to Dr. Witt that he suffered from PTSD?

3    A.   Yes.

4    Q.   And did he say what the cause was?

5    A.   Yes, his military service.

6    Q.   Okay.  And did he say he was suffering from depression?

7    A.   Yes.

8         MR. EISER:  Roll that -- roll forward.  Hold on.

9    BY MR. EISER:

10   Q.   All right.  The record reflects he's positive for sleep

11   disturbance, negative for suicidal ideas, behavioral problems,

12   confusion, self-injury, dysphoric mood and agitation.  Is that

13   -- have I read that accurately?

14   A.   Yes.

15   Q.   Okay.  And there's a list there of his other medical

16   problems.  Do you see those --

17   A.   I do.

18   Q.   -- on the past medical?

19        Okay.  Those are all things he suffered since before 2012;

20   right?

21   A.   Exactly, every one of them.

22   Q.   Okay.  At this visit with Dr. Witt in August of 2016, did

23   Mr. Leininger mention anything about an assault at the VA or

24   problems he may have been having as a result?

25   A.   He did not.

16-2627 Leininger v USA et al   7.9.20 Vol. 4                790

1   Q.  And was this treatment --

2         MR. EISER:  Pull that forward again.

3   BY MR. EISER:

4   Q.  Was this treatment paid through the VA Choice Program also?

5   A.  Yes, it was.

6   Q.  Okay.

7   A.  And for everybody's clarity, Mr. Leininger was seeing

8   Dr. Witt for pain management.  Dr. Witt is a public health

9   physician and a family physician who apparently was running the

10  pain management clinic -- or participating in the pain

11  management clinic in his -- 2016 before she went on leave for

12  pregnancy later in 2017.

13  Q.  Okay.

14        MR. EISER:  Go to U.S.A. 447 -- 446.

15  BY MR. EISER:

16  Q.  All right.  We've talked about U.S. Exhibit 446.  And in it

17  there's a notation of a phone call in which a healthcare

18  provider at the KU office said that we -- that the

19  understanding of the front desk was that Mr. Leininger had left

20  a urine sample.  "We discussed that this would have been his

21  third breach of contract.  He has had a negative drug screen

22  previously, loss of medication.  Discussed that we would not be

23  refilling his narcotics any longer.  He expressed his

24  understanding.  Discussed that we can continue to take care of

25  him for his other needs but not pain management."

1        What does this mean, "breach of contract?"

2    A.  Would you like to give me -- would you like me to provide

3    you and the court with some background information?

4    Q.  Yes, explain what the contract is --

5    A.  Yes.

6    Q.  -- and how that came about.

7    A.  So already by 2016, and I would say certainly beginning in

8    2014, there was a recognition of what was called an opioid

9    epidemic in the United States.  And it did not start in 2014,

10   but by 2014 nearly every medical institution, organization,

11   state licensing board was keenly aware of the diversion of

12   opioid medications to the general public for profit resulting

13   in extreme numbers of opioid deaths per day and opioid

14   enslavement in record numbers.

15       In 2014 the CDC and most state medical organizations,

16   licensing boards set rules for physicians prescribing opioid

17   medication for non-cancer pain, and the general rules for

18   opioid treatment were that the lowest dose would be prescribed,

19   that there would be regular random urine testing to determine

20   that the patient was not selling or diverting their dangerous

21   opioid medications to the community, that they would sign a

22   contract, that they would only have opioids filled at one

23   pharmacy, and only receive opioids from one pharmacy and one

24   prescriber, and a number of other things about participating in

25   other forms of pain management, including the understanding

1  that tapering the patient off opioids might be in their best

2  medical interest.

3      Physicians were left with discretion how many violations of

4  an opioid treatment contract for non-cancer pain the patient

5  could have before the contract specified they would be cut off

6  or deprived of further opioid prescriptions.

7      Typically contracts did not provide for graduated tapering

8  of opioids.  They provided for cold turkey:  you violated,

9  you're selling drugs on the street, we're not going to engage

10  in that behavior with you.

11  Q.  Okay.  Now, we don't know in this particular -- on the

12  third breach, we presented testimony that -- or Mr. Leininger

13  gave those -- the reason he failed the test was --

14      You know the reason he failed on his third urine test?

15  A.  Yes.

16  Q.  What?  What was it?

17  A.  That he showed no evidence that he was using the pills, and

18  the conclusion was that he was diverting them.

19  Q.  Okay.  And that's a violation of the contract; right?

20  A.  Yes.

21  Q.  And this would be his third one?

22  A.  (No response.)

23  Q.  All right.

24          MR. EISER:  Put up after he was --

25          THE WITNESS:  Let me just say it was his third one at

1   the University of Kansas.

2           MR. EISER:  Okay.  Go to Plaintiff's Exhibit 187.

3   BY MR. EISER:

4   Q.  It appears from our records that about three weeks later

5   Mr. Leininger showed up at Providence Medical Group.

6   Dr. King --

7           MR. EISER:  Roll down the page.

8           MR. THOMAS:  Your Honor, this wasn't in his report or

9   in his depositions.

10          THE COURT:  What wasn't?

11          MR. THOMAS:  Talk about the visit with Dr. King.

12          THE COURT:  Well, I don't know what --

13          MR. EISER:  This record --

14          THE COURT:  Hold on just a second.  What's required

15  for an expert to testify under Rule 26 is he must disclose the

16  opinions he plans to render.  I don't know whether he's going

17  to render an opinion or try to render an opinion about this

18  medical record or not.  So if you have an objection to make,

19  you can make it when it becomes an issue.  Right now it's

20  premature.

21  BY MR. EISER:

22  Q.  Dr. Abrams, you -- did you have these records from

23  Providence Medical Group before you wrote your report?

24  A.  I did not.

25  Q.  Okay.

1    A.   And Mr. Leininger never mentioned seeing Dr. William King.

2    Q.   Okay.  Now, when he went to see Dr. King, he said he was

3    there to establish care and that he had been seen at KU.  But

4    due to insurance, he declines to go back.  Is that accurate

5    that he didn't go back because of insurance?

6    A.   No.

7         MR. THOMAS:  Your Honor, if I may.  He just asked the

8    witness, "Did you see these records before you wrote your

9    report?"

10        And he said, "He did not."

11        MR. EISER:  Your Honor, I don't think plaintiff's

12   counsel wants to go there.

13        THE COURT:  Hold on just a second.  Hold on just a

14   second.  I want to hear -- I heard what you said, Mr. Thomas.

15   What is -- where are you going with this?

16        MR. THOMAS:  I don't think he should be allowed to

17   talk about the record at all.

18        THE COURT:  The record's in evidence.  He can talk

19   about it if it's not otherwise objectionable.

20        MR. THOMAS:  Fair enough.  I'll object to him offering

21   any opinions about it then and I'll wait until that happens

22   though, Your Honor.

23        THE COURT:  I think you should.

24        MR. THOMAS:  Okay.

25        MR. EISER:  I apologize, Your Honor, these records

1  weren't provided to us until after the deadline for his report

2  was provided.

3  BY MR. EISER:

4  Q.  But these records do support the same opinions that you've

5  held since you wrote your report; is that right?

6  A.  Exactly.  They strengthened my opinions.

7  Q.  In what way?

8  A.  Mr. Leininger's behavior with Dr. William King is

9  consistent with his behavior at the VA and consistent with his

10  documented behavior with Dr. Witt and the other providers at

11  the University of Kansas.

12  Q.  Now, in this record Mr. Leininger has told Dr. King that

13  VA -- he has a pending lawsuit against the VA, so he does not

14  go there.  Now, I want to ask what --

15       For a person who suffers from PTSD, can being involved in a

16  lawsuit, just being in it -- plaintiff, defendant, at all --

17  can that cause problems?

18  A.  Yes, I would assume for some people it could cause

19  problems.

20  Q.  Okay.  And, in your evaluation of Mr. Leininger, do you

21  think he is suffering anxiety, stress, depression simply as a

22  result of being a part of a lawsuit?

23  A.  Yes, I do.

24  Q.  Can you explain?

25  A.  There are numerous documented statements by Mr. Leininger

1   how the lawsuit is extremely stressful to him, how angry he is

2   about the lawsuit, and that it clearly was causing him

3   emotional stress.

4   Q.   An issue in our case is about whether or not Mr. Leininger

5   needs additional treatment for his PTSD exacerbation, one, and,

6   two, whether he -- even if he needs it, whether he would get

7   it.   And with that as a foundation as you review these records

8   both before and after his encounters with Mr. Wisner, do you

9   believe he would get psychological treatment to -- in the

10  future for PTSD?

11  A.   Well, it's always difficult to predict a person's behavior

12  into the future.   What I certainly can say, that since 2008,

13  when Mr. Leininger first went to the Leavenworth VA, he has

14  been referred for psychological treatment for PTSD both at the

15  VA and through the University of Kansas for treatment of PTSD.

16  I believe he saw a Mr. Newsome (sic) in 2009, 2010 for two

17  sessions dealing with PTSD and some other sessions dealing with

18  him getting social work benefits unrelated to PTSD.

19  Mr. Newsome, I believe, was a social worker at the VA.

20       But there are two visits that report some psychotherapy

21  related to PTSD, many missed visits, canceled visits, and then,

22  finally, two visits where Mr. Leininger needed helped:   money

23  to pay the rent, money to get food, workers' compensation

24  benefits, things like that, straight social work not related to

25  PTSD.

1      Other than that, Mr. Leininger has gotten medication

2   treatment for his report of symptoms of PTSD and other

3   psychiatric problems but has refused all other referrals for

4   treatment other than what you showed me with Ms. Newsome.

5   Q.   Okay.  I think you said Newsome.  You mean Ms. Newcomer?

6   A.   Newcomer, yes, okay.

7   Q.   All right.  You examined Mr. Leininger in 2018; is that

8   right?

9   A.   I had an appointment to examine him in December of 2018,

10  but he failed to appear.  I then scheduled that for April of

11  2019 I believe.

12  Q.   Okay.  Based on that examination, your review of the

13  records, in your opinion, held to a reasonable degree of

14  medical certainty, does he suffer from any psychiatric

15  diagnostic conditions today that he didn't suffer from before

16  he encountered Mr. Wisner?

17  A.   No.

18  Q.   And why do you say that?

19  A.   Prior to ever seeing Mr. Wisner, he reported he had

20  experiences with anxiety, with panic, with depression, with

21  what I would call chronic pain, with social anxiety, with

22  insomnia, with PTSD, with a variety of substance use disorders,

23  and as the MMPI and my evaluation indicated, a chronic

24  personality disorder, as well as some medical problems.

25  Q.   What's the chronic personality disorder?

1    A.   I think Mr. Leininger -- and it's difficult because he's

2    obviously not a reliable historian about himself or other

3    events, but I suspect that he had a fair amount of difficulty

4    and unhappiness prior to joining the military and chronic

5    unhappiness for much of the time after leaving the military.  I

6    certainly have documented records indicating severe sleep

7    problems after leaving the military, severe anxiety problems

8    after leaving the military based on Dr. Wendler's evaluation of

9    moderate to severe posttraumatic stress disorder.  Based on

10   Dr. Wendler and other accounts, several substance use disorders

11   in his past and this preoccupation with pain and bodily

12   illness.

13   Q.   All right.  So there's no new conditions that he suffers

14   from after seeing Mr. Wisner; is that right?

15   A.   That's correct.

16   Q.   But of the conditions he suffered from previously, have any

17   of those conditions manifested appreciable measurable symptoms

18   that are worse today than before he saw Mr. Wisner?

19   A.   Well, by Mr. Leininger's subjective report, his sex life

20   went from awesome to non-existent.  That's not documented

21   anywhere in medical records.  I see no documentation of how

22   frequently he had sex prior or how frequently he has sex

23   subsequently.

24        I infer that currently Mr. Leininger is extremely angry at

25   Mr. Wisner but Mr. Leininger was extremely angry and irritable

1   and aggressive before he ever met Mr. Wisner.  Remind you,

2   Mr. Leininger was hospitalized almost nine months before ever

3   seeing Mr. Wisner for extreme anger and threats to hurt others

4   in authority.

5        So now instead of others in authority or the person who

6   Mr. Leininger claims stole his opioid prescription and cashed

7   it at a pharmacy without his knowledge who he said he was

8   thinking of killing, now he has told Dr. Peterson that he

9   thinks of killing Mr. Wisner.  So there's a substitution of

10  target but still a problem with extreme anger and irritability.

11       The other symptoms I believe have by and large all improved

12  from the records I reviewed subsequent to February 2014.

13  Q.  Thank you.

14       Now, you have reviewed the report and -- and listened to

15  the testimony, I believe, of Dr. Peterson, plaintiff's

16  independent psychiatrist, to review Mr. Leininger; is that

17  right?

18  A.  That's correct.

19  Q.  Okay.  And I want to take his opinions one at a time.

20       In Dr. Peterson's report on page 11 it says, "It is unclear

21  if Mr. Leininger will ever be able to establish trust in the

22  VA.  It is medically likely that he will be unable to accept

23  even basic medical treatment from any VA medical healthcare

24  provider without exacerbating his underlying PTSD symptoms due

25  to his history with the PA Wisner and the VA's failure to

1    protect him."

2        What's your opinion regarding that conclusion by

3    Dr. Peterson?

4    A.   I disagree with that opinion.  I would add that

5    Dr. Peterson's diagnosis of PTSD as a result of Mr. Leininger's

6    interactions with Mr. Wisner is nowhere documented.  I see

7    nothing in any record that the nature of the sexual assault --

8    if I am allowed to call it such -- from Mr. Wisner against

9    Mr. Leininger would meet criteria of PTSD, and I see no

10   symptoms other than Mr. Leininger's supposed account to

11   Dr. Peterson, or Mr. Leininger telling me that when he has

12   sexual relations, he thinks of Mr. Wisner (onomatopoeia),

13   Wisner (onomatopoeia) abusing him.

14       I don't see any account of numbing, any account of actual

15   avoidance.  He claims intrusive thoughts, but that's not enough

16   to meet criteria for PTSD.  Even though assuming Dr. Wendler's

17   listing of symptoms is accurate based on what Mr. Leininger

18   told her, he met criteria for PTSD as of 2010 and perhaps

19   earlier.

20       I noted in my report, and I continued to note, I have no

21   idea when Dr. Peterson believes the alleged -- by his

22   diagnosis -- PTSD from Mr. Wisner's molesting of Mr. Leininger

23   began.  You've basically stated I'm to assume Mr. Leininger was

24   molested beginning in June of 2012.

25   Q.   February, but yes.

1   A.   June -- first visit June 2012.  Am I not correct?

2   Q.   I'll --

3   A.   Just unless there is some confusion, there was -- there

4   were --

5   Q.   I'm sorry.  Neither of us are right.  It's July 2012.

6   A.   July, okay, that's best.

7        So Dr. Peterson never specifies when he believes PTSD first

8   occurred for Mr. Leininger based on Mr. Wisner's actions.  That

9   makes this a difficult proposition because then there's no

10  accounting of symptoms that occurred after a certain date when

11  the PTSD occurred.  So I would infer from Mr. Leininger's

12  statements that he had no PTSD until he spoke Special Agent

13  Kerry Baker or perhaps received a letter from Special Agent

14  Kerry Baker some time in late 2014 or early 2015.

15       When Mr. Leininger is asked under oath what his response to

16  Mr. Wisner's examinations and comments, his response is, "I

17  felt uncomfortable."  He did not say, I felt terrified, I felt

18  helpless, I felt that I couldn't go on with my life, I felt

19  depressed, I felt avoidant, I felt I could never see Mr. Wisner

20  again.  He said, "I felt I should bring my wife with me."

21       When asked in deposition how he felt after he received the

22  letter from Special Agent Kerry Baker, he said he felt

23  vindicated; that he knew Mr. Wisner was a low-life.  That's not

24  terrified.  That's not helpless.  That's not in fear of his

25  life.  Those are Mr. Leininger's words.

 1       Now, I see plaintiff's expert has disregarded that and in

 2  his exam in 2019 suddenly Mr. Leininger is saying how

 3  Mr. Wisner ruined his life.  I don't see that documented up

 4  until 2019 when Dr. Peterson examined Mr. Leininger.

 5       What I do see is that, in 2018 when his stepdaughter,

 6  Miranda, committed suicide, that had a profound affect on

 7  Mr. Leininger.  And when I asked Mr. Leininger in my exam

 8  about, oh, almost a year after the suicide of his stepdaughter,

 9  he said it had no affect on him.

10       When I received plaintiff's exhibit from Dr. King, it

11  appears Mr. Leininger had a major depressive episode due to his

12  stepdaughter's suicide.  And you -- and you look at my

13  report --

14            MR. THOMAS:  I'll object.

15            THE WITNESS:  -- you will see --

16            THE COURT:  Hold on just one second.

17            MR. THOMAS:  He's just offered opinion that he had --

18            MR. EISER:  I can't hear his honor.

19            THE COURT:  I'm sorry, I tried -- when I turn over to

20  a new page of notes, I mute it so I don't interrupt.  You have

21  an objection, Mr. Thomas.

