```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF KANSAS
 2

 3   AARON LEININGER,              Case No. 16-2627
                                   Circuit No. 21-3031
 4     Plaintiff,

 5     v.
                                   Kansas City, Kansas
 6   UNITED STATES OF AMERICA and  Date:  07/10/2020
     MARK E. WISNER,
 7
       Defendants.                 Volume 5
 8                                 (Pages 903-954)
     .........................
 9

10

11              TRANSCRIPT OF BENCH TRIAL
                      Via Zoom
12
            BEFORE THE HONORABLE DANIEL D. CRABTREE
13            UNITED STATES DISTRICT COURT JUDGE

     APPEARANCES:
14
     For the              Daniel A. Thomas
15   Plaintiff:           Michael S. Kilgore
                          Humphrey, Farrington & McClain
16                        221 West Lexington Avenue
                          Suite 400
17                        Independence, MO 64050

18
     For the United       Lawrence Eiser
19   States of America:   Sarah Haston
                          U.S. Department of Justice
20                        Civil Division, Torts Branch
                          Benjamin Franklin Station
21                        P.O. Box 888
                          Washington, DC 20044
22

23

24   _____
        Proceedings recorded by machine shorthand, transcript
25   produced by computer-aided transcription.
```

1                        I N D E X

2                                                      Page

3      Closing Argument by Mr. Thomas                  912

4      Closing Argument by Mr. Eiser                   926

5      Closing Argument by Ms. Haston                  934

6

7                      E X H I B I T S

8       Plaintiff's
9       Exhibits              Offered          Received

10         180                 908              908

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (Court called to order 9:33 a.m.)

 2          THE COURT:  All right.  The case is set for closing

 3     argument this morning.  Before we turn to that, I do want to

 4     take up the ruling that Ms. Haston reminded me of last night,

 5     and this is the objection to portions of the testimony or a

 6     portion -- maybe two questions placed -- or put to Dr. Kelley

 7     during the direct examination.

 8          The questions were about the prescription of

 9     morphine SA at 15 grams specifically.  The questions inquired

10     about the risk of dependency from such a prescription and risk

11     of abuse.  The objection by the defendant was that those

12     questions exceeded the scope of the expert report that

13     Dr. Kelley had provided.  The defendant responded that

14     Dr. Kelley had provided in his report an entire section that

15     discussed Mr. Wisner's prescriptive practices.

16          In preparing to rule this motion, I reviewed what I

17     believed to be Dr. Kelley's report, which the plaintiff's

18     marked as Exhibit 161.  I note that it was not offered in

19     evidence but it -- the court did have access to it.  Here are

20     my -- here's my ruling:

21          As a starting point, I agree with the general tenor of

22     Mr. Kilgore's response to -- to the objection.  The report,

23     specifically at pages 4 and 5, and that is Exhibit 161,

24     discusses Dr. -- or discloses, rather, Dr. Kelley's opinion

25     that the VA Hospital failed to supervise Mr. Wisner --

1    Mr. Wisner adequately.  It recites a number of actions and

2    inactions by Mr. Wisner's supervising medical doctor that, in

3    Dr. Kelley's opinion, deviated from the standard of care.

4         It cites, as an example of that deviation, multiple

5    examples of inappropriate prescribing by Mr. Wisner,

6    referencing Dr. Ray's statement to Investigator Baker, that

7    some of the patients that were referred to her by Mr. Wisner --

8    or some of those patients, Dr. Ray noted, that Mr. Wisner was

9    generous in prescribing narcotics, and it was particularly

10   unusual for a physician's assistant to prescribe such high

11   doses of pain medication.  Also recites that Mr. Wisner

12   reportedly agreed that he had overprescribed medication to his

13   patients and failed to comply with the applicable standard of

14   care and had committed repeated acts of professional

15   incompetency.

16        And then at that point Dr. Kelley's report pivots back

17   to a more generalized discussion of statements by Dr. Desai,

18   and D-e-s-a-i, and Dr. Cline, C-l-i-n-e, about their

19   supervision and purported inaccuracy.

20        Turning now to the specific objections that the

21   defendant made, it is to a part of the direct examination of

22   Dr. Kelley about Exhibit 200 which was received in evidence.

23   Addressing the defendant's objection specifically, I conclude

24   that the following questions and answers were not disclosed in

25   the fashion required by Rule 26.  Specifically the question --

1    and this is about Document 200's reference to morphine

2    15-milligram, the question is:  Risk of dependency?

3              Answer:  Very high.

4              Followed with a question:  Risk of abuse?

5              That's when the objection was made.

6              I conclude that both of those questions exceed the

7    scope of Dr. Kelley's report and the disclosure of his risk --

8    his -- his opinions, and so I'm striking those from the

9    evidence -- those questions and the answer -- actually, answer

10   because the second question did not ever get answered from the

11   evidentiary record.  The court does not plan to consider it

12   when it decides the issues in the case.

13             All right.  Ms. Haston, does that -- have I reached

14   all portions of your objection that you wanted the court to

15   rule?

16             MS. HASTON:  Yes, Your Honor.  Thank you.

17             THE COURT:  All right.  Thanks very much.  All right.

18   Let me -- I think we've got some people that are on this task.

19   Everyone who is listening to the proceedings who are listening,

20   to make sure their device is muted so we don't generate any

21   feedback.

22             I'll start by turning to the parties' closing

23   arguments.  As I said yesterday, the plaintiff, bearing the

24   burden of proof, will have the opportunity to open and close

25   the argument.  Mr. Thomas, do you wish for me to nudge you or

```
 1   warn you when you hit a certain time mark?

 2           MR. THOMAS:  I do, Your Honor.  But before I get into

 3   that, I have a couple preliminary issues I'd like to ask the

 4   court.

 5           THE COURT:  All right.

 6           MR. THOMAS:  One, we would like to offer one more

 7   piece of evidence.  It is the Defendant's Responses to Requests

 8   for Admissions, and it is Plaintiff's Exhibit 180.  It's

 9   appropriate for admission.  We intended to offer it earlier in

10   the week and we just overlooked it.

11           THE COURT:  So it is marked as Exhibit 180?

12           MR. THOMAS:  Yes, Your Honor.  It was on our exhibit

13   list.

14           THE COURT:  Is there objection from the defendant to

15   the offer of 180?

16           MR. EISER:  It's okay, Your Honor.

17           THE COURT:  All right.  Then Exhibit 180 is received

18   without objection.

19           Mr. Thomas, you said you had a couple.  That's one I

20   think.

21           MR. THOMAS:  Your Honor, I had a second one.  I would

22   never ask this if this was a jury trial, but I underestimated

23   my time yesterday.  I have tried to cut it as -- as extensively

24   as I can, but I would ask for an additional 15 minutes on our

25   closing.  I remind the court that we have -- we have
```

1   two-and-a-half hours left on our presentation.  We tried not to

2   waste any time this week.  We really have tried to streamline

3   this as much as possible and -- and I -- I've really cut a lot

4   of fat but there is still a lot of evidence, particularly

5   evidence that is in the depositions that will not be -- the

6   court will review later on and I'd like to address some of it.

7           THE COURT:  Have you communicated to the defendant

8   that you were going to make this request so they would have a

9   chance to prepare to extend their remarks as well?

10          MR. THOMAS:  I did not, Your Honor.  I didn't -- I

11  didn't time -- I didn't realize how bad I was over until this

12  morning.

13          THE COURT:  Yeah, so we're going to stay with the

14  30 minutes.  I conclude it wouldn't be fair to the defendant to

15  have an on-the-spot increase in the volume of the closing.  I

16  -- that's my ruling.  Naturally, if the defendant wanted to

17  consent to it and likewise take an equal amount of time, then I

18  would defer to the parties.  Mr. Eiser, what's your temperature

19  on that issue?

20          MR. EISER:  No, we don't need anymore time, Your

21  Honor.

22          THE COURT:  All right.  We'll stand with the 30.  I'm

23  sorry, but that's the rule we all went home with and it's not

24  fair to the defendant to change the game that much at the last

25  second.

1      MR. THOMAS:  Understood.

2      THE COURT:  Are you -- any other preliminary issues

3   from you, Mr. Thomas?

4      MR. THOMAS:  No, Your Honor.

5      THE COURT:  All right.  Defendant ready to go this

6   morning?