22            MR. THOMAS:  Yes, Your Honor.  He's going back into

23  the King records which he testified he did not see at the time

24  he wrote his report, and he just offered an opinion based on

25  the King records that my client had severe trauma as a result

```
 1    of his daughter's suicide.  He's --

 2            THE COURT:  All right.  Mr. -- all right.

 3            MR. THOMAS:  Sorry.

 4            THE COURT:  Go ahead.  Go ahead.  I think I understand

 5    your objection; it is he is giving an undisclosed opinion.

 6            MR. THOMAS:  Yes, Your Honor.

 7            THE COURT:  Mr. Eiser, is this opinion disclosed?

 8            MR. EISER:  Yes.  His opinion is that the injury that

 9    he suffered as a result of the -- the plaintiff suffered as a

10    result of his encounters with Mr. Wisner was minimal.  He is

11    now explaining the basis for that.

12            THE COURT:  And the basis --

13            MR. EISER:  And he is also saying that the records

14    that we were given after his report was -- after the deadline

15    for his report passed, he's saying that supports the opinion

16    I've already given.  And we've already been through it in -- it

17    in this record from -- that we got from plaintiffs, it said

18    major depressive episode.  It's highlighted and we talked about

19    it, major depressive episodes.  He's saying, yeah, he can have

20    these things, he can have a major depressive episode from a

21    particular event.  Here's an example, but there's not one from

22    2014 up until the lawsuit is filed.

23            THE COURT:  My question is a simple one:  Was this

24    listed in his report as a statement of the basis and reasons

25    for his opinion?
```

1       MR. EISER:  "This" meaning the records that plaintiff

2  didn't give us until after his -- we didn't have them then.

3       THE COURT:  Well, hold on.  Hold on.  That's -- that's

4  fine.  When did you get -- when did you receive the records

5  from the plaintiff?

6       MR. EISER:  February this year.

7       THE COURT:  Yeah, that would have been a perfectly

8  good reason for you to seek leave to supplement the witness's

9  report, but it's not a reason for you to circumvent the

10 disclosure requirement in the rule.  And so --

11      MR. EISER:  Your Honor --

12      THE COURT:  All right.

13      MR. EISER:  It's not a new opinion.  It's not a new

14 opinion.

15      THE COURT:  Well --

16      MR. EISER:  It's just an additional basis for it.

17      THE COURT:  I am striking -- if you'd let me finish, I

18 was going to say I am striking this reason because it was not

19 disclosed.  That was the scope of the objection I heard from

20 Mr. Thomas, and I'm sustaining that objection.

21      MR. EISER:  Okay.

22      THE WITNESS:  Can I add something, Your Honor?

23      THE COURT:  I'm sorry --

24      THE WITNESS:  I believe in my report I wrote --

25      THE COURT:  I -- I'm not striking any opinion.  The

 1   statement of reasons was it's not in the report it can't be

 2   testified to.

 3            THE WITNESS:  It is in the report.

 4            THE COURT:  Well, I can't -- I'm not going to stop the

 5   testimony now and resolve that.  Mr. Eiser, you told me it was

 6   -- that was not given as a statement of a reason in the report

 7   and I sustained the objection based on it.

 8            MR. EISER:  Thank you.

 9   BY MR. EISER:

10   Q.  Dr. Abrams, did you -- was this mentioned in your report?

11   A.  Yes.

12   Q.  I'm sorry, when I say "this," these -- Dr. King's records

13   from Providence Medical Group?

14   A.  Not Dr. King's records, but I wrote in my report that the

15   suicide of Miranda, which Mr. Leininger denied in the IPE had

16   any emotional affect on him, I wrote in the report I believe

17   that was not credible and I believed it was a significant

18   emotional trauma for him.

19   Q.  Okay.

20   A.  I did not know and did not write that Dr. King had

21   diagnosed him with major depression, but I did write that it

22   was a major trauma and Mr. Leininger's denial was not credible.

23            THE COURT:  So that it is clear -- so that it is

24   clear, my ruling is the reliance on the content of Dr. King's

25   report, since not expressed in the report as one of the basis

1   or reasons for the opinion that was apparently disclosed, I'm

2   striking that as a reason.  The stuff that's in the report I'm

3   not striking.

4            THE WITNESS:  Thank you.

5            MR. EISER:  Thank you, Your Honor.

6   BY MR. EISER:

7   Q.  All right.  For the purposes of this question, Dr. Abrams,

8   I want you to assume, as we've stipulated, that Mr. Wisner

9   (sic) was fondled during his nine visits with Mr. Wisner and

10  the rest just consider the record.

11      Would a reasonable person in Mr. Leininger's position

12  eventually at some point return to the VA to get his care --

13  healthcare there?

14  A.  I don't need to speculate.  I believe I counted over 50

15  contacts with the VA after 2014, and understand those records

16  only extend to August --

17  Q.  Twenty --

18  A.  -- 2016.  Mr. Leininger tells me he still goes to the VA

19  and had been at the VA a few weeks before the IPE.

20  Q.  Okay.  So when Dr. Peterson testified that he based his

21  opinion that -- with absolute certainty that Mr. Leininger

22  would never return to the VA -- and you heard this testimony.

23  I asked him, "What's that based on?"

24      And he said, "Because Mr. Leininger told me he hasn't been

25  back in five years at all," and when -- from when he was

 1    interviewing him.

 2        And we -- you heard the testimony.  I put up the records

 3    from the VA in the chart that showed he's been there more than

 4    20 in-person visits and more than 50 contacts you talked about.

 5    He was genuinely surprised.

 6        Does that support your opinion that -- in disagreeing with

 7    Dr. Peterson that he would never return to the VA for care?

 8    A.   While I think the behaviors speak for themselves, he did

 9    return for care.  As I read the records in 2016, because of

10    breaches of the opioid contract with the VA -- and this was, I

11    believe, Mr. Leininger's fifth or sixth opioid contract

12    beginning in 2009 -- because he violated the opioid contract,

13    he was told that he would be tapered off his opioid

14    medications.  That's the last visit that is documented in the

15    VA records the government provided to me.  That appears to be

16    the reason for Mr. Leininger going to see Dr. Witt was to

17    continue opioid treatment.

18    Q.   Okay.  Regarding future treatment, Dr. Peterson states that

19    the plaintiff will need approximately $200,000 in psychiatric

20    medications over the course of his life as a result of his

21    encounters with Mr. Wisner.  Do you agree?

22    A.   No.

23    Q.   Why not?

24    A.   Well, it may well be that Mr. Leininger will require

25    psychiatric medications for the rest of his life given all of

1    the psychiatric diagnoses that existed prior to 2011 -- prior

2    to 2012 more probably.  I think Mr. Leininger has many

3    problems, and whether it's medication or CPAP therapy or

4    psychotherapy, he has to deal with his problems if he wants a

5    better life.  If he doesn't want a better life, he certainly

6    won't require psychiatric medications or a CPAP machine or

7    psychotherapy.

8    Q.  Okay.

9         THE COURT:  Mr. Eiser, I don't know whether you're

10   closing in on the finish of the direct, I do owe the court

11   reporter a break here.  I don't know how close you are to

12   finish.

13        MR. EISER:  Not too far, but I don't want to hold up

14   your court reporter.  We -- this is a fine time for a break for

15   me.

16        THE COURT:  All right.  I always blame the court

17   reporter; that's not exactly fair.  I think all of us could use

18   a break.

19        So it's closing in on a quarter until the hour.  Let's

20   plan to resume at the top of the hour with the witness in place

21   and ready to continue and finish your direct and then we'll go

22   straight to the cross.  I'll see you in 15 minutes.  Thank you.

23        (Recess.)

24        THE COURT:  All right.  We're back on the record, I

25   think in the presence of all counsel.  Check signals around.

1    Mr. Thomas from your room broadcasting okay?  Thumbs up.

2           And from the defense room?

3           MR. EISER:  Yes, Your Honor.

4           THE COURT:  And likewise with the witness?

5           THE WITNESS:  Yes.  Thank you.

6           THE COURT:  All right.  Great.  Very well.  Mr. Eiser

7    you may resume your examination.

8    BY MR. EISER:

9    Q.  All right.  Dr. Abrams --

10          MR. EISER:  You can go ahead and put that up.

11   BY MR. EISER:

12   Q.  During the break I was looking for and able to find the

13   exhibit I wasn't able to find before, which is Plaintiff's 195,

14   which is, I guess, the result of the evaluation by Dr. Wendler

15   in terms of the disability rating of Mr. Leininger in August of

16   2011.  Do you remember discussing this?

17   A.  Yes.

18   Q.  Okay.  When they come up with a final disability rating, is

19   that just Dr. Wendler or are there more people involved in a

20   final decision of the disability rating at the VA?

21   A.  I believe, based on the compensation and pension

22   examination, the raters go through a schedule or a matrix and

23   then calculations to service-connected disability rating.

24   Q.  Okay.  And --

25          MR. EISER:  I want to roll ahead to page 3 of this

```
1    report.
2    BY MR. EISER:
3    Q.   And I want to read this and stop and ask you a question
4    about it.
5    A.   Sure.
6         MR. EISER:   Page 3 in there.
7    BY MR. EISER:
8    Q.   Okay.  The -- in the -- on the page Reasons for Decision,
9    the bottom paragraph says, "Entitlement to a temporary total
10   evaluation because of hospital treatment in excess of 21 days
11   is denied, because if you are not hospitalized in excess of
12   21 days" -- and I think you mentioned this.  You -- off the top
13   of your head you recalled that.
14        Now --
15   A.   Yes, I did.
16   Q.   -- it goes on to say -- it goes on to say, "However, the
17   evaluation of posttraumatic stress disorder is increased to
18   50 percent effective June 28, 2011, the date you were
19   hospitalized for your mental disorders.  An evaluation of
20   50 percent is assigned for occupational and social impairment
21   with reduced reliability and productivity due to such symptoms
22   as impaired judgment, disturbances of motivation and mood,
23   difficulty in establishing and maintaining effective work and
24   social relationships.  A higher evaluation of 70 percent is not
25   warranted unless there are deficiencies in most areas such as
```

16-2627 Leininger v USA et al   7.9.20 Vol. 4         811

1   work, school, family relations, judgment, thinking or mood due

2   to such symptoms as suicidal ideation, obsessional rituals

3   which interfere with routine activities, speech, intermittently

4   illogical obscure or irrelevant near continuous panic or

5   depression affecting the ability to function independently,

6   appropriately, and effectively."  And it goes on to list a

7   number of other conditions and symptoms that would justify the

8   higher disability rating through 70 percent.

9        Now, having read that, does that support your opinion that

10  you can get a PTSD reading -- rating higher than 50 or

11  60 percent?

12  A.   Yes.

13  Q.   And does it further support your opinion why he did not get

14  a rating higher than that in 2011?

15  A.   Yes.

16  Q.   Okay.  Now, I want to go back to Dr. Peterson's opinions.

17  Dr. Peterson also contends that, as a result of his encounters

18  with Mr. Wisner, plaintiff will need individual psychiatric

19  sessions for the rest of his life which the plaintiff's

20  economist estimates will cost 240 -- which Dr. Peterson

21  estimates will cost $240 per session and lifetime estimated

22  cost of approximately $40,000.  Do you agree?

23  A.   I do not.

24  Q.   Why not?

25  A.   I infer that Dr. Peterson believes or asserts that

1   Mr. Leininger was totally normal in July 2012, and that all of

2   his mental health problems are the result of his encounter with

3   Mr. Wisner.  I do not believe any record or any fact could

4   possibly support that opinion.

5       So I may be wrong.  Maybe Dr. Peterson, in something like

6   he did here said, oh, no, I believe Mr. Leininger was severely

7   disabled but didn't need therapy for his severe mental illness

8   and disabilities that existed prior to July 2012.  I didn't

9   hear that.  So it appears to me Dr. Peterson is saying

10  Mr. Leininger needs this extensive treatment only because of

11  the events with Mr. Wisner.  That makes no sense to me.

12      All of Mr. Leininger's mental health problems appear quite

13  chronic, that is lasting more than six months.  Most existed in

14  2008, which is the earliest record we have.  His severity of

15  mental health problems, as far as we have them documented in

16  2011, are severe enough to have required emergency inpatient

17  psychiatric hospitalization.  The records after 2011 until the

18  evaluation with Dr. Peterson -- and I won't comment on

19  Dr. King's records -- but the records I can comment on show

20  Mr. Leininger was considerably better than he was in June 2011.

21      So I disagree entirely with Dr. Peterson's opinion and I

22  don't really see that Dr. Peterson explains anything about the

23  chronic symptoms that Mr. Leininger had and has that are

24  well-documented.

25  Q.  You have just said that he doesn't need a lifetime of

 1   psychiatric treatment because of his encounters with

 2   Mr. Wisner.  But would the plaintiff benefit from psychiatric

 3   treatment for the problems that you've discussed unrelated to

 4   Mr. Wisner?

 5   A.   Unrelated --

 6   Q.   Yes.

 7   A.   -- is that the question, Mr. Eiser?

 8   Q.   Yes.

 9   A.   I think he needs a lifetime of mental health treatment for

10   all of his problems unrelated to his encounters with

11   Mr. Wisner, and he probably needs a lifetime of treatment for

12   his sleep apnea since Mr. Leininger believes that his sleep

13   problem is among the worst of his problems.

14   Q.   Okay.  And is it your opinion -- I believe we've testified

15   to this -- that that -- that treatment, if he were to get it,

16   he would most likely -- a reasonable person in Mr. Leininger's

17   position would return to the VA to get it, whether after

18   getting some treatment to get over whatever anger problem he

19   has or simply being -- in the future being able to return to

20   the VA; is that your opinion?

21   A.   No --

22           MR. THOMAS:  I'll object.

23           THE COURT:  Hold on just a second.  There's an

24   objection.

25           MR. THOMAS:  We'd object.  The standard isn't what a

```
 1   reasonable person would do.  At issue is Mr. Leininger's
 2   damages and what he should do and whether he can.  I think
 3   that's an appropriate inquiry, not what a reasonable should do
 4   person.
 5            THE COURT:  I'm not going to rule that legal issue now
 6   based on an oral objection at trial, so I'm not -- I don't
 7   understand why you're making the objection now.
 8            MR. THOMAS:  I clearly made a mistake.  Sorry, Your
 9   Honor.
10            THE COURT:  All right.
11   BY MR. EISER:
12   Q.  Again, with this question I'm assuming that these
13   molestations happened, that whatever harm he suffered from it
14   -- well, you've already said you don't think he needs any
15   treatment from those events because of the -- but you do think
16   he could benefit from future treatment.
17        And my question is:  Do you think he would return to the VA
18   eventually to get it?
19        Can you hear me, sir?
20   A.  I'm sorry, I think -- did I just get cut off?
21   Q.  No, I can hear you.
22            THE COURT:  We can hear you.
23            THE WITNESS:  Okay.
24   BY MR. EISER:
25   Q.  The question is:  Would he most likely in the future return
```

1    to the VA to get that lifetime of treatment that you say he

2    needs?

3    A.   It appears that Mr. Leininger had no problem attending

4    treatment at the VA until he was told that they were going to

5    cut off his opioids.  So I'm not clear that Dr. Peterson's

6    analysis is in conformance with reality.

7         What I do believe is that Mr. Leininger is extremely angry

8    at Mr. Wisner and the VA, but he's been extremely angry at

9    other people before he ever met Wisner and after he met Wisner.

10   So I think it would be useful for Mr. Leininger to get some

11   help with his anger so that it doesn't interfere with his

12   treatment.  Because we know people who are angry at their

13   doctors don't get the best treatment, whether it's justified or

14   not.

15   Q.   And what treatment would that be that would get him over

16   his anger at the VA, what would you believe?

17   A.   Well, I think a few sessions, individual sessions not

18   classroom anger management, but a few sessions.  I think in the

19   deposition I said two, maybe ten.  I don't know.  And not with

20   the purpose of making Mr. Leininger happy that he had this

21   horrid experience with Mr. Wisner, but getting Mr. Leininger to

22   understand that he has seen other male PAs at the Leavenworth

23   VA, that that was not a problem; that Mr. Wisner will never see

24   him again and he will never see Mr. Wisner at the Leavenworth

25   VA, and that he can get superior treatment at the Leavenworth

1   VA compared to what private insurance might allow.

2       So, for instance, we know in 2011 Mr. Leininger was

3   diagnosed with sleep apnea and could have received excellent

4   treatment for his insomnia.  He decided to never go back even

5   though, as we looked, Ms. Newcomer recommended that he go back

6   to get a sleep study and treatment.  Why Mr. Leininger didn't

7   go back, I think he typically says he was too busy.  But I

8   think the VA seemed to have excellently (sic) program.  They

9   did comprehensive polysomnography and made a diagnosis that

10  makes sense, and he certainly absolutely needs sleep treatment,

11  including a CPAP machine.

12      In terms of medication, Dr. Witt, knowing nothing about the

13  interaction between Mr. Leininger and Mr. Wisner, knowing about

14  his military PTSD, reported that he was doing quite well on

15  venlafaxine, and other doctors have reported that he was doing

16  well on venlafaxine.  I have no understanding why Mr. Leininger

17  has discontinued his treatment with venlafaxine so that his

18  symptoms would get worse.