7      MR. EISER:  Yes, Your Honor.

8      THE COURT:  Nothing from your side that we ought to

9   take up before we turn to the meat of the closings?

10      MR. EISER:  No, Your Honor.

11      THE COURT:  All right.  So, Mr. Thomas, you said you'd

12   like a nudge on the clock.  When would you like that?

13      MR. THOMAS:  Please don't laugh at me, but I would ask

14   for 10, 5, 3 and 1.  As I said that, everybody behind me

15   laughed.

16      THE COURT:  I've developed a poker face since I came

17   to the job.  So you want me to -- you -- you want -- you want

18   me to warn you when you have 10 minutes left or you've used

19   10 minutes?

20      MR. THOMAS:  When I've got 10, 5, 3 and 1 left.

21      THE COURT:  Okay.  And then you're not -- you're going

22   to go as long as you want and what you have left in your 30 you

23   will say -- use in rebuttal?

24      MR. THOMAS:  Yes, Your Honor.

25      THE COURT:  Okay.  And does the defendant want similar

1   nudges?

2        MR. EISER:  Yes, Your Honor, at 15 minutes I would

3   appreciate it.

4        THE COURT:  All right.  Let me get ready here for you.

5        All right.  Ready to hear your closing arguments.

6   And, Mr. Thomas, you're recognized for closing.

7        MR. THOMAS:  Oh, Your Honor, I apologize.  I do have

8   one other thing I totally forgot.  It's at the top of my

9   outline.

10        THE COURT:  We were that close too a clean getaway.

11   Go ahead.

12        MR. THOMAS:  There's -- we have rough transcripts of

13   the trial.  There's a local rule which forbids citation or even

14   publication of rough transcripts in a jury trial.  I do not

15   plan on publishing any of them but I do -- was going to quote

16   some language from some of the testimony and arguments, and the

17   rule says I have to ask leave of court before doing that, and I

18   would request leave of court.

19        THE COURT:  Mr. Eiser, do you have objection to that?

20        MS. HASTON:  No, Your Honor.  And I -- we would

21   request the same leave to quote from the unofficial

22   transcripts.

23        THE COURT:  That's the reason I always ask the other

24   side; sometimes you don't have to make a ruling.  I'm glad it

25   works.  And I -- that -- that rule is really designed to

1    prevent unfairness in a jury setting.  And in this setting I

2    think it's different enough.  So, sure, you may do so without

3    leave.

4          MR. THOMAS:  Thank you, Your Honor.

5          THE COURT:  All right.  Mr. Thomas, the defendant --

6    the plaintiff is recognized for closing arguments.

7          MR. THOMAS:  Thank you, Your Honor.

8          May it please the court.

9          THE COURT:  Counsel.

10         MR. THOMAS:  Before I begin, I want to thank the court

11   and the court's staff.  None of us have ever tried a case via

12   videoconferencing.  We have tried our best to present the

13   evidence as smoothly and efficiently as we would if we were in

14   court.  Sometimes it didn't go the way we liked; that was

15   usually my fault.  But the court and the court's staff has gone

16   above and beyond in their patience with us and we're all very

17   thankful.

18         Before I talk about the evidence, I want to talk about

19   the law and the standard that the facts should be applied to.

20   During the directed verdict argument, I was a little alarmed

21   when the court indicated that the scope of employment analysis

22   was more nuanced than the arguments had suggested.  I didn't

23   know if that was directed to plaintiff, but the court also said

24   clearly the conduct at issue here is radically different from

25   the store manager in the *O'Shea* case and so the court didn't

1    want the guidance of those facts -- or the direct -- the court

2    said the direct guidance of those facts to this -- to these

3    facts is not a good fit.

4           I was honestly a little unnerved when I heard that.

5    And, please, please, don't mistake me, I wasn't upset with the

6    court at all.  I was upset with myself.  I felt that I didn't

7    do a good job explaining to the court our legal arguments.  To

8    be clear, we do not think this is a case of a store employee

9    taking a detour on his way to the office.  We never made that

10   analogy in the extensive briefing to the United States'

11   dispositive motions.

12          I don't know if the court has had a chance to read

13   those pleadings, so I want to spend a little bit of time

14   talking about the law of the case.  The landmark Kansas Supreme

15   Court case on scope of employment is *Williams versus Community

16   Drive-in Theatre, Inc., 214 Kan. 359.  At Williams* the Kansas

17   Supreme Court stated that the basic Kansas law on scope of

18   employment was contained within the PIK 7.04.

19          It said an employee acting within the scope of his

20   authority when he is performing services for which he has been

21   employed or when he is doing anything which is reasonably

22   incidental to his employment, the test is not necessarily

23   whether the specific conduct was expressly authorized or

24   forbidden by the employer but whether such conduct should have

25   been fairly foreseen from the nature of the employment and the

1    duties relating to it.

2         In *Williams* the Kansas Supreme Court refined the rule

3    to apply to situations involving intentional torts committed by

4    employees.  The Supreme Court said if the assault is committed

5    by the employee while furthering employee's interests in some

6    way, the employer is liable under the doctrine of respondeat

7    superior.  So to aid in this analysis, the courts are to look

8    at the slight deviation analysis set forth in *O'Shea*.  These

9    are the six factors the court's heard about at length.

10         Under the slight deviation analysis, an employee could

11   pursue a dual purpose -- could pursue dual purpose ventures

12   without the conduct amounting to an entire departure from the

13   scope of employment.  *O'Shea* further held that an employee does

14   not cease to be acting within the course of his employment

15   because of an incidental personal act or by slight deflections

16   for personal or private purpose if his main purpose is still to

17   carry on the business of the employer.

18         The court then goes on to the six factors.  This is

19   the foreseeability analysis.  And let me first say that the

20   Tenth Circuit did not say that the court has to find for

21   plaintiff on all six factors.  The Tenth Circuit also did not

22   say that any one factor should weigh more heavy -- should weigh

23   more importantly than another.  As I mentioned in my opening

24   statement, four of the O' Shea factors are undisputed.  The two

25   that are disputed are factors one and five, so I'm going to

1    address these out of order.

2          Factor two:  The nature, time and place of the

3    deviation.  Every time Aaron was molested, it occurred at a VA

4    Hospital in Leavenworth during normal business hours at

5    regularly-scheduled appointments in the course and scope of

6    routine medical exams.

7          Factor three:  The time consumed in the deviation.  In

8    his deposition Wisner testified that he set aside an hour for

9    each exam, that physical examinations encompassed more than

10   just physical manipulation of the genitalia, and there was

11   testimony from both sides' experts on that.  If the court would

12   just look at the Wisner's medical records which have been

13   admitted, you will see that there is far more going on, there's

14   diagnostic tests, there's other tests, there's other

15   examinations.  The genital exam was only a small part of the

16   overall health and fitness examination.  The undisputed

17   testimony has been that at most the deviation was two minutes,

18   at most.

19         Factor four:  The work for which the employer --

20   employee was hired.  It is undisputed that the VA hired and

21   paid Wisner to perform physical exams, including genital exams.

22   The VA literally paid him to physically touch veterans'

23   genitals, among other body parts.

24         Factor six:  The freedom allowed the employee in

25   performing his job responsibilities.  Evidence clearly

1   demonstrates that the VA provided Wisner too much freedom.  He

2   was not a doctor.  They gave him free rein of a thousand

3   patient clinics.  He was not closely monitored or supervised.

4   He wasn't monitored or supervised at all.  He was permitted to

5   do these exams in a room alone with no nurse or other physician

6   present.  And it was at that free rein that led to the

7   plaintiff's injuries.  There were scope and practice policies.

8   He had a history of violating them, but he was never

9   disciplined.

10          There was policies and a directive that said

11   Dr. Cline, his supervising physician, was supposed to supervise

12   him.  In fact, it said that he was supposed to audit one out of

13   every four of his patient files.  He never did any of that.  At

14   a minimum he was supposed to have audited 250 of Wisner's

15   patient files.  He didn't audit a single one.  It's in his

16   deposition; he admitted to it.  And Dr. Cline's supervisors

17   admitted that Wisner was not properly supervised.  They

18   admitted that the VA committed numerous violations of the

19   standard of care.  Again, we ask the court to look for the

20   depositions of Klopfer, Cline and Desai.