19      Mr. Leininger, on numerous occasions prior to ever

20  encountering Mr. Wisner, was offered psychotherapy and group

21  psychotherapy at the VA.  I think whether a person suffers

22  military sexual trauma, healthcare provider sexual abuse, or

23  combat PTSD or childhood PTSD, being in a peer group is an

24  essential part of treatment.  I didn't see that as a

25  recommendation from Dr. Peterson.  I believe that Mr. Leininger

 1   would benefit from a group therapy treatment that would

 2   encompass his childhood PTSD, his occupational PTSD, his

 3   military PTSD, his horrible, painful experience with his

 4   step-daughter's suicide, and his encounter with Mr. Wisner.  I

 5   think that's probably best provided at the VA, but certainly it

 6   could be provided anywhere.  I do not see any mental illness

 7   that prevents Mr. Leininger from getting optimal treatment at

 8   the VA.

 9   Q.  Thank you, Dr. Abrams.

10         MR. EISER:  We're concluded with the witness.  Thank

11   you, Your Honor.

12         THE COURT:  All right.  Cross-examination from the

13   plaintiff.

14         MR. THOMAS:  Yes, Your Honor.  Would you give me a

15   moment to organize my papers?  Kind of a mess.

16         THE COURT:  I couldn't hear all of that, but if you

17   need a moment, of course.

18         MR. THOMAS:  Yes, please.  I'm a little scattered.

19   I'll get it together real quick though.  Sorry about that, Your

20   Honor.  May it please the court.

21         THE COURT:  Counsel, please proceed.

22                    CROSS-EXAMINATION

23   BY MR. THOMAS:

24   Q.  Good morning, Dr. Abrams.

25   A.  Good morning, Mr. Thomas.

1   Q.  It's nice to see you again.

2   A.  And vice versa.

3   Q.  Thank you.

4       You're a lawyer, aren't you, sir?

5   A.  I am, yes.

6   Q.  You got your law degree in 1992.  And it wasn't just to

7   learn how to be a better expert witness, you actually practiced

8   law for a number of years; right?

9   A.  Yes, I did and I'm still practicing law.

10  Q.  That's right.

11      And you're still a member of the California Bar; correct?

12  A.  That's correct.

13  Q.  And your CV says that you specialize in legal medicine; is

14  that right?

15  A.  Well, I do forensic psychiatry, and that's legal medicine,

16  yes.

17  Q.  Do you remember when I asked you about the -- it says you

18  specialize in legal medicine, am I right?

19  A.  I don't recall, but I am a fellow of the College of Legal

20  Medicine and I do --

21  Q.  Ah.

22  A.  -- practice forensic psychiatry as my main specialty, and

23  forensic psychiatry is a subspecialty of legal medicine,

24  meaning the interface of the law and the medical professionals.

25  Q.  Understood.

1      In your deposition you told me that you are a professional

2  testifier; is that true?

3  A.   No.  You said that, Mr. Thomas.

4  Q.   And what did you say in response?

5  A.   I said that more accurately would be I'm a professional

6  report writer.  That I testify maybe ten times a year but write

7  about a hundred reports a year.

8  Q.   And you also said you're an excellent report writer;

9  correct?

10 A.   You have my report.  You're welcome to compare it with any

11 other expert's report for clarity and reasoning and

12 documentation of reasoning.

13 Q.   You spend about eight hours -- according to you, you spend

14 about eight hours per week seeing patients; isn't that true?

15 A.   Well, since I last saw you, which was maybe the day before

16 COVID struck, my practice has changed horribly.  I rarely see

17 people face-to-face.  I only see people on Zoom or by

18 telephone, and I have not entered a jail or prison since I saw

19 you because of the virus.  So, you know, I'm basically

20 gardening most of the time now because I don't want to die.

21 Q.   Well, I'm sorry to hear that.  It's affected all of us in

22 this country, and I am sorry to hear that it's affected your

23 practice such.

24      At the time of your deposition, you told me that you -- at

25 the time of the deposition, you spent about 70 hours per week

16-2627 Leininger v USA et al   7.9.20 Vol. 4          820

1   doing legal consulting; is that correct?

2   A.   That was correct then, yes.

3   Q.   Okay.   There's about 300 -- so that means you do about

4   3,640 hours per year of legal consulting if you just take that

5   70 by 52?

6   A.   Sure.

7   Q.   Does that sound right?

8   A.   Yeah, sure.

9   Q.   And you bill at $450 an hour?

10  A.   In this case, yes.

11  Q.   And so you bring in approximately $1.638 million a year for

12  your work as a legal testifier?

13  A.   No, not hardly.

14  Q.   Okay.   You've billed over $200,000 for your work in this

15  case; correct?

16  A.   That's correct.

17  Q.   How much have you billed since I took your deposition?

18  A.   I believe an additional 28,000.

19  Q.   You're getting close to $300,000 on these cases; is that

20  right?

21  A.   No.   I mean, as they say in law school, how close is close?

22  But I think I'm right around 235,000, which I don't think is

23  close to 300,000, but, you know, that's up for legal argument.

24  Q.   I was wrong.   You were right.   I'll take 235,000.

25      Before about 85 percent of the legal work you do is

16-2627 Leininger v USA et al   7.9.20 Vol. 4

821

1  forensic analysis; correct?

2      Well, let me --

3  A.  I don't understand.  I'm sorry.

4  Q.  Horrible question.  I'm sorry, doctor, that was a poor

5  question.

6      About 85 percent of your work is forensic work; is that

7  correct?

8  A.  Yes.

9  Q.  Okay.  That was a bad question on my part.  It won't be my

10  last one, I promise.

11  A.  Sure thing.  No judgments.

12  Q.  Out of that work that is forensic, only 20 percent of it is

13  personal injury; is that right?

14  A.  I'd say less than 20 percent.  I --

15  Q.  About -- sorry.  Go ahead.

16  A.  I -- my real interest in psychiatric forensics is in

17  criminal matters.

18  Q.  Eighty-five percent of your work is criminal; correct?

19  A.  I would say that's about right, understanding that I

20  include administrative quasi-criminal matters as criminal

21  rather than civil.  So I do quite a lot of work with the

22  medical board of California assessing whether doctors are safe

23  to practice.  So that's administrative, but mostly it's because

24  they've done very bad things like in this case, and so I

25  include that in my criminal practice.  My work with sex

1    offenders I include in my criminal practice.  So that's why I

2    say 85 percent, but it -- you know, we could quibble.

3    Q.   The majority of the work you do is for competency to stand

4    trial; right?

5    A.   No, that's a small part of the criminal work I do.   In

6    recent years, I would say a substantial amount of the work I do

7    relates to death penalty trials or -- or I should say capital

8    cases.

9    Q.   In your deposition you said by and large it involves

10   assessing people for competency to stand trial, people who are

11   making insanity pleas, and to a large degree people who need

12   mental health assessments to present as mitigation evidence in

13   homicide cases.  Does that sound right?

14   A.   Yes.

15   Q.   Okay.

16   A.   The death penalty cases are all mitigation presentations.

17   Q.   You testified in 42 cases over the last four years; is that

18   correct?

19   A.   Yes.

20   Q.   Twenty percent of the legal consulting work you do is

21   actually dedicated to time testifying; right?

22   A.   No.

23   Q.   Okay.  You talked about your treatment of veterans over the

24   years.  You interned at a VA Hospital in the '70s for one year;

25   isn't that right?

16-2627 Leininger v USA et al   7.9.20 Vol. 4          823

1   A.   No, I was on attending staff.  I interned at UCLA.

2   Q.   Okay.  But you -- how long were you on that staff in the

3   '70s at the VA Hospital?

4   A.   For one year.

5   Q.   For one year?

6   A.   I was -- I was also on the staff during my residency, that

7   is the VA paid for my work as a resident at the VA, but I was

8   not on the staff.

9   Q.   You talked about how you've treated veterans, but you had

10  -- that was in the '70s, am I right, all of that was?

11  A.   I've treated veterans in the '80s, in the '90s, in the '10s

12  and until recently.

13  Q.   My question wasn't clear.  When you worked at that VA

14  Hospital when you were an intern there and -- and did -- I

15  think you said residency, that was in the '70s; right?

16  A.   And when I was on attending staff, that was 1979 and 1980.

17  So 1980 is probably a part of the '70s in cultural history.

18  Q.   And while you have treated veterans in the '70s, '80s, '90s

19  and '00s, you have only treated one patient with combat-related

20  PTSD since your work at the VA in the '70s; isn't that true?

21  A.   No.

22  Q.   Do you remember when I took your deposition and asked you

23  this?

24  A.   Yes.

25  Q.   And in your deposition you told me --

```
 1          MR. EISER:  Your Honor, could we -- Your Honor, could

 2   we -- could we be provided the page and line and a second to

 3   find it and which deposition?  And if he could, please, read

 4   the question and answer rather than just skip ahead to the part

 5   he wants.

 6          THE COURT:  So you get to make an objection to

 7   improper impeachment if you believe it is, but you don't get to

 8   give a list of requests for him.  Is your objection that this

 9   is an improper impeachment?

10          MR. EISER:  Yes.

11          THE COURT:  And what's -- why are you objecting that

12   it's improper?

13          MR. EISER:  I'd like to be provided the page and line

14   that he's reading from.

15          THE COURT:  Mr. Thomas, if you're going to read from

16   the witness's deposition, you are required to identify where

17   you're reading from.  I don't know if you are, but it sounded

18   like you were.

19          MR. THOMAS:  I was going to publish it but didn't know

20   if that would be appropriate, Your Honor.

21          THE COURT:  Well, whether you're going to show it or

22   read from it, you do have to -- under the convention under the

23   Federal Rules, you do have to identify the source you're using

24   for the impeachment.

25          MR. THOMAS:  Yes, yes, Your Honor.  The source is
```

```
 1    Dr. Abrams' deposition from January 31st, 2020, page 105, lines
 2    1 through 18.  May we publish, Your Honor?
 3            THE COURT:  You may.  I don't really care whether you
 4    show it or read it.  If we were a jury trial, you couldn't show
 5    it, but you can here if you think it will move it along.
 6    BY MR. THOMAS:
 7    Q.  Sir, we've published your testimony from January 31st on
 8    this issue.  Would you mind reviewing that for a moment and see
 9    if that reflects -- refreshes your recollection on what you
10    told me under oath earlier this year.
11    A.  Yes.
12    Q.  Okay.  After reading that, am I correct that during your
13    deposition you told me that you had only treated one patient
14    with combat-related PTSD since your work with the VA in the
15    '70s?
16    A.  I believe there was more to my testimony.  I believe that I
17    indicated I had worked with and, in my mind, treated but not
18    prescribed medication for a sniper in the Marine Corps who was
19    charged and convicted of first degree murder, and that's
20    probably in the pages.  After that I also worked with some
21    veterans in the prison who had combat-related PTSD and service
22    connection.  But really I didn't treat them for the PTSD, I
23    treated them for depression or anxiety.
24    Q.  My question to you at the time was verbatim, "Okay.  What I
25    want to know is, in your clinical practice, have you ever
```

1    treated a combat veteran for combat-related PTSD?"

2        And you said, "Yes."

3        Are you with me so far?

4    A.  Yes.

5    Q.  And then I said, "Okay.  How long ago was the last time?"

6        And you answered, "Probably before I went to law school."

7        Are we good so far?

8    A.  Yes.

9    Q.  And then I thought that was -- I said, "Which in the '70s?"

10       And you said, "In the late '80s I was working with someone

11   who was on the Bataan Death March and had horrible PTSD and all

12   the consequences of beriberi and every horrible thing of what

13   he went through."  Did I read it correct?

14   A.  Yes.

15   Q.  And then I asked you, "Is that the only patient you can

16   recall at this time?"

17       And you said, "Yes.  And, as I indicated yesterday, maybe

18   earlier today, the '70s I worked for a year at the VA.  Of

19   course, we saw Vietnam veterans all the time."

20       Did I read it correct?

21   A.  You read it correct.

22   Q.  Okay.  Now, because you brought this up, I think you did

23   tell me about this veteran you worked with who was a sniper.

24       And you were hired as an expert witness in his case,

25   though; right?

16-2627 Leininger v USA et al   7.9.20 Vol. 4                827

1   A.   Yes, I was, but I met with him --

2   Q.   Okay.

3   A.   -- 25 times for therapy so he wouldn't commit suicide.   I

4   considered what I was doing with him treatment, though, I was

5   also seeing him to present to the jury mitigation evidence.

6   Q.   And that's fair.  I do -- I do want to be fair to you

7   because I do believe you told me about that in your deposition

8   and I had not remembered it until you mentioned it.

9   A.   Okay.

10  Q.   So thank you very much.

11       Moving on.  You have not published any peer-reviewed

12  publications on sexual trauma; correct?

13  A.   I don't believe I have, no.

14  Q.   You have not published any peer-reviewed publications on

15  PTSD; correct?

16  A.   No, I have not.

17  Q.   You have not published any peer-reviewed publications on

18  combat-related PTSD; correct?

19  A.   That's correct.

20  Q.   You have not published any papers on sexual assault; is

21  that correct?

22  A.   That's correct.

23  Q.   You have not published any peer-reviewed papers on sexual

24  assault related PTSD; is that correct?

25  A.   That's correct.

1    Q.  Give me a second, I'm going to skip over a bunch of

2    exhibits that I was going to use.  Oh, that went faster than I

3    thought.

4        Now, at the time I deposed you, your opinions then are a

5    little different than the opinions you've offered today; is

6    that fair?

7    A.  No.

8    Q.  Well, when I deposed you, your primary opinions were;

9    number one, that he wasn't credible, and number two, that he

10   had -- he had not been harmed.

11           MR. EISER:  Objection.  Beyond the scope of direct.

12           THE COURT:  Overruled.  That's fair cross-examination.

13   BY MR. THOMAS:

14   Q.  Did you -- do you remember my question, sir?

15   A.  I didn't know if it was a question or a testimony.

16   Q.  It's always a question.  I'm not allowed to testify.

17       Your opinions at the time fundamentally were, one, that

18   he's -- Aaron's not credible, and number two, that he has not

19   been harmed by the acts of Mr. Wisner; is that true?

20   A.  I think I explained exactly what I told Mr. Eiser about

21   Mr. Leininger's chronic problems with irritability, anger, and

22   aggression.

23       And I believe in deposition I said that Mr. Wisner and/or

24   the VA -- I don't recall word-for-word what I said, but that

25   Mr. Wisner certainly was now the target of his anger, but that

```
 1   I did not believe Mr. Leininger suffered any new mental

 2   disorder as a result of his interactions with Mr. Wisner.

 3   Q.   In rendering your opinions in this case, you authored,

 4   what, about a 90-page report; is that right?

 5   A.   Yes.

 6   Q.   But in doing so, you didn't conduct any research into the

 7   medical or psychiatric literature; is that correct?

 8   A.   No, that's not correct.

 9   Q.   As it relates to Mr. Leininger's case, did you do any

10   research?

11   A.   Help me understand.  Is there a research paper written

12   about Mr. Leininger that I failed to notice in the *Journal of*

13   *Medicine*, is that what you're asking?

14   Q.   Well, let me clarify.  I think you did some research for a

15   plaintiff named John Doe PM, but I believe you testified you

16   did not do any research for Mr. Leininger's case.  Does that

17   sound correct?

18   A.   No, it does not.

19   Q.   All right.  What research did you do for this case?

20   A.   I think we clarified in the deposition that I did research

21   on the general qualities of repressed memory, because I wrote

22   that Mr. Leininger, both in my IPE and in his deposition,

23   answered many questions with the response, "I don't know," "I

24   don't remember," and that Dr. Peterson offered the hypothesis

25   that this is because he suffered repressed memory.  I did
```

1   research if this was a possible explanation, and it's not a

2   possible explanation.

3   Q.   Did you do any research in this case -- for this case

4   involving combat-related PTSD?

5   A.   I've read, in my 41 years of clinical practice and my five

6   years of training to be a psychiatrist, hundreds if not

7   thousands of articles about combat PTSD and general PTSD, and I

8   don't particularly need to reteach myself with every case.  So

9   I did not cite any specific references to combat PTSD because

10  none were required.  I did reference a citation to sleep apnea

11  and its occurrence among people with PTSD, and you'll see that

12  in my report.

13  Q.   Well, the reason I asked you that is because at the time I

14  took your deposition you didn't believe that Aaron had

15  combat-related PTSD; isn't that true?

16  A.   Yes, that's true.

17  Q.   You didn't believe he even saw combat; isn't that true?

18  A.   No.  I said I needed documentation that he was involved in

19  combat, and that he was in the mortuary duty, that he shot into

20  a group of children, and that he witnessed a daughter and a

21  father being killed by American troops despite the fact that

22  they had an American flag.  I told you I had no way to verify

23  whether those events occurred or not.

24  Q.   Isn't it true that out of all the plaintiffs you've

25  examined for these Wisner-related case -- cases, you only found

1   two of them to be credible?

2   A.   I only saw eight individuals.

3   Q.   So is that a "yes?"

4   A.   Out of eight individuals that I examined related to the set

5   of cases where Mark Wisner is a defendant along with the

6   U.S.A., I found two credible and six not credible, including

7   Mr. Leininger as not credible.

8   Q.   And you didn't believe he was credible in terms of what he

9   was reporting as it relates to his combat experience either;

10  isn't that true?

11  A.   "Either?"  I'm not sure what "either" refers to, so perhaps

12  you could clarify your question, Mr. Thomas.

13  Q.   Yes.  Do you -- sorry.  Yes.

14       You don't believe that he's credible, in terms of his

15  reported PTSD as a result of what Wisner did to him; right?