21          So those are the four undisputed factors.  That right

22   there is enough for the court to grant judgment in our favor,

23   but we proved the other two as well.

24          Factor one:  The employee's intent.  The only evidence

25   of Wisner's intent is his own testimony and statement.  And as

```
 1   I said that was -- thinking about that this morning, we also
 2   have his medical records.  When we deposed him he was emphatic
 3   that, even if he went too far, his intent was always
 4   thoroughness.  That's what he told Special Agent Kerry Baker
 5   six years ago before he was ever charged with a crime.  And
 6   that's what he said 12 days ago when we took his deposition.
 7   His intent first and foremost was to do his job.  At other
 8   times that intent mixed with his desire to obtain personal
 9   gratification.  These mixed motives place Wisner's actions
10   squarely within the scope of his employment.
11            No. 5:  The incidental acts reasonably expected by the
12   employer.  The United States has misinterpreted and
13   oversimplified this prong for four years.  In his order denying
14   summary judgment, Judge Murguia noted, "Defendant merely
15   focuses on Wisner's intent and the fact that the defendant did
16   not hire Wisner to sexually molest patients, a fact that seems
17   rather obvious."  In explaining the folly of their argument,
18   Judge Murguia continued, "The error that defendant makes is
19   treating the situation as if Wisner did not conduct the
20   unnecessary and improper examinations in the context of a
21   longer medical appointment."  He went on to say, "The evidence
22   shows a triable issue regarding whether Wisner's actions were
23   incidental given the time, place, intent, and context of his
24   improper actions."
25            Now, that evidence demonstrates not only a triable
```

1    issue of fact but demonstrates that we have met our burden.  We

2    have provided the court with a mountain of evidence, and there

3    are still depositions to review.  While the VA claims it may

4    not have expected Wisner to perform ungloved genital exams,

5    there is no doubt that he was expected to conduct genital

6    exams.

7          Now, let's humor the Department of Justice for a

8    minute.  Let's say their interpretation is correct.  They still

9    lose.  Let's go back to Judge Murguia's ruling on another

10   matter.  This is the case of *John Doe P.M.*  We'll give the

11   caption in our subsequent pleadings.  It's ECF Document 49.  In

12   that case Judge Murguia's held, "The failure to wear gloves

13   and/or an excessive number of examinations might be improper,

14   but this conduct in general is not unforeseeable or unexpected

15   of a PA required to treat VA patients."

16         Now, I understand this court is not required to follow

17   Judge Murguia's findings or his basis, so I want to explore

18   this a little further.  Was it foreseeable that a physician

19   assistant could abuse his position to sexually exploit

20   patients?  Of course it was.  It happens all the time in the

21   healthcare industry.  That's why the VA has a nationwide

22   directive that requires its hospitals to implement a

23   centralized and comprehensive policy to track sexual complaints

24   against healthcare providers.  That's Exhibit 27.  It's in

25   evidence.

1        But the analysis doesn't end there.  The Eastern

2   Kansas VA system, which Leavenworth falls under, has their own

3   policies regarding sexual abuse, neglect, and exploitation by

4   healthcare providers.  It's Exhibit -- the 2010 is Exhibit 61,

5   2013 one is 63.  Both in evidence.  The VA foresaw the

6   possibility that one of their employees would abuse his

7   position and exploit patients, that's why they had these

8   policies.

9        Healthcare sexual abuse has been a known problem in

10  this country for quite some time.  In fact, I asked that

11  question to Dr. Abrams verbatim and he said yes; one of the few

12  times I could get him to give me a straight answer.  He then

13  went on to explain how doctor-patient abuse goes back -- all

14  the way back to the 1940s in this country.  It's been a known

15  problem in the healthcare industry for 80 years, but the

16  Department of Justice would have the court believe this is the

17  first time something like this has ever happened.

18       Not only was it foreseeable to the healthcare industry

19  in general, it was specifically foreseeable to Wisner.  When

20  the court's reading the depositions, the court's going to find

21  that he was arrested and charged before he ever worked for the

22  VA with exposing himself in public at an adult book store.  But

23  even after he was hired, there were numerous complaints about

24  him over the year.  Mr. Kilgore went over them at length with

25  Dr. Kelley.  And, again, we've provided the court with the

1    deposition of the employees who received those complaints.

2         Switching gears.  In their opening statement, the

3    United States acknowledged that they made concessions.

4    Finally, in the pretrial order, they said that "respect and

5    honor compels us to make certain concessions in this case."

6    This was not some act of benevolence on their part and it had

7    nothing to do with respect and honor for Aaron.

8         We put those concessions in the pretrial order and we

9    took that language directly from the Requests for Admissions we

10   sent them, Exhibit 180.  After four years of discovery, we

11   finally were able to pin them down and send them those Requests

12   for Admissions.  So they had no choice but to -- to agree to

13   the evidence, and so they made those -- those stipulations.

14        And they're important stipulations for the *O'Shea*

15   analysis.  I'm not going to read them but I'm going to give the

16   court the numbers of those stipulations from the pretrial

17   order.  They are 8, 9, 10, 11, 15, 16, 17, 18, and 19.  These

18   admissions alone justify verdict in Aaron's favor.  These

19   admissions alone satisfy the *O'Shea* analysis before the first

20   witness ever took the stand.

21        The United States did something in their opening

22   statement that I've never seen.  I don't claim to be the most

23   experienced trial lawyers, but I've been doing it for almost

24   20 years.  They busted out the Kansas PIK to argue

25   reasonableness of damages.  They did this because they know

16-2627 Leininger v USA et al 7.10.20   Vol. 5   921

1  they can't meet their burden.  They know we're right on the

2  *O'Shea* analysis.

3       I want to talk a little bit about Aaron Leininger.

4  Yes, he dropped out of 11th -- high school in the 11th grade

5  and he enlisted in the Army.  And when the time came, he

6  answered the call and he went into the bowels of hell, truly.

7  He saw and did things the average human mind just can't

8  understand.  He didn't do it for glory.  He didn't do it for

9  recognition.  He didn't do it for medals.  He's got a stack of

10 them.  He doesn't even know where they are.

11      He did it because it was his duty to his country and

12 he didn't ask for anything in return, but they promised him

13 something.  One of the few meaningful benefits they gave him is

14 they promised him that because of his sacrifices, his injuries,

15 and his trauma they would provide full healthcare for the rest

16 of his life.  But instead of caring for him, they allowed him

17 to be further injured by unleashing Wisner, who used his

18 position, to molest him nine times.  Nine times that man

19 sexually molested him.  I won't repeat the things he said and

20 did to him.  They're in the record and the United States admits

21 all of it.

22      They also admit he has severe PTSD.  They don't really

23 believe that somebody as fragile as Aaron Leininger can be

24 sexually molested nine times and not be traumatized.  I doubt

25 anybody could go through that and not be traumatized.  Guys

1  like Aaron Leininger, the toughest, bravest guys you'll ever

2  meet, I know it, but he's been reduced to thoughts of suicide.

3  Sitting on a bed with a loaded gun to his head, finger on the

4  trigger, ready to end it, to end the pain, the humiliation, the

5  sadness, to finally get some sleep all because of Mark Wisner

6  and the VA.  He was already severely traumatized but he never

7  put a gun to his head, not until after Wisner.  It affected him

8  to his core.  It affected his self-worth as a man.  It affected

9  his trust in people.  It wreaked havoc on his marriage.  It

10  took away what little joy he could get out of life.

11      I want to switch gears and talk about the experts in

12  this case.  We brought you three local experts, three rational

13  and honest experts.  They brought you an MD/JD and a guy who

14  owns his own expert witness headhunting service.  They brought

15  the court what I will politely refer to as ringers.

16      Dr. Abrams, he's so critical of Aaron because of what

17  he calls inconsistency in his records over 12 years.  This guy

18  can't stay consistent from his deposition from six months ago,

19  he cherry picks the records.  He exaggerates.  He excludes

20  certain parts of the record that don't suit his purpose.  But

21  even Dr. Abrams admitted that Aaron needs intense psychotherapy

22  for the rest of his life.

23      Dr. Abrams wants to cast Aaron as a malingerer at the

24  same time not only for his combat-related PTSD but for his

25  Wisner-related PTSD.  And all the records we saw this week,

1    there's 2,700 pages of them according to one witness, they

2    never showed you a single record suggesting Aaron was a

3    malingerer.