16  A.   He clearly does not have PTSD by his own testimony.

17  Q.   Okay.  And you don't believe -- and you didn't believe at

18  the time I took your deposition that he was credible in terms

19  of his reports of combat-related PTSD; isn't that right?

20  A.   I said I don't know any of the circumstances, but I have

21  real doubts about Mr. Leininger's credibility because of so

22  many discrepancies in the record.

23  Q.   And another reason you -- you thought that he didn't have

24  combat-related PTSD is -- and this is what you just said on

25  your direct today -- he never mentioned the incident involving

 1   the men from his unit shooting down a little girl and her

 2   father until 2011.  That's what you said in your depo and

 3   that's what you said earlier this morning; correct?

 4   A.  No, you completely mischaracterized my testimony,

 5   Mr. Thomas.

 6   Q.  Let me rephrase it then.

 7       Did you say earlier today that Mr. Leininger never

 8   mentioned the incident with the little girl and her father

 9   until 2011 with Dr. -- what's her name -- Wendler?

10   A.  No, that's completely wrong.

11   Q.  Well, the record will demonstrate.  The court will have a

12   chance to review your testimony, so I'm not going to quibble

13   with you.

14       The fact is, though, he had mentioned it to healthcare

15   providers before 2011; isn't that true?

16   A.  Mr. Thomas, I would like to explain what I testified to

17   which I believe the transcript of today's proceeding will

18   confirm.  Do I have that opportunity?

19   Q.  No, you don't.  Respectfully, Mr. Eiser can ask you

20   questions, but right now it's my turn to ask questions.  Okay?

21   A.  Then the answer to my question -- to your question is you

22   have totally mischaracterized and distorted what I said in

23   court today.

24   Q.  Okay.  My question is different.  I don't -- I asked you

25   something different.

1      Isn't it, in fact, true that he reported the incident

2   involving the little girl and her father several times before

3   the 2011 visit with Dr. Wendler?

4   A.  The visit with Dr. Wendler was in 2010.  I was talking

5   about a statement that Mr. Leininger made in 2011 after his

6   psychotic episode where he said he was ordered and did fire

7   upon children.  "We opened up with our" -- I don't know --

8   "25 millimeters" or 35 millimeters; that's what he said in

9   2011, "we."  He had never said that before.  He had never said

10  anything about shooting children himself.

11      In 2008, 2009 and 2010, he had said, "I have PTSD because I

12  witnessed American troops killing a father and daughter who

13  were waving an American flag."

14      After he bit into an egg roll that he alleged had a dead

15  mouse in it, he then reported that he was on the mortuary duty,

16  and the dead mouse reminded him of the smell of death from

17  burning bodies.  He had never, ever mentioned that to anybody

18  prior to his biting into a dead mouse in an egg roll and

19  wanting to bring suit over being harmed by the Chinese

20  restaurant.

21      So we have three accounts.  And I understand people with

22  PTSD often don't tell the worst of their trauma until they've

23  established trust, so I'm saying I don't know.  I mean, these

24  three episodes have very different import.  If they occurred,

25  of course, each of them would be traumatic themselves.  But I

```
 1   don't know if they're true because sometimes, when people
 2   change their story to make a case for themselves, that reflects
 3   deceit.  I'm -- as I told you at the deposition, I am not a
 4   human lie detector.  I rely on documents to verify what people
 5   say as either consistent or inconsistent.
 6   Q.   Thank you for that answer.
 7        Did you listen to Mr. Leininger's testimony today?
 8   A.   No, I wasn't allowed to.
 9   Q.   I mean, earlier this week?
10   A.   No, I wasn't allowed to.
11   Q.   That's right.  Excuse me.
12        Have you seen any other place in the medical records where
13   Leininger used the word "we" when describing that situation
14   with the little girl and her father other than that 2011 report
15   you just mentioned?
16   A.   No.  And it's very rare in the records, after he was
17   awarded his service-connected disability, that he ever
18   mentioned anything about his PTSD.
19   Q.   Isn't it -- he testified that he was given orders -- that
20   his unit was given orders to open fire on anybody and everybody
21   even if they were children.  Do you understand that?
22   A.   I understand that's what you're telling me.
23   Q.   Okay.  I'll represent to you that's the truth.  But he's
24   always consistently said that the incident involving the little
25   girl and her father was members of his unit doing it, except
```

1   for on this 2011 report it says, "We shot into crowds of

2   children;" right?

3   A.   You know, I looked at 8,000 pages, Mr. Thomas.  I believe

4   his accounts were "our troops" not my small battalion or

5   fighting group or whatever.  And I told you at deposition, I am

6   not a military strategist expert or I don't really know much

7   about military affairs.  But in the records I recall he spoke

8   not that it was his local group that was ordered to fire but

9   that he felt other soldiers had killed these friendlies, a

10  father and daughter, out of malice and that shocked his

11  conscience.

12  Q.   You ever served in the military, sir?

13  A.   We went through this.  I know nothing about military

14  affairs.

15  Q.   You don't.  You've never served in the military.  You've

16  never been in combat; right?

17  A.   I had volunteered to enlist but I was rejected.

18  Q.   In treating patients at the VA clinic, do you ever treat

19  any guys from World War II?

20  A.   Yes.  A person on the Bataan Death Match was in World

21  War II -- Death March, pardon me.

22  Q.   Guys who have been in the real stuff, the real nasty stuff,

23  they don't usually like talking about it, do they, sir?

24  A.   I would say the huge majority of both World War I veterans

25  and World War II veterans and Korean War veterans never related

 1   any of their experiences to anyone; so, yes that's certainly

 2   true.  I think with improved recognition, even Iraq,

 3   Afghanistan, Desert Storm, and Vietnam veterans are loathe to

 4   share their experiences.

 5   Q.  It's hard to face and it's hard to talk to other people

 6   about; isn't that true?

 7   A.  I think that is true, yes.

 8   Q.  And sometimes it can take decades.  There's all these

 9   stories about kids learning for the first time what their

10   grandfather did in World War II or Vietnam because for decades

11   they wouldn't talk about it; right?  You've heard these

12   stories?

13   A.  Oh, of course, of course.  And I'm -- particularly I have a

14   subinterest in World War I and the nature of PTSD and shell

15   shock and it's remarkable that after World War I there was very

16   little interest in psychological PTSD but only in neurological

17   PTSD.

18           MR. THOMAS:  Let's put up Exhibit 210, please.

19           I think Ms. Greiner may have a problem, Your Honor.

20       (Court reporter interruption.)

21           THE COURT:  She's making her motion-activated lights

22   turn back on; looks like sometimes she's swinging.

23   BY MR. THOMAS:

24   Q.  Do you remember reviewing this record in your review of the

25   hundreds and thousands of pages of Mr. Leininger's medical

1  records?

2  A.   Yes, I do.

3  Q.   This is from October 21st, 2008; correct?

4  A.   Yeah.

5  Q.   And in this record it's -- and it's a mental health

6  consult; correct?

7  A.   That's what it says.

8  Q.   Okay.  It says -- he's talking to her.  It says, "Sometimes

9  he would get teary-eyed as he reports past military experiences

10  while in Desert Storm and in Iraq, especially on report of

11  anger towards his fellow soldiers who killed a father and a

12  young daughter for crossing a restricted area."  Did I read

13  that correct?

14  A.   Yes.

15  Q.   It says, "States that he saw them kill them and was very

16  upset about it but he could not do anything.  He states that

17  every night he will have nightmares and will be waking up in

18  sweats with recurrent flashbacks of the incidents."  Did I read

19  that correct?

20  A.   Yes, you're a very good reader.

21  Q.   Thank you.

22       This is 2008, so it's about 27 years since he rotated back

23  into the country; right?

24  A.   I don't calculate it quite the same way.

25  Q.   Well, your math is, I guarantee, better than mine.  I'm

16-2627 Leininger v USA et al   7.9.20 Vol. 4      838

1   notoriously poor.

2   A.   I had 17 years.

3   Q.   Well, he became back in 1991?

4   A.   Yes.

5   Q.   So -- you're right.  You're right.  So it's only 18 years.

6   Thank you very much.  I embarrassed myself with math for the

7   18th time in the last week.

8       Eighteen years and this is the first report we find in his

9   medical record regarding this incident; right?

10  A.   Yes.

11  Q.   Is that uncommon, in your understanding with veterans of

12  serious, horrific combat-related trauma?

13  A.   Is it -- and, I'm sorry, your predicate and subject were

14  unclear to me.  Do I think it is uncommon for a American

15  soldier to first go to a Veterans Hospital 17 or 18 years after

16  they were discharged?

17  Q.   No.  Let me be more clear.  I apologize.  Is it -- is it --

18  and let me put it -- let me use opposing counsel's word.

19      Is it reasonable that it would take a veteran 18 years to

20  talk to a healthcare professional about something as horrific

21  as this?

22  A.   I don't know.  I don't have a scale of horrificks,

23  Mr. Thomas, so I --

24  Q.   This was a --

25  A.   -- prefer just to use the term traumatic because horrific

1    covers a wide range of trauma.  It's certainly possible.  There

2    are many explanations.

3        So I don't think it's particularly common that a

4    post-Vietnam era soldier would first go to a VA Hospital for

5    what they now are identifying as PTSD?  I think that's

6    relatively uncommon.

7    Q.  Does she say that he claims he has PTSD or is that what she

8    diagnosed him with?

9    A.  Well, he's describing PTSD.

10   Q.  Okay.  But he never told her, according to her notes, "Hey,

11   I've got PTSD;" right?

12   A.  I'm not sure, but it's not a matter of import.

13   Q.  That might be your opinion.  You've testified in your

14   deposition that the only reason he started talking about this

15   stuff was because he was trying to get money on a comp and pen

16   case; right?

17             MR. EISER:  Objection.  Beyond the scope of direct.

18             THE COURT:  Overruled.

19             THE WITNESS:  I believe that Mr. Leininger filed his

20   first request for PTSD-related service-connected disability on

21   or about October 21st, 2008, so that's why I made that

22   statement.

23   BY MR. THOMAS:

24   Q.  Okay.  Do you know --

25   A.  By indication he goes to the VA and describes classical

1    symptoms of PTSD.

2    Q.  Did you know that there is a regulation that when a veteran

3    reports what -- symptoms of PTSD, the doctors and therapists

4    are obligated under VA regulation to tell him or her that he

5    has a right to file a claim?  Did you know that?

6    A.  No.  I told you I don't know anything about military

7    affairs.

8    Q.  Did you read any of the depositions in this case?

9    A.  The deposition of Mr. Leininger and the deposition of

10   Mrs. Leininger.  I, of course, read my deposition also.

11   Q.  You don't know if this -- if this healthcare provider, upon

12   hearing what he was reporting to her, told him, "Hey, by the

13   way, I'm obligated to tell you, you need to file a claim for

14   disability," you don't know that, do you?

15   A.  No, I don't.

16   Q.  You didn't know there was actually a pool -- a VHA

17   regulation that says they're required to do that, did you?

18           MR. EISER:  Objection.

19           THE COURT:  What's the objection?

20           MR. EISER:  Facts not in evidence, this VA regulation

21   or whatever it is we just heard about.

22           THE COURT:  Well, the question isn't evidence.  It's a

23   question and he can answer it with what he knows about it.

24   Overruled.

25           MR. EISER:  Thank you.

1        THE WITNESS:  I don't know if there was such a rule in

2   2008.  I would have to research that, but I did not do so.  And

3   I did not see anything in the note where Dr. Lisondra (ph)

4   wrote, "I counseled veteran that he needs to obtain an

5   application for PTSD."

6   BY MR. THOMAS:

7   Q.  He's coming to this woman because he wants to have help

8   with his nightmares; isn't that true?

9   A.  Are you testifying as to his mental state?  I don't know

10  his mental state in 2008.

11  Q.  Is he telling her he's having nightmares?

12  A.  That's what he's telling her.  You were testifying about

13  his motive.  I don't know what his motive was.

14  Q.  You don't know what his motive was today, but in your

15  deposition you actually did.  In your deposition you said his

16  motive was to get VA disability.  That's what you said back in

17  January, isn't it, sir?

18  A.  I believe I did because it struck me as interesting and

19  perhaps causal that before -- or on the same day or the day

20  after that he sees Dr. Lisondra he files a claim.  And it seems

21  further that perhaps he did not believe she would support his

22  claim and so he then complained that he didn't like the way she

23  spoke English and wanted a new doctor.

24        MR. THOMAS:  Move to strike as non-responsive, the

25  last part.

1        THE COURT:  Yeah, sustained.  I would ask the witness,

2    please, to confine the answers to the question that is

3    answered.  So I'm going to testify -- or, rather, I'm going to

4    strike the portion of the testimony after the words I believe I

5    did.

6    BY MR. THOMAS:

7    Q.  Did he tell this healthcare provider that he's been married

8    twice and he says he's afraid he will lose his third wife if

9    his problems continue.  Did I read that correct?

10   A.  Yes.

11   Q.  He admits that he has used alcohol and illicit drugs since

12   leaving Iraq; correct?

13   A.  For the past -- not for the past four years, correct.

14   Q.  He admits that he gets aggressive and that he's afraid he

15   might hurt somebody non-purposefully; correct?

16   A.  Correct.

17   Q.  Yet and you could -- six months ago you were -- you were

18   fine giving me a motive opinion, but now you can't -- you don't

19   want to give me a motive opinion; is that right?

20   A.  I told you what I inferred based on everything I saw in the

21   record.  I inferred a motive.  You were telling me he was going

22   because he was so upset with his nightmares.  I don't see that

23   I would agree with that.

24   Q.  Let's move on to Exhibit 248.

25        THE COURT:  Do you intend to offer Exhibit 210?

```
 1              MR. THOMAS:  I apologize.  Yes, Your Honor.
 2   Plaintiffs offer Exhibit 210.
 3              THE COURT:  Any objection to 210?
 4              MR. EISER:  No, Your Honor.
 5              THE COURT:  Received.
 6   BY MR. THOMAS:
 7   Q.  While we're doing that, you're not an expert on disability
 8   -- VA disability procedures, are you?
 9   A.  Not expert; I'm familiar with them.
10   Q.  Yeah, you're familiar with them.  You testified earlier
11   today that in order for the VA to get disability benefits, the
12   VA can't initiate it -- the military can't initiate it, the VA
13   has to initiate it; is that right?
14   A.  I'm sorry, that was very confusing to me, Mr. Thomas.
15   Q.  You testified earlier today that in order to get VA
16   disability benefits, the veteran has to initiate the claim; is
17   that right?
18   A.  I think I said generally that is correct unless -- and I
19   wasn't certain, but I believe if they were in the hospital that
20   might set off reporting from the VA for increased benefits, but
21   I can't swear to that.
22   Q.  Did you know that the military and the VA routinely
23   examines records sua sponte to determine if a veteran is
24   entitled to benefits?
25   A.  Again, that question was very unclear to me.
```

1    Q.  Did you know that the VA can and does initiate disability

2    benefits?

3    A.  Yes, I think I said if a person's hospitalized.  I don't

4    think they just take veterans and apply for disability.

5    Usually it's a VA representative who will speak with the

6    veteran and counsel the veteran about what's available.

7    Q.  Right.  You don't know if somebody -- you want to cast

8    Aaron Leininger as a money seeker or something, but you don't

9    know if somebody from the VA is the one who told him to file

10   his disability benefits; isn't that true?

11   A.  Well, I know that on the VA records regarding his

12   disability application, his disability application was made on

13   October 6, 2008.  I don't believe he saw Dr. Lisondra until two

14   weeks later.  So I would be surprised that it was Dr. Lisondra

15   who counseled him by time travel backwards to file a disability

16   claim.  He filed it on October 8th.  He saw Dr. Lisondra on

17   October 21st.  How could that possibly be?

18              MR. THOMAS:  Move to strike as non-responsive.

19              THE COURT:  Yeah, again, I would ask the witness to

20   confine the answer to the question that is phrased.  And I

21   would suggest to the questioner that the questions focus on one

22   fact at a time.  We've got a little bit of -- well, I won't

23   tell you how to do your jobs.  But I think the question and

24   answer dialogue is not what it should be in a

25   cross-examination, so I am going to strike this particular

 1   answer because it was not responsive.

 2   BY MR. THOMAS:

 3   Q.   Do you know if he had seen a social worker before he saw --

 4        We don't know if she's a doctor; right?

 5        Do you know if he saw a social worker before he saw Miss or

 6   Dr. Lisondra?

 7   A.   I do not know.

 8   Q.   Do you know that veterans are assigned case workers and

 9   social workers at the clinics?

10   A.   I do not know if every VA throughout the world assigns a

11   social worker to every veteran.  I do not know that.

12   Q.   Do you know if he had a social worker at this VA?

13   A.   Yes, he did.

14   Q.   And do social workers refer veterans and advise them on

15   their benefits that are available?

16   A.   Yes.  I think I explained that the interactions between

17   Mr. Newsome and Mr. Leininger were very much focused on social

18   work assistance getting a variety of benefits.

19   Q.   You are --

20        MR. THOMAS:   Okay.  Let's pull up 248.  Let's start

21   with the first page.