4         THE COURT:  Mr. Thomas -- Mr. Thomas, you have

5    10 minutes remaining.

6         MR. THOMAS:  He said that he was faking his PTSD.

7    Dr. Abrams would have the court believe that he memorized --

8    that Aaron memorized the 17 PTSD diagnostic criteria so he

9    could fool Dr. Wendler.

10        They brought you Dr. Nicholson.  He says the standard

11   comes from him and him alone.  He admits it's a new standard.

12   It's never been tested and it's never been peer reviewed and

13   it's never been accepted by any court.  He disagrees with

14   Dr. Kelley, the Kansas Board of Healing Arts, the Kansas

15   statute, which we would ask the court to take judicial note of

16   and the consent decree.  But one thing he does agree is that

17   Wisner's failure to wear a glove was a -- a deviation in the

18   standard of care.

19        We brought you Dr. Peterson.  He treats patients in

20   Kansas City and Missouri.  He's licensed in both states.  He

21   does security evaluations for the Department of Energy.

22        He said Aaron report --

23        He's done over 200 mentor abuse evaluations.  He is

24   vigilant for the signs of false reporting, and he said that

25   Aaron presented as an honest responder and there's absolutely

 1   no evidence of malingering.  He concluded that Wisner's conduct

 2   has extremely exacerbated his pre-existing PTSD and he

 3   testified as to what the treatment will be that Aaron needs

 4   moving forward.  He said that Aaron should never have to return

 5   to the VA.  He can't trust them so he can't have a meaningful

 6   healthcare alliance, number one.  Number two, it is

 7   psychologically retraumatizing for him to have to go back to

 8   the scene of the crime.

 9        We also brought you Dr. Kelley.  He's not some

10   professional testifier.  He's a family practitioner from

11   North Kansas City, treats 25 to 30 patients a day.  He says

12   there was a final line between a proper and improper genital

13   exam, and that there is no dispute that Wisner was hired to

14   perform genital exams as a core and routine part of his job.

15   The Consent Decree is Exhibit 129.  I'll ask the court, when it

16   looks at this, to look at paragraph 30.

17        The last witness we brought is Dr. Jack Ward.  I don't

18   need to spend a lot of time here.  Dr. Ward's reputation speaks

19   for himself -- for itself.  He literally wrote the book on

20   forensic economics.  He's not an advocate.  He's just a numbers

21   guy.  We asked him to calculate the cost of insurance that

22   Aaron -- that could provide Aaron healthcare for the rest of

23   his life so he doesn't have to go back to the VA.  He said it's

24   not a golden insurance card.  He had the golden insurance card

25   but they blew it, but he found something that wasn't as good as

1    the VA but it was the closest he could find.  We also asked him

2    to take Dr. Peterson's future care recommendations and reduce

3    them to present value.  And according to Dr. Ward's

4    calculations, Aaron's economic damages are $779,487.  Now, to

5    save time, I'm going to round that up to 780 -- $780,000.

6    That's economic damages.

7            But under Kansas law, Aaron is also entitled to

8    uneconomic damages:  damages for the unthinkable pain, anguish

9    he has suffered.  I'll be honest, if it was a jury trial, I

10   would be asking for ten times the actuals or I'd be asking for

11   $730,000 for each and every time he was molested by Wisner.

12   But I was thinking about this, $780,000 is a fair component for

13   his pain and suffering.  He was sexually molested nine times.

14   So maybe we value the pain and suffering in a similar way that

15   we value the economic damages.  His mental health is certainly

16   worth more than the economic damages.

17           And I think we look at this in three components.  The

18   depression, the PTSD, and the mistrust.  What are those worth?

19   I view them as three separate parts of a pie:  $780,000 for the

20   depression, $780,000 for the PTSD, and $780,000 for the loss of

21   trust.

22           THE COURT:  You have five minutes remaining.

23           MR. THOMAS:  So coupled with the actual damages, that

24   comes to about $3,120,000, and I don't think the court would be

25   out of line in awarding Aaron that amount of money.  Thank you,

1    Your Honor.

2         THE COURT:  Thanks very much.  You have four and a

3    half minutes remaining for your rebuttal.

4         All right.  Mr. Eiser, give me just a moment to reset.

5    All right.  You may proceed, sir.

6         MR. EISER:  Thank you, Your Honor.

7         As I said at the outset, out of respect for

8    Mr. Leininger's service and sacrifice, the United States has

9    accepted his assertion that he was fondled by Mr. Wisner during

10   his nine encounters in 2012 to 2014.  But what are his

11   compensable damages?  Now, there's no punitive damages.

12   There's no damages for negligent hiring, retention,

13   supervision, or anything that any VA employee did or failed to

14   do other than Mark Wisner.  Now, that's why no VA employee's

15   testified to you and why we object to plaintiff entering all

16   those deposition transcripts into evidence.

17        We're not hiding anything.  We are the parties who

18   presented you with the OIG report that details this whole

19   sordid, sad affair.  But all those depositions about what the

20   VA employees could have done, should have done, will do in the

21   future simply aren't relevant to plaintiff's claims in this

22   case.

23        Similarly, none of the testimony of Dr. Abrams, an

24   exceptionally well-qualified expert psychiatrist with extensive

25   experience doing forensic psychiatric evaluations, on direct

1    examination Dr. Abrams testified about all of the objective

2    evidence and medical records that confirm that Mr. Leininger

3    had these several severe chronic mental health problems going

4    back to at least 2008 and in some cases longer:  PTSD, sleep

5    disturbance, anger problems, anxiety, depression.  Serious

6    symptoms, chronic symptoms, and leading up to a psychotic

7    breakdown in June of 2011, some eight months before ever seeing

8    Mr. Wisner.

9            Dr. Abrams also explained that after those encounters,

10   after February of 2014, there's no objective evidence of any

11   exacerbation of those symptoms.  None.  Now, that's the

12   relevant evidence.

13           Because Dr. Abrams is so experienced and thorough, he

14   did write in his report that he found several suspicious

15   anomalies in plaintiff's medical records and what the plaintiff

16   was telling him.  We did not introduce any of that evidence.

17   We did not introduce it on direct, plaintiff's counsel did.  We

18   objected as beyond the scope of cross.  But Mr. Thomas pressed

19   on, as I suspected he would, and by the end of the afternoon

20   yesterday he was having great difficulty defending the initial

21   PTSD rating plaintiff won in 2011.

22           But none of that is relevant.  We aren't here to

23   decide anything about Mr. Leininger's initial PTSD rating or

24   the connection between his symptom spikes and his disability

25   evaluations or what the VA supervisors did.

1        We are here to evaluate the evidence to decide whether

2   Mr. Leininger's encounters with Mr. Wisner made the documented

3   PTSD that he already had any worse and whether or not the

4   United States legal defenses preclude liability altogether.

5        Now, what is the objective -- I'm talking about just

6   damages.  What is the objective evidence of injury after the

7   encounters with Mr. Wisner?  No medical bills.  No medical

8   treatment connected to Wisner despite several hours and

9   recommendations of treatment from his providers at VA and his

10  private providers saying he should get PTSD treatment, but he

11  doesn't.  There's no evidence of impairment of any functional

12  abilities:  no lost job, no impairment of future income, not a

13  single missed day of work, no mention of the event or problems

14  from it to any provider in the six years since it happened

15  despite extensive medical records and inquiries into his

16  medical health.

17       Now, what conditions does he suffer from now that he

18  didn't have before?  None.  What symptoms does he suffer from

19  now that were exacerbated after Mr. Wisner?  None except one,

20  his lawyers claim that he will never return to the VA for his

21  free healthcare for life, which I will return to.

22       We never heard from a treating physician because there

23  weren't any.  As -- as the plaintiff's wife explained, he's off

24  alcohol, off opioids, and has a job he enjoys.  And she

25  couldn't say that his PTSD symptoms were worse after Wisner

 1   than before.

 2          Now, the plaintiff received a comprehensive

 3   psychological evaluation from the VA in November 2010 and

 4   received a disability rating of 50 percent for his PTSD.

 5   That's years before Wisner.  That was never raised after.  It

 6   was never sought to be raised after.  That's the objective

 7   evidence.