22   BY MR. THOMAS:

23   Q.   This is again -- this is another medical record from the

24   VA before the 2010 and 2011 incidents?

25   A.   And let me apologize to you, Mr. Thomas, to Mr. Eiser.

1    Rumney is the name of the social worker not Newsome.

2    Q.   Okay.  I'm not sure what you're referencing.

3    A.   I had said he had been seeing a social worker who I

4    recalled the name was Newsome, but it was Rumney that he had

5    seen twice for PTSD therapy and then it became more emergency

6    social work assistance.

7    Q.   Here -- thank you.

8         This is a social work note, a psychosocial assessment dated

9    September 18, 2009; correct?

10   A.   Yes.

11   Q.   And it gives a recount -- it says he's there for therapy;

12   right?

13   A.   Yes.

14   Q.   And it gives a recount of his experience in Iraq; correct?

15   A.   Yes.

16   Q.   And it talks again about -- I'm not going to go into

17   detail, but it talks again about the incident involving the

18   young girl and her father; right?

19   A.   Yes.

20   Q.   And it also talks about them being in a -- in a free fire

21   zone; right?

22   A.   Yes.

23   Q.   Do you know what a free fire zone is?

24   A.   I assume where people are shooting at each other.

25   Q.   No.  Free fire means you fire at will.

1    A.   Okay.  Thank you.

2    Q.   So when he says -- when he says that they have orders to

3    shoot any and all, that's what that -- that's what that means.

4    A.   Fine.  Thank you.

5    Q.   Okay.  But you said the first time he mentioned -- well,

6    just forget it.

7         If you go to the next page at the bottom paragraph, he

8    again talks about being on the Highway of Death and again the

9    incident with the young girl and her father; correct?

10   A.   Yes.

11   Q.   He was having problems with these memories; is that fair?

12   A.   Can you refer me to where that line is?

13   Q.   Well, it actually goes on on the next page, but I'll

14   withdraw it.  You're going to --

15        THE COURT:  Let's do this -- let's do this:  I've got

16   to actually recess a little early today for lunch because of a

17   request from my chief judge, so let's go ahead and take our

18   lunch recess here.

19        Let me just clarify one thing, Mr. Thomas,

20   Exhibit 248, am I missing that on your exhibit list or is this

21   a newly marked exhibit?

22        MR. THOMAS:  I apologize, Your Honor, it is a new one

23   because we sent it --

24        THE COURT:  Yeah, if you'll circulate it, I would be

25   grateful for that, and then I'll plan to see you all resuming

```
 1    with the witness at 20 after the hour in various parts of the

 2    country.  All right.  I'll plan to see you in about an hour.

 3    Thanks very much.

 4         (Recess.)

 5         THE COURT:  All right.  Good afternoon, everyone.  It

 6    appears that counsel and the witness are in place.  I'll just

 7    do a quick sound check around the board starting with

 8    plaintiff's room.

 9         MR. THOMAS:  I can hear you, Your Honor.  Can you hear

10    me?

11         THE COURT:  I can.  You're fine.  And likewise the

12    video is working there?

13         MR. THOMAS:  Yes, it is, Your Honor.

14         THE COURT:  Good.  And then from the defendant's room?

15         MR. EISER:  Yes, Your Honor, we can hear you.

16         THE COURT:  All right.  And, Dr. Abrams, are you

17    hearing me and seeing me from all sources?

18         THE WITNESS:  I am.  Thank you, sir.

19         THE COURT:  All right.  We've got a little bit of

20    feedback coming from somewhere and I think I see a couple of

21    phones shown on the participation list.  It looks like a person

22    is identified as Rebecca doesn't have her phone muted and I'd

23    ask that she do so.  And I think at least the feedback seems to

24    have stopped, at least I'm hearing it.

25         So with that, Mr. Thomas, you may resume your
```

 1   cross-examination of the witness.

 2             MR. THOMAS:  Thank you, Your Honor.  Your Honor, we

 3   offer Exhibit 248, which was the last exhibit we went over with

 4   the witness before the lunch hour.

 5             THE COURT:  Is there objection to 248?

 6             MR. EISER:  No objection.

 7             THE COURT:  It's received.

 8             MR. THOMAS:  Okay.  Let's pull up Exhibit 211.  This

 9   is already in evidence.  Oh, no, I'm sorry.  I've got my

10   exhibits -- my outline is wrong.  I need the Wendler from 2010.

11   This says it's Exhibit 211 but it's not.

12   BY MR. THOMAS:

13   Q.  I want to move on -- we're looking for it.

14       While we're looking for it, I can ask you some questions.

15   As it relates to Dr. -- he went to see Dr. Wendler on November

16   9th, 2010.  Does that sound right?

17   A.  Yes.

18   Q.  Okay.  And do you know why he was there?

19   A.  For a compensation and pension examination in response to

20   his request for a reassessment of benefits.

21   Q.  And what was the -- what is the base -- your basis that

22   this was a comp and pen exam?

23   A.  That's what it said on the top.

24   Q.  Of the -- of the medical record itself?

25   A.  Yes.

1   Q.  Okay.  And Dr. Wendler noted that in the case of this

2   veteran --

3       During your deposition I asked you, I noted Dr. Wendler

4   noted that he demonstrated 12 out of the 17 PTSD stressors

5   based on her evaluation.  Do you remember that?

6   A.  Roughly, yes.

7   Q.  Okay.  And you testified, in response to me pointing out

8   that she identified 12 out of 17 of the stressors, that in your

9   experience the people have memorized what the criteria are, and

10  you thought that, in the case of Mr. Leininger because he had

11  taken some nursing courses, he was aware -- he would be aware

12  of what the mental illness diagnosis criteria are under the

13  DSM; is that right?

14  A.  I indicated that he hit every checkmark, every severe

15  indication in his self-report to Dr. Wendler, that that raised

16  some red flags for me.

17  Q.  You thought that he had -- that Aaron Leininger, because he

18  may have taken some nursing courses some time in his life, had

19  memorized the DSM diagnostic criteria; right?

20  A.  I said that was possible or it's possible he looked online

21  and found the -- a website how to get service-connected

22  benefits or looked up online what the symptoms of PTSD are.  I

23  don't know what he did, but it struck me unusual in my

24  experience that someone with actual, clear PTSD would hit every

25  criteria.

1   Q.  Well, he didn't hit every criteria.  He hit 12 out of 17,

2   am I right?

3   A.  Yes.

4   Q.  Does Aaron Leininger strike you as a sophisticated man?

5   A.  He struck me as a complicated man.

6   Q.  I did have the right number; I looked at the wrong spot.

7   So, yes, let's pull up 210 -- or 211.  I'm sorry.

8        If you go to -- what is it sixth page -- there it is.  Here

9   again he's recounting to Dr. Wendler the story about what he

10  saw in Iraq and the story about the little girl and her father;

11  right?

12  A.  Yes.

13  Q.  And then if you continue on in the examination, Dr. Wendler

14  noted that, "In the case of this veteran, it is clear that the

15  development of his PTSD symptoms is most likely caused by or as

16  a result of combat trauma he experienced during Desert Storm."

17  Is that correct what she wrote?

18  A.  That's what she wrote.

19  Q.  She also noted that, "He did not have a problem with

20  substance abuse until after combat exposure which was likely a

21  means of coping with PTSD symptoms;" is that correct?

22  A.  That's what she wrote.

23  Q.  At the time I deposed you, you didn't believe any of this

24  was true; correct?

25  A.  Sometimes when you've used very general references --

1        Do I believe that Dr. Wendler wrote what she wrote?  I

2    believe she wrote what she wrote.  I believe that's true she

3    wrote what she wrote in the report.

4    Q.   Maybe my question wasn't clear.  You don't believe -- you

5    didn't believe, at the time I deposed you, that he actually had

6    combat-related PTSD; right?

7    A.   I have real doubts about it.  I would like to see some

8    evidence relating his assignment, his unit's action in Desert

9    Storm, because, as I said in the deposition, his first

10   application was denied because the VA said it couldn't find

11   evidence he was in combat.

12   Q.   Right.  And we're going to get into that.

13        But you also said -- well, it's interesting that you're

14   sitting here admitting this because earlier today you testified

15   that he does have severe psychological trauma, severe PTSD, and

16   that he will need treatment for the rest of his life.  That's

17   what you said; right?

18   A.   I did.

19   Q.   At your deposition you told me that, in order for you to

20   believe his story about seeing the little girl and the father

21   killed by American troops, you would have to see a picture of

22   him -- of troops or him standing over the dead body; isn't that

23   true?

24   A.   No, I told you you mischaracterized it.

25   Q.   All right.  You first mentioned that the -- you brought up

16-2627 Leininger v USA et al   7.9.20 Vol. 4          853

1   the picture -- seeing the picture of him standing over the dead

2   body in your January 30th deposition; right?

3   A.   I said that would be one form of evidence.

4   Q.   And then I asked you again about it at your next deposition

5   on January 31st; correct?

6   A.   Yes.

7   Q.   And you again stated that would be something that would

8   corroborate his story?

9   A.   Yes, that that would be one form of evidence.

10  Q.   You would need to see pictures of the carnage in order to

11  believe this man; is that right?

12  A.   No, it's not right.

13  Q.   And, in fact, the VA, after this initial evaluation,

14  Dr. Wendler, she didn't have his C file at the time of that

15  initial evaluation, did she?

16  A.   That's correct.

17  Q.   And -- and the C file is what?

18  A.   I believe it is the central file.

19  Q.   And it contains information such as their -- his -- it

20  contains his history in the military; right?

21  A.   Sometimes it does.  Sometimes it contains when the date of

22  enlistment, the date of discharge.  It rarely has medical

23  information.  It will have information about awards or

24  reprimands or court marshals or distinguished service, things

25  likes that.

1   Q.  I asked you if you had done any independent investigation

2   to determine if he had actually been --

3        You didn't believe he had even been in combat; right?

4   A.  I had no reason to believe one way or the other.  I told

5   you, I believe in the deposition, that I tried to look on the

6   Internet about the 3/E7's assignment during Desert Storm and I

7   couldn't find anything.  And you asked me if I knew what

8   11 hotel meant, and I told you no, and that was our decision.

9   Q.  And then I started showing you some records to show you

10  some of his award and badges.  Do you remember that?

11  A.  I remember you told me he had those awards and badges.

12  Q.  Good point.

13       Did you know that the attorneys that hired you in this case

14  back in 2018 had written to the National Archives to get a full

15  copy of his military records?

16  A.  No.

17  Q.  Has anybody ever provided that --

18  A.  I do not have his full military records.

19  Q.  Did they provide you with the records they received from

20  the National Archives?  They're already in evidence.

21  A.  I do not have his military records, as I stated at the

22  deposition.

23  Q.  I understand that.  My question is a little bit different.

24       Did you -- did they give you the records from the National

25  Archives that they obtained?

16-2627 Leininger v USA et al   7.9.20 Vol. 4          855

1    A.   I think I answered that by saying I do not have them.

2    Q.   Well, Dr. Wendler asked for his C file and she wrote an

3    addendum on January 5th, 2011; right?

4    A.   Yes.

5    Q.   And it says, "A review of the C file supports the

6    information provided in the initial PTSD exam information

7    gathered on November 9, 2010."  Did I read that correct?

8    A.   Yes.

9    Q.   You testified that he made this whole story up about the

10   little girl and her father to force an admission to the VA --

11   to the Topeka VA Hospital?  Do you remember that?

12             MR. EISER:  Objection.

13             THE WITNESS:  That's incorrect.

14             MR. THOMAS:  You're muted, Your Honor.

15             THE COURT:  I apologize.  I heard the -- I heard an

16   objection was made but I don't know what it is.

17             MR. EISER:  Beyond the scope of direct.

18             THE COURT:  I think it's within the questioning that

19   you opened up about the PTSD generally, and so it's related to

20   that and I'm overruling the objection.

21             MR. EISER:  Thank you, Your Honor.

22             THE WITNESS:  Again, I believe that's incorrect.

23   BY MR. THOMAS:

24   Q.   I asked you, I said -- I said, "Okay.  So due to what you

25   have determined in your opinion to be that due to plaintiff's

1   medical knowledge that he, in your view, concocted these

2   stories about dead corpses and seeing a father and daughter

3   gunned down, that he has fabricated these stories in order to

4   fit into, provide a scenario that would provide a basis for a

5   PTSD diagnosis; is that your testimony?"

6       Do you remember me asking you that?  You can pull it up.

7   A.  I don't remember you asking that, Mr. Thomas.  But I think

8   my answer was consistently I do not know but I had reason to

9   doubt Mr. Leininger's credibility in many areas.

10  Q.  Well, that's not what you said earlier this morning and

11  that's the problem I'm trying to figure out.  Because earlier

12  this morning you said he has very real and very severe

13  combat-related PTSD and something has changed between January

14  and now.  Am I correct?

15  A.  I have real doubts about it, but I can't prove those

16  doubts, and so I'm assuming at testimony today that I'm

17  accepting that what Mr. Leininger told Dr. Wendler is accepted

18  as true.  I have doubts about it but certainly there are, in my

19  thinking, two ways to address this case.

20          THE WITNESS:  If I can explain, Your Honor?

21          MR. THOMAS:  No.

22          THE COURT:  Look, look, you need to answer the

23  questions.  If there are things that the defendant wants you to

24  explain, of course he'll have the chance to redirect.  I just

25  would say -- I was going to say this at the beginning of the

1  day.  I think on balance the parties have handled the

2  challenges of trying a case by video admirably.  I think one of

3  the --

4      (Interruption by phone caller.)

5          THE COURT:  Hello.

6          I think one of the things that has happened, as the

7  trial has dragged on, is we have lapsed into the culture of

8  this being a video deposition.  And I would just encourage

9  counsel on both sides of the caption to focus the inquires on

10  the issues that really drive the outcome of the trial, and

11  that's not -- and I'm just saying this now.  I thought about it

12  at various times during yesterday afternoon and today.  It's

13  not directed solely at you, Mr. Thomas, and, please, don't take

14  it that way.

15          MR. THOMAS:  Understood, Your Honor.  I'll move on.

16  Trimming the fat, Your Honor.

17  BY MR. THOMAS:

18  Q.  Earlier today, sir, you testified that you did not believe

19  Aaron suffered PTSD as a result of the conduct of Mark Wisner;

20  is that true?

21  A.  Yes.

22  Q.  And you testified that one of the reasons is there has to

23  be a proximity to the time the conduct occurred to him

24  experiencing, I think you said, horror and -- what was the

25  other word you used?

16-2627 Leininger v USA et al   7.9.20 Vol. 4          858

1   A.   Fear and helplessness.

2   Q.   -- horror and helplessness; isn't that correct -- horror,

3   fear, and helplessness?   I apologize.

4   A.   Yes.

5   Q.   It has to be experienced at the time --

6   A.   At some time.

7   Q.   -- in order to be --

8   A.   I think I was indicating there's much doubt as to

9   Mr. Leininger's specifying when he believes he developed PTSD,

10  that Dr. Peterson does not specify when Mr. Leininger developed

11  PTSD.   And I do not believe he suffers PTSD from his

12  interactions with Mr. Wisner because of the absence of the

13  strong emotions that are listed in the DSM as part of the

14  syndrome of PTSD.

15          MR. THOMAS:   I'd move to strike.   I didn't even ask a

16  question.

17          THE COURT:   You did ask in order -- "it has to be

18  experienced at the time."   "At some time" was the answer.   Then

19  there was talking over one another.   I agree with the

20  objection -- or the request.   I would request the witness to

21  confine to the answer as it's put.   Wait for the question.   I

22  am striking the exchange that follows "in order to be."   You

23  can ask a new question, please.

24  BY MR. THOMAS:

25  Q.   You testified this morning that in order to meet the

16-2627 Leininger v USA et al   7.9.20 Vol. 4          859

 1    criteria for PTSD, the horror, fear, and helplessness has to be
 2    experienced at the time the act is committed; is that correct?
 3    A.   I don't recall.  I thought I said it has to be experienced
 4    at some time.
 5    Q.   Horror, terror, and helplessness are actually no longer
 6    part of the DSM criterion for PTSD; isn't that true?
 7    A.   They're still part of the description of the mental state
 8    that causes PTSD.
 9    Q.   Under the DSM-IV, somebody had to experience horror,
10    terror, and helplessness at the time of the event in order to
11    meet the criteria for PTSD; isn't that true?
12            MR. EISER:  Your Honor --
13            THE WITNESS:  That was the DSM-IV?
14            THE COURT:  Hold on just a second.  There's an
15    objection.
16            MR. EISER:  He's repeated the mischaracterization of
17    the testimony three times in three straight questions.  The
18    witness has corrected him each time.  He didn't say these
19    symptoms had to be felt at the time.  He said it had to be felt
20    at some time, and I don't -- so I object to the question.
21            THE COURT:  That's not an evidentiary objection.
22    There was a new question put to the witness.
23            Will you repeat it, Mr. Thomas?
24            The objection's overruled.
25            MR. THOMAS:  Yes.

```
 1   BY MR. THOMAS:
 2   Q.  Sir, my question was:  Under the DSM-IV, the patient had to
 3   experience horror, terror, and helplessness at the time that
 4   the act was committed in order to meet the criteria for PTSD
 5   under the DSM-IV; is that correct?
 6   A.  Yes.
 7   Q.  The DSM-V changed that requirement, the new one.  The
 8   current one that we're operating under today does not have that
 9   requirement; is that true?
10   A.  That's true it's been changed.
11   Q.  And, in fact, they removed it because then people who have
12   been groomed or manipulated wouldn't know that they were being
13   sexually abused until there was an outside verification or
14   notice; isn't that true?
15   A.  No, I don't believe that's true.
16   Q.  Why -- well, forget it.
17       Isn't it true, though -- even if you don't believe that's
18   true as to why they changed it, isn't it true that victims who
19   are being groomed or manipulated may not know or often do not
20   know that they've been sexually abused until later?
21   A.  That's not my experience, and I believe that would be a
22   mischaracterization of the term "know."
23   Q.  Fair enough.
24       And isn't it also true that it can be even more difficult
25   to recognize that the victim has been groomed or manipulated
```

16-2627 Leininger v USA et al   7.9.20 Vol. 4                   861

1    when they are in a dependent relationship with their abuser?