 8          Now, what about plaintiff's testimony?  As Dr. Abrams

 9   said in his testimony, Mr. Leininger is an unreliable historian

10   of his medical history.  His lawyer, Mr. Thomas, apparently

11   agreed because on redirect examination he brought out that

12   Mr. Leininger's answers here to my questions were unknowing.

13   So given that, no award can be based on his testimony.

14          What about his wife's testimony?  Well, he never

15   mentioned any injury to her.  She explained that they don't

16   have a happy marriage, that the problems go back before

17   Mr. Wisner, and that her husband's PTSD condition seems to be

18   the same, as bad now as it was before.  In fact, she confirmed

19   that he's -- he's better having gotten off the opioids and the

20   alcohol.

21          Now, Mr. Thomas tries to explain the lack of any

22   evidence on which to base an award because it's too personal

23   and humiliating for the plaintiff to have mentioned this to

24   anyone in six years.  The medical records before and after

25   Mr. Wisner document him telling them repeatedly about ED,

1    domestic abuse, drug abuse, the stepdaughter's suicide, his own

2    feelings of homicidal ideation, and many other deeply personal

3    and painful subjects.  But nothing about Mr. Wisner.

4         What about the paid experts?  Dr. Jack Ward,

5    plaintiff's economist, was called to calculate the cost if

6    plaintiff were to purchase a gold-plated health insurance

7    policy every year for the rest of his life:  $700,000.  Now, if

8    the plaintiff is awarded that sum, of course there's no

9    guarantee that he would buy such an insurance policy every year

10   for the rest of his life or even need to.  So plaintiff's

11   counsel had his client commit to you here in court that he

12   would never return to the VA and he would buy this insurance

13   next year and every year after that.

14        Why would anyone make such a commitment?  Who knows

15   the future of someone's mental health?  Mr. Leininger has

16   beaten his problems with alcohol addiction, drug addiction, and

17   a host of other mental health problems to become a functioning,

18   well-employed member of society.  How could anyone say beyond

19   rank speculation that after the stress of this lawsuit is over

20   that Mr. Leininger wouldn't, with some anger management

21   treatment or simply with the passage of time, recover from his

22   anxiety about the VA and return to receive the care and

23   benefits that he has earned and that the United States pays

24   for?

25        The most interesting thing that Dr. Ward said to me

1   was his explanation that no healthcare insurance on the private

2   market is as good as the healthcare available to veterans at

3   the VA.   Plaintiff himself has a preference for receiving

4   healthcare from providers familiar with war veterans, all seem

5   to agree that is where he should go.   But this is a lawsuit by

6   a plaintiff who has no special damages.   So we've heard this

7   claim that he can't and won't go back.

8           Dr. Peterson, plaintiff's retained psychiatrist,

9   testified all morning about mental health injuries that can

10  befall victims of sexual assault in general.   Then he confirmed

11  he spent only about three hours reviewing the 8,000 pages of

12  our discovery record and cited none of it as a basis for his

13  opinions.

14          He stated Mr. Leininger would not return to the VA

15  ever.   He based that opinion on no objective evidence from our

16  record but simply on Mr. Leininger's statement to him in

17  January 2019 that he had not returned to the VA in five years.

18  It was too emotionally difficult for him since -- since he had

19  -- his encounters with Mr. Wisner.

20          Now, we -- I -- as we showed in opening statement, he

21  had been back for visits during those three years more than 24

22  times for medical care, including, as you'll see in the

23  records, mental healthcare.   You saw how surprised Dr. Peterson

24  was to find out that Mr. Leininger had been back to the VA for

25  treatment more than 20 times from 2014 to 2017.   Without any

1    documentation anywhere, even here, of suffering mental health

2    distress or emotional upset from those visits, Mr. Leininger

3    stopped going in 2017 because, as is documented in the record

4    of his treatment with his private doctors, he stopped because

5    of this lawsuit.

6         Now, so the basis of Dr. Peterson's opinion was pulled

7    out from under him.  And the big surprise to me was having put

8    this up in opening statement.  I would have expected somebody,

9    Mr. Leininger, his wife, somebody to talk about the devastating

10   effects he had going back on any one of these 25 occasions:

11   the hyperventilation, the anxiety, the sweats, the cold sweats,

12   any sign of emotional distress.  There is none of that in the

13   record.

14        After telling them that he was there and there being

15   nothing in the record of any sort of adverse consequences from

16   going, I expected maybe on rebuttal somebody is going to come

17   up and say, oh, this totally disabled him, he couldn't hardly

18   walk after any of these visits, after any of these visits.

19   Nobody said a word.  It's just sitting there, the objective

20   evidence, showing he can go back, he has gone back, has no

21   adverse consequences.  This is a lawyer's claim, Your Honor.

22        Now, plaintiff's counsel emphasizes that the case law

23   says a plaintiff can't be forced to return to the VA for his

24   future treatment.  But in entering a judgment here, you don't

25   force anything.  There's no request for an injunction here.

1    The issue is what expense is he most likely to incur in the

2    future as a result of his encounters with Mr. Wisner?  Which

3    Dr. Abrams testified, and as commonsense tells you, it is more

4    likely than not that Mr. Leininger will return to the VA to

5    receive his free superior healthcare.

6         Now, I don't -- there's a -- there's a number of

7    issues there that you'll have to deal with, but I don't think

8    you have to deal with them because I think this case is decided

9    on liability.  We talked about the statute of limitations

10   defense in opening statement.  The question then becomes did he

11   know of his injury and his government cause before his last

12   visit with Mr. Wisner in February of 2014?  Close call.  You

13   know, it's close.

14        Then there's our scope of employment defense, and

15   counsel talked about that quite a bit.  I've talked about it in

16   opening statement.  We've briefed it.  I don't want to go

17   through it again but except to point out that, in attempting to

18   get around the scope defense and -- and plaintiff's counsel's

19   misunderstanding about the foreseeability element of the scope

20   of employment defense, the plaintiff's counsel presented a

21   mountain of evidence showing this was no accident.

22        This was an intentional grooming assault.  These --

23   this was pattern, a criminal pattern that Mr. Wisner was

24   playing out.  And as a result, in trying to avoid our scope

25   defense, the plaintiff has run headlong into our intentional

 1    battery defense.  And the conclusion there is now unavoidable.

 2         And every time we talked about the unintentional

 3    battery defense from the VA statute, Mr. Thomas talks about the

 4    *O'Shea* factors.  It's an entirely different defense.  The scope

 5    of employment follows state law on scope and we're dealing with

 6    *O'Shea*.

 7         The intentional battery defense comes from the federal

 8    -- Federal Tort Claims Act and the federal VA immunity statute.

 9         And I'm going to stop now and let my co-counsel, Sarah

10    Haston, explain to you this aspect of our defense.  Thank you,

11    Your Honor.

12         THE COURT:  Thank you.

13         MS. HASTON:  Your Honor, as my co-counsel, Mr. Eiser,

14    noted, there's been a lot of focus in this case on scope of

15    employment, and that makes sense under the FTCA the government

16    employee at issue must be acting within the scope of his or her

17    office of employment, but that doesn't end the matter.  Even if

18    an employee is found to be acting within the scope of his

19    employment, the court still does not have jurisdiction if one

20    of the FTCA exceptions apply.

21         Now, in 28 U.S.C. 2680(h) an exception to the FTCA

22    exists for intentional conduct, specifically any claim arising

23    out of assault, battery, false imprisonment, false arrest,

24    enumerated intentional torts, and here there can be no dispute

25    that the intentional tort exception to the FTCA applies to

1    plaintiff's claim.  There has been a consistent theme

2    throughout this entire trial:  sexual molestation, sexual

3    assault, sexual abuse.  We heard it in plaintiff's opening and

4    closing statements.  We've heard this from plaintiff's expert

5    psychiatrist, Dr. Peterson.  We heard this from plaintiff's

6    liability expert, Dr. Kelley, and we heard this from the

7    plaintiff.

8          So the only question is does the VA immunity statute,

9    which contains a limited exception to the intentional tort

10   exception, save the claim?  And as confirmed by both the text

11   and the purpose of the statute, it clearly does not.

12         The VA immunity statute provides that the FTCA is the

13   exclusive remedy for a patient who sues a VA healthcare

14   employee for negligence or malpractice in the exercise of that

15   employee's duties for the Veterans Health Administration.  It

16   was enacted to ensure that VA healthcare employees are

17   personally immune from suit for such claims.