2    A.   You're asking hypothetically and generally?

3    Q.   I'll stick to my question, sir.

4    A.   Please repeat it so I can understand how it relates to

5    Mr. Leininger.

6    Q.   Isn't it true that for victims who have been sexually

7    assaulted via grooming or manipulation that it can also be

8    difficult for them to recognize that they were victims because

9    of the dependent relationship on their abuser?

10   A.   Again, are you asking hypothetically and generally?

11   Q.   Sure.

12   A.   Everything is possible in this world.

13   Q.   Under the DSM-V -- strike that.

14        The DSM-V, the current standard, recognizes that sexual

15   abuse can occur without the victim recognizing until later

16   after their psychological defenses have been overcome; would

17   you agree with that?

18   A.   Again, we're talking about very sophisticated meanings

19   to --

20        (Court reporter interruption.)

21             THE COURT:  Your answer started, "Again, we're talking

22   about very sophisticated meanings so" -- that's the question we

23   didn't hear the answer to.

24             THE WITNESS:  Okay.  Thank you, Your Honor.

25             People who form repressed memories will not

1    consciously know.  But the fact of repressed memories indicates

2    that they know in some manner which we attribute to

3    subconscious knowing.

4    BY MR. THOMAS:

5    Q.  I wasn't asking about repressed memories.  I'm just asking

6    isn't it possible and does the DSM-V recognize that sexual

7    abuse can occur without the victim realizing -- recognizing it

8    as such at the time it occurred?

9    A.  I can't answer that.

10   Q.  Okay.

11   A.  Everything's possible in this world.

12   Q.  I didn't ask if it was -- see, sir, I didn't ask if it was

13   possible.  I didn't ask a general overarching question like

14   that.  I asked if the DSM-V recognized it.

15   A.  I don't know.  I have a DSM-V in my library.  Would you

16   care to point out the paragraph?

17   Q.  That's okay.

18       Have you ever treated somebody who was the victim of mentor

19   abuse?

20   A.  Yes.

21   Q.  How many times?

22   A.  I've treated several people who were abused by clergy and

23   then in turn became child molesters themselves.

24   Q.  Have you ever treated somebody who had been a victim of

25   sexual abuse by a healthcare practitioner?

1  A.  Yes, I have.

2  Q.  How many times?

3  A.  I can only recall one patient at the moment.

4  Q.  Have you ever treated somebody who had been a victim of

5  prolonged or covered up mentor abuse?

6  A.  Yes, the clergy patients were all prolonged, extended,

7  covered up mentor abuse, as I understand the term.

8  Q.  And in those cases, did any of those patients develop a

9  distrust of the church or the religious institution from which

10  their abuse came?

11  A.  In my specific cases, no.  They became clergy and proceeded

12  to abuse children.  In my readings on the subject, of course,

13  many people who suffer clergy abuse also suffer a loss of

14  faith.

15  Q.  It's a common experience, correct, amongst victims of

16  church abuse to lose faith; right?

17  A.  Yes.

18  Q.  Did your -- your patient that had experienced healthcare

19  abuse, was it prolonged over a period of time?

20  A.  Yes.

21  Q.  Did they develop a distrust of the healthcare institutions?

22  A.  No.  They developed a distrust of the legal system because

23  they were barred by the statute of limitation and were very

24  angry about that but --

25  Q.  Have you ever --

1    A.   -- but they were seeing me for mental health assistance.

2    Q.   Have you ever done any research on the prevalence of

3    healthcare abuse -- healthcare sexual abuse in this country?

4    A.   I'm quite familiar with much of the literature because I

5    see many physicians and other healthcare professionals in

6    California for various licensing boards who are referred

7    because of a patient complaint against them for sexual boundary

8    crossings.

9    Q.   Healthcare sexual abuse has been a known problem in this

10   country for quite some time; would you agree?

11   A.   Yes.   A very, very famous psychiatrist in the 1940s was

12   later revealed, for instance, to be drugging his patients with

13   barbiturates and raping them.

14   Q.   And isn't it also true that the victims of healthcare

15   sexual abuse often develop a lack of trust of the healthcare

16   professionals -- the healthcare profession and the associated

17   institution?

18   A.   Some do, some might, some don't.

19   Q.   And don't you think it's reasonable that a victim of

20   healthcare sexual abuse would develop a distrust of the

21   healthcare system?

22   A.   Again, people are not stereotyped puppets.   Humanity

23   encompasses a wide range of experiences and responses to

24   experiences.

25   Q.   So is that a "yes?"

 1    A.   It's a people respond in a wide range of responses to the

 2    experiences of life.

 3    Q.   In your experience with patients who develop a distrust of

 4    the healthcare system after being a victim of healthcare sexual

 5    abuse, isn't it also common that they might not seek care when

 6    they need it or comply with physician recommendations?

 7    A.   I don't understand that question at all, Mr. Thomas.

 8    Please be a little more specific.

 9    Q.   I'll do my best.  Isn't it also -- and it was a compound

10    question at that.  Isn't it true that victims of healthcare

11    sexual abuse who lose trust in the system may not seek care

12    when they need it, healthcare?

13    A.   That's a possibility, yes.

14    Q.   And -- and that they also might have a problem complying

15    with physician recommendations?

16    A.   So, as I understand your question, because they were

17    connecting at first.  So those persons who don't lose trust who

18    then seek medical assistance, you're asking if they might be

19    non-adherent to medical advice?

20    Q.   I'll withdraw the question.

21         Isn't it true that healthcare provider sexual abuse causes

22    significant emotional and psychological harm?

23    A.   Not in every case.  It depends on specific facts and

24    specific responses.

25    Q.   Isn't it true that the psychological consequences of being

1    a victim of healthcare sexual abuse can include depression?

2    A.   That can occur with certain individuals.  Again,

3    Mr. Thomas, it's very uncommon in psychiatry to say everyone

4    who had "x" experience has "y" response.  Humanity, the brain

5    is far more complicated.

6               MR. THOMAS:  Move to strike as non-responsive.

7               THE COURT:  Overruled.  I think it was responsive.

8    BY MR. THOMAS:

9    Q.   Let me just ask you this and you can give your answer.

10   Isn't it also true that anger, drug and alcohol abuse,

11   distrust, and posttraumatic stress symptoms are common

12   consequences of being the victim of healthcare sex abuse?

13   A.   It can be.  It might not be.  Again, it's the same answer

14   as before, Mr. Thomas, that people vary, and it depends on the

15   extent of the abuse, what time in life it occurs, how long it

16   occurred, what the response of the person at the time was, how

17   people that it may have been reported to responded, whether the

18   person was made to feel shame or guilt for reporting it or

19   whether they were supported for reporting it.  Too many

20   variables to be able to answer a question other than everything

21   is possible.

22   Q.   When -- during your deposition you testified that you

23   thought Aaron Wisner (sic) was malingering about his combat

24   PTSD; isn't that true?

25   A.   I don't know who Aaron Wisner is.

1  Q.  Anger Leininger, sorry.

2  A.  I have real doubts, but I have to remain agnostic in the

3  face of no evidence other than Mr. Leininger's self-report.

4  Q.  You also believe Aaron Leininger is malingering, in terms

5  of his PTSD in terms of his result of his interactions with

6  Mark Wisner; isn't that true?

7  A.  I believe that's true, yes.

8  Q.  And you also testified that you thought Aaron was

9  manipulating Wisner; right?

10  A.  No, I didn't say that.  You said that, that was your

11  comment, Mr. Thomas.

12          MR. THOMAS:  Out of order.  We'll come back to it.

13  BY MR. THOMAS:

14  Q.  You testified earlier that you thought you didn't believe

15  Aaron when he said that his marriage had been affected by the

16  conduct of Wisner.  Do you remember that?

17  A.  I believe I said I have no evidence one way or the other

18  from the records, but that it would surprise me enormously if a

19  person on very high doses of powerful opioids who has a serious

20  lumbar spine injury that requires high-dose opioids and who has

21  low testosterone and who had been separated from his wife not

22  because of circumstances related to illness but because of

23  serious marital problems would have an awesome sexual life,

24  including hypersexuality of up to 13 orgasms intercourse.  I

25  said I was highly skeptical of that.  I have no doubt that

16-2627 Leininger v USA et al   7.9.20 Vol. 4          868

```
 1   there are severe marital problems related to the death of their
 2   daughter/stepdaughter Miranda.
 3   Q.  Yeah, that was something interesting is that you testified
 4   that his PTSD is no worse, no better than it was before the
 5   events of Wisner, yet somehow the death of his daughter in 2008
 6   severely exacerbated his PTSD?
 7   A.  I'm sorry, his daughter died in 2018.
 8   Q.  That's what I said.
 9   A.  You can hear the record.  I didn't hear that.
10   Q.  Okay.  So there's a contradiction there.  Do you see, sir?
11   A.  No, there's none.  I didn't believe --
12   Q.  Okay.
13   A.  -- Mr. Leininger one iota when he said the death of his
14   daughter did not affect him.
15   Q.  That's not what I'm saying, sir.  You testified on direct
16   that Mr. Wisner's PTSD (sic) is no worse, no better than it was
17   before the events of Wisner, and other than anger Wisner was a
18   non-factor; right?
19   A.  Roughly.  I, in fact, think his -- the records indicate his
20   PTSD is considerably better.  He hasn't had a psychotic episode
21   since his first visit with Mr. Wisner.  He had reported several
22   psychotic symptoms prior and was hospitalized for a psychotic
23   episode.
24   Q.  But in the same breath a little bit later you said his PTSD
25   was severely exacerbated by the death of his daughter in 2018;
```

1   is that true?

2   A.   I think his mental condition has been worsened by the death

3   of his stepdaughter Miranda.   I don't think learning about the

4   death by suicide of your stepdaughter causes PTSD.   It causes a

5   worsening in your mental state, including depression,

6   self-criticism, anger, et cetera.   I'm sorry if I implied that

7   having a family member pass away would be coded as PTSD.

8   Q.   Okay.   During your deposition on this issue of --

9        Yeah, I don't know why I moved on on this issue with his

10  marriage.   He never told you 13 to 14 times.   He said that he

11  had intercourse with his wife 7 to 12 times; isn't that what he

12  told you?

13  A.   Okay.   If it's 12 not 13 times a week, that's still more

14  than 10 or more, that characterizes hypersexuality.   And I

15  think 7 to 12 would reflect a very wonderful marital

16  relationship with strong bonds that somebody would experience

17  that sort of desire and desire to satisfy during a period of

18  marital strife, extreme use of high-dose opioids, and severe

19  lumbar pain.

20       MR. THOMAS:   I move to strike everything after the

21  first sentence.

22       THE COURT:   Yeah, I'm going to grant the motion.

23       Dr. Abrams, I think you've explained your testimony.

24  I am going to ask you to confine your answers to the question

25  that is placed to you.

16-2627 Leininger v USA et al   7.9.20 Vol. 4                   870

1        I would encourage the questioner, likewise, to ask

2   narrow questions if we're going to get through this

3   examination.

4        THE WITNESS:  Thank you, Your Honor.

5   BY MR. THOMAS:

6   Q.  Back to his daughter's death.  Something traumatic like

7   that can worsen already existing PTSD; is that true?

8   A.  It worsens everything about a person's life.

9   Q.  A second trauma can exacerbate a prior -- a pre-existing

10  PTSD; is that true?

11  A.  It certainly can.  Not always but it certainly can.  It

12  more likely would induce grief and depression and a variety of

13  painful feelings.

14  Q.  Isn't it true that victims of sexual trauma often do not

15  come forward?

16  A.  Yes, that's quite common and well-documented.

17  Q.  You don't know what Veterans Choice is; correct?

18  A.  I thought I said I did.

19  Q.  Okay.

20        COURTROOM DEPUTY:  Judge, excuse me, judge.  We

21  noticed that the defense counsel's video is missing, so it

22  might be best to give them a few minutes to rejoin.

23        THE COURT:  Let's get them reconnected.  Let's just

24  pause in place everyone.

25        All right.  Mr. Eiser, we have you back.  Are you able

1    to hear and see us?

2           MR. EISER:  Yes, Your Honor.

3           THE COURT:  And the question -- I believe I noticed

4    you were present on the question about "a second trauma can

5    exacerbate a prior pre-existing PTSD.  And through the answer

6    of that question is that when you dropped off.

7           MR. EISER:  I believe so, Your Honor.

8           THE COURT:  All right.  So in fairness here,

9    Mr. Thomas, the question that you asked, "Isn't it true that

10   victims of sexual trauma often do not come forward?"  "You

11   don't know what Veterans Choice is; correct?"

12          I think those two answers, in fairness given the

13   technology drop, should be stricken.  If you want to explore

14   those two topics, you should re-ask them now.

15          MR. THOMAS:  Could I ask what that first question was

16   again, Your Honor?

17          THE COURT:  You can.  You asked -- the first of the

18   two questions was, "Isn't it true that victims of sexual trauma

19   often do not come forward?"  The witness answered.

20          And then the second question you asked was, "You don't

21   know what Veterans Choice is; correct?"

22          So those two questions and answers I'm striking from

23   the record.  And if you want the witness's answers, if you want

24   to explore those questions, you need to re-ask the questions.

25          MR. THOMAS:  Understood, Your Honor.

```
1    BY MR. THOMAS:

2    Q.   Dr. Abrams, I'll ask again:  Isn't it true that victims of

3    sexual trauma often don't come forward?

4    A.   Yes, that's well-documented.

5    Q.   Isn't it true Veterans Choice is a temporary program?

6    A.   I never understood it to be a temporary program.  I

7    understood it to be an as-needed program.

8    Q.   Do you know what the requirements are for it?

9    A.   I cannot say what they are.  I understand the central

10   requirement is for services that the veterans clinic cannot

11   provide to the veteran.

12   Q.   You believe that he hasn't returned to the VA because they

13   cut off his pain meds; is that right?

14   A.   I'm sorry, it was difficult for me to understand your

15   question, Mr. Thomas.  Could you, please, repeat it?

16   Q.   Yes.  You believe that Aaron Leininger hasn't returned to

17   the VA in three-and-a-half years because they cut off his pain

18   meds; is that right?

19   A.   No, that's not right; he has returned.

20   Q.   He's returned in the last three-and-a-half years?

21   A.   Yes.

22   Q.   When?

23   A.   I don't have the records, but if you -- I assume you have

24   the transcript of the IME since you were just telling me about

25   it.  He told me he had been to the VA a month or so before I
```

1    examined him.

2    Q.  Do the actual records show that he has been to the VA since

3    2017?

4    A.  I have no records from the VA after August or September

5    2016.

6    Q.  Okay.  You testified earlier that -- I mean, you testified

7    that you thought he wouldn't -- he wasn't going back or he was

8    refusing to go back because they cut off his pain meds, not

9    because of what Wisner did to him; am I right?

10   A.  Oh, I think I was saying something different.

11   Q.  All right.  Then I'll move on.

12       They cut off his pain meds, by the way, because he wasn't

13   taking the pills; right?

14   A.  No, because he was abusing his contract, his opioid

15   contract, the same as happened at the University of Kansas.

16   Q.  But the abuse, as you call it, the abuse of the contract is

17   that he wasn't taking the pain pills that they were

18   prescribing, am I right?

19   A.  The abuse, as I understand it, was that his drug testing

20   showed an absence of the opioid suggesting diversion.

21   Q.  Okay.  They didn't say -- it didn't say suggesting

22   diversion, did it?

23   A.  No, but that's why physicians are instructed to do urine

24   testing.

25   Q.  He wasn't taking the pills they were giving him; can we

1   agree on that?

2   A.   We can agree that his urine test was negative when they did

3   it, yes.

4   Q.   This veteran, was he in STA's platoon, the sniper?

5   A.   You're talking about my other case?

6   Q.   Yeah.

7   A.   What platoon does he ask.

8   Q.   Does he talk about -- he was a victim of sex abuse?

9   A.   No.

10  Q.   Oh, okay then.  Has he talked to you about his experiences

11  in combat?

12  A.   Extensively.

13  Q.   Did he talk to you about that the first time you met him?

14  A.   I don't think the first time.  I think he told me the first

15  time his experiences were classified and he wasn't sure he

16  could talk about them.

17  Q.   You've -- you've examined him or met with him 25 times; is

18  that correct?

19  A.   That's correct.

20  Q.   You've established a rapport with him?

21  A.   I believe an important rapport that kept him from killing

22  himself.

23  Q.   And -- and bless you for that.

24       Would you agree that continuity of care with a provider you

25  can trust is important for somebody like this sniper?