18   Subsection 7316(f) provides that the FTCA's intentional tort

19   exception does not apply to claims for a VA healthcare

20   provider's conduct in furnishing medical care or treatment

21   while in the exercise of such person's duties for the Veterans

22   Health Administration.

23         This is an entirely separate inquiry from the scope of

24   employment inquiry which is governed by state law.  Whether the

25   VA immunity statute applies is a question of federal statutory

 1    interpretation.  The foreseeability and the *O'Shea* factors that

 2    plaintiff's counsel has mentioned numerous times throughout

 3    this trial are simply not relevant to this analysis.  Congress

 4    created the VA immunity statute to immunize VA providers in

 5    states where medical malpractice claims such as failure to

 6    obtain informed consent were characterized as batteries.

 7    Congress did not create the VA immunity statute to extend

 8    personal immunity to sexual predators who sexually assault and

 9    molest wounded veterans under the guise of medical care, and

10    that's precisely what occurred here.

11          Now, I anticipate that Mr. Kilgore will try to argue

12    that the consent order wherein Mr. Wisner voluntarily

13    surrendered his PA license resolves the matter because, in that

14    order, the Kansas Board of Healing Arts refers, among other

15    things, to Wisner's failure to adhere to the applicable

16    standard of care.  Mr. Kilgore will argue, I'm sure, that this

17    phrase presupposes the existence of a medical standard of care

18    to Mr. Wisner's intentional acts and thus brings the claim

19    within the VA's immunity statute's breach.

20          But neither state law nor the decisions of a state's

21    licensing board are relevant to Subsection 7316(f) of the VA

22    immunity statute.  Federal law controls this matter.  In fact,

23    the language of Subsection 7316(f) was added to the VA immunity

24    statute to address the very issue of varying state law on

25    characterizing true medical malpractice claims.

1          Even if we were to accept the premise of what I expect

2    will be Mr. Kilgore's argument that the Kansas Board of Healing

3    Arts determined that a medical standard of care applied to

4    Mr. Wisner's sexual molestations, to find that the Kansas Board

5    of Healing Arts can characterize intentional and criminal

6    conduct as medical care for purposes of FTCA coverage would

7    substitute the judgment of a state medical board for that of

8    Congress in determining what conduct is immunized pursuant to

9    the VA immunity statute.

10          It's also important to put this consent order into its

11   proper context.  The consent order revoking Mr. Wisner's PA

12   license was entered two weeks after the Kansas Board of Healing

13   Arts received a copy of a criminal complaint charging

14   Mr. Wisner with sexual battery and two weeks after receiving a

15   letter from Mr. Wisner himself stating that he is incapable of

16   providing patient care.  The suggestion that the Kansas Board

17   of Healing Arts was concerned with how they characterize

18   Mr. Wisner's sexual misconduct rather than how to quickly and

19   legally revoke his license under the authority the board has is

20   simply not convincing.

21          There can be no doubt that Mr. Wisner's abusive and

22   intentional conduct is not medical care or treatment and there

23   can be no doubt that Congress did not intend to extend personal

24   immunity to predators like Mr. Wisner when it enacted the VA

25   immunity statute.  The evidence presented by both parties

1    confirms Mr. Wisner was not furnishing medical care or

2    treatment when he sexually molested this plaintiff.

3           Dr. Peterson, plaintiff's expert psychiatrist, told us

4    that when plaintiff received the letter from Kerry Baker,

5    plaintiff finally realized that Mr. Wisner's conduct was not

6    appropriate medical care but rather sexual molestation.

7           Dr. Kelley, plaintiff's liability expert, told us that

8    Mr. Wisner's genital examinations of the plaintiff were neither

9    medically nor ethically appropriate; that what Mr. Wisner did

10   to the plaintiff was sexual assault and, of course, that there

11   is never a medical reason to sexually molest a patient.

12          And Mr. Nicholson, the United States PA expert, told

13   us that Mr. Wisner's ungloved genital examinations were not

14   medical care.

15          Now, to be sure, Dr. Kelley has pointed out that

16   medical providers wear gloves during genital examinations to

17   protect the patient from the transmission of diseases.  But

18   this is not a case about a plaintiff claiming he contracted a

19   disease from an ungloved exam.

20          Dr. Kelley also suggested that unnecessary or

21   prolonged genital examinations might reveal pathology, malices,

22   hernias.  But this is not a case about a plaintiff claiming he

23   was harmed by a provider's discovery or failure to discover

24   pathology, masses, or hernias during a legitimate genital exam.

25          No, this is a case about the emotional harm plaintiff

1    alleges he suffered because of the sexual molestation at the

2    hands of a convicted sex offender.  As the United States PA

3    testified and the plaintiff's liability expert conceded, there

4    was no medical purpose behind Mr. Wisner's repeated, prolonged,

5    ungloved genital examinations of this plaintiff.  Mr. Wisner

6    did this for his own sexual desires, his own sexual curiosity,

7    and he knew it was wrong.

8            This plaintiff is not bringing a case as a patient who

9    was harmed while receiving medical care or treatment from a

10   medical provider.  He brings this case as a victim of a sexual

11   predator who abused his position to prey upon wounded veterans.

12   So the intentional tort exception applies and is not saved by

13   the VA immunity statute; therefore, this court does not have

14   jurisdiction over any of the plaintiff's claims.

15           THE COURT:  Does that conclude the defendant's closing

16   statement?

17           MR. EISER:  Yes, Your Honor.

18           THE COURT:  All right.  Thank you very much.

19           So I'll turn to you, Mr. Kilgore, to close the

20   argument, and your trial colleague has left you a generously

21   with four-and-a-half minutes; so get ready for the lightning

22   round.

23           MR. KILGORE:  Yes.  Thank you, Your Honor.

24           The entire defense end -- the entire defense really

25   boils down to this:  that molesting patients is not medical

 1   care and, therefore, it can't be in the course and scope and

 2   it's an intentional act, and that's a gross over-simplification

 3   of what the law says on the matter.

 4          First, judge, with respect to foreseeability, what

 5   they're asking you to do is to consider foreseeability and

 6   exclude actual knowledge that the VA had.  So when Mr. Eiser

 7   tells you that the actions of the VA are irrelevant, that

 8   cannot be further from the truth because actual knowledge of

 9   Wisner's conduct demonstrates foreseeability with respect to

10   course and scope.

11          The argument that there's not sufficient evidence that

12   Aaron Leininger was harmed by Wisner's conduct ignores all of

13   the evidence.  First, with respect to what actually happened to

14   him where he was subjected to these exams on nine separate

15   occasions, which is absolutely undisputed, and the fact that

16   the description of what occurred and what the fallout was for

17   him because they say, "oh, he's better now," when Mary

18   Leininger described, in excruciating detail, how he goes home

19   from work and sits in his room every single night.

20          THE COURT:  You have three minutes remaining.

21          MR. KILGORE:  The idea that Dr. Abrams and his

22   inconsistencies are irrelevant, it goes directly to the

23   credibility of his opinions, Your Honor.  Because he said

24   before Aaron Leininger doesn't suffer from PTSD, that's what he

25   said in his deposition.  Questioned everything.  And then came

```
1   into court and said, "oh, no, it's all PTSD, and he needs
2   life-long care, just has nothing to do with this case." That
3   flip-flop is just -- it destroys his credibility.
4           I want to get to some of the specific things on the
5   issues that were addressed.
6           The statute of limitations, Your Honor, that ship has
7   sailed. That ship has sailed. It's undisputed. Dr. Abrams,
8   their own expert, took the position that he did not -- that
9   Aaron did not recognize the harm at the time of the visits.
10  That was his testimony.
11          And -- and the *Plaza Speedway* case requires that you
12  have to recognize the harm and the cause of that harm. And in
13  this -- in this provider-patient relationship, there's no
14  dispute Aaron Leininger did not fulfill that recognition such
15  that the statute of limitations was triggered, and it was only
16  after received the letter from the OIG.
17          This issue on the intentional tort immunity, Your
18  Honor, I don't have time to go through all the statutes, but
19  that issue has been litigated and decided over and over again
20  in this litigation, and there is -- there is no immunity for
21  the VA when it involves furnishing medical care. Intentional
22  torts committed in the course of furnishing medical care or
23  treatment, the VA is not immune from those -- from those
24  claims, and it's been decided. And when the court looks at the
25  case law, that's what the court will find, it's not a defense
```

1    in this case.