1   A.   I absolutely believe that, yes.

2        MR. THOMAS:  No further questions.

3        THE COURT:  Redirect for the witness?

4        MR. EISER:  Very briefly, Your Honor.

5                   REDIRECT EXAMINATION

6   BY MR. EISER:

7   Q.   Dr. Abrams, can you hear me?

8   A.   Yes, I can.  Thank you.

9   Q.   Okay.  On cross-examination counsel brought out the fact

10  that you've -- your bill to the United States thus far was for

11  235,000.  That's not all for this case, is it?

12  A.   No, it's not.  It's for all eight Kansas City cases

13  involving the Leavenworth VA and Mark Wisner.

14  Q.   During your cross-examination you mentioned something I

15  hadn't heard before, psychological PTSD as opposed to

16  neurological PTSD.  What's that?  Can you explain that?

17  A.   Yes.  And I don't want to be extremely tangential, but PTSD

18  was labeled shaking or shakiness after World War I -- during

19  World War I because what was primarily recognized among

20  shell-shocked victims of World War I was a sort of palsy,

21  irregular movement disorder where they would fall over, they

22  would be unsteady on their feet, they would have seizures of

23  shaking, and that was almost the entirety of the literature on

24  World War I PTSD.  There is nothing in the World War I

25  literature about reexperiencing avoidance and numbing.

1   Q.   Okay.  Is that considered psychological PTSD or

2   neurological PTSD?

3   A.   Well, for instance, you can go on the passé news archives

4   and see films of World War I veterans, and almost all of their

5   symptoms are neurological not psychological.

6   Q.   You were asked about Dr. Peterson's report.  Did

7   Dr. Peterson rely on the DSM-IV for any of his opinions that he

8   testified to in this case?

9          MR. THOMAS:  Your Honor, I didn't ask him any

10  questions about Dr. Peterson.

11         THE COURT:  You opened up the legitimate -- overruled.

12  You opened up the legitimacy of relying on the DSM-IV.  The

13  objection's overruled.

14         THE WITNESS:  I do not recall.  I thought he was

15  relying on DSM-V, but I don't recall whether he also relied on

16  DSM-IV.

17  BY MR. EISER:

18  Q.   Does he cite any DSM citation in his report?

19  A.   I'd have to look at his report.  Can you put that up

20  perhaps?

21  Q.   That's okay.  Don't worry about it.

22  A.   Okay.

23  Q.   I'll move on.

24         Did Dr. Peterson cite and rely on any specific medical

25  records as a basis for his opinion that the plaintiff suffered

1   PTSD from his encounters with Wisner?

2   A.   Yes.   He relied extensively on Dr. Wendler's records as he

3   testified on Monday.

4   Q.   Okay.   You might not have heard that.   I might have mumbled

5   the end of the question.

6        Did he cite and rely on any medical records as a basis for

7   his opinion that the plaintiff suffered PTSD from his

8   encounters with Mr. Wisner?

9   A.   He only relied on what he testified to took place when he

10  examined Mr. Leininger.

11  Q.   Okay.   You were just asked whether some victims of

12  healthcare sexual abuse experience avoidance of the entire

13  healthcare system, and I believe you said sometimes; is that

14  right?

15  A.   Exactly.

16  Q.   Okay.   Is that the case -- does that apply to

17  Mr. Leininger?

18  A.   Not at all.

19  Q.   Why not?

20  A.   Mr. Leininger first encountered Mr. Wisner in July 2012.

21  I did not count all the visits beginning with July 2012, visits

22  going to the VA Hospital in person to pick up a prescription,

23  calling the VA Hospital, but I would guess it was well over a

24  hundred times.   And I believe in his deposition Mr. Leininger

25  said from that very first visit he felt uncomfortable and that

1    that was his response to every subsequent visit.

2    Q.  If he hasn't returned -- assume for the question that he

3    has not returned in three years.  Do you -- would that be

4    because he is avoiding the entire VA healthcare system because

5    of sexual abuse --

6    A.  I --

7    Q.  -- by Mr. Wisner?

8    A.  I could not say that.

9    Q.  Why not?

10   A.  Because --

11          MR. THOMAS:  Objection.  Calls for speculation.

12          THE COURT:  I don't -- I don't understand the -- the

13   expertise that permits the witness to testify -- or to render

14   an opinion on this subject.  It's a causation subject.

15          MR. EISER:  All right, Your Honor.

16          THE COURT:  Well, I'm going to sustain the objection.

17   I think that's a decision for the finder of fact.  Doesn't make

18   it necessarily an improper question, but I -- I think the

19   objection challenges the expertise of the opinion -- or the

20   witness to give an opinion on that.  And I think it's fairly

21   made, so I'm sustaining it.

22   BY MR. EISER:

23   Q.  You were -- you were -- or you conceded that you don't know

24   the requirements for the VA Choice Program; is that right?

25   A.  I don't know all the requirements.  The old requirement I'm

1   familiar with is that the veteran has to be asking for a

2   service that the VA cannot provide.

3   Q.   Okay.  From your review of the records, do you know if

4   Mr. Leininger received VA Choice benefits?

5   A.   Yes, I saw documentation in VA memos that he was approved

6   for Choice.  I saw the record of Social Worker Newcomer, and I

7   believe the record from the University of Kansas indicated that

8   billing was to VA Choice.

9            MR. EISER:  Thank you, Dr. Abrams.

10           That's all we have, Your Honor.  May he be dismissed?

11           THE COURT:  Let me see if there's any recross.

12           MR. THOMAS:  If I may, one question, Your Honor?  May

13   I, Your Honor?

14           THE COURT:  Of course.

15                      RECROSS-EXAMINATION

16   BY MR. THOMAS:

17   Q.   Sir, do you understand that Mr. Leininger isn't asking for

18   damages for medical care that the VA cannot provide; right?

19   A.   I believe the VA can provide all of the treatment that

20   Mr. Leininger needs, whether he agrees with that or not.

21           MR. THOMAS:  No further questions.

22           THE COURT:  Anything else for the witness?

23           MR. EISER:  No, Your Honor.

24           THE COURT:  All right.  I don't hear anything.  I

25   assume the witness can be released.  And we'll go ahead and ask

1   you, Dr. Abrams, to terminate your participation in the

2   conference.  Thank you, sir.

3           THE WITNESS:  Thank you very much, Your Honor.

4           THE COURT:  Mr. Eiser, does the United States have

5   additional evidence?

6           MR. EISER:  No, Your Honor.

7           THE COURT:  All right.  Do you wish to rest at this

8   time?

9           MR. EISER:  Yes, Your Honor.

10          THE COURT:  All right.  The government has rested its

11  case.  Plaintiff, are you planning to present rebuttal

12  evidence?

13          MR. THOMAS:  Yes, Your Honor.

14          THE COURT:  And what will that consist of?

15          MR. THOMAS:  It would consist -- consist of

16  Dr. Peterson rebutting some of the testimony of Dr. Abrams on

17  Mr. Leininger's current diagnosis of PTSD secondary to the

18  trauma caused by Wisner.

19          THE COURT:  So the rebuttal case consists of one

20  witness?

21          MR. THOMAS:  Let me -- let me check, Your Honor.  Your

22  Honor, we do -- we would call Dr. Kelley again but we can't get

23  him until the morning to rebut the standard of care opinions

24  offered by the United States expert Dr. Nicholson.

25          THE COURT:  Well, I -- here's what I'll say to you:

 1   Certainly the plaintiff has a right to put on a rebuttal case.

 2   I have done my best to be patient and forgiving of the

 3   examinations.  I may not have always succeeded, but that's been

 4   my aim.  I just want to announce to both sides of the caption

 5   that when it comes to a rebuttal case, that's what it means.

 6   It has to be rebuttal not repeat, and the same for the

 7   cross-examination of rebuttal witnesses.

 8           I've heard your cross.  This is not a context of who

 9   says what last.  And so I would expect any rebuttal evidence to

10   be narrowly tailored to a rebuttal mission, just so we're all

11   clear on that.  And I probably will not be as forgiving of the

12   scope of questioning as I have been to date.

13           So do you have -- Mr. Thomas, do you have Dr. Peterson

14   up and ready to go?

15           MR. THOMAS:  I believe so.  I believe he's on now.

16   There he is.

17           THE WITNESS:  Your Honor, I'm here.

18           THE COURT:  Good, we've got transition from you.

19           Mr. Eiser, I just -- I saw you were standing at the

20   lectern and I was fearful that I had skipped over.

21           I see you, Dr. Peterson.  It seems like you're

22   adjusting.

23           Mr. Eiser, I think I may have skipped over something

24   that you wanted to say before we turned to the rebuttal case.

25           MR. EISER:  Well, I --

```
 1            THE COURT:  Go ahead.

 2            MR. EISER:  According to the rules, my experts are

 3    rebuttal experts.  I'm unfamiliar with -- and I don't -- most

 4    judges I've been with don't allow rebuttal to the rebuttal, and

 5    I don't see how whatever he's going to say now is going to be

 6    in his report, so but I -- if we want to start and try --

 7            THE COURT:  I don't -- I don't know, perhaps this is a

 8    regional difference.  I have, in every case I have had -- gone

 9    to trial in this job, whether civil or criminal, I have offered

10    the party bearing the burden of proof the opportunity to

11    present a rebuttal case or rebuttal evidence.  It is that

12    though.  It is not a chance to replay your case or to repeat

13    your case themes, and so I do expect and require it to be

14    narrowly tailored.

15            But if you want an objection to this premise that the

16    plaintiff, as the party bearing the burden, has an opportunity

17    to present rebuttal -- evidence of rebuttal testimony, I hear

18    your objection.  I'll treat it that way.  I'm overruling it and

19    you may pursue that issue as you see fit.

20            MR. EISER:  Just to be clear, Your Honor, we don't --

21    of course he is -- the plaintiff is entitled to rebuttal

22    evidence and put on rebuttal testimony.  My point is I don't

23    know that he can put on rebuttal expert testimony to rebut the

24    rebuttal expert.  And to be consistent with the rules that have

25    been -- that we're following, to get the report, take the
```

1    deposition, let's streamline this, these are the issues, no

2    surprises at trial.  I think I'm about to be surprised, but

3    let's -- let's proceed.

4           THE COURT:  Well, I -- look, the rule governing what

5    disclosures must come from the experts still applies, and so

6    undisclosed opinions are not permitted in the rebuttal case or

7    otherwise.  But there may have been opinions in the report, I

8    don't know.  Of course I have not lived through the report

9    making or read those.  There may well have been opinions that

10   are within Dr. Peterson or Dr. Kelley's report that the

11   plaintiff chose not to present during their case in chief

12   because they didn't know whether your expert was going to put

13   them -- your experts would put them in play.

14          Perhaps believing, just for discussion sake, that they

15   have put those in play, they may now choose to present a

16   response or a rejoinder to that.  I can't sort that out in the

17   abstract in advance of the testimony.  But so that it is clear,

18   Mr. Thomas, this is not a pathway for going outside the report,

19   which, of course, Rule 26 requires all opinions, all bases, all

20   facts, all exhibits.  So I think we're all on the same page.

21          Mr. Eiser, I'll note your objection for the record.

22   And to the extent it is an objection to the rebuttal case in

23   the abstract, I'm overruling it.  If you have objections that

24   you contend aren't disclosed or not proper rebuttal, you may

25   raise them as you see fit.

1          MR. EISER:  Thank you, Your Honor.

2          THE COURT:  All right.

3          All right.  Are you ready to proceed with

4     Mr. Peterson?

5          MR. THOMAS:  Yes, I am.

6          THE COURT:  I said -- Dr. Peterson, I explained this

7     to the lawyers yesterday.  When there's a jury involved,

8     everybody's a mister.  Nobody gets a doctor or an agent or an

9     officer or any of that.  In bench trials, I should be better

10    about that.  I mean no insult to your training and experience,

11    so, please, forgive me.

12         Mr. Thomas, you may proceed with your witness.

13         MR. THOMAS:  Sir, thank you, Your Honor.

14         THE COURT:  And I'll just say, Dr. Peterson, we are

15    not going to ask the deputy clerk to readminister the oath.  It

16    was applied to you previously during this trial and, of course,

17    it's obligation still apply to you.

18         THE WITNESS:  I understand that, sir.

19                   STEPHEN E. PETERSON, M.D.,

20    recalled as a witness on behalf of the Plaintiff, having first

21    been reminded of the oath previously administered, testified as

22    follows:

23                        DIRECT EXAMINATION

24    BY MR. THOMAS:

25    Q.  Doctor, when you were on the stand earlier, we -- you

 1   disclosed the fact that you had examined over 200 -- somewhere

 2   between 200 to 250 victims of mentor abuse; correct?

 3   A.   Yes.

 4        MR. EISER:   Objection.   Beyond the scope of Mr. --

 5   Dr. Abrams' testimony.

 6        THE COURT:   I'm overruling.   I think this is

 7   preliminary.   We'll see where it goes, but for now I'm

 8   overruling that objection.

 9   BY MR. THOMAS:

10   Q.   Is -- is the concept that healthcare providers can abuse

11   their position to sexually exploit patients a novel one?

12   A.   No.   It's a well-established concept in mental health

13   literature.

14   Q.   And you talked about in your report the impacts the mentor

15   abuse relationship, the mentor doctor-patient relationship --

16        This is awful I move to strike my own question.

17        THE COURT:   Granted.

18   BY MR. THOMAS:

19   Q.   You talked about the significance of betrayal, and that's

20   my word, but your report discusses this issue and how it's

21   impacted Mr. Leininger; correct?

22   A.   Yes.

23   Q.   Okay.

24        MR. EISER:   Objection.   Mentor is not mentioned in his

25   report, mentor relationship.

1          THE COURT:  Mr. Thomas.

2          MR. THOMAS:  He talked about it in his -- he did talk

3    about it in his deposition and he -- I think he mentioned it in

4    his report that he'd done over 200 cases of -- but maybe not.

5    But we talked about it during his direct.  It's not surprise.

6    It was just a prefatory statement to set up the next question.

7          THE COURT:  So, Mr. Eiser, I'll give him some

8    preliminary leeway just to set the table for the question.  I

9    don't think this has gone to the nature of an opinion.  So the

10   reference, I view, as collateral and I overrule your objection.

11         MR. EISER:  Thank you.

12         MR. THOMAS:  Let me approach this differently.

13   BY MR. THOMAS:

14   Q.   Do you have an opinion as to whether or not the

15   significance of the relationship between Wisner and

16   Mr. Leininger is part of what's had an impact on his current

17   mental health?

18   A.   Yes.

19   Q.   And what is that opinion?

20         MR. EISER:  Objection.

21         THE COURT:  What is the objection?

22         MR. EISER:  Nothing in the report about the

23   relationship.

24         THE COURT:  Well, look, I can get the report out and

25   we can all start taking it apart on whether this question,

1   wherever it leads, is within the report.  I'm going to take the

2   objection with the case.  And if indeed this opinion is

3   undisclosed, I'll disregard it and it won't form a part of the

4   evidentiary basis.

5           MR. EISER:  Thank you, Your Honor.

6   BY MR. THOMAS:

7   Q.  You can answer, sir.

8   A.  Mr. Wisner made it very clear to Mr. Leininger that they

9   were both battle buddies, that they had -- that he was a

10  lieutenant colonel, that he would take care of them, that

11  veterans were treated safely, and this is part and parcel of

12  creating a mentor relationship with the patient; in other

13  words, the superior officer who is also a medical officer is

14  reassuring the patient that he will be taken care of.  This is

15  a very common power imbalance between the perpetrator and

16  victim commonly seen in mentor abuse relationships.

17  Q.  And didn't your report talk about the fact that

18  Mr. Leininger has distrust in the VA?

19  A.  Yes.

20  Q.  And that correlated to the nature of the relationship he

21  had with Wisner?

22  A.  Yes.

23  Q.  Can you explain that?

24  A.  Well, Mr. Leininger had severe pre-existing wartime PTSD

25  and didn't seek care for the psychological aspects of it until

1    many years after his wartime service.  And so trust in the

2    overall institution, trust in the individual treaters, trust

3    from the safety of the system is all part of his ability to

4    come in and receive care.

5    Q.   Is it common for sex abuse victims who have been victimized

6    by healthcare providers to show a diminished trustworthiness of

7    healthcare professionals?

8    A.   Yes, it is, very much so.  There is even research about

9    that.

10   Q.   Let's not get into any research that wasn't disclosed in

11   your report.  Okay?

12   A.   Yes, sir.

13   Q.   Okay.  Is it common that for victims of sex abuse by

14   healthcare providers, for them not to be discouraged from

15   seeking care and -- and -- strike that.

16        Can patient victims of sex abuse by healthcare providers be

17   discouraged -- strike that.  Still not coming out right.  Not

18   my best day.

19        Let's switch gears.  Well, before we do, there was

20   questioning and testimony from Dr. Abrams about the fact that

21   Wisner did not -- or Aaron did not disclose Wisner's conduct to

22   the VA.  Do you remember that?

23   A.   Yes.

24   Q.   And you've talked about this before.  Why didn't -- in your

25   opinion, why didn't Aaron report Wisner to the VA?

1   A.   Well, first off, in abuse of persons by physicians, very

2   few people actually report.  It's something like 5 to

3   10 percent of persons who are abused by a physician will

4   actually report it to anyone.  The second is that Mr. Leininger

5   felt betrayed, didn't know who to trust in the system.