2            THE COURT:  You have a minute remaining.

3            MR. KILGORE:  Your Honor, the last thing is really,

4    you know, this case boils down to what is the loss?  And the

5    loss is Aaron Leininger earned, he earned the right to never

6    have to be concerned about his medical care ever again.  He

7    earned it through his military service and it was promised that

8    he would always get free care at the VA.  And it comes down to

9    they want to tell you that, "oh, he went back to the VA."

10   First it was 70 contacts.  Now I'm hearing, well, it was 20

11   visits.  And out of those visits, 11 of them were emergency

12   room visits, 11.  He wasn't going there to get -- to get

13   psychiatric treatment.  He was going there because he was in

14   pain, because he needed medications.

15           And the final thing I would say on that subject,

16   judge, is, you know, whether or not -- what Aaron Leininger

17   does in the future, he deserves to make the choice.  It's his

18   choice.  He -- he deserves the ability to make the choice.  He

19   should not have to go back to the very system, the VA system

20   that violated his trust and broke their promise to provide the

21   free care.

22           This is the opportunity -- they say honor and respect

23   Aaron Leininger.  This is -- this is the final opportunity to

24   honor and respect him and it's -- and the court has the

25   opportunity to provide justice for Aaron, and this is the final

 1   opportunity to do that and we -- we respectfully, respectfully

 2   ask that the court -- the court do that.

 3          And since I have the last word, I will say thank you

 4   for accommodating us and allowing us to present this case to

 5   you, and I thank you on behalf of all the attorneys and the

 6   parties.

 7          THE COURT:  Thank you very much, Mr. Kilgore.

 8          Counsel, thank you very much for your preparation and

 9   thoughtful argument today.  As you know, I came into the life

10   of this case later than all of you, and I regret that because

11   it's -- it is an interesting case that presents interesting and

12   significant legal and factual issues, and I plan to go to work

13   on them.

14          I do have a couple of questions, sort of substantive.

15   I said this was on my time, and I have a few I think or couple

16   for each side, and then I want to talk with you about

17   post-trial submissions of the kind that I think would be most

18   useful for the court as we endeavor to do our work here.

19          The first -- the first question I have goes to the

20   plaintiff's room, and it's this:  When -- when -- when the

21   court evaluates your negligence claim, which the pretrial order

22   characterizes as medical malpractice, whose conduct -- what

23   person's conduct does that claim focus on?  Who is the -- who

24   were the negligent people?

25          MR. THOMAS:  It's both, Your Honor.  I think it's

```
 1   both, Your Honor.

 2         THE COURT:  "Both."  What's the antecedent of both?

 3         MR. THOMAS:  Wisner and VA.

 4         THE COURT:  Okay.  I can identify Mr. Wisner.  Who --

 5   I mean, negligence in the real world gets committed not by

 6   institutions but by people, and so who else besides -- I was

 7   clear that you thought Mr. Wisner was a -- was a tortfeasor,

 8   but who else?

 9         MR. THOMAS:  So, okay, get ready:  Dr. Cline.

10         THE COURT:  You don't have to list them all, but I'd

11   like direction to the ones you think are most significant.

12         MR. THOMAS:  Dr. Cline, Dr. Desai, Michelle Boylan,

13   Richard Lawrenz, L-a-w-r-e-n-z, Melanie Lehman, L-e-h-m-a-n,

14   oh, and Dawn Clouse, C-l-o-u-s-e.

15         THE COURT:  All right.  So here's my second question

16   for your room, and then I do have I think a couple for the

17   other side of the end of the caption?  So it seems -- of all

18   the spirited factual contests in the case, there seems to be

19   some unanimity on both sides of the caption --

20         Is it Leininger or Leininger, what's the correct

21   pronunciation?

22         MR. THOMAS:  Leininger.

23         THE COURT:  There seems to be --

24         MR. THOMAS:  Oh, it's Leininger?  Leininger.  I was --

25   right, Leininger.
```

 1          THE COURT:  So there seems to be agreement that

 2   Mr. Leininger sustained PTSD as a consequence of his service in

 3   the Persian Gulf and that that PTSD stayed with him and

 4   tormented him at least through the early 2010s, and I think the

 5   defendant would say beyond.  So one of your damage elements is

 6   life care for that PTSD.  Is the plaintiff's position that all

 7   of Mr. Leininger's currently existing PTSD results from what

 8   I'll call the VA and Mr. Wisner's conduct?

 9          MR. THOMAS:  No, Your Honor, but there is a Kansas PIK

10   on aggravation of pre-existing circumstances.  I was going to

11   talk about it in my closing but Michael -- Mr. Kilgore used all

12   my time.  But in the findings of fact --

13          THE COURT:  It's funny, he thinks you used all the

14   time.  Go ahead.

15          MR. THOMAS:  I plan on submitting that to the court in

16   the findings of fact and conclusions of law because it

17   specifically talks -- I mean, there's a PIK right on point on

18   this issue on the aggravation of pre-existing condition.  I'm

19   not going to read it because that would basically be me doing

20   part of my closing right now.

21          THE COURT:  Do you have a cite to that PIK?

22          MR. THOMAS:  I do, Your Honor.  It's 171.43.

23          THE COURT:  Thank you.

24          MR. THOMAS:  And we were also going to --

25          THE COURT:  That's my -- go ahead.

1        MR. THOMAS:  In that regard, we were also going to

2   submit PIK 171.02 because it also talks about that the court

3   doesn't have to find that he was totally disabled.  That's the

4   damage instruction and, again, I won't argue it, but there are

5   pertinent points of that PIK that I think will be instructional

6   for the court.

7        THE COURT:  All right.  Thank you very much.

8        Let me turn to Mr. -- Mr. Eiser, your room.  By the

9   way, if I called you Eisner this morning, I apologize.  I

10  wanted to make sure I didn't make you the retired CEO of Disney

11  during the trial.  I think I held to it until today.  If I've

12  gotten it wrong, forgive me.

13       MR. EISER:  A common mistake.

14       THE COURT:  I'm sorry.

15       MR. EISER:  A common mistake.

16       THE COURT:  Well, not one I should make; I apologize.

17       So I recall -- and I can't give you direction, simply

18  too much has gone by too fast, but I thought I saw that the

19  defendant was arguing pretrial -- maybe it's in the pretrial

20  order -- that if -- if the -- if the VA should lose on

21  liability and the damage award is made, that you were

22  advocating for some sort of reversionary trust arrangement.  Am

23  I remembering it correctly?

24       MR. EISER:  Yes, Your Honor.  I mentioned --

25       THE COURT:  Where's the -- yeah, where is the

1   authority that comes from?  And I hope you will address that in

2   your post-trial submissions.

3          MR. EISER:  We will do that, Your Honor.

4          THE COURT:  And from experience, I take it -- I don't

5   know this, is this -- this may not be your first VA case.  Has

6   any other court ever used that kind of trust?

7          MR. EISER:  Yes.  It -- there's a couple of situations

8   where courts have used them.  Some where the plaintiff consents

9   to it, I've had those cases.  Also where a state has a periodic

10  payment statute that allows a defendant's award to be paid

11  periodically, we've had those cases where the court places the

12  judgment so that the United States can be treated under the

13  FTCA equivalently to a private person.

14          Because it's an FTCA case, we can only be -- we can

15  only be award -- a lump sum of damages can be awarded.  But

16  what we do is take that lump sum and put it into a reversionary

17  trust.  A trustee manages it.  A trustee, for example, decides

18  whether or not it would be cheaper to get an insurance policy

19  to pay for the medical benefits.  The trustee can also

20  coordinate benefits.  So we use it in those contexts where

21  there's a periodic payment statute, which Kansas has, and also

22  in a situation like this where the fact finder is not certain

23  whether the plaintiff is going to need or use the future

24  medical care damages.

25          Kansas has a periodic --

1              MS. HASTON:  Yeah.

2              MR. EISER:  We'll brief that for, Your Honor.

3              THE COURT:  All right.  And then just last question

4     for you.  I have found my mind at times during the case

5     wondering about this issue, both wandering and wondering.  So

6     describe your view of the boundary that separates a claim kind

7     of in these facts for negligence, good old-fashioned medical

8     malpractice negligence and negligent supervision.  What's --

9     where do those two, in this kind of context, where's the

10    boundary between those two things?

11             MR. EISER:  The FTCA liability is based on the -- not

12    just the -- the general presence of the institution.  It's the

13    harm causing act or acts of negligence; that's what FTCA --

14    triggers FTCA liability, the harm causing act or actions.

15             Mr. Thomas just has you heading off to read a whole

16    bunch of depositions.  I know one of those people wasn't

17    employed by the VA at the time.  So these others are

18    supervisors who have known something or could have known

19    something.  They did not -- as we've heard, over and over.  The

20    plaintiff was in the room with Mr. Wisner by himself.  The

21    person who does the act is the -- is what causes FTCA liability

22    to arise.  The rest of it is negligent supervision, negligent

23    hiring, negligent retention, and we've heard a week of evidence

24    on that but there is no such claim in this case.

25             THE COURT:  Let me look at my notes just a second.  I

1   think you -- I think those are the two for your room.  Thank

2   you very much.

3          MR. EISER:  Thank you, Your Honor.

4          THE COURT:  Counsel, let me just talk with you about

5   your post-trial submissions.  I think what the most useful

6   thing that I can --

7          Let me get a broader view up.  Here we go.

8          I think on -- the most useful things that we can get

9   from you are proposed findings of fact, that is, as I said

10  yesterday, I don't think we need stem to stern kind of findings

11  but rather findings -- proposed findings from the parties that

12  focus on what you perceive to be the decisive issues, the

13  pivotal decisions in the case.

14         I think we've got a pretty good grasp even coming to

15  the case late on the factual setting, and -- and so we don't --

16  I don't think we need you to help us tell the entire story in

17  our order.  But if you were to submit proposed findings that go

18  to the -- what you, on your view of the case, your side of it

19  view to be the things that really decide the case and organize

20  them in that fashion I think is the most useful and, naturally,

21  citations to the relevant exhibits.

22         References, I don't know if you have -- both sides

23  have access to rough transcripts.  I haven't -- I haven't

24  spoken with Ms. Greiner about that.  Naturally, you need to

25  comply with the court's local rule on that.  But if you want to

```
 1   direct to passages and testimony even informally, that would be
 2   useful.
 3           On the law side, I really don't think it's very
 4   helpful, given the high quality briefing that was done at
 5   summary judgment, for us to get -- for us to ask you to bear
 6   the expense and burden of preparing comprehensive conclusions
 7   of law.
 8           I think what would be useful, again, is if we received
 9   from you something in the range of 10 pages.  I'd encourage you
10   to discipline yourself to keep it to that level.  If it's -- if
11   it ends up being 11, I won't throw away the last page, but I'd
12   rather you not send us 20 pages because I think you've already
13   done the difficult work of turning the ground over on most of
14   the issues, but explaining now, in the full evidentiary context
15   of the case that's been tried and submitted, again, the
16   material decisive issues and why you think you come out on
17   those issues.  And I think you know what those issues are,
18   you've referenced them in your discussions, and so I would not
19   ask you to go beginning to end on those things.
20           I'd like to get those from you -- I was going to say
21   within 10 days' time.  That gets you through -- that gives you
22   all of next week and sort of into -- let me look at my calendar
23   and see what date that looks like.  When I start talking about
24   the calendar, you better fasten your seat belt because I've
25   been known to do a very poor job.
```

 1              I was looking at something if you could have them to

 2      us by July 20th.  Is that doable from both ends?

 3              MR. EISER:  Yes.

 4              THE COURT:  Does that mess up somebody's summer

 5      vacation?

 6              MR. THOMAS:  I'm going camping next week, Your Honor,

 7      but I'm going to take stuff with me, and poor Mr. Kilgore,

 8      we'll make it work, Your Honor.

 9              THE COURT:  Well, look, I mean, one of the things I'm

10      trying to do is to get the case decided as promptly as possible

11      so that the parties will have the -- the benefit of how the

12      court evaluates this case in trial.  Whether it serves and

13      functions as something of a bellwether for others, I don't

14      know.  Time will tell.  But it certainly won't if we don't get

15      the decision out to you.

16              Let me -- let me just try to lighten the personal load

17      on Mr. Kilgore and suggest July 22nd.  That gets you back from

18      camping and gives you a chance at least to pour your heart and

19      soul into it for the last three days of that time period.  I

20      would give you longer, I just think we need to get to work on

21      that.  We need to get down the road.  We're not going to wait

22      for you to submit your stuff to start our work on this, but I

23      think we'd like to get it before much later than that.

24              So, again, I don't need it to be everything in the

25      case, but I think on the material issues, both factually and

1    legally telling us here's why we win that issue, here's why we

2    win this factual fight, is really what we're looking for.

3              MR. EISER:  Your Honor, on that issue, could I ask a

4    question?

5              THE COURT:  You can, of course.

6              MR. EISER:  You mentioned do the findings of fact, and

7    we'll be disciplined about it, then you mentioned the

8    conclusions of law and said no more than ten pages.  Is it ten

9    pages for the conclusions of law or ten pages for the whole

10   thing?

11             THE COURT:  You're not limited on the facts.  You --

12   you only have to apply your good advocate's judgment about how

13   much is too much.  The conclusions of law, I just as soon,

14   frankly, that you not even call them that, that you address

15   this as a legal memorandum on specific issues, understanding

16   that we've got a background in the issues and you're not

17   beginning at step one in the recipe.  But I'm more interested

18   in getting analysis and not having them artificially divided

19   into paragraph 1, paragraph 2.  So in lieu of conclusions of

20   law, I would invite memoranda from the parties and limit that

21   to ten pages.  On the findings you're not limited.  You're only

22   limited by your good judgment of what -- how much is too much.

23             MR. EISER:  Very good, Your Honor.

24             THE COURT:  All right.  I think that consumes the list

25   of things I wanted to talk about with you before we close the

 1    trial proceedings.  Turning now to you one last time, are there

 2    additional matters or issues that we ought to take up from the

 3    plaintiff's side, Mr. Thomas?

 4          MR. THOMAS:  No, Your Honor.

 5          THE COURT:  All right.  Or from the defendant's side,

 6    Mr. Eiser?

 7          MR. EISER:  Your Honor, those -- the one issue that's

 8    -- we haven't resolved, we can resolve it post trial, we just

 9    haven't raised it, the plaintiff put in this deposition that

10    was taken a week before trial and we objected to it and we've

11    got -- both sides have written briefs to you.  Is that just an

12    issue you're going to resolve later?

13          THE COURT:  I think it is.  Whether I -- whether I

14    address it in the main body of the court's decision under

15    Rule 52 or whether it's a freestanding order, I haven't really

16    thought through yet, but I'm planning to decide that.  I think

17    -- I think we're still within the reply period under the rule

18    that's permitted.  So we haven't tried to take it up during the

19    trial because I wanted to give at least the timetable for full

20    briefing to close.  But I do -- I'm mindful that's an issue and

21    my belief is, when we issue the decision, we will -- we will

22    produce a product, or products, that decides all pending

23    motions, whatever they are.

24          MR. EISER:  Very well.  We will -- we will probably be

25    filing a reply.  Mr. Wisner's letter that you received during

1   trial is significant to that motion, and I believe we'll be

2   filing a reply regarding that.

3        THE COURT:  Yeah.  And on that letter, which I --

4   which was docketed, I'm planning to deny that today as moot.

5   That ruling only applies if, of course, you read that letter to

6   request relief, which it, I think, fairly does.  But that does

7   not decide anything else other than treating it as a pro se

8   motion.

9        All right.  Counsel, thank you very much for -- your

10  innovative approach to getting the case presented and submitted

11  during a time of enormous uncertainty in our country.  I

12  commend you for your creativity.  It's an experience I don't

13  think I'll forget.  I commend you for it.  I hope you all stay

14  well as we find our way through, and I'll look forward to your

15  post-trial submissions.  All right.  I'll go ahead and close

16  the record and be in recess.

17       (Proceedings adjourned.)

18

19                        CERTIFICATE

20       I certify that the foregoing is a true and correct

21  transcript from the stenographically reported proceedings in

22  the above-entitled matter.

23       DATE:  March 5, 2021

24

25                    /s/Kimberly R. Greiner
                      KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                      United States Court Reporter