6       And initially before -- before the notice from the Officer

7   of Inspector General's letter, he believed that he needed to

8   comply with Mr. Wisner's examinations as a part of his care.

9   So he believed that the care was required and exams were

10  required, so he wasn't going to -- he would not be in a

11  position to -- to report something he thought that was required

12  of him as his medical care.

13  Q.   Dr. Nicholson said that you stated, or in your depo or in

14  your report, that Aaron had repressed memories.  Is that what

15  you said?

16  A.   I'm sorry, do you mean Dr. Abrams?  You said Dr. Nicholson.

17  Q.   Dr. Abrams.  Dr. Abrams testified that you thought Aaron

18  Leininger had repressed remembers -- memories and that's why he

19  didn't report.  Is that what you believe?

20  A.   No, that's incorrect.  I did not believe that Mr. Leininger

21  experienced repressed memories.  He believed that Dr. -- or

22  Mr. Wisner's extended genital exams were part of the required

23  medical care and effectively was groomed and disarmed.  These

24  were inappropriate until an external validation, such as Kerry

25  Baker's letter, I've commonly talked about how it pierces

1   someone's defenses.  It made him realize that the care was much

2   more than just uncomfortable, it was inappropriate.

3   Q.   During your deposition you were asked questions about the

4   DSM-V.  Do you remember that?

5   A.   Yes.

6   Q.   And do you remember that you actually brought the DSM-V

7   with you so you could answer questions from defense counsel

8   about it?

9   A.   Yes, I brought a pocket version.

10   Q.   Did you hear Dr. Abrams testify that in order to meet the

11   criteria for PTSD, the victim has to experience horror, terror,

12   and helplessness at the time of the act?  Did you hear that

13   testimony?

14   A.   I heard.

15        MR. EISER:  Objection.  Objection.  Misstates.

16        THE COURT:  What's the objection?

17        MR. EISER:  Again, that's the mischaracterization that

18   he did three or four times in a row and I objected when he did

19   it then during his questioning of Dr. Abrams.

20        THE COURT:  Well, it either is or isn't a

21   mischaracterization.  The record will reflect that.  If the

22   witness answered a question that has a false premise, that will

23   come out.  So the objection is overruled.  The question itself

24   is not evidence.

25        MR. THOMAS:  Can I rephrase the question to make sure

16-2627 Leininger v USA et al   7.9.20 Vol. 4                891

 1   I'm clean on the record?

 2          THE COURT:  It, of course, is your question, you may.

 3   BY MR. THOMAS:

 4   Q.  Dr. Peterson, does a victim need to experience horror,

 5   terror, and helplessness at the time of the horror -- strike

 6   that.

 7       Does the victim -- doctor -- let me start over.

 8       Does the victim need to experience horror, fear, and

 9   helplessness at the time of the traumatic event in order to

10   meet the criteria for PTSD?

11   A.  No, not according to the DSM-V.

12   Q.  Did that used to be a requirement?

13   A.  It was a -- the -- I think the second requirement of

14   Category A in DSM-IV.

15   Q.  And you were actually on a committee involved in reviewing

16   this change; is that correct?

17   A.  Yes, I was.  I am on the American Academy of Psychiatry and

18   Law Trauma and Stress Committee.  I was on that committee and

19   contributed to our comments about the change in criteria from

20   DSM-IV to DSM-V.  And that was one of the changes which was

21   that the helplessness, horror, and fear wasn't -- didn't apply

22   to all people who had PTSD or could be having PTSD because

23   children may be too young to be able to have those experiences,

24   and those who are under -- dependent on or under the care of or

25   under the influence of someone perpetrating against them may

 1   not recognize that it is actually sexual or physical or

 2   emotional abuse until an external factor notices them or points

 3   out to them that the conduct is inappropriate.  So this was a

 4   substantial change from DSM-IV to DSM-V.

 5        I'm still on the Trauma and Stress Committee and some of

 6   the changes that we recommended were implemented and some were

 7   not.

 8   Q.  In your expert opinion, was Aaron Leininger groomed or

 9   manipulated by Wisner?

10   A.  Yes.

11   Q.  And in your expert opinion, did that impact whether or not

12   he realized he was a victim of sexual abuse at the time it was

13   happening?

14   A.  Yes.

15   Q.  And that's consistent with the change that the DSM-V gives

16   us; right?

17   A.  That is correct.

18   Q.  That change was made specifically for these types of

19   situations; correct?

20   A.  Yes, it was.

21   Q.  So when then -- when did -- when would the trauma occur for

22   -- for -- not when would.

23        When did the trauma occur to Aaron Leininger?

24   A.  Well, I think this is an interesting question.

25             MR. EISER:  Objection.

1          THE COURT:  Hold on just a second.  There's an

2   objection.

3          MR. EISER:  Yeah.  It's the same objection.  As the

4   witness just said, it's difficult to answer.  He didn't answer

5   it in his report.  We didn't get this, the "when he suffered

6   PTSD."

7          THE COURT:  Mr. Thomas, is it in the report?

8          MR. THOMAS:  Yes, it is, Your Honor.  It's -- it's not

9   worded the way I've worded it, but it's in his report.  It's --

10  and he talked about it briefly in his -- in his testimony.  He

11  called -- if I could -- I don't want to coach the witness, so

12  I'm not going to say what he said.

13         THE COURT:  Well, I think -- I think the problem that

14  I'm having is exactly the one you were talking about:  this

15  does not strike me as rebuttal.

16         MR. THOMAS:  Fair enough.  I'll withdraw the question

17  and I have no further questions, Your Honor.

18         THE COURT:  All right.  Is there cross-examination

19  from the defense side of the caption?

20         MR. EISER:  No, Your Honor.  Thank you.

21         THE COURT:  Thank you.  Dr. Peterson, you're released

22  again and you can disconnect any time you wish.

23         THE WITNESS:  Thank you, Your Honor.

24         THE COURT:  Thank you.  All right.  So, counsel --

25  Mr. Thomas, yes.

16-2627 Leininger v USA et al   7.9.20 Vol. 4          894

1          MR. THOMAS:  We're not going to call Dr. Kelley.

2          THE COURT:  Okay.

3          MR. THOMAS:  All we would offer is we'd like to offer

4   some materials for the court to take judicial notice of and we

5   will close our rebuttal -- or rest our rebuttal.

6          THE COURT:  All right.  What are the -- what are the

7   materials?

8          MR. KILGORE:  Your Honor, this relates to exhibit --

9   Plaintiff's Exhibit 129, which is the consent order for

10  surrender that's in evidence.  We simply wanted to -- and we've

11  marked all of these as exhibits and provided them to the court

12  and -- and opposing counsel.  Simply wanted to ask the court to

13  take judicial notice of the statutes and regulations that are

14  cited in that consent order, Exhibit 129.

15         And so I have four exhibits that I can identify for

16  the record if the court will allow.

17         THE COURT:  All right.  And these are -- these are new

18  exhibits; they're not on your list?

19         MR. KILGORE:  No, they weren't on our original list

20  but -- but it relates to 129.

21         THE COURT:  All right.  Why don't you identify the

22  materials and offer them and specify what they are and then

23  I'll hear from the defendant.

24         MR. KILGORE:  Okay.  And we've marked them each as --

25  starting with the first one as 129A, we've marked the statute

1    K.S.A. 21-5505.

2          The next exhibit is Exhibit 129B, and that is

3    K.S.A. 65-28a05.

4          Exhibit 129-C is a regulation.  It's K.A.R. 100-28a-7.

5          And the fourth exhibit is -- is Exhibit 129D and it is

6    another regulation K.A.R. 100-28a-8.

7          All of these were, as I say, cited in the consent

8    order that's already in evidence.  It is all of the citations

9    that are relevant and weren't -- not intended to select

10   particular ones but rather simply provide the court with the

11   statutes and regulations that were cited in Exhibit 129, and I

12   offer those.

13         THE COURT:  Mr. Eiser -- thank you.  Mr. Eiser, is

14   there any objection to the court receiving those exhibits under

15   a judicial notice offer?

16         MR. EISER:  No, Your Honor.

17         THE COURT:  All right.  Exhibits 129A, B, C and D are

18   received under the principles of judicial notice is, I guess,

19   the correct way to describe it.  I believe it's -- the correct

20   way to describe it is evidence of the state law that is

21   referenced in an exhibit that was received substantive

22   evidence.

23         All right.  With that does the plaintiff rest his

24   rebuttal case?

25         MR. KILGORE:  Yes, Your Honor.

1        THE COURT:  All right.  Thank you very much.  Counsel,

2   I want to talk about this before I forget and then talk about

3   where we head from here.  In my mail today I received a

4   handwritten letter from -- or purporting to be from Mr. Wisner

5   -- Mr. Wisner, rather.  It did bear the return address of the

6   Kansas Department of Correction facility where the parties

7   referenced he was incarcerated earlier.  I've read it.  I'm

8   going to put it up on CM/ECF so that the record is not

9   mysterious on this point.  I directed the deputy clerk to

10  docket it as a pro se motion for a protective order.

11        In either full, exclusive, or large measure, the

12  motion, or the letter, seems to request relief from the request

13  by the plaintiff pretrial to have Mr. Wisner brought to the

14  courthouse for trial.  I think it is either largely or wholly

15  moot.  I'll take time after court today to study that.  If it

16  is as moot as I believe it to be, I'll deny it as such.  But I

17  wanted you to know that event happened and you would receive a

18  CM/ECF notice about it.

19        All right.  From here, counsel, tell me your

20  temperature, your preference, your wish for going forward

21  toward a decision in the case.  Mr. Thomas, Mr. Kilgore?

22        MR. THOMAS:  Not -- I'm not entirely sure what the

23  court is asking.  Are you asking if we want to do a closing?

24        THE COURT:  Well, it was a mysterious question.  I

25  confess it was purposefully that way.  I didn't want to suggest

1    what the parties should do.  Certainly in some bench trials

2    I've requested --

3          I've got -- hang on just a second, I've got something

4    that came up and I want to make sure it doesn't interrupt what

5    I'm trying to say.

6          So I've requested post trial proposed findings and

7    conclusions of law.  That's a lot of work for the parties and I

8    am mindful of Rule 1's command that courts manage cases

9    efficiently and not impose needless delay or inefficiency.  I'm

10   not sure that I need that kind of comprehensive submissions

11   from either side of the caption.  But if the parties had strong

12   feelings about it, I wanted to be open to hearing it.

13         You also have time remaining on your respective

14   clocks, and so I guess if somebody told me they wanted to make

15   a closing argument, they would be within their rights to do

16   that.

17         So it was really purposefully open-ended in an effort

18   not to try to guide the discussion which I've now guided the

19   discussion.

20         MR. THOMAS:  Your Honor, how much time do I have?  I'm

21   joking.

22         THE COURT:  Forty-five seconds.

23         MR. THOMAS:  Okay.  That's fair.

24         THE COURT:  No, here, I've got -- let me get the --

25   let me get the time you've got.  So the clock assessments are

 1   plaintiff at 2 hours and 51 minutes and the defendant at

 2   9 hours 22 minutes.

 3           MR. THOMAS:  We would like to do a closing.  Could

 4   we -- but we wouldn't be ready today.  Would we be able to do

 5   it tomorrow?

 6           THE COURT:  I can do that tomorrow.

 7           Mr. Eiser, can you present your -- do you want to

 8   present a closing as well?  I assume if they do, you do.

 9           MR. EISER:  Yes, Your Honor.

10           THE COURT:  All right.  Can -- so let's talk about

11   some guidance on how long you anticipate talking to me.  What

12   is in your mind, Mr. Thomas?

13           MR. THOMAS:  Well, a judge once told me I should get

14   five minutes for every day of evidence.  That would be

15   20 minutes.  I don't think I could get it done in 20.  Thirty

16   though, I think I could get it more than with time to spare if

17   I had 30.

18           THE COURT:  Mr. Eiser, what do you think of that

19   timeline?

20           MR. EISER:  Your Honor, I just want to be clear, we --

21   we would -- we could use 30 minutes of closing.  I believe I

22   could do 20, maybe 15 minutes briefly on the damages, and I'd

23   like to turn it over to my co-counsel to do about 10 or

24   15 minutes on the liability defense if that would be acceptable

25   to split it up that way.  Is that acceptable, Your Honor?

1          THE COURT:  Yeah.  So here's what -- because the

2   parties were so disciplined and got the case in so much

3   below -- beneath their original three-week estimate to try the

4   case, I will hear closing arguments.  I think 30 minutes a side

5   is fair.  So under the traditional rules, of course, the

6   plaintiff would have the right to open and close the argument

7   reserving no more than half their time for rebuttal.  And on

8   the defendant's side, the request to split the argument, is

9   there objection to that, Mr. Thomas?

10         MR. THOMAS:  No, Your Honor.

11         THE COURT:  Good.  So that is permissible and, again,

12  you'll have your 30 minutes, but the plaintiff will have the

13  right to have the last word if they choose to save time for

14  rebuttal.

15         MR. THOMAS:  Your Honor.

16         THE COURT:  Yes.

17         MR. THOMAS:  I just asked my partner if he would like

18  to do the rebuttal too and split it up to give him so I don't

19  take all the action, and would it be okay if we split up ours

20  and he can handle the rebuttal?

21         THE COURT:  Mr. Eiser, I assume there's no objection

22  to that?

23         MR. EISER:  No, Your Honor.

24         THE COURT:  Good.  That's fine.  That will give

25  everybody a chance to have a parting shot here.

1          Let me just reflect on what I have going tomorrow.  I

2     was going to suggest that you -- we have a leisurely morning

3     and convene for closing argument at 9:30 tomorrow morning.  Is

4     that -- 10:30 your clock, Mr. Eiser, Ms. Haston, is that

5     acceptable to everyone?

6          MR. EISER:  Yes, Your Honor.

7          MR. THOMAS:  Yes, Your Honor.

8          THE COURT:  Okay.  I'll plan to see you then and I'll

9     make this deal with you.  I don't want to surprise anyone.  I

10    reserve the right to ask questions during your argument if I

11    believe there are things argued that I want to know.  I also

12    may have the discipline to ask at the end of your argument.

13    That time is on me.  It doesn't come out of your 30 minutes,

14    but I don't want to startle anyone.  I may not ask questions.

15    I've done it both ways.  I don't view it as oral argument about

16    the law.  But sometimes, on important factual or interpretation

17    or motive issues, counsel will say -- make an argument I hadn't

18    considered before or something I've heard during the evidence

19    and I've wanted to follow up on, so I don't want to startle

20    anyone either way.

21          All right.  That's it from my desk.  Anything from

22    either party before we close the record for today.  Mr. Thomas?

23          MR. THOMAS:  No, Your Honor.

24          THE COURT:  All right.  Mr. Eiser?

25          MR. EISER:  Just a clarification.  The parties would

1   still be permitted post trial to submit post-trial findings of

2   fact and conclusions of law tying it up to the testimony that

3   we're having?

4           THE COURT:  You certainly -- here's what I'm going to

5   do:  I'm going to permit the parties to do that.  I would say

6   that I'm not going to require -- I'm going think about that

7   overnight.  I'm not foreclosing that even if I tell you I don't

8   think I need them tomorrow -- and I'm not ready to draw that

9   conclusion, I want to talk with the law clerk about the case

10  and our state of readiness on our end.  I would counsel you on

11  those that they don't need -- it's unlikely I'll want stem to

12  stern kind of findings because the record in the case is very

13  thorough already.  So we'll talk about that at the end of your

14  closing arguments.  I'm not foreclosing that today, Mr. Eiser,

15  by the opportunity to argue the case.

16          MR. EISER:  Thank you, Your Honor.

17          THE COURT:  All right.  Anything else from the defense

18  side of the caption?

19          MS. HASTON:  Your Honor, from Dr. Kelley's testimony,

20  you had asked for me to remind you about an objection to --

21  well, I have it written down as Exhibit 200 as beyond the

22  scope.  Do you want -- would you like to take that up now or do

23  it tomorrow?

24          THE COURT:  I think what I'm planning to do, it's

25  still on my list of -- as I understand the objection,

```
 1    Ms. Haston, is that Exhibit 200 exceeded the scope of the
 2    disclosure for Dr. Kelley and that expert disclosure's 161.
 3    I'm going to look at that in the extra time I have this
 4    afternoon.  And if I'm prepared to rule on that in the morning,
 5    I'll give that ruling to you before we start the closings.  I
 6    may elect to take it with the case, but I appreciate your
 7    reminding me of it.
 8              MS. HASTON:  Okay.  And, Your Honor, to be clear, we
 9    do not object to Exhibit 200.  It was just the question that
10    was asked about that exhibit.
11              THE COURT:  Okay.  Thank you.  All right.
12              Mr. Kilgore, anything else from your end?
13              MR. KILGORE:  No, Your Honor.
14              THE COURT:  All right.  Thank you all.  I'll go ahead
15    and disconnect and close the record.
16       (Proceedings adjourned to July 10, 2020, at 9:30 a.m.)
17
18                         CERTIFICATE
19         I certify that the foregoing is a true and correct
20    transcript from the stenographically reported proceedings in
21    the above-entitled matter.
22       DATE:  March 5, 2021
23
24                    /s/Kimberly R. Greiner
                      KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                      United States Court Reporter
25
